IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DENICOLE YOUNG, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No.:  07-cv-00983 (ESH) |
| | ) |
| | ) |
| WILLIAM F. BURTON, ESQUIRE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DEFENDANTS' RULE 26(a)(2) DISCLOSURE STATEMENT

In accordance with Federal Rule of Civil Procedure 26(a)(2) and this Honorable Court's

Scheduling Orders dated July 6, 2007 and July 9, 2007, and as amended on December 19, 2007;

the Defendant, William F. Burton, Esquire; and the Defendant, Lewis and Tompkins, P.C., by

and through their undersigned and respective counsel, file this Rule 26(a)(2) Disclosure

Statement to designate and to disclose the individuals whom they may call as an expert witnesses

at any trial of this matter to present evidence under Rules 702, 703, 704, and 705 of the Federal

Rules of Evidence and state as follows:

1.    Ira Tauber, M.D.
      Oser & Tauber, MD., P.A.
      10301 Georgia Avenue, Suite 304
      Silver Spring, Maryland 20902-7200

Dr. Tauber is an expert in internal medicine, pulmonary medicine, and critical care

medicine and is board certified in those specialties.  Dr. Tauber obtained his medical education

and degree from George Washington University 1971 and has been in the private practice of

internal and pulmonary medicine since he 1976 following his completion of his internship,

residency, and fellowship. Dr. Tauber is on the attending staff of Holy Cross Hospital and is an associated clinical professor of medicine at the University of Maryland. Dr. Tauber's *curriculum vitae,* which summarizes his qualifications, education, and training, is attached hereto as Exhibit A and incorporated by reference. Dr. Tauber has not authored any publications in the last ten (10) years.

Dr. Tauber charges $600.00 per hour for his time, whether spent in the examination of a patient or in reviewing a patient's medical records. In the previous four (4) years, Dr. Tauber has not testified as an expert at trial and in which Dr. Tauber has testified as an expert by deposition or at trial.

A copy of Dr. Tauber's signed written report regarding his examination of the Plaintiff, Vanessa Ghee, on Monday, November 5, 2007 at 2:00 p.m., regarding his review of her available medical records, regarding his evaluation of her condition, and regarding the outline of the opinions to which he is expected to testify at any trial of this matter is attached hereto as Exhibit B and incorporated by reference. As Exhibit B reflects, Dr. Tauber will offer his opinions as to the nature and extent of the claimed illnesses and claimed disability of the Plaintiff, Vanessa Ghee. It is Dr. Tauber's opinion that the Plaintiff, Vanessa Ghee, had no pulmonary impairment based upon spirometry, and he could not attribute her current symptoms to her alleged indirect exposure to sewage and mold in August to September of 2002.

A copy of Dr. Tauber's signed written report regarding his examination of the Plaintiff, Denicole Young, on Tuesday, November 13, 2007 at 2:00 p.m., regarding his review of her available medical records, regarding his evaluation of her condition, and regarding the outline of the opinions to which he is expected to testify at any trial of this matter is attached hereto as

Exhibit C and incorporated by reference. As Exhibit C reflects, Dr. Tauber will offer his opinions as to the nature and extent of the claimed illnesses and claimed disability of the Plaintiff, Denicole Young. It is Dr. Tauber's opinion that the Plaintiff, Denicole Young, had mild obstructive disease compatible with asthma which he believes may well have been pre-existing.

Beyond the opinions set forth in his signed reports, Dr. Tauber may also offer his opinions as to the reasonableness, the fairness of, and necessity for the two Plaintiffs' medical treatment and bills claimed as damages.

Dr. Tauber's present testimony and opinions derive from his education, training and experience and from his review of the Plaintiffs' presently available medical records. Dr. Tauber's testimony is also based upon the independent medical examinations of the Plaintiffs that he conducted. Dr. Tauber's testimony at trial may also be based upon his review of the deposition transcripts of the Plaintiffs, the report deposition transcript of the Plaintiffs' medical expert, Dr. Ritchie C. Shoemaker, the complete healthcare provider and medical records of the Plaintiffs, and the reports of other experts, including the other medical experts of the Defendants.

    2.    Robert F. Redmond, Jr., Esquire
          Williams Mullen
          Two James Center
          1021 East Cary Street
          P.O. Box 1320
          Richmond, Virginia 23218

Mr. Redmond is a partner with law firm of Williams Mullen and has practiced products liability and toxic tort litigation since his admission to the Maryland Bar in 1986. Mr. Redmond received his undergraduate degree with high honors from the University of Virginia. Mr.

Redmond received his law degree from Georgetown University Law Center.  Mr. Redmond's

biographical information, which summarizes his qualifications, education, and training and the

publications that he has authored within the last ten (10) years, is attached hereto as Exhibit D

and incorporated by reference.

Mr. Redmond will testify concerning the liability issues of causation and concerning the

Plaintiffs' claimed damages, including whether the Plaintiffs had viable toxic tort cases against

their former landlord, Stanton Glenn Limited Partnership, and regarding the potential value of

those cases if the Plaintiffs were able to establish that their claims were meritorious.  Mr.

Redmond will also testify in response to the opinions of any the Plaintiffs' legal expert,

Christopher G. Hoge, Esquire, regarding whether the Plaintiffs had viable personal injury claims.

A copy of Mr. Redmond's signed written report is attached hereto as Exhibit E and incorporated

by reference.

Mr. Redmond's testimony will derive from his education, training and experience and

from his review of pleadings and documents produced by the Plaintiffs and the Defendants in

discovery in this lawsuit and of the other materials listed in Exhibit E.

> 3.    Patrick M. Regan, Esquire
>        Regan Zambri & Long, PLLC
>        1919 M Street, NW
>        Suite 350
>        Washington, DC 20036

Mr. Regan is the president and senior partner of the litigation firm of Regan, Zambri &

Long, PLLC, and is licensed to practice law in the District of Columbia, Maryland, and Virginia.

Mr. Regan is a Fellow of the American College of Trial Lawyers.  Mr. Regan is board certified in

Civil Trial Advocacy by the National Board of Trial Advocacy and a member of the American

Board of Trial Advocates.  Mr. Regan has practiced personal injury and products liability

litigation on behalf of seriously injured plaintiffs for twenty-seven (27) years.  Mr. Regan's

professional biography, which summarizes his qualifications, education, and training and the

publications that he has authored and presentations that he has made within the last ten (10)

years, is attached hereto as Exhibit F.

Mr. Regan will testify concerning the issues of liability, including the applicable standard

of care for discharging clients and whether the letter authored by Sharon Tompkins on July 1,

2005 and sent to the Plaintiffs terminating the representation of the Plaintiffs by the Defendants

complied with the general standard of care and the specific standard of care applicable to the

Defendants.  As part of his opinions, Mr. Regan will testify to the opinions offered by the

Plaintiffs' legal expert, Christopher G. Hoge, Esquire.  A copy of Mr. Regan's signed written

report is attached hereto as Exhibit G and incorporated by reference.

As Exhibit G indicates, Mr. Regan's testimony will derive from his education, training

and experience and from his review of pleadings and documents produced by the Plaintiffs and

the Defendants in discovery in this lawsuit and of the other materials listed in Exhibit G.

       4.       S. Michael Phillips, M.D.
               University of Pennsylvania
               School of Medicine
               3400 Spruce Street
               3 Ravdin, Suite G
               Philadelphia, Pennsylvania 19104

Dr. Phillips is an expert in internal medicine, allergy and immunology medicine and is

board certified in those specialties.  Dr. Phillips is licensed in the District of Columbia as well as

Pennsylvania, Massachusetts, and Wisconsin.  Dr. Phillips obtained his medical education and

degree from the University of Wisconsin in1958 and completed his internship and residency at

the University of Pennsylvania.  Dr. Phillips is the Director of Allergy Services at the University

of Pennsylvania and is a Professor of Medicine in the Pulmonary Allergy Critical Care Division

of the University of Pennsylvania School of Medicine.  Dr. Phillips' *curriculum vitae,* which

summarizes his qualifications, education, and training and which lists his publications and

professional accomplishments, is attached hereto as Exhibit H and incorporated by reference.  A

list of the cases in which, during the previous four years, Dr. Phillips testified in trial or in

deposition is attached hereto as Exhibit I and incorporated by reference.

Dr. Phillips will provide testimony and opinions regarding causation and the Plaintiffs'

claimed damages and injuries and will respond to the opinions of the Plaintiffs' medical expert,

Ritchie C. Shoemaker, M.D., as contained in his written report (Exhibit 1to the Plaintiffs' Rule

26(a)(2) Disclosures) and in his deposition testimony.  Importantly, Dr. Phillips will opine that

Dr. Shoemaker's diagnoses of the Plaintiffs are not medically or scientifically accepted or

reliable.  A copy of Dr. Phillips' signed written report that summarize his opinions, including his

evaluation of the damage and injury claims made by the Plaintiffs is attached hereto as Exhibit J.

Dr. Phillips' testimony derives from his education, training and experience.  Dr. Phillips'

testimony will also be based upon his review of the deposition transcripts of the Plaintiffs, the

deposition transcript and report of the Plaintiffs' medical expert, Dr. Ritchie Shoemaker, the

presently available healthcare provider and medical records of the Plaintiffs, and the medical

research conducted by Dr. Phillips.  Dr. Phillips may review other documents which become

available in discovery including medical and healthcare records and occupational records which

the Plaintiffs have not identified or supplied in discovery.

6

5.     Scott D. Phillips, M.D., F.A.C.P., F.A.C.M.T., F.A.A.C.T.
       730 17th Street
       Suite 925
       Denver, Colorado 80202

Dr. Phillips is an expert in medical and clinical toxicology as well as emergency medicine

and internal medicine.  Dr. Phillips is board certified in preventive medicine, pediatrics, and

emergency medicine and medical toxicology and internal medicine.  Dr. Phillips is an Associate

Clinical Professor in the Division of Clinical Pharmacology & Toxicology at the University of

Colorado Health Sciences Center and he has a private toxicology practice.  Dr. Phillips'

*curriculum vitae,* which summarizes his qualifications, education, and training and which lists

his publications, grants, and professional honors, awards, and accomplishments, is attached

hereto as Exhibit K and incorporated by reference.  A list of the cases in which, during the

previous four years, Dr. Phillips testified in trial or in deposition is attached hereto as Exhibit L

and incorporated by reference.

Dr. Phillips will provide testimony and opinions regarding the Plaintiffs' underlying

causes of action and the lack of evidence and causation for their claims of toxic mold exposure.

Dr. Phillips will also offer testimony and opinions regarding the Plaintiffs' claimed damages and

injuries and will offer opinions about the diagnoses and treatment made by the Plaintiffs' medical

expert, Ritchie C. Shoemaker, M.D., and his unscientific methodology as contained in his written

report (Exhibit 1to the Plaintiffs' Rule 26(a)(2) Disclosures) and in his deposition testimony.  Dr.

Phillips will opine that Dr. Shoemaker's opinions regarding Plaintiffs' medical conditions are not

accepted or reliable in the medical community or toxicology community and will opine that using

cholestyramine as Dr. Shoemaker has prescribed is not FDA approved or supported by peer

reviewed scientific literature.  A copy of Dr. Phillips' signed written report that summarize his opinions, including his evaluation of the damage and injury claims made by the Plaintiffs is attached hereto as Exhibit M.

Dr. Phillips' testimony will derive from his education, training and experience and derives from scientific and medical literature.  Dr. Phillips' testimony is based upon his review of the deposition transcripts of the Plaintiffs, the deposition transcript and report of the Plaintiffs' medical expert, Dr. Ritchie Shoemaker, the presently available healthcare provider and medical records of the Plaintiffs, the complaint, and the Plaintiffs' answers to interrogatories, and the medical and scientific research conducted by Dr. Phillips.  Dr. Phillips may also testify based upon his review of additional medical and employment records of the Plaintiffs to the extent that those records are discovered, obtained through subpoena, or supplied by the Plaintiffs in discovery.

This Disclosure Statement outlines the subject matter about which the proposed experts are expected to testify in accordance with Fed. R. Civ. P. 26(a)(2).  The written reports of the proposed experts are based upon the information presently available in discovery.  Because discovery is in progress, the Defendants reserve the right to supplement this Statement and the reports of their experts.  The Defendants will also make their experts available for deposition during discovery at a time mutually convenient for all counsel and the deponent.

The Defendants also reserve the right to identify additional experts or to substitute experts based upon receipt of the Plaintiffs' full medical records and history, based upon the discovery of other relevant information, and based upon the designations of any rebuttal experts disclosed by the Plaintiffs.

Respectfully submitted,

JORDAN, COYNE SAVITS, L.L.P.              CARR MALONEY, P.C.


By: /s/ *DEBORAH MURRELL WHELIHAN*       By: /s/ *PAUL J. MALONEY*
    Deborah Murrell Whelihan,#412454          Paul J. Maloney, Esquire, #362533
    1100 Connecticut Ave., N.W.               Ali A. Beydoun, Esquire, # 475413
    Suite 600                                 1615 L Street, N.W.
    Washington, D.C.  20036                   Suite 500
    Telephone:  (202) 296-4747                Washington, D.C.  20036
    Fax: (202) 496-2800                       Telephone: (202) 310-5500
                                              Fax: (202) 310-5555

Attorneys for Defendant                  Attorneys For Defendant
William F. Burton, Esquire               Lewis & Tompkins, P.C.

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true copy of the foregoing Defendants' Rule 26(a)(2)

Disclosure Statement was sent electronically on this 29th day of December, 2007, to:

        Peter C. Grenier, Esquire
        Michael K. Hibey, Esquire
        Bode & Grenier, L.L.P.
        1150 Connecticut Avenue, N.W.
        9th Floor
        Washington, D.C.  20036

        Paul J. Maloney, Esquire
        Ali A. Beydoun, Esquire
        Carr Maloney, P.C.
        1615 L Street, N.W.
        Suite 500
        Washington, D.C.  20036


        /s/ *DEBORAH MURRELL WHELIHAN*
        Deborah Murrell Whelihan

9

OSER & TAUBER, MD., P A.
SUITE 304
10301 GEORGIA AVENUE
SILVER SPRING, MARYLAND 20902-5088
———
Telephone (301) 681-7200

IRNEST S. OSER, M.D.
IRA TAUBER, M.D.
MARSHA J. SEIDELMAN, M.D.
LILA M. BAHADORI, M.D.

Internal Medicine
Pulmonary Medicine
Critical Care Medicine

IRA TAUBER, M.D.

TAX IDENTIFICATION NUMBER:  52-2127508

STATE LICENSE NUMBER:  D18813

MEDICAL SPECIALTY:

    PRIMARY:   PULMONARY AND CRITICAL CARE MEDICINE
    SECONDARY:  INTERNAL MEDICINE

PRE-MEDICAL EDUCATION:  BROOKLYN COLLEGE 1963-1967

MEDICAL EDUCATION:  GEORGE WASHINGTON UNIVERSITY 1971
    ELECTED TO MEMBERSHIP, ALPHA OMEGA ALPHA MEDICAL HONOR SOCIETY

INTERNSHIP:  UNIVERSITY OF MIAMI/JACKSON MEMORIAL HOSPITAL 1971-1972

RESIDENCY:  GEORGE WASHINGTON UNIVERSITY (INTERNAL MEDICINE) 1972-1974

FELLOWSHIP:  WASHINGTON VETERANS HOSPITAL (PULMONARY) 1974-1976

BOARD CERTIFIED IN INTERNAL MEDICINE 1975

BOARD CERTIFIED IN PULMONARY MEDICINE 1976

BOARD CERTIFIED IN CRITICAL CARE MEDICINE 1991

FELLOW OF THE COLLEGE OF CHEST PHYSICIANS

PHONE NUMBER:  301-681-7200

ADDRESS:  10301 GEORGIA AVENUE, SUITE 304
    SILVER SPRING, MD  20902

HOSPITAL:  ATTENDING STAFF OF HOLY CROSS HOSPITAL

POSITIONS HELD:     (1)   CHAIR, ICU COMMITTEE
                HOLY CROSS HOSPITAL, 1981-1982

              (2)   ASSISTANT CHAIR, DEPARTMENT OF MEDICINE
                HOLY CROSS HOSPITAL, 1987

              (3)   CHIEF, PULMONARY/CRITICAL CARE SUBSECTION
                HOLY CROSS HOSPITAL, 1994-2001

              (4)   ASSOCIATE CLINICAL PROFESSOR OF MEDICINE
                UNIVERSITY OF MARYLAND, 1998-PRESENT

EXHIBIT

tabbies®

A

**OSER & TAUBER, M.D., P.A.**
SUITE 304
10301 GEORGIA AVENUE
SILVER SPRING, MARYLAND 20902-5088

———
Telephone (301) 681-7200

IRNEST S. OSER, M.D.
IRA TAUBER, M.D.
MARSHA J. SEIDELMAN, M.D.
LILA M. BAHADORI, M.D.

December 21, 2007

Internal Medicine
Pulmonary Medicine
Critical Care Medicine

Ms. Deborah Whelihan
Jordan Coyne & Savits, LLP
1100 Connecticut Avenue, NW, Suite 600
Washington, DC  20036
Fax (202) 496-2800

RE:  Vanessa Ghee

Dear Ms. Whelihan:

This is a 33-year-old African-American female, who functions as a paralegal.  She dates her present illness back to August 2002, when she moved into an apartment in the District of Columbia at 3064 Stanton Road, SE.  The patient was living in apartment 2A.  Within a day or two of moving into this apartment, the patient and her roommate began to notice odors emanating from the apartment next door that is 1A.  The patient notes that the odors had a sewage/feces type smell.  Within approximately seven days, the patient reports the development of a dry cough, associated chest pains related to the cough, headaches, and dizziness.  The patient relates that she was seen at George Washington University Emergency Room on September 6, 2002 and was told that she had bronchitis and treated with a Z-Pak plus a cough syrup.  The patient notes that her symptoms partially improved over approximately three to four days.  She and her roommate attempted to investigate the source of the odors coming from their next-door apartment.  Peering into a window, they noted that the walls of this apartment appeared stained green and black, as was the floor.  There appeared to be mold on the walls.  In addition, there were industrial drying fans noted on the floor of the apartment.  The patient informed the building superintendent of the situation and in addition spoke to the owner of the building.  She relates that she was offered  $1000 and payment of her medical bills.  Over the course of time, she had the occasion to speak to one of the contractors that served the building and she was informed by him that the building suffered from frequent sewage back ups and leaks.

After approximately six months, the patient sought out her primary care physician.  She continued to have cough and shortness of breath.  Her primary care physician informed her that she had asthma as a result of her living conditions.  She was moved by the building owner on September 23, 2002 to another Stanton Road property.  Her symptoms continued despite moving.  During her stay on Stanton Road, the patient developed what she describes as allergic rhinitis that is nasal congestion, rhinorrhea, sinus pressure, and sneezing.  Her symptoms have continued after moving and she notes that they are particularly worse in the fall.  She relates that she has frequent sinus infections that began in 2002.  These are usually right-sided involving her frontal and maxillary sinuses.  She has been treated in the past with Nasonex, Zyrtec, Allegra, and Levaquin.  She also uses a nasal saline rinse.  She was evaluated by Dr. Chabalai, an

EXHIBIT

B

RE: Vanessa Ghee
December 21, 2007
Page Two

otolaryngologist, who told her that she was suffering from allergies. In March 2005, she ultimately saw an allergist, Dr. V.A. Carregal. The allergist suggested that she undergo desensitization, but the patient refused. She notes that she has chronic postnasal drip with associated "sinus headaches." This involves tightness of her head and the retro orbital pressure. She has intermittent shortness of breath, which requires the use of albuterol, approximately one time monthly. She feels winded if she walks rapidly. She is able to climb three to four flights of stair and she believes that she could walk for 20-30 minutes. She denies any current wheezing. While living in her apartment at Stanton Road, she developed patchy rashes on her arms and legs and this lasted for approximately one year and subsequently resolved. The patient notes that she never had any allergies prior to her Stanton Road exposure. She denies any prior history of urticaria, eczema, allergic rhinitis, asthma, etc. Currently, the patient gets what she describes as a sinus headache, approximately every two weeks. These headaches last for approximately two days. She gets occasional chest pain that she associates with a dry cough. Her dry cough tends to be intermittent. She has chronic postnasal drip and frequent throat clearing. She sleeps on one pillow comfortably. She reports that for approximately the last two years, she has what she describes as night sweats that involve sweating over her head and chest.

Social history includes a one-year history of smoking, which she ceased in 2002 shortly after the onset of her symptoms. The patient notes that at no time she did smoke on a regular basis and she considers herself a social smoker. In addition to this, her alcohol use is social in nature. She has regular periods with an interval of 28 days and duration of four to five days. She is gravida 0, para 0. The patient is a DC native. She does not have any pets. She has functioned as a paralegal for the last six years. She was legal assistant for two years prior to this. Before that the patient was a ticket agent for a shuttle airline service for approximately 18 months. Prior to that, she did retail sales for Nordstrom. Her hobbies include reading and TV viewing. She had a negative sleep study in June 2007.

Her family history includes that her mother is alive at age 54 and is healthy. Her father is alive at 59, and healthy. She has one sister of age 25, who is healthy. The patient is single.

Her past medical history is relatively benign. She had a nasal turbinectomy in September 2007 secondary to ongoing nasal congestion and in addition to this, she had a kidney infection in 1996.

Her only drug reaction is to penicillin, which resulted in a seizure at age 14 associated with a strep throat. She has had no recurrence of seizures since then.

Her review of systems is essentially negative. She has a daily stool. There is no hematochezia, melena, or narrowing. Her urinary day/night frequency is 15/2. She sleeps on one pillow comfortably. She has rare daytime somnolence and occasional nocturnal choking. The patient does snore, but as noted above, she had a negative sleep study.

RE: Vanessa Ghee
December 21, 2007
Page Three

On physical examination, her weight is 130 lb, her height is 5'1¼", her pulse is 76, respirations are 16, and her blood pressure is 140/90 bilaterally. She is a well-developed, well-nourished African-American female, in no distress. Examination of the skin reveals acne scars on her face with tattoos on her posterior neck and the base of her spine. HEENT is negative. Examination of the nose reveals no significant erythema or inflammation. Throughout the interview, the patient frequently cleared her throat, but had no rhinorrhea or cough. The neck reveals no adenopathy, thyromegaly, or masses. There is no stridor. The lungs are clear to PP&A. The heart reveals PMI on the mid-clavicular line. S1 and S2 are within normal limits. No murmurs, rubs, or gallops are appreciated. The abdomen is soft. There is no organomegaly, masses, or tenderness. Bowel sounds are active. There is no rebound. An umbilical ring is noted. The extremities reveal no edema, clubbing, or splinter hemorrhages. Peripheral pulses are all intact. There is no lymphadenopathy. Neurological is within normal limits.

**Impressions:**

1. Allergic rhinitis.
2. Recurrent sinusitis.
3. Mild intermittent asthma--possible.
4. Headaches, muscle tension, rule out secondary to allergic rhinitis/sinusitis.
5. Status post turbinectomy.
6. Childhood seizure history.

The patient while in the office underwent a spirometry, which revealed normal flows at rest. There was no significant change post bronchodilator therapy. In addition to this, she underwent a six-minute walk. The patient was able to walk for 357 meters. This actually decreased from what would be predicted for her. She had normal saturations of 99% both at rest and with exercise, and as noted above she had normal flow rates by spirometry.

**Assessment:** The patient presents with the aforenoted history and physical examination. The patient claims no history of allergic phenomenon prior to her exposure to her Stanton Road apartment in August 2002. Almost immediately following her residence there, the patient began having symptoms involving both the upper and lower respiratory systems. The patient was initially diagnosed with bronchitis, and then following this she was told that she had allergic rhinitis, sinusitis, and asthma. The patient subsequently moved from that apartment after a brief residence. Despite her removal from this domicile, the patient continues to experience allergic-related phenomenon.

It is not possible for me to attribute her current symptoms to her indirect exposure to the neighboring apartment at 3064 Stanton Road SE.

RE: Vanessa Ghee
December 21, 2007
Page Four


     I hope that this answers all of your questions.  Please let me know if I can be of any further aid to you

                    Sincerely yours,

                    Ira Tauber, M.D.


IT/prn:mbm:lax
Enclosure
Today: Vanessa Ghee Rx/E
D: 11-06-07
T: 11-07-07
P: 11-07-07
R: 11-08-07
R: 11-13-07
R: 12-21-07

# OSER & TAUBER, M.D., P.A.

SUITE 304
10301 GEORGIA AVENUE
SILVER SPRING, MARYLAND 20902-5088

Telephone (301) 681-7200

IRNEST S. OSER, M.D.
IRA TAUBER, M.D.
MARSHA J. SEIDELMAN, M.D.
LILA M. BAHADORI, M.D.

December 21, 2007

Internal Medicine
Pulmonary Medicine
Critical Care Medicine

Ms. Deborah Whelihan
Jordan Coyne & Savits, LLP
1100 Connecticut Avenue, NW, Suite 600
Washington, DC 20036
Fax (202) 496-2800

RE:    Denicole Young

Dear Ms. Whelihan:

I evaluated Ms. Young on November 13, 2007. She presented with a chief complaint of asthma. She is a 30-year-old African American female who notes that she is a "real estate investor." She reports that in August 2002, she moved into a basement apartment in the District of Columbia at 3064 Stanton Road, SE, Apt. 2A. She relates that after a few days, she developed some rhinorrhea that was colored yellow. She had associated sneezing and nasal congestion. She also had itchiness of her eyes and throat. Over several days, she developed a cough, which was occasionally productive of yellow green sputum. The patient noted that her temperature was elevated but she is not sure to what degree. She denied any chills or sweats. She had diarrhea associated with this illness. The patient saw Dr. Raval, and was told she had bronchitis. She was treated with a Z-Pak. Ultimately in September, because of the lack of improvement, she self referred to George Washington University Emergency Room. She was again told that she had bronchitis. She was given more medications, although she is unclear as to what they were. She received no relief on this round of medication. She again saw Dr. Raval and was also re-evaluated at GW, where in the ER she was informed that she had asthma. She was given albuterol and Zyrtec. She moved out of her apartment at 3064 Stanton Road in September 2002 after only being in the apartment for several weeks, due to what she described as a stench emanating from the apartment next door. She indicated that the apartment next door was observed through an outside window by Ms. Ghee and herself, and it appeared to be filled with sewage and mold, discoloring the walls.

Despite moving from 3064 Stanton Road to a new apartment at 3084, she still complained of symptoms of asthma. On March 21, 2003, she was evaluated at George Washington University Emergency Room for shortness of breath diagnosed as asthma, and was treated with prednisone and albuterol. On April 15, 2003, the patient had a severe attack of shortness of breath, which was diagnosed as asthma. She was hospitalized at GW for approximately 10 days, requiring intubation. She has poor recall for the events surrounding this. She was then begun on Advair and nebulizer treatments with albuterol and Singulair. She was seen by a pulmonologist at GW, Dr. Hasselquist. Dr. Hasselquist referred her to Dr. Ein, who is an allergist. Skin testing was positive through his office for tree pollen, Bermuda grass, dust mites, dog and cat dander. Xolair was recommended, and the patient refused. Desensitization was not proposed.

**EXHIBIT**

C



RE: Denicole Young
December 21, 2007
Page Two

Pulmonary function tests on June 9, 2003 revealed borderline restriction with a decreased DLCO. In July 2003, she developed what she describes as lymphedema involving her hands and feet. Workup at the NIH revealed no specific cause.

Currently the patient is able to walk four or five blocks without difficulty. In addition to this, she is able to climb two flights of stairs. She sleeps on one pillow comfortably. There is no PND or orthopnea. She denies any nocturnal asthma symptoms. She has no pet exposures. Her hobbies include reading, real estate, and TV watching. She notes that she was an electrician technician from 2002 to 2004.

Her social history includes that of a non-smoker. She uses occasional wine. She has no exposure to street drugs. Her menstrual history includes 30-day intervals with a 5-day duration of periods. She is gravida 1, TAB 1.

Her family history includes a mother alive at age 46 with hypertension and father alive at age 47 in good health. She has a brother aged 21 who is healthy and a brother aged 19 who had asthma as a child. The patient is single. She has no children.

Her past medical history includes sickle trait with hematuria in 1997, appendectomy in 2005, tonsillectomy as a child, pneumonia in 2003, and urticaria to bananas and plantains in 2003. The patient has no prior history of allergies. In July of 2005 she had an allergic reaction to Bactrim, with dysphagia and shortness of breath.

Her current medications include Symbicort 160 two puffs bid, Zyrtec 10 mg daily, Lasix 20 mg daily, albuterol nebulizer p.r.n., and Flonase two puffs daily. Her medication allergies include Bactrim, morphine, and Cipro, all which induce urticaria.

Her review of systems reveals occasional headaches. She denies any abdominal pain. She has daily stool. There is no melena, hematochezia, or narrowing. Her urinary day and night frequency is 20/2. The patient has what she describes as intermittent leg swelling. Over the last several months, she has lost 8 lb related to voluntary dieting. She does not have symptoms compatible with sleep apnea.

Her physical examination reveals weight 168 lb, height 5'2½", temperature 95, pulse 60, respirations 16, and blood pressure 130/80 bilaterally. Skin reveals tattoos on her right neck and left shoulder. HEENT is negative. The neck reveals no adenopathy, thyromegaly, or masses. The lungs reveal a decrease in her breath sounds. There is no stridor or wheeze appreciated. The heart reveals PMI on the mid-clavicular line. S1 and S2 are within normal limits. No murmurs, rubs, or gallops are appreciated. The abdomen is soft. There is no organomegaly, masses, or tenderness. Bowel sounds are active. There is no rebound. There is a laparoscopy umbilical scar noted. No hernias are appreciated. The extremities reveal no current edema. Peripheral pulses are all intact. Negative Homans' sign. No splinter hemorrhages are observed. There is no lymphadenopathy noted.

RE: Denicole Young
December 21, 2007
Page Three

**Impressions:**

1. Allergic rhinitis.
2. Asthma.
3. Sickle trait.
4. History of renal hematuria secondary to sickle trait.
5. Urticaria related to drugs.
6. Leg edema probably secondary to venous insufficiency, rule out lymphedema.

While in the office, the patient underwent a spirometry, which revealed a pattern compatible with mild obstructive disease that was partially reversible post bronchodilator therapy. This is compatible with a diagnosis of asthma.

**Assessment:** The patient presents with the aforenoted history and physical examination. During an office visit on 7/29/98 with CANP Grandjean she had symptoms of sinus congestion, post nasal drip, cough, and chest congestion. She was noted to have "diminished breath sounds and some slight end-expiratory wheezes that are scattered." She was treated with Z-Pak, Azmicort, and Proventil. She was diagnosed with bronchitis. A discharge summary from GWUH from 4/15-4/24/03 reveals that the patient reported a history of asthma and "required intubation several years ago." According to a "History of Present Illness" dated 4/15/05, this occurred in 1997. A GWUH ER record from 9/13/02 indicates asthma as part of her past medical history.

A note from C. Grandjean, CANP, from 3/16/00 indicates complaints of chronic fatigue, and the assessment was "chronic fatigue." Similarly, a 3/10/00 note by the same health care provider indicates "she has been evaluated for fatigue in the past." The assessment indicated "fatigue of unknown etiology."

Her initial August 2002 presentation sounds as if she had an infectious etiology. She was producing purulent sputum with elevated temperature. She was diagnosed by at least two separate physicians as having bronchitis. Ultimately, it appears that the patient developed bronchospasm, and was subsequently diagnosed as asthma. This may well have been an exacerbation of pre-existent asthma induced by her recent bout of bronchitis. The patient had wheezed associated with a bout of bronchitis during a 7/29/98 evaluation. The patient reports that she did not have direct exposure to the next-door apartment that was contaminated by sewage. Over the course of just a few weeks she was removed from this environment. Despite this, the patient's symptomatology continued. The patient apparently has low-grade reactive skin tests, which would be compatible with an allergic etiology for her asthma. At the present time, her symptoms appear to be well controlled and she appears to be stable.

Thanks for allowing us to evaluate her.

RE: Denicole Young
December 21, 2007
Page Four


Sincerely yours,

Ira Tauber, M.D.


IT/prn:gmh:lax
Enclosure
Tauber: Denicole Doll
D: 12-11-07
T: 12-12-07
P: 12-12-07
R: 12-17-07
R: 12-21-07
R: 12-28-07





Home    Our Firm    Practice Areas    Attorneys    News/Resources    Careers    Contact

View Narrative Version


Advanced Search

‣ Education
‣ Professional Affiliations
‣ Awards and Honors
‣ Publication
‣ Community Involvement

**ATTORNEYS**
‣ **Alphabetical Listing**
‣ **By Practice Area**
‣ **By Location**



## Robert F. Redmond, Jr.

Richmond, VA
Voice (804) 783-6439
FAX (804) 783-6507
rredmond@williamsmullen.com

**Practice Areas**
Employee Benefits Litigation
Insurance Industry Service Group
Litigation

Robert Redmond is a partner in the Litigation Section at Williams Mullen. He focuses on national mass tort and product liability defense. Mr. Redmond has served as national coordinating counsel in several mass tort and multi-district litigations including Silica, MDL 1553; MTBE, MDL 1358; Latex Glove Litigation 1148. Mr. Redmond also serves as regional and local counsel in asbestos, lead paint, toxic tort, medical device and pharmaceutical litigation in Virginia, Maryland and Washington DC. He also serves as counsel for corporations involved in complex commercial, patent, trademark and intellectual property litigation in Virginia. Mr. Redmond writes and speaks extensively on products liability litigation.

**Education**
Georgetown University Law Center, J.D., *cum laude*, - 1986
University of Virginia, B.A., with high distinction, - 1983

**Professional Affiliations**
American Bar Association, Products Liability Committee
Defense Research Institute
John Marshall American Inn of Court
Virginia State Bar
Texas State Bar
Maryland State Bar
District of Columbia Bar

**Awards and Honors**
Listed in *The Best Lawyers in America* - Mass Tort Litigation
Recognized by the *National Law Journal* as defense counsel for one of the "Top 10 defense wins for 2002"
Phi Beta Kappa
*Georgetown Law Journal*
*Virginia Lawyers Weekly* Leaders in the Law Award 2006
Listed in *Virginia Super Lawyers* magazine - Litigation
Listed in *Virginia Business* magazine's "Legal Elite"

Mr. Redmond has been listed in *Best's Directory of Recommended Insurance Attorneys, Adjusters and Expert Service Providers*. For more information about this publication, please visit **www.ambest.com**

**Publications**
HCT/P: The Next Big Thing in Product Liability Litigation?

Co-Author, "Taming the Five-Ton Elephant," *Electrical Wholesaling* magazine, July 2007

Author, "Yes, Virginia, There is Daubert in State Court", May 10, 2007, VADA Spring Section Series, Products Liability

Co-Author with D. Earl Baggett IV, "Protecting Your Most Valuable Assets," *Industrial Distribution*, March 2007

Co-Author, "The Good, the Bad and the Ugly," *Industrial Distribution*, December 2005


**EXHIBIT**
D

Author, "Defending the Distributor in Mass Tort Litigation," *DRI: For The Defense*, Vol. 45, No. 11, November 2003

Author, "The New Privilege Log Amendment and Discovery of the Plaintiff," *The Journal of Civil Litigation*, Vol. IX, No. 4, Winter 1999

**Speaking Engagements**
Past

- "The Current Status of MTBE Litigation—A Jurisdictional Analysis," Mealey's™ MTBE Litigation Conference *New Issues, Current Analysis and the Future of the Litigation*, June 5, 2007, Santa Monica, Calif.

- "Yes, Virginia, There is *Daubert* in State Court", May 10, 2007, VADA Spring Section Series, Products Liability

- "Litigating the Maximum Contaminant Level," December 5, 2006, Mealey's MTBE Litigation Conference, New York, New York

- "Staying in Business and Out of Court," April 2005, The National Association for Hose and Accessories Distributors Annual Meeting and Convention

- "Performance: Stay in Business & Out of Court," October 2004, Independent Sealing Distributors Thirteenth Annual Convention

- "Defending the Distributor in Mass Tort Litigation," September 2004, FISA Annual Convention

- "Defending the Distributor in Mass Tort Litigation," July 2004, Safety Equipment Distributors Association

- "Litigation Management, Use of the Extranet," March 2004, LexisNexis Innovative Defense Strategies in Drug & Medical Device Litigation

- "Overview of the Science, Medicine and Litigation Related to Welding Rod Toxicity," March 2004, ABA Tort Trial and Insurance Practice Section, Preparing for Litigation Beyond the Asbestos Horizon

- "Human Cellular and Tissue-based Products: The Next Big Thing?," March 2003, ABA Products Liability Committee Meeting

- "The FDA Defense: Beyond Preemption," February 2003, Mealey's Innovative Defense Strategies in Drug & Medical Device Litigation

- "Defending the Distibutor in Mass Tort Litigation," March 2002, ABA Tort Trial and Insurance Practice Section Annual Meeting

**Community Involvement**
Virginia Hispanic Chamber of Commerce, Board of Directors

Copyright 1996-2007 Williams Mullen. All Rights Reserved.
For information about the content of this page, contact Julious P. Smith Jr., at Richmond address.
See our Privacy Policy and Disclaimers.



WILLIAMS MULLEN

Direct Dial: 804.783.6439
rredmond@williamsmullen.com

# ROBERT F. REDMOND, JR.

Robert Redmond is a partner in the Litigation Section at Williams Mullen. He focuses on national mass tort and product liability defense. Mr. Redmond has served as national coordinating counsel in several mass tort and multi-district litigations including Silica, MDL 1553; MTBE, MDL 1358; Latex Glove Litigation 1148. Mr. Redmond also serves as regional and local counsel in asbestos, lead paint, toxic tort, medical device and pharmaceutical litigation in Virginia, Maryland and Washington DC. He also serves as counsel for corporations involved in complex commercial, patent, trademark and intellectual property litigation in Virginia. Mr. Redmond writes and speaks extensively on products liability litigation.

Mr. Redmond serves as national counsel for an insurer handling personal injury claims allegedly caused by exposure to electro-magnetic field (EMF) radiation. In that role, Mr. Redmond was trial counsel in a case selected by the *National Law Journal* as one of the "Top Ten Defense Verdicts of 2002." Mr. Redmond also serves as counsel for corporations involved in complex commercial product liability, patent and intellectual property litigation in Virginia. He recently served as co-counsel in one of the largest Lanham Act cases filed in Virginia.

Mr. Redmond has published articles on complex litigation and was recently invited to speak on mass tort litigation at the American Bar Association Mass Tort Seminar in Phoenix, Arizona. *The Best Lawyers in America* lists Mr. Redmond as a top attorney for Mass Tort Litigation. He has also been recognized by *Virginia Business* magazine as one of the "Legal Elite" and singled out by *Virginia Super Lawyers* magazine. He is a member of the John Marshall American Inn of Court, the American Bar Association Products Liability Committee and the Defense Research Institute. He also serves on the board for the Virginia Hispanic Chamber of Commerce. Mr. Redmond is admitted to practice law in Virginia, Maryland, Washington D.C. and Texas, as well as federal courts in those jurisdictions.

Prior to entering private practice, Mr. Redmond was a prosecutor in the U.S. Army serving in the 82nd Airborne Division at Fort Bragg, N.C. He received his bachelor of arts degree, with high distinction, from the University of Virginia, where he was elected to Phi Beta Kappa. He received his juris doctor degree, *cum laude*, from the Georgetown University Law Center, where he was associate editor of the *Georgetown Law Journal*.

*A Professional Corporation*

NORTH CAROLINA • VIRGINIA • WASHINGTON, D.C. • LONDON
Two James Center   1021 East Cary Street (23219)   P.O. Box 1320   Richmond, VA 23218-1320   Tel: 804.643.1991   Fax: 804.783.6507
www.williamsmullen.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DENICOLE YOUNG, et al.,           )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )   Civil Action No.:  07-cv-00983 (ESH)
                                   )
WILLIAM F. BURTON, ESQUIRE, et al.,  )
                                   )
        Defendants.                )
                                   )
_____  )

Federal Rule of Civil Procedure
26(a)(2)(B) Report of Robert F. Redmond, Jr.

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I am

providing the following report:

**List of Qualifications:**

I am an attorney licensed to practice in Maryland (1986); Washington, D.C.

(1989); Virginia (1991) and Texas (1993).  I am a partner in the Litigation Section at

Williams Mullen.  My professional background and qualifications are more particularly

detailed in Exhibit D to the defendants' Rule 26(a)(2) Expert Disclosure Statement,

which is my law firm's biographical information for me.  Exhibit D also contains a list of

all publications which I have authored in the last ten (10) years.

I obtained my B.A. degree from the University of Virginia (UVA) in 1983 from

the College of Arts and Sciences in the Honors English program.  I graduated "with high

distinction" which is the UVA equivalent of *magna cum laude.*

1

**EXHIBIT**

E

I am a graduate of the Georgetown University Law Center ("Georgetown") and I graduated from Georgetown in 1986, earning my *juris doctorate cum laude*. At Georgetown, I was an Associate Editor for the Georgetown Law Journal.

During law school, I became interested in environmental law and toxic tort cases while working as a law clerk for the law firm of Steptoe and Johnson.

With the exception of my fulfilling my active duty commitment to the United States Army where I was assigned to the 82d Airborne Division in Fort Bragg, North Carolina and served as a prosecutor, my practice has focused on product liability and toxic tort litigation, including alleged toxic mold exposure cases. I have also been involved in numerous complex commercial, patent, and intellectual property lawsuits.

I have also been the National Coordinating Counsel (NCC) for several national clients in multi-district litigation involving thousands of product liability and toxic tort cases. An NCC in toxic tort litigation is an attorney that develops and implements a nationwide defense strategy for a toxic tort defendant. As NCC, I have had final responsibility for the defense of the clients, including all pretrial, trial and appellate activities. Those cases have included product liability and toxic tort litigation related to latex allergy and latex medical products, silica products, and oil refining.

As NCC, I founded a Joint Defense Committee for medical product distributors. I was responsible for identifying, educating and presenting expert witnesses in a variety of fields including toxicology, epidemiology, pulmonology and FDA regulation of medical products.

In my twenty (20) plus years of practice, I have tried approximately fifty (50) cases nationwide and been involved as local and regional counsel for thousands of cases.

In the last month, I tried a mold case to verdict in Fairfax County, Virginia where my

client, the landlord defendant, prevailed upon all claims brought against it and also

obtained a stipulated judgment for unpaid rent due to it.

I am "AV" rated by Martindale Hubbell. I have been listed in "The Best Lawyers

in America" for Mass Tort Litigation since 2006.

**Basis for Opinions:**

I have been provided with numerous documents, which include the pleadings,

written discovery exchanged among the parties, and the deposition transcripts of the

parties and the Plaintiffs' two experts. To date, my opinions are based upon my review

of the following:

1. Complaint; 2.Plaintiffs' Joint Response to Defendant Lewis & Tompkins, PC's
Interrogatories to Denicole Young and Vanessa Ghee; 3. Plaintiffs' Joint Response to
Defendant Lewis & Tompkins, PC's Request for Production of Documents to Denicole
Young and Vanessa Ghee; 4. Plaintiffs' Initial Disclosures; 5. Plaintiffs' Rule 26(a)(2); 6.
Deposition Transcripts of Denicole Young with Exhibits; 7. Deposition Transcripts of
Vanessa Ghee with Exhibits; 8. Deposition Transcript of Christopher G. Hoge, Esquire
with Exhibits; 9. Deposition Transcript of Dr. Shoemaker with Exhibits; 10. Odaris, et
al. v. Morton G. Thalhimer, Inc., Order, February 2, 2007; 11. Roche v. Lincoln Property
Co., et al., July 25, 2003; 12. Montgomery Mutual Insurance Co. v. Chesson, et al.,
Opinion, May 23, 2007; 13. Curry v. Persica Design and Construction, Inc., Order, April
30, 2004; 14. Dumoulin v. Her Majesty the Queen in Right of Ontario, et al.,
Supplementary Reasons for Decision, March 29, 2006; 15. materials from Kim Stewart
Ford v. Summit Realty Group, Inc., LR 2009-1; 16. Wright, et al. v. Fort Lincoln Realty
Co., et al., Order, October 15, 2007; 17. George Washington Hospital Bills;
18. Unity Health Care, Inc., Adult Progress Notes, September 24, 2002 and November 5,
2002; and 19. Institute of Medicine, "Damp Indoor Spaces and Health", 2004.

I have not read the reports of the experts retained by the Defendants but I do

anticipate that I will rely upon those reports as further support for my opinions listed

below. I may also rely upon the depositions of witnesses and of the other experts

identified by the Defendants, but those materials are not yet available.

3

**Summary of Opinions:**

It is my opinion, within a reasonable degree of professional certainty as an experienced toxic tort trial and litigation attorney, that the plaintiffs did not have a meritorious or viable cause of action against Stanton Glenn Limited Partnership or Stanton Glenn Apartments. Because of the costs involved to prosecute toxic tort cases, it is further my opinion that the costs of prosecution of the Plaintiffs' cases against their former landlord would have exceeded any potential recovery, if the case was cognizable which it was not because of causality problems. I also intend to offer my expert opinion in the following six areas:

1. Absence of causation evidence for Plaintiffs' alleged injuries;

2. Inadequacy of Expert Witness Testimony;

3. Credibility of Plaintiffs as Witnesses;

4. Fault of Plaintiffs;

5. Statute of Limitations; and

6. Valuation of the underlying Toxic Tort case

I hold all of my opinions outlined above to a reasonable degree of professional certainty as an experienced litigator and trial attorney in the area of toxic tort litigation.

**1. Absence of Causation Evidence for Plaintiffs' Injuries**

It is my opinion that the Plaintiffs suffered no harm because they could not have proven any causal link between their respiratory complaints and alleged exposure to mold, had the plaintiffs timely filed a complaint against Stanton Glenn, and their case within the case was not a good cause of action.

4

The Plaintiffs moved into their first apartment at Stanton Glen on or about August 19, 2002. The Plaintiffs moved out of building 3064 to building 3084 on or about September 23, 2002. Both Plaintiffs testified that there was no mold or raw sewage in their first apartment, 2A. The Plaintiffs first retained the Defendants on May 3, 2003, some seven months after they had moved, long after appropriate testing could have been done which would show the type and quantity of the mold in the adjacent apartment or in their apartment at the time.

In a toxic tort case, the Plaintiffs must prove both general and specific causation. General causation addresses whether a substance is capable of causing a particular injury. Specific causation addresses whether the substance caused Plaintiffs' specific injury.

**General Causation:**

Plaintiffs claim that exposure to mold in an adjacent apartment over a period of a few weeks caused a combination of injuries that can generally be categorized as 1) diffuse neurological complaints (i.e. Chronic Fatigue Syndrome) and 2) respiratory symptoms.

As to the Plaintiffs' claim that they were exposed to mold that caused diffuse neurological complaints, that theory has been roundly rejected by numerous courts, governmental publications and peer reviewed medical reports. By way of example ( and not limitation), the Institute of Medicine of the National Academies ( of Sciences, Engineering and Medicine) published a book titled "Damp Indoor Spaces and Health" and concluded that there is inadequate or insufficient evidence to determine whether an association exists between exposure to damp indoor spaces and mold and fatigue or neuropsychiatric symptoms. Similar conclusions have been reached by scientist from

5

NIOSH and CDC, the American Academy of Allergists and Immunologists and the American College of Occupational and Environmental Medicine. Additionally, numerous courts have also held that there is insufficient evidence that exposure to mold in damp indoor spaces causes fatigue or neuropsychiatric symptoms including, most recently, the D.C Superior Court in the decision of <u>Wright v. Fort Lincoln Realty Co.</u>

With respect to Plaintiffs' respiratory complaints, the IOM report does not find evidence of a causal relationship between exposure to damp indoor spaces and respiratory symptoms but does find evidence of an association between exposure to damp indoor spaces and respiratory symptoms. (Association is not the same as causation.)  However, the studies that the IOM relies upon for the association involve, primarily, mold in the home or work place of the study participants and exposure for longer periods of time than in this case.  There are no studies that support an association between short term exposure to mold in an adjacent dwelling with respiratory symptoms.  Consequently, the Plaintiffs lack general causation between the Plaintiffs' respiratory symptoms and their claimed exposure.

### Specific Causation

Plaintiffs must prove, not only, that exposure to damp indoor spaces can cause injuries like those they claim, they also must prove that **their** exposure to a damp indoor space caused **their** injuries.  Plaintiffs also cannot prove this because neither the science, the circumstantial or the medical evidence they have produced supports it.

### Plaintiffs' Exposure to Damp Indoor Spaces

Both Plaintiffs claim the same exposure to the same allegedly damp indoor space. That space is the Apartment 1A 3064 Stanton Road Washington DC 20020.  Plaintiffs

6

claim that they were exposed while they were living in the adjacent apartment, Apartment 2A. Plaintiffs moved into Apartment 2A on August 19, 2002 and moved out, on September 23, 2002. They entered Apartment 1A by climbing into the window one day, perhaps on September 12, 2002 (since Plaintiffs are unsure of the date), and stayed for five or ten minutes. They claim to have videotaped the inside of 1A but lost the videotape. They took some photographs of 1A with a disposable camera. The disposable camera pictures are the only physical evidence of mold in 1A. According to Denicole Young's testimony, she did not have an acute reaction when she climbed into Apartment 1A or when she was in the Apartment. 1A.

The Plaintiffs' evidence of mold in Apartment 1A is based on their own lay observations. Although there is some evidence in Mr. Keemer's September 27, 2002 letter that mold was in Apartment 1A, he does not describe it in the dramatic terms used by Plaintiffs. More importantly, Plaintiffs have no samples of the mold to permit a scientific evaluation of the types of mold in Apartment 1A, i.e. whether the mold was toxic or harmless. ( Dr. Shoemaker himself relates how easy it is to obtain samples of mold—simply apply scotch tape to the mold and lift it off).

The Plaintiffs also have no evidence of air transfer between Apartments 1A and 2A. This is significant because Plaintiffs testified in their depositions that they did not have mold in their apartment. Thus, the Plaintiffs' alleged exposure to mold (attributable to the landlord) could only come from Apartment 1A. At a minimum, they would need evidence that mold from Apartment 1A moved through the air to Apartment 2A. It is my understanding from reviewing the reports of the Plaintiffs' experts that they have no expert evidence from any environmental engineer or HVAC expert that will establish that

7

there was toxic mold in Apartment 1A or that there was any transfer of air between the Apartment 1A and Apartment 2A.

An essential element of toxic tort litigation is proving exposure through evidence of "proximity, frequency and regularity." From my research in my practice, there must be evidence of exposure to a specific product or substance on a regular basis over some extended period of time in proximity to where the plaintiff worked or lived.

Here, the Plaintiffs' best evidence is that they lived near a vacant apartment for 34 days that appeared to have mold in it. This evidence, absent some expert support on air transfer between the apartments fails the "proximity, frequency and regularity" test and fails to prove exposure.

**Specific Causation: Denicole Young's Alleged Injuries**

Plaintiff Young cannot prove that her alleged injuries are caused by her alleged exposure to mold in Apartment 1A rather than some other cause.

With respect to her claims of diffuse neurological injuries (i.e. Chronic Fatigue Syndrome), she cannot cross the hurdle of general causation outlined above. But even if she could, she cannot establish that her particular neurological injuries were caused by mold in Apartment 1A because she has a prior history of fatigue and related neurological/ psychological complaints. These pre-incident illnesses were developed at her deposition and show that she was being treated for fatigue since January 1998 and had complaints of fatigue for several months before that. She was prescribed anti-depressants for her fatigue symptoms several years before her alleged exposure to mold.

Similarly, Plaintiff Young had an extensive pre-incident history of respiratory illness. The discussion of her pre-existing illnesses goes on for several pages in her

8

deposition. The medical records suggest that Plaintiff was intubated in 1997. As Dr. Shoemaker concedes, if Plaintiff was intubated in 1997, that fact strongly undercuts specific causation from mold in Apartment 1A. Additionally, Plaintiff Young was found to have several allergies that could account for her respiratory problems in September 2002. These include her allergy to ragweed as well as other allergens. Notably, at the same time Plaintiff Young was suffering her symptoms in the late summer of 2002, her air conditioning unit was not working and she had to open windows in her apartment.

All of this evidence, as well as other evidence in the medical records prevents Plaintiff Young from establishing that her respiratory illness in September 2002 is attributable to mold in Apartment 1A.

Equally important, Plaintiff Young's only medical expert, Dr. Ritchie Shoemaker, did not learn of these pre-incident illnesses during his two-plus hour interview with Ms. Young. By his own admission, Dr. Shoemaker relies, for his opinion, on a differential diagnoses. He cannot offer a sound differential diagnosis without a complete medical history. The medical history he was provided was incomplete and therefore, his differential diagnosis is unsound. Additionally, because Plaintiff Young has not followed Dr. Shoemaker's protocol (taking cholesterol medicine for mold illness), Dr. Shoemaker cannot offer an opinion on specific causation for Plaintiff Young.

The largest portion of Ms. Young's medical expenses are for her ICU hospital stay at George Washington Hospital in the spring of 2003, after she was no longer living in Apartment 2A. Plaintiff Young cannot attribute that stay to her alleged exposure to mold in the late summer of 2002 because it is too remote in time and because of her history of pre-existing respiratory illnesses. Dr. Shoemaker conceded in his deposition

that "I don't have the data" to associate that hospital stay with her mold exposure in late

summer of 2002. This concession is dispositive and precludes Plaintiff Young from

offering the Spring 2003 hospital stay as damages for her alleged mold exposure.

In sum, Plaintiff Young cannot prove specific causation for any of her injuries

because she has no medical or scientific evidence to meet her burden of proof and

because her medical records show that she had pre-existing injuries that mirrored the

injuries she would have sued for. Additionally, her own medical expert will not testify as

to specific causation for the reason stated in his deposition and outlined above.

**Specific Causation: Vanessa Ghee's Alleged Injuries**

Plaintiff Ghee's medical expenses are limited to $1,628. She went to George

Washington Hospital two times with Ms. Young and was treated and released both

times. Ms. Ghee's only complaints are nasal/respiratory illnesses. She admits that she

was a smoker with a history of allergic reactions. Like Plaintiff Young, Plaintiff Ghee's

alleged injuries arose in the late summer of 2002 when their air conditioning unit was

broken and when they had to leave windows open.

Because of the paucity of evidence that her two medical treatments were

attributable to mold in Apartment 1A and because of other sources of respiratory illness

(i.e. smoking, pollen/dust allergies) as well as other evidence in the medical records

Plaintiff Ghee cannot establish that her respiratory illness in September 2002 is

attributable to mold in Apartment 1A.

Additionally, because Plaintiff Ghee, like Plaintiff Young, has not followed Dr.

Shoemaker's protocol, Dr. Shoemaker conceded that he cannot offer an opinion on

specific causation for Plaintiff Ghee.

Because of the Plaintiffs' lack critical expert testimony and because of the facts alleged by the Plaintiffs, it is my opinion to a reasonable degree of professional certainty that Plaintiffs would not have been able to establish either general or specific causation for any of their injuries and that they would not have been successful in the prosecution of their claims against their former landlord for their alleged indirect exposure to mold and/or raw sewage.

**Inadequacy of Plaintiffs' Expert Witness Testimony**

Plaintiffs rely on Dr. Ritchie C. Shoemaker of Pocomoke City, Maryland for causation and medical testimony. Because of my toxic tort practice, I am very familiar with Dr. Shoemaker and his opinions, which lack accepted scientific and medical bases. His diagnosis of chronic biotoxin associated illness is of his own creation, and his treatment using "off label" prescription medication is at best controversial.

I agree with the Plaintiffs' legal expert insofar as Mr. Hoge testified that Plaintiffs "need to find a toxicologist." Unfortunately, they do not have one in Dr. Shoemaker. By his own admission, he is a "country doctor" who has no board certifications in toxicology (or allergy, immunology, rheumatology, epidemiology, mycology, pulmonology, environmental medicine, occupational medicine, neuropsychology, or a host of other specialties). Dr. Shoemaker has not published on mold illness in significant or accepted peer reviewed publications and he attempts, in his deposition as he does in other depositions and court testimony, to exaggerate the stature of both his publications and his "poster" presentations.

Dr. Shoemaker is a family practitioner who has no hospital privileges. Many of his patients are referred by attorneys who file personal injury lawsuits. He writes books

11

about his availability as a plaintiff's mold witness. He operates a website that provides referral and contact information for personal injury plaintiff's attorneys.

Significantly, Dr. Shoemaker appears to engage in the practice of "litigation screening." This practice, roundly excoriated by many courts, involves doctors who provide medical support for questionable legal claims. The practice was most thoroughly examined and criticized by Judge Janis Jack in MDL 1553, Silica Products Litigation. Judge Jack conducted in-court depositions of several doctors and learned that they were favorites, chosen by plaintiff's attorney to reliably provide medical reports that claimed that persons allegedly exposed to silica products suffered from silicosis. Judge Jack learned that some of these doctors found silicosis in 90% – 94% of the patients they examined. Judge Jack concluded that these positive rates were wildly beyond expectations and could only be explained by either 1) a nationwide silicosis epidemic or 2) litigation chicanery. She concluded the latter.

I note that Dr. Shoemaker relies on his own diagnostic method that both he and many courts consider "not generally accepted" in the medical community. Dr. Shoemaker's method appears to generate a 92% positive rate. This number mirrors the positive rate found by Judge Jack in her analysis of silicosis screeners in MDL 1553. It is also significant that Dr. Shoemaker uses a boilerplate expert report in this case. He conceded that "there is a lot of template" in the report. Indeed, one can see the grammatical confusion when Dr. Shoemaker tried to make his boilerplate report fit for two plaintiffs: "Mss. Young's and Ghee's past medical history and absent any other confounding occupational or townhouse (sic) exposures and after reviewing the results of her (sic) comprehensive lab evaluation...."

Interestingly, the Plaintiffs seem to recognize that Dr. Shoemaker is in the litigation business and not the healing arts. Neither Plaintiff has followed Dr. Shoemaker's prescriptions. Both are waiting until they can talk to a treating doctor for a second opinion before taking Dr. Shoemaker's medicine and following his protocol. Even though both Plaintiffs have had an opportunity to seek this second opinion, they have not followed through and, to date, they have not taken Dr. Shoemaker's medicine.

It is my opinion that Dr. Shoemaker would have been excluded, had he been used by the Plaintiffs to prosecute their claims against their former landlord in the action that they claim they intended the Defendants file in the District of Columbia Superior Court. Dr. Shoemaker is subject to exclusion because his opinions and methodology are not generally accepted in the scientific community and because his methodology is not reliable. Dr. Shoemaker's unique, litigation friendly practice has resulted in his exclusion as an expert witness in the District of Columbia Superior Court and in Virginia, as well as other jurisdictions. Dr. Shoemaker is the subject of an exclusory hearing in the remanded Chesson litigation in Maryland, which I understand is due to be heard in early 2008. I have relied on the numerous opinions which I have reviewed and which are listed above, including the decision by the D.C. Superior Court in *Wright,* as well as my own knowledge and experience from my toxic tort practice.

In his deposition, I note that Dr. Shoemaker seems to recognize his vulnerability for exclusion and was very defensive about the prior orders excluding his testimony. His description of some of those orders was incomplete and inaccurate. He alluded to a confidential communication he had with an attorney warning him about the dangers of serial exclusion. His open contempt for defense experts and even for the competence of

the plaintiffs' lawyers that have retained him shows that he is not an objective expert and that, if allowed to testify, he would have been an ineffective and unbelievable expert. His poor demeanor, his dissembling, his boilerplate expert report and his generally pedantic attitude would likely alienate a District of Columbia jury.

Furthermore, because the weaknesses of the Plaintiffs' claims and because they have not followed his protocols, Dr. Shoemaker's deposition testimony narrowed and, perhaps even eliminated most of his opinions provided in his written report, making his testimony even weaker. In his deposition, he clearly testified that he cannot associate Plaintiff Young's Spring 2003 hospitalization with the August/September 2003 alleged mold exposure in Apartment 1A. He concedes that, if the Plaintiffs do not follow his protocol, then he cannot offer specific causation testimony. Even if Dr. Shoemaker was a legitimate medical expert, his testimony makes it virtually impossible for the Plaintiffs to establish any causal relationship between their claimed medical issues and their prior indirect alleged mold and raw sewage exposure.

It is my opinion, to a reasonable degree of professional certainty that Dr. Shoemaker would have been excluded from testifying, had the Plaintiffs relied upon Dr. Shoemaker to prosecute their lawsuit in the District of Columbia Superior Court, as he was in the *Wright* decision. It is also my opinion, to a reasonable degree of professional certainty, that to the extent Dr. Shoemaker would have been permitted to testify and to the extent that a jury was allowed to consider his opinions about the Plaintiffs, the jury would have likely disregarded his testimony because he because of his inadequate professional qualifications, his frequent exclusions, his lack of professional standing in

14

the relevant fields, his combative demeanor, his lack of adequate foundation for any conclusions about the Plaintiffs, and his poor credibility.

**Credibility of Plaintiffs as Witnesses**

Both Plaintiff have substantial problems with their credibility.

**Vanessa Ghee:** Plaintiff Ghee is impeachable because of her past theft conviction. This fact is admissible as evidence and would have a negative impact upon a jury considering her case. Ms. Ghee has also offered testimony that seems incredible on its face, and she is not an effective witness. For example, in her deposition, Ms. Ghee testified that when she complained to the landlord about the smell in the adjacent apartment, the landlord complimented her sunglasses, told her she was too good for the apartment complex, offered to move her out of the complex and offered her $1000.00. There are several other instances in Ms. Ghee's deposition where she offers testimony that is not credible or seems very unbelievable. Additionally, Ms. Ghee demonstrates a selective memory in her deposition, which would make her subject to impeachment.

**Denicole Young:** Ms. Young is subject to impeachment because she has not filed tax returns for many years or paid taxes, yet is making a substantial salary apparently as a source of business for mortgage company which pays her commissions. Additionally, even though Ms. Young has been employed making $7,000-8000 per month from her mortgage banking commissions and drives a Mercedes-Benz, she was relying on Medicaid for health insurance. Ms. Young is also subject to impeachment based on her very selective memory. Her deposition revealed numerous instances where Ms. Young

had no memory of pre-existing illnesses and the details related to those illnesses. However, she claims a verbatim memory of events related to her pending claim.

Although I am offering opinions as to the viability of the "case within the case," I agree with the Plaintiffs' standard of care expert, Mr. Hoge, that juries tend to favor or punish parties based on their assessment of character. I think that fact will work to the detriment of the Plaintiffs in this case, and, assuming that a D.C. jury was allowed to consider the Plaintiffs' claims (which I believe would have been unlikely), it is my opinion to a reasonable degree of professional certainty that both Ms. Ghee's and Ms. Young's credibility would be held in low regard by a District of Columbia jury for the reasons set forth above.

**Fault of Plaintiffs**

Plaintiffs have fault that supports viable defenses of contributory negligence and assumption of the risk defenses. Plaintiffs' fault also weighs on the jury's assessment of liability and damages.

Here, Plaintiffs' have fault as to both the underlying medical issues and also the prosecution of their case. Regarding the medical issues, in their depositions, the Plaintiffs had a difficult time explaining why they did not move out of their allegedly toxic apartment before September 23, 2002. According to their testimony, neither Plaintiff even tried to move away from the apartment although both could have made alternate temporary living and/or sleeping arrangements. The fact that both Plaintiffs continued to live, work, eat and sleep in an apartment that they claim made them sick is evidence of contributory negligence and assumption of the risk. The Plaintiffs may also have caused their alleged injuries by illegally breaking into Apartment 1A to take their

16

photographs and their videotape of that apartment, as Dr. Shoemaker acknowledged in his deposition.

The Plaintiffs also failed to prosecute their case. Ms. Ghee has direct and practical experience in personal injury litigation as the paralegal and sole office worker for an experienced personal injury plaintiff attorney just blocks from D. C Superior Court. Although she was frequently in court, she never checked on the status of her case. In her deposition, Ms. Ghee clearly testified to her knowledge of the Statute of Limitations for her and Ms. Young's case and her concern that the case had not been filed before the Statute of Limitations or then served and prosecuted. Ms. Ghee discussed her concerns with Ms. Young, and Ms. Young was also aware of the Statute of Limitations bar.

It is my opinion to a reasonable degree of professional certainty that, if the Plaintiffs' claims had been decided by a District of Columbia jury, the jury would have rejected the Plaintiffs' claims or substantially reduced any damages that they might have awarded to the Plaintiffs because of their contributory fault and/or assumption of the risk.

**Statute of Limitations**

The Plaintiffs' claims are governed by a three year statute of limitations. Under the discovery rule, their claims accrue when they know or have reason to know that their injuries are caused by the negligence of another. As noted above, I do not think that the Plaintiffs suffered any injuries caused by exposure to mold in Apartment 1A. Thus, they do not have a claim that accrued.

To the extent Plaintiffs can establish some causal nexus between their medical treatment and their brief residence in Apartment 2A, both of their claims likely accrued

on September 6, 2003, the date they first visited the ER at George Washington Hospital,

At that time, Plaintiffs themselves associated their alleged injuries with mold.  Thus, it is

my opinion, within a reasonable degree of professional certainty, that the applicable

Statute of Limitations likely would have expired on September 6, 2005, although it could

have been later on September 13, 2005.   I hold these opinions to a reasonable degree of

professional certainty.

### Valuation of the underlying Toxic Tort case

As noted above, it is my opinion that the Plaintiff Young cannot associate her

Spring 2003 claims with mold exposure, nor can her expert, Dr. Shoemaker.

Additionally, as noted above, Dr. Shoemaker cannot offer an opinion on specific

causation because Plaintiffs have not followed his protocol.  He also cannot offer general

or specific causation opinions for either plaintiff for any injury because his methodology

is unsound and not generally accepted in the scientific community.  Additionally, for all

the reasons outlined above, the Plaintiffs' claims are very weak, and it is my opinion that

the case within a case was not a good case that would have survived a motion for

judgment to be heard by a jury.

Assuming that the Plaintiffs' speculative claims would have been decided by a

D.C. jury (which is not my opinion), I do have an opinion of the value the potential jury

verdicts in the event of a successful verdict which I think was highly unlikely.   It is my

opinion that the underlying defendants would have received a defense verdict because the

jury would not find either of the plaintiffs or Dr. Shoemaker to be credible or effective

witnesses.  In the unlikely event of a plaintiff's verdict for either Plaintiff (which again I

think is highly unlikely), I agree with Mr. Hoge that the value of Plaintiffs' toxic tort

claims are affected by many factors, including the medical expenses incurred by Plaintiffs as well as their credibility or lack of credibility. Relying on the medical expenses reported in the discovery responses and produced by Plaintiffs (and excluding Ms. Young's medical expenses for the 2003 ICU stay), I calculate Ms.Ghee's medical expenses that she can attribute to mold exposure at $1628. I calculate Ms. Young's medical expenses that she can attribute to mold exposure at $1200.50, although I am missing bills for some of her clinic treatment from September of 2002 and November of 2002. Given those medical specials, it would be unlikely that a jury would award either plaintiff more than their specials and no more than $3,500.00 each. Because of the costs involved in prosecution of their alleged mold claims, the plaintiffs would not have received any recovery since the costs would have exceeded any potential for recovery.

Based on the weaknesses of their claims, as outlined above, it is my opinion to a reasonable degree of professional certainty that, in terms of settlement value for the underlying case, a well-informed defendant would pay no more than $3,500 for Ms. Ghee and $2,500 dollars for Ms. Young's claims.

### Rule 26(a)(2)(B)(iii): Exhibits

I have not prepared any exhibit to summarize my testimony.

### Rule 26(a)(2)(B)(v) : Prior Trial and Deposition Testimony

I have not testified in trial or by deposition in the past four (4) years.

### Rule 26(a)(2)(B)(vi): Compensation

I am being paid $375 per hour for my time, which time to date has included reviewing the pleadings and documents produced in discovery, formulating my opinions, and preparing this Report

Robert F. Redmond, Jr.

# REGAN ZAMBRI & LONG, PLLC

## EXPERIENCED TRIAL ATTORNEYS

1919 STREET NW • SUITE 350 • WASHINGTON, DISTRICT OF COLUMBIA 20036-3513
PHONE 202-463-3030 • WWW.REGANFIRM.COM • FAX 202-463-0667

PATRICK M. REGAN
VICTOR E. LONG
SALVATORE J. ZAMBRI
PAUL J. CORNONI
JACQUELINE T. COLCLOUGH
CATHERINE D. BERTRAM
AMY S. GURGLE
JULIE L. MITCHELL

VIRGINIA OFFICE
703-549-9663

MARYLAND OFFICE
301-762-8464

PATRICK M. REGAN
BOARD CERTIFIED, CIVIL TRIALS
NATIONAL BOARD OF TRIAL ADVOCACY
ADMITTED IN DC, VA & MD
DIRECT: 202-822-1880
PREGAN@REGANFIRM.COM

## PATRICK M. REGAN
## PROFESSIONAL BIOGRAPHY

Patrick M. Regan is President and Senior partner with the Washington, D.C. litigation firm of Regan Zambri & Long and limits his practice to representing seriously-injured clients in medical malpractice, product liability and other serious personal injury and wrongful death claims. Mr. Regan is board-certified in Civil Trial Advocacy by the National Board of Trial Advocacy and is licensed to practice in the District of Columbia, Maryland and Virginia, and regularly handles cases throughout the United States.

*Washingtonian* Magazine has repeatedly honored Mr. Regan as one of the top attorneys in the Washington metropolitan area, out of a total of more than 90,000 attorneys. Mr. Regan is listed in *The Best Lawyers in America,* the preeminent listing of attorneys in the country, and is a Fellow of the American College of Trial Lawyers. The *Legal Times,* a national legal publication, selected Mr. Regan as one of the top litigators in Washington, and he has been selected as one of Washington's top lawyers by both *Super Lawyers* and *Law Dragon.* Mr. Regan was also selected by the *National Law Journal* as one of the "Top Ten Power Lawyers" in Washington. This award specifically mentioned Mr. Regan's numerous significant verdicts and settlements within the last few years, including the largest verdict ever upheld by the Virginia Supreme Court. Mr. Regan is the recipient of the "Trial Lawyer of the Year" award from the Trial Lawyers Association of Metropolitan Washington, D.C. Mr. Regan currently serves on the Board of Governors of the American Association for Justice and has served as President of the Trial Lawyers Association of Metropolitan Washington, D.C., and President of the Trial Lawyers Association Foundation. Mr. Regan has had more than 60 cases which have resulted in settlements or verdicts in excess of $1 Million.

Mr. Regan has been featured on numerous national and local television and radio programs, including NBC Today Show, WJLA, WRC, FOX NEWS, CBS News, WUSA, WTTG and many cable television programs dealing with legal issues. Articles concerning Mr. Regan's cases have appeared in many publications including *The Washington Post, Washingtonian Magazine, The National Law Journal, The Washington Times, The Legal Times, Trial Magazine, The Daily Washington Law Reporter, The ABA Journal,* and *The Journal Newspapers.*

EXHIBIT

F

Mr. Regan has litigated cases resulting in precedent-setting appellate decisions in medical malpractice, wrongful death, police misconduct/high-speed pursuit, premises liability, and products liability. Mr. Regan and his partners recently obtained significant appellate decisions which: (1) established the new tort of spoliation for destruction of evidence in the District of Columbia; and (2) established dram shop liability for restaurants serving alcohol to minors. Within the last several years alone, Mr. Regan has obtained verdicts or settlements which have resulted in total awards in excess of $65 Million. Some of these cases include the following:

- A $14 Million confidential settlement in a serious personal injury case. This represents one of the largest cash settlements in the District of Columbia.

- A verdict of $4.7 Million in a medical malpractice case that was tried in the United States District Court for the District of Columbia. This verdict, which was paid in full, was one of the largest medical malpractice verdicts in recent years in the District of Columbia.

- A verdict of $6.2 Million for a skier who suffered a traumatic brain injury in an accident at the Massanutten Ski Resort in Virginia. This case was tried to a jury in Charlottesville, Virginia and resulted in the largest verdict ever rendered in Albemarle County, Virginia. The verdict was ultimately upheld by the Virginia Supreme Court and with interest the plaintiff collected nearly $7.0 Million. This is also the largest verdict against a ski operator that has been upheld in the country.

- A $6.0 Million verdict in a high-speed police pursuit which resulted in the deaths of two innocent bystanders. This case represents one of the largest verdicts in the nation in a high-speed pursuit case.

- A verdict of more than $4.1 Million for several U.S. Army soldiers who were injured when a Greyhound bus crashed in North Carolina. This case was tried in the United States District Court for the District of Columbia and was paid in full.

- A $5 Million verdict on behalf of a ten-year old child who fell off of a high diving board and sustained a traumatic brain injury.

- A $4.0 Million settlement in a wrongful death case resulting from the death of a construction foreman who was struck and killed by a tractor trailer truck that did not have an operable backup alarm. This was one of the largest wrongful death settlements in Virginia.

- A $3.0 Million settlement for a woman who suffered a traumatic amputation of a leg when struck by a truck while crossing the street.

- A $1.4 Million judgment entered for the widow of a police officer who was killed in the line of duty while assisting in a traffic accident.

- $5.5 Million settlement resulting from a defective portable electric space heater that resulted in the death of a 14 year old, severe injuries to a 36 year old woman and severe burn injuries to an 18 year old young man.

- A settlement with total payments in excess of $11 Million in a medical malpractice case against a health maintenance organization and hospital for failure to perform a pregnancy test on a patient before admitting her for heart surgery.  The patient suffered a stroke and is severely disabled.

- A $3.65 Million settlement in a medical malpractice case against an HMO and individual physicians for failing to diagnose a brain tumor in a ten-year old boy.  The settlement includes periodic payments which are expected to exceed $10,000,000 over the plaintiff's lifetime.

- A settlement totaling in excess of $2.9 Million for two construction workers who were burned in a fire in Virginia caused by the negligence of the general contractor.

- A $7.3 Million verdict for a young woman who was paralyzed in an automobile accident and who filed suit against her original lawyer who failed to protect her rights.  Mr. Regan tried this case in the United States District Court for the District of Columbia, and the $7.3 Million verdict was one of the largest legal malpractice verdicts in the District.

- A settlement totaling in excess of $15.2 Million for the death of a 35 year old carpenter who was crushed by a dump truck that had a defective back-up alarm.  This settlement includes payments over the lifetimes of the widow and children of the victim.

- A $2.3 Million settlement in a products liability case for a 16 year old boy riding in the rear seat of an automobile that did not have a shoulder belt.

Mr. Regan is a member of numerous national and local professional associations including, the American Association for Justice (Sustaining Member), Member Board of Governors (1994-Present), the American Bar Association, the District of Columbia Bar Association, the Maryland

and Virginia Trial Lawyers Associations, the Civil Justice Foundation and the Roscoe Pound Foundation. He is also a member of the American Board of Trial Advocates, serves on the Executive Committee of the Academy of Trial Advocacy, and on the Board of Directors of the Public Justice Foundation. He has served the D.C. Trial Lawyers Association as Chairman of the Membership Committee (1988-1991), Vice President (1989-1990), President-Elect (1990-1991) and as a member of the Board of Governors (1984-Present). Mr. Regan has also served on a variety committees for the D.C. Bar including Chairman of the Injury to Persons and Property Section (1988-1989). Mr. Regan served as a Master of the Bench of the Thurgood Marshall American Inn of Court (1988-2004).

Mr. Regan has written and lectured extensively in the field of personal injury law. Mr. Regan is one of the authors of the six-volume publication, "ATLA's Litigating Tort Cases," published by Thomson-West. He has been an Adjunct Professor of Law, Catholic University School of Law (1985-1986, and 1992-1999), has taught many Continuing Legal Education courses for the District of Columbia Bar, and has served as a speaker for numerous national seminars presented by the National College of Advocacy, the American Board of Trial Advocates, the American Bar Association, the Maryland Institute for Continuing Education of Lawyers, and the National Business Institute.

Mr. Regan has been elected President of the D.C. Chapter of the American Board of Trial Advocates (2004-2006) and is a Member of the Board of Regents of the Catholic University of America (1990-1998), and is a Member of the Board of Visitors of the Catholic University of America School of Law (1996-Present). In addition to his professional activities, Mr. Regan has served on the boards of numerous other organizations, including the Board of Trustees, The Holton Arms School (2002-present); the Board of Directors, Columbia National Bank (1985-1990) and the Board of Trustees, Metropolitan Day School (1995-2001).

Mr. Regan has also made presentations at the District of Columbia Bar Annual and Mid-Winter Conventions, and has served as a delegate to the Judicial Conference for the United States Court of Appeals for the District of Columbia Circuit. Mr. Regan also serves as a Mediator, Evaluator and Arbitrator for the Alternative Dispute Resolution Programs in the United States District Court for the District of Columbia and the Superior Court for the District of Columbia.

G:\Regan\PMR Bios\EXPD.wpd

## REGAN ZAMBRI & LONG, PLLC

### EXPERIENCED TRIAL ATTORNEYS

1919 M STREET NW • SUITE 350 • WASHINGTON, DISTRICT OF COLUMBIA 20036-3513
PHONE 202-463-3030 • WWW.REGANFIRM.COM • FAX 202-463-0667

PATRICK M. REGAN
VICTOR E. LONG
SALVATORE J. ZAMBRI
PAUL J. CORNONI
JACQUELINE T. COLCLOUGH
CATHERINE D. BERTRAM
AMY S. GURGLE
JULIE L. MITCHELL

VIRGINIA OFFICE
703-549-9663

MARYLAND OFFICE
301-762-8464

PATRICK M. REGAN
BOARD CERTIFIED, CIVIL TRIALS
NATIONAL BOARD OF TRIAL ADVOCACY
ADMITTED IN DC, VA & MD
DIRECT: 202-822-1880
PREGAN@REGANFIRM.COM

## REPORT OF PATRICK M. REGAN

Pursuant to FED. R. CIV. P. 26(a)(2)(b), I am submitting the following expert report on behalf of the Defendants in the case of *Young and Ghee v. Burton, et al.*, Civil Action No. 07-cv-00983 (ESH) currently pending in the United States District Court for the District of Columbia.

I am an attorney licensed to practice in the District of Columbia, Maryland and Virginia, and various federal courts in those jurisdictions, including the United States Supreme Court. I am President of the law firm of Regan Zambri & Long and have been continuously in the private practice of law since 1980. I am board certified in Civil Trial Advocacy by the National Board of Trial Advocacy, I am a Fellow of the American College of Trial Lawyers, a Past President of the Trial Lawyers Association of Metropolitan Washington, DC, and currently serve on the Board of Governors of the American Association for Justice. I am also a member of the American Board of Trial Advocates, serve on the Executive Committee of the Academy of Trial Advocacy, and serve on the Board of Directors of the Public Justice Foundation. My professional qualifications are more fully described in the attached biography. Throughout my more than 27 years in the practice of law, I have represented more than a thousand plaintiffs in negligence actions in various jurisdictions. I have an AV rating from Martindale-Hubbell. My fee for expert services in this case is $400.00 per hour.

I am familiar with the applicable standard of care for attorneys practicing in the District of Columbia under the circumstances of the underlying case. My familiarity with the applicable standard of care is as a result of my experience and education as a practicing attorney. I teach Continuing Legal Education courses approximately one to two times per year, and I attend an average of 50 hours of CLE annually.

I have reviewed a stack of documents approximately a foot high in connection with this case. Included in these materials are the following pertinent documents:

EXHIBIT

G

(1)    Complaint;

(2)    Plaintiffs' Joint Response to Defendant Lewis & Tompkins, PC's Interrogatories to Denicole Young and Vanessa Ghee;

(3)    Plaintiffs' Joint Response to Defendant Lewis & Tompkins, PC's Request for Production of Documents to Denicole Young and Vanessa Ghee;

(4)    Plaintiffs' Initial Disclosures;

(5)    Plaintiffs' Rule 26(a)(2);

(6)    Deposition Transcript of Denicole Young;

(7)    Deposition Transcript of Vanessa Ghee;

(8)    Deposition Transcript of William Burton with Exhibits;

(9)    Deposition Transcript Christopher G. Hoge, Esquire with Exhibits;

(10)   Deposition Transcript Vol. II of Denicole Young;

(11)   Deposition Transcript Vol. II of Vanessa Ghee;

(12)   Deposition Transcript Vol. III of Vanessa Ghee;

(13)   Deposition Transcript of William Burton Vol. II;

(14)   Deposition Transcript of Dr. Shoemaker with Exhibits;

(15)   July 1, 2005 letter from Sharon Lewis Tompkins to Denicole Young and Vanessa Ghee; and,

(16)   Copy of the Lewis & Tompkins file.

Based upon my review of the materials outlined above, and my knowledge and experience in representing plaintiffs in personal injury actions for over 27 years, I have formed the following opinions, all of which I hold with a reasonable degree of professional certainty:

(1)    The July 1, 2005 discharge letter from Ms. Tompkins to Denicole Young and Vanessa Ghee complied with the applicable standard of care for attorneys under similar circumstances when discharging clients.

(2)    The Defendants, William F. Burton and the law firm of Lewis & Tompkins, PC, complied with the standard of care for attorneys under the circumstances, and specifically complied with Rule 1.16(b) of the District of Columbia Bar Rules of Professional Conduct, by notifying the clients that they were withdrawing from the case in the July 1, 2005 letter from Ms. Tompkins. It is my further opinion that the July 1, 2005 letter met the applicable standard of care: (1) by informing the clients that they were withdrawing from the case due to insufficient evidence; (2) by providing them with a complete copy of their file; (3) by advising them of an appropriate statute of limitations; and (4) by further advising them that in the event they wish to pursue their case, Ms. Young and Ms. Ghee should contact another attorney immediately.

(3)     It is my further opinion that the underlying cases (i.e. the potential toxic tort claims on behalf of Ms. Young and Ms. Ghee) were extremely weak and speculative and were unlikely to result in a favorable settlement or verdict for Ms. Young and Ms. Ghee.

(4)     It is my further opinion, in light of the opinions set forth in the preceding paragraph, that there was no proximate cause between any alleged breaches by William F. Burton and the law firm of Lewis & Tompkins, PC and any injuries or damages to Ms. Young and Ms. Ghee.

As indicated earlier, the bases for my opinions and conclusions as set forth in this report are the various materials that I have reviewed in connection with the case, as well as my own knowledge and expertise in representing plaintiffs in negligence actions for more than 27 years. I have not prepared any exhibits or summaries to use with my testimony, although I anticipate that if I am asked to testify at trial exhibits and/or summaries will be prepared as demonstrable exhibits/evidence.

All of my publications are listed on the separate attachment. To the best of my recollection, within the last four years, I have served as an expert witness in one prior case, *Phillips, et al. v. Snyder, Weiner, Weltchek, Vogelstein & Brown*, pending in the Superior Court for the District of Columbia. I was retained as an expert on behalf of the defendants and gave deposition testimony in approximately April 2004 and trial testimony in approximately February 2005.

I anticipate that as the case progresses I will be furnished with additional materials by counsel for William F. Burton and/or counsel for the law firm of Lewis & Tompkins. In the event that my review of additional materials results in any substantive change in the opinions and conclusions expressed in this report, a supplemental report will be issued.

Date: 12/28/07

Patrick M. Regan

# UNIVERSITY OF PENNSYLVANIA - SCHOOL OF MEDICINE

## Curriculum Vitae

September 2007

## S. Michael Phillips, M.D.

Home Address:
613 Tunbridge Road
West Chester, PA  19382

Office Address:
University of Pennsylvania
School of Medicine
Allergy & Immunology Section
3400 Spruce Street
3 Ravdin, Suite G
Philadelphia, PA 19104

**Social Security Number: 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**

Citizenship:
U.S.A.

Education:
1958-62 B.S., University of Wisconsin
1962-66 M.D., University of Wisconsin
1966-69 Intern, Resident, Research Fellow, University of  Pennsylvania
1969-72 Research Fellow, Instructor, Harvard Medical School

**Postgraduate Training and Fellowship Appointments:**
7/66 - 6/67    Straight Medical Internship, Hospital of the University of Pennsylvania, Phila., PA
7/67 - 6/68    Straight Medical Residency, Hospital of the University of Pennsylvania, Phila., PA
7/68 - 6/69    Fellow-Allergy & Immunology, Hospital of the University of Pennsylvania, Phila., PA
7/69 - 6/72    Fellow-Nephrology & Immunology, Peter Bent Brigham Hospital, Harvard Medical
                School, Boston, MA

**Military Service:**
1972-75    Lt. Col., M.C., Dept. Immunology, Div. Communicable Diseases and Immunology,
                Sr. Research Assoc., Walter Reed Army Institute of Research, Washington, DC

1



EXHIBIT

H

**Faculty Appointments:**

| | |
|---|---|
| 1969 | Teaching Fellow and Instructor in Medicine, Harvard Medical School, Boston, MA |
| 1971 | Instructor in Medicine, Harvard Medical School, Boston, MA |
| 1973 | Assistant Professor of Medicine and Consultant in Immunology & Nephrology, George Washington University Medical School, Washington, DC |
| 1975 | Assistant Professor of Medicine, University of Pennsylvania, Philadelphia, PA |
| 1975 | Consultant in Medicine, PVAH, Philadelphia, PA |
| 1980 | Associate Professor of Medicine, University of Pennsylvania, Philadelphia, PA |
| 1986- | Senior Scholar in Clinical Epidemiology, University of Pennsylvania, Philadelphia, PA |
| 1992- | Professor of Medicine, University of Pennsylvania, Philadelphia, PA |
| 1994- | Professor of Neurology, University of Pennsylvania, Philadelphia, PA |
| 1995- | Director of Medical International Health Program, University of Pennsylvania |
| 2001- | Director of Allergy and Immunology Clinical Services: University of Pennsylvania/ Presbyterian Medical Center: University of Pennsylvania |
| 2006 | Lead Clinical Physician: University of Pennsylvania |
| 2007 | Director of Allergy: Pulmonary Allergy Critical Care Division: Univ. Of Pennsylvania And Penn Medicine at Radnor |

**Hospital and University Administrative Appointments:**

| | |
|---|---|
| 1971 | Assistant Technical Director, Tissue Typing Lab., Boston Intrahospital Organ Bank, Boston, MA |
| 1995 | Clinical Research Center Advisory Committee, Hospital of the University of Pennsylvania, Philadelphia, PA |
| 1995 | Institutional Animal Care and Use Committee;   University of Pennsylvania |

**Speciality Certification:**

| | |
|---|---|
| 1974 | American Board of Internal Medicine |
| 1980 | American Board of Allergy & Immunology |

Licensure:    WI (15983), MA (31618), D.C. (3820) and PA (0171 62 E)

**Awards, Honors and Memberships in Honorary Society:**

| | |
|---|---|
| 1958-1962 | Wisconsin: Phi Eta Sigma; Phi Kappa Phi; Phi Beta Kappa; Soph., Jr., Sr. honors |
| 1966 | Univ. Wisconsin President Medical School Class: Upper 10% Scholastic Ranking |
| 1968 | Outstanding Medical Resident, University of Pennsylvania |
| 1972-75 | Walter Reed Army Institute of Research: Outstanding Classification: Efficiency Reports |
| 1977 | Amer. Assoc. Immunologists: Travel Award to attend 3rd Int. Congress of Immunology |
| 1980 | American Association of Immunologists: Travel Award to attend 4th |
| 1980- | American Society for Clinical Investigation |
| 1983- | Honorary Masters of Science, University of Pennsylvania |
| 1990- | Univ. PA Alpha Omicron Chapter of Phi Beta Delta, the Honor Society of Int. Scholars |

1991-     Clinical Immunology Society
1993-     Fellow, American College of Physicians

1993-     The John Morgan Society, University of Pennsylvania
2006      Clinical Lead Physician

## Membership in Professional and Scientific Societies:
National Societies:

     American Academy of Allergy, Asthma & Immunology
     American Association for the Advancement of Science
     American Association of Immunologists
     American College of Physicians
     American Federation for Clinical Research
     American Society for Clinical Investigation
     American Society of Nephrology
     American Society of Parasitology
     American Society of Tropical Medicine & Hygiene: Com   mittee on Public Affairs;
     Committee on the Future of Tropical Medicine; Representative Council of Medical
     Subspecialties, American College of Physicians;  Chairman, Committee on Nominations

     Reticuloendothelial Society
     Transplantation Society
     Clinical Immunology Society

## Editorial and Consultative Positions:
1977-81     Consultant to the Surgeon General in Immunology, U.S. Army Medical Research &
            Development Command
1978-81     Chairman, Scientific Advisory Board, Edna McConnell Clark Foundation
1978-82     Member, Tropical Medicine and Hygiene Study Section, National Institute
            of Allergy & Infectious Disease, National Institute of Health
1978-85     Editorial Board: Immunopharmacology
1978-88     Editorial Board: American Journal of Tropical Medicine and Hygiene
1979-       Chairman, Scientific Advisory Group: International Atomic Energy Agency
            for Radiobiology of Parasites
1980-82     Consultant to WHO in Immunoparasitology
1980-89     Editorial Board: The Reticuloendothelial System: A Comprehensive Treatise,
            Plenum Press
1982-88     American College of Physicians: Committee on Immunization Policies;
            Council of Medicine Subspecialties
1983-85     Advisory Committee on Immunization Policies
1983-       Consultant in Immunology; Smith Kline Beckman, Philadelphia, PA
1983        Chairman, Review Committee on Allergy & Immunology, American
            College of Physicians and Surgeons
1983-85     United States Army Medical Research Development Command: Advisory

|       | Committee on Parasitic Diseases |
|-------|---------------------------------|
| 1986- | International Network of Clinical Epidemiology: Rockefeller Foundation, New York, NY |
| 1987- | Senior Scholar in Clinical Epidemiology, University of Pennsylvania |
| 1989- | Consultant to Minister of Health, Egypt, Schistosomiasis Research Project |
| 1993- | Member: Joint Council of Allergy and Immunology |
| 1994- | Chairman, Scientific Advisory Board, CRI |

### *Academic Committees at the University of Pennsylvania:*

Molecular Cell Biology Graduate Group
Clinical Research Center Advisory Committee
Immunology Graduate Group
International Relations Advisory Board
Medical House Staff Selection Committee
Parasitology Graduate Group
Council on International Medical Programs
Cell and Molecular Graduate Group
Institute for Human Gene Therapy
Center for Molecular Studies in Digestive and Liver Disease
Clinical Practice Leader

### *Major Teaching and Clinical Responsibilities at the University of Pennsylvania:*

1. General Medical Attending: H.U.P/P.M.H.: 1-2 mon/yr
2. Allergy/Immunology Attending: H.U.P/P.M.C.: 3 mon/yr
3. Allergy/Immunology Clinic: Supervise U.P. Clinic 2,5 days/week, 6 months/year
4. Clinical Immunology Conferences - participate: U.P. 2 hours/week
5. Department of Medicine: Medical Student Rotations, 1-4 year
6. Visiting Professor's Program: 1 Lecture/month
7. Medical Group - Allergy/Immunology: U.P. 3/4 day/week
8. Director of Allergy, Penn Medicine @ Radnor: 2 days/weekw

**Original Papers**

1.  Phillips, S.M., Kornguth, S.E., and Thompson, H.G.: Serum haptoglobulin changes in multiple sclerosis. Neurology 15:415, 1965.

2.  Phillips, S.M., and Silvers, N.P.: Glucose-6-phosphate dehydrogenase deficiency, infectious hepatitis, acute hemolysis and renal failure. Ann. Int. Med. 70:99, 1969.

3.  Phillips, S.M., and Zweiman, B.: Response of guinea pig lymphocytes to PHA and antigen. J. Immunol. 105:204, 1970.

4.  Zweiman, B., and Phillips, S.M.: In vitro lymphocyte reactivity during depression of tuberculin hypersensitivity by 6-mercaptopurine. Science 169:284, 1970.

5.  Carpenter, C.B., Phillips, S.M., Boylston, A.W., and Merrill, J.P.: Immunosuppressive alpha globulin from bovine thymus: Mechanism of action. Transplant. Proc. 3:929, 1971.

6.  Carpenter, C.G., Phillips, S.M., and Merrill, J.P.: Immunosuppressive alpha globulin from bovine thymus: II. Mode of action. Cell. Immunol. 2:435, 1971.

7.  Phillips, S.M., Martin, W.J., Shaw, A.R., and Wegmann, T.G.: Serum mediated immunologic non-reactivity between histoincompatible cells in tetraparental mice. Nature 234:146, 1971.

8.  Phillips, S.M., Carpenter, C.B., and Merrill, J.P.: Cellular immunity in the mouse. I. In vitro lymphocyte reactivity. Cell. Immunol. 5:235, 1972.

9.  Phillips, S.M., Carpenter, C.B., and Merrill, J.P.: Cellular immunity in the mouse. II. Correlation of in vivo and in vitro phenomena. Cell. Immunol. 5:249, 1972.

10. Hirsch, M.S., Phillips, S.M., Solnik, C., Black, P.H., and Schwartz, R.S.: Activation of leukemia viruses by graft vs. host and mixed lymphocyte reactions in vitro. Proc. Natl. Acad. Sci. USA 69:1069, 1972.

11. Phillips, S.M., Strom, T.B., Corson, J.M., Carpenter, C.B., and Merrill, J.P.: Enhancing antibody: In vitro studies on mechanisms of action and specificity upon mouse lymphocytes. Proc. 7th Leukocyte Conf. 601, 1973.

12. Phillips, S.M., Strom, T.B., Corson, J.M., Carpenter, C.B., and Merrill, J.P.: Enhancing antibody: In vitro studies on mechanisms of action upon the sensitization and effector arc. Transplant. Proc. V:577, 1973.

13. Phillips, S.M., and Wegmann, T.G.: Active suppression as a possible mechanism of tolerance in tetraparental mice. J. Exp. Med. 137:291, 1973.

14. Garavoy, M.R., Phillips, S.M., Carpenter, C.B., and Merrill, J.P.: Antibody modulation of cellular reactivity post renal transplantation. Transplant. Proc. V:129, 1973.

15. Phillips, S.M., and Zweiman, B.: Mechanisms in the suppression of delayed hypersensitivity in the guinea pig by 6-Mercaptopurine. J. Exp. Med. 137:1494, 1973.

16. Strom, T.B., Carpenter, C.B., Phillips, S.M., Garavoy, M.R., and Merrill, J.P.: Rejection and enhancement of an in vitro model of alloimmunity: Comparisons of $F_1$ and parental strains. Transplantation 16:103, 1973.

17. Andre-Schwartz, J., Schwartz, R.S., Hirsch, M.S., Phillips, S.M., and Black, P.H.: Activation of leukemia viruses by graft vs. host and mixed lymphocyte culture reactions: Electron microscopic evidence of C-type particles. J. Natl. Cancer Inst. 51:507, 1973.

18. Phillips, S.M., Carpenter, C.B., and Strom, T.B.: Cellular immunity in the mouse. III. In vitro kinetic studies on the relationship between recognition and effector phases. Transplant. Proc. 5:1699, 1973.

19.    Phillips, S.M., Lane, P., and Carpenter, C.B.:  Immunosuppressive alpha globulin from bovine thymus and blood:  *In vitro* studies on mechanisms of action upon the sensitization and effector arcs.  Ann. N.Y. Acad. Sci. 249:236, 1975.

20.    Strom, T.B., Hirsch, M.S., Black, P.H., Carpenter, C. B., Phillips, S.M., and Merrill, J.P.:  Modulation of GvH proliferation by cyclic nucleotides.  Transplant. Proc. VII Suppl. 1:305, 1975.

21.    Phillips, S.M., Gleichmann, H., Hirsch, M.S., and Carpenter, C.B.: Cellular immunity in the mouse. IV. Altered thymic dependent lymphocyte reactivity in the chronic graft vs. host reaction. Cell. Immun. 15:169, 1975.

22.    Phillips, S.M., Hirsch, M.S., Andre-Schwartz, J., Solnik, C., and Carpenter, C.B.:  Cellular immunity in the mouse. V. Further studies on leukemia virus activation in allogenic reactions of mice: Stimulatory parameters.  Cell. Immunol. 15:169, 1975.

23.    Phillips, S.M., Reid, W.A., Campbell, R.A., Bruce, J. I., Hedlund, K., Diggs, C.L., and Sadun, E.H.: The cellular and humoral immune response to *Schistosoma mansoni* infections in inbred rats. I. Mechanisms during initial exposure.  Cell. Immunol. 19:99, 1975.

24.    Greenberger, J.S., Phillips, S.M., Stephenson, J.R., and Aaronson, S.A.:  Induction of mouse type-C RNA virus by liopolysaccharide.  J. Immunol. 115:317, 1975.

25.    Phillips, S.M., Stephenson, J.R., Greenberger, J.S., Lane, P.E., and Aaronson, S.A.: Release of xenotrophictype-C RNA virus in response to lipopolysaccharide: Activity of lipid-A portion upon "B" lymphocytes. J. Immunol. 116:1123, 1976.

26.    Shirai, A., Catanzaro, P.J., Phillips, S.M., and Osterman, J.V.: Host defenses in experimental scrub typhus. Role of cellular immunity in heterologous infections.  Infect. and Immun. 14:39(1), 1976.

27.    Catanzaro, P.J., Graham, R.C., Jr., Powell, E.A., and Phillips, S.M.: Characteristics of a xenogeneic lymphocyte transfer reaction: Its use in the study of graft vs. host capability of mouse lymphoid cells from various anatomic sites. Cell. Immunol. 22:140, 1976.

28.    Catanzaro, P.J., Brandt, W.E., Hogrefe, W.R., Phillips, S.M., and Top, F.H.: Virus enhanced modulation of cell surface antigen: Effect on immune lytic susceptibility.  J. Immunol. 117:1104, 1976.

29.    Campbell, G.H., and Phillips, S.M.:  Immune mechanisms in African Tropanosomiasis. I. Adoptive transfer of variant specific resistance to *Trypanosoma rhodesiense* with "B" lymphocytes and serum.  Infect. and Immun. 14:1144, 1976.

30.    Phillips, S.M., Reid, W.A., and Sadun, E.H.: The cellular and humoral immune response to *Schistosoma mansoni* infection in inbred rats. II. Mechanisms during reexposure. Cell. Immunol. 28:75, 1977.

31.    Wells, R.W., Diggs, C.L., and Phillips, S.M.: Cyclophosphamide induced specific immunosuppression of protective immunogens of malaria. J. Immunol. 118:472, 1977.

32.    Phillips, S.M., Stephenson, J.R., and Aaronson, S.A.: Genetic factors influencing mouse type-C RNA virus induction by naturally occurring B-cell mitogens. J. Immunol. 118:662, 1977.

33.    Phillips, S.M., DiConza, J.J., Gold, J.A., and Reid, W. A.: Schistosomiasis in the congenitally athymic (nude) mouse. I. Thymic dependency of eosinophilia, granuloma formation, and host morbidity.  J. Immunol. 118:594, 1977.

34.    Reid, W.A., Phillips, S.M., and Roscinski, R.J.: Radioisotropic uptake and retention by cercariae and developing worms.  Exp. Parasitol. 42:331, 1977.

35.    Phillips, S.M., Reid, W.A., Khoury, P.B., and Doughty, B.L.:  The immune response to *Schistosoma mansoni* in inbred rats.  IV. A. posteriori interpretations. Am. J. Trop. Med. Hyg. 26:48, 1977.

36.    Cantanzaro, P.J., Agniel, L.D., Jr., Hogrefe, W.R., and Phillips, S.M.: Interaction of peritoneal eudate lymphocytes with histocompatibility antigens. Cell. Immunol. 29:394, 1977.

37.    Cantanzaro, P.J., Agniel, L.D., Jr., Hogrefe, W.R., and Phillips, S.M.: Evidence that circulating lymphocytes are not related to the recirculating pool of lymphocytes. J. Reticuloendothel. Soc. 23:459, 1978.

38.    Phillips, S.M., Reid, W.A., Doughty, B.L., and Khoury, P.B.: The immune response to *Schistosoma mansoni* infections in inbred rats. III. Mechanisms of optimal development of protective immunity. Cell. Immunol. 38:225, 1978.

39.    Phillips, S.M., Reid, W.A., Doughty, B.L., and Khoury, P.B.: The cellular and humoral immune response to *Schistosoma mansoni* infections in inbred rats. V. Prerequisite mechanisms for the development of optimal protective immunity. Cell. Immunol. 38:239, 1978.

40.    Lisak, R.P., Zweiman, B., and Phillips, S.M.: Thymic and peripheral blood T- and B-cell levels in myasthenia gravis. Neurology 1298:1309, 1978.

41.    Campbell, R.A., Esser, K.L., and Phillips, S.M.: *Trypanosoma rhodesiense* infection in the congenitally athymic (nude) mouse resistance and morbidity. Infect. and Immun. 20:714, 1978.

42.    Phillips, S.M., Catanzaro, P.J., Carpenter, C.B., and Zweiman, B.: Mechanisms in the suppression of delayed hypersensitivity in the guinea pig by 6-mercaptopurine. II. Kinetic and morphologic studies on the monocyte-macrophage component. Immunopharmacology 1:277, 1979.

43.    Neilson, E.G., and Phillips, S.M.: Cell-mediated immunity in interstitial nephritis. I. T-lymphocyte systems in nephritic guinea pigs: The natural history and diversity of the immune response. J. Immunol. 123:2373, 1979.

44.    Neilson, E.G., and Phillips, S.M.: Cell-mediated immunity in interstitial nephritis. II. T-lymphocyte effector mechanisms in nephritic guinea pigs: Analysis of the renotropic migration and cytotoxic response. J. Immunol. 123:2381, 1979.

45.    Phillips, S.M., Reid, W.A., Doughty, B.L., and Bentley, A.G.: The immunologic modulation of morbidity in schistosomiasis studies in athymic mice and *in vitro* granuloma formation. Am. J. Trop. Med. Hyg. 29:820, 1980.

46.    Neilson, E.G., Phillips, S.M., and Agus, A.S.: Plasmapheresis in fulminating crescentic nephritis. Lancet 1:264, 1980.

47.    Neilson, E.G., Jimenez, S.A., and Phillips, S.M.: Cell-mediated immunity in interstitial nephritis. III. T-lymphocyte-mediated fibroblast proliferation and collagen synthesis: An immune mechanism of renal fibrogenesis in interstitial nephritis. J. Immunol. 125:1708, 1980.

48.    Phillips, S.M., and Reid, W.A.: *Schistosoma mansoni*: Immune response to normal and irradiated cercariae or soluble stage-specific surface immunogens. Intl. J. Nucl. Med. Biol. 7:173, 1980.

49.    Neilson, E.G., Jimenez, S.A., and Phillips, S.M.: An immune mechanism for renal fibrosis in interstitial nephritis, in *Immunoregulation and Autoimmunity*, Vol. 13, (R.S. Krakauer and M.K. Cathcard, eds.), Elseiver/North Holland Publishing, New York, p. 249-250, 1980.

50.    Neilson, E.G. and Phillips, S.M.: The immunobiology of nephritis. Prog. Allergy 27:167, 1980.

51.    Neilson, E.G., and Phillips, S.M.: Cell-mediated immunity in interstitial nephritis. IV. Antibasement membrane antibody functions in antibody-dependent cellular cytotoxicity reactions: Observations on a nephritogenic effector mechanism acting as an informal bridge between the humoral and cellular immune response. J. Immunol. 126:1990, 1981.

52.  Abdolmohammad, R., Pleasure, D.E., Lisak, R.P., Silberberg, D.H., Abramsky, O., and Phillips, S.M.: Radioimmunoassay for detection of anti-oligodendrocyte antibodies. Neuroscience Letters 23:143, 1981.

53.  Bentley, A.G., Carlisle, A.S., and Phillips, S.M.: Ultrastructural analysis of the cellular response to Schistosoma mansoni: Initial and challenge infections in the rat. Am. J. Trop. Med. Hyg. 30:102, 1981.

54.  Bentley, A.G., Carlisle, A.S., and Phillips, S.M.: Ultrastructural analysis of the cellular response to Schistosoma mansoni: II. Inflammatory responses in rodent skin. Am. J. Trop. Med. Hyg. 30:815, 1981.

55.  Khoury, P.B., Doughty, B.L., Lloyd, S.S., and Phillips, S.M.: Kinetics and characterization of antigen-binding and antibody producing cells in the regional draining lymph nodes and spleen during initial murine schistosomiasis: I. Cellular response against cercarial antigens. Cell. Immunol. 59:223, 1981.

56.  Khoury, P.B., and Phillips, S.M.: Kinetics and characterization of antigen-binding and antibody producing cells in the regional draining lymph nodes and spleen during initial murine schistosomiasis. II. Cellular responses against egg antigens. Cell. Immunol. 59:246, 1981.

57.  Khoury, P.B., and Phillips, S.M.: Characterization of the cellular responses of the pulmonary and hepatic phases of primary murine Schistosomiasis mansoni infections. Am. J. Trop. Med. Hyg. 30:394, 1981.

58.  Neilson, E.G., Phillips, S.M., and Jimenez, S.A.: Lymphokine modulation of fibroblast proliferation. J. Immunol. 128:1484, 1982.

59.  Neilson, E.G., and Phillips, S.M.: Suppression of interstitial nephritis by auto-anti-idiotypic immunity. J. Exp. Med. 155:179, 1982.

60.  Doughty, B.L., and Phillips, S.M.: Delayed hypersensitivity granuloma formation around Schistosoma mansoni eggs in vitro. I. Definition of the model. J. Immunol. 128:30, 1982.

61.  Doughty, B.L., and Phillips, S.M.: Delayed hypersensitivity granuloma formation and modulation around Schistosoma mansoni eggs in vitro. II. Regulatory T-cell subsets. J. Immunol. 128:37, 1982.

62.  Neilson, E.G., and Phillips, S.M.: Murine interstitial nephritis: I. Analysis of disease susceptibility and its relationship to pleiomorphic gene products defining both immune response genes and a restrictive requirement for cytotoxic T-cells at H-2K. J. Exp. Med. 155:1075, 1982.

63.  Campbell, G.H., Esser, K.M., and Phillips, S.M.: Parasite antigen specific stimulation of B- and T-cells in African trypanosomiasis. J. Immunol. 129:1272, 1982.

64.  Phillips, S.M.: Monoclonal antibodies and mechanisms of immunogenesis. Proceedings of the 5th International Congress of Parasitology, Vol. II, p. 25, 1982.

65.  Bentley, A.G., Doughty, B.L., and Phillips, S.M.: Ultrastructural analysis of the cellular response to Schistosomiasis mansoni. III. The in vitro granuloma. Am. J. Trop. Med. Hyg. 31(6):1168, 1982.

66.  Phillips, S.M., and Reid, W.A.: Nuclear techniques in the study of resistance to schistosomiasis: Studies on in vitro labelled cercariae. IAEA-SM-256/74, 161, 1982.

67.  Zodda, D.M., and Phillips, S.M.: Monoclonal antibody mediated resistance to Schistosoma mansoni infection in mice. J. Immunol. 129(6):2326, 1982.

68.  Neilson, E.G., Gasser, D.G., McCafferty, E., Zakheim, B., and Phillips, S.M.: Polymorphism of genes involved in anti-tubular basement membrane disease in rats. Immunogenetics 17:55, 1983.

69. Zodda, D.M., Abdel-Hafez, S.K., and Phillips, S.M.: Characterization of monoclonal antibodies against *Schistosoma mansoni*. Am. J. Trop. Med. Hyg. 32(1):69, 1983.

70. Abdel-Hafez, S.K., Phillips, S.M., and Zodda, D.M.: *Schistosoma mansoni*: Detection and characterization of antigens and antigenemia in inhibition enzyme-linked immunosorbent assay (IELISA). Exp. Parasitol. 55:219, 1983.

71. Phillips, S.M., Bentley, A.G., Linette, G., Doughty, B. L., and Capron, M.: The immunologic response of congenitally athymic rats to *Schistosoma mansoni* infection. I. *In vivo* studies of resistance. J. Immunol. 131(3):1466, 1983.

72. Capron, M., Capron, A., Abdel-Hafez, S.K., Bazin, H., Joseph, M., and Phillips, S.M.: Immunologic response of athymic rats to *Schistosoma mansoni* infection. II. Antibody-dependent mechanisms of resistance. J. Immunol. 131(3):1475, 1983.

73. Abdel-Hafez, S.K., Zodda, D.M., and Phillips, S.M.: Effect of monoclonal antibodies on *S. mansoni* cercarial penetration of mouse skin. Folia Parasitologica 30:351, 1983.

74. Abdel-Hafez, S.K., Phillips, S.M., and Zodda, D.M.: *Schistosoma mansoni*: Detection and characterization of schistosome derived antigens by inhibition enzyme-linked immunosorbent assay (IELISA) utilizing monoclonal antibodies. Z. Parasitenkd 70:105, 1984.

75. Neilson, E.G., McCafferty, E., Phillips, S.M., Clayman, M.D., and Kelly, C.: Antiidiotypic immunity in interstitial nephritis. II. Rats developing anti-tubular basement membrane disease fail to make an anti-idiotypic regulatory response: The modulatory role of an RT7.1[+], OX8[-] suppressor T cell mechanism. J. Exp. Med. 159:1009, 1984.

76. Doughty, B.L., Ottesen, E.A., Nash, T.E., and Phillips, S.M.: Delayed hypersensitivity granuloma formation around *Schistosoma mansoni* eggs *in vitro*. J. Immunol. 133:933, 1984.

77. Doughty, B.L., Zodda, D.M., Kholy, A.E., and Phillips, S.M.: Delayed type hypersensitivity granuloma formation around *Schistosoma mansoni* eggs *in vitro*. IV. Granuloma formation in human schistosomiasis. Am. J. Trop. Med. & Hyg. 33(6):1173, 1984.

78. Rostami, A., Eccleston, P.A., Silberberg, D.H., Hirayama, M., Lisak, R.P., Pleasure, D.E., and Phillips, S.M.: Generation and biological properties of a monoclonal antibody to galactocerebroside. Brain Research 298:203, 1984.

79. Lammie, P.J., Linette, G.P., and Phillips, S.M.: Characterization of *Schistosoma mansoni* antigen reactive T cell clones which form granulomas *in vitro*. J. Immunol. 134:4170, 1985.

80. Bentley, A.G., Phillips, S.M., Kaner, R.J., Theodorides, V.J., Linette, G.P., and Doughty, B.L.: *In vitro* delayed hypersensitivity granuloma formation: development of an antigen-conjugated bead model. J. Immunol. 134:4163, 1985.

81. Kennedy, T.L., Merrow, M., Phillips, S.M., Norman, M., Neilson, E.G.: Macrophage chemotaxis in anti-tubular basement membrane-induced interstitial nephritis in guinea pigs. Clin. Immunol. Immunopathol. 36:243, 1985.

82. Lammie, P.J., Phillips, S.M., Linette, G.P., Michael, A.I., and Bentley, A.G.: *In vitro* granuloma formation using defined antigenic nidi. Tenth International Conference on Sarcoidosis and Other Granulomatous Disorders. Ann. N.Y. Acad. Sci. 465:340, 1986.

83. Lammie, P.J., Michael, A.I., Linette, G.P., and Phillips, S.M.: Production of a fibroblast-stimulating factor by *Schistosoma mansoni* antigen-reactive T cell clones. J. Immunol. 136(3):1100, 1986.

84. Linette, G.P., Lammie, P.J., and Phillips, S.M.: Allogeneic substitution for nominal antigen-specific T-cell clone reactivity in schistosomiasis. Immunology 57:567, 1986.

85. Kelly, C., Simpson, A.J.G., Fox, E., Phillips, S.M., and Smithers, S.R.: The identification of *Schistosoma mansoni* surface antigens recognized by protective monoclonal antibodies. Parasite Immunology 8:193, 1986.

86. Phillips, S.M., Fox, E.G., Fathelbab, N.G., and Walker, D.: Epitopic and paratopically directed anti-idiotypic factors in the regulation of resistance to murine *schistosomiasis mansoni*. J. Immunol. 137(7):2339, 1986.

87. Wyler, D.J., Lammie, P.J., Michael, A.I., Rosenwasser, L.J., and Phillips, S.M.: *In vitro* and *in vivo* evidence that autoimmune reactivity to collagen develops spontaneously in *Schistosoma mansoni* infected mice. Clin. Immunol. and Immunopathol. 44:140, 1987.

88. Phillips, S.M., Linette, G.P., Doughty, B.L., Byram, J.E., and von Lichtenberg, F.: *In vivo* T cell depletion regulates resistance and morbidity in murine schistosomiasis. J. Immunol. 139:919, 1987.

89. Mouelhi, M., Black, M., and Phillips, S.M.: Hepatic cytochrome P-450 system in experimental schistosomiasis. Presence of an artifact in spectrophotometric analysis. Biochem. Pharmacol. 36:2621, 1987.

90. Phillips, S.M., Walker, D., Abdel-Hafez, S.K., Linette, G.P., Doughty, B.L., Perrin, P.J., and Fathelbab, N.: The immune response to *Schistosoma mansoni* infections in inbred rats. VI. Regulation by T cell subpopulations. J. Immunol. 139:2781, 1987.

91. Omer-Ali, P., Smithers, S.R., Bickle, Q., Phillips, S.M., Harn, D., and Simpson, A.J.G.: Analysis of the anti-*Schistosoma mansoni* surface antibody response during murine infection and its potential contribution to protective immunity. J. Immunol. 140:3273, 1988.

92. Lammie, P.J., Monroe, J.G., Michael, A.I., Johnson, G. D., Phillips, S.M., and Prystowsky, M.B.: Partial characterization of a fibroblast-stimulating factor produced by cloned murine T lymphocytes. Am. J. Path. 130:289, 1988.

93. Phillips, S.M., Perrin, P.J., Walker, D.J., Fathelbab, N.G., Linette, G.P., and Idris, M.A.: The regulation of resistance to *Schistosoma mansoni* by auto-anti-idiotypic immunity. J. Immunol. 141:1728, 1988.

94. Perrin, P.J., and Phillips, S.M.: The molecular basis of granuloma formation in schistosomiasis. I. T cell derived regulatory factors. J. Immunol. 141:1714, 1988.

95. Mishra, B.B., Phillips, S.M., Patrick, H., and Israel, H.L.: *In vitro* sarcoid granulomas differences between active and inactive disease; In *Sarcoidosis and Other Granulomatous Diseases*, Grassi, C., Rizzato, G., and Pozzi, E., eds., Milan, Elsevier Science Publishers B.V., 1988.

96. Perrin, P.J., Prystowsky, M.B., and Phillips, S.M.: The molecular basis of granuloma formation in schistosomiasis. II. Analogies of a T suppressor effector factor to the T cell receptor. J. Immunol. 142:985, 1989.

97. Perrin, P.J., and Phillips, S.M.: The molecular basis of granuloma formation in schistosomiasis. III. *In vivo* effects of a T cell derived suppressor effector factor and IL-2 on granuloma formation. J. Immunol. 143:649, 1989.

98. Perrin, P.J., Phillips, R.J., and Phillips, S.M.: The molecular basis of granuloma formation in schistosomiasis. IV. T cell derived suppressor-inducer and suppressor-effector factor reactivities are regulated by a TCR $\beta$ chain analog. Cell. Immunol. 124:345, 1989.

99. Phillips, S.M., Lin, J., Walker, D.J., Linette, G.P., Fathelbab, N.G., and Perrin, P.J.: The regulation of resistance to *Schistosoma mansoni* by auto-anti-idiotypic immunity. II. Global qualitative and quantitative regulation. J. Immunol. 144:4005, 1990.

100.  Phillips, S.M., Lin, J., Galal, N., Linette, G.P., Walker, D.J., and Perrin, P.J.: The regulation of resistance to *Schistosoma mansoni* by auto-anti-idiotypic immunity. III. An analysis of effects on epitopic recognition, idiotypic expression, and anti-idiotypic reactivity at the clonal level. J. Immunol. 145:2272, 1990.

101.  Emberton, K.C., Kuncio, G.S., Davis, G.M., Phillips, S.M., Monderewicz, K.M., and Guo, Y.H.: Comparison of recent classifications of stylommatophoran land-snail families, and evaluation of large-ribosomal-RNA sequencing for their phylogenetics. Malacologia 31:327, 1990.

102.  Phillips, S.M., Lin, J., Galal, N., Tung, A.S., Linette, G.P., and Perrin, P.J.: Resistance in murine schistosomiasis is contingent on activated IL-2 receptor bearing L3T4$^+$ lymphocytes, negatively regulated by Lyt-2$^+$ cells, and uninfluenced by the presence of IL-4. J. Immunol. 146:1335, 1991.

103.  Phillips, S.M., Perrin, P.J., Tung, A.S., Lin, J., Diamantstein, T., and Galal, N.: Immune response to *Schistosoma mansoni* infections in inbred rats: VII. Resistance is contingent on OX-8$^+$ regulated high affinity IL-2 receptor-bearing W3/25$^+$ lymphocytes but not on IL-4 dependent cells. J. Immunol. 147:330, 1991.

104.  Phillips, S.M., Perrin, P.J., Shi, L., and Gaafar, T.: Molecular basis of granuloma formation in schistosomiasis: interaction of T cells, their alpha-idiotypic regulatory and subsequent T suppressor factor activity, in *Cellular and Molecular Aspects of Cirrhosis*, Eds. B. Clement, A. Guillouzo, Colloque INSERM/John Libbey Eurotext Ltd., Vol. 216, p. 39-48, 1992.

105.  Phillips, S.M.: Schistosomiasis: An immunological disease. In Aquaculture and Schistosomiasis, National Academy Press, Washington, DC, p. 160, 1992.

106.  Ndhlovu, P.D., Chandiwana, S.K., Taylor, P., Phillips, S.M., Mason, P., Sola, P.S., Kaondera, K.K., Mandaza, G., and Kubara, E.: Human immune responses during infection with *Schistosoma haematobium*: cell mediated immunity. In Aquaculture and Schistosomiasis, National Academy Press, Washington, DC, p. 196, 1992.

107.  Perrin, P.J., and Phillips, S.M.: The regulation of resistance to *Schistosoma mansoni* by a soluble $\alpha/\beta$ TCR analog, produced by a cloned T cell hybridoma. Cell. Immunol. 149:155, 1993.

108   Perrin, P.J., Fidelus, R.K., Lee, K.M., and Phillips, S.M.: The immunologic regulation of intracellular lymphoid differentiation during schistosomiasis: Influence of T cell derived suppressor molecules on antigen recognition, glutathione, ornithine decarboxylase, and granuloma formation. Therapeutic Immunol. 1:257, 1994.

109.  Ramadan, A.M., Gabr, N.S., Bacha, P., Gunzler, V., and Phillips, S.M.: Suppression of immunopathology in schistosomiasis by Interleukin-2 targeted fusion toxin, DAB$_{389}$IL-2:Studies of In vitro and in vivo efficacy. Cell. Immunol. 166:001, 1995.

110.  Gabr, N.S., Adbel-Ghaffar, F., Ramadan, M.A., and Phillips, S.M.: Suppression of immunopathology in    schistosomiasis by antigen-daunomycin immunoconjugates I-In vitro studies on antigen specificity and genetic restriction. E. J. Immunol. 4:251, 1995.

111.  Gabr, N.S., Adbel-Ghaffar, F., Ramadan, M.A., and Phillips, S.M.: Immunoregulation of granuloma formation and fibrosis in schistosomiasis by antigen-daunomycin immunoconjugates II-In vivo studies . E. J. Immunol. 4:257, 1995.

112.  Maklad, S.S., Aly, F.T., Raid, M. Phillips, S.M., and El-Sheikh, N: On vitro delayed hypersensitivity granuloma formation in mice vaccinated with ultra-violet attenuated cercariae of Schistosoma mansoni. E. J. Immunol. 4:125, 1997

113.    Maklad, S.S., Mobdy, H.R., El-Rafaei, M.M., Galal, N., Phillips, S.M., and El-Sheikh, N: Adhesion Molecules in Human Schistosomiasis: I  Their expression correlates with protection against Schistosoma mansoni.  E. J. Immunol. 4:373, 1997

114.    Abdel Ghaffar, A,B,, Borai, I.H., Phillips, S.M., and El-Sheikh, N.:  ELISPOT analysis of pulmonary and systemic cytokins in ultra-violet attenuated cercariae vaccine model.  E. J. Immunol. 5: 203, 1998.

115.    Rumbley, C.A., ., Zekavat, S.A., Sugaya, H., Perrin, P.J., Ramadan, M.A., and Phillips, S.M.: The schistosome granuloma;  characterization of lymphocyte migration, activation, and cytokine production .  J.  Immunol.  161: 4129-4137, 1998.

116.     Mobdy, H.H., Manaa, W.M., Nassar, M., Phillips, S.M., and El-Sheikh, N Vaccination induced changes in adhesion molecules in murine schistosomiasis.  E. J. Immunol. 6: 203, 1999.

117.    Rumbley, C.A., Sugaya, H., Zekavat, S.A., El Refaei, M., Hilliard, B., Perrin, P.J. and Phillips, S.M.: Activated Eosinophils are the Major Source of Th-2   Associated Cytokines in the Schistosome Granuloma. J.  Immunol., 162: 1003-1009, 1999.

118.    Perrin, P.J., Lavi, E., Rumbley, C.A., Zekavat, S.A., and Phillips, S.M.:      Experimental Autoimmune Meningitis: A Novel Neurological Disease in CD28 Deficient Mice.  Clinical Immunology  91(1): 41-49, 1999.

119.    Rumbley, C.A. and Phillips, S.M.  The Schistosome Granuloma:  an immunoregulatory organelle. Microbes and Infection  1: 499-504, 1999.

120.    Perrin, P.J., A.E. Lovett-Racke, S.M. Phillips, and M.K. Racke.  1999. Differential requirements of naive and memory T cells for CD28 costimulation in autoimmune pathogenesis. Histol. Histopathol.  14:1269-1276, 1999.

121.    Perrin, P.J., S.M Phillips, and E. Heber-Katz.  1999.  Experimental autoimmune meningitis as a        model for activation and differentiation of pathogenic T cells.  Recent Res. Dev. Immunol. 1: 197-207, 1999

122.    Perrin, P.J., Rumbley, C.A., Beswick, R.L., Lavi, E. and Phillips, S.M.  Differential Cytokine and Chemokine Production Characterizes Experimental Autoimmune Meningitis and Experimental Autoimmune Encephalomyelitis. Clinical Immunology: 94:114-124, 2000.

123.    Rumbley, C.A., Sugaya, H., Zekavat, S.A., and Phillips, S.M.  Elimination of Granuloma but not Splenic Lymphocytes by Fas-Fas Ligand Mediated Apoptosis in S. Mansoni Infected Mice.  Journ Am. Soc. Trop Med & Hygiene: 65(5):442-449, 2001.

124.    Rumbley, C.A., Silver, J., and Phillips, S.M.  development of  Obliterative Bronchiolitis in Murine Tracheal Transplants is CD40L Dependent. 1999 Transplantation

125.    Perrin, P.J.,  E. Lavi, S.A. Zekavat, C.A. Rumbley, and S.M. Phillips.  1999. Experimental autoimmune meningitis: A novel neurological disease in CD28-deficient mice.  Clin. Immunol.  91:49.

126.    Perrin, P.J., A.E. Lovett-Racke, S.M. Phillips, and M.K. Racke.  1999.  Differential requirements of naive and memory T cells for CD28 costimulation in autoimmune pathogenesis.  Histol. Histopathol. 14:1269.

127.    Perrin, P.J., C.A. Rumbley, R.L. Beswick, E. Lavi, and S.M. Phillips. 2000.  Differential cytokine and chemokine production characterizes experimental autoimmune meningitis and experimental autoimmune encephalomyelitis. Clin. Immunol. 94:114.

126.     Rumbley, C.A., Sugaya, H., Zekavat, S.A., and Phillips, S.M. 2001 Elimination of Granuloma but not Splenic Lymphocytes by Fas-Fas Ligand Mediated Apoptosis in S. Mansoni Infected Mice-Am. Journ. Trop. Med Hyg.. , 65:442.

129.  Rumbley, C.A., Silver, S.J., and Phillips, S.M.  2001 Dependence of Obstructive Airway Disease  on CD40L igand. Transplantation  72 (10): 1616-1625.
130.   S. Phillips, M. Bhopale, C. Constantinescu, B. Ciric, B. Hilliard, E. Ventura, E. Lavi, A. Rostami , 2007. Effect of DAB389IL-2 immunotoxin on the course of experimental autoimmune encephalomyelitis in Lewis rats. Journal of the Neurological Sciences, Volume 263, Issue 1-2, Pages 59-69


**Abstracts:**
No record of previously published abstracts has been compiled.  Approximate number - 150.

**Editorials, Reviews, and Chapters:**
1.  Phillips, S.M.: Immunologic activation of oncogenic viruses. Immunology of Cancer.  Prog. Exp. Tumor Res. 19:37, 1974.
2.  Phillips, S.M., and Colley, D.G.:  The immunology of *Schistosoma mansoni* infection.  Am. J. Trop. Med. Hyg. 25:657, 1976.
3.  Phillips, S.M., and Colley, D.G.:  The immunology of *Schistosoma mansoni* infection.  Am. J. Trop. Med. Hyg. 26:826, 1977.
4.  Phillips, S.M., and Colley, D.G.:  Immunologic aspects of host response to schistosomiasis: Resistance, immunopathology and eosinophil involvement.  Prog. Allergy 24:49, 1978.
5.  Phillips, S.M., and Colley, D.G.:  The immunology of *Schistosoma mansoni* infection.  Am. J. Trop. Med. Hyg. 27:1058, 1978.
6.  Phillips, S.M., and Colley, D.G.:  The immunology of *Schistosoma mansoni* infection.  Am. J. Trop. Med. Hyg. 28:914, 1979.
7.  Neilson, E.G., and Phillips, S.M.: The immunobiology of nephritis.  Prog. Allergy 27:167, 1980.
8.  Hoffman, D.G., Phillips, S.M., and Cook, J.A.:  Vaccine development for schistosomiasis.  Am. J. Trop. Med. Hyg. 30:1247, 1981.
9.  Phillips, S.M., and Fox, E.G.:  The immunopathology of parasitic disease.  Clin. Immunol. Allergy 2(3):667, 1982.
10.  Phillips, S.M., and Zodda, D.M.:  Monoclonal antibodies and immunoparasitology, in Monoclonal Antibodies: Second Edition, Ed. Kennett, R.E., McKearn, T.J., and Bechtol, K.B., Plenum Press, NY, 1984.
11.  Phillips, S.M., and Fox, E.G.:  The immunopathology of parasitic diseases: A conceptual approach, in: Contemporary Topics in Immunobiology, ed. J.J. Marchalonis, Plenum Press, NY, Vol. 12:421, 1984.
12.  Brown, K.R., and Phillips, S.M.:  Tropical diseases of importance to the traveler, in: Advances in Internal Medicine, ed. by E. Stollerman, Vol. 29. Yearbook Medical Publishers, Chicago, IL, 1984.
13.  Lammie, P.J., and Phillips, S.M.: Immunopathology of granuloma    formation and fibrosis in schistosomiasis. Parasitology Today 2:296, 1986.
14.  Phillips, S.M., Kemp, W.M., and Dissous, C.:  Discussion summary: Molecular modulators of immunity, in *Molecular Paradigms for Eradicating Helminthic Parasites*, p. 367, Alan R. Liss, Inc., New York, 1987.

15. Perrin, P.J. and Phillips, S.M.: The molecular basis of receptor mediated regulation of granulomatous hypersensitivity, in *Basic mechanisms of granulomatous inflammation*. T. Yoshida and M. Torisu, eds. Excerpta Medica, Amsterdam, p. 185, 1989.

16. Phillips, S.M.: Nuclear applications in parasitic and communicable infections, in *Nuclear and related techniques in the control of communicable diseases*, International Atomic Energy Agency, Vienna, IAEA-TEC Doc613, p. 9, 1989.

17. Phillips, S.M., and Perrin, P.J.: Applications of radio nuclides in the study of cellular mechanisms in helminthic infections, in *Nuclear and related techniques in the control of communicable diseases*, International Atomic Energy Agency, Vienna, p. 17, 1989.

18. Kunkel, S.L., Chensue, S.W., Phillips, S.M., Tarleton, R.L., and Pearson, R.D.: Mechanisms of immunopathology in parasitic infections, in *Immunology and Molecular Biology of Parasitic Infections*, ed. K.S. Warren, MacMillan, Inc., New York, NY, p. 52, 1992.

19. Perrin, P.J. and Phillips, S.M.: Differential requirements of naive and memory T cells for CD28 costimulation in autoimmune pathogenesis, in *Histology and Histopathology* .14: 1269,, 1999.

**Books:**

Guide for Adult Immunization, First Ed., Pub. Amer. College of Physicians, Phila., PA, USA, 1985.

"The Reticuloendothelial System: A Comprehensive Treatise: Hypersensitivity", Edited by Phillips, S.M. and Escobar, M., Volume 9, Plenum Publishing Corporation, New York, NY, 1986.

List of Depositions and Trial Testimony for past 4 years:

Jolicoeur v. Altoona Hospital, et al.
Trial Testimony, 1/11/06
Attorney for plaintiff : Richard Kronz 564 Forbes St., Pittsburgh, PA
15219
Case USDC Western District PA/CA02-170 J

James and Kathleen Evridge v. Soco Enterprises, Et. Al.
Discovery Deposition:  10/10/06
Attorney: Stacy Mitchell
Cozzen O'Connor
457 Haddonfield Road
Cherry Hill , N.J.

Rowe v. Jupiter Outpatient Surgery Center, et. al.
Discovery Deposition 12/21/06
Attorney: Milton Blaut
100 Cypress Rd
Ft. Lauderdale Fl  33309
Florida Court, Case number not known

Thomas v. H.E. Butt
Harris County District Ct
#2005-24183
Discovery Deposition in Philadelphia, 4/19/2007
Attorney: Brad Guillory
1520 E. Highway
Alvin, Tx  7751

2077 Tenants v H. Nathan Yagoda
Superior Court, Bergen Ct. NJ:
L-6529-05
Trial Testimony 10/26/07
Deborah Dunn
Stark and Stark
993 Lenox Drive
PO Box 5315
Princeton, NJ  08543



EXHIBIT

I

Mary Dale Ellis v. Colonnade Condominium Council of Co-owners
Superior Ct for District of Columbia
No. 04-CA-4223
Deposition in Philadelphia Nov. 9, 2007
Attorney: Justin M. Flint, Esq.
ECCLESTON & WOLF
2001 S Street, N.W.
Suite 310
Washington, D.C. 20009

Colin Fraser, et. al. v. 301-52 Township Corp., et. al.
Supreme Court of the State of New York, New York County:
Case number: 113586/02
Frye Hearing: 3/28/06
Attorney: Thomas Juneau
Schecter and Brucker
350 5th Avenue, Suite 4510
NY, NY 10118

Moffat v. Lawrence Samuels, M.D.
Deposition testimony: 5/11/06
Case filed in Missouri
Attorney: M. Jane Schweizer
Gateway one on the Mall
701 Market Street, Suite 1550
St. Louis, MO 63101

Santarsiero v. Cypress Garden Apartments
Deposition testimony: 4/14/05
Attorney: Karen Quinn Sopko
Law Offices of Sherman and Viscomi
100 Frankln Square Drive, STE 201
PO Box 6782
Somerset, NJ 08875

This record represents my good faith review for
depositions and trial testimony for the past 4 years.

# S. Michael Phillips, M.D., F.A.C.P.

Professor of Medicine and Neurology
Lead Clinical Physician
Division of Pulmonary Allergy and Critical Care
University of Pennsylvania
School of Medicine

Dec. 29, 2007

Paul J. Maloney, Esquire
Carr Maloney, P.C.
1615 L. Street NW
Washington, D.C.  20036-5652

Re: Denicole Young and Vanessa Ghee v. Lewis & Tompkins, et. al.
    File No.: 89007DC002

Dear Mr. Maloney:

I have reviewed the Medical Records regarding Denicole Young and Vanessa Ghee , which you have sent me.  These records include those designated as Bates 0001-2207.   Major records reviewed include:
1. Medical Records of Calvert Internal Medicine Group
2. Medical Records of George Washington University Hospital
3. Multiple Pleadings , Complaints, Discovery Responses to Interrogatories, and Deposition exhibits
4. Depositions of Denicole Young and Vanessa Ghee
5. Medical records, Report and Deposition of Dr. Ritchie Shoemaker

In addition to reviewing the above records, I have also performed a Medline search of the National Library of Medicine: OVID relative to the diagnosis and treatment of Denicole Young and Vanessa Ghee.  I have also investigated various literature, online information, databases including PubMed, UPTODATE and The University of Pennsylvania online databases relative to the diagnosis and treatment of the putative adverse reactions experienced by Denicole Young and Vanessa Ghee.

1

EXHIBIT

J

My opinions below are based on over 30 years of clinical and basic science experience in the field of Internal Medicine, Allergy and Immunology.  I am currently a Professor of Medicine in the Pulmonary Allergy Critical Care Division of The University of Pennsylvania School of Medicine and a Lead Clinical Physician at the University of Pennsylvania, Department of Medicine.  I am Director of Allergy Services at the University of Pennsylvania and a Consultant in Medicine and Immunology to the Philadelphia Veterans Administration Hospital. I am Board Certified in Allergy and Immunology and Internal Medicine. In addition, I am a Senior Scholar in Clinical Epidemiology at The University of Pennsylvania and a Fellow of the American College of Physicians.

I have also done extensive research in international health and served as a Consultant to the Surgeon General, World Health Organization, and United States National Institutes of Health in International Health. I am the former Director of the Geographic Medicine Department at the University of Pennsylvania and have extensive experience in international health.    Mold is a particular problem in the developing world.

I maintain an active clinical practice devoting over 95 percent of my time to the clinical evaluation and treatment of patients.  I am very familiar with the various medical conditions, which have affected Denicole Young and Vanessa Ghee.  As a member of the Pulmonary, Allergy & Critical Care Division, I am very familiar with the evaluation of clinical morbidity due to mold and other adverse atmospheric exposures. I am specifically familiar with presenting of clinical signs and symptoms, finite risks, modes of clinical presentation, proper clinical monitoring, treatment, expectant morbidity, and clinical course.  Specifically, I evaluate patients for adverse reactions to molds in terms of allergies, hypersensitivity pneumonitis, direct fungal invasion, and toxic reactions.  In my role as a clinical immunologist, I am familiar with the roles of adverse reactions to environmental agents, vis-à-vis human respiratory disease including reactive airway disease, allergies, and both vasomotor and atopic disease.

As a Clinical Immunologist, I am also very familiar with the various illnesses from which Denicole Young and Vanessa Ghee suffer. I am specifically familiar with the presenting clinical signs and symptoms, finite risks, modes of clinical presentation, proper clinical monitoring, treatment, expectant morbidity, and clinical course of these diseases. I am also familiar with the appropriate therapy for these conditions and

the complications of such therapy. I evaluate patients with these problems on a daily basis.

My experience includes both human and animal models in terms of theoretical concepts, experimental models, and epidemiologic evidence.  As a Senior Scholar in Clinical Epidemiology, I am called upon to review disease manifestations not only on an individual patient basis but also on a population basis.

I anticipate rendering opinions in the fields of Allergy and Immunology and Epidemiology.

My opinions below are based on Reasonable Medical Certainty.

## REVIEW OF RECORDS:

Vanessa Ghee has a relatively short and unimpressive medical history. Although she complains of the same exposures as those of Ms. Young, her total medical bill is under $2000 and can be explained by a transient mild irritant reaction while living in Apt. #2A.

Denicole Young's history begins 12/10/1996 she complained to Dr. David Tardio of ear and nasal congestion, facial pain, rhinorrhea, cough, and chest congestion.  She had been seen in an ER 4 days earlier for similar complaints.  A diagnosis of persistent bronchitis and possible right maximally sinuses was made and she received antibiotics and decongestants.  On 12/14 she was seen by Cynthia Grandjean, CANP, for sinusitis.  On 10/21/1997 she was again seen for sinus congestion, post-nasal drip, ear fullness, and cough.   PE confirmed sinusitis and pharyngitis.  On 11/9/1998 she was evaluated by Dr. David Gallatin, for hematuria and extreme tiredness of 4 months duration.  She also had lymphadenopathy and a complete lab work-up showed no explanation for her complaints.  On 7/29/1998 Ms. Grandjean evaluated her for sinus congestion, post-nasal drip, congestion, cough, and wheezing with chest congestion.  Ms. Grandjean diagnosed sinusitis, pharyngitis, and asthma based on wheezing which was detected by auscultation.  The wheezing cleared with nebulizer treatment confirming asthma and she was treated with two anti-asthma medications, albuterol and Azmacort.  Two days later she was treated for resolving bronchitis.  There was no wheezing  as

3

she was continuing her anti-asthma meds. A diagnosis of gastric esophageal reflux disease was also made. On 8/7/1998 she was reevaluated for bronchitis and reflux. On 3/10/2000 she was reevaluated for chronic fatigue. On 3/16/2000 she complained of fatigue and was given an Rx for Zoloft, a drug given for depression, a frequent cause of fatigue. Extensive lab studies showed no other co-morbid conditions. At this time a family history of asthma was elicited. On 4/1/2002 she was evaluated at the Unity Health Care for submental lymphadenopathy. These had appeared a year prior and exacerbated 2 weeks earlier. On 4/22 she was reevaluated and noted a good response to Motrin.

Vanessa was evaluated at GWUH on 9/6/02 for three weeks of coughing. A diagnosis of viral bronchitis was made. She had had a similar episode 3 months earlier, i.e. before moving into the apartment, which was treated with an antibacterial antibiotic and codeine. At this time she was given albuterol, a drug usually used for asthma. According to this record she was smoking a pack per week for one year. No mention of mold was made. She was instructed to stop smoking and use a humidifier. On 9/13/02 she was again evaluated at GWUH for bronchitis. She was given Claritin, an antihistamine, and asked to continue her albuterol inhaler and to stop smoking. At this time a history of observing mold around the windows was obtained.

She was seen again at GWUH on 1/10/04 for complaints of sore throat and ear pain. She received Azithromycin. On 9/24/04 she was treated for sinusitis or an orbital cellulitis. A final diagnosis of a viral infection was made.   On 3/3/05 an allergy evaluation by Dr. David Eisenman suggested perennial allergic rhinitis with seasonal exacerbation. Skin tests were positive for oak, grass, roach, mite, cat, dog, ragweed, and Alternaria, a strictly outside mold.  Her PFTs were normal showing no asthma (obstruction) or restrictive disease.

Denicole was seen at GWUH on 9/6/02 for coughing. A chest x-ray was normal. Azithromycin was prescribed ostensibly for a bacterial infection. This drug would not affect mold. She also received albuterol.

On 9/13/02 she was seen again with a complaint of coughing, burning in the chest, and nausea for 4 weeks. If this timing is accurate it suggests that she was sick for at least a week prior to moving into the apartment. At this time she gave a history of asthma suggesting a

preexisting condition. She had used a Z-pack for ostensible bacterial infection as well as Percocet and codeine. She ascribed her problem to mold exposure. A diagnosis of bronchitis was made and she was instructed to continue her use of albuterol and use codeine and Claritin.

On 9/24/02 Denicole was seen at Unity Health Care for bronchitis and asthma not responsive to Azithromycin. She blamed mold exposure at home. She received Flovent, Zyrtec and albuterol. She was seen again at Unity on 11/5/02 at which time she had moved and "pt feels much better". A previous history of asthma was elicited. Her lungs were clear with good air exchange. She was to continue Zyrtec, Flovent, albuterol. She was evaluated at Unity on 2/25/03 for headache and loss of taste and smell. Her lungs were clear and a diagnosis of allergic rhinitis was made. A Unity visit on 3/11/03 showed she was doing well and a visit on 3/26/03 reiterates the previous GWUH admission for asthma on 3/21/03. She was using systemic steroids at this time for increased asthma.

On 4/15/03 Denicole was admitted to GWUH for an asthma exacerbation. This admission also documented a right lower lobe pneumonia. At this time a history of prior intubations for asthma was documented on three occasions and dated to 1997. Her "known triggers of asthma are noted pollen and URI". Parenthetically, this exacerbation occurred in the tree season (Bates 674 and 726) and she was subsequently shown to be allergic to trees by allergy skin testing. Two brothers were noted to have asthma. Her symptoms were progressive over several days and on admission she was in severe respiratory distress, with hypoxia. She required intubations on three occasions. Her right lower lobe pneumonia was confirmed on chest x-ray and responded to Imipenem, suggesting it was bacterial in origin. I will not iterate the details of this admission (Bates 672-898). After a nine-day course she was transferred to Greater Southeast Hospital for insurance reasons. She was stable at transfer.

Denicole was evaluated for recurrent edema at the USNIH on 12/21/2004. No new diagnosis was forthcoming. She also has had numerous evaluations for asthma. The frequency and severity of the illness has not decreased since leaving her initial apartment. She was evaluated on 6/20/2005 by Dr. Daniel Ein, GWU, who documented that her asthma was worse in the spring. Her intradermal skin tests showed reactivity to several trees, grass, mite, cat and dog. She also had an oral allergy syndrome.

Deposition of Denicole Young (10/31/2007) Ms. Young states that she is taking medication for asthma and allergy (10). Her brother had asthma (21). She had a history of sickle cell trait and hematuria (37). She has food allergies (48). She ascribes her current swelling to molds and intubations(57). She was inordinately influenced by the opinions of Dr. Shoemaker (62--). She is allergic to mites, pollen, ragweed, fungus, and foods (98). She did not recall previously documented visits for respiratory issues (112) or fatigue (128). She crawled thru a window into the adjacent apartment (1A) and recalls the anatomy of the apartment well. She describes heavy mold growth and sewage stains, therein (175--). The photos were taken on 9/12/02. The air-conditioner was not working and she complained to management(182). She had a headache, stomachache, hurting chest, coughing, and sneezing within a few days after moving into the apartment (185). She moved into a new apartment on Sept. 23 (192). She remembered her medical visits approximately and did not add any significant details to what is documented in the medical records. In 1999 or 2000 she began awakening completely paralyzed and these symptoms continue to this day (227). She subsequently recalled being tired a lot prior to August 19, 2002(263). She also has excessive dry mouth tingling, numbness, joint pain, and skin and food sensitivity subsequent to Sept. 19, 2002(266-267). She recalls discussing mold effects with Ms. Ghee after Ms. Ghee had done literature research(287). This literature is documented (Bates 1746-1794).

Deposition of Vanessa Ghee (10/30/2007). Ms Ghee stated that she developed asthma around 2002 after residing in the apartment(20). She stated that the second apartment flooded 3 times (23). She was treated by Dr. Yasmin Panahy beginning in 2000 (46)and at the GWUH (27). She too was inordinately impressed by the emphasis, which Dr. Ritchie Shoemaker placed on mold toxicity (63---). She smoked pack of cigarettes every 2-3 months(112), less than other documentations. She had a turbinectomies, which were not related to mold(114). Her economic losses due to illness were $1,628 (116). She has severe allergies in spring and fall (116) and asthma since exposure to mold (116). She had problems a week after moving into the apartment(150). After seeing the pictures of mold in the adjacent apartment the manager was very supportive of their desire to move (169).

The Deposition exhibits documented that the lease for #3064 2A began on Aug. 19, 2002. They remained there until 9/23/2002, when they moved to Apt. 101 at 3084 Stanton Road. There is no evidence

or claim of mold exposure in this or later apartments.  Thus there was an approximate claimed exposure of 34 days.

Deposition of Ritchie Shoemaker: A few statements do deserve more specific review and are referred by Deposition page number.  He states that chronic fatigue was diagnosed in 2000 before the putative mold exposure (20), but he was not comfortable with this diagnosis.  She was also treated for depression and on March 16, 2000 for bronchitis (18).  There were three references in the GWUH records suggesting she was on a ventilator for asthma in 1997 (25).  Known triggers for her asthma included upper respiratory infections and pollen (28).  Ms. Ghee was a smoker (33) and probably underestimated the amount she smoked (33).  He speaks of a 7 step protocol to diagnose CBAI which is a totally non-evidence based approach(38) and also states that "no one else who works using my protocols has published anything"(39).  Neither the CDC nor any other organizations validated his diagnostic and treatment approaches (41).  He has no data to support the relationship between serologically defined (56) or molecularly defined (54) genes and specific diseases, which he claims to define by these techniques.  He was not able to pin down if mold exposure in the second building was a likely cause for the GWUH admission on April 15, 2003(66) and certainly other exposures could have caused it (67).  He does not know what kind of mold was in the apartment (72), therefore there is no evidence for toxic mold per se. Dr Ein showed that Ms. Young attributed most of her symptoms to pollen, but Dr. Shoemaker incorrectly characterized the positive allergy test as being negative (79).  The MMp was his specific test, set up for him by Estoterix for which he has no normal range (96) and his estimates of normal exceed those of LabCor , which have been validated, by tenfold (97).  How can these be valid criteria?  The use of Cholestyramine is "off label" (112), meaning it is not approved by the manufacturer for use in the way he uses it.  His assertions that measuring C4a and VIP are useful (127) are not substantiated by any evidence-based medicine.  Of great importance is his admission that even if he had seen Denicole and Vanessa in 2005, he would not know what happened in 2002 and his data base was less developed (128).  For example the half-life of C4a (time required for its level to reduce by 50%) is measured in minutes, not months.  His claim that the CNI test is "hugely accurate" (136) is not substantiated by any evidence based medical study. There is no ICD9 code for CBAI (196), again showing the diagnosis is not accepted by the medically evidence-based scientific community.   He is not a Toxicologist, Mycologist, Allergist, Immunologist, Epidemiologist, Rheumatologist, Industrial Hygienist, Neuropsychologist, or expert in Occupational Environmental

Medicine(188-189).  With these qualifications, how is he qualified to create new scientific theories, evaluation strategies, and treatments and evaluate them with any validity?  "I'm a Country Doctor..."(193). He simply does not have the training to do what he is doing.  When asked whether CBAI is not a generally accepted diagnosed, he answered "No argument about that" and then admitted that there was no ICD-9 code so he misrepresents the accepted definition of mycotoxins illness (i.e. proven illness due primarily to ingestion of mycotoxins) for billing purposes (196).  He admits that MSH is not specific for molds(199) and VIP is investigational (202), i.e. not accepted for human use as a diagnostic agent.  He discussed a proinflammatory "stew" of materials, which have potential toxic effects on humans  besides mycotoxins(204), but has no data to show that Denicole and Vanessa were exposed to these agents.  Similarly MSH does not indicate mold illness (210).   He doesn't use VCS to measure mold illness and then misrepresents its value in other venues (211).

In summary, this Deposition of Dr. Shoemaker is of interest as it is fraught with scientific inaccuracies, contentions of biological phenomena, measurement of irrelevant factors, and unsubstantiated claims.  His arguments  are not predicated on evidence-based medicine and admittedly not accepted by the general medical community, which requires evidence-based medicine as its criterion of validity.  Most of his statements are flights of scientific fantasy and are totally unaccepted by the established and reputable scientific community.  Please see discussion on Biotoxin Associated Illness.

## FORMULATION:

Denicole Young and Vanessa Ghee suggest that a significant portion of their problems is related to adverse reactions stemming from exposures to mold.

The critical issue is did atmospheric conditions cause the problems experienced by Denicole Young and Vanessa Ghee? The most current, accurate  and accepted reference on molds was published as a Position Paper for the American Academy of Allergy, Asthma and Immunology (AAAAI): Bush, R. et.al. The Medical Effects of Mold Exposure :  JACI, 117:326, 2006. The leading clinical experts on the effects of molds on human disease prepared this report.   The report is the current "state of the art" and widely accepted as authoritative.  Less the 1% of the members of the American Academy of Allergy, Asthma, and

Immunology, questioned the report. In this context, the criticisms did not in any way support the majority of the contentions of the plaintiffs. This publication has certain conclusions, which are germane to this case.

1. Allergic responses to inhaled outdoor mold (Alternaria) are a recognized factor in lower airway disease (asthma); however the effect of indoor mold is less clearly established.
2. Current studies do not conclusively prove that exposure to outdoor mold play a role in allergic rhinitis and studies on the contribution of indoor mold to upper airway allergy are even less compelling.
3. Exposure to molds is not recognized as a contributing factor in atopic dermatitis.
4. Exposure to mold is not recognized as a cause of urticaria, angioedema, or anaphylaxis.
5. Patients with suspected mold allergy require confirmation by an accepted method of detection.
6. Data supporting the role of fungi in chronic rhinosinusitis are lacking at this time.
7. The occurrence of mold-related reactions from exposure to fungal irritants in nonoccupational settings is theoretically possible, although unlikely to occur in the general population given exposure and dose considerations.
8. Such irritant reactions would produce transient symptoms-signs related to mucus membranes of the eyes and upper and lower respiratory tracts but would not be expected to manifest in other organs or in a system fashion.
9. Further evidence for thresholds for irritant reactions in at-risk populations is needed to better define the role of mold, mold products, and other potential irritants.
10. Exposure to molds or their products does not induce a state of immune dysregulation (e.g. immunodeficiency or autoimmunity).
11. The practice of performing large numbers of nonspecific immune-based tests as an indication of mold exposure or mold-related illness is not evidence-based and is to be discouraged.
12. Measurement of antibodies to specific mold has scientific merit in the assessment of IgE-mediated allergic disease, HP, and allergic bronchopulmonary mycosis.
13. Measurement of antibodies to molds cannot be used as an immunologic marker to define dose, timing, and/or location of exposure to mold antigen in a noninfectious setting.

14. Testing for antibodies to mycotoxins is not scientifically validated and should not be relied on.
15. Sampling of both indoor and outdoor mold spores provides a measure of potential exposures and can be useful in certain clinical conditions, but it has many shortcomings.
16. Bulk, surface, and within-wall cavity measurement of molds or mycotoxins, although having potential relevance for other purposes, cannot be used to assess exposure.
17. Testing for airborne mycotoxins in nonagricultural environment cannot be used to diagnose mold exposure.

An amazingly consistent spectrum of potential mold associated illness was summarized in the article: Adverse Human Health Effects Associated with Molds in the Indoor Environment, Journal of Occupational and Environ. Medicine, 45:470, 2003.

Molds may cause a wide spectrum of illnesses, including allergies, irritation, hypersensitivity pneumonitis, and direct infection. However, these and innumerable other medical reports predicated on evidence-based medicine clearly show that the contentions of the plaintiffs and Dr. Ritchie Shoemaker are totally inconsistent with these medical reports and reflect "junk" science, unaccepted by the general medical community.

In the case of Denicole Young and Vanessa Ghee, molds and sewage exposure may have caused transient irritation; however, these irritants caused no objectively documented illness.
In reviewing the medical records, I find overwhelming evidence to suggest that these allegations are not substantiated. There is no evidence to suggest a causal relationship between the problems experienced by Denicole Young and Vanessa Ghee and their putative environmental exposures. A causal relationship requires several criteria, and these criteria must be met to prevent fallacious conclusions based on the supposition or chance association. Unless these criteria are met, one must conclude that a causal relationship does not exist.

As paraphrased in the criteria espoused by Dr. Bradford Hill, the most critical issues relative to these criteria include:

1. A precipitating event: In this case, there is an allegation of exposures to molds and toxic sewage. There did appear to be mold as well as defective plumbing in the apartment next door.

There was also evidence of a sewer contamination in the yard behind their apartment. However, the medical records which I have been provided do not substantiate that there were actually any measurements of molds, bacteria, biological, or organic materials in the environment. Thus there is no evidence that they were ever exposed to any molds or their toxins, based on any objective studies.  In addition, if they were exposed to any significant amount of mold, it occurred when they voluntarily exposed themselves in an unauthorized entry into the adjacent apartment.

2.  The spectrum of disease should be logically attributable to mold exposure.  This criterion was also not met. There is no evidence that excess moisture and subsequent mold growth, lead to any disease in the Plaintiffs.  Many of the subjective complaints of the Plaintiffs are very common in all humans, regardless of their exposure to molds.  In this context it would be of value to review the ICTM Electronic Report, Vol 4, No 1,  "Baseline levels of symptom reporting".  For example, 46 % have stuffy noses, 33 have headache, 30 % are fatigued, 26 % have cough, 25% have itchy eyes, 22% have sore throats, 12% have rashes, 10% have difficulty breathing during the two week period prior to questioning (Hayworth and McCaul, 2001).  The NIH found that 30% of girls had headaches and fatigue on a weekly basis (Ghandouer, et al, 2004).   70% of English adults have headache regularly (Boardman, et al, 2003).  Asthmatic symptoms such as wheezing or cough are found in 28% and 37% of Canadian adults (Manfred, et al, 2001).  Thus most of the subjective symptoms of the Plaintiffs are really normal findings without mold exposure.

Molds can cause irritant reactions , allergies and  asthma. However these illnesses would occur only in the context of specific significant exposure.  However, Denicole Young complains of a very wide spectrum of diverse physical and psychological problems, including chronic fatigue, depression, idiopathic edema, lymphadenitis, gastroesophageal reflux, somatic pain, weakness, inability to move, cognitive issues, dry mouth, etc. Molds do not cause these latter problems.

Some physicians have dutifully documented the history as iterated by Ms. Denicole Young and Vanessa Ghee .  They accept

their rendition of events and draw a time correlation, not a causal one. The only physician who strongly supports their contentions of a mold-associated illness is Dr. Ritchie Shoemaker. Dr. Shoemaker claims that these effects are a consequence of a "Chronic Biotoxin Related Illness", stemming from exposure to toxic mold and other environmental products.

Dr. Shoemaker is known for this position, and he has taken it without any evidence vis-à-vis specific physical findings or laboratory findings of support. It appears that he reiterated the history and provided support of mold-associated illnesses, based on no rational thought process, predicated on evidence. He did not and cannot justify his conclusions. I will discuss this issue below.

3. The next criterion included should be a temporal association of effects; i.e., the specific risk factor such as mold exposure should be associated with the onset of problem. In this case, this was not established. The problems preceded the exposure to molds and did not correlate with a mold exposure etiology. Mild irritant reactions can occur quickly with exposure; however, these problems are not true disease and disappear rapidly with the removal of the mold stimulus. When exposed to mold, it takes months or years to develop a true immunologic sensitivity. No clinically consistent sensitivity responses were noted and the problems occurred at too short an interval to allow for mold sensitivity to develop and manifest itself. Indeed the GW Medical Record suggests that Ms. Young had developed her problems several days before renting the apartment, wherein she was putatively exposed to mold and sewage.

4. The next criterion is that there should be a reversal of pathological consequences if the etiology is treated; i.e., when leaving the environment, she should have improved. The medical records document improvement after moving. In the absence of documented re-exposure, their subsequent problems must be ascribed to an alternative cause. There is no evidence for re-exposure. This lack of exposure is a critical factor in determining that the severe exacerbation of asthma on 4/15/03 could not be related to mold exposure, which ended seven months earlier.

5. The next criterion is that there should be physical findings compatible with mold-associated disease. This clearly is not true. Physical findings corroborated a number of physical findings; however, none of these could be ascribed specifically to molds. Indeed bacterial infections (sinusitis, bronchitis, pneumonia) and allergic reactions to pollens were documented as probably causes of their problems.

6. Another criterion for a causal relationship is that there should be no other logical explanations. This clearly is not true. The medical record shows that her asthma would exacerbate with allergies in the spring and with respiratory infections. With specific reference to the 4/15/03 GWUH admission, her respiratory problems can be more ascribed to other allergens such as trees. The exacerbation occurred at the height of the tree allergen season. She was also sensitive to foods, grass, cats, dogs and mites and may have been exposed to these other allergens. Bacterial infections were also directly implicated in their problems and Denicole had pneumonia during this hospitalization. Since x-ray changes generally take several days to develop after the onset of pneumonia, the pneumonia undoubtedly was a cause not effect of the asthma. Pneumonia is well documented as a precipitator of asthma and would be an antecedent cause for the exacerbation of her respiratory symptoms. Finally, she was exposed to passive smoke, a known precipitator of respiratory problems due to irritant reactions. Psychological factors are also important given the unselective research done my Ms. Ghee and the untoward influence of Dr. Shoemaker.

7. The next criterion of mold-associated illness would be confirmation of physical findings or laboratory data. There is no evidence for mold-induced disease on physical examination or by x-rays of her chest and sinuses during the 4/15 admission. There were also no culture criteria demonstrating the presence of mold infection. Her chest x-ray was compatible with bacterial infection and her physicians treated her for a bacterial pneumonia at during this admission. Denicole had no mold sensitivities established by allergy testing criteria. However, she did have documented allergies to trees, grass, mite, dog, and cat. Vanessa was sensitive to several allergens but only to a single mold, Alternaria, which is a strictly outdoor mold. It does not grow in houses or sewage.

13

8.  If mold could cause their problems, then there should be valid epidemiologic studies documenting an association between mold and the signs and symptoms, which they experienced. In addition, treatment for these sensitivities or removal from the environment should improve well-being on a population basis. I specifically reviewed the medical literature, and as an epidemiologist and Senior Scholar in clinical Epidemiology, I can unequivocally state that there are no epidemiologic studies, which would remotely support the contentions of Denicole Young and Vanessa Ghee. The epidemiologic studies, based on population bases, clearly do not substantiate the possibility of any such association. Diseases associated with either acute stimulation of the Innate Immune System or the Cognate Immune System, both require finite re-exposure to perpetuate and/or exacerbate disease.

9.  The final criterion would be animal models, wherein exposures to molds might recapitulate the signs and symptoms experienced by Denicole Young and Vanessa Ghee. No such experimental models exist in the literature. Therefore, there is no theoretical or experimental construct upon which to base a validation of a causal relationship. This contention is especially relevant vis-à-vis CBAI.

**CHRONIC BIOTOXIN ASSOCIATED ILLNESS:**

Dr. Ritchie Shoemaker contends that the problems of Denicole Young and Vanessa Ghee can be explained by exposure to bacteria, fungi, biotoxins, and allergens found in moist areas. These mold-derived biotoxins enter the body and by unknown mechanisms can cause literally any pathologic manifestation in humans, including all the complaints of Denicole and Vanessa. The illness is related to activation of the primordial immune response, termed the Innate Immune system. The immune system recognizes consensus surface structures, shared by many pathogens such as bacteria and molds. Alternatively, the organisms can produce materials, which directly stimulate the Innate Immune System. The result is analogous to an acute irritant reaction. The disease (Chronic Biotoxin Associated

Illness) is characterized by an elaborate two tier series of clinical and laboratory criteria. These include abnormalities of certain laboratory values for HLA-DR, MSH, ADH, ACTH, cortisol, VEGF, C4a, MMP-9, anti-MBP antibody, etc. There are also a variety of genetic markers, which are highly suggestive of this disease. This "illness" can only be cured by Cholestyramine, a compound that binds the toxins in the gut and removes them from the body, curing the disease. Dr. Shoemaker claims the illness has solid scientific underpinnings and is widely accepted by the scientific community.

His argument is not valid both in general terms and with specific reference to Denicole Young and Vanessa Ghee. Unfortunately, Dr. Shoemaker has convinced Denicole and Vanessa of the validity of his arguments and this belief perpetuates the complaints and maladies of Denicole and Vanessa. Please see additional documentation in my review of his Deposition.

General Critique:

1. Biotoxins exist but must be ingested to reach toxic levels. Aerosolized biotoxins, especially mold-derived biotoxins virtually never reach high enough concentrations to cause disease.

2. The putative precipitating biotoxins, bacterial endotoxin, mycotoxins, fungi, allergens, etc. all act in different way, stimulating different portions of the innate and/or cognitive immune system. They cannot be lumped together by some amorphous hypothesis.

3. Biotoxins do not cause the spectrum of disease shown by Denicole and Vanessa. Biotoxins primarily cause gastrointestinal symptoms and or liver and marrow toxicity.

4. The laboratory criteria, which Dr. Shoemaker claims to establish the presence of effects of biotoxins, do not establish the presence of biotoxins. Mass spectrophotometric or immunologic criteria can show these compounds. They were not done. Indirect measurements are neither specific nor sensitive for establishing the presence or effects of biotoxins. He admits in his Deposition that the tests are not specific and not validated

by others.  Indeed he establishes his own criteria for normal values, which may very by 10 fold from values established by reputable laboratories.

5. The criteria described are purely theoretical.  None have been causally associated with specific biotoxin associated human illnesses.  The various measurements are associated with certain diseases, but not with biotoxins in the array described by Dr. Shoemaker.  The Federal government has not permitted the use of the measurements to be used clinically to diagnose biotoxin-associated illness.  Indeed reputable labs, when reporting values for these compounds, carefully admonish the physicians to interpret the findings with caution.  The factors are neither sensitive enough to detect toxins nor specific enough to rule-out other factors.  In general they have nothing to do with toxins. For example, VEGF, Vascular Endothelial Growth Factor, causes capillary ingrowth and therefore is important in cancer growth or wound healing.  MBP, major basic protein, is a constituent of myelin, which coats neurons. Antibodies against MBP may be associated with demyelinating processes such as Multiple Sclerosis, or Amyotropic Lateral Sclerosis.  ADH, anti-diuretic hormone, controls fluid and electrolyte balance by promoting water and salt resorption in the kidney in response to intravascular hypovolemia.  ACTH, adrenal cortical stimulating hormone, stimulates the production of cortisol, during stress. HLA-DR is the major histocompatability Locus, defined serologically in humans.  It is associated with various genetic linkages and diseases but has never been shown to be important in biotoxin injury.  MSH, melanocyte-stimulating hormone, is produced by the supra-optic nucleus, and regulates the sleep cycle.  MMP9 is one of a family of naturally occurring membrane metalloproteinases, which are non-specific regulators of tissue inflammation, working by destroying inflammatory materials and/or activating non-inflammatory suppressive factors.  None of these agents, alone or in concert have been shown to be germane to biotoxin activity or any toxin related disease.

6. Cholestyramine acts in the gut to absorb toxins. Denicole and Vanessa would have to eat significant amounts of toxic mold to get sick and have it in their gastrointestinal  tract for removal by Cholestyramine.  Classically Cholestyramine has been used to absorb C. difficile toxin, preventing reactions by preventing the

C. difficile toxin from entering the body.  Cholestyramine has never been shown to absorb mycotoxins out of the body. Cholestyramine  is in the gut; how would it reach materials in the blood and then how would it remove the toxins?  In addition, the ability of Cholestyramine to absorb biotoxins and ameliorate human disease has never been shown.   Dr. Shoemaker admits that no one using his methodology has published on its success and that the use of Cholestyramine for this purpose is "off-label", i.e. not suggested as a valid therapy for this disease by the manufacturer or any other recognized medical authority.  He himself has not published any articles in peer-reviewed journals, which establish efficacy.

7. There are no accepted genetic markers for susceptibility to mold or toxin induced diseases.  Genotype can affect phenotype(the presence of disease) and it does in many instances; however, not in the context of a putative biotoxic response.

8. The article referring to biotoxin-induced disease, as described by Dr. Shoemaker, has not been published in refereed, peer-reviewed journal and the general medical community does not accept the concept.

9. There are no ICD-9 Codes for biotoxin-associated illnesses, indicating that the medical community does not recognize this entity.

Specific Critique:

1. No biotoxins have been demonstrated in this case
2. No biotoxin producing molds, i.e. Stachybotrys, bacteria, endotoxins, glucans, proteinases, etc. have been found in the home of Denicole Young and Vanessa Ghee.
3. No responses to biotoxins have been found in the blood of Denicole Young and Vanessa Ghee.
4. No signs or symptoms have been found in Denicole Young and Vanessa Ghee to confirm toxicity due to biotoxins.
5. No neuro-cognitive testing, imaging studies, and blood work show any evidence of biotoxic effects.
6. No laboratory tests, such as multiple chemical analyses have shown any abnormalities of liver, kidneys, etc. which would be caused by a toxin.

7. Dr. Shoemaker saw Denicole and Vanessa long after the putative biotoxin exposure. By his own admission, he could not do the tests necessary to confirm his diagnoses.
8. Denicole and Vanessa have never been shown to be responsive to Cholestyramine, a necessary criteria for his diagnosis.
9. Dr. Shoemaker admits to an incomplete knowledge of the medical records and that allergies and infections may be plausible explanations of Denicole's major respiratory exacerbation.
10. There is no evidence of re-exposure to molds or biotoxins, which would be necessary to explain Vanessa's and Denicole's exacerbations and continued disease.

In summary, Chronic Biotoxin Associated Illness is a creation by Dr. Ritchie Shoemaker. It does not exist and is totally unaccepted by the scientific medical community. It is not contingent on evidence-based medicine. Similarly the putative Cholestyramine–based treatment is not established. Even if CBAI did exist, Dr. Shoemaker admits that he did not establish its existence in Denicole and Vanessa. Finally, Dr. Shoemaker admits that he is not fully cognizant of the Medical Records and that pollen allergy or infections are plausible explanations for the problems of Denicole (with special reference to the 4/15/03 GWUH admission).

## CAUSATION:

I conclude with Reasonable Medical Certainty that there is evidence to support a short-term irritant response during the 34 days of habitation and voluntary unauthorized exposure to mold. There is no relationship between the medical problems experienced by Denicole Young and Vanessa Ghee and putative exposures to molds or other biotoxins. Although Denicole Young and Vanessa Ghee claim to be exposed to molds and perhaps other microbiological products due to water incursion in their home, aside from a minor transient possible irritant reaction, there is no evidence to substantiate their assertion of harm due to putative exposures.

These conclusions are based on Reasonable Medical Certainty.

Thank you for your consideration.  If I can provide any additional information, please do not hesitate to contact me directly.

Sincerely yours,

S. Michael Phillips, MD, FACP
Professor of Medicine and Neurology
Senior Scholar in Clinical Epidemiology
Lead Physician in Medicine:
Director of Allergy
Pulmonary, Allergy and Critical Care Division
University of Pennsylvania School of Medicine

# CURRICULUM VITAE

## Scott D. Phillips, M.D., F.A.C.P., F.A.C.M.T., F.A.A.C.T.

Fellow of the American College of Physicians
Fellow of the American College of Medical Toxicology
Fellow of the American Academy of Clinical Toxicology

10099 Ridgegate Parkway
Suite 220
Lone Tree, CO 80124
Phone 303-815-1960
Fax 303-815-1963
Email Scott.Phillips@UCHSC.edu

730 17th Street
Suite 925
Denver, CO 80202
Phone 303-294-0950
Fax    303-294-9220
E-mail Scott.Phillips@UCHSC.edu

## ACADEMIC APPOINTMENTS

Associate Clinical Professor
Division of Clinical Pharmacology & Toxicology, Department of
Medicine, University of Colorado Health Sciences Center,
Denver, CO,                                              1999 - Present

Associate Clinical Professor
Division of Emergency Medicine, Department of Surgery, University of
Colorado Health Sciences Center, Denver, CO,        2002 - 2004

Assistant Clinical Professor
Occupational Health Services Division of Emergency Medicine,
Department of Surgery, University of Colorado Health Sciences Center,
Denver, CO,                                              1993 - 1999

Assistant Clinical Professor
Division of Clinical Pharmacology & Toxicology, Department of
Medicine, University of Colorado Health Sciences Center,
Denver, CO,                                              1994 - 1999

Clinical Instructor
Division of Emergency Medicine, Department of Surgery, University of
Colorado Health Sciences Center, Denver, CO,        1992 - 1993



EXHIBIT

K

Scott Phillips, MD

Clinical Instructor
>Division of Clinical Pharmacology & Toxicology, Department of Medicine, University of Colorado Health Sciences Center, Denver, CO,                    1992 - 1993

Assistant Director
>Occupational Health/Environmental Toxicology Clinic, University of Colorado Health Sciences Center, Denver, CO,         1994

## PROFESSIONAL AFFILIATIONS

Partner, NewFields, LLC, Denver, CO

## PROFESSIONAL APPOINTMENTS

Attending Physician
>Department of Medicine, Medical Toxicology, Sky Ridge Medical Center, Lone Tree, CO,                    2005 - Present

Attending Physician
>Division of Clinical Pharmacology & Toxicology, Department of Medicine, University Hospital, University of Colorado Health Sciences Center, Denver, CO,                    1992 - Present

Attending Physician
>Denver Health Medical Center, Department of Medicine/Toxicology, Division of Medical Toxicology, Denver, CO,         1992 - Present

Attending Physician
>The Children's Hospital, Department of General Pediatrics, Toxicology Privileges, Denver, CO,                    2002 - Present

Attending Physician

Scott Phillips, MD

___

Porter Adventist Hospital Regional Poison Treatment Center (Adult and
Pediatric Privileges), Denver, CO                1990 - Present

Attending Physician
        Littleton Adventist Hospital, Toxicology, Littleton, CO,
                                                1993 - Present

Attending Physician
        Swedish-Columbia Medical Center Internal Medicine & Toxicology,
        Englewood, CO,
                                                1990 - Present

Attending Physician
        Rocky Mountain Poison and Drug Center and Clinical Toxicology Service,
        Denver, CO,
                                                1993 – Present

Attending Physician
        Rocky Mountain Poison Center Medical Toxicology Fellowship Task
        Force, Denver, CO,                      1995 - Present

Attending Physician
        Baromedical Physicians at PorterCare Hospital
        Regional Baromedical Center, Denver, CO        1993 - 2000

Attending Physician
        Occupational Medicine & Toxicology, Coors' Industries Medical Center,
        Golden, CO,
                                                1992 - 1996

Attending Physician
        Emergency Department, Landmark Medical Center Woonsocket, Rhode
        Island,
                                                1988 - 1990

## EDUCATION

College:
        Gonzaga University, Spokane, WA  1974 - 1978
        Degree:  B.S. Biology

Scott Phillips, MD

Graduate School:
> Washington State University, Pullman, WA 1978 - 1980

Medical School:
> American University of the Caribbean School of Medicine, Montserrat, British West Indies 1980 - 1984, Degree: M.D. January 1984

Graduate Medical Education:
> <u>Internship</u>:   Internal Medicine, Framingham Union Hospital/Boston University, School of Medicine, Framingham, MA. Graduated June 1984 - 1985
>
> <u>Residency</u>:  Internal Medicine, Framingham Union Hospital/Boston University, School of Medicine, Framingham, MA.  Graduated June 1985 - 1987
>
> <u>Chief Medical Resident</u>:  Internal Medicine, Framingham Union Hospital/Boston University, School of Medicine, Framingham, MA. June 1987 - 1988
>
> <u>Fellowship</u>:  Clinical Toxicology, Rocky Mountain Poison and Drug Center, Denver General Hospital, University of Colorado Health Sciences Center.  1990 - 1992

## COURSES

Foundations of Doctoring Physical Examination/Communication 2005-Present
> University of Colorado Health Sciences Center, Denver CO

PRMD 6615 Topics in Environmental & Occupational Health 2006 (Spring & Fall)
> Preventive Medicine and Biometrics
> University of Colorado Health Sciences Center, Denver CO

## BOARD CERTIFICATION

Diplomate – Joint American Boards of Preventive Medicine, Pediatrics and Emergency Medicine, Sub-Specialty Sub-Board on Medical Toxicology, Re-Certified 2005 - 2015

Diplomate – Joint American Boards of Preventive Medicine, Pediatrics and Emergency Medicine, Sub-Specialty Sub-Board on Medical Toxicology, Certified 1995-2005

Diplomate – American Board of Internal Medicine, Certified 1987 (Permanent Certificate No. 114277)

## LICENSURE

| | |
|---|---|
| Colorado: | #30404 (Active) |
| Rhode Island: | #7092 (Inactive) |
| Pennsylvania: | #MD-037713-E (Inactive) |

## AWARDS/HONORS

Outstanding Volunteer Faculty Award.  Denver Health Medical Center, 2007

Department of Medicine's Physical Exam Instructor Award for the Foundation of Doctoring Program, University of Colorado, 2007

Top Consultant, Annals of Emergency Medicine, 2001

University of Colorado Health Sciences Center - Outstanding Clinical Faculty Community Service Award 2001

Top Consultant, Annals of Emergency Medicine, 2000

Fellow of the American College of Medical Toxicologists, 1999

Top Consultant, Annals of Emergency Medicine, 1999

National Environmental Health Association, Certificate of Appreciation, 1999

National Environmental Health Association, Certificate of Appreciation, 1999

University of Colorado Health Sciences Center - Outstanding Clinical Faculty Academic Publications Award 1998

National Environmental Health Association, Certificate of Appreciation, 1998

American Association of Poison Control Centers and Micromedex, Inc. – Best Scientific Paper Award 1997

American College of Physicians, Preceptorship Award, 1997

National Environmental Health Association, Certificate of Appreciation, 1997

American Academy of Family Physicians, Certification of Recognition for Teaching, 1996

National Environmental Health Association, Certificate of Appreciation, 1996

National Environmental Health Association, Certificate of Appreciation, 1995

American Academy of Family Physicians, Certification of Recognition for Teaching, 1995

Metropolitan State College of Denver, Recognition for Teaching, 1992

Fellow of the American College of Physicians, 1992

## CERTIFICATIONS

Board Certified in Medical Toxicology
    Joint American Boards of Preventative Medicine,
    Pediatrics and Emergency Medicine subspecialty sub board
    Diplomate Medical Toxicology       1995
    Re-Certified                           2005

Board Certified in Internal Medicine
    Diplomate American Board of Internal Medicine    1987

Colorado Department of Labor and Employment
    Workers' Compensation Certification
    Level II Accreditation, Dept. of Labor
    Div. or Workers' Compensation    1992
    Re-Certified              1996
    Re-Certified              2001
    Re-Certified              2004

Carolina Hyperbarics
    Hyperbaric Medicine         1993

| | |
|---|---|
| <u>Medical Review Officer Certification Council</u><br>    Medical Review Officer | 1993 |
| <u>Medical Review Officer Certification Council</u><br>    Medical Review Officer | 1998 |
| Pediatric Advanced Life Support | 1989 |
| Advanced Trauma Life Support | 1987 |
| Advanced Cardiac Life Support | 2007 |
| Federation of State Medical Boards | 1984 |
| Educational Commission for<br>    Foreign Medical Graduates | 1983 |

## AMERICAN COLLEGE OF MEDICAL TOXICOLOGY

| | |
|---|---|
| Medical Toxicology<br>    Consultant | Region 8 ACMT-ATSDR Cooperative Partnership |
| Co-Chair | Liaison Committee |
| Chair | Occupational & Environmental Sub-Committee of<br>Practice Management Committee |
| Member | Practice Management Committee |
| Member | Occupational and Environmental Medicine subcommittee |
| Member | ATSDR Web Based Learning Project |

## <u>AMERICAN ACADEMY OF CLINICAL TOXICOLOGY</u>

| | | |
|---|---|---|
| Member | Board of Trustee's | 2002-2004 |
| Chair | Communication and Technology<br>Committee | 1999 - 2003 |
| Member | Membership Committee | |

Scott Phillips, MD

| | | |
|---|---|---|
| Member | Research Committee | |
| Member | Regional Toxicology Treatment Center subcommittee | |
| Member | *Ad Hoc* Committee on Internet Based Learning | |

## ADVANCED HAZARDOUS MATERIALS LIFE SUPPORT (AHLS)

| | | |
|---|---|---|
| Regional Director | AHLS | 1999-2001 |
| National Faculty | AHLS | |
| Member | Science Advisory Committee | |

## SOCIETY OF TOXICOLOGY

| | |
|---|---|
| Member | Carcinogenesis Specialty Section |
| Member | Occupational Toxicology Section |

## AMERICAN COLLEGE OF OCCUPATIONAL & ENVIRONMENTAL MEDICINE

| | | |
|---|---|---|
| Chair | Occupational & Clinical Toxicology Committee | 1999 - 2005 |
| Member | Council of Scientific Affairs | 1999 - 2005 |
| Member | Occupational & Clinical Toxicology Committee | |

## AMERICAN INDUSTRIAL HYGIENE ASSOCIATION

| | |
|---|---|
| Member | Emergency Response Planning Guidelines Committee |

## MEDICAL REVIEW OFFICERS CERTIFICATION COUNCIL

| | | |
|---|---|---|
| Member | Board of Directors | 1996 - 2002 |
| Chair | Nominating Committee of Board of Directors | 1999 - 2002 |

## RHODE ISLAND ADVERSE DRUG REACTION REPORTING COMMITTEE

Member                                                              1989 - 1990

## HOSPITAL COMMITTEES

Swedish Medical Center
    Member              Pharmacy & Therapeutics Committee     2003 - present

Porter/Littleton Adventist Hospital
    Advisor             Centura Hospital Research Center      2000 - 2001
    Chairman            Human Research IRB, Porter-Littleton
                        Joint Institutional                   1999 - 10/2001
    Member              Human Research IRB, Porter-Littleton
                        Joint Institutional Review Board      1997 - 2002
    Member              Pharmacy and Therapeutics Committee,
                        Porter Adventist Hospital,            1997 - 2002

University Hospital
    Member              Safety Committee                      1994
    Member              Laser Safety Committee                1994
    Member              Infectious Disease Committee          1994
    Director            Student Health Advisory Committee     1994
    Member              Practice Directors Committee          1994

Landmark Medical Center
    Member of the Pharmacy and Therapeutics Committee,
    Woonsocket, Rhode Island, 1989-1990
    Medical Director; Woonsocket Fire Department Rescue,     1989 - 1990

Framingham Union Hospital (MetroWest Medial Center)
    Member; Coronary Care Committee,                      1987 - 1988
    Member; Pharmacy and Therapeutics Committee,          1984 - 1985

## PROFESSIONAL ORGANIZATIONS

American College of Physicians
American College of Medical Toxicology
American Academy of Clinical Toxicology

American College of Occupational and Environmental Medicine
American Industrial Hygiene Association
Society of Toxicology
American Conference of Governmental Industrial Hygienists
Rocky Mountain Academy of Occupational & Environmental Medicine
American Medical Association
Colorado Medical Society
Denver Medical Society

## GRANTS

1. A Multicenter Study of the Efficacy of 4-Methylpyrazole in the Treatment of Methanol and Ethylene Glycol Poisoning.
   Source:          Orphan Medical, Inc.
   Awarded to:      Toxicology Associates (Jeffrey Brent, M.D., Ph.D. Principal Investigator, Scott D. Phillips, MD, Kenneth Kulig, MD Co-investigators)
   Period:          3/1/95 to 12/31/97

2. A Prospective Multicenter Study of Antidepressant Drug Overdoses.
   Source:          Eli Lilly Company
   Awarded to:      The Rocky Mountain Poison Center (Kenneth Kulig, M.D., Jeffrey Brent, M.D., Ph.D., and Scott Phillips, M.D.)
   Period:          11/1/90 to 11/1/92

3. Professional and Community Education of Vasquez Boulevard – Interstate 70 Site.
   Source:          Association of Occupational Environmental Clinics Agency for Toxic Substances Disease Registry
   Awarded to:      Toxicology Associates, Prof. LLC AOEC Clinic
   Period:          4-20-01 to 4-20-02

4. Worker Focused Bio terrorism Education Module.
   Source:          Association of Occupational Environmental Clinics Agency for Toxic Substances Disease Registry
   Awarded to:      Toxicology Associates, Prof. LLC AOEC Clinic
   Period:          5-01-02 to 5-01-03

5. Blue Ribbon Panel on Molds in the Building Industry.
   Source:          North American Home Builders Association
   Awarded to:      Scott Phillips, MD Panel Chair
   Period:          6-1-02 to 12-31-02

6.    Conduct peer review and develop educational packages for Case Studies in Environmental Medicine for Chlordane.

Source:            Association of Occupational Environmental Clinics
                   Agency for Toxic Substances and Disease Registry
Awarded to:        Scott Phillips, MD
Period:                    6-15-05 to 9-30-05

7.    Conduct peer review and develop educational packages for Case Studies in Environmental Medicine for Dioxins.

Source:            Association of Occupational Environmental Clinics
                   Agency for Toxic Substances and Disease Registry
Awarded to:        Scott Phillips, MD
Period:                    6-15-05 to 9-30-05

8.    Conduct peer review and develop educational packages for Case Studies in Environmental Medicine for Ethylene/Propylene Glycol.

Source:            Association of Occupational Environmental Clinics
                   Agency for Toxic Substances and Disease Registry
Awarded to:        Scott Phillips, MD
Period:                    6-15-05 to 9-30-05

9.    Conduct peer review and develop educational packages for Case Studies in Environmental Medicine for Nitrate/Nitrite.

Source:            Association of Occupational Environmental Clinics
                   Agency for Toxic Substances and Disease Registry
Awarded to:        Scott Phillips, MD
Period:                    6-15-05 to 9-30-05

10.   Conduct peer review and develop educational packages for Case Studies in Environmental Medicine for Polycyclic Aromatic Hydrocarbons.

Source:            Association of Occupational Environmental Clinics
                   Agency for Toxic Substances and Disease Registry
Awarded to:        Scott Phillips, MD
Period:                    6-15-05 to 9-30-05

11.   Conduct peer review and develop educational packages for Case Studies in Environmental Medicine for Environmental Triggers of Asthma and Ionizing Radiation.

Source:            Association of Occupational Environmental Clinics
                   Agency for Toxic Substances and Disease Registry
Awarded to:        Scott Phillips, MD
Period:                    6-15-05 to 9-30-05

12.   Conduct pilot testing for CSEMs:  Lead, Mercury and Arsenic.

Source:              Association of Occupational Environmental Clinics
                     Agency for Toxic Substances and Disease Registry
Awarded to:          Scott Phillips, MD
Period:                  6-15-05 to 9-30-05

## RISK COMMUNICATION AND PUBLIC MEETINGS

6-6-00          North Platte, NE.  Degreasers in Locomotive washhouse.

10-17-00        Boone, CO.  Pueblo Chemical Depot,
                Explosive By-products and VOC in groundwater.

10-19-00        Denver, CO. Vapor Intrusion and Volatile Organic Compounds in
                groundwater and soil.

11-28-00        Denver, CO. Vapor Intrusion and Volatile Organic Compounds in
                groundwater and soil.

12-7-00         Denver, CO. Vapor Intrusion and Volatile Organic Compounds in ground
                water and soil.

2-13-01         Denver, CO.  Video for Volatile Organic Compounds in groundwater.

3-8-01          Boone, CO.  Pueblo Chemical Depot,
                Explosive Byproducts and Volatile Organic Compounds in groundwater.

5-15-01         Denver, CO. Vapor Intrusion and Volatile Organic Compounds in
                groundwater and soil.

6-12-01         Denver, CO. Vapor Intrusion and Volatile Organic Compounds in
                groundwater and soil.

6-28-01         Windsor Locks, CT.  Polychlorinated Biphenyls, Volatile Organic
                Compounds and Chromium, soil and groundwater contamination.

2-27-02         Brantford, Ontario. Vapor Intrusion and Volatile Organic Compounds,
                Ground Water Contamination.

10-29-02        Denver, CO.  Vapor Intrusion and Volatile Organic Compounds in
                groundwater and soil.

Scott Phillips, MD

| | |
|---|---|
| 9-23-03 | Denver, CO. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 4-22-04 | Roy, UT. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 4-29-04 | Layton, UT. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 5-20-04 | Hill AFB. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 6-10-04 | Hill AFB. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 4-5-05 | Roy, UT. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 5-19-05 | Layton/Sunset, UT. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 6-16-05 | Weber, UT. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 11-17-05 | Clearwater, UT. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 3-22-06 | Roy, UT. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |
| 2-20-07 | Layton, UT. Hill AFB. PCB's soil contamination. |
| 3-20-07 | Layton, UT. Hill AFB. PCB's soil contamination. |
| 9-18-07 | Layton, UT. Hill AFB. Vapor Intrusion and Volatile Organic Compounds in groundwater and soil. |

## GOVERNMENT SCIENCE REVIEW BOARDS

| | |
|---|---|
| 1999 | Nominated by the American College of Occupational and Environmental Medicine to the United States Environmental Protection Agency Food Quality Protection Act (FQPA) Science Review Board (SAB) for the |

Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Scientific Advisory Panel (SAP).

| | |
|---|---|
| 2001 | Nominated by the American College of Occupational and Environmental Medicine to the United States Environmental Protection Agency Food Quality Protection Act (FQPA) Science Review Board (SAB) for the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Scientific Advisory Panel (SAP). |
| 2002 | United States Department of Labor, Occupational Safety & Health Administration. Emergency Preparedness and Response. Subject Technical Editorial Board. |

## JOURNAL EDITORIAL ACTIVITIES

| | | |
|---|---|---|
| Editor-in-Chief | Internet Journal of Medical Toxicology | 2004 |
| Editor-in-Chief | Journal of Medical Toxicology | 2005 |

## EDITORIAL ACTIVITIES NON-TEXTBOOK PEER REVIEW

**Journal of Medical Risk**

CRC Press
Amherst Scientific Publishers
Editorial Board Member                                    2003 - 2004

**ChemKnowledge Micromedex**

Editorial Advisory Board                                  2002 - present

**TOMES Editorial Board**
Senior Associate Editor/Toxicology Medical Advisor         2000 - present
Associate Editor:                                        1996 - present

**POISINDEX Editorial Board**
Senior Associate Editor/Toxicology Medical Advisor         2000 - present

**MEDITEXT REVIEWS/REVISIONS**

| | |
|---|---|
| Ethyl Acrylate | 8/1998 |
| Ethyl Chloride | 8/1998 |
| Ethyl Ether | 8/1998 |
| Ethyl Ether | 8/1998 |

Scott Phillips, MD

| | |
|---|---|
| Ethylene Chlorhydrin | 8/1998 |
| Gallium Trichloride | 8/1998 |
| Dithiazanine Iodide | 10/1998 |
| Dichlorophenylarsine | 10/1998 |
| Dimetilan | 10/1998 |
| 4,6-Dinitro-o-Cresol | 10/1998 |
| Ouabain | 10/1998 |
| Toluene-2,4-Diisocyanate | 10/1998 |
| Chlorofuurazole | 11/1998 |
| Cadmium Sterate | 11/1998 |
| Bitoscanate | 1/1999 |
| Chlorophacinone | 1/1999 |
| Methyl Isothiocyanate | 1/1999 |
| Cyanogen Iodide | 1/1999 |
| 1,2-Dichlorethyl Acetate | 1/1999 |
| Cyanuric Fluoride | 2/1999 |
| Ethyl Thiocyanate | 2/1999 |
| Methyl Thiocyanate | 2/1999 |
| Selenium Oxychloride | 2/1999 |
| Cadmium | 2/2000 |
| Formaldehyde | 4/2000 |
| Lead | 4/2000 |
| Styrene | 4/2000 |
| Disulfiram | 4/2000 |
| Hydrofluoric Acid | 5/2000 |
| Polychlorinated biphenyls | 7/2000 |
| Polybrominated biphenyls | 7/2000 |
| Chromium Hexavalent | 7/2000 |
| Iron | 7/2000 |
| Phenol and Related | 7/2000 |
| Ethylbenzene | 8/2000 |
| Pseudocumene | 8/2000 |
| Methylene Chloride | 9/2000 |
| Diethylhexyl phthalate | 9/2000 |
| Arsenic | 7/2001 |
| Methanol | 7/2001 |
| Cyclonite | 7/2001 |
| Allyl Chloride | 7/2001 |
| Glycol Ethers | 7/2001 |
| Chloroform | 7/2001 |
| Aniline | 7/2001 |
| Parathion | 7/2001 |

**POISINDEX REVIEWS/REVISIONS**

| | |
|---|---|
| Cadmium | 12/1998 |
| Benzene | 12/1998 |
| Methyl Isocyanate | 12/1998 |
| Acrylamide | 12/1998 |
| Cyanide | 6/2001 |
| Selenious acid | 6/2001 |
| Phosphine | 6/2003 |

**REPROTEXT REVIEWS/REVISIONS**

| | |
|---|---|
| Polyvinyl Acetate | 2/1997 |
| Formaldehyde | 4/2000 |
| Lead | 4/2000 |
| Ethylbenzene | 8/2000 |
| Hydrogen Fluoride | 8/2000 |

## EDITORIAL ACTIVITIES TEXTBOOKS

Occupational, Industrial and Environmental Toxicology. Greenberg, Hamilton, Phillips, eds. Mosby-Year Book Publishers, St. Louis, MO, 1997.

Occupational, Industrial and Environmental Toxicology. (Second Edition) Greenberg, Hamilton, Phillips, McCluskey, eds. Mosby Publishers, St. Louis, MO, 2003.

Clinics in Occupational and Environmental Medicine: Chase, Upfal, Krieger, Phillips, Guidotti, Weissman, eds. Vol. 2, No. 2, Saunders Div. of Elsevier Science. Orlando, FL, 2003.

Scientific Literature Review of Mold: A report on the health effects of indoor mold. National Association of Home Builders. Washington, DC., September 2003.

Industrial Solvents and Human Health, Part I. Phillips SD, Krieger GR, eds.. Elsevier Saunders Pub., Philadelphia PA, August 2004. (Clinics in Occupational and Environmental Medicine, Vol. 4, No. 3.)

Industrial Solvents and Human Health, Part II. Phillips SD, Krieger GR, eds.. Elsevier Saunders Pub., Philadelphia PA, November 2004. (Clinics in Occupational and Environmental Medicine, Vol. 4, No. 4.)

Critical Care Toxicology: Diagnosis and Management of the Critically Poisoned Patient. Brent, Wallace, Burkhart, Phillips, Donovan, eds. Elsevier Mosby Publishers. Philadelphia, PA. 2005.

Scott Phillips, MD

Occupational and Environmental Medicine Review.  Pearls of Wisdom.  Greenberg, Hendrickson, Lyons, Madsen Meier, Morocco, Phillips, Waksman, eds.  McGraw Hill Medical Publishing Division, New York City, NY.  2006.

## PEER REVIEWER for:

Reviewer:
 Journal of the American Medical Association     2007-Present

Reviewer:
 Archives of Environmental and Occupational Health    2006 - Present

Reviewer:
 Journal of Agricultural Medicine      2004 - Present

Reviewer:
 Journal of Occupational & Environmental Medicine    2002 - Present

Reviewer:
 American Institute of Biological Sciences     2000 - Present

Reviewer:
 Journal of Toxicology Clinical Toxicology     2000 - Present

Reviewer:
 International Journal of Toxicology     1999 - Present

Reviewer:
 Archives of Internal Medicine      1995 - Present

Reviewer:
 Annals of Emergency Medicine      1993 - Present

Reviewer:
 Journal Emergency Medicine      1994 - Present

Reviewer:
 Agency for Toxic Substances      1993 - Present
 Disease Registry

Scott Phillips, MD

Editorial Board:
    Rocky Mountain
    Poison Center Bulletin             1992 - 1994

Reviewer:
    The Journal of Critical Illness    1988 – 1992

Abstract Reviewer:
    North American Congress of
    Clinical Toxicology            1992 - 2000

## **INVITED LECTURES**

October 1, 1990. Emergency Treatment of Methemoglobinemia. St. Joseph's Hospital Medical Center, Denver, CO.

October 9, 1990. Environmental Toxins. Emergency Medicine Conference, Denver General Hospital, Denver, CO.

October 26, 1990. Digitalis Toxicity. University of Colorado Health Sciences Center, Clinical Pharmacology/Clinical Toxicology Conference, Denver, CO.

November 3, 1990. Responding to Poisoning Emergencies, Family Practice Update, AMI/Presbyterian-Saint Luke's Medical Center, Denver, CO.

November 15, 1990. Role of Poison Centers in the Health Care System, Univ. CO Health Sci Center, School of Pharmacy, Denver, CO.

January 4, 1991. Analgesic Toxicity: Recognition and Response, Saint Luke's Medical Center, Denver, CO.

February 5, 1991. Treatment of Anticholinergic Poisoning. Emergency Medicine Conference, Denver General Hospital, Denver, CO.

May 3, 1991. Unknown Toxicologic Emergency Medical Grand Rounds, Riverton Memorial Hospital, Riverton, WY.

May 24, 1991. Mushroom Poisoning and Management, Internal Medicine Conference. Framingham Union Hospital, Framingham, MA.

Scott Phillips, MD

June 4, 1991.  <u>Mushroom Poisoning and Management</u>, Emergency Medicine Conference, Denver General Hospital, Denver, CO.

June 18, 1991.  <u>Acute Methanol Poisoning in Children and Treatment</u>, The Children's Hospital Pediatric Conference, Denver, CO.

June 26, 1991.  <u>Clandestine Laboratory Health Hazards</u>, New Mexico State Police, FBI and DEA Training Course, Santa Fe, NM.

August 28, 1991.  <u>Clandestine Laboratory Health Hazards</u>.  Wyoming State Police, FBI and DEA, Cheyenne, WY.

September 4, 1991.  <u>Pediatric Gastrointestinal Decontamination</u>.  Pediatric Conference.  Fitzsimmon's Army Medical Center, Denver, CO.

September 13, 1991.  <u>Recognition and Treatment of Antidepressant Poisoning</u>. Clinical Conference, Littleton-Porter Hospital, Littleton, CO.

November 6, 1991.  <u>Arthropod Envenomations</u>, Conf. at Rocky Mtn Poison Center, Denver, CO.

November 19, 1991.  <u>The Management of Toxicologic Emergencies</u>, Toxicology Conference at The Blodgett Regional Poison Center, Blodgett Memorial Hospital, Grand Rapids, MI.

December 3, 1991.  <u>Snake Venom Poisoning in North America</u>, Emergency Dept Lecture Series, Denver General Hospital, Univ. of Colorado Health Sciences Center, Denver, CO.

January 22, 1992.  <u>Emergency approach to the Toxic Patient</u>, Emergency Dept Lecture Series, Univ. Colorado Health Sciences Center, Denver, CO.

January 31, 1992.  <u>Arthropod Venom Poisoning</u>, Pathophysiology of Disease Course, 2nd year Class, Univ. Co Health Sciences Center, Denver, CO.

February 19, 1992.  <u>Tricyclic Antidepressant Poisoning</u>, Rocky Mtn Poison Center, Denver General Hospital, Univ. Co Health Sciences Center, Denver, CO.

February 22, 1992.  <u>Environmental Health</u> Toxic Substances that Affect Our Health.  Metropolitan State College of Denver, Alumni Workshop, Denver, CO.

May 6, 1992.  <u>Ocular Acid and Base Toxicity and Current Research in Treatment</u>, Rocky Mtn Poison Center, Denver, CO.

Scott Phillips, MD

May 7, 1992.  <u>Gastrointestinal Decontamination</u> - Toxicology Conference at Humana-Sunrise Hospital, Las Vegas, NV.

May 7, 1992.  <u>Tricyclic Antidepressant Toxicity</u> - Toxicology Conference at Humana-Sunrise Hospital, Las Vegas, NV.

May 7, 1992.  <u>Bugs, Bites and Stings</u>- Toxicology Conference at Humana-Sunrise Hospital, Las Vegas, NV.

May 11, 1992.  <u>Brown Spider Envenomation - A trial of three Therapies</u>. UCHSC - Emergency Medicine Research Symposium, University of Colorado Health Sciences Center, Denver, CO.

May 13, 1992.  <u>The Role of Regional Poison Centers in Animal Poisoning</u>:  Where do we go from here? Rocky Mtn Poison Center Veterinary Toxicology Conference "Pets and Poisons", Denver, CO.

July 13, 1992.  <u>Toxic Alcohols</u>:  Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

July 31, 1992.  <u>Reptile Envenomations</u>.  Swedish Medical Center Paramedic In-service Conference.

August 3, 1992.  <u>Anti-arrhythmics:  Poisoning and Profiles of Action</u>:  Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

September 21, 1992.  <u>Brown Spider Envenomation</u>:  A study of Three Therapies Platform Presentation, 1992 AAPCC, ABMT, AACT, CAPCC Annual Meeting in Tampa, FL.

October 16, 1992.  <u>Arthropod Venom Poisoning</u>:  Swedish Medical Center Paramedic In-service Conference.

October 26, 1992.  <u>Mushroom Poisoning</u>:  Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

October 30, 1992.  <u>Necrotic Arachnidism</u>:  Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

January 27, 1993.  <u>Brown Spider Envenomation:  A Study of Three Therapies</u>, Winter Symposia on Hyperbaric Medicine, Steamboat Springs, CO.

Scott Phillips, MD

July 20, 1993.  <u>Arthropod Venom Poisoning</u>, Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

September 14, 1993.  <u>Cutaneous Arachnidism</u>, Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

September 27, 1993.  <u>Antidepressant Poisoning, Porter Memorial Hospital</u>, "Toxicology Symposia", Denver, CO.

September 27, 1993.  <u>Hazardous Materials Toxicology</u>, Porter Memorial Hospital, "Toxicology Symposia", Denver, CO.

September 30, 1993.  <u>The Hazards of Hypnotics</u>, Golden, CO.

October 25, 1993.  <u>Sleep Pharmacology</u>, The Hazards of Hypnotics, Medical Grand Rounds, University of Colorado Health Sciences Center, Denver, CO.

February 15, 1994.  <u>Carbon Monoxide Poisoning and the Mental Status Exam</u>, Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

March 12, 1994.  <u>Snake Venom Poisoning</u>, Black Hills Winter Conference on Emergency Medicine, Rapid City, SD.

March 12, 1994.  Case <u>Studies in Toxicology (hydrogen sulfide, carbon monoxide, chlorine gas)</u>, Black Hills Winter Conference on Emergency Medicine, Rapid City, SD.

September 25, 1994.  <u>Fluoxetine v. Tricyclic Antidepressants:  A Prospective Multi-center Trial.  North American Congress of Clinical Toxicology (</u>NACCT), Salt Lake City, UT.

October 5, 1994.  <u>Antidepressant Poisoning, Annual Toxicology Conference</u>, Porter Memorial Hospital, Denver, CO.

October 5, 1994.  <u>Antiarrhythmic Poisoning</u>, Annual Toxicology Conference, Porter Memorial Hospital, Denver, CO.

October 19, 1994.  <u>Hyperbaric Oxygen Therapy in Carbon Monoxide Poisoning</u>, Lutheran Medical Center Emergency Department, Wheat Ridge, CO.

October 25, 1994. Seminar Director: <u>Toxicology Emergencies in the Workplace</u>: Preparation and Management ACOEM State-of-the-Art Conference, Denver, CO.

October 25, 1994. <u>Hyperbaric Oxygen Therapy in Cellular Poisonings</u>. ACOEM State-of-the-Art Conference, Denver, CO.

October 27, 1995. <u>Toxic Case Presentations</u> (hydrogen sulfide, carbon monoxide, chlorine and ammonia gas), ACOEM State-of-the-Art, Denver, CO.

June 27, 1995. <u>Hazardous Waste/Materials (cyanide, hydrogen sulfide and carbon monoxide)</u>, National Environmental Health Association Annual Meeting. Session Director, Denver, CO.

June 27, 1995. <u>Heavy Metal Poisoning: Cadmium, Lead, Mercury</u> National Environmental Health Association Annual Meeting, Denver, CO.

June 27, 1995. <u>Risk Communication</u>, National Environmental Health Association Annual Meeting, Denver, CO.

July 27-28, 1995. <u>Medical Monitoring Programs</u>, Rocky Mountain Environmental Health and Safety Forum.

September 5, 1995. <u>Organophosphate Poisoning</u>. Rose Medical Center Internal Medicine Mortality and Morbidity Conference, Denver, CO.

September 15, 1995. <u>Acute Tricyclic Antidepressant Poisoning</u>. Grand Rounds in Emergency Medicine, Medical College of Pennsylvania, Philadelphia, PA.

September 28, 1995. <u>Explosives Toxicology: Remnants in Soil and Water</u>. Agency for Toxic Substances & Disease Registry of Centers for Disease Control & St. Francis Medical Center, Grand Isle NE.

October 3, 1995. <u>Acute Tricyclic Antidepressant Poisoning</u>. Grand Rounds in Internal Medicine, MetroWest Medical Center, Framingham, MA.

October 24, 1995. <u>Health Effects of Soil and Water Contamination</u>. ACOEM 1995 State-of-the-Art Conference, Seattle, WA.

December 13, 1995. <u>Use of 4-Methylpyrazole in Methanol and Ethylene Glycol Poisoning</u>. Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

January 15, 1996.  <u>Baromedicine and Carbon Monoxide Poisoning</u>.  PorterCare Hospital, Denver, CO.

January 19, 1996.  <u>Cadmium Poisoning in the Workplace</u>. Rocky Mountain ACOEM 31st Annual Conference on Occupational Medicine, Denver, CO.

January 19, 1996.  <u>Cyanide Poisoning Cases from Local Industry</u>.  Rocky Mountain ACOEM 31st Annual Conference on Occupational Medicine, Denver, CO.

February 20, 1996.  <u>Toxic Alcohols and Treatment</u>.  The Children's Hospital, Denver, CO.

February 22, 1996.  <u>Ethylene Glycol, Methanol, and Isopropanol Poisoning</u>. Denver General Hospital, Denver, CO.

March 4, 1996.  <u>Health Hazards of Water Pollution</u>, Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

July 2, 1996.  <u>Chemical Carcinogenesis</u>, National Environmental Health Association 60th Annual Meeting, Chicago, IL.

July 2, 1996.  <u>Radon</u>, National Environmental Health Association 60th Annual Meeting, Chicago, IL.

July 2, 1996.  <u>Heavy Metal Carcinogenesis</u>, National Environmental Health Association 60th Annual Meeting.  Chicago, IL.

July 2, 1996.  <u>Investigating Cancer Clusters</u>, National Environmental Health Association 60th Annual Meeting.  Chicago, IL.

September 30, 1996.  <u>Chemical Carcinogenesis</u>, Rocky Mountain Poison Center, University of Colorado Health Sciences Center, Denver, CO.

October 22, 1996.  <u>Salicylate Poisoning</u>, The Children's Hospital, University of Colorado Health Sciences Center, Denver, CO.

June 29, 1997.  <u>Organophosphate Toxicity</u>, National Environmental Health Association 61st Annual Meeting, Washington, DC.

June 29, 1997.  <u>Environmental Monitoring of Organophosphates</u>, National Environmental Health Association 61st Annual Meeting, Washington, DC.

Scott Phillips, MD

___

June 29, 1997.  <u>Cancer Clusters</u>, National Environmental Health Association 61 Annual Meeting, Washington, DC.

July 9, 1997.  <u>Beta-Blocker and Calcium Channel Blocker Poisoning</u>.  Rocky Mountain Poison and Drug Center, University of Colorado Health Sciences Center, Denver, CO.

July 16, 1997.  <u>Carbon Monoxide, Cyanide and Hydrogen Sulfide Poisoning</u>. Rocky Mountain Poison and Drug Center, University of Colorado Health Sciences Center, Denver, CO.

September 15, 1997.  <u>The Utility of Magnetic Resonance Imaging in the Bite from the Prairie Rattlesnake</u>.  North American Congress of Clinical Toxicology Annual Meeting, St. Louis, MO.

January 16, 1998.  <u>Low Level Toxicants and Causation</u>.  The Rocky Mountain Academy of Occupational & Environmental Medicine and Denver Colorado Association of Occupational Health Nurses.  The 33rd Annual Conference on Occupational Medicine, Health & Safety, Denver, CO.

July 1, 1998.  <u>Basic Toxicology Course.</u> National Environmental Health Association 62nd  Annual Meeting, Las Vegas, NV.

October 22, 1998.  <u>Limitations of the MSDS.</u> Toxicology Information Roundtable TIR' 98, Denver, CO.

February 19, 1999.  <u>Antidote Stocking</u>.  Ada County Medical Society Annual Medical Conference, McCall, ID.

May 20, 1999.  <u>Cotton Dust Exposure</u>.  Rocky Mountain Poison and Drug Center, University of Colorado Health Sciences Center, Denver, CO.

July 6, 1999.  <u>Practical Toxicology for Environmental Health Specialists</u>. National Environmental Health Association, Nashville, TN.

October 2, 1999.  <u>Volatile Organic Compounds, and Drinking Water Regulations.</u> American Academy of Clinical Toxicology Occupational and Environmental Symposium at the North American Congress of Clinical Toxicology Annual Meeting, La Jolla, CA.

October 18, 1999.  <u>Workshop on Plasticizers:  Scientific Issues in Blood Collection, Storage and Transfusion</u>. Panel Discussion.  Food and Drug Administration, National Institutes of Health, Bethesda, MD.

Scott Phillips, MD

October 26, 1999. <u>The Role of Physicians in Community Right-to-Know</u>. 1999 NEHA Right-to-Know Conference and Exhibition, Denver, CO.

October 27. 1999. <u>Understanding How the Environment Impacts Public Health: Information Needs of Health Care Providers</u>. 1999 NEHA Right-to-Know Conference and Exhibition, Denver, CO.

December 9, 1999. <u>Clinical Aspects of Medical Monitoring and Medial Surveillance</u>. National Medical Services, Willow Grove, PA.

December 10, 1999. <u>Selected Cases in Toxicology.</u> Medical College of Pennsylvania-Drexel University, Philadelphia, PA.

December 10, 1999. <u>4-Methylpyrazole as an Antidote for Toxic Alcohols</u>. Medical College of Pennsylvania-Drexel University, Philadelphia, PA.

February 11, 2000. <u>Precautionary Principle from the Medical Toxicologists Perspective</u>. The Toxicology Forum, Washington D.C.

May 15, 2000. <u>Occupational Toxicology: A Historical Perspective</u>. American College of Occupational & Environmental Medicine: American Occupational Health Conference, Philadelphia, PA.

June 16, 2000. <u>Toxicology and Exposure Assessment</u>. National Environmental Health Association, Denver, CO.

September 15, 2000. <u>Medical Toxicology Fellows Opportunities in Occupational and Environmental Toxicology Seminar.</u> 2000 North American Congress of Clinical Toxicology, Tucson, AZ.

September 17, 2000. <u>The Role of the Medical Toxicologist in Consulting with Industry an Hour in the Life</u>. 2000 North American Congress of Clinical Toxicology, Tucson, AZ.

September 19, 2000. <u>Diesel Fuel and Diesel Exhaust Toxicology</u>. American Industrial Hygiene Association/American Society of Safety Engineers Fall 2000 Technical Conference. Colorado School of Mines, Golden, CO.

December 8, 2000. <u>Internal Medicine M & M Conference.</u> University of Colorado Health Sciences Center, Denver, CO.

Scott Phillips, MD

April 26, 2001. <u>Introduction to Toxicology Principles</u>. Farmworker Children, Health and the Environment: A Pediatric Environmental Health Intensive. 2001 National Farmworker Health Conference, San Juan, Puerto Rico.

April 26, 2001. <u>Water and Sanitation Session, Toxicologic Aspects of Drinking Water Contamination</u>. Farmworker Children, Health and the Environment: A Pediatric Environmental Health Intensive. 2001 National Farmworker Health Conference, San Juan, Puerto Rico.

April 26, 2001. <u>Pesticide Toxicology</u>. Farmworker Children, Health and the Environment: A Pediatric Environmental Health Intensive. 2001 National Farmworker Health Conference, San Juan, Puerto Rico.

May 2, 2001. <u>Risk Communication and Toxicology</u>. University of Colorado Health Sciences Center, Rocky Mountain Poison and Drug Center, Denver, CO.

June 23, 2001. <u>Pesticides and Human Health</u>. Clinical & Environmental Issues on the Border. Toxicology has No Borders. Fourth Bi-National Conference. Texas Tech health Sciences Center- Emergency Medicine. University of Texas at El Paso-CERM & HETCAT, El Paso, TX.

June 27, 2001. <u>The Use of the Internet as a Clinical and Scientific Information Source</u>. Colorado Council of Medical Librarians. Porter Adventist Hospital, Denver, CO.

October 8, 2001. <u>National Library of Medicine Workshop: Web Resources in Clinical Toxicology. A Medical Toxicologist Perspective on Web-Based Toxicology Resources</u>. North American Congress of Clinical Toxicology Annual Meeting, Montreal, Quebec, Canada.

October 9, 2001. <u>American Academy of Clinical Toxicology – Year in Toxicology. Systemic Lupus Erythematosus.</u> North American Congress of Clinical Toxicology Annual Meeting, Montreal, Quebec, Canada.

October 9, 2001. <u>Topics in Industrial Hygiene, Environmental Monitoring, and Exposure Assessment for Clinical Toxicologists. How dose and Exposure Become a Dose?</u> North American Congress of Clinical Toxicology Annual Meeting, Montreal, Quebec, Canada.

October 31, 2001. <u>Update of Biological and Chemical Terrorism: Clinical Presentation, Management, and Preparedness</u>. American College of Occupational and Environmental Medicine State-of-the-Art Conference, Seattle, WA.

Scott Phillips, MD

December 12, 2001.  <u>Industry Preparation for Nuclear Biological and Chemical Events</u>.  IPE Industry Conference, Englewood, CO.

December 14, 2001.  <u>Standing Tall:  Emergency Preparedness Training for Business.  Medical Facts and Issues</u>.  South Metro Denver Chamber of Commerce, Centennial, CO.

March 4, 2001.  <u>Environmental Toxicology</u>. Toxicology Grand Rounds MicroMedix, Thompson Publishing, Englewood, CO.

April 14, 2002.  Introduction and Overview of Neurotoxicology.  <u>Millennium Series Occupational & Environmental Toxicology session on Clinical Neurotoxicology</u>. 2002 American Occupational Health Conference, ACOEM, Chicago, IL.

September 29, 2002.  <u>A Medical Toxicologists Perspective on Web-based Toxicology Resources</u>.  National Library of Medicine Symposium:  digital Resources for Clinical Toxicology.  2002 North American Congress of Clinical Toxicology, Palm Springs, CA.

October 10, 2002.  <u>Selected Toxicology Case Presentations</u>.  Deaconess Medical Center, Spokane, WA.

October 10, 2002.  <u>Common Cardiovascular Toxicants</u>.  Deaconess Medical Center, Spokane, WA.

October 27, 2002.  <u>Fertilizer and Chemical Toxicology</u>.  2002 State of the Art Conference Millennium Series, Agrochemical Toxicology. American College of Occupational Environmental Medicine, Baltimore, MD.

October 27, 2002.  <u>Agrochemical Toxicology</u>.  2002 State of the Art Conference Millennium Series, Agrochemical Toxicology. American College of Occupational Environmental Medicine, Baltimore, MD.

June 16, 2003.  <u>Clinical Aspects of Pesticide Intoxication:  Pesticides & Sovereignty</u>.  Pesticide Illness Prevention Management and Enforcement on the Flathead Reservation, Polsun, MT.

June 16, 2003.  <u>Bioterrorism, Homeland Preparedness and Pesticides:  Pesticides & Sovereignty</u>.  Pesticide Illness Prevention Management and Enforcement on the Flathead Reservation, Polsun, MT.

June 16, 2003. Special Session: <u>Pesticide Toxicity and Health Care Providers: Pesticides & Sovereignty</u>. Pesticide Illness Prevention Management and Enforcement on the Flathead Reservation, Polsun, MT.

July 28, 2003. <u>Overview and introduction to pesticides and prevention: Pesticide Intoxication</u>. Recognition, Management and Prevention in Pacific Northwest Tribal Agriculture, Nespelem, WA.

July 28, 2003. <u>Obtaining an Occupational and Environmental Exposure History: Pesticide Intoxication</u>. Recognition, Management and Prevention in Pacific Northwest Tribal Agriculture, Nespelem, WA.

July 28, 2003. <u>Bioterrorism and Pesticide disease surveillance systems in high risk populations: Pesticide Intoxication</u>. Recognition, Management and Prevention in Pacific Northwest Tribal Agriculture, Nespelem, WA.

July 28, 2003. <u>Implication of research on insecticide and other pesticides found in farm workers or high risk populations: Pesticide Intoxication</u>. Recognition, Management and Prevention in Pacific Northwest Tribal Agriculture, Nespelem, WA.

July 30, 2003. <u>Exposure Assessment for the Primary Health Care Provider, Firefighting and Pesticide-related Illness</u>. Recognition, Management and Prevention of asthma and Pesticide Illnesses: A course for health care professionals, environmental professionals, emergency responders, school leaders and Nez Perce community member, Lapwai, ID.

July 30, 2003. <u>Responses to Bioterrorism: Focus on Pesticide Chemicals an other weapons of Terrorism</u>. Recognition, Management and Prevention of asthma and Pesticide Illnesses: A course for health care professionals, environmental professionals, emergency responders, school leaders and Nez Perce community member, Lapwai, ID.

September 8, 2003. National Library of Medicine Symposium: <u>Using the Web to Access Clinical Toxicology Information</u>. A Medical Toxicologists Perspective on Web Resources. North American Congress of Clinical Toxicology, Chicago, IL.

July 29, 2004. <u>Pulmonary Inhalation Injuries</u>. Rocky Mountain Poison and Drug Center, University of Colorado Health Sciences Center, Denver, CO.

September 13, 2004. National Library of Medicine Symposium: <u>Using the Web to Access Clinical Toxicology Information</u>. A Medical Toxicologists Perspective on Web Resources. North American Congress of Clinical Toxicology, Seattle, WA.

September 22, 2004.  <u>Disinfectant Byproducts  the Clinical Perspective</u>.
Disinfection Byproducts Symposium.  CIIT Centers for Health Research.
Research Triangle Park, NC.

September 29, 2004.  <u>Observed Behaviors During Mass Chemical Exposures:  Are
All of These Patients Poisoned?</u>  Public Health in the Rocky Mountains 2004.
Weapons of Opportunity. Breckenridge, CO.

September 29, 2004.  <u>Chemical Terrorism of Food and Water</u>.  Public Health in
the Rocky Mountains 2004.  Weapons of Opportunity. Breckenridge, CO.

October 20, 2004.  <u>Chemical Agents of Opportunity for Terrorism.  The Medical
and Psychological Consequences of TICs (Toxic Industrial Chemicals) and TIMs
(Toxic Industrial Materials)</u>.  American College of Medical Toxicology/Agency
for Toxic Substances Disease Registry.  Montana Department of Health and
Human Services.  Helena, MT.

February 8, 2005.  <u>Chemical Agents of Opportunity for Terrorism.  The Medical
and Psychological Consequences of TICs (Toxic Industrial Chemicals) and TIMs
(Toxic Industrial Materials).  Agrochemical Terrorism</u>.  American College of
Medical Toxicology/Agency for Toxic Substances Disease Registry.  US
Environmental Protection Agency.  Agency for Toxic Substance Disease Registry.
Las Vegas, NV.

May 17, 2005.  <u>Vapor Intrusion from Groundwater Contamination</u>.  Davis
Community Hospital, Layton, UT.

May 18, 2005.  <u>Vapor Intrusion from Groundwater Contamination</u>.  Restoration
Advisory Board.  Weber State-Layton campus, Layton, UT.

March 3, 2006.  <u>Introduction to Medical Toxicology</u>.  Presbyterian St. Lukes
Hospital.  Pediatric Grand Rounds, Denver CO.

April 2nd , 2006. <u>Toxicology Principles</u>.  National Jewish Medical and Research
Center. Denver, CO.

April 16th , 2006.  <u>Basic Occupational Toxicology</u>.  National Jewish Medical and
Research Center. Denver, CO.

April 28th , 2006. <u>Environmental Toxicology</u>.  National Jewish Medical and
Research Center. Denver, CO.

August 7th, 2006. Terrorism by Fear and Uncertainty: Delayed Toxic Syndromes. Chemical Agents of Opportunity for Terrorism: The Medical Consequences of TICs (Toxic Industrial Chemicals) and TIMs (Toxic Industrial Materials). 9th Annual Forces Health Protection Conference CHIPPM. Albuquerque, NM.

October 8, 2006.  AACT Year in Toxicology:  The New OSHA Chromium Standard.  North American Congress of Clinical Toxicology, Annual Meeting. San Francisco, CA.

February 9, 2007. Introduction to Pulmonary Toxicology.  Pulmonary and Critical Care Fellows, University of Colorado Health Sciences Center, Veterans Affairs Medical Center, Denver, Co.

February 23rd, 2007.  Management of the Acutely Poisoned Patient. Pulmonary and Critical Care Fellows, University of Colorado Health Sciences Center, Veterans Medical Center, Denver, CO

March 6th, 2007.  Introduction to Medical Toxicology.  HealthOne Outreach Lectures.  Miners' Colfax Medical Center, Raton, NM

May 31, 2007. Public Health Impact Assessments and Toxicology in Vietnam. BP Health Impact Assessment Workshop, Boulder, Co.

August 2, 2007.  Inhalation Toxicology. Rocky Mountain Poison & Drug Center, University of Colorado Health Sciences Center. Denver, CO

August 5, 2007.  Chemical Contamination of Food, Drinks and Drugs. Chemical Agents of Opportunity for Terrorism:  The Medical Consequences of TICs (Toxic Industrial Chemicals) and TIMs (Toxic Industrial Materials).  10th Annual Forces Health Protection Conference CHIPPM. Louisville, KY.

September 14, 2007.  Biomonitoring of Hazardous Materials in the Workplace. Medichem International Congress XXXV. Queretaro, Mexico.

September 20, 2007.  Introduction to Occupational and Environmental Toxicology. National Jewish Medical and Research Center. Denver, CO.

September 24, 2007.  Methamphetamine Production & Abuse on Tribal Lands. The National Indian Health Board, 24th Annual Conference. Portland, OR.

October 25th, 2007.  Medical Surveillance.  Basic Curriculum in Occupational Medicine.  State-of-the-Art Conference. American College of Occupational & Environmental Medicine.  Vancouver, BC.

October 25th, 2007.  Respiratory Protection.  Basic Curriculum in Occupational Medicine.  State-of-the-Art Conference. American College of Occupational & Environmental Medicine.  Vancouver, BC.

## Meeting or Session Moderator

September 14, 1998.  Basic Science Research, Platform Session 5, North American Congress of Clinical Toxicology Annual Meeting, Orlando, FL.

October 4, 1999.  Keys to Success in the Managed Care Environment.  American College of Medical Toxicology Practice Symposium.  North American Congress of Clinical Toxicology Annual Meeting, La Jolla, CA.

October 4, 1999.  Junk Science Attacks – Rescuing the Public from Media Hyped Toxic Scares:  A Seminar in Risk Communication.  North American Congress of Clinical Toxicology Annual Meeting, La Jolla, CA.

October 4, 1999.  Keys to Success in the Managed Care Environment. North American Congress of Clinical Toxicology Annual Meeting, La Jolla, CA.

October 26, 1999.  The Role of Health Care Providers in Providing Environmental Information and Interpretation of Data to the Public.  1999 NEHA Right-to-Know Conference and Exhibition, Denver, CO.

September 17, 2000.  The Role of the Medical Toxicologist in Consulting with Industry an Hour in the Life.  2000 North American Congress of Clinical Toxicology, Tucson, AZ.

October 31, 2001. Update of Biological and Chemical Terrorism: Clinical Presentation, Management, and Preparedness. American College of Occupational and Environmental Medicine State-of-the-Art Conference, Seattle, WA.

April 14, 2002.  <u>Millennium Series Occupational & Environmental Toxicology session on Clinical Neurotoxicology</u>. 2002 American Occupational health Conference, ACOEM, Chicago, IL.

September 29, 2002.  <u>NBC Boot Camp:  Workshop on Biological Terrorism and Warfare Agents</u>. 2002 North American Congress of Clinical Toxicology, Palm Springs, CA.

October 27, 2002.  <u>Agrochemical Toxicology</u>.  2002 State of the Art Conference Millennium Series, Agrochemical Toxicology. American College of Occupational Environmental Medicine, Baltimore, MD.

February 8, 2005.  Chemical Agents of Opportunity for Terrorism.  <u>The Medical and Psychological Consequences of TICs (Toxic Industrial Chemicals) and TIMs (Toxic Industrial Materials)</u>.  Agrochemical Terrorism American College of Medical Toxicology/Agency for Toxic Substances Disease Registry.  US Environmental Protection Agency.  Agency for Toxic Substance Disease Registry. Las Vegas, NV.

March 28th, 2006.  <u>Introduction to Occupational Toxicology</u>.  National Jewish Medical and Research Center, University of Colorado Health Sciences Center, Denver, CO.

April 4th, 2006.  <u>Case Evaluations</u>.  National Jewish Medical and Research Center, University of Colorado Health Sciences Center, Denver, CO.

## <u>BIBLIOGRAPHY</u>

## <u>ABSTRACTS</u>

1.   Phillips S, Kohn M, Baker D, et al.  Brown Spider Envenomation:  a controlled study of Dapsone, Hyperbaric Oxygen and Cyproheptadine.  Ann Emerg Med 1995;25:363-368.  (AACT 1990)

2.   Phillips S, Burkhart K, Hartman P, et al.  Can dental fluoride exposures of less than or equal to 8 mg/kg be managed at home? (AACT 1990)

3.   Philips S, McKinney P, Gomez H, et al.  Mercury exposures in schools:  A cause for concern? (AACT 1992)

4.   Phillips S, Peterson J, Hogue K, Brent J, Kulig K, Rumack B.  Hydrofluoric Acid Burns from Rust Removers Applied to Clothing. Vet Hum Toxicol 1991; 33(4):358.

Scott Phillips, MD

5.    Phillips S, Brent J, Kulig K, Rumack B.  Ocular Hydrofluoric Acid Exposure From Rust Remover Products in the Home. Vet Hum Toxicol 1991; 33(4):358.

6.    Hord K, Phillips S, McKinney P, et al.  The incidence of hyperamylasemia following acetaminophen overdose.  (AACT 1992)

7.    Hurlbut KM, Dart RC, Garcia RA, Bond GR, Phillips S.  Changes in White Blood Cell Counts (WBC) Associated with dimercaptosuccinic Acid (DMSA) Therapy.  (AACT 1993)

8.    McKinney P, Phillips S, Gomez, HF, et al.  Acute propylene glycol ingestion:  2 cases. (AACT 1992)

9.    Gomez HF, McKinney P, Phillips S, et al.  Postmortem acetaminophen pharmacokinetics:  site and time dependent concentration changes. (AACT 1992)

10.    McKinney P, Brent J, Phillips S, Kulig K, Rumack B.  Correlation of Biochemical Parameters with Antidotal Efficacy in the Treatment of Acetaminophen Overdose in Mice. AACT Platform 1991.

11.    McKinney P, Tomaszewski C, Phillips S, Brent J, Kulig K, Rumack B.  Prevention of Methamphetamine Toxicity by Activated Charcoal. Vet Hum Toxicol 1991, 33(4);386.

12.    Tomaszewski C, McKinney P, Phillips S, Brent J, Kulig K.  Prevention of Toxicity from Oral Cocaine by Activated Charcoal in Mice. Vet Hum Toxicol 1991, 33(4):386.

13.    Gomez HF, Ziller A, McKinney P, Phillips S, et al.  Negative inotropic effects of intravenous esmolol in a theophylline-toxic patient. (AACT 1992)

14.    Gomez HF, Johnson R, Guven H, Phillips S, et al.  Adsorption of botulinum toxin to activated charcoal using a mouse bioassay. (AACT 1992)

15.    Brent J, Slattery J, Kalhorn T, McKinney P, Phillips S, Kulig K.  Production of Acetaminophen Metabolites in Human Acetaminophen Poisoning. Vet Hum Toxicol 1991, 33(4);355.

16.    Gomez HF, Moore M, Davis M, Anderson G, McKinney P, Phillips S, et al.  Elevation of breath ethanol measurements by metered dose inhalers. (AACT 1992)

17. McKinney P, Watson W, McIntyre M, Phillips S, et al. Time-related postmortem changes in cocaine & metabolites in blood, urine & vitreous humor. (AACT 1992)

18. McKinney P, Gomez HF, Watson W, Phillips S, et al. Vitreous humor postmortem pharmacokinetics: ethanol and acetaminophen. (AACT 1992).

19. Watson W, McKinney P, Gomez HF, Phillips S, et al. Ethanol necrokinetics: changes in postmortem blood concentrations over time. (AACT 1992)

20. Hollander JE, Shih RD, Hoffman RS, Harchelroad FP, Phillips S, et al. Predictors of Coronary Artery Disease in Patients with Cocaine Associated Myocardial Infarction. Clin Toxicol 1995;33:532 (#122).

21. Moreau C, Kerns W, Tomaszewski C, Rose R, Ford M, McMartin K, Brent J, META Study Group. Glycolate kinetics and hemodialysis clearance in ethylene glycol poisoning. J Toxicol Clin Toxicol 1997;35:506.

22. Brent J, McMartin K, Phillips S, Wells M, Donovan W, Burkhart K, Kulig K, META Study Group. 4-Methylpyrazole (Fomepizole) therapy of ethylene glycol poisoning: Preliminary results of the META trial. J Toxicol Clin Toxicol 1997;35:507.

23. Brent J, McMartin K, Phillips S, Aaron C, Wells M, Kulig K, META Study Group. 4-Methylpyrazole (Fomepizole) therapy of methanol poisoning: Preliminary results of the META trial. J Toxicol Clin Toxicol 1997;35:507.

24. Phillips S, Rose B, Kulig K, Brent J. Envenomation from the bite of the western Hognose Snake. J Toxicol Clin Toxicol 1997;35:532.

25. Phillips S, Smith M, Brent J, Kulig K, Martorano F. The utility of magnetic resonance imaging (MRI) in soft tissue swelling from the bite of the prairie rattlesnake. J Toxicol Clin Toxicol 1997;35:563.

26. Brent J, McMartin K, Phillips S, Kulig K, Pluss R. Prognostic value of plasma glycolic acid levels in ethylene glycol (EG) poisoned patients. J Am. Soc. Neph 1997;8:599A.

27. DeWitt C, Palmer R, Phillips S, Dart RC. False Positive Ethylene Glycol Level. # 227. J Toxicol Clin Toxicol 2003; 41:736.

28. Bebarta VS, Philips, S, Eberhardt A, Callihan KJ, Heard K, Waksman J. Incidence and Outcomes of Patients with the Brugada Pattern in a Large Case Series of Tricyclic Overdoses. #3. J Toxicol Clin Toxicol 2004;42 (5).

29.　Hoppe JA, Schaeffer TH, Phillips SD.  Persistent Hypoglycemia Complicating Metfromin Overdose in a Non-diabetic Adult.  J Toxicol Clin Toxicol 2007; 45: 605-648.

## EDITORIALS

1.　Phillips S. Pesticides: What Is the Role of Toxicovigilance.  Journal of Agromedicine. 2006;11(2):9-10.

## LETTERS

1.　Phillips S, Ringo P.  Phenelzine-Venlafaxine Interaction:  A Case Report. Am J Psychiatr 1995;152:1400-1401.

2.　Phillips S.  Letter to the Editor.  Annals of Internal Medicine 1994;120:247.

3.　Phillips S.  A Possible Paroxetine Withdrawal Syndrome.  Am J Psy 1995;152:645.

4.　Kulig, K Brent J, Phillips S.  Letter to the Editor (Atypical Chest Pain syndrome in Patients with Breast Implants) S Med J 1996;89:98-99.

5.　Brent J, Kulig K, Phillips S.  Letter to the Editor (Humoral Adjuvancy of Silicone Oils and Silicone Gels) Immunol Investig 1997:26;505-508.

6.　Phillips S.  Letter to the Editor (Safety of Phthalates) JAMA 2001;286:1450-1451.

## MANUSCRIPTS

1.　Phillips S, Kohn M, Baker D, et al.  Brown Spider Envenomation:  a controlled study of Dapsone, Hyperbaric Oxygen and Cyproheptadine. Ann Emerg Med 1995;25:363-368.

2.　Phillips S, Heiligenstein J, Burkett M, et al.  Fluoxetine v. Tricyclic Antidepressants:  A Prospective Multicenter Study of Antidepressant Drug Overdoses.  J Emerg Med   1997;15: July/August.

3.　Phillips S.  Editorial Comment:  Asbestos and Fiber Types in Asbestos Related Lung Disease.  AACT Clinical Toxicology Update 1994;7:2.

Scott Phillips, MD

4.  Philips S.  Editorial Comment:  Alkalemia: a Potential Fatal Hazard of Treatment for TCA Overdose. AACT Clinical Toxicology Update 1993;6:1.

5.  Phillips S, Gomez H, Brent J.  Pediatric gastrointestinal decontamination in acute toxin ingestion. J Clin Pharmacol 1993, 33;497-507.

6.  Phillips S, Gomez H.  A Current Overview of Gastrointestinal Decontamination. Current Trends in Drug Therapy 1991: 12;1-9.

7.  Phillips S.  Mercury in Amalgam fillings. Rocky Mountain Poison Center Bulletin. 1990;10:3-4.

8.  Phillips S.  Poison! Poison!: First Aid Basics.  Health Confidential 1990;4:3.

9.  Phillips S, Kulig K.  Phenylpropanolamine and Stroke.  American Stroke Association. 1990.

10. Phillips S.  Sex after Myocardial Infarction.  Resident and Staff Physician. 1984, 30: 45-51.

11. Phillips S.  Medical Times. 1985. 113: 42.

12. Phillips S.  Shock:  The Body's Defense.  Emergency 1982. 14:  44.

13. Revicki DA, Palmer CS, Phillips SD, et al.  Fluoxetine vs. Tricyclic Antidepressants:  A Prospective Multicenter Study of antidepressant Drug Overdoses:  Acute Medical Costs'. Pharmacoeconomics 1997;11:48-55.

14. Gomez HF, Johnson R, Gueven H, McKinney P, Phillips S, Judson F, Brent J. Adsorption of botulinum toxin to activated charcoal with a mouse bioassay. Ann Emerg Med 1995;25:818-822.

15. Gomez HF, Moore L, McKinney P, Phillips S, Guven H, Brent J.  Elevation of Breath Ethanol Measurements by Metered-Dose Inhalers.  Ann Emerg Med 1995;25:608-611.

16. Kulig K, Brent J, Phillips S, Messanger T, Hoffman R.  Epidemiologic Notes and Reports; Severe Acute Respiratory Illness Linked to Use of Shoe Sprays - Colorado, November 1993. MMWR 1993; 42:885-887.

17. McKinney P, Phillips S, Gomez HF, et al.  Corneal abrasions secondary to activated charcoal therapy. Am J Emerg Med 1993. 11:562.

18.  Treadwell T, Phillips S, Jablonski WJ. Mediterranean Spotted Fever in Travelers Returning from France. Arch Dis Child. 1990. 144: 1037.

19.  Davis M, Gomez HF, Phillips S, et al. Human Envenomation from a wandering garter snake. Ann Emerg Med 1994;23:1119-1112.

20.  McKinney P, Phillips S, Gomez HF, et al. Vitreous humor cocaine metabolite concentrations: Do postmortem specimens reflect blood levels at the time of death? J Forensic Sci 1995;40:102-107.

21.  McKinney P, Gomez HF, Phillips S, et al. The fax machine: a new method in plant identification. Letter; J Toxicol-Clin Toxicol 1993;31:663.

22.  McKinney P, Tomaszewski C, Phillips S, et al. Methamphetamine toxicity prevented by activated charcoal in a mouse model. Ann Emerg Med 1994;24:220-223.

23.  Gomez HF, McKinney P, Phillips S, et al. Charcoal Stercolith with Intestinal Perforation in a Patient Treated for Amitriptyline Ingestion. J Emerg Med 1994;12(1).

24.  Gomez HF, McKinney P, Phillips S, et al. Postmortem acetaminophen pharmacokinetics: an experimental study of site and time-dependent concentration changes. J Forensic Sci 1995; 40:980-982.

25.  Hollander JE, Shih RD, Hoffman RS, Harchelroad FP, Phillips S, et al. Predictors of Coronary Artery Disease in Patients with Cocaine-Associated Myocardial Infarction. Am J Med 1997;102:158-163.

26.  Hollander JE, Hoffman RS, Burstein JL, Shih RD, et al. Cocaine-Associated Myocardial Infarction: Mortality and Complications. Arch Int Med 1995;155:1081-1086.

27.  Hollander JE, Burstein JL, Hoffman RS, Shih RD, et al. Cocaine-Associated Myocardial Infarction: Clinical Safety of Thrombolytic Therapy. Chest 1995;107:1237-1241.

28.  Hollander JE, Hoffman RS, Gennis P, et al. Prospective Multicenter Evaluation of Cocaine-Associated Chest Pain. Cocaine Associated Chest Pain (COCHPA) Study Group. Acad Emerg Med 1994;1:330-339.

29.  Tomaszewski C, McKinney P, Phillips S, et al. Prevention of toxicity from oral cocaine by activated charcoal in mice. Ann Emerg Med 1993;22:1804-1806.

30.  Phillips S.  Editorial Comment:  Intellectual Impairment in children exposed to polychlorinated biphenyls in utero. AACT Clinical Toxicology Update 1997;9:2.

31.  Brent J, McMartin K, Phillips S, et al.  Fomepizole for the treatment of ethylene glycol poisoning.  NEJM 1999;340:832-8.

32.  Brent J, McMartin K, Phillips S, Aaron C, Kulig K.  Fomepizole for the treatment of methanol poisoning.  NEJM 2001; 344:424-9.

33.  Wexler P, Phillips S.  Tools for Clinical Toxicology on the World Wide Web: Review and Scenario.  J Toxicol Clin Toxicol 2002;40:893-902.

34.  Staudenmayer, H, Binkley KE, Leznoff A, Phillips S.  Idiopathic Environmental Intolerance.  Part 1: A Causation Analysis Appling Bradford Hill's Criteria to the Toxicogenic Theory.  Toxicol Rev. 2003;22(4):235-246.

35.  Staudenmayer, H, Binkley KE, Leznoff A, Phillips S.  Idiopathic Environmental Intolerance.  Part 2: A Causation Analysis Appling Bradford Hill's Criteria to the Psychogenic Theory.  Toxicol Rev. 2003;22(4):247-261.

36.  Nanotechnology and Nanotoxicology. Curtis, Greenberg, Kester, Phillips, Krieger. Toxicol Rev 2006;25(4); 245-260

37.  Staudenmayer H, Phillips S. MMPI-2 validity, clinical and content scales, and the Fake Bad Scale for personal injury litigants claiming idiopathic environmental intolerance. J Psychosom Res. 2007 Jan;62(1):61-72.

38.  Waksman, JC, Brody A, Phillips, SD.  Nonselective nonsteroidal anti-inflammatory Drugs and Cardiovascular Risk:  Are they Safe?.  Ann Pharmacotherapy 2007;41: 1163-1173.

39.  Bebarta V, Phillips S, Eberhardt A, Calihan KJ, Waksman JC, Heard K. Incidence of Brugada Electrocardiographic Pattern and Outcomes of These Patients After Intentional Tricyclic Antidepressant Ingestion.  Am J Cardiology 2007;100(4):656-660

## TEXTBOOK - CHAPTERS

1.  Phillips S, Brent J.  Phencyclidine.  In:  Medicine for the Practicing Physician, 3rd. edition, Hurst JW, ed., Butterworth, Stoneham, MA, 1992.

Scott Phillips, MD

2.    Phillips S, Brent J. <u>Phencyclidine</u>. In:  Medicine for the Practicing Physician, 4th, edition, Hurst JW Editor, Butterworth, Stoneham, MA 1996.

3.    Phillips S, Brent J. <u>Air Pollution</u>.  In Occupational, Industrial and Environmental Toxicology, 1st edition, Greenberg, Hamilton, Phillips, eds.  Mosby-Year Book Publishers, St. Louis, MO 1997.

4.    Phillips S. <u>Carcinogenesis</u>.  In Occupational, Industrial and Environmental Toxicology, 1st edition, Greenberg, Hamilton, Phillips, eds.  Mosby-Year Book Publishers, St. Louis, MO 1997.

5.    Phillips S. <u>Non-ionizing Radiation</u>. In Occupational, Industrial and Environmental Toxicology, 1st edition, Greenberg, Hamilton, Phillips, eds. Mosby-Year Book Publishers, St. Louis, MO 1997.

6.    Phillips S. <u>Plastics</u>.  In Occupational, Industrial and Environmental Toxicology, 1st edition, Greenberg, Hamilton, Phillips, eds.  Mosby-Year Book Publishers, St. Louis, MO 1997.

7.    Turchen S, Phillips S.  <u>Photographers and Film Developers</u>. In Occupational, Industrial and Environmental Toxicology, 1st edition, Greenberg, Hamilton, Phillips, eds. Mosby-Year Book Publishers, St. Louis, MO 1997.

8.    Greenberg M, Phillips S.  <u>A Brief History of Occupational, Industrial and Environmental Toxicology</u>.  In Occupational, Industrial and Environmental Toxicology, 1st edition, Greenberg, Hamilton, Phillips, eds. Mosby-Year Book Publishers, St. Louis, MO 1997.

9.    Phillips S. <u>Ship and Dockyard Workers</u>.  In Occupational, Industrial and Environmental Toxicology, 1st edition, Greenberg, Hamilton, Phillips, eds. Mosby-Year Book Publishers, St. Louis, MO 1997.

10.   Phillips S. <u>Environmental Toxicology</u>, Chapter 30.  In:  Clinical Management of Poisoning and Drug Overdose, 3rd edition, Haddad, Winchester, Shannon, eds. Saunders Pub. Philadelphia, PA (1998).

11.   Phillips S. <u>Drug Testing in the Workplace</u>.  Chapter 15. In Clinical Toxicology, 1st edition.  Ford, Delaney, Ling, Erickson, eds. WB Saunders Company, Philadelphia, PA 2001, 127.

Scott Phillips, MD

12. Burkhart K, Phillips S. <u>Cyclic Antidepressant Poisoning</u>; The Clinical Practice of Emergency Medicine. Harwood-Nuss, Linden, Luten, Moore-Shepherd, Wolfson, eds. Second Edition, Lippincott-Raven Publishers. Philadelphia, PA 1996; 1249.

13. Gablehouse T, Phillips S. <u>Environmental Audits and Property Transfers</u>. In Occupational, Industrial and Environmental Toxicology, 1ˢᵗ edition, Greenberg, Hamilton, Phillips, eds. Mosby-Year Book Publishers, St. Louis, MO 1997.

14. Gomez H, Phillips S. <u>Health Hazards of Water Pollution</u>. In Occupational, Industrial and Environmental Toxicology, 1st edition, Greenberg, Hamilton, Phillips, eds. Mosby-Year Book Publishers, St. Louis, MO 1997.

15. Phillips S. <u>Carbon Monoxide Poisoning</u>. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1ˢᵗ edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000 , 304.

16. Phillips S. <u>Adult Lead Poisoning</u>. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1ˢᵗ edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 458.

17. Phillips S. <u>Gulf War Syndrome</u>. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1ˢᵗ edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 32.

18. Phillips S. <u>Hyperbaric Oxygen Therapy</u>. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1ˢᵗ edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 124.

19. Phillips S. <u>Fomepizole (Antizol) as an Antidote</u>. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1ˢᵗ edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 120.

20. Phillips S. <u>Cadmium Poisoning</u>. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1ˢᵗ edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 284.

21. Phillips S. Cyanide Poisoning. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1st edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 342.

22. Phillips S. Isocyanate Poisoning. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1st edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 448.

23. Phillips S. Organochlorine Pesticide Poisoning. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1st edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 552.

24. Phillips S. Chromic Acid Toxicity. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1st edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 320.

25. Phillips S. Copper Toxicity. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1st edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 338.

26. Phillips S. Levamisole Toxicity. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1st edition, Dart, Hurlbut, Kuffner, Yip, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 464.

27. Phillips S. Sulfur Dioxide Poisoning. In The Rocky Mountain Poison and Drug Center Five-Minute Consult in Toxicology, 1st edition, Dart editor. Lippincott Williams & Wilkins Publisher, Philadelphia, PA 2000; 654.

28. Phillips S. Fungicides and Biocides. In Clinical Environmental Health and Toxic Exposures (Chapter 102), 2nd edition, Sullivan & Krieger, eds. Lippincott Williams & Wilkins Publisher, Philadelphia, PA. 2001;1109-1125.

29. Phillips S, Klein R, Walter F. Cholinesterase Inhibitors: Organophosphates and Carbamates. Chapter 13. In Advanced HazMat Life Support, Instructors Manual, 1st edition, Walter, Meislin, eds. Arizona Board of Regents 1999.

30. Phillips S, Klein R, Gibly R. Pyrethrins and Pyrethroids. Chapter 16. In Advanced HazMat Life Support, Instructors Manual, 1st edition, Walter, Meislin, eds. Arizona Board of Regents 1999.

Scott Phillips, MD

31. Phillips S, Klein R. <u>Fumigants</u>. Chapter 17. In Advanced HazMat Life Support, Instructors Manual, 1st edition, Walter, Meislin, eds. Arizona Board of Regents 1999.

32. Phillips S, Klein R. <u>Herbicides</u>. Chapter 18. In Advanced HazMat Life Support, Instructors Manual, 1st edition, Walter, Meislin, eds. Arizona Board of Regents 1999.

33. Phillips S, Klein R, Walter F. <u>Cholinesterase Inhibitors: Organophosphates and Carbamates</u>. Chapter 16. In Advanced HazMat Life Support, Instructors Manual, 2nd edition, Walter, Meislin, eds. Arizona Board of Regents 2000.

34. Phillips S, Klein R, Gibly R. <u>Pyrethrins and Pyrethroids</u>. Chapter 19. In Advanced HazMat Life Support, Instructors Manual, 2nd edition, Walter, Meislin, eds. Arizona Board of Regents 2000.

35. Phillips S, Klein R. <u>Fumigants</u>. Chapter 20. In Advanced HazMat Life Support, Instructors Manual, 2nd edition, Walter, Meislin, eds. Arizona Board of Regents 2000.

36. Phillips S, Klein R. <u>Herbicides</u>. Chapter 21. In Advanced HazMat Life Support, Instructors Manual, 2nd edition, Walter, Meislin, eds. Arizona Board of Regents 2000.

37. Phillips S, Klein R, Walter F. <u>Cholinesterase Inhibitors: Organophosphates and Carbamates</u>. Chapter 16. In Advanced HazMat Life Support, Instructors Manual, 3rd edition, Walter, Meislin, eds. Arizona Board of Regents 2001.

38. Phillips S, Klein R, Gibly R. <u>Pyrethrins and Pyrethroids</u>. Chapter 19. In Advanced HazMat Life Support, Instructors Manual, 3rd edition, Walter, Meislin, eds. Arizona Board of Regents 2001.

39. Phillips S, Klein R. <u>Fumigants</u>. Chapter 20. In Advanced HazMat Life Support, Instructors Manual, 3rd edition, Walter, Meislin, eds. Arizona Board of Regents 2001.

40. Phillips S, Klein R. <u>Herbicides</u>. Chapter 21. In Advanced HazMat Life Support, Instructors Manual, 3rd edition, Walter, Meislin, eds. Arizona Board of Regents 2001.

41.    Gomez H, Phillips S. <u>Health Hazards of Water Pollution</u>. In Occupational, Industrial and Environmental Toxicology, 2nd edition, Greenberg, Hamilton, Phillips, McCluskey, eds. Mosby Publishers, Philadelphia, PA. 2003; pg. 636-649.

42.    Phillips S. <u>Plastics</u>. In Occupational, Industrial and Environmental Toxicology, 2nd edition, Greenberg, Hamilton, Phillips, McCluskey, eds. Mosby Publishers, Philadelphia, PA. 2003; 584-597.

43.    Phillips S, Greenberg M. <u>Carcinogenesis</u>. In Occupational, Industrial and Environmental Toxicology, 2nd edition, Greenberg, Hamilton, Phillips, McCluskey, eds. Mosby Publishers, Philadelphia, PA. 2003; pg. 670-681.

44.    Sullivan, JB, Stewart C, Phillips S. <u>Weapons of mass destruction: Biological Agents</u>. Clinics in Occupational and Environmental Medicine. Vol 2. No. 2 Chase, Upfal, Krieger, Phillips, Guidotti, Weissman, eds. Saunders (Div. of Elsevier). Philadelphia, PA 2003.

45.    Sullivan, JB, Stewart C, Phillips S. <u>Weapons of mass destruction: Chemical Agents</u>. Clinics in Occupational and Environmental Medicine. Vol 2. No. 2 Chase, Upfal, Krieger, Phillips, Guidotti, Weissman, eds. Saunders (Div. of Elsevier). Philadelphia, PA 2003.

46.    Sullivan, JB, Stewart C, Phillips S. <u>Weapons of mass destruction: Vesicants</u>. Clinics in Occupational and Environmental Medicine. Vol 2. No. 2 Chase, Upfal, Krieger, Phillips, Guidotti, Weissman, eds. Saunders (Div. of Elsevier). Philadelphia, PA 2003.

47.    Broderick A, Schwartz DA, Phillips S. <u>Halogen Gases, Ammonia and Phosgene</u>. Clinics in Occupational and Environmental Medicine. Vol 2. No. 2 Chase, Upfal, Krieger, Phillips, Guidotti, Weissman, eds. Saunders (Div. of Elsevier). Philadelphia, PA 2003.

48.    Greenberg M, Phillips S. <u>A Brief History of Occupational, Industrial, and Environmental Toxicology</u>. In Occupational, Industrial and Environmental Toxicology, 2nd edition, Greenberg, Hamilton, Phillips, McCluskey, eds. Mosby Publishers, Philadelphia, PA. 2003; pg. 2-5.

49.    Phillips S. <u>Non-Ionizing Radiation</u>. In Occupational, Industrial and Environmental Toxicology, 2nd edition, Greenberg, Hamilton, Phillips, McCluskey, eds. Mosby Publishers, Philadelphia, PA. 2003, pg. 716-721.

Scott Phillips, MD

50.    Phillips S, Rahorst W, Schoenwetter WF, Thomann WR. <u>Scientific Literature Review of Mold</u>: A report on the health effects of indoor mold. National Association of Home Builders (NAHB). Washington, DC. September 2003.

51.    Waksman J, Phillips S. <u>Biological Markers of Exposure to Chlorinated Solvents</u>. Clinical in Occupational and Environmental Medicine. Industrial Solvents and Human Health, Part 1. Phillips Krieger, eds. Elsevier Saunders Pub. August 2004; 4(3) 413-422.

52.    Phillips S, Krieger, G, Palmer R, Waksman. <u>Solvents and Vapor Intrusion Pathways</u>. Clinical in Occupational and Environmental Medicine. Industrial Solvents and Human Health, Part 1. Phillips Krieger, eds. Elsevier Saunders Pub. August 2004; 4(3) 423-444.

53.    Phillips S, Waksman JC. <u>Hepatorenal solvent Toxicology</u>. Clinical in Occupational and Environmental Medicine. Industrial Solvents and Human Health, Part 1. Phillips Krieger, eds. Elsevier Saunders Pub. November 2004; 4(4) 731-740.

54.    Phillips S, Waksman JC. <u>Antimony and Nickel</u>. In Critical Care Toxicology, Brent J, Wallace KL, Burkhart KK, Phillips SD, Donovan JW, eds. Elsevier Mosby Publishers. Philadelphia, PA. 2005, p. 845-850.

55.    Phillips S. <u>Fumigants</u>. In: Critical Care Toxicology, Brent J, Wallace KL, Burkhart KK, Phillips SD, Donovan JW, eds. Elsevier Mosby Publishers. Philadelphia, PA. 2005, p. 909-915.

56.    Phillips S. <u>Hydrogen Sulfide</u>. In Critical Care Toxicology, Brent J, Wallace KL, Burkhart KK, Phillips SD, Donovan JW, eds. Elsevier Mosby Publishers. Philadelphia, PA. 2005, p. 1029-1033.

57.    Phillips S. <u>Organochlorine, Phrethrin, and Pyrethroid Insecticides</u>. In Critical Care Toxicology, Brent J, Wallace KL, Burkhart KK, Phillips SD, Donovan JW, eds. Elsevier Mosby Publishers. Philadelphia, PA. 2005, p. 929-936.

58.    Krieger G, Phillips S. <u>Blood</u>. In Encyclopedia of Toxicology, Wexler P, ed. Academic Press. San Diego, CA. 2005, p. 323-329.

59.    Palmer R, Phillips S. <u>Chlorinated Hydrocarbons</u>. Haddad and Winchester's Clinical Management of Poisoning and Drug Overdose, 4th ed. Shannon M, Borron S, Burns M eds. Elsevier Saunders Publishers. Philadelphia, PA. 2007, 1347-1361

Scott Phillips, MD

## BOOK REVIEWS

1. Impact of Hazardous Waste on Human Health:  Hazard, Health Effects, Equity, and Communications Issues.  BL Johnson; Lewis Publisher; 1999; 389 pages. Reviewed for:  Journal Toxicology – Clinical Toxicology 2001;39:425-426.

2. Epidemiology of Work Related Diseases, 2nd Edition; C McDonald and M Wheatley; BMJ Books; 2000; 556 pages.  Reviewed for:  Journal Toxicology – Clinical Toxicology 2001;39:655.

3. Environmental Tobacco Smoke:  R Watson and M Witten, eds.; CRC Press, 2001; 377 pages. Reviewed for:  Journal Toxicology – Clinical Toxicology, 2002.

4. Goldfrank's Toxicological Emergencies:  L. Goldfrank, N Flomenbaum, MA Howland, R Hoffman, L Nelson, eds.  McGraw-Hill Professional Publishing; ISBN: 0071360018; 7th edition (May 15, 2002), for Doody Publishing.

11-11-07

# LEGAL APPEARANCES
## By
## SCOTT D. PHILLIPS, M.D., FACP, FACMT

| Date | Court Name | Parties Name | Case Number | Type of Testimony |
|------|-----------|--------------|-------------|-------------------|
| 5-4-04 | 21st Judicial District Court, Tangipahoa parish, State of Louisiana | Clarence Zahn, et a vs. Eckerd Corporation, et al | No.: 2001-003450, Division "D" | Deposition |
| 5-6-04 | 23 Judicial District Court, Parish of St. James, State of Louisiana | Vulcan Geismer 2001 Release Litigation | No.: 39,388-A | Hearing |
| 7-1-04 | State of Colorado Executive Department | Myra Wozzniczka v. T.J. Maxx and CNA/RSKCO, Insurer | WC # 4-507-822 Claim: 3B802377 | Hearing |
| 8-24-04 | Superior Court of the State of California or the County of San Bernardino | Redlands Tort Litigation | No. RCV 31496 | Deposition |
| 2-21-05 | State Court Parish of Ascension, State of Louisiana | Cheryl Lanoux, et al, versus Crompton Manufacturing Company | No. 72, 897, "B" | Deposition |
| 3-4-05 | Unitec States District Court for the District of New Jersey | Nutraquest Inc., Debtor | No 03-CV-44147 | Deposition |
| 4-4-05 | Unitec States District Court for the District of New Jersey | Nutraquest Inc., Debtor | No 03-CV-44147 | Hearing |
| 4-12-05 | Unitec State District Court for the | John Armstrong, et al versus Durango-Georgia | NO. CV202-85 | Deposition |

**EXHIBIT**

L

| | Southern District of Georgia, Brunswick Division | Paper Company | | |
|---|---|---|---|---|
| 5-20C5 | United States District Court for the State of Nebraska | Kanyer v. Union Pacific Railroad | | Trial |
| 12-2C-05 | Superior Court of the State of California for the county of Los Angeles | Genevieve Selby, et al, v. PRC DeSoto International Inc., and Goodrich Corporation, et al. | No. MC015412 | Deposition |
| 4-6-06 | Superior Court, State of Alaska, third Judicial District at Anchorage | Lisa Anders, et. al. v. Alaska Pacific University | 3AN-04-11167 | Deposition |
| 8-15-06 | United States Federal Court, USCD Middle District of Louisiana, Baton Rouge, LA | Andrea Abbott v. Honeywell International, Inc | 04596-c-M2 | Deposition |
| 8-24-06 | United States District Court Southern District of Georgia Brunswick Division | John Armstrong et al. v. Durango Georgia Paper Company | CV 202-85 | Trial |
| 9-7-06 | Court of Common Pleas Cuyahoga County, Ohio | Joseph Boyd and Kathaleen Boyd v. Lincoln Electric Company et al. | CV 04 545/13 | Deposition |
| 2-16-07 | United States District Court, Northern District of Ohio Western District | Marvin Crowl et al. v. Norfolk Southern Railway Corp et al. | Case No: 3:06CV-1116 | Deposition |

| | | | | Hearing |
|---|---|---|---|---|
| 6-14-07 | United States District Court Middle District of Louisiana | Andrea Abbott v. Honeywell International., Inc | C.A. No. 04596-C-M2 | |
| 7-6-07 | Court of Common Pleas of Scioto County, Ohio | Mark G. Maynard vs. Norfolk Southern Railway, Co | Case No.: 05-CIH-335 | Deposition |
| 7-10-07 | District court of Wilson County, Kansas | City of Neodesha, Kansas, et al, vs. BP Corporation North America | Case No.: 2004-CV-19 | Deposition |
| 12-11-07 | District court of Wilson County, Kansas | City of Neodesha, Kansas, et al, vs. BP Corporation North America | Case No.: 2004-CV-19 | Trial |

These appearances have been prepared, and to the best of my knowledge, are all inclusive and accurate.

**Scott Phillips, MD, FACP, FACMT, FAACT**

**Newfields, LLC**

**730 17th Street, Suite 925**

**Denver, CO 80202**

**Phone 303-294-0950**

**Fax 303-294-9220**

*Denicole Young & Vanessa Ghee v. Lewis Tompkins, et al.*

December 26, 2007

EXHIBIT

N

tabbies

1

**Introduction**

I hold the following opinions and conclusions in this report to a reasonable degree of medical and toxicological probability (certainty). I reserve the right to amend my report or opinions should further information become available.

My name is Scott D. Phillips, M.D. I am a practicing physician who is subspecialty board certified in medical toxicology. Medical toxicology is a subspecialty specified by the American Board of Medical Specialties, the medical oversight organization, which defines all specialties and subspecialties that are officially recognized in the United States. Medical toxicology is a scientific discipline dealing with the evaluation, diagnosis, and treatment of adverse effects of chemical and some biological substances, on living systems. All medical toxicologists are thus physicians. Fundamental to this sub-specialty is that medical toxicologists must routinely perform an assessment of whether there exists a causal link between an exposure and an adverse effect. Such an analysis requires the application of proper and generally accepted scientific methodology.

I am a licensed physician in the State of Colorado and I am board certified in medical toxicology and internal medicine by the American Board of Medical Specialists. My medical toxicology training consisted of a two-year post-doctoral fellowship at the University of Colorado Health Sciences Center in Denver, Colorado. I then took and passed the required board certifying examination. The board certification in medical toxicology is a board supported by the joint American Boards of Preventive Medicine, Pediatrics and Emergency Medicine as the Sub-Specialty Sub-Board on Medical Toxicology. I was originally certified in

2

1995, the first year the board was given, and re-certified in 2004. Physicians who are board certified in internal medicine are eligible for the joint medical toxicology boards through the American Board of Emergency Medicine pathway.

I am a member of the American Academy of Clinical Toxicology, the American College of Medical Toxicology, the Society of Toxicology, the American College of Occupational and Environmental Medicine and the American Industrial Hygiene Association. I have been asked to serve on both governmental and non-governmental advisory panels and committees. I have received research grants and have published many peer-reviewed papers.

Currently, I hold a university faculty appointment in toxicology and I am an Associate Clinical Professor at the University of Colorado Health Sciences Center in the Department of Medicine, Division of Clinical Pharmacology, and Toxicology. I am also an attending physician with the Rocky Mountain Poison and Drug Center, and in a medical practice in Denver, Colorado. In my role at the University I provide both didactic lectures and bedside clinical teaching in the area of medical toxicology and general medicine. I routinely teach medical students, interns, residents, and fellows who are completing subspecialty training in medical toxicology.

Throughout my professional career, I have served in various capacities in the American Academy of Clinical Toxicology (AACT) and other major societies dealing with clinical toxicology. I have been elected to the Board of Directors of the AACT and have served on many committees within this organization. The Academy is the largest

organization in the world devoted to clinical aspects of toxicology and has among its members virtually all medical toxicologists and poison control center directors in the United States and Canada, and a large proportion of those worldwide. In addition, many regulators, policy makers, and scientists with an interest in clinical toxicology are members of the Academy.

I routinely serve as a peer-reviewer for major journals in clinical toxicology and other medical journals in general. I am asked to peer-review many articles a year for these journals.

As noted in my *vitae* I have published approximately 123 scientific articles, letters to the editor, editorials, book chapters, and abstracts, virtually all of them related to clinical toxicology. I have also served as an Editor of several a major toxicology texts, including a new book entitled *Critical Care Toxicology – The Diagnosis and Management of the Acutely Poisoned Patient* published in 2005 by Mosby-Saunders-Harcourt.

My clinical practice consists of treating toxicology patients in emergency departments, intensive care units, the hospital in general, and in the outpatient setting. I see patients both in the context of my teaching role at the University and in private practice. My private practice involves seeing patients in seven Denver area hospitals, and in my outpatient clinic. In the course of my clinical practice, I routinely evaluate and treat patients with all types of clinical illnesses including neurological, pulmonary, liver, kidney, skin, cardiovascular, metabolic disorders and other organ system injuries related to various agents. I also serve on the Pharmacy and Therapeutics Committee at

Swedish Medical Center.  A complete summary of my academic training and position as well as of my publications and hospital appointments can be found in a copy of my *Curriculum vitae*.

**Materials Reviewed**
Medical records and other material Young/Ghee 0001-2207
The Complaint
Answers to Interrogatories
Dr. Shoemaker report and materials
Depositions of Young/Ghee
Deposition of Shoemaker

**Summary of Cases**

There are two plaintiffs in this case whom are claiming that they were exposed "sewage odor" in their apartment and to "mold" from an adjacent apartment.  The Plaintiff's signed a lease on August 19th, 2002 and apparently moved out on September 23rd, 2002.  The apartment was not the one they resided in rather a nearby unit.  The plaintiffs apparently entered the apartment and took photographs.  The plaintiffs are claiming that their health was adversely affected by this brief exposure.

It is my understanding that there was no sampling of the dark material on the adjacent apartment walls "mold", to determine a species and genus.  Furthermore, I know of know direct and specific testing on the Plaintiffs that would document that the "mold" material interacted with their bodies.

The following is an overview of records, and is not meant to be a complete chronology of all of the Plaintiffs records.

5

Denicole Young

Ms. Young alleges to have been more effected by the exposure.

Ms. Young has been diagnosed with Sickle Cell Trait. Persons with the
heterozygous genotype (AS) have sickle cell trait. They may be
clinically normal and have acute painful episodes only under extreme
conditions such as vigorous exertion at high altitudes (or in
unpressurized aircraft). Patients with the Trait are hematologically
normal, with no anemia and normal red blood cells on peripheral blood
smear. They may, however, have a defect in renal tubular function,
causing an inability to concentrate the urine, and experience episodes
of gross hematuria, which may lead to anemias. This appears to be
caused by many years of sickling in the sluggish circulation of the
renal medulla.

Ms. Young was evaluated for hematuria in September 1995. She was
treated with Bactrim.

In November of 1995, Ms. Young was seen following an MVA. She was
diagnosed with musculoskeletal strain and possible rib fractures.

In December of 1996, Ms. Young was seen in ER follow up for 4 days
of bronchitis, nasal congestion and rhinorrhea with right sided facial
pain. She also reported chest congestion. She had right facial
tenderness, and rhonchi on auscultation of the lungs. She was
diagnosed with persistent bronchitis and sinusitis. Four days later she
was seen again with persistent maxillary sinusitis.

6

Ms. Young was seen in June of 1997 for hemorrhagic cystitis and prescribed Bactrim.

In September of 1997, she was evaluated again with hemorrhagic cystitis. She was treated with Cipro and Pyridium.

In October of 1997, Ms. Young was evaluated for sinus congestion, facial pressure, and non-productive cough. She was diagnosed with sinusitis and hematuria. She was treated with Bactrim DS and Vicodin Tuss.

In November of 1997, Ms. Young was admitted to Calvert Memorial Hospital for hematuria and was found to have sickle cell trait and anemia.

In January of 1998, Ms. Young was seen for hematuria and tiredness. She was diagnosed with hematuria associated with sickle cell trait, tiredness, and lymphadenopathy.

Ms. Young was evaluated in July of 1998 for a several day history of sinus congestion, cough, chest congestion, and wheezing. The record reflects that she is possibly allergic to Cipro. Her chest exam revealed diminished breath sounds and wheezing, which cleared after a nebulizer treatment. She was diagnosed with bronchitis and prescribed antibiotics, Proventil and Azmacort. In follow up she reported feeling much better on the antibiotic and inhalers. She was also felt to have GERD. She responded to the addition of Zantac and Chromagen (Iron preparation).

In January of 1999, Ms. Young was evaluated for kidney pain. She was found to have a fair number of WBC's and bacteria and was felt to have a UTI. She was treated with Bactrim DS.

In March of 2000, Ms. Young was evaluated for fatigue. She reported that she was not able to get out of bed and had no motivation. Lab tests were ordered and she was scheduled for a follow up examination. The tests returned normal. She as started on Zoloft for her fatigue complaints.

No medical records were available for the time period between 3/2000 and 4-1-2002.

In April 1st, 2002 Ms. Young was evaluated for lymph node under her chin. It was felt to be reactive in nature.

On September 13th, 2002, Ms. Young was seen at GWUH who is returning a week after being seen (9-6-02) for a diagnosis of bronchitis. She continued to have a dry cough, which she reported to be continued for 4 weeks from what she states was from mold in an apartment. Her medications were Percocet, codeine, and an inhaler. She gave a prior history for "SC" and asthma. She had no fever, congestion, or chest pain, and her pulmonary and ENT exams were normal. She was given an antihistamine and discharged to follow up with her doctor.

Ms. Young complained of cold symptoms, postnasal drip on September 24th, 2002, and was diagnosed with allergic rhinitis and asthma. She reported 4 weeks of symptoms at that time. She reported a history of

asthma at that time. She was treated with Flovent, Zyrtec, and albuterol.

In November 5th, 2002 Ms. Young was evaluated for rhinitis. She reported being allergic to mold from an adjacent apartment. She reported that she felt better after moving to a new apartment. She was diagnosed with allergic rhinitis and asthma. She was treated with Zyrtec, albuterol, and Flovent.

In February 25, 2003 Ms. Young was evaluated for headaches and loss of smell/taste. She reported a history of asthma, allergic rhinitis, and anemia. She was diagnosed as having allergic rhinitis and being non-compliant with her medication. She was instructed to restart her Zyrtec and Flonase.

On March 11th, 2003 Ms. Young was evaluated for her allergies. She was found to have allergic rhinitis, anemia, and polydipsia. Her history was positive for IDDM in a maternal grandmother. Her fasting blood sugar was 77.

On March 28th, 2003 Ms. Young was evaluated for asthma exacerbation on 3-21-03. The exacerbation was resolving.

In March of 2003 she was evaluated for shortness of breath and found to have an asthma exacerbation. She was treated and released to follow up with her private physician.

In April of 2003, Ms. Young presented to George Washington University Hospital with status asthmatics. She was aggressively

treated and required endotracheal intubation. She failed removal of the endotracheal tube twice but was eventually able to be extubated. It was determined at that time that her triggers were URI and pollen. During that visit, the records indicate that she had been previously intubated.

In May of 2003, she reported that she had awoke with facial swelling and some wheezing after eating pizza the night before. She was taken to the ED and given diphenhydramine.

In June of 2003, Ms. Young had pulmonary function test done, which suggested borderline restrictive defect and decreased DLCO.

In July of 2003 she was evaluated for swelling of her ankles and hands as well as an asthma flare. She was treated and discharged from the emergency department.

In September of 2003, she was evaluated for a crush type injury of the finger. At that visit, Ms. Young reported that she was not taking any medication.

In March of 2004, she underwent an endoscopy procedure for esophageal reflux.

In April of 2004, Ms. Young was seen in an emergency department for an anaphylactic reaction.

In May of 2004 she was seen for a bruise on her leg, and was assessed as having bilateral ankle swelling and arthralgias.

7-13-04  Ms. Young was evaluated at NIH for ankle swelling and possible Pulmonary HTN.  She had PFT's. HR-CT, and an echocardiogram.  Her PFT's demonstrated a slightly decrease DLCO (77% predicated) and increased TLC/RV.  Her CT scan was negative and she was felt to have no evidence of pulmonary HTN.

On 7-20-04 she had eaten a bowl of chili from a mix and within 15 minutes developed hives, facial swelling and lip swelling.  She was taken to the ED and admitted.  She was given an Epi-pen.  She reported that eggs and milk may maker her asthma worse.

On 7-26-04 she was seen at NIH and reported another episode do severe allergic reaction with facial swelling, hives and dyspnea.

On 12-21-04 Ms. Young was seen at NIH for swelling in ankles and feet.  She also reported dry eyes and morning stiffness and a taper off steroids.  She was diagnosed with Sicca and possible Raynauds syndrome.

In March of 2005.  Ms. Young was seen at that time for an asthma exacerbation.

In April of 2005, she was seen for an acute allergic reaction to food. She also fell and suffered a fracture of the wrist.

Ms. Young was seen on June 7(or 9th) of 2005 and 6-20-05 at Unity Health Care for a complaint of swollen ankles.  She also reported a severe allergic reaction to plantain and used an Epi-pen.  In addition,

11

was seen in the ER.  No obvious swelling was seen.

July 12th, 2005.  Ms. Young was seen at GWUH for allergy testing by the scratch method for aeroallergens.  These tests were negative.  She was rescheduled for intradermal skin testing which was done on 7-20-05 where she was found to be allergic to a number of tree pollens, Bermuda grass, dust mites and dog and cat dander.  The allergist noted… "It is interesting that her worst asthma has been in the Spring when the tree pollens counts are highest".

In September 2005, Ms. Young was seen for abdominal pain and was diagnosed with a urinary tract infection.  At that time she reported that she has environmental, sulfa, Cipro and morphine allergies.  Although she reported that she had an allergy to sulfa drugs, she was treated with Bactrim (trimethoprim/sulfamethoxazole).  Due to this error, and her underling allergy, she took the Bactrim and suffered and acute anaphylactic reaction requiring emergent treatment.  At this time, she also had acute appendicitis.

In March of 2006 Ms. Young was treated for a urinary tract infection.

On 4-4-06 Ms Young was seen at GWUH for an Asthma exacerbation

In June of 2006 she was treated, for a toothache and a fever.

In July of 2006 Ms. Young was treated for ankle swelling and myalgias as well as right calf pain.

In December of 2006, Ms. Young suffered from an acute anaphylactic

reaction to strawberries. It was recommended at that time that she undergo skin tested, but that she apparently stated that she would hold off.

Ms. Young also reports allergies to bananas, walnuts, preservatives, and certain spices.

Ms. Vanessa Ghee

In September 6th, 2002 Ms. Ghee was seen at GWUH for a productive cough for 3 weeks. Records indicate that she had a similar episode 3 months prior to this visit. She reportedly started smoking 2 years prior 1-pack per week a year prior to this visit. Her ENT and lung exams were normal except for a cough. She was diagnosed with viral bronchitis and discharged with antihistamines and an inhaler to follow up.

On September 13th, 2002 Ms. Ghee was seen again for her bronchitis. Her lung exam and ENT exams were normal with the exception of enlarged turbinates. She was again instructed again to stop smoking and was given an inhaler.

In November of 2002, Ms. Ghee was seen for an upper respiratory infection and sinusitis. She was further evaluated and found to have allergic rhinitis. She had a allergy/immunology evaluation at Kaiser. During that evaluation she denied smoking and a family history of allergies. She was found to have positive "...prick test against Alternaria, Aspergillis and Cladosproium. Dust mites were negative and cockroach gave a borderline reaction although histamine did not

13

react significantly.  The patient developed some itching on her arm most likely secondary rot skin testing."

On January 10th, 2004 Ms. Ghee was seen for sore throat and right ear pain.  With a reported history of asthma.  She was taking Singular and Advair, and reported being allergic to penicillin.  She was diagnosed with a URI and right-sided otitis media.  She was given antibiotics and discharged.

On September 24th, 2004 Ms. Ghee was evaluated for eye pain and swelling.  She also complained of maxillary sinus pain.  She was diagnosed with conjunctivitis, likely viral and sinusitis.

**Biomarkers**

The Plaintiff's expert suggests a profile for susceptibility and effect in persons exposed to mold.  He specifically opines that an increase leptin, and increase in MMP-9 a decrease in VEGF and MSH are markers of effect.  He further defines the haplotype 4-3-53 as being more susceptible to "biotoxin illness".  Multiple investigators have not prospectively studied these markers with appropriate control groups in order to validate these tests.

## METHODOLOGIES OF MEDICAL TOXICOLOGY

Certain basic tenets of medical toxicology are used to define a toxicological methodology for evaluating whether a given exposure to a substance causes some physiological or physical injury.  These tenets are described below.

## Dose Response Relationship

The notion that the dose makes the poison is the most basic rule in toxicology. This is also known as the biological gradient in Hill's postulates, or the dose-response relationship. This refers to an increase in the severity of signs and symptoms and the dose of a substance is increased in individuals. Furthermore, the dose-response relationship encompasses a threshold level. The threshold is the dose below which the probability of an individual(s) responding should be zero. The toxicological and biologic basis of thresholds is well established both clinically and experimentally. (Aldrich 1986)

## Target Organ Specificity

Substances may cause local or systemic effects if of sufficient dose. Local effects may occur at the initial site of contact between the chemical and the biological system. The substance, its physical chemistry, and the pathway of exposure, the meteorological conditions and setting all factor in the determination of the degree of injury. Systemic effects may occur only after sufficient dose has been achieved. In systemic toxicity, not all organs are affected to a similar degree. Rather, one or two organ systems are the target of the substance. These are the "target organs" and specific substances are therefore said to have "target organ specificity". The target organs for chlorine and chlorine dioxide include the moist mucous membranes, and the respiratory tract. The Institute of Medicine report on Damp Indoor Spaces reports that only allergic reactions have sufficient medical evidence to support a cause and effect relationship. It is my opinion that a causal nexus has not been demonstrated by Plaintiff's in this case.

15

## Requirement For Physical Contact with Substance

In order for either local or systemic toxicity to occur, there must be physical contact between the substance and the biological system.  If there is no exposure, then there can be no contact.  If there is no contact, there is no dose and no potential for associated medical illness.  In this instance, inhalation was the potential pathway of exposure.  Exposure is the opportunity for contact, which is the case with Plaintiff's.  They had opportunity, but no evidence of direct and specific contact with the material.

## Cause and Effect Relationship

There is an accepted scientific methodology for establishing a cause and effect relationship between potential exposure to a substance in the environment and the development of a medical illness or the establishment of a risk for development of injury in the future.  This methodology requires a case-by-case assessment of the exposure, all relevant medical and exposure circumstances, as well as host susceptibility.

The dose absorbed by an individual depends on numerous factors including exposure (e.g., the concentrations of the substances and frequency and length of time of contact and the pathway of the substance), the nature of the substance, and numerous medical and other susceptibility factors relevant to the individual.  Thus, reaching an acceptable conclusion must unavoidably involve an analysis of the pertinent toxicological data, (i.e. the exposure, dose if any, and medical condition or estimated risk of developing a medical condition), as well as accepted criteria for establishing causation of the medical condition (or risk of its development in the future).  These criteria include the nature of the effect, its dose-response relationship, time-

course relationships, alternative causes evaluated by performing a differential diagnosis, and the coherence of the evidence including its consistency and biologic plausibility. Such an analysis on a case-by-case basis is the only medically and scientifically valid process for establishing the presence and cause of a medical condition.

I have reviewed extensive materials in this case and I find in this material no basis for concluding that the plaintiffs' exposure to "mold" resulted in any persistent adverse health consequences. Even though it is customary and acceptable in the practice of medicine to consider many possibilities in reaching a diagnosis, even those that may be improbable, establishing causation to a reasonable degree of medical and toxicological certainty requires, in most instances, a high standard of evidence and logical analysis. This formal causation analysis is lacking in plaintiffs' expert reports.

## EXPOSURE/DOSE ASSESSMENT

To evaluate whether a given exposure might result in a defined injury, certain specific information must be considered. The development of a toxin-induced illness requires the presence of a substance, the opportunity for contact, a dosage, and an illness that is consistent with the specific substance. These required steps are illustrated and presented (abstracted and modified from) below according to the International Programme on Chemical Safety (IPCS 2000) and include source, exposure issues, intake, uptake, doses and some potential

17

adverse health effect.



**Fig. 2. The domain of exposure assessment in relation to an environmental health paradigm (adapted from IPCS, 1993; Sexton et al., 1995a)**

*Sources*

The origin of an occupational or environmental agent is known as the source. Sources include primary sources, including *point sources* (e.g. air-handling units, building materials) versus *area sources* (e.g. vehicular traffic), *stationary sources* (e.g. refinery) versus *mobile sources* (e.g. automobile), and *anthropogenic sources* (e.g. landfill) versus *non-anthropogenic sources* (e.g. natural vegetation) and secondary sources including *vapor condensation* on particles and *neo-toxicants*. A source of potential exposure to specific substances in this case includes the dark material on the walls of the adjacent apartment. Plaintiffs have not demonstrated that there is shared air

between the apartments, or that the dark material on the walls was penetrating the wallboard into their apartment. This was not characterized by Plaintiff's. No other testing was done it the apartment by Plaintiffs to determine if other allergens may have been causing or contributing.

### Exposure Pathway

The pathway is the physical course that an agent takes, in moving from a source to the point of potential contact with a subject. The amount of substance in the media is quantified as its concentration. Media concentrations may be defined in dust or soil, food, water, air, and other. Here, the only potential pathway is inhalation. There are reports of a sewer gas odor in their apartment, which is an exposure by the inhalation pathway. The perception of odor does not translate into an illness. There is no demonstration that any materials were in the air at the time the Plaintiffs were in the apartment. Therefore, the pathway is incomplete.

### Exposure Concentration

The amount of a substance in a carrier medium at the point of contact with the outer boundary of the human body is known as exposure concentration. This is the mass of a substance present and is expressed as volume or mass. This information is not necessarily useful unless it is further converted into dose or risk assessment. The concentration of the substances decreases due to dilution; the further one is form the source. The concentration in a vapor cloud may also be affected by wind spread and eddy currents that may exist in and around a facility. No quantification has been done in this case.

### Exposure Route

Routes of exposure include inhalation, ingestion, dermal contact, or a combination of the aforementioned.  The potential exposure route in these plaintiffs potentially includes inhalation and dermal contact on uncovered areas of the skin.  Not determined by Plaintiffs in this case.

### Intake

Typically, intake is associated with either inhalation or ingestion of an agent, which is likely to be taken up as part of a carrier medium in air, soil, water, dust, food, etc.  This typically enters the body by bulk transport either through the nose or mouth.  It can be defined by the mass that crosses the given boundary per unit time as the intake rate.  This is the product of exposure concentration times the rate of either ingestion or inhalation.  For inhalation the intake may be calculated for a defined period of time based on the volume of air consumed.  An ingestion intake is usually expressed as the amount of food or water consumed, times a substance concentration in the media during a given time.  Not determined by Plaintiffs in this case.

### Uptake

Uptake refers to the amount of the substance that crosses the boundary of the body either by absorption through the skin, respiratory, or gastrointestinal tracts.  The rates of bulk transport across absorption barriers are generally not the same for the agent and the carrier medium.  The amount that crosses the barrier per unit time is referred to as the uptake rate.  This is a function of the concentration, carrier mechanism, permeability and surface area of the exposed barrier and may be referred to as flux.  The uptake of a

substance is subject to the water solubility of the substance.  The Plaintiffs have not determined that this occurred.

### Dose

Once a toxicant enters the body either by intake or uptake it is described as dose.  The dose is further defined into several levels that are relevant to exposure estimations.  No direct determination by Plaintiffs'.

### Potential Dose

This is the amount of an agent that is actually ingested, inhaled, or applied to the skin.  It may also be referred to as the administered dose.  The concept of potential dose is straightforward in inhalation or ingestion applications.  However, more complicated for dermal routes.  For example, an agent that is applied in a pure form may be in direct contact with the skin.  However, this is diluted, as part of a carrier medium in water (perspiration), solvents (lotions or creams) or other carriers.  Not all the potential dose will actually be touching the skin and available for absorption, but may also evaporate or dislodge from the skin.

### Applied Dose

This is the amount of the agent that is in direct contact with the body's absorption barrier such as the skin, respiratory or gastrointestinal tract and therefore available for absorption.  Typically the applied dose is not readily available for measurement and is calculated from the potential dose based on a variable such as bioavailability.

### Internal or Absorbed Dose

This is the amount of an agent absorbed and therefore available to undergo pharmacokinetic or toxicokinetic processes.  Not determined in this case.

### Delivered Dose

Delivered dose is the portion of the internal dose or absorbed dose that reaches the tissue of interest.  This step includes bioavailability and distribution.  Not determined in this case.

### Biologically Effective Dose or Target Dose

This is the portion of the delivered dose that ultimately reaches the site or sites of potential activity, the target organ.  The association between biologically effective or target dose and subsequent disease or illness depends on the relationship between the dose and the response (for example, the shape of the dose/response curve) as well as application of a formal causation analysis.  This also includes underlying toxicodynamic mechanisms (for example, compensation, damage, repair) and susceptibility factors (for example, environmental weather conditions, health status, nutrition, stress, genetic predisposition). Not determined in this case.

### Biologic Effect

This is a measurable response to a dose on a receptor cell or tissue.  The significance of a biologic effect, whether it is an indicator or precursor for subsequent adverse health effects, may not be known.  These effects may be either beneficial or cause adverse physiological

consequences. The body has the ability to repair many inconsequential injuries, and no adverse effect occurs until this capacity has been overwhelmed.

### *Adverse Effect*

This is a biological effect that causes some change in morphology, physiology, growth, development, or lifespan. It may result in impairment of functional capacity to compensate for additional stress or increase in susceptibility to the harmful effects of other influences. (IPCS 2000) Substances may be filtered, ignored or cause injury to tissues. If an injury occurs, repair mechanisms may be either partial or complete.

## Causation Methodology

A medical complaint alone cannot be used to determine dose, exposure, or a source. If an individual has had the opportunity to contact a substance (exposure), has received a dose of a sufficient quantity and a recognized medical condition develops, then a differential diagnosis must be performed to consider all possible etiologies known to present with the objective findings. A consideration of alternative causes for a diagnosis must be considered at this juncture. Then causation analysis must be used to determine if the illness is the direct result of the substance. Typically, the causation criteria put forth by Sir Austin Bradford Hill are used to determine causation (Hill 1965); others are also used (Doll 1984, Evans 1976, Guidotti 1986, Hackney 1979). If the individual has been exposed, has received a dose, and the dose is of a sufficient

magnitude to cause an injury, then there must be a compatible medical condition. Evaluation of the medical condition is achieved through the traditional approach including a history, a physical examination, and the application of medical laboratory tests. From these, a list of possible diagnoses (differential diagnosis) is assembled. There are entire texts devoted to the differential diagnosis of signs and symptoms. Then the process of differential diagnosis possibilities are included or excluded until the best diagnosis of the person's condition is established. This entity then becomes the subject for a formal toxicological causation analysis. See Attachments 1-2.

In addition, there are few medical conditions specific to one complaint. In diagnostication, a symptom is considered to be an abnormal sensation perceived by the patient, as contrasted with a physical sign that can be seen, felt, or heard by the examiner.

Complaints (symptoms) are subjective, and must be supported with objective (physical signs, testing) data. Medical conditions caused by a substance can also be caused by many other circumstances. A substance may produce several different kinds of physiological perturbations to different tissues depending on the dose and duration at which it was been received. Substances generally can produce a range of health effects that overlap with, or may be identical to, those effects caused by infectious agents, genetic deficiencies or other factors based on dose-response. Therefore, all causation criteria should be considered, not simply the specific disease or range of conditions reported in a group of individuals, before arriving at a final opinion.

A common inaccuracy in causation analysis is reasoning by the use of *post hoc, ergo propter hoc* (after the fact, therefore, because of the fact). That is, the alleged symptoms and ailments are used in an attempt to explain that sufficient exposure and dose have occurred. Then, it is argued that exposure has now been shown to be sufficient, and this "proof of exposure" becomes a basis for explaining the cause of the symptoms and ailments. In short, the symptoms fundamentally become the basis for explaining themselves. Such circular reasoning is not scientifically or medically acceptable. Subjective symptoms thus cannot serve as the basis for concluding that an individual has in fact been exposed to, or received a significant toxicological dose. This circular reasoning is, in fact, the methodology used by plaintiffs in this case. No evaluation was done by Plaintiffs to determine if there are any alternative explanations for the health conditions in these plaintiffs.

Perhaps the most widely accepted methodology for the establishment of causation is that proposed by Sir Austin Bradford Hill in 1965 (Hill 1965). Hill broke down the question of causation into nine distinct conditions necessary to establish a causal relationship between two things (*e.g.* an exposure and the development of a health effect). The nine "Hill Criteria" for establishing causation are as follows:

1. Strength
2. Consistency
3. Specificity
4. Temporality
5. Biological Gradient
6. Plausibility
7. Coherence
8. Experiment
9. Analogy.

This methodological approach has been adopted by several agencies and bodies, including, but not limited to: the World Health Organization (2006), United States Environmental Protection Agency (2005), Agency for Toxic Substances and Disease Registry (ATSDR) 2001, National Academy of Sciences (1999).

In order to provide an appropriate framework for the present discussion, each of the Hill Criteria is described.

1. *Strength*: *The magnitude of the alleged association when measured using appropriate statistical tests.*
2. *Consistency*: *Different persons in different places, circumstances and times, must also observe the observed association.*
3. *Specificity*: *A single cause produces a specific, defined effect.*
4. *Temporality*: *Exposure must occur prior to development of the outcome.*
5. *Biological Gradient*: *The "dose-response" relationship.*
6. *Plausibility*: *The association is consistent with current accepted understanding of pathological mechanisms.*
7. *Coherence*: *The association is compatible with existing theory and knowledge.*
8. *Experiment*: *Introducing an appropriate experimental regimen can alter the condition.*
9. *Analogy*: *Consideration for all other possible alternative explanations.*

If these criteria are applied in this case, there is no support for a causal association between the dark material on the adjacent apartment walls and the Plaintiffs health complaints.

**Cholestyramine**

This drug adsorbs and combines with bile acids in the intestinal track to form an insoluble complex that is then excreted from the bowel. This

results in partial removal of bile acids. The increased fecal loss of bile acids leads to an increased oxidation of cholesterol to bile acids, which results in a decrease in LDL and total serum cholesterol levels. Cholestyramine is not absorbed from in intestinal track, but may bind with concurrent medications to alter their absorption.



typical structure of main polymeric groups

Cholestyramine has been studied as a method to reduce mycotoxins in cereals and feed grains. It does apparently decrease the free-fraction of fumonisins. (Solfrizzo 2000) These mycotoxins have been found to cause hepatotoxicity in and hepatocellular tumors in rats. However, this has not been studied in humans to reduce mycotoxin levels or to alter health effects. Cholestryamine is an approved medication that is being prescribed by Plaintiff's expert on an "off-label" experimental protocol. However this is not supported by weight of the scientific literature. The Plaintiffs have not followed this recommendation to take this medication by Dr. Shoemaker.

**Summary and Basis of Opinions**

1.    Ms. Denicole Young sufferers from multiple allergies, including food, environmental and medication.  She has not been tested for specific mold antigens that may have been present in the apartment she photographed in 2002.  This is based on the medical records.  Thus, there is no specificity in this case.

2.    Ms. Denicole Young has asthma, caused by allergic precipitants. There is no evidence that the "moldy" walls of the next-door apartment caused or aggravated her asthma.  This is based on the scientific literature and the supported by Institute of Medicine Report that states that there is "Inadequate or Insufficient Evidence to Determine Whether an Association Exists" between mold exposure in damp indoor spaces and "Airflow obstruction (in otherwise-healthy persons)" or "Asthma development".  This is also based on the medical records.

3.    There is no supportive data that the episode of status asthmaticus (April 2003) suffered by Ms. Young was caused by an exposure to "mold" in an apartment several months prior to the hospitalization.  This is based on the scientific literature and the Institute of Medicine Report.  There are no specific allergy tests in the Plaintiff that would demonstrate a link with the "mold" found in the adjacent apartment in 2002.

4.    The methodology offered by Plaintiff's expert is not generally accepted in the toxicology community.  His own laboratory "normal ranges" does not support his use of a "pattern of biomarkers" for Ms. Young.  If the laboratory assigned normal ranges is used, there are no significant abnormalities in some of the tests.  These tests have not been validated in prospective controlled trials from multiple investigators. In fact, the laboratories that did the tests consider many of the tests that the Plaintiffs' expert relies upon experimental.  An example can be seen on the laboratory sheets at Bates number 00002165, but is present for many of his biomarkers:

> MMP-9 (matrix Metalloproteinase-9)
> "This test was performed using a kit that has not been cleared or approved by the FDA.  The analytical performance characteristics of this test have been determined by Quest diagnostics Baltimore.  This test should not be used for diagnosis without confirmation by other medically established means."

28

Dr. Shoemaker testified that there is a Japanese study that supports his contention about susceptibility genes. Ando (et al 1989) studied an association between hypersensitivity pneumonitis and Trichosporon cutaneum. The paper did not study a similar exposure event to the Plaintiffs in this case.

5.   Treatment with cholestyramine, as recommended by Dr. Shoemaker, is not prescribed as an FDA approved indication. This medication was not used by plaintiffs, and is not supported by the peer reviewed scientific literature to be efficacious for "mold" exposure.

5.   Similarly, the use of the susceptible haplotypes has not been prospectively validated against controls as truly being markers of increased susceptibility. This is nothing more than a hypothesis, similar to the biomarkers discussed above, and not generally accepted in the general medical community.

6.   There is no evidence that Ms. Young has suffered any illness directly <u>caused</u> by the brief exposure to "mold" in the apartment in 2002. This is based on the medical records that follow the exposure event.

7.   There is no evidence that Ms. Ghee has suffered any illness directly <u>caused</u> by the brief exposure to "mold" in the apartment in 2002. This is based on the medical records.

8.   Ms. Young has sickle cell trait, which is not related to the exposure in the home in 2002. This is based on her medical records and scientific literature.

9.   It is my opinion that measuring the biomarkers selected by Dr. Shoemaker in September 2007 would not bear any direct connection to an event 5 years earlier. Furthermore, if the Plaintiffs elected to take the cholestyramine and prescribed by Dr. Shoemaker, any change in the biomarkers in the few months that followed would not have any relevance to the event of August and September of 2002.

## List of Testimony

A complete list of my testimony for the last 4 years is attached.

**Invoicing Rates**

I invoice my time at $395.00 per hour for all work performed on this case.

Sincerely,

Scott Phillips, MD, FACP, FACMT, FAACT
Associate Clinical Professor of Medicine
Rocky Mountain Poison & Drug Center
University of Colorado Health Sciences Center
Newfields, LLC
Denver, CO