UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DENICOLE YOUNG and    :
VANESSA GHEE,      :
            :
   Plaintiffs,      :
            :
  v.         :  Case No.: 1:07cv983 (ESH)
            :
LEWIS & TOMPKINS, P.C, *et al.*,  :
            :
   Defendants.     :

## DEFENDANTS' MOTION TO EXCLUDE OPINION
## TESTIMONY OF PLAINTIFFS' EXPERT, DR. RITCHIE SHOEMAKER

Pursuant to *Daubert v. Merrell Dow*, 508 U.S. 579, 113 S.Ct. 2786 (1993), and its progeny, Fed. R. Evid. 702, and Fed. R. Evid. 703, Defendants Lewis & Tompkins, P.C. and William F. Burton, Esquire, by and through their respective and undersigned counsel, move to exclude the opinions of plaintiffs' identified "biotoxin associated illnesses" or mold expert, Ritchie Shoemaker, MD (hereinafter "Dr. Shoemaker"). As grounds for this Motion, and based upon the record developed in this litigation, Defendants request that this Honorable Court exclude Dr. Shoemaker and his opinion testimony because it is inadmissible for the following reasons: (1) Dr. Shoemaker admits that he cannot testify to the nature and extent of plaintiffs' injuries and as such all opinions to that effect must be precluded; (2) Dr. Shoemaker admits that he cannot causally relate alleged mold exposure in August/September 2002 to DeNicole Young's hospitalization for asthma in April 2003, and as such, all opinions to that effect must be precluded; (3) Dr. Shoemaker's causation opinions are not based on a reliable methodology and must, therefore, be excluded; (4) even if Dr. Shoemaker's causation opinions follow reliable methodology, he and plaintiffs have failed to follow

them in this instance, and therefore his opinions must be excluded; and (5) other courts have excluded or limited Dr. Shoemaker's testimony.

As additional support for the grounds of this Motion, Defendants refer this Honorable Court to their accompanying Memorandum of Points and Authorities, which is incorporated herein by reference.

WHEREFORE, Defendants Lewis & Tompkins, P.C. and William F. Burton, Esquire respectfully request that this Honorable Court exclude Dr. Shoemaker and his opinion testimony and request a *Daubert* hearing in connection with this Motion.

Respectfully submitted,

CARR MALONEY P.C.                          JORDAN, COYNE & SAVITS, L.L.P.

By:/s/  ***Paul J. Maloney***                     By:/s/  ***Deborah Murrell Whelihan***
    Paul J. Maloney, #362533                  Deborah Murrell Whelihan #412454
    Ali Beydoun, 475413                          1100 Connecticut Avenue, N.W.
    1615 L Street, N.W., Suite 500              Suite 600
    Washington, D.C.  20036                     Washington, D.C.  20036
    (202) 310-5500 (Telephone)                 (202) 296-4747 (telephone)
    (202) 310-5555 (Facsimile)                 (202) 496-2800 (facsimile)
Attorneys for Defendant Lewis & Tompkins,     Attorneys for Defendant William F. Burton,
P.C.                                          Esquire

### ORAL *DAUBERT* HEARING REQUESTED

Defendants, in accordance with LCvR 7 (f) request an oral hearing on this Motion.

*/s/  **Paul J. Maloney***
    Paul J. Maloney

## LCvR 7(m) STATEMENT

I, Paul J. Maloney, Esquire hereby certify that I conferred with the Plaintiffs' counsel, Peter C. Grenier, Esquire, by telephone on February 15, 2008, about this Motion and about Defendants' belief that Dr. Shoemaker's testimony is not properly admissible. Plaintiffs disagree and will oppose this Motion.

**/s/  *Paul J. Maloney***
Paul J. Maloney

## CERTIFICATE OF SERVICE

I HEREBY certify that a true copy of the foregoing Motion, accompanying Memorandum of Points and Authorities, and Proposed Order were served electronically and via hand delivery on this 15th day of February, 2008 to:

> Peter Grenier, Esquire
> Michael Hibey, Esquire
> Bode & Grenier
> 1150 Connecticut Avenue, N.W.
> 9th Floor
> Washington, D.C.  20036
>
> Deborah M. Whelihan, Esquire
> Jordan Coyne & Savits, LLP
> 1100 Connecticut Avenue, N.W.
> Suite 600
> Washington, D.C.  20036

/s/  ***Paul J. Maloney***
Paul J. Maloney

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DENICOLE YOUNG and        :
VANESSA GHEE,           :
                              :
        Plaintiffs,        :
                              :
     v.                 :     Case No.: 1:07cv983 (ESH)
                              :
LEWIS & TOMPKINS, P.C, *et al.*,  :
                              :
        Defendants.      :

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE OPINION
TESTIMONYOF PLAINTIFFS' EXPERT, DR. RITCHIE SHOEMAKER**

Defendants Lewis & Tompkins, P.C. and William F. Burton, Esquire, by and through their respective and undersigned counsel, move to exclude the opinions of plaintiffs' identified "biotoxin associated illnesses" or mold expert, Ritchie Shoemaker, MD (hereinafter "Dr. Shoemaker"), and, for reasons therefor, state as follows:

## I.   FACTUAL BACKGROUND

### a.    Plaintiffs' Allegations as to Missed Statute of Limitations

This case involves the legal malpractice claims of DeNicole Young (hereinafter "Young") and Vanessa Ghee (hereinafter "Ghee") against defendants on a claimed missed statute of limitations for plaintiffs' toxic mold case. Plaintiffs allege that, as a result of defendants' breach in failing to prosecute their toxic mold claims prior to the running of the statutory period for bringing such claims, they are barred from receiving any relief for the injuries they claim to have suffered as a result of their alleged exposure toxic mold.

For purposes of this Motion, defendants need not address the merits of the alleged missed statute of limitations. Plaintiffs' legal malpractice case only has merit to the extent their underlying mold case had merit. This Motion simply addresses whether Dr. Shoemaker should be excluded from testifying to his opinions regarding a causal connection between an alleged exposure to an unknown mold toxin and regarding plaintiffs' alleged injuries.

### b.    Plaintiffs' Residence at Stanton Glen Apartments

Plaintiffs moved to Apartment 2A at 3064 Stanton Road, S.E. on or about August 19, 2002. (Complaint, ¶8). Plaintiffs resided in this apartment for approximately 34 days or until September 23, 2002. (Exhibit 1, Deposition of Ghee, pp. 15, 141-143). Plaintiffs contend that they were exposed to toxic mold and/or raw sewage while living in this apartment. (Complaint, ¶¶8-11). Plaintiffs contend that the raw sewage was draining from a pipe outside of their apartment, and that mold was located in the adjacent apartment while they resided in Apartment 2A. In September 2002, in the course of investigating the smell of sewage, plaintiffs entered Apartment 1A through a window and took photographs of purported mold at that time. (Exhibit 3, Young Deposition, pp. 175-178). Plaintiffs are not certain how long they remained in Apartment 1A, but believe it may have been a minute or two. (*Id.*) Plaintiffs do not believe that Apartment 1A and 2A shared a common air source during the time they lived in Apartment 2A. (Exhibit 1, pp. 452-453). On September 23, 2002, plaintiffs signed a second lease agreement for a different building in the apartment complex, 3084 Stanton Road, Apartment 101 (Exhibit 2, Lease Agreement), and they moved to that second apartment on or about that date. Based on this approximate 34-day exposure to an unknown mold or other toxin from an adjacent apartment, and from exposure inside the adjacent apartment for maybe a minute or two, plaintiffs claim a myriad of medical problems.

### c.     Plaintiffs' Medical Complaints

There has been a significant medical record developed for both Ghee and Young in the course of this litigation.  Relevant records for Ghee are attached as Exhibit 4, and those for Young as Exhibit 5.  Defense expert toxicologist, Scott Phillips, M.D., and defense expert immunologist, allergist and epidemiologist, S. Michael Phillips, M.D. (no relation), summarized plaintiffs' medical records in their reports at Exhibit 6, Dr. Scott Phillips' Report, pp. 6-14, and Exhibit 7, Dr. Michael Phillips' Report, pp. 3-5.  A brief summary of plaintiffs' medical records follows.

Ghee has a much less complicated medical history than Young.  She was seen at George Washington University Hospital (hereinafter "GWUH") on September 6, 2002 for a productive cough of three weeks duration. She had a similar episode three months prior to this visit.  She reportedly smoked one pack per week for one year prior to this visit (Exhibit 6, Dr. Scott Phillips' Report, p. 13, and Exhibit 4 at Y/G 19).  She was diagnosed with viral bronchitis and discharged with an antihistamine and inhaler.  On September 13, 2002, she was again seen at GWUH for bronchitis.  Her lung and ENT exams were normal with the exception of enlarged turbinates.  She was again instructed to stop smoking, and given an inhaler.  After moving out of Apartment 2A on September 23, 2002, Ghee had additional but limited visits with health care providers.  (Exhibit 4).

Young's medical history was much more complicated.  In 1996, she was treated for bronchitis, sinusitis, nasal and chest congestion, facial pain, and rhinorrhea.  In 1997, she was treated for complications for her sickle cell trait, sinusitis, and pharyngitis.  In 1998, she was diagnosed with sinus congestion, wheezing with chest congestion, sinusitis, pharyngitis, and apparently asthma.  She was prescribed two anti-asthma medications, Albuterol and Azmacort.  In 2000, Young was diagnosed with chronic fatigue.  It was reported that she was not able to get out of

bed, and had no motivation. There are no medical records available from March 2000 to April 2002.

Young had two visits to GWUH during the time that she lived in Apartment 2A. On September 6, 2002, she had complaints of coughing for which she was treated for bacterial infection. She also received Albuterol. On September 13, 2002, she provided the hospital with a prior history for "SC" (sickle cell) and asthma. (Exhibit 5, Y/G 656). She had no fever, congestion, or chest pain, and her pulmonary and ENT exams were normal. On September 24, 2002, she was seen by her primary care physician and treated for allergic rhinitis and asthma. Significantly, on November 5, 2002, Young reported to her primary care physician that she felt better after moving to a new apartment. She was seen by a number of health care providers for allergies, rhinitis, and asthma over the course of the next five months. On April 15, 2003, she was admitted to GWUH for asthma exacerbation. Part of the medical history included a prior intubation for asthma in 1997, and known triggers for her asthma were identified as pollen and URI (upper respiratory infection). (Exhibit 5, Y/G 672-674, 726, 727). This hospitalization, approximately nine months after she moved from Apartment 2A, cost approximately $80,000, and is the primary reason why Young retained defendants on May 3, 2003 (Exhibit 8, Retainer Agreement). The causal connection between this hospitalization and the alleged mold exposure nine months earlier is a critical issue in this litigation.

Following April 2003, Young had numerous medical complications to include anaphylactic reactions, asthma exacerbation, swelling of ankles and feet, and much more, all of which defendants contend are not causally related to any alleged mold exposure in August/September 2002.

**d.      Plaintiffs' Expert – Ritchie Shoemaker, M.D.**

Plaintiffs' sole identified medical and causation expert, Dr. Shoemaker, is a family practitioner from Pocomoke County, Maryland.  Dr. Shoemaker has had no privileges at any hospital since 2002 (Exhibit 9, Shoemaker Deposition at p. 32).  Dr. Shoemaker admits that he is not a specialist in any of the following medical disciplines:  genetics, toxicology, mycology, allergy, immunology, epidemiology, rheumatology, occupational environmental medicine, industrial hygiene medicine, neuropsychology, pulmonology, endocrinology, or teratology, among others. (*Id*. at p. 188, 189).  Dr. Shoemaker's practice concerns the treatment of patients with a constellation of illnesses for which Dr. Shoemaker has created the term, chronic biotoxin associated illness or "CBAI" and concerns the industry that Dr. Shoemaker has build around CBAI in which he markets his so-called expertise in the diagnosis and treatment and sells among other things, his self-published book, "Mold Warriors." (*See*, Exhibit 9, Shoemaker Deposition at p. 196).

Following his single evaluation of plaintiffs on September 11, 2007 and before he realized that he was a consultant for the plaintiffs (Exhibit 9, Shoemaker Deposition at pp. 195-196), he issued a lengthy (193 pages), rambling report six days later (Exhibit 10, Shoemaker Report) in which he offered, *inter alia*, the following opinions:

1.      "To a reasonable degree of medical certainty at this point in time it is my opinion that the exposure to the interior environment of the water-damaged building is the sole cause of the acute and then chronic illnesses of Mss. Young and Ghee.  There is no evidence that their illness syndrome is affected by any other medical condition." (Exhibit 10, Shoemaker Report, p. 1).

2.    "The time line in this case supports the contention that exposure to the indoor air environment of Mss. Young and Ghee's townhouse causes their complex, multisystem, multisymptom illness." (Exhibit 10, Shoemaker Report, p. 1).

3.    "…to a reasonable degree of medical certainty…not only did Mss. Young and Ghee suffer a chronic disease as a result of their exposure to the WDB, but also it is my opinion to a reasonable degree of medical certainty that their illness was as a result of a gradually developing, ongoing injury caused by exposure to toxigenic organisms, including but not limited to, toxigenic fungi." (Exhibit 10, Shoemaker Report, p. 5).

The 26(a)(2) disclosures for plaintiffs state that Dr. Shoemaker will provide "expert testimony concerning, *inter alia*, the cause and extent of the injuries and damages to DeNicole Young and Vanessa Ghee, the necessity of the medical care they have received, the amount of and reasonableness of the costs related thereto, as well as the cause, extent, and permanency of their injuries arising from the exposure giving rise to this litigation."  (Exhibit 11, Plaintiff's Rule 26(a)(2) Disclosures).

Dr. Shoemaker is a self-proclaimed and self-promoting "mold expert" or expert in the diagnosis and treatment of chronic biotoxin associated illnesses.  Dr. Shoemaker defines mold illness or chronic biotoxin associated illness in two tiers.  To satisfy the first tier, the patient must have: (1) the potential for exposure; (2) the presence of a distinctive grouping of symptoms; and (3) the absence of confounding diagnoses and exposures. The second tier of objective factors include three of six of the following:  (1) HLA DR by PCR showing susceptibility; (2) reduced levels of melanocyte stimulating hormone (MSH) in a properly performed specimen; (3) elevated levels in Matrix Metalloproteinase-9 (MMP-9) in a properly prepared serum specimen; (4) deficits in visual contrast sensitivity (VCS); (5) dysregulation of ACTH/Cortisole in

simultaneously obtained specimens; and (6) dysregulation of ADH/Osmolality in simultaneously obtained specimens. (Exhibit 10, Shoemaker Report, p. 23-32).

Besides his creation of the disease, Dr. Shoemaker has also created his own five-step protocol for diagnosing mold illness and causally relating the illness to mold exposure as follows: (1) evaluate the patient by way of physical examination, pulmonary function test, VCS test, and blood test to determine biomarkers identified in tier two above; (2) treat the patient with cholestyramine (CSM), a cholesterol-lowering drug that he uses on an off-label basis; (3) once the biomarkers are moderated based on CSM treatment, eliminate all other potential sources of exposure (*e.g.*, home, car, shopping centers, *etc.*) by having the patient stay off CSM and not return to the suspected mold environment; (4) return to the mold environment without cover of CSM for no more than three days; and (5) retest for higher biomarkers based on re-exposure. (Exhibit 10, Shoemaker Report, pp. 31, 32; and Exhibit 12, *Mold Warriors*, pp. 59-104, pp. 191-205). By following this protocol, Dr. Shoemaker believes that he can then establish cause and effect between mold exposure and a patient's symptoms.

Dr. Shoemaker's methodology and protocols are not accepted in the medical community, generally or otherwise, and are not followed by anyone except him and his fellow "mold warriors" followers. Dr. Shoemaker lacks appropriate qualifications to render opinions about the ailments from which the plaintiffs claim to suffer and about the causality for those ailments. The only publications that support and accept his diagnosis and treatment methodologies are his own. For these reasons as well as the reasons that follow, Dr. Shoemaker should be precluded from testifying at trial in this matter.

## II.    STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

In the United States District Court for the District of Columbia, the admissibility of expert testimony is governed by the analysis set forth by in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and the Federal Rules of Evidence, particularly Fed. R. Evid. 702 and Fed. R. Evid. 703.

In *Daubert,* the Supreme Court of the United States described a trial judge's "gatekeeping" function and the trial court's responsibility "to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." (*Id.* at 509 U.S. at 589).  In carrying out its analysis, the trial court must determine "first, whether the expert's testimony is based on 'scientific knowledge'; and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" (*Id.* 509 U.S. at 592); *Raynor v. Merrell Pharmaceuticals, Inc.*, 323 U.S. App. D.C. 23; 104 F.3d 1371, 1374-1376 (D.C. Cir. 1997).

The first prong of the *Daubert* analysis requires the trial court to assess the methodology employed by the expert as a means of ensuring evidentiary reliability. (*Id.*)  The Supreme Court has provided a non-exhaustive, flexible list of factors to help courts determine whether the proffered testimony satisfies the first prong of the *Daubert* test. This list includes: (1) whether the subject of the expert's testimony "can be (and has been) tested"; (2) whether it has been "subjected to peer review and publication"; (3) "the known or potential rate of error" of the relevant scientific technique; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether it is "generally accepted" in the relevant scientific community. *U.S. v. Libby*, 461 F.Supp.2d 3, 6 (D.D.C. 2006) (citing *Daubert,* 509 U.S. at 593-94).

In applying the second prong of the *Daubert* test, evidence must be relevant. Basing its logic on the text of Rule 702 (evidence must "assist the trier of fact"), the Court explained that "expert testimony which . . . is not relevant [is] ergo non-helpful." *509 U.S. at 591* (quoting 3 Weinstein & Berger, paragraph 702[02], at 702-18).

As a whole, *Daubert* and its progeny require trial courts to act as gatekeepers to the admission of expert testimony. With respect to mold litigation, an expert must be able to demonstrate—by a preponderance of the reliable evidence—that exposure to toxic mold *caused* plaintiffs' injury. Absent such proof, the expert's analysis is unreliable and irrelevant. As discussed below, the testimony of Dr. Shoemaker has not, and cannot prove, a causal connection between plaintiffs' alleged exposure to mold in the underlying litigation and any particular illness from which the plaintiffs may suffer.

### III.    ARGUMENT

a.    **Dr. Shoemaker Admits That He Cannot Testify To a Causal Connection Between Young's Alleged Mold Exposure in August/September 2002 And Young's April 15, 2003 Hospitalization**

Dr. Shoemaker's testimony fails to provide a reliable or a sufficient basis that would demonstrate any casual connection between Plaintiffs' allegations of toxic mold exposure from their first apartment and their various subsequent illnesses which they attribute to toxic mold exposure. Searching for such support, Defendants asked Dr. Shoemaker a series of questions at his deposition relating to the causal relationship between an alleged mold exposure in August/September 2002 and Young's nine-day hospitalization in April 2003. Dr. Shoemaker admits that he has no objective information to substantiate that the plaintiffs were exposed to toxic mold since no testing was done by the plaintiffs at the time of their exposure. (Exhibit 9, Shoemaker Deposition at pp. 203-206). Dr. Shoemaker also concedes that the plaintiffs'

unauthorized entry into the adjacent apartment for the purpose of taking photographs and a video increased any alleged indirect exposure that the plaintiffs might have had from their brief residency in apartment 2A. (Exhibit 9, Shoemaker Deposition at pp. 194-195).

In at least three places, the 2003 GWUH records refer to Young having been on a ventilator as recently as 1997.  (Exhibit 5, Y/G 672-673, 674, and 727).  The GWUH records also attribute the cause of Young's ongoing asthma emergency, per her patient history, to pollen and to upper respiratory infection (URI).  (Exhibit 5, Y/G 674).  During the deposition, Dr. Shoemaker questioned the accuracy of the GWUH records due to: (1) lack of supporting documentation concerning a prior ventilator; (2) an interview with Young; and (3) errors in the GWUH chart.  (Exhibit 9, Shoemaker Deposition at pp. 176-179).  Despite his misgivings, Dr. Shoemaker admits that he cannot express an opinion that the alleged mold exposure seven months earlier caused Young's asthma attack in April, 2003.  (Exhibit 9, Shoemaker Deposition at pp. 174-180).

Significantly, Dr. Shoemaker concedes that, even if there was no ventilator in 1997, he still cannot identify the cause of Young's April 2003 hospitalization.  Dr. Shoemaker cannot say whether Young's condition in March/April 2003 was due to pollen, infection, or exposure to mold in a different building.  (Exhibit 9, Shoemaker Deposition at pp. 177-178).  Similarly, Dr. Shoemaker cannot say whether Young had allergic asthma in April 2003 because he does not have contemporaneous data such as a blood sample that would have shown what her C-4A was at that time.  (Exhibit 9, Shoemaker Deposition, pp.  179-180).  In sum, Dr. Shoemaker can offer no opinion that Young's April 2003 hospitalization was causally related to alleged mold exposure in August/September 2002.  Whether Young takes CSM or not will have no effect on

this non-opinion.  Dr. Shoemaker simply has no data to support such an opinion, and he should be precluded from testifying differently at trial.

**b.**    **Dr. Shoemaker Admits that He Cannot Testify To the Nature and Extent of Plaintiffs' Injuries**

Despite the declarations made in Plaintiffs' Rule 26(a)(2) Disclosures, it is clear Dr. Shoemaker is unable to present any of the opinions and testimony asserted in their disclosures to this Court.  Those disclosures had indicated that Dr. Shoemaker would be opining as to the "cause and extent" of plaintiffs' injuries, as well as "the cause, extent and permanency of their injuries arising from the exposure giving rise to this litigation."  (Exhibit 11, Plaintiff's 26(a)(2) Designation).  A review of the facts of this case, and of the evidence produced, indicates that the subjects upon which Dr. Shoemaker can opine, are vastly different from those anticipated testimony topics suggested in plaintiffs' disclosures.

Until deposed in this litigation, Dr. Shoemaker was unaware that he was expected to opine on the nature and extent of plaintiffs' injuries.  (Exhibit 9, Shoemaker Deposition at pp. 174-175; Exhibit 11).  He admitted candidly that since plaintiffs have not received any treatment (*i.e.*, CSM), then there is no way that he can testify to permanency.  (Exhibit 9, Shoemaker Deposition at p. 36, 175).

Q:    You can't testify to the permanency?

A:    That's right.

As such, Dr. Shoemaker should be precluded from testifying as to the nature and extent of plaintiffs' injuries in this litigation to include any claim of permanent injury.

Similarly, Dr. Shoemaker cannot opine as to the cause of plaintiffs' injuries as he has not conducted any type of a differential diagnosis that would rule out other potential illnesses or

possible diagnoses which could explain plaintiffs' alleged condition. As will be fully discussed in the following sections of this Motion, Dr. Shoemaker never conducted any investigation or reliable testing regarding the specific mold which plaintiffs alleged they were exposed to, the manner in which they were allegedly exposed, or the amount of time of the alleged exposure. Without this vital data, Dr. Shoemaker does not have any data to support the opinions of his expected testimony as stated in Plaintiffs' Rule 26(a)(2) Disclosures.

Therefore, because Dr. Shoemaker is unable to testify as to the cause, extent or permanency of plaintiffs' alleged injuries, Dr. Shoemaker should be precluded from testifying at trial. *Calvetti v. Antcliff,* 346 F.Supp.2d 92, 111 (D.D.C. 2004)( "[T]he court may reject as unreliable expert testimony that is based on "subjective belief or unsupported speculation.'")(*citing Daubert*, 509 U.S. at 590)(internal citations omitted).

### c. Dr. Shoemaker's Methodology for Diagnosing Mold Illness and Causally Relating Such Illness to Mold Exposure Are Not Generally Accepted in the Medical Community

The burden of proving causation is a weighty one for plaintiffs in mold litigation. The plaintiff must show that the agent is capable of causing the injury complained of (general causation), and must further prove that the toxic agent, in fact, did cause that injury in the present case (specific causation). *The Same Mold Story?: What Toxic Mold is Teaching Us About Causation in Toxic Tort Litigation*, 83 N.C.L. Rev. 518, 533 (2005). As this law review article notes, there are often pointed disagreements over issues such as whether and to what extent the plaintiff was actually exposed, and what evidence exists to support the determination that the offending substance was, in fact, "toxic" at the plaintiff's level of exposure. (*Id.*) In addition, plaintiff must rule out other potential causes of the same injury. (*Id.*) Every link in the causal chain is susceptible to attack by the opposing party. (*Id.*)

12

In the case at bar, Dr. Shoemaker has failed to provide a reliable basis which this Court could rely upon for "ruling in" mold exposure as the sole cause of Plaintiffs' illnesses and "ruling out" all other potential illnesses. Without having provided any valid basis for evaluating Plaintiffs' conditions, Defendants request that this Honorable Court exclude Dr. Shoemaker's testimony and his opinion regarding Plaintiffs' conditions and the causality for those conditions.

1.    <u>Dr. Shoemaker's Opinions Must be Excluded Since He Does Not Know the Nature and Extent of Exposure, and Since He Cannot Exclude Other Causes of Plaintiff's Injuries</u>

A review of the record underscores why this Court should preclude Dr. Shoemaker's opinions because of the lack of any reliable data or testing results relied upon by Dr. Shoemaker in support of his opinions regarding plaintiffs' alleged illnesses. For example, Dr. Shoemaker acknowledges that the plaintiffs' problem with mold was not something found in their Apartment 2A, but rather the adjacent apartment. (Exhibit 9, Shoemaker Deposition, pp. 68-69). Dr. Shoemaker is aware that both plaintiffs went into the adjacent apartment that reportedly had mold in it and he believes that that direct exposure was more of a risk to the plaintiffs. (*Id*. at 194-195). Dr. Shoemaker admits that he does not know the type of mold in the adjacent apartment, he does not know how long plaintiffs were in that apartment, and he does not know if plaintiffs were exposed to mold in an airborne fashion while in their own apartment. (*Id*. at p. 72 and pp. 203-206). Dr. Shoemaker's opinions are based, in part, on the subjective history which he took from plaintiffs, which is at best incomplete. (Exhibit 9, Shoemaker Deposition, p. 76-80). Clearly, there is much investigation that Dr. Shoemaker could have (and should have) conducted. Dr. Shoemaker has not investigated and is unaware of pollen levels in September 2002, and he does not know if apartment 2A had cockroaches, mice, rats, *etc*. Furthermore, Dr. Shoemaker is aware that Ghee was a smoker and that Young had seasonal allergies and that her

13

asthma is worst in the spring when tree pollen counts are highest, yet he does not include these potentially crucial environmental factors into his evaluation of plaintiffs' condition. Likewise, despite his awareness that Young has been found to have allergic reaction to a number of trees, Bermuda grass, dust mites, cabbage, nuts and cat and dog dander when subsequently tested, he does not conduct any investigation into these potential contributing factors. (Exhibit 9, Shoemaker Deposition, pp. 76-80). Dr. Shoemaker was not aware if any relatives or close friends had cats or dogs, which Young regularly visited in August/September 2002. All of these potential other causes of Young and Ghee's illnesses are apparently of no importance to Dr. Shoemaker because he is not concerned with plaintiffs' "acquired immune response," but rather only their "innate immune response." (*Id*. p. 80; Exhibit 10, Shoemaker Report, pp. 1-2). His opinions are primarily based on interviews and blood tests five years after the alleged exposure. His opinions are not based on any reliable scientific testing of the apartment which plaintiffs allege was the source of their alleged exposure during the time of their exposure.

Dr. Shoemaker's opinions should be excluded because they are speculative and they lack evidentiary reliability as required by *Daubert*. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999) ("The objective of [the *Daubert* gate-keeping requirement] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

> 2.    Dr. Shoemaker's Methodology for Defining Mold Illness by use of Six Biomarkers Is Not Generally Accepted by the Medical or Scientific Community

Dr. Shoemaker defines mold illness as "…the presence of definable abnormalities in innate immune responses and multiple laboratory studies in cases that confirm the presence of an

underlying abnormality responsible for the health symptoms of the affected patients...." (Exhibit 10, Shoemaker Report at p. 6). In the instant case, Dr. Shoemaker relies upon bloodwork drawn from both plaintiffs some six years after their alleged exposure to confirm causation between an unknown toxin and plaintiffs' illnesses. With respect to the exposure in August/September 2002, while Dr. Shoemaker believes there was an innate immune disorder, he cannot say for certain when the abnormalities in an innate immune response developed since there was no bloodwork done prior to plaintiffs' visit to him. (Exhibit 9, Shoemaker Deposition at pp. 11 and 12).

To support his theories on mold related illness, Dr. Shoemaker provides a case definition for mold illness, which includes examination of patients in order to find three of following six biomarkers (tier two): deficits in visual contrast sensitivity (VCS), presence of susceptible HLA DR genotypes, as analyzed by PCR; elevated levels of matrix metalloproteinase-9 (MMP-9), dysregulation of ACTH/cortisol, dysregulation of ADH/osmolality, and reduced levels of melanocyte stimulating hormone (MSH). (Exhibit 10, Shoemaker Report, p. 30, *et seq.*). According to Dr. Shoemaker, these biomarkers are reflective of biological activity of a mold illness in humans. (*Id.*) However, Dr. Shoemaker's tests, and the manner in which they are utilized in diagnosing his patients, are neither generally accepted, clinically-validated, nor logically related to the alleged causal factors he claims between plaintiffs' alleged exposure to mold and their claimed injuries. (Exhibit 6, Dr. Scott Phillips' Report, p. 14, 28, 29).

It is axiomatic that for a test methodology to apply to diagnose the cause of a patient's condition, the test must be properly validated for that purpose. A medical test may be valid for one purpose, but not for another. This is why scientists validate tests by using controlled studies in order to determine a test's reliability. If a test has not been so validated, it cannot be considered reliable for the purpose it is being used. Dr. Shoemaker's "three of six biomarker"

15

tests have not been accepted or validated by a controlled study for diagnosing mold illness, and the methodology by which Dr. Shoemaker determines that these are markers for his biotoxin mediated illness, has not been validated. (Exhibit 7, Dr. Michael Phillips Report, p. 16). ("The criteria described are purely hypothetical. . . The measurements are associated with certain diseases, but not with the biotoxins in the array described by Dr. Shoemaker. . . None of the agents [described in the biomarkers], alone or in concert have been shown to be germane to biotoxin activity or any toxin related disease.")

The first of the six biomarkers which Dr. Shoemaker claims are diagnostic is the Visual Contrast Sensitivity test (VCS), a subjective eye test. VCS is used by Dr. Shoemaker to test a patient's ability to distinguish visual patterns. According to Dr. Shoemaker, a VCS test can be used to detect the effects of biotoxins on the visual system. In fact, the test is so simple to take that it does not need to be administered or evaluated by any medical specialist. Dr. Shoemaker promotes and sells this test on his website for home use by individuals who believe they have suffered a biotoxin dosage.[1] The website claims that VCS test is the most sensitive indicator of effects caused by biotoxins and other neurotoxins. (*Id.*) While the VCS test has certain recognized uses, they do not include the applications advertised on the website, or in his reports or testimony. No one other than Dr. Shoemaker has published any literature, text or journals advancing the hypothesis that VCS deficits relate to mold exposure. (Exhibit 9, Shoemaker Deposition, p. 57).

Dr. Shoemaker's second biomarker, use of HLA/DR genotypes as a diagnostic tool for mold illness, relates to a hypothesis that individuals with certain selected genotypes are more susceptible to mold illness. (Exhibit 10, Shoemaker Report, p. 29, 30). Once again, no one other than Dr. Shoemaker has published on the use of HLA/DR genotypes as a diagnostic tool for

---

[1] http://www.biotoxin.info/test_instructions

mold illness[2].  (Exhibit 9, Shoemaker Deposition, pp. 55-57).  In his 2005 publication *Mold Warriors*, in a question and answer narrative, his questioner asks: " 'Have you done the basic research to prove the HLA 'toxin theory'? It seems like once the HLA is expressed, then that's when susceptibility to toxin gets started,' he asked.  'Not yet,' (Dr. Shoemaker) replied. 'The problem is, we don't have any good way to identify many of these toxins in blood….' " (Exhibit, 11, *Mold Warriors*, pp. 65-66).  This Court should not accept this **theory** of Dr. Shoemaker.  As Dr. Scott Phillips points out, the use of susceptible haplotypes has not been prospectively validated against controls as truly being markers of increased susceptibility, and the use of such biomarkers are not generally accepted in the medical community.  (Exhibit 6, Dr. Scott Phillips' Report, p. 29).

A finding of elevated levels of MMP-9 is Dr. Shoemaker's next biomarker.  (Exhibit 10, Shoemaker Report, pp. 29, 30).  Again, this has not been validated in the scientific community and there is no other peer-reviewed written literature written that the elevation of MMP-9 is a sign of mold exposure.  As Dr. Shoemaker testified at his deposition, "It's one of the situations of *has someone taken a general concept and applied it to this as I have*, not at this time." (Exhibit 9, Shoemaker Deposition at pp. 57-59) (emphasis added).  This methodology is not generally accepted in the medical, and specifically not accepted in the toxicology community. (Exhibit 6, Dr. Scott Phillips' Report, p. 28).  Dr. Shoemaker's tests have not been validated in prospective controlled trials from multiple investigators.  (*Id.*)  In fact, the laboratory that performs the MMP-9 test, qualifies the test results.  The specific language used by Quest Diagnostic Labs ("Quest") is:

---

[2] Dr. Shoemaker testified that Japanese literature on the subject exists as to studies on trichosporon and HLA/DR. There is no medical evidence on the record in this matter to suggest that either plaintiff was exposed to trichosporon. Furthermore, the paper Dr. Shoemaker references did not study a similar exposure event to the plaintiffs in this case. (Exhibit 6, Dr. Scott Phillips' Report, pp. 28, 29).

"This test was performed using a kit that has not been cleared or approved by the FDA. The analytical performance characteristics of this test have been determined by Quest Diagnostics Baltimore. This test should not be used for diagnosis without confirmation by other medically established means."

(Exhibit 13, Quest Diagnostic MMP-9 Test for Ghee).

Even more disturbing is that the two labs Dr. Shoemaker primarily uses have different ranges of "normal" for MMP-9. Quest has a normal range of 0-332, while Laboratory Corporation of America ("LabCorp") has a normal range of 0-983. Dr. Shoemaker tried to get LabCorp to change their normal range, but they refused to do it. (Exhibit 9, Shoemaker Deposition, pp. 95-98).

MSH, the fourth biomarker, is similarly suspect as to reliability. Dr. Shoemaker admits that no one else has published on MSH deficiency and the relation to mold exposure. (Exhibit 9, Shoemaker Deposition, pp. 57-58). The lab report for Ghee's MSH, obtained from LabCorp, contains similar language disclaiming the validity of the results as that with MMP-9. (Exhibit 14, LabCorp MSH Test for Young). LabCorp originally had a "normal range" for MSH of 35-81, but on September 25, 2006 changed "normal" to 0-40. (Exhibit 9, Shoemaker Deposition, pp. 96-98, 104). Dr. Shoemaker has asked LabCorp to change the norm, but they have refused. (*Id.*) Even so, Dr. Shoemaker continues to use 35-81 as the "norm" for his purposes. (Exhibit 9, Dr. Shoemaker Deposition, p. 104).

Finally, no one other than Dr. Shoemaker has written on the relationship between mold exposure and Dr. Shoemaker's last two biomarkers: ADH/osmolality or ACTH/cortisol dysregulation. (Exhibit 9, Shoemaker Deposition, p. 59).

Dr. Shoemaker's use of these six biomarkers to identify mold illness has not been replicated or validated by anyone in the generally recognized medical or scientific community.

Dr. Shoemaker admits that no one in the medical field has published on the two tier definition that he uses.  (Exhibit 9, Shoemaker Deposition, pp. 51, 52).  Neither the Center for Disease Control, the Institute of Medicine, nor any other generally accepted and recognized medical or scientific community have ever validated his diagnostic and treatment approaches with regard to testing for mold exposure.  (Exhibit 9, Shoemaker Deposition, pp. 40-41).  Certainly Dr. Phillips (allergist and immunologist) and Dr. Phillips (toxicologist) do not recognize Dr. Shoemaker's approach as valid.  (Exhibits 6 and 7).

      3.      <u>Dr. Shoemaker's Five-Step Protocol for Determining Causation in Mold Exposure Cases is not Generally Accepted in the Medical or Scientific Community</u>

Dr. Shoemaker's five-step protocol for diagnosing mold illness and establishing causation is as follows:  (1) evaluate the patient by way of physical examination, pulmonary function test, VCS test, and blood test; (2) treat the patient with cholestyramine ("CSM"), a cholesterol-lowering drug that he uses on an off label basis; (3) once the biomarkers are lower based on CSM treatment, eliminate all other potential sources of exposure (*e.g.*, home, car, shopping centers, *etc*.) by having the patient stay off CSM, and not return to the suspected mold environment; (4) return to the mold environment without cover of CSM for no more than three days; and (5) re-test for higher biomarkers based on re-exposure. (Exhibit 12, *Mold Warriors*, pp. 59-104, 191-205; Exhibit 10, Shoemaker Report, pp 31-32; Exhibit 9, Shoemaker Deposition, pp. 36-37).  Dr. Shoemaker's methodology and protocols are not accepted in the medical community, and are not followed by anyone except for his fellow "mold warriors". (Exhibit 9, Shoemaker Deposition, pp. 39, 40).  ("No, no one else who works using my protocols has published that at this time.").

The first step of the protocol involves evaluating the patient by way of physical examination, including measuring some of the biomarkers previously discussed, and administering pulmonary function test. (Exhibit 10, Shoemaker Report, p. 32). According to Dr. Shoemaker, these tests help set up a "baseline" evaluation of the patient which are compared to the same parameters measured after treatment with CSM. (*Id.*) In the instant case, Dr. Shoemaker prescribed use of CSM even before obtaining the results of the blood tests for plaintiffs. (Exhibit 10, Shoemaker Report, p. 18). He obviously had no "baseline" from which to work since he did not see plaintiffs until five years after the alleged exposure.

With respect to the second step of the protocol, Dr. Shoemaker suggests that the plaintiffs' baseline evaluations are necessary so that the findings may be compared with measurements taken after treatment with CSM. In fact, treatment with CSM, as recommended by Dr. Shoemaker, (1) is not prescribed as an FDA approved indication, (2) has not been used by plaintiffs, and (3) is not supported by the peer reviewed scientific literature to be efficacious for mold exposure. (Exhibit 6, Dr. Scott Phillips' Report, p. 29). CSM is a drug which absorbs and combines with bile acids in the intestinal track to form an insoluble complex that is then excreted from the bowel. (*Id.* at p. 26). CSM is not absorbed in the intestinal track, but may bind with concurrent medications to alter their absorption. (*Id.* at 27). CSM has not been studied in humans to reduce mycotoxin levels or to alter health effects. (*Id.*) Dr. Shoemaker admits that he is prescribing CSM, an otherwise approved medication, in a manner that is "off-label" and experimental[3]. (*Id.* at 27; Exhibit 9, Shoemaker Deposition, pp. 112). As Dr. Phillips notes: "Dr. Shoemaker admits that no one using his methodology has published on its success and that the use of (CSM) for this purpose is "off-label", i.e. not suggested as a valid therapy for disease

---

[3] At his deposition, Dr. Shoemaker discussed being precluded from testifying in the case of Rose Odaris et al. v. Thalhimer, Inc., in the Circuit Court for the City of Richmond, Virginia, because "the judge said I could not testify because I use cholestyramine off label." (Exhibit 9, Shoemaker Deposition, p. 43).

by the manufacturer or any other recognized medical authority.  He himself has not published any articles in peer reviewed journals, which establish efficacy." (Exhibit 7, Dr. Michael Phillips' Report, p. 7).

Even more problematic for Dr. Shoemaker is that he admits his own protocol has not been followed.  (Exhibit 9, Shoemaker Deposition, p. 37).  Plaintiffs have never used CSM, and as a result, have opted out of any possibility that they could be assessed under Dr. Shoemaker's five step protocol.  (Exhibit 10, Shoemaker Report, p. 18).  ("The symptoms of (Plaintiffs) *will likely* be significantly reduced . . . with *institution* of CSM therapy . . .")(emphasis added).  All other steps of the protocol depend on the results of successful treatment with CSM.  Absent the plaintiffs following Dr. Shoemaker's CSM treatment regiment, the five step protocol loses any probative value in assessing plaintiffs' health effects from alleged mold exposure.  For these reasons alone, Dr. Shoemaker should be precluded from testifying at trial in this matter regarding his findings and opinions regarding his five step protocol.

The remaining steps in the protocol depend on plaintiffs' deliberate re-exposure to the alleged mold environment as a way of comparing plaintiffs' reaction to the baseline evaluation conducted in step one of the protocol.  Given the lapse of time since plaintiffs' alleged exposure, and the loss of any biological or environmental testing of the townhouse where the original exposure is alleged to have occurred, re-exposure into the same environment is impossible.  Moreover, even if the environment could be recreated (a scientific impossibility) and if plaintiffs had accepted the CSM treatment prescribed by Dr. Shoemaker (which they did not) measuring the selected biomarkers in 2008 would have no bearing to an alleged exposure that occurred more than five years ago.  Thus, the key element to Dr. Shoemaker's own protocol to prove causation is lost in the case.

4.     Many Courts Have Rejected Dr. Shoemaker's Opinions As Not Recognized In the Medical Or Scientific Community

As noted in *The Same Mold Story?:  What Toxic Mold is Teaching Us About Causation in Toxic Tort Litigation*, 83 N.C.L. Rev. 518, 536, *et seq.* (2005), many Courts have considered the admissibility of expert testimony on mold causation.  Some Courts have admitted such testimony, and some have excluded it.  Recognizing the evidentiary obstacles for his own testimony, Dr. Shoemaker even devoted an entire chapter in *Mold Warriors* to his views of admissibility of expert testimony in mold litigation.  (Exhibit 12, *Mold Warriors*, pp. 319-355).

Dr. Shoemaker's opinions on the causation between mold and illness have been rejected or limited on at least seven occasions.

In a recent case decided by the Superior Court of the District of Columbia, the Court where Plaintiffs complain that their cause of action was not filed, Judge Natalia Combs Greene excluded Dr. Shoemaker's testimony following a *Frye* hearing by opinion dated October 12, 2007.  (Exhibit 17, Judge Combs Green Opinion).  The Court noted, *inter alia*, that plaintiff failed to show by a preponderance of the evidence that Dr. Shoemaker's theory regarding the causal relationship between exposure to mold from indoor environments and CBAI [mold illness] is generally accepted within the scientific community.  (*Id*. at p. 3).  Judge Combs Greene also rejected Dr. Shoemaker's methodology for case definition and diagnosis of mold illness.  (*Id*. at 4-7).

In the adjacent jurisdiction of Virginia, Dr. Shoemaker has never been qualified as an expert.  He was excluded from testifying in the *Odaris* case in Virginia, purportedly after he testified in *voir dire* that he used CSM off-label.  (*Id*. at pp. 43, 44).  Dr. Shoemaker was also excluded from providing expert testimony by the Circuit Court for the City of Richmond, Virginia in *Kim Stewart Ford v. Summit Realty Group, Inc.*, et al, LR2009-1 because the Virginia

Court found that his testimony was factually insufficient and scientifically unreliable under the Virginia rules and case law.

His testimony has been excluded or limited in Florida, Alabama, and even Canada. Dr. Shoemaker was excluded on a Frye-Reed challenge in Florida in the *Curry* case in 2003. (Exhibit 9, Shoemaker Deposition, p. 41, 42). In excluding his testimony, Judge Ferris concluded:

> Dr. Shoemaker will not be permitted to testify: his diagnostic protocol, which includes certain blood and genetic marker tests, is novel, and is not generally accepted in the scientific or medical community. Further, he cannot provide his diagnosis of plaintiff's illness on the basis that it is "pure opinion" because that opinion is based in discernable part on a diagnostic technique or methodology that is not *Frye* admissible, is based on a theory of causation that is not generally accepted in the scientific or medical community, and does not meet the rigorous analysis required to admit Dr. Shoemaker's opinion as a differential diagnosis.

(Exhibit 15, p. 17, *Curry* Opinion).

Dr. Shoemaker's opinions were initially excluded, and then limited to respiratory issues in the *Fico* litigation in Florida in 2003. (Exhibit 9, Shoemaker Deposition, pp. 41-43). He was also excluded from testifying in the *Capaci* case in Alabama. (*Id*.) On March 29, 2006, a Court in Ontario refused to certify a class action lawsuit in which Dr. Shoemaker's methodology was at issue. (Exhibit 16, Ontario Opinion). The Court looked to decide whether the methodology used by Dr. Shoemaker constitutes proof of exposure to biotoxins and, if so, what level of proof was necessary to establish causation on an individual basis. (*Id*. at 4). The plaintiff failed in carrying its burden, and the class was not certified.

In *Montgomery Mutual v. Chesson*, 399 Md. 314, 923, A.2d 939 (2007), the Maryland Court of Appeals remanded for a Frye-Reed hearing on Dr. Shoemaker's methods and theories.

In doing so, the Court noted that Dr. Shoemaker employs medical tests to reach a conclusion that is not so widely accepted to be subject to judicial notice of reliability. (*Id*. at p. 326).

## IV.    CONCLUSIONS

As a whole, *Daubert* and its progeny, requires trial courts to act as gatekeepers to the admission of expert testimony. *See* Fed.R.Evid. 702, Advisory Committee Notes, 2000 Amendments. In so doing, judges must "ensur[e] that the expert's testimony rests on reliable foundation and is relevant to the task at hand." *Houlahan v. World Wide Ass'n of Specialty Programs and Schools,* 2007 WL 4730934, *1 (D.D.C. 2007). It is clear from reading Dr. Shoemaker's testimony and his reports that his testimony should not be admissible under the *Daubert* standard. His theories have not yet been validated, nor generally accepted by the scientific and medical communities. His opinions are not reliable, not generally accepted in the scientific or medical communities, and have not been the subject of adequate peer review. Furthermore, Dr. Shoemaker's failure to follow his own protocol has fatally flawed any possibility that his opinions and theories are related to any of the facts of this case. Unable to connect his causation theories to plaintiffs' alleged exposure to mold and the illnesses they claim to suffer, his opinion does not have the assurances of reliability or relevance. As a result, Defendants request that Dr. Shoemaker be precluded from testifying and from offering his opinions as to Plaintiffs' medical conditions and the causality for those conditions since such testimony is both inadmissible and entirely speculative.

Respectfully submitted,

CARR MALONEY P.C.

By:/s/ ***Paul J. Maloney***
　Paul J. Maloney, #362533
　Ali Beydoun, 475413
　1615 L Street, N.W., Suite 500
　Washington, D.C.  20036
　(202) 310-5500 (Telephone)
　(202) 310-5555 (Facsimile)
Attorneys for Defendant Lewis & Tompkins,
P.C.

JORDAN, COYNE & SAVITS, L.L.P.

By:/s/ ***Deborah Murrell Whelihan***
　Deborah Murrell Whelihan #412454
　1100 Connecticut Avenue, N.W.
　Suite 600
　Washington, D.C.  20036
　(202) 296-4747 (telephone)
　(202) 496-2800 (facsimile)
Attorneys for Defendant William F. Burton,
Esquire

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DENICOLE YOUNG and         :
VANESSA GHEE,            :
                               :
        Plaintiffs,         :
                               :
     v.                   :    Case No.: 1:07cv983 (ESH)
                               :
LEWIS & TOMPKINS, P.C, *et al.*,    :
                               :
        Defendants.      :

# **O R D E R**

Upon consideration of the Defendants' Motion to Exclude Opinion Testimony of Plaintiffs'

Expert, Dr. Ritchie Shoemaker, any Opposition filed by the Plaintiffs, and the entire record herein

and upon consideration of the oral argument by counsel at the *Daubert* hearing, it is this

_____ day of _____, 2008,

ORDERED, that the Defendants' Motion Exclude Opinion Testimony of Plaintiffs'

Expert, Dr. Ritchie Shoemaker, is GRANTED; and it is further,

ORDERED, that the Plaintiffs' medical expert, Dr. Ritchie Shoemaker, is excluded from

testifying in this matter and from offering any opinions because that testimony and those

opinions are inadmissible under Fed. R. Evid. 702, Fed. R. Evid. 703, and *Daubert v. Merrell*

*Dow*, 508 U.S. 579, 113 S.Ct. 2786 (1993).

_____
ELLEN S. HUVELLE
UNITED STATES DISTRICT JUDGE,

Copies To:

Paul J. Maloney, Esquire
Carr Maloney, P.C.
1615 L Street, N.W.
Suite 500
Washington, D.C.  20006

Deborah Murrell Whelihan, Esquire
Jordan, Coyne & Savits, L.L.P.
1100 Connecticut Avenue, N.W.
Suite 600
Washington, D.C.  20036

Peter C. Grenier, Esquire
Bode & Grenier, L.L.P.
1150 Connecticut Avenue, N.W., 9th Floor
Washington, D.C.  20036

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| DENICOLE YOUNG and | | |
| VANESSA GHEE, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No.: 1:07cv983 (ESH) |
| | : | |
| LEWIS & TOMPKINS, P.C, et al., | : | |
| | : | |
| Defendants. | : | |

## <u>NOTICE OF FILING BULKY EXHIBITS</u>

Please note that the exhibits to Defendants' Motion to Exclude Opinion Testimony of

Plaintiffs' Expert Dr. Ritchie Shoemaker will be separately hand-delivered to the Court and counsel.

Respectfully submitted,

CARR MALONEY P.C.

By:      /s/ Paul J. Maloney          _
Paul J. Maloney, #362533
Ali A. Beydoun, #475413
1615 L Street, N.W., Suite 500
Washington, D.C.  20036
(202) 310-5500 (telephone)
(202) 310-5555 (facsimile)

20080211-NOG-3 (notice of bulky exhibits to mot to exclude shoemaker)

<u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that a copy of the foregoing Notice of Bulky Exhibits was electronically filed on this 15th day of February, 2008 to:

                Peter Grenier, Esquire
                Michael Hibey, Esquire
                Bode & Grenier
                1150 Connecticut Avenue, N.W.
                9th Floor
                Washington, D.C.  20036

                Deborah M. Whelihan, Esquire
                Jordan Coyne & Savits, LLP
                1100 Connecticut Avenue, N.W.
                Suite 600
                Washington, D.C.  20036

                                  ___/s/  Paul  J.  Maloney_____
                                    Paul J. Maloney