**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **DENICOLE YOUNG and** ) | |
| **VANESSA GHEE** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | CIVIL ACTION NO. 07-CV-983 (ESH) |
| ) | |
| **WILLIAM F. BURTON and** ) | |
| **LEWIS & TOMPKINS, P.C.** ) | |
| ) | |
| **Defendants** ) | |
| ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**(1) IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINION**
**TESTIMONY OF PLAINTIFFS' EXPERT DR. RITCHIE SHOEMAKER AND**
**(2) IN OPPOSITION TO DEFENDANTS' REQUEST FOR A *DAUBERT* HEARING**

Plaintiffs have designated Dr. Ritchie Shoemaker as an expert witness to testify on mold, mold toxin exposure, and the cause, nature, and extent of Plaintiffs' damages as a result of Plaintiffs' exposure to toxic mold. Dr. Shoemaker is a nationally renowned expert on mold and mold related illness, who has published peer reviewed literature on the subject and been invited to present papers and testimony before the United States Senate, the United States House of Representatives, the Maryland Senate, and numerous medical societies involved in mold science. He has treated over 4,700 mold patients and testified in over 50 civil litigations.

No binding precedent would preclude Dr. Shoemaker from testifying, and as more fully stated herein, Defendants' motion to exclude and request for a *Daubert* hearing must be denied for the following reasons:

(A)    Dr. Shoemaker's methodology for diagnosing mold illness and causally relating such illness to mold exposure is scientifically valid and generally accepted in the scientific community.

(B)    Dr. Shoemaker's methodology for diagnosing mold illness and causally relating such illness to mold exposure has been peer reviewed, tested, contains rigorous standards, and is based on over thirty years of practical experience.

(C)    Dr. Shoemaker's methodology for diagnosing mold illness and causally relating such illness to mold exposure has been accepted by the majority of courts that have assessed the scientific validity of his methodology.

(D)    Dr. Shoemaker's conclusion that Plaintiff Denicole Young's mold exposure in August/September 2002 is causally connected to her April 2003 hospitalization is based on scientifically valid methods, and therefore not an appropriate subject for a *Daubert* challenge.

(E)    Dr. Shoemaker's conclusions regarding the nature and extent of Plaintiffs' injuries are based on scientifically valid methods, and therefore not appropriate subjects for a *Daubert* challenge.

## I.    <u>OVERVIEW</u>

To reach conclusions on the diagnosis, cause, nature, and extent of Plaintiffs' injuries, Dr. Shoemaker conducted a differential diagnosis and standard medical tests and procedures, including the taking of histories, physical examinations, and the conducting of blood tests.

The methods utilized by Dr. Shoemaker are scientifically valid and generally accepted in the scientific community, as well as by the federal courts. Based on these scientifically valid and generally accepted methods, Dr. Shoemaker reaches *conclusions* that Defendants dispute.

However, this Court's focus "must be solely on principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

Defendants miss *Daubert's* focus on methods by conflating Dr. Shoemaker's methodology with his conclusions. Repeatedly, Defendants in their motion attack what they claim to be Dr. Shoemaker's methods by arguing his conclusions are unsupportable. Essentially, Defendants claim that because their expert doctors reach different conclusions, Dr. Shoemaker's methods are invalid.

A detailed focus on Dr. Shoemaker's methods and conclusions, with the necessary and appropriate distinction highlighted, will show that his methods are scientifically valid. From there, doctors evaluate facts and can reach different conclusions. That is the case we have here.

Defendants' Motion to Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker ("Defendants' Motion") first attacks Dr. Shoemaker's conclusions regarding causation and his conclusions on the nature and extent of damages by alleging various admissions. (Defendants' Motion, pp. 9-12.) Defendants' Motion then attacks Dr. Shoemaker's methodology by reiterating the same arguments related to causation and the nature and extent of damages, before focusing on what Defendants claim is Dr. Shoemaker's methodology, and what Defendants claim has happened in other cases where Dr. Shoemaker has been offered to testify as an expert.[1] (Defendants' Motion, p. 12-24.)

Plaintiffs' response to Defendants' Motion will first address Defendants' attacks on Dr. Shoemaker's methodology. This is because the scientifically valid and generally accepted methodology utilized by Dr. Shoemaker is the basis for his conclusions on causation and the nature and extent of damages.

---

[1]     Ironically, one of Defendants' own legal experts is currently using Dr. Shoemaker as an expert in a case pending in the Superior Court for the District of Columbia.

After explaining the science and methodology utilized by Dr. Shoemaker, and its general acceptance, Plaintiffs will show the Court how this generally accepted methodology was applied in this case to reach conclusions regarding causation and the nature and extent of damages.

Because what Defendants really dispute are Dr. Shoemaker's conclusions, drawn from reliable and generally accepted methods, Dr. Shoemaker's testimony should be permitted, and Defendants' motion should be denied, as should Defendants' request for a *Daubert* hearing.

But before fully detailing scientific methodologies, principles, and conclusions, Plaintiffs offer a brief recitation of the facts presented and the applicable legal standard in this case.

## II.    FACTUAL BACKGROUND

This is a legal malpractice claim. Plaintiffs Denicole Young and Vanessa Ghee retained Defendants Lewis & Tompkins, P.C. and William F. Burton to prosecute their toxic mold claims against Stanton Glen Apartments and related entities. (Young Retainer, Exhibit 1; Ghee Retainer, Exhibit 2.) Defendants failed to file a lawsuit within the statute of limitations, failed to notify Plaintiffs of such a failure until after the statute had run, and then fraudulently concealed their failure to file the lawsuit. (Complaint, ¶¶30, 32-33.) Defendants drafted and even attempted to file a lawsuit on Plaintiffs' behalf. (Defendants' Improperly Filed Complaint, Exhibit 3.) For unknown reasons, the complaint was rejected. (Rejection Sheet, Exhibit 4.)

The underlying lawsuit, had it been properly filed, would have sought recovery for damages suffered by Plaintiffs as a result of their exposure to toxic mold while residing at the Stanton Glen Apartments. Defendants' now argue that same case lacks merit, despite their clear beliefs to the contrary. (Defendants' Improperly Filed Complaint, Exhibit 3.)

### A.    **Plaintiffs' Residence at Stanton Glen Apartments**

Plaintiffs moved into Apartment 2A at 3064 Stanton Road, S.E. ("Apartment 2A") on or about August 19, 2002.  (Complaint, ¶8.)  Shortly after moving in, Plaintiffs smelled noxious fumes in the apartment building and in Apartment 2A.  (Ghee Deposition, Exhibit 5, 252:8-21 (October 30, 2007); Young Deposition, Exhibit 6, 204:3-8 (October 31, 2007).)  Plaintiffs also began feeling ill shortly after moving into Apartment 2A.  (Ghee Deposition, Exhibit 5, 149:3-22; Young Deposition, Exhibit 6, 201:2-20.)

Plaintiffs later learned that the odor was coming from the apartment directly next door to theirs, an abandoned apartment infested with sewage and mold that shared a wall with Apartment 2A.  (Young Deposition, Exhibit. 6, pp. 174-78.)  Plaintiffs photographed the interior of the mold infested next door apartment.  (Photographs, Exhibit 7.)  In September 2002, The District of Columbia Department of Consumer and Regulatory Affairs cited Stanton Glen Apartments for a sewage backup in the next door apartment.  (D.C. Citation, Exhibit 8.)  By letter, the District of Columbia Department of Health notified Stanton Glen Apartments of musty odors and mold related complaints at the apartments, specifically warning of the harmful effects of mold.  (D.C. Letter, Exhibit 9.)

After numerous complaints, on September 23, 2002, Plaintiffs signed a lease agreement with Stanton Glen Apartments for a different apartment.  On or about that date, Plaintiffs moved out of Apartment 2A.

### B.    **Plaintiffs' Medical Complaints**

On September 6, 2002, while still living in Apartment 2A, Plaintiffs were treated at George Washington University Hospital ("GWUH") for complaints of coughing.  Ms. Ghee was diagnosed with viral bronchitis, and Ms. Young was diagnosed with bacterial infection.  On

September 13, 2002, Plaintiffs again returned to GWUH for follow up and continued respiratory complaints.  (September 6, 2002 and September 13, 2002 GWUH Medical Records of Young and Ghee, Exhibit 10.)

After the first two visits to GWUH, Ms. Ghee's medical complaints continued intermittently.  (Ghee Medical Records, Exhibit 11.)  Ms. Young's medical complaints have been more regular and intense.  (Young Medical Records, Exhibit 12.)

On September 24, 2002, Ms. Young followed up with her primary care physician and was treated for allergic rhinitis and asthma.  (*Id.*, Exhibit 12, Y/G p. 170.)  Ms. Young again saw her primary care physician group on November 5, 2002, November 30, 2002, February 25, 2003, March 11, 2003, and March 26, 2003.  (*Id.*, Exhibit 12, Y/G pp. 168, 124, 167, 159, 158.)  Each of these visits was for continuing follow up from exposure to the toxic mold in Apartment 2A.  (*Id.*, Exhibit 12.)  The visits ranged from treatment for allergies to rhinitis to asthma.  (*Id.*, Exhibit 12.)  On March 21, 2003, Ms. Young also sought treatment at GWUH for asthma and shortness of breath.  (*Id.*, Exhibit 12, Y/G pp. 661-671.)

On April 15, 2003, Ms. Young was admitted to GWUH for asthma exacerbation.  (*Id.*, Exhibit 12, Y/G pp. 983-94, 672-73.[2])  During this hospitalization, Ms. Young was intubated for the first time ever.  (Young Aff. ¶¶5-8, Exhibit 13.)  In these records, there is some indication that Ms. Young had previously been intubated, but this is an error.  (*Id.*, Exhibit 13, ¶¶5-8.)

Ms. Young was able to recover after nearly a week at GWUH.  Following this experience, Ms. Young has continued to have serious health issues, *inter alia*, respiratory infections, restrictive lung capacity, "asthma," and numerous allergies.  (Exhibit 12, Y/G pp. 155-57, 152-54, 150, 148-49, 145, 141-44, 138-140, 133-34, 127-31, 122-23, 117-18, 116, 80-

---

2    The medical records from this hospital stay exceed 200 pages, only portions of which have been attached.

84, 75, 971-82, 924-35, 912-23, 899-911, 1000-1022, 1055-68, 1070-83, 1292-97, 1086-1106, 1308-13, 1326-30, 1332-38.)

Ms. Young struggles with her health on a daily basis, and her respiratory concerns remain life-threatening.[3]

**C.    Ritchie C. Shoemaker, M.D.**

Dr. Shoemaker is a board certified Family Practitioner.  He has been practicing medicine for 28 years and is a member of the American Medical Association, the Maryland Medical Chirurgical Faculty, the American Society for Microbiology, the International Association for Chronic Fatigue Syndrome, and the American Society of Tropical Medicine and Hygiene. (Shoemaker Aff. ¶2, Exhibit 14; Shoemaker C.V., Exhibit 15.)

For the past ten years, Dr. Shoemaker has been the treating physician for over 4,700 patients who have been diagnosed with ailments caused by exposure to water-damaged buildings.  (Shoemaker Aff. ¶36, Exhibit 14.)  In 2000, Dr. Shoemaker was named the Maryland Family Physician of the Year by the Maryland Academy of Family Practice.  (*Id*., Exhibit 14, ¶4.)  In 2002, he was named runner-up as the National Family Practice Physician in the United States.  (*Id*., Exhibit 14, ¶4.)

In addition to being a recognized physician, Dr. Shoemaker has published three peer reviewed academic papers on biotoxin associated illness and Sick Building Syndrome in a variety of medical journals including Environmental Health Perspectives, Neurotoxicology and Teratology, and Maryland Medical Journal.  (*Id*., Exhibit 14, ¶¶7-8; Shoemaker Peer Reviewed Mold Papers, Exhibit 16.)  Peer review is a scholarly process used in the publication of

---

3    Defendants argue the importance of Ms. Young's prior medical complaints from 1995 to March 2000. None of these records reflect illness or treatment within the two and a half years directly preceding the mold exposure.  These records were reviewed by Dr. Shoemaker, and are discussed later.  (Exhibit 12, Y/G pp. 642-44, 637-39, 634, 631-32, 624-25, 619, 611, 607-09, 604, 602, 599.)

manuscripts because the publishers can use peer review to select and screen submissions.  In order to achieve scientific objectivity, Dr. Shoemaker's work and ideas have been scrutinized by other experts in the field to make sure that his work and ideas meet the standards of his discipline.  Dr. Shoemaker has also been a peer reviewer for Environmental Health Perspectives and Environmental Research.  (Shoemaker Aff. ¶2, Exhibit 14.)  He has authored numerous books including *Mold Warriors* in 2005.  (*Id.*, Exhibit 14, ¶5.)

Dr. Shoemaker has given presentations to numerous groups and associations including the American Society of Microbiology, the American Psychiatric Association, the International Society of Neurobiology, the American Academy of Environmental Medicine, the International Symposium of Neurotoxicology, the American Society for Tropical Medicine and Hygiene, the International Society for Testing and Measurement, the International Association for Chronic Fatigue Syndrome, the Indoor Air Quality Association, the National Institute for Building Sciences, the National Center for Biodefense, the International Symposium on Cyanobacteria and the Veteran Administration Research Committee on Gulf War Illness.  (*Id.*, Exhibit 14, ¶2.)

In addition to publishing peer reviewed articles and giving presentations on the topic of mold illness, Dr. Shoemaker has been accepted as an expert in 14 states and has testified on over 50 separate occasions concerning his opinions on biotoxin associated illness.[4]  (*Id.*, Exhibit 14, ¶10.)  His testimony has been the subject of *Daubert* or *Frye* challenges, and he has been permitted to testify in the majority of those cases.  (*Id.*, Exhibit 14, ¶10.)  Further discussion of Dr. Shoemaker's trial testimony experience follows in Section IV(B)(2)(e), *infra*.

Dr. Shoemaker has also gained public recognition as an expert in the field of mold illness by being invited to present papers and testimony before various branches of the state and federal

---

4    Dr. Shoemaker is currently involved in the group of consolidated Ritz Carlton toxic mold cases pending in the D.C. Superior Court (*Gannon v. 2200 M Street, LLC, et al.*, Case No. 2003 CA 3973B).  He has not offered trial testimony, but has diagnosed and evaluated twelve individuals in those cases.

government, including the United States Senate, the United States House of Representatives, and the Maryland State Senate. (*Id*., Exhibit 14, ¶6.) The Federal Emergency Management Administration and Homeland Security requested he conduct an on-site health investigation for victims of Hurricane Katrina. (*Id*., Exhibit 14, ¶6.) Dr. Shoemaker published the results of his investigation showing health effects associated with exposure to water-damaged buildings in New Orleans were consistent with the environmental findings of the National Institute of Occupational Safety and Health ("NIOSH") report on the courthouse in St. Bernard's Parish. (*Id*., Exhibit 14, ¶6; New Orleans Papers, Exhibit 17.) At the request of Congressman Wayne Gilchrest (Md., 1st Dist.), Dr. Shoemaker submitted a diagnosis of patients potentially affected by the exposure to areas with water damage in Building 18 of the Walter Reed Army Hospital. (*Id*., Exhibit 14, ¶5.) Further, Dr. Shoemaker is currently the Physician-In-Charge of the health investigation of the Federal Aviation Administration's air controller cohort from the Detroit Metro airport. (*Id*., Exhibit 14, ¶5.)

### III.    EXPERT TESTIMONY ADMISSIBILITY STANDARD

Expert testimony based on "scientific, technical, or other specialized knowledge" must meet the requirements of Rule 702 of the Federal Rules of Evidence. Fed. R. Evid. 702. However, the inquiry envisioned by Rule 702 is a flexible one. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993).

The plain text of Rule 702 provides that expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid (first prong) and of whether that reasoning or methodology properly can be applied to the facts in issue (second prong). *Daubert*, 509 U.S. at 592-93.

Pursuant to Rule 104(a) of the Federal Rules of Evidence, preliminary questions concerning the admissibility of expert testimony must be determined by the trial judge. Fed. R. Evid. 104(a); *see also Daubert*, 509 U.S. at 589 (trial judge serves "gatekeeping" function); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (same).

In the first prong of the *Daubert* test, the Court can consider a variety of factors.[5] More importantly, the Court must focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *U.S. v. Libby*, 461 F. Supp. 2d 3, 6 (D.D.C. 2006). The second prong of the *Daubert* test requires expert evidence be relevant, under the liberal standard of relevance in Rule 401 of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 591.

Within this assessment, it is important to note that differential diagnosis is a standard medical technique. *In re: Paoli RR Yard PCB Litigation*, 35 F.3d 717, 755 (3d Cir. 1994); *Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248 (1st Cir. 1998). Differential diagnosis is a common scientific technique, and federal courts generally recognize that a properly conducted differential diagnosis is admissible. *Ambrosini v. Labarraque*, 101 F.3d 129, 140-41 (D.C. Cir. 1996); *Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998); *Westberry v. Gislaved Gummi AB, et al.*, 178 F.3d 262, 262-66 (4th Cir. 1999); *Baker*, 156 F.3d at 252-53.

Moreover, to be admissible on causation, an expert's testimony need not eliminate all other causes of injury. *Ambrosini*, 101 F.3d at 140 (uneliminated possible causes only go to the accuracy of the conclusion, not the soundness of the methodology). Alternative causes

---

5    The Supreme Court has provided a non-exhaustive, flexible list of factors for courts to consider when determining the first prong of the Daubert test, including: (1) whether the scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the scientific theory is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593-94; U.S. v. Libby, 461 F. Supp. 2d 3, 6 (D.D.C. 2006).

suggested by Defendants go to weight, not admissibility.  In *Heller v. Shaw Industries, Inc.*, 167

F.3d 146, 155-56 (3rd Cir. 1999), the court explained:

> In the actual practice of medicine, physicians do not wait for conclusive, or even published or peer reviewed studies to make diagnosis to a reasonable degree of medical certainty.  Such studies of course help them to make various diagnoses or to rule out prior diagnoses that the studies call into question.  However, experience with hundreds of patients, discussions with peers, attendance at conferences and seminars, detailed review of patient's family, personal and medical histories, and thorough examinations are the tools of the trade and should suffice for the making of a differential diagnosis even in those cases in which peer reviewed studies do not exist to confirm the diagnosis of the physician.  The Federal Rules of Evidence recognize as much.  See e.g., Fed. R. Evid. 703 advisory committee's note ("[A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety . . . .  The physician makes life and death decisions in reliance upon them.  His validation, expertly performed and subject to cross examination, ought to suffice for judicial purposes."  (Emphasis added.)

*Id.*

In denying defendant's claim that the trial court erred in admitting plaintiff's expert testimony that related plaintiff's respiratory problems associated with exposure to mold, the Supreme Court of Maine stated:

> Dr. Upham has extensive experience in diagnosing environmental health problems in a variety of settings; performs toxicology work associated with indoor air quality; has completed a two year fellowship in environmental occupational medicine; and has practiced in the field for twelve years . . . .

> Dr. Upham, however, is a specialist who has been trained to diagnose and treat people who have been exposed to substances such as molds . . . .  Dr. Upham's opinion was not formed in the abstract; it was tailored to the facts of this case. She personally examined Debra Searles, reviewed the relevant medical records, considered the reports of the experts who did mold testing at the Searles' home, and completed a differential medical diagnosis**.**  Based on the foregoing, several factors support the trial court's foundational finding that Dr. Upham's testimony was sufficiently reliable.  Dr. Upham's qualifications established her as an expert in environmental occupational medicine . . . there is support in the relevant scientific community for her opinion regarding causation . . . the record supports the court's finding that Dr. Upham's testimony was sufficiently reliable . . . .

*Searles v. Fleetwood Homes of Pennsylvania, Inc., et al.*, 878 A.2d 509, 518 (Me. 2005).

Additionally, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  Fed. R. Evid. 702; *see also Kumho Tire Co*., 526 U.S. at 156 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

The key focus of *Daubert* is on scientific principles and methodology, not conclusions. Additionally, federal courts have recognized that experts may testify on the basis of a differential diagnosis and specialized experience.  As discussed below, the methodologies and principles utilized by Dr. Shoemaker are scientifically valid, relevant to this case, based on a differential diagnosis and specialized experience, and lead to Dr. Shoemaker's conclusions regarding the causal connection between Plaintiffs' exposure to toxic mold and their damages, as well as the nature and extent of such damages.

## IV.    ARGUMENT

To reach his conclusions, Dr. Shoemaker relies upon two fundamental and scientifically valid premises: (A) mold causes human injury and (B) evaluation, differential diagnosis, and testing leads to diagnosis and causation.

### A.    Mold Causes Human Injury

Much of Defendants' criticisms regarding Dr. Shoemaker's conclusions are more form and procedure than substance, issues which a jury decides on credibility, not a court on exclusion.  This is because no matter what Defendants think about process, the fundamental method of Dr. Shoemaker is scientifically and medically sound, and supported in the published literature.

A brief review of some of the science and scholarship on the subject will show that a general consensus in the scientific community exists that mold, mold mycotoxins, and mold volatile organic compounds ("VOCs") can cause human injury.

### 1.    United States Environmental Protection Agency: 2001

In 2001, the United States Environmental Protection Agency ("EPA") published the first mold guidance document. (*Mold Remediation in Schools and Commercial Buildings*, EPA 402-K-01-001, March 2001, Exhibit 18.) In the introduction, the authors write, "Concern about indoor exposure to mold has been increasing as the public becomes aware that exposure to mold can cause a variety of health effects and symptoms, including allergic reactions." (*Id.*, Exhibit 18, p. 1.) The guidance further states:

> All molds have the potential to cause health affects. Molds can produce allergens, irritants, and in some cases, toxins that may cause reactions in humans . . . . Specific reactions include . . . allergic reactions: inhaling or touching mold spores may cause allergic reactions in sensitive individuals. Allergic reactions to mold are common . . . can be immediate or delayed . . . include hay fever-type symptoms, such as sneezing, runny nose, red eyes, and skin rash . . . spores and fragments can produce allergic reactions . . . repeated or single exposures can cause previously non-sensitive individuals to become sensitive . . . molds can trigger asthma attacks . . . may worsen asthma in non-allergic people . . . may cause hypersensitivity pneumonia . . . can cause irritation of eye, skin, nose, throat and lungs . . . [a] weakened immune system may be more vulnerable . . . .

(Id., Exhibit 18, pp. 40-41.)

### 2.    United States Department of Labor: 2003

The United States Department of Labor, in a Safety and Health Bulletin, followed suit with the EPA in 2003:

> Molds can cause adverse health effects by producing allergens . . . potential health concerns are important reasons to prevent mold growth and to remedy existing problem areas. The onset of allergic reactions to mold can be either immediate or delayed. Allergic responses include hay fever-type symptoms such as runny nose and red eyes. Molds may cause localized skin or mucosal infections but, in general, do not cause systemic infections in humans, except for persons with

impaired immunity, AIDS, uncontrolled diabetes, or those taking immune suppressive drugs. . . molds can cause asthma attacks in some individuals who are allergic to mold . . . .

(United States Department of Labor, *A Brief Guide to Mold in the Workplace*, Safety and Health Bulletin 101003 (2003), Exhibit 19.)

By 2003, nearly all governmental agencies and industrial hygienists had concluded mold causation for a number of health effects as noted above. The medical community was churning out papers by the hundreds, many mentioned in the reference documents provided to this court, all of which prompted the National Institute of Medicine ("IOM") to publish its consensus report in 2004.

### 3.    National Institute of Medicine: 2004

The National Institute of Medicine's ("IOM") consensus report in 2004 identified the problem by its location: *Damp Indoor Spaces*. The IOM report is over 350 pages, so Plaintiffs cite to important highlights, including:

**Toxic effects of mold and bacteria**. Although a great deal of attention has focused on . . . allergic responses, these microorganisms *also cause nonallergic responses* . . . molds can produce mycotoxins . . . in vitro [outside living animal] and in vivo [in living things] have demonstrated adverse effects - including immunotoxic, neurologic, respiratory, and dermal responses . . . *such studies have established that exposure to microbial toxins can occur via inhalation* and dermal exposure and through ingestion of contaminated food (p 7); **Allergens of Microbial Origin**. Fungi produce an enormous array of potentially allergenic compounds (p. 67); **Toxic Effects of Fungi and Bacteria**. Studies of health effects associated with exposure to bacteria and fungi show that respiratory and other effects that resemble allergic responses occur in nonatopic [non-allergic] persons. In addition, outcomes not generally with an allergic response - including nervous system effects, suppression of the immune response, hemorrhage in the mucous membranes of the intestinal and respiratory tracts, rheumatoid disease, and loss of appetite - have been reported in people who work or live in buildings that have microbial growth (p.125); *Exposure to microorganisms and their products can irritate mucous membranes . . . and lead to inflammation via an immune response . . . [and] can cause damage to lung and other adverse effects. Immune responses triggered by exposure to microorganisms . . . include increased production of inflammatory mediators, such as cytokines, interlukin, reactive oxygen species, and indirectly nitric oxide* (pp. 133-34); *Microorganisms*

14

*and their toxins can lead to effects on the tissues and cells of the respiratory system* (p. 136). **Upper Respiratory Tract Effects** (nose, mouth, sinuses, throat). The committee concludes *"there is sufficient evidence of an association between exposure to a damp indoor environment and upper respiratory tract symptoms . . . there is sufficient evidence of an association between the presence of "mold" (otherwise unspecified) in a damp indoor environment and upper respiratory tract symptoms.* (p. 194); **Lower Respiratory Tract effects** (windpipe, lungs, bronchi, bronchioles, and alveoli). The committee concludes, as to cough and wheeze, *there is sufficient evidence of an association between exposure to a damp indoor environment and cough and wheeze, and sufficient evidence of an association between the presence of mold and cold and wheeze* (pp. 201, 208). (Emphasis added.)

(National Institute of Medicine, *Damp Indoor Spaces*, Exhibit 20.)

The IOM report found that damp indoor spaces are strongly associated with respiratory symptoms and disease. Such spaces contain molds and bacteria, but especially smaller, more readily inhaled products. Moisture is rather obviously not the cause of the illness, but what grows and is produced by microbes is, with a high degree of scientific certainty. (*Id.*, Exhibit 20.)

### 4. University of Connecticut: 2004

In 2004, under a grant from and in conjunction with the EPA, a group at the University of Connecticut published guidance on the diagnosis and management of mold caused injury from damp building exposures. (*Guidance for Clinicians on the Recognition and Management of Health Effects Related to Mold Exposure and Moisture Indoors* ("EPA/Connecticut Guidance"), Exhibit 21.[6]) The publication describes exactly what causes the potential for human exposures in damp buildings:

Three factors combine in indoor environments to support mold growth and the corresponding potential for human exposure to mold: building materials that can become sources of nutrition for mold; moisture from leaking roofs, leaking pipes, or from condensation on or water intrusion through walls or basements; [and] inadequate or poorly maintained ventilation systems that may not provide enough

---

6    The text of the EPA/Connecticut Guidance, omitting Chapter 8, "References," is attached as Exhibit 21.

> air for dilution or dehumidification or that may themselves harbor sources of mold
> or disperse mold spores into the occupants' breathing zone.

(*Id.*, Exhibit 21, p. 3.)

As all documents before it, the EPA/Connecticut Guidance makes a clear statement about

mold and human health:

> Fungi can cause disease in humans and animals by a variety of biological
> mechanisms, which can be classified into four groups: (1) infections, (2) allergic
> or hypersensitivity reactions, (3) irritant reactions, and (4) toxic reactions.

(*Id.*, Exhibit 21, p. 21.)

### 5.    New York Guidelines: 2006

New York City, with many older apartments plagued with moisture problems, and a

leader in mold investigations, issued its revised guidance document in 2006, stating:

> Inhalation of fungal spores, fragments (parts), or metabolites (e.g. mycotoxins and
> volatile organic compounds) from a wide variety of fungi may lead to or
> exacerbate immunologic (allergic) reactions, cause toxic effects, or cause
> infections . . . intensity of exposures and health effects seen in studies of fungal
> exposure in the indoor environment was typically much less severe than those
> experienced by agricultural workers but were of a long term duration . . . illnesses
> can result from both high level, short-term exposures and lower level, long term
> exposures . . . most common symptoms . . . are runny nose, eye irritation, cough,
> congestion, aggravation of asthma, headache, and fatigue . . . immunological
> reactions include asthma, HP [hypersensitivity pneumonitis], and allergic rhinitis.
> A wide variety of symptoms have been attributed to toxic effects . . . such as
> fatigue, nausea, and headaches, and respiratory and eye irritation.

(New York City Department of Health & Mental Hygiene, *Guidelines on Assessment and
Remediation of Fungi in Indoor Environments* 2006, Exhibit 22, pp. 3-4.)

The 2006 New York City guidelines embrace all fungi types because of the potential to

produce potent mycotoxins and an expansion of known health effects.  (Id., Exhibit 22, p. 1.)

### 6.    Centers for Disease Control: 2005 & 2007

In October 2005, the United States Centers for Disease Control and Prevention ("CDC")

addressed the potential adverse health effects related to exposure to mold.  (*Prevention Strategies*

*and Possible Health Effects in the Aftermath of Hurricanes Katrina and Rita* ("CDC 2005"),

Exhibit 23.)  The authors summarized the findings of the IOM report mentioned above and

discussed various diseases and other adverse health symptoms that are known to be caused by

exposure to molds.  (*Id.*, Exhibit 23, pp. 20-28.)

The CDC now acknowledges that illness is associated with levels of mycotoxins,

endotoxins, and beta glucans found in homes damaged by Hurricane Rita and Katrina.  On

January 5, 2007, in follow up to research done on victims of the hurricanes, scientists with the

CDC stated "[m]olds, [e]ndotoxins and fungal [g]lucans were detected in the environment after

Hurricanes Katrina and Rita in New Orleans at concentrations that have been associated with

health effects."  (*Characterization of Airborne Molds, Endotoxins, and Glucans in Homes in*

*New Orleans after Hurricanes Katrina and Rita*, Applied and Envtl. Microbiology, Vol. 73, No.

5 (March 2007), Exhibit 24, p. 1630.)  This peer reviewed article further states, "[M]uch

evidence exists indicating that indoor exposure to molds contribute to occupant respiratory

disease and symptoms."  (*Id.*, Exhibit 24, p. 1630.)

Dr. Shoemaker also conducted on-site health investigations for victims of Hurricane

Katrina located in New Orleans.  He published the results of those investigations consistent with

the environmental findings of the NIOSH.  (Shoemaker Aff. ¶6, Exhibit 14; New Orleans Papers,

Exhibit 17.)

### 7.     Government Publications and Peer Reviewed Papers: 2007

A 2007 peer reviewed paper found that "dampness and mold in buildings is a significant

public health problem with substantial economic impact," noting that exposure to water-damaged

buildings accounts for 21% of asthma nationwide, at a cost of over $3.5 billion.  (D. Mudarri &

W.J. Fisk, *Public Health and Economic Impact of Dampness and Mold,* Indoor Air, Vol. 17,

Issue 3 (2007), Exhibit 25.)  They further found that "there is general consensus in the scientific community that exposure to dampness and mold substantially increases the risk of a variety of health effects, most notably those associated with the respiratory system." (*Id*., Exhibit 25, p. 230.)

The Minister of Health of Canada no longer requires fungal sampling to determine health risk, saying, "The large number of mould species and strains growing in buildings and the large inter-individual variability in human response to mould exposure preclude the derivation of exposure limits."  Minister of Health, *Residential Indoor Air Quality Guideline*, Exhibit 26, p. 3.) Health Canada recommends all mold be cleaned up to prevent human health effects, and with exposure limits eliminated, the risk to the health of building occupants should not be assessed by tests for fungi in the air.  (*Id*., Exhibit 26, pp. 1-3.)

Another 2007 peer reviewed paper concluded "that dampness and mold were associated with depression."  (Edmond Shenassa et al., *Dampness and Mold in the Home and Depression*, Am. J. of Pub. Health, Vol. 97, No. 10 (October 2007), Exhibit 27, p. 1.)  The study used "both objective and subjective measures of dampness and mold [and] produced results showing associations with depression and with reports of emotional distress."  (*Id*., Exhibit 27, p. 1.)

NIOSH published that the total fungal biomass is associated with human illness from water-damaged buildings.  (Ju-Hyeong Park, et al., *Hydrophilic Fungi and Ergosterol Associated with Respiratory Illness In A Water-Damaged Building,* Environmental Health Perspectives, Vol. 16, No. 1 (January 2008), Exhibit 28.)

Finally, the National Institute for Environmental Health and Safety leads to a mini-monograph about water-damaged buildings by stating: "Don't mess with mold.  If you can see it or smell it, and especially if health problems are occurring, clean it out, throw it out or get out."

(Bob Weinhold, *A Spreading Concern: Inhalation Health Effects of Mold*, Environmental Health Perspectives, Vol. 115, No. 6 (June 2007), Exhibit 29, p. A305.)

## 8.    Scientific Literature

The scientific literature supports the conclusion the mold causes human illness. (*Establishing the Relevant Scientific Community* (Exhibit 30); *Cognitive Deficits and Inflammation* (Exhibit 31); *Epidemiology: Association, Causation, Bias and Confounders* (Exhibit 32); and *Current WDB References* (Exhibit 33).[7]

The vast difference in epidemiological quality of academic papers presented by those who discuss illness from exposure to water-damaged buildings ("Association studies") versus those who oppose is evident.  (Shoemaker Aff. ¶118, Exhibit 14; Exhibit 30 references these various papers.)

Association studies use epidemiological study methods in over 50,000 patients from the United States, Japan, Canada, Denmark, Sweden, Germany, Finland, and multi-country studies to conclude that there are health effects that follow exposure to water-damaged buildings.  These studies all involve people.  Included in this group are Dr. Shoemaker's papers, which include double blinded, placebo controlled clinical trials, which were peer reviewed, and use a prospective study design which gives Dr. Shoemaker the right to use the word cause in a medical and epidemiological sense.  (Shoemaker Aff. ¶118, Exhibit 14.)

Opponents present no studies of actual intervention; no studies on people; no epidemiological methods except for review; no authors who actually treat patients; and fatally,

---

7        Exhibits 30-33 are annotated, reference documents.  Only the references listed in Exhibits 30-33 that are specifically mentioned elsewhere in this brief are attached hereto; the full text of each reference not specifically mentioned herein is available for review, but withheld from attachment hereto because these reference lists include hundreds of articles, filling at least 9 binders.  Each of the papers identified in the attached reference lists is pertinent and relevant to the science that that underlies Dr. Shoemaker's methods and conclusions.  (Shoemaker Aff. ¶¶46, 92-94, 118, 130-32, Exhibit 14.

never show any attempt to be thorough in their discussion of the literature in their review.  (*Id.*, Exhibit 14, ¶¶118-28.)  *See* Exhibits 30 and 34 for examples of the absence of reliable science in these types of papers.  (Examples of Opponents' Unreliability, Exhibit 34.)

Additionally, those who might disagree fail to discuss the amplifying, multiplying biological cascade that marks the innate immune response system.  (Shoemaker Aff. ¶130-32, Exhibit 14.)  This system uses recognition molecules to detect foreign antigens of particular kinds.  (*Id.*, Exhibit 14, ¶130.)  The recognition leads to a rapid delivery of a intracellular messenger that activates DNA replication.  (*Id.*, Exhibit 14, ¶130.)  Gene activation leads to inflammation and amplification of complement and cytokine responses.  (*Id.*, Exhibit 14, ¶130.)  These multiplying cascades then lead to secondary metabolic effects systemically.  (*Id.*, Exhibit 14, ¶130; *Current WDB References*, *Gene Expression Papers*, Exhibit 33, pp. 63-71, *Genomics Papers*, Exhibit 33, pp. 97-99, *Toll Receptors Papers*, Exhibit 33, pp. 111-16, and *Mannose Receptors Papers*, Exhibit 33, pp. 103-09.)  Finally, adding genetic susceptibility renders the idea of dose response invalid.  (Shoemaker Aff. ¶131, Exhibit 14.)  Therefore, a relative small number of initiating exposures can lead to an exponential magnification of inflammatory response.

Lastly, the scientific literature is clear that various elements in water-damaged buildings can be harmful:  mycotoxins (*Current WDB References*, Exhibit 33, pp. 32-40); fragments of fungal particles (*Id.*, Exhibit 33, pp. 48-50); actinomycetes (*Id.*, Exhibit 33, pp. 51-52); bacteria and endotoxins (*Id.*, Exhibit 33, pp. 53-56); beta glucans (*Id.*, Exhibit 33, pp. 72-78); and mycobacteria (*Id.*, Exhibit 33, pp. 101-02).  (Shoemaker Aff. ¶37, 45, 94, 132, 135, Exhibit 14.)  The interior environment of water-damaged buildings is home to a variety of elements, each of which may hurt individuals.  But, the combination of effects are potent, especially considering

the inflammatory findings referenced previously (*Id.*, Exhibit 33, pp. 63-71, 97-99, 103-109,

111-16) and the extensive section of Association findings regarding buildings and microbial

growth (*Establishing the Relevant Scientific Community*, Exhibit 30).    Together, this means that

even a one time exposure to the interior of a water-damaged building can cause activation of

pattern recognition systems, each of which sets off its inflammatory cascade.  (Shoemaker Aff.

¶131, Exhibit 14.)

### 9.    Conclusion: Mold Causes Illness

The conclusion in the scientific community is that exposure to water-damaged buildings

creates the potential for human illness. The scientific community accepts the premise that

exposure to water-damaged buildings makes people sick.  Those who disagree do not have

anything to argue with that is comparable.

Claims that the science is uncertain, or that there is no consensus on mold causation is

incorrect.  The above references, and we could have provided over a 100 more from the general

scientific literature, show that there is a general consensus among the medical and scientific

community that molds cause human illness.

### B.    Evaluation, Differential Diagnosis, and Testing Leads to Diagnosis and Causation

With the above scientific information, Dr. Shoemaker, as a physician with extensive and

specialized experience in the practice of toxic exposures, could conclude, if he had properly

conducted an evaluation and differential diagnosis, which he did, and considering all applicable

factors, reach a conclusion of mold causation.

A scientific diagnosis of causally connected illness or disease includes: evaluation,

differential diagnosis, and testing.  The federal courts accept this, and even Defendants' own

expert agrees.  (Defendants' Exhibit 6, Exhibit 35, p. 23 ("differential diagnosis must be

performed to consider all possible etiologies known to present with objective findings" and "[a] consideration of alternative causes for a diagnosis must be considered at this juncture"), p. 24 ("[e]valuation of a medical condition is achieved through the traditional approach including a history, a physical examination, and the application of medical laboratory tests").

This is what Dr. Shoemaker did, and more. Even according to the framework of Defendants' own expert, Dr. Shoemaker's method in this case is scientifically valid and appropriate. Again, it is Dr. Shoemaker's conclusions that Defendants dispute. The following section will detail: (1) Dr. Shoemaker's methodology, (2) its scientific validity, (3) how it was applied in this case, and (4) the conclusions it reached.

### 1.    Dr. Shoemaker's Methodology: Described

Dr. Shoemaker follows the same methodologies as other health care professionals to reach a differential diagnosis to determine whether someone suffers from exposure to water-damaged buildings, and he routinely does more than what most clinicians do in order to determine the accuracy of his diagnosis. (Shoemaker Aff. ¶¶11-19, 92, Exhibit 14.)

Dr. Shoemaker's focus is on the entire patient and not just one specialized analysis of one organ system. (*Id.*, Exhibit 14, ¶14.) For example, if the patient complains about sneezing and coughing, then Dr. Shoemaker examines the respiratory system. (*Id.*, Exhibit 14, ¶14.) If the patient complains about chronic illness or constant fatigue or aches and pains in the joints, then Dr. Shoemaker examines the immune system through laboratory tests performed on serum and plasma. (*Id.*, Exhibit 14, ¶14.)

Specifically, when diagnosing or treating a patient, Dr. Shoemaker takes a history of the patient, reviews a patient's medical records, conducts a physical examination of the patient, runs tests on the patient, and reviews medical literature to try to determine what may be causing the

patient's problems.  (*Id.*, Exhibit 14, ¶¶12, 92.)  Dr. Shoemaker also questions a patient about

when, where and how often a patient is ill, and the patient's answers will lead Dr. Shoemaker to

determine whether or not a patient is ill because he/she acquired a "flu bug" or because the

patient has liver disease, or because the patient may have been exposed to some environmental

contaminant, and more.  (*Id.*, Exhibit 14, ¶¶13-15.)

 If there is a temporal relationship between being in a place and being ill while at that

place, then Dr. Shoemaker seeks to find out if "that place" has substances documented in peer

reviewed literature that can cause the type of illness or are associated with the type of illness

described by the patient.  (*Id.*, Exhibit 14, ¶15.)

 As stated above, and throughout the attached affidavit, Dr. Shoemaker does not jump to

any conclusions based on the results of any one of the battery of tests or procedures that he

follows in evaluation of his patients.  (*Id.*, Exhibit 14, ¶¶12-15, 18, 19, 21, 23, 25, 26, 28, 30, 31-

34.)  Rather, to assure the accuracy of his diagnosis, Dr. Shoemaker goes beyond the necessary

requirements and follows a more rigorous two tiered model, which incorporates generally

accepted practices and includes additional levels of criteria, where certain findings must be

present before he will conclude that a patient is suffering from an illness due to an

environmentally acquired biotoxin.  (*Id.*, Exhibit 14, ¶¶12-15, 18, 19, 21, 23, 25, 26, 28, 30, 31-

34.)

 The first tier for diagnosis of an environmentally acquired biotoxin illness, including that

from molds and other sources of inflammation found in water-damaged buildings but not as a

whole elsewhere, includes: (1) the potential for exposure; (2) the presence of a distinctive

grouping of symptoms; and (3) the absence of confounding diagnoses to determine whether there

are any other possible diagnoses for the patient's problems.  (*Id.*, Exhibit 14, ¶18.)  In order for

Dr. Shoemaker to diagnose a patient with an illness related to environmental exposure, there must be positive findings in each of the parameters of the first tier of exposure. Otherwise, he does not diagnose the patient as being sick due to an environmental or biotoxin exposure. (*Id.*, Exhibit 14, ¶18.) It is through this process that Dr. Shoemaker addresses and evaluates prior medical history and other potential causes of injury, among other factors. (*Id.*, Exhibit 14, ¶92.)

The second tier for diagnosis of an environmentally acquired biotoxin illness consists of conducting objective lab tests. The tests either support or do not support Dr. Shoemaker's initial diagnoses derived from the first tier. (*Id.*, Exhibit 14, ¶19.) The tests are for HLA DR genotype (*Id.*, Exhibit 14, ¶¶20-21); MSH hormone (*Id.*, Exhibit 14, ¶¶22-23); MMP-9 enzymes (*Id.*, Exhibit 14, ¶¶24-25); ACTH and Cortisol hormones (*Id.*, Exhibit 14, ¶¶27-28); Leptin (*Id.*, Exhibit 14, ¶31); ADH (*Id.*, Exhibit 14, ¶¶29-30); and C3a and C4a (*Id.*, Exhibit 14, ¶32). Each of the lab tests Dr. Shoemaker uses are approved for use by the federal licensing agency; each lab test is federally approved from high complexity, national labs. (*Id.*, Exhibit 14, ¶33.) Each of these lab tests has been around for years and are scientifically valid tests.

None of the tests mentioned above are used to say: "This test result proves that the patient got sick as a result of exposure to mold or mycotoxins." (*Id.*, Exhibit 14, ¶33.) Instead, the test results are used to show exactly the physiologic mechanisms they were designed and accepted to show. (*Id.*, Exhibit 14, ¶33.)

Dr. Shoemaker also uses the Visual Contrast Sensitivity ("VCS") test as a barometer for evaluating neurologic activities and symptoms to determine whether there is a preliminary indication that the patient may be suffering from biotoxin illness. (*Id.*, Exhibit 14, ¶26.) Dr. Shoemaker did not develop the VCS test, and it has been used by other scientists for diagnostic purposes for years as a reliable and established method of gauging one's ability to determine an

object's contrast compared to an affixed color background.  (*Id.*, Exhibit 14, ¶26; Current

Procedural Terminology Code for VCS Test, Exhibit 36.)  VCS tests how well the eye's retina is

able to translate a visual image into neural code, and a number of previously published studies

confirm the role of VCS as an indicator of effect of capillary hypoperfusion in biotoxin illnesses,

with correction of the biotoxin illness accompanied directly over time by improvement in VCS.

(Shoemaker Aff. ¶26, Exhibit 14.)

Dr. Shoemaker does not say that an abnormal finding on a VCS test means that the

patient was ill as a result of exposure to mold.  (*Id.*, Exhibit 14, ¶26.)  Dr. Shoemaker's

application of the VCS test is merely as a reliable barometer for evaluating neurologic activities

and symptoms.  (*Id.*, Exhibit 14, ¶26.)

These tests are one part of the overall differential diagnostic work up.  (*Id.*, Exhibit 14,

¶34.)  Each test result is merely "one spoke on a wheel" of many other "spokes" of evidence.

(*Id.*, Exhibit 14, ¶34.)  The entire wheel consists of evidence from a patient's medical records

and history, a patient's history of environmental exposure, the temporal relationship between

exposure and illness, the physical examination of the patient, each peer reviewed article utilized

to evaluate general causation capabilities, and each result from the objective lab tests.  (*Id.*,

Exhibit 14, ¶34.)  And again, the lab tests themselves do not show illness from exposure to

molds and/or mycotoxins.  (*Id.*, Exhibit 14, ¶34.)

As demonstrated above and further addressed in Dr. Shoemaker's affidavit, Dr.

Shoemaker can demonstrate why these tests are relevant to his diagnostic process.  All of these

laboratory tests for HLA-DR, MSH, MMP-9, ACTH, Cortisol, Leptin, ADH, and C4a are

generally accepted tests in the medical and scientific communities.  Dr. Shoemaker, through his

extensive and specialized practical and clinical experience, is able to utilize the results of these

tests as part of his diagnostic work up.

Using the above two tiered model, Dr. Shoemaker diagnoses and causally connects mold exposures to environmentally acquired biotoxin illnesses.[8]

### 2.    Dr. Shoemaker's Methodology: Scientifically Valid

Part of the scientific basis for Dr. Shoemaker's methodology derives from the underlying scientific principles and literature, detailed above and attached hereto, that mold can cause human injury.  In addition to this underlying science, Dr. Shoemaker's methodology is valid for each of the following reasons: (a) his method is generally accepted in the scientific community; (b) his method has been subjected to peer review and tested; (c) his method contains rigorous standards that control the operation of his analysis; (d) his method applies many years of extensive and specialized experience researching, studying, treating, and diagnosing individuals exposed to biotoxic contaminants (which alone qualifies Dr. Shoemaker to testify); and (e) his method has been deemed scientifically valid numerous times in various courts.

### a.    Dr. Shoemaker's methods are generally accepted in the scientific community.

As described above, Dr. Shoemaker's method is simple: he reviews medical records, he takes histories, he conducts examinations, he performs a differential diagnosis, he runs laboratory tests.  This is what the United States Court of Appeals for the District of Columbia Circuit, among other federal courts, determined is generally accepted.  *See Ambrosini*, 101 F.3d

---

[8]    In his research, Dr. Shoemaker applied an additional five step protocol for diagnosing  and causally connecting exposures and mold illnesses.  The protocol established the research basis which allows Dr. Shoemaker to prove causation.  Since Dr. Shoemaker has proven the research model, there is no need to follow the five step protocol in the future, or in this case.  Once the research model is proven, Dr. Shoemaker can rely on the two-tiered process to determine whether an individual is a case or not.  The case definition does not include treatment, or any other aspects of the five step protocol.  For this reason, among others, Dr. Shoemaker has not, will not, and does not need to follow the five step protocol in this case.  Defendants' Motion needlessly discusses the five step protocol at length.  (Shoemaker Aff. ¶¶41, 93, 109, Exhibit 14.)

at 137-41. Defendants cannot argue that Dr. Shoemaker's methods are not generally accepted simply because they weigh factors differently and dispute conclusions.

Differential diagnosis is a common scientific technique, accepted by the scientific community and previously accepted by courts addressing *Daubert*. *See, e.g. Ambrosini*, 101 F.3d at 137-41; *Heller*, 167 F.3d at 155-56; *In re: Paoli RR Yard PCB Litigation*, 35 F.3d at 755; *Baker*, 156 F.3d at 252-53; *Kennedy*, 161 F.3d 1226; *Westberry*, 178 F.3d at 262-66.

The full methodology of Dr. Shoemaker has been outlined above. His method involved the performance of a differential diagnosis, and more. Indeed, Dr. Shoemaker could identify the first tier of his two tier model as encompassing, *inter alia*, generally accepted practices for consistency, specificity, temporality, biological gradient, plausibility, coherence, and analogy. However, it is easier to use plain English and explain what he does. And again, to avoid confusion regarding terminology, the tier two testing, the lab tests and the VCS test, fit within generally accepted practices for testing to determine causation and for strength, plausibility, coherence, and analogy.

Defendants' Motion spends a lot of time arguing that the test conclusions Dr. Shoemaker makes are at variance with the test's original purpose. In other words, Dr. Shoemaker draws *conclusions* from test methods and lab tests established for other purposes, and applies them to a different use. Defendants argue that this is wrong; yet, Dr. Shoemaker argues it is good medicine and he has treated *hundreds* of patients successfully. Regardless, this goes directly to Dr. Shoemaker's conclusions, not his methods. Even if Dr. Shoemaker's conclusions are wrong, he cannot be excluded from testifying on this basis. *Cf. Ambrosini*, 101 F.3d at 138 ("Even where a party has admitted that no biochemical or epidemiological test has been done that can

conclusively establish a link between a drug and an illness, their expert evidence on the subject is not rendered inadmissible.").

And again, Dr. Shoemaker does not use laboratory tests to show causally connected illness from exposure to molds and/or mycotoxins.  He uses the tests for their purpose, and then draws conclusions.

Dr. Shoemaker, like every other physician, takes a history of his patient, reviews medical records of the patient, performs a physical examination of the patient, conducts a differential diagnosis of the patient, runs tests on the patient, and reviews medical literature to try to determine what might be causing problems for the patient.  This process is followed and validated by physicians across America.  Dr. Shoemaker has followed the scientific process.  He concluded causation.  Defendants' experts did not.  That does not mean Dr. Shoemaker should be excluded from testifying.

**b.      Dr. Shoemaker's methods have been subjected to peer review and tested.**

Dr. Shoemaker has now published three papers in peer reviewed scientific journals.  The peer reviewed literature is how scientists and doctors put their work before others, show their evidence and invite comment and authentication.  (Shoemaker Peer Reviewed Mold Papers, Exhibit 16.)  Of particular note is the latest paper which contains a causation finding, i.e., the peer reviewed committee approved a finding of causation between the mold exposures and the illness, based on Shoemakers' methods and evidence, exactly the process Defendants attack.

The requirement that methods be tested can also be met through the large body of scientific research conducted by Dr. Shoemaker and others, *inter alia* the studies presented in the Association papers referenced in Exhibit 30, the references in Exhibits 31-33, and additional research done by Dr. Shoemaker.  (Shoemaker Research, Exhibit 37).

28

Further, government organizations have tested the principles underlying Dr. Shoemaker's methods. The CDC acknowledged that illness is associated with levels of mycotoxins, endotoxins and beta glucans found in homes damaged by Hurricane Rita and Katrina. (Exhibit 24.) The EPA acknowledged the role of exposure to water-damaged buildings in their University of Connecticut study. (Exhibit 21.) The EPA released academic work substantiating that exposure to water-damaged buildings accounts for 21% of asthma nationwide at a cost of over $3.5 billion. (Exhibit 25.) NIOSH published that the total fungal biomass is associated with human illness from water-damaged buildings. (Exhibit 28.) The Minister of Health of Canada no longer requires fungal sampling to determine health risk. (Exhibit 26.)

    **c.**    **Dr. Shoemaker's methods contain rigorous standards that control the <u>operation of his analysis to a known error rate.</u>**

Dr. Shoemaker's two tiered model for diagnosing causally related mold illness contains rigorous standards that control the operation of his analysis. For one thing, his two tiered model incorporates all of the generally accepted scientific practices for evaluating and diagnosing a patient. Additionally, Dr. Shoemaker undertakes a thorough evaluation of a patient's entire history and well-being, followed by extensive testing. Dr. Shoemaker does not simply rely on one element of the process for determining whether an individual has suffered from toxic mold exposure. In taking histories from patients, in reviewing records, and in performing examinations and laboratory tests, Dr. Shoemaker's methods incorporate at the very least rigorous control standards, as they are directly in line with generally accepted scientific practices.

The error rate of this controlled process is known. (Shoemaker Aff. ¶¶46-47, 100, Exhibit 14; Statistical Analysis, Exhibit 38.) Dr. Shoemaker's methods are highly accurate. (Shoemaker Aff. ¶46-47, 100, Exhibit 14.) To date, none of the over 4,700 similar patients in

Dr. Shoemaker's practice have not met this case definition and none of the non-illness patients (over 1,000) have met the case definition. (*Id*., Exhibit 14, ¶100.)

The rigorous standards employed by Dr. Shoemaker stand in contrast to those used by Defendants' experts. Specifically, any reference to the American College of Occupational and Environmental Medicine ("ACOEM") statement of October 2002 regarding mold illness is not generally accepted. (*Id*., Exhibit 14, ¶¶120-28.) The ACOEM statement, relied upon by Defendants, is outdated and fundamentally flawed in science and logic. (*Id*., Exhibit 14, ¶¶120-28; ACOEM Statement, Exhibit 39.) The ACOEM statement relies on science that has been rejected. (Id., Exhibit 14, ¶¶120-28; Veritox I & II, Exhibit 40.) The American Academy of Allergy, Asthma and Immunology ("AAAAI") mold statement of February 2006 suffers the same failures in rigor. (*Id*., Exhibit 14, ¶¶120-28; AAAAI Statement, Exhibit 41.) Indeed, in September 2006, the AAAAI published ten letters (including Dr. Shoemaker's) that criticized the AAAAI statement as a biased instrument of defense consultants. (AAAAI Critical Letters, Exhibit 42.) Both the ACOEM and the AAAAI statement show none of the same rigor, transparency, and disclosure exhibited by Dr. Shoemaker.

> d.    **Dr. Shoemaker's methods apply many years of practical experience treating and diagnosing individuals exposed to biotoxic contaminants.**

Dr. Shoemaker's extensive expertise in the area of treating and diagnosing causally connected mold illness was noted in the factual background section; however, some of it bears repeating here, as "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co.*, 526 U.S. at 156.

For the past ten years, Dr. Shoemaker has been the treating physician for over 4,700 patients who have been diagnosed with ailments caused by exposure to water-damaged buildings. (Shoemaker Aff. ¶36, Exhibit 14.) He has published three peer reviewed academic

papers on biotoxin associated illness and sick building syndrome, and he has been a peer reviewer for journals. (*Id*., Exhibit 14, ¶2, 7-8.) Dr. Shoemaker has given numerous presentations to groups and associations interested in toxic mold and its effects on the human body. (*Id*., Exhibit 14, ¶¶2, 9.)

Dr. Shoemaker has gained public recognition as an expert in the field of mold illness by being invited to present papers and testimony before the United States Senate, the United States House of Representatives, and the Maryland State Senate, and by being asked by federal and state governments to investigate mold exposures (*Id*., Exhibit 14, ¶¶5, 6 (Maryland congressman, FAA, FEMA and Homeland Security).)

Through all this experience, Dr. Shoemaker has become an authority on the treatment of mold illness. His research and peer reviewed papers on Pfiesteria were accepted as authoritative. (Pfiesteria Research and Papers, Exhibit 43.) His research on inflammatory illness was also accepted for peer reviewed publication. (Inflammatory Illness Papers, Exhibit 44.) His research on mold illness has likewise been accepted for peer reviewed publication. (Shoemaker's Peer Reviewed Mold Papers, Exhibit 16.) Dr. Shoemaker's work, research and study of mold illness is extensive. (*Id*., 16; Shoemaker Research, Exhibit 37; Pfiesteria Research and Papers, Exhibit 43; Inflammatory Illness Papers, Exhibit 44; Additional Mold Research, Exhibit 45.) Regularly, physicians around the country contact Dr. Shoemaker to learn how to treat mold illness. (Physician Logs, Exhibit 46.) Dr. Shoemaker's vast experience permits him to draw on this clinical background to further support his use of laboratory testing. While all of the laboratory tests are generally accepted and scientifically valid, Dr. Shoemaker's experience qualifies him to reach the appropriate conclusions from these tests.

Alone, Dr. Shoemaker's experience in researching, understanding, treating, and

diagnosing toxic mold injuries qualifies his methods as scientifically valid and qualifies his testimony as sufficient under *Daubert*.  Dr. Shoemaker has ample extensive and specialized experience with and knowledge about treating and diagnosing toxic mold injuries.  And his extensive and specialized experience has been nationally recognized by his patients, his peers, and federal and state governments.

> **e.    Dr. Shoemaker's trial testimony experience provides further evidence that his methods are relevant, reliable, and scientifically valid.**

Defendants cite numerous cases where Dr. Shoemaker's testimony was challenged. None of these cases are binding on this Court, and more importantly, none of them were actually analyzed under *Daubert*.  Notably, Defendant cites no binding precedent either at the trial court or appellate level with regard to Dr. Shoemaker or any mold science.

Over 20 times now, Dr. Shoemaker's trial testimony has been challenged under *Daubert*, *Frye*, or some other standard.  The overwhelming majority of the time, Dr. Shoemaker has been permitted to testify.  Defendants' Motion mischaracterizes Dr. Shoemaker's past trial testimony.

> **i.    Recent Holdings**

Dr. Shoemaker has recently been permitted to testify in several state courts for the very same reasons Plaintiffs cite herein.

On May 29, 2007, a Michigan state court ruled that Dr. Shoemaker would be permitted to testify at trial, stating:

> Dr. Ritchie C. Shoemaker, M.D., is board certified in family practice medicine. He treats patients three days per week and does research on Tuesdays and Thursdays. His practice involves treating mold illnesses primarily.  He does not have any board certifications in any specialized areas more directly related to mold toxicology.  He has published papers on sick building syndrome.  He testified to the specific indicators of sick building syndrome, such as deficiency of melanocyte stimulating hormone, and elevation of matrix metalloproeinases 9, and other hormones that could be objectively measured.  He and three other doctors studied 156 patients to develop this medical profile for people suffering

32

from exposure to water damaged buildings. Dr. Shoemaker's opinions seem to be well grounded in his personal studies of patients as well as the work of other physicians. His work is not unscientific in any way. The Court will allow Dr. Shoemaker to offer the types of opinions he offered in his deposition testimony regarding symptoms associated with toxic mold exposure and means for diagnosing toxic mold exposure.

(*Colaianni v. Stuart Frankel Development Corporation, et al.*, Case No. 2003 051245 (Mich.Cir. Ct., Oakland County 2007) Opinion, Exhibit 47.)

On August 27, 2007, a California state court denied a series of motions related to Dr.

Shoemaker and other expert doctors, stating:

The defense will have ample opportunity to cross-examine each expert as to their medical opinions and the basis for them, and will also have the opportunity to counter with their opposing experts. Any novel application of an existing medical procedure can likewise be dealt with in this traditional manner . . . .

Defendants' motion to exclude the results of the visual contrast sensitivity test conducted by Dr. Shoemaker is denied. This is not a Kelly issue, and any dispute regarding the validity and use of the results can be covered with cross-examination and opposing opinions of other experts.

(*Wigle v. Yarnell*, Case No. 1112810 (Superior Court of California, County of Santa Barbara, Anacapa Division) Rulings, Exhibit 48.)

On November 15, 2005, a Colorado state court denied a motion to exclude the testimony

of Dr. Shoemaker, stating:

Dr. Shoemaker's diagnosis of the Plaintiff is based on his area of expertise as a medical doctor. The fact that he has been practicing for many years and has treated thousands of patients makes his testimony in the field of medicine reasonably reliable. Any questions regarding the validity of his scientific methods or specific areas of expertise in diagnosing mold related illness can be addressed during cross-examination and are subject to rebuttal witnesses.

(*Lake v. Village Homes of Colorado, Inc., et al.*, Case No. 2003 CV 4227 (State of Colorado District Court, Jefferson County) Order, Exhibit 49.)

Dr. Shoemaker has recently testified in Maryland, Virginia, and numerous other

jurisdictions. In the District of Columbia, Dr. Shoemaker was recently excluded from testifying;

however, a closer look at that case shows why it must be ignored.

### ii.    District of Columbia

*Wright v. Fort Lincoln Realty* was determined under different, inapplicable law, and

relied on erroneous testimony.  *Wright* decided the exact opposite of what this Court must

decide, concluding:

> The Court under *Frye* is <u>not</u> required to determine the validity of Dr. Shoemaker's theory regarding the health effects of the inhalation of indoor mold or his methodology used to diagnose the Wrights with CBAI.  Rather, the Court must determine whether Dr. Shoemaker's <u>conclusions</u> are generally accepted among scientists.  <u>The Court concludes that plaintiff has failed to demonstrate under *Frye* that Dr. Shoemaker's conclusions meet this standard.</u>

(*Wright v. Fort Lincoln Realty Co.*, Civil Action No. 03-ca-4555 (D.C. Superior Court)
Order, Exhibit 50.)  (Emphasis added.)

Clearly, *Wright* is based on conclusions, not methods, and must be ignored for this reason,

among others.

For example, *Wright* relied on blatantly erroneous testimony, stating in the Order, "Dr.

Gots stated that abnormal readings in biomarkers may have been attributable to the patient's fear

of being re-exposed to a dangerous environment, rather than the actual exposure to mold itself."

(*Id*., Exhibit 50, p. 5.)  This is simply false – nothing could be further from the truth.

(Shoemaker Aff. ¶105, Exhibit 14.)

Lastly, the court in *Wright* made its decision after a perfunctory opposition from the

plaintiffs that fails to discuss methodology, underlying scientific validity and basis, and general

acceptance, not to mention it was decided under inapplicable law.  (Plaintiff's Opposition in

*Wright*, Exhibit 51.)  This Court will hear argument that Judge Combs-Greene did not consider,

arguments that are supported by case law and facts.

### iii.    Virginia

Defendants assert that Dr. Shoemaker has never qualified as an expert witness in Virginia, and was excluded in two prior cases. This is incorrect and misleading. Dr. Shoemaker was qualified as an expert and permitted to testify in July 2007 in *Kristensen v. Spotnitz, et al.* (Shoemaker Aff. ¶105, Exhibit 14.) Additionally, Dr. Shoemaker's testimony has never been excluded in Virginia for the reasons this Court will be considering – that his methods are not scientifically valid.

In the first case cited by Defendants, *Ford v. Summit Realty*, Dr. Shoemaker was excluded because his testimony was deemed duplicative, not based on his expertise as a doctor. (*Id.*, Exhibit 14, ¶105.) Plaintiff had two treating doctors, and the plaintiff chose not to call Dr. Shoemaker.[9] (*Id.*, Exhibit 14, ¶105.) In the second Virginia case cited by Defendants, *Odaris*, Dr. Shoemaker was excluded because the trial court believed his use of a cholesterol drug to treat the Plaintiff was not accepted by the medical community. (*Id.*, Exhibit 14, ¶105.) The court based its decision upon the misperception that "off-label" use of a FDA approved drug was not accepted in the medical community. (*Id.*, Exhibit 14, ¶99.) The Virginia Supreme Court granted *certiorari* on this issue, and the appeal is currently pending. (*Id.*, Exhibit 14, ¶99.)

In sum, Dr. Shoemaker has only been excluded once in Virginia, not for his diagnosis but for off-label drug treatment. This decision was incorrect and is not binding on this Court.

### iv.    Maryland

Dr. Shoemaker has testified numerous times in Maryland after *Frye* challenges. In *Chesson, et al. v. Montgomery Mutual Insurance Company*, the Circuit Court for Howard

---

9    This is the same situation presented here, where Defendants have presented two experts to testify to health issues of Plaintiff, as well as two attorneys to testify as legal experts. Such is redundant, and here either of Defendants' doctors or lawyers could be excluded.

County admitted Dr. Shoemaker's testimony without subjecting him to a *Frye-Reed* hearing. Dr. Shoemaker testified, and the plaintiffs in that case prevailed. The defendants appealed to the Court of Special Appeals of Maryland, who affirmed the decision. (*Chesson* Court of Special Appeals Decision, Exhibit 52.) The defendants then appealed to the Maryland Court of Appeals, who simply remanded the case for a *Frye-Reed* hearing.[10] *Montgomery Mutual Insurance Company v. Chesson, et al.*, 923 A.2d 939 (Md. 2007).

Interestingly, the trial court and the intermediate appellate court deemed Dr. Shoemaker's testimony so acceptable that no hearing on his admissibility was necessary. Then, Maryland's highest court remanded the issue for a hearing. Yet, nothing about any of the *Chesson* decisions indicates that Dr. Shoemaker's testimony is inadmissible.

Also in Maryland, Dr. Shoemaker's testimony has been permitted over objection in at least three other recent cases, *Bligen v. Belvedere, LLP*, in Montgomery County, Maryland (*Frye* challenge denied, January 5, 2007; later motion to strike denied and trial testimony permitted) (*Bligen* Docket Sheet, Exhibit 53); *Buckler v. Raley, et al.*, in St. Mary's County (motion to strike denied, October 20, 2006; trial testimony permitted) (*Buckler* Docket Sheet, Exhibit 54); and *Washington v. Board of Education of Montgomery County*, in Montgomery County, Maryland (motion in *limine* to exclude testimony denied, trial testimony permitted).

### v.    Other Jurisdictions

In addition to Michigan, California, Colorado, Virginia, and Maryland, Dr. Shoemaker has been permitted to testify in Mississippi, Pennsylvania, Florida, Delaware, Hawaii, New Jersey, Oregon, Rhode Island, Pennsylvania and North Carolina. (Shoemaker Aff. ¶10, Exhibit 14.).

---

10    The remanded hearing was recently conducted in late February 2008, and a decision on Dr. Shoemaker's testimony is expected within the next 60 days.

In Florida, Dr. Shoemaker's testimony has been limited once and excluded once.    (*Id*., Exhibit 14, ¶¶106.)  In  *Curry v. Persica Design and Construction, Inc.*, Dr. Shoemaker's testimony was excluded.    (*Id*., Exhibit 14, ¶106.)  Again, this case is nonbinding, and the exclusion occurred nearly 4 years ago, before the availability of much of the scientific literature attached hereto, including the IOM report, and more recent government publications and peer reviewed papers.  (*Id*., Exhibit 14, ¶106.)

Also in Florida, Dr. Shoemaker's testimony was permitted in *Fico v. Berkley South Condominium Association.*  In *Fico*, the trial judge recused himself for bias after a *Frye* challenge regarding the testimony of Dr. Shoemaker.    (*Id*., Exhibit 14, ¶106.)  After the judge recused himself for bias, the *Fico* case subsequently settled due to complete recovery of Plaintiff after successfully using Dr. Shoemaker's treatment protocols.    (*Id*., Exhibit 14, ¶106.)

In Mississippi, Dr. Shoemaker was permitted to testify in *Matthews v. Harrison,* but when the same Mississippi attorney offered Dr. Shoemaker to testify in *Capaci* in Alabama, Dr. Shoemaker was excluded from testifying.  (*Id*., Exhibit 14, ¶108.)  This exclusion was apparently based on the procedure of that case.  (*Id*., Exhibit 14, ¶108.)

Dr. Shoemaker was not excluded from testifying in Canada.  As seen in Exhibit 16 to Defendants' Motion, Dr. Shoemaker was involved in a potential class action in Canada, but the class was not certified for a variety of reasons.

### 3.    Dr. Shoemaker's Methodology: Applied

In this case, Dr. Shoemaker performed the same methods, as stated above, that he performs with each patient he treats.  (*Id*. Exhibit 14, ¶92.)  Specifically, he reviewed an extensive body of past medical records, comprising three binders of documents before the patients were seen.  (*Id*., Exhibit 14, ¶97.)  He reviewed every medical record attached hereto as

Exhibits 10-12, and more. Then, with respect to each patient he took numerous steps. He asked

them about their prior medical history and prior potential for exposure. (*Id*., Exhibit 14, ¶92.)

He took a medical and factual history. (*Id*., Exhibit 14, ¶97.) He performed a physical exam.

(*Id*., Exhibit 14, ¶97.) He ordered ancillary testing, including pulmonary function testing, pulse

oximetry and electrocardiogram. (*Id*., Exhibit 14, ¶97.) He performed the VCS test. (*Id*.,

Exhibit 14, ¶97.) He ordered laboratory testing. (*Id*., Exhibit 14, ¶97.) Dr. Shoemaker

developed a differential diagnosis on a preliminary basis at the day of Plaintiffs' office visit.

(*Id*., Exhibit 14, ¶97.)

Dr. Shoemaker observed that there was a clear indication that Plaintiffs met criteria for

illness seen in mold illness patients because they met the first tier of Dr. Shoemaker's diagnosis

model. (*Id*., Exhibit 14, ¶74.) The potential for exposure existed, as evidenced by Plaintiffs'

description of their residential unit, the timeline associated with their move into the unit and their

perception of mold and foul odors after moving in, the timeline associated with their move into

the unit and their need for medical intervention after moving in, the smells they experienced, the

mold they saw and photographed, and the presence of mold documented by the District of

Columbia government records. (*Id*., Exhibit 14, ¶¶39, 84, 97; Shoemaker Report, Exhibit 55, p.

16.) With all this information, and the scientific literature telling us that the total fungal biomass

is associated with human illness, no environmental testing was needed to further confirm the

potential for exposure. (Shoemaker Aff. ¶37, 41, 45, 79, 94, 131-32, 135, Exhibit 14; Exhibit 28;

Exhibit 29.) Both Plaintiffs exhibited a distinctive grouping of symptoms, which is described in

Dr. Shoemaker's report of September 17, 2007. (Shoemaker Report, Exhibit 55, p. 15.) After

considering prior medical records and illnesses, including those of Ms. Young from 1995-2000,

and prior potential for exposures, Dr. Shoemaker concluded that there was an absence of

confounding diagnoses and no other possible diagnoses for Plaintiffs' problems.[11] (Shoemaker Aff ¶¶37, 87, 92; Shoemaker Report, Exhibit 55, pp. 2-3.)

In order to further support his conclusion, and to further refine the differential diagnosis, Dr. Shoemaker performed the needed blood draws and ordered a comprehensive battery of laboratory tests for Plaintiffs. (Shoemaker Aff. ¶98, Exhibit 14.) The objective laboratory results confirmed Dr. Shoemaker's initial clinical impression that Plaintiffs were a case with an illness caused by exposure to biotoxins and sources of inflammatory responses made by toxigenic organisms present in the residence. (*Id.*, Exhibit 14, ¶99.)

Dr. Shoemaker applied the data for each patient to the peer reviewed, published case definition for acute and chronic illness acquired following exposure to a water-damaged building. Each patient met the strict requirements of the two-tiered case definition.

Plaintiff Young has a dual mold susceptible HLA DR analyzed by PCR. (*Id.*, Exhibit 14, ¶103.) One haplotype is 13-5-52C and the other is a rare haplotype that carries dire consequences should the carrier become ill for exposure to a water-damaged building. (*Id.*, Exhibit 14, ¶103.) Dr. Shoemaker has published in the past that this haplotype is "dreaded," in that the incidence of this haplotype is increased 22-fold in patients with the worst illness compared to control populations. (*Id.*, Exhibit 14, ¶103.) Ms. Young had a deficit in VCS. (*Id.*, Exhibit 14, ¶103.) Her MSH was 12, with normal ranges being 35-81 pg/ml. (*Id.*, Exhibit 14, ¶103.) Her MMP9 was 565, with normal range 0-332. (*Id.*, Exhibit 14, ¶103.) These are four of the six parameters required to meet he second tier of the case definition; only three parameters

_____

11    Defendants attempt to create additional potential causes for Plaintiffs' illness by mention of various factors that could have impacted Plaintiffs' health. Dr. Shoemaker considered other potential causes and other various factors that could have impacted Plaintiffs' health. The weight and importance of various factors is obviously disputed. For example, Defendants put little emphasis on Plaintiff Young's lack of medical treatment from 2000 through 2002, while emphasizing illness from the 1990s. Still, this is not a basis to exclude Dr. Shoemaker, as it goes to conclusions, and is more appropriately the subject of cross-examination.

are required.  (*Id*., Exhibit 14, ¶103.)  She had a C4a result of 10,935, with normal less than 2830

ng/ml.  (*Id*., Exhibit 14, ¶103.)  This level is astronomically elevated and is not found in non-

cases to date.  (*Id*., Exhibit 14, ¶103.)  The illness severity can be paralleled to the elevation of

C4a.  Dr. Shoemaker emphasizes that there is no way that a patient can fake these objective tests.

(*Id*., Exhibit 14, ¶103.)  Potential confounders, such as allergy to trees, dander and grasses, for

example, never give any abnormalities of these tests.  (*Id*., Exhibit 14, ¶103.)  Additionally, Dr.

Shoemaker is aware of certain diseases that do not give these lab abnormalities, namely low

MSH, VCS deficits, or elevated C4a, yet exist with mold illness.  (*Id*., Exhibit 14, ¶103.)  Based

on these laboratory findings, Ms. Young is a case. (*Id*., Exhibit 14, ¶103.)

Plaintiff Ghee has dual HLA DR haplotypes that provide her with increased susceptibility

to mold illness.  (*Id*., Exhibit 14, ¶104.)  She also had a deficit in visual contrast testing (VCS).

(*Id*., Exhibit 14, ¶104.)  Her MSH was 18, too low compared to the normal range of 35-81.  (*Id*.,

Exhibit 14, ¶104.)  Her labs were otherwise normal, including C4a of 2694.  (*Id*., Exhibit 14,

¶104.)  Her illness is much less severe compared to Ms. Young, but she nonetheless has three of

the six parameters required to meet the strict requirements of the second tier of the case

definition.  (*Id*., Exhibit 14, ¶104.)

As stated above, the laboratory data are consistent with what treating physicians see on a

regular basis in patients with mold illness. The fact that Dr. Shoemaker takes these delineated

steps to assure himself of the diagnosis of Plaintiffs in this case, just like he does with all of his

patients, *does not subject his opinions to a Daubert hearing*. There are no scientifically invalid

procedures or methodology that would require Dr. Shoemaker's techniques to be evaluated at a

hearing.

### 4. Dr. Shoemaker's Conclusions

After applying scientifically valid methods, Dr. Shoemaker concluded to a reasonable degree of medical certainty, *inter alia*: (1) Plaintiff Denicole Young's respiratory failure of April 2003 is causally related to her exposure in 2002, and (2) both Plaintiffs have suffered permanent impairment to their innate immune regulation, *inter alia* the onset of Ms. Young's permanent respiratory disease and restrictive lung capacity, which reveals itself as asthma. (*Id*., Exhibit 14, ¶¶83-91.)

The exposures sustained by Plaintiffs in the residential unit, detailed above and in Dr. Shoemaker's September 17, 2007 report, are adequate and sufficient to create the abnormalities in innate immune responses that exist here. These abnormalities are confirmed by blood tests performed by Dr. Shoemaker.

As a result of the exposure, Plaintiff Young's innate immune response was compromised and directly caused the catastrophic event of respiratory failure that resulted in her life-saving intubation and ventilator treatment at GWUH in April 2003. (*Id*., Exhibit 14, ¶¶83-88.)

But for the pre-existing condition created by the exposure in her residence, it is Dr. Shoemaker's opinion to a reasonable degree of medical certainty that she would not have been intubated in April 2003. (*Id*., Exhibit 14, ¶88.) The exposure was the direct and proximate cause of Ms. Young's respiratory failure and intubation.

Additionally, both Plaintiffs have suffered permanent impairment to innate immune regulation, *inter alia*, Ms. Young's permanent respiratory disease and restrictive lung capacity, revealed as asthma. (*Id*., Exhibit 14, ¶90.) This is the nature and extent of Plaintiff's injuries. (*Id*., Exhibit 14, ¶90.) Defendants misunderstand Dr. Shoemaker's repeated comments in his report regarding the potential for future medical needs by citing one answer to one question in

41

his deposition. (*Id.*, Exhibit 14, ¶91.) Dr. Shoemaker's report states what the patients will

experience in the future, even in the absence of drug therapy. (Shoemaker Report, Exhibit 55.)

The following is a sample of some of the comments in Dr. Shoemaker's report reflecting the

permanency, nature, and extent of Plaintiffs' injuries:

> It is my opinion to a reasonable degree of medical certainty that the well-documented symptoms complex of Mss. Young and Ghee before treatment by my protocols are solely due to their townhouse exposure. They never should have been exposed to an indoor environment known to be a water-damaged site.

(*Id.*, Exhibit 55, p. 2, ¶6.)

> Given the time that has elapsed since the onset of their illness to definitive delineation of their deranged physiology, caused by their townhouse exposures, it is more likely than not that they have sustained a permanent disabling illness. They will require close follow-up in the months to come.

(*Id.*, Exhibit 55, p. 2, ¶7.)

> In my opinion Mss. Young and Ghee will need ongoing medical care for the predictable future to ensure that they won't suffer an additional mold illness following exposure to another water-damaged building, as would happen given their prior mold illness. To date, there are no therapies available for mold illness patients that can correct the increased susceptibility to illness caused by re-exposure. I must emphasize that newer modalities for treatment of mold illness may cause me to reassess these current care guidelines.

(*Id.*, Exhibit 55, p. 17, ¶1.)

> It is further my opinion that Mss. Young and Ghee are at-risk for recurrence of illness should they be re-exposed without the use of medications for prophylaxis to indoor areas with amplified growth of molds or other toxigenic organisms. They will need ongoing medical care, with significant expense related to monitoring and treating their illness.

(*Id.*, Exhibit 55, p. 19, ¶2.)

> Mss. Young and Ghee will continue to be at risk for additional deleterious inflammatory responses over time; they will likely need to take toxin-binding medication on an ongoing basis.

(*Id.*, Exhibit 55, p. 23, ¶1.)

These conclusions are supported by Dr. Shoemaker's scientifically valid methodology. Regardless, even if his conclusions are wrong, Plaintiffs have sufficiently shown that Dr. Shoemaker's methodology is based on scientifically valid principles which were appropriately applied to this case.

### V.     CONCLUSION

The evidence from the medical, scientific, industrial hygiene and governmental community is overwhelming as to mold causation of human injury from both allergic and toxic effects.  On this basis, along with a proper differential diagnosis, an experienced physician such as Dr. Shoemaker is both qualified and has sufficient basis to render conclusions under *Daubert*.

Defendants have a contrary view about Dr. Shoemaker's conclusions, and if their experts are qualified and otherwise not excluded, they may render their opinions.  The jury then decides who is more credible and believable.

Defendants vehemently disagree with the conclusions Dr. Shoemaker draws from all his diagnostic work-up evidence – including the aforementioned laboratory test results.  Again, that is why we have juries.  The jury listens to each expert testify (and get cross-examined about the basis of the expert opinions) – but a disagreement amongst experts on conclusions regarding medical causation is not a basis to exclude testimony pursuant to *Daubert*.

Alone, Dr. Shoemaker's differential diagnosis qualifies him to testify.  Alone, Dr. Shoemaker's experience qualifies him to testify.  Together, there can be no question that Dr. Shoemaker is qualified to testify.

Based upon the above, Defendant's Motion must be denied, and Defendants' request for a *Daubert* hearing must also be denied.

Respectfully submitted,

_Peter C. Grenier /s/_ _____

By:    Peter C. Grenier (D.C. Bar No. 418570)
Michael K. Hibey (D.C. Bar No. 502890)
Bode & Grenier, L.L.P.
1150 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 828-4100
(202) 828-4130 (fax)
*Counsel for Plaintiffs*

Dated: March 17, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of March 2008, I served a true and accurate copy of the foregoing Memorandum of Points and Authorities (1) In Opposition to Defendants' Motion to Exclude Opinion Testimony of Plaintiffs' Expert Dr. Ritchie Shoemaker And (2) In Opposition to Defendants' Request for a *Daubert* Hearing, by electronic case filing upon:

Paul J. Maloney, Esquire
Carr Maloney, P.C.
1615 L Street, N.W., Suite 500
Washington, D.C.  20006
*Counsel for Defendant Lewis & Tompkins, P.C.*

Deborah Murrell Whelihan, Esquire
Jordan, Coyne & Savits, L.L.P.
1100 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
*Counsel for Defendant William F. Burton*


_____*Peter C. Grenier /s/*_____
Peter C. Grenier

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **DENICOLE YOUNG and** )<br>**VANESSA GHEE** )<br> )<br>     **Plaintiffs,** )<br> )<br>     v. )<br> )<br>**WILLIAM F. BURTON and** )<br>**LEWIS & TOMPKINS, P.C.** )<br> )<br>     **Defendants.** )<br> ) | **CIVIL ACTION NO. 07-CV-983 (ESH)** |

**<u>ORDER</u>**

Upon consideration of Defendants' Motion to Exclude Opinion Testimony of Plaintiffs'

Expert, Dr. Ritchie Shoemaker, Plaintiffs' Opposition thereto, and the entire record herein, it this

_____ day of _____, 2008,

ORDERED, that Defendants' Motion to Exclude Opinion Testimony of Plaintiffs'

Expert, Dr. Ritchie Shoemaker, is DENIED.


_____
Judge Ellen S. Huvelle

Copies To:

Deborah Murrell Whelihan, Esquire
Jordan, Coyne & Savits, L.L.P.
1100 Connecticut Avenue, N.W., Suite 600
Washington, DC 20036

Paul J. Maloney, Esquire
Carr Maloney, P.C.
1615 L Street, N.W.
Suite 500
Washington, D.C.  20006

Peter C. Grenier, Esquire
Bode & Grenier, L.L.P.
1150 Connecticut Avenue, N.W.
9th Floor
Washington, D.C.  20036

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division**

| | |
|---|---|
| **DENICOLE YOUNG** and **VANESSA GHEE** | ) ) ) |
| | ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **CIVIL ACTION NO. 07-CV-983 (ESH)** |
| | ) |
| **WILLIAM F. BURTON** and **LEWIS & TOMPKINS, P.C.** | ) ) ) |
| **Defendants.** | ) ) |

## NOTICE OF BULKY FILING

Please note that the exhibits to "Plaintiff's Memorandum of Points and

Authorities (1) In Opposition to Defendants' Motion to Exclude Opinion Testimony of

Plaintiffs' Expert Dr. Ritchie Shoemaker And (2) In Opposition to Defendants' Request

for a Daubert Hearing" will be separately hand-delivered to the Court and counsel

pursuant to LCvR 5.4(e)(1).

Respectfully submitted,

*Peter C. Grenier /s/*
By:    Peter C. Grenier (D.C. Bar No. 418570)
        Michael K. Hibey (D.C. Bar No. 502890)
        Bode & Grenier, L.L.P.
        1150 Connecticut Avenue, N.W.
        Ninth Floor
        Washington, D.C.  20036
        (202) 828-4100
        (202) 828-4130 (fax)
        *Counsel for Plaintiffs*

Dated: March 17, 2008

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of March 2008, I served a true and accurate copy of the foregoing Notice of Bulky Exhibits, by electronic case filing, and the referenced Exhibits, by hand delivery, upon:

Paul J. Maloney, Esquire
Carr Maloney, P.C.
1615 L Street, N.W.
Suite 500
Washington, D.C.  20006
*Counsel for Defendant Lewis & Tompkins, P.C.*

Deborah Murrell Whelihan, Esquire
Jordan, Coyne & Savits, L.L.P.
1100 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
*Counsel for Defendant William F. Burton*

*Peter C. Grenier /s/*
Peter C. Grenier