UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

DENICOLE YOUNG and
VANESSA GHEE,                                     :
                                                 :
          Plaintiffs,                            :
                                                 :
     v.                                          :     Case No.: 1:07cv983 (ESH)
                                                 :
LEWIS & TOMPKINS, P.C, et al.,                   :
                                                 :
          Defendants.                            :

### DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINION TESTIMONY OF RITCHIE SHOEMAKER, M.D.

Defendants Lewis and Tompkins, P.C., and William F. Burton, Esquire by and through their respective and undersigned counsel, hereby responds to Plaintiffs' Opposition to Defendants' Motion to Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Shoemaker ("Plaintiffs' Opposition" or "Pl. Opp."). Notwithstanding Plaintiffs 45-page Opposition, Dr. Shoemaker's rambling 59-page Affidavit, and 55 exhibits, Dr. Shoemaker's opinions should be excluded. Plaintiffs have not and cannot prove: (1) general or specific causation; (2) Dr. Shoemaker's differential diagnosis is based on reliable medical or scientific methodology; or (3) Dr. Shoemaker's methodologies are generally accepted in the medical community. A careful review of Dr. Shoemaker's methodologies leads to an inescapable conclusion—the louder he protests, the less believable he is.

### I.    Plaintiffs Have Not Shown And Cannot Prove General Or Specific Causation

Dr. Shoemaker is Plaintiffs' sole causation expert. He first saw Plaintiffs on September 11, 2007, approximately five years after their alleged exposure to mold in a neighboring apartment for two minutes or less. Plaintiffs remained in their apartment for a total of 34 days,

during which time they may have smelled odors from the neighboring apartment or from outside. It is undisputed that approximately six weeks after Ms. Young moved from Apartment 2A, she reported to her primary care provider that she felt much better. (*See* Exhibit 18). Both Plaintiffs have had a myriad of medical complaints since 2002, the most significant of which was Ms. Young's hospitalization in April 2003.

It is undisputed that no one can say at this time what mold was located in the neighboring apartment to Apartment 2A in September 2002. There is no scientific methodology to establish whether there was a biotoxin present in Plaintiffs' apartment in August/September 2002, and if so, what it was.

Dr. Shoemaker's "methodology" for diagnosing Plaintiffs' illness consisted of (1) a review of a summary of their medical records; (2) an interview with each Plaintiff; and (3) conducting certain tests on Plaintiffs to include VCS and blood work analysis not relied upon to diagnose mold illness in the medical communities. (*See* Exhibits 19 and 20, Affidavits of Drs. S. Phillips and M. Phillips.)

Plaintiffs contend that Dr. Shoemaker need not rely upon his five-step protocol to prove causation in this case since he has proven causation through his research model. (*See* Pl. Opp. at 26, fn. 8.) In essence, Dr. Shoemaker believes that once he establishes a "case" based on his own two-tiered definition of mold illness, he has established causation. Dr. Shoemaker is wrong.

**A.  Plaintiff's Cannot Prove General Causation**

Plaintiffs must prove that an agent is generally capable of causing the injuries of which Plaintiffs' complain (also known as, general causation). While defense experts concede that there are some medical problems associated with mold, there is no medical or scientific methodology to support a general causal relationship for the myriad of Plaintiffs' medical

problems, particularly where the agent is unknown and unknowable, and where the exposure was limited in time, and occurred approximately five years earlier, as in this case. Even Dr. Shoemaker's published papers (Pl. Opp. at Exhibit 16) refer to "chronic exposure" causing a multitude of illnesses as "controversial". *Sick building syndrome (SBS) and exposure to water-damaged buildings: Time series study, clinical trial and mechanisms (*hereinafter "double-blind paper*")*, Ritchie C. Shoemaker, Dennis E. House, Neurotoxicology and Teratology 28 (2006) (573-588) (stating "The hypothesis that chronic exposure to the indoor environments of water-damaged buildings (WBD) causes a multi-system illness, often referred to as "sick building syndrome" (SBS), remains controversial.").

To prove general causation, Plaintiffs must demonstrate that whatever agent they were allegedly exposed to in August/ September 2002 was generally capable of causing illnesses that they experienced thereafter. The methodology set forth by Dr. Shoemaker fails to do so and the literature does not help. There is simply no scientific or medical basis for Plaintiffs to establish general causation under the facts of this case, and Dr. Shoemaker's opinions must be excluded.

## B. Plaintiffs Cannot Prove Specific Causation Because Dr. Shoemaker has not Followed his Own Studies

For the first time in their Opposition, Plaintiffs contend that they need not prove causation because Plaintiffs meet Dr. Shoemaker's two-tiered definition for mold illness. (*See* Pl. Opp. at 26, fn. 8.) This study was accepted for publication in the Neurotoxicology and Teratology Journal on July 31, 2006. (*See* Pl. Opp. at Exhibit 16). Plaintiffs' reliance on Dr. Shoemaker's double-blind paper is misplaced. There are significant problems with this study, some of which are outlined here, which completely discount any validity for the "causation methodology" relied upon by Plaintiffs.

(1) Plaintiffs would not even have qualified for this limited study involving 28 patients. Plaintiffs' exposure was not chronic in nature as was the subjects of this paper. This study also makes no reference to haplotypes or other genome findings. The double-blinded, placebo-controlled clinical trial involved only 13 patients, and only for a two-week period of time.

(2) All participants in the above-referenced study followed the five-step protocol to include use of cholestyramine (hereinafter "CSM") and re-exposure to a contaminated building, all of which Dr. Shoemaker now says is unnecessary with current Plaintiffs. Dr. Shoemaker has no way of knowing what Plaintiffs' underlying blood work was at the time of exposure, and has no way of testing what the blood work would have been at any time during the five-step protocol. Plaintiffs have not even undertaken a course of CSM.

(3) The subjects in the double-blind study provided mold samples, and obviously none were provided in the instant case.

(4) The general hypothesis that Dr. Shoemaker attempted to prove in his study is that Sick Building Syndrome is "associated with exposure to water-damaged buildings." (Id. at 575.) Association, however, does not prove causation.

(5) One of the key blood tests done by Dr. Shoemaker in his report measured MSH. LabCorp, Inc. was the laboratory used for this study and it had a normal range for MSH of 35-81 pg/ml serum. As noted, this study was accepted on July 31, 2006. Significantly, less than two months later, on September 25, 2006, LabCorp changed its "normal" range from 35-81 to 0-40 pg/ml serum for MSH. Similarly, LabCorp has a normal range of 0-983 ng/ml for MMP-9 whereas Quest Diagnostics, Inc., relied upon in the paper, has a normal range of 0-332 ng/ml

serum. Dr. Shoemaker used the more favorable Quest "norm". (*See* Def. Motion at 18). These variables serve to show the inherent unreliability of Dr. Shoemaker's methodology.

(6)    Dr. Shoemaker concluded his study by noting that "a more thorough inventory of physiologic and biochemical parameters of affected patients at baseline and during therapy is required, as is a more precise delineation of parametric changes during re-exposure and re-acquisition of illness." (Pl. Opp. at Exhibit 16 at 585). Contrary to what Dr. Shoemaker now contends, which is that he can do away with such analysis, his paper identified a need for a more thorough analysis of this type of detail that has not and cannot be provided in the instant case.

In sum, Plaintiffs would not qualify for the study done by Dr. Shoemaker which he contends establishes specific "causation" for them in this case. He does not know what agent they were exposed to, how long they were exposed to that particular agent, and yet, five years after the fact, he purports to establish causation by interviewing Plaintiffs, conducting a VCS, and a few random blood tests, which, by his own admission, do not establish mold illness. This is not the type of methodology envisioned by *Daubert v. Merrell Dow*, 508 U.S. 579, 113 S.Ct. 2786 (1993) to establish specific causation. As such, his testimony should not be allowed.

### C. Dr. Shoemaker's own Methodologies for Proving Causation have been Ignored.

In this matter, Dr. Shoemaker has failed to follow his own protocols with respect to evaluating causation and replaces such analysis with personal opinion and circular reasoning. For example, Dr. Shoemaker's methodology to establish has always included re-exposure to the water damaged building. (*See* Def. Motion at Exhibit 9 at 11-13). In fact, on Dr. Shoemaker's website relating to questions and answers concerning *Mold Warriors* (printed on September 24, 2007, after Plaintiffs' submitted his expert report in this matter), **i** states " . . . the most unbeatable

evidence is your response to treatment and re-exposure in the five-step repetitive exposure protocol." (Exhibit 21 at 3). Despite relying upon his five step protocol for proving causation in written papers (*e.g.*, Def. Motion at Exhibit 9 at 11-12; *see also* Pl. Opp. at Exhibit 16), it is only in footnote 8 of Plaintiffs' Opposition that Dr. Shoemaker walks away from causation as a necessary part of that analysis claiming that because the model has already been proven, causation is an established fact. (*See* Pl. Opp. at 26 fn. 8; *see also*, Pl. Opp. at Exhibit 14 at ¶ 109 (stating that "[O]nce established, causation does not have to be re-invented for each repeat case.")). To suggest, as Dr. Shoemaker does, that once the process is established you don't have to do it again is divergent from mainstream medical teaching. (*See* Exhibit 19 at ¶ 28).

The methodology used by Dr. Shoemaker in his assessment of the Plaintiffs in this case is fatally flawed because it is not generally accepted in science or medicine. He prepared a report, including his opinions, which were furnished prior to obtaining his laboratory test results. This is in direct contradistinction to his personal "methodology" that he outlines in his affidavit. He claims that he uses a standard methodology in his assessment; however, it appears that we are to accept his opinions as fact prior to receiving the objective data of the laboratory test. While it is true that some diagnoses do not always require a laboratory test (e.g., skin laceration), much of his report is devoted to his efforts to convince the readers that the novel, non-validated laboratory tests are generally accepted in the medical community. (*See* Exhibit 19 at ¶ 12).

The same inconsistencies exist in Dr. Shoemaker's affidavit where he continues to cite re-exposure to establish causation. (*See* Pl. Opp. at Exhibit 14 at ¶¶ 41, 63, 64 and 109). Dr. Shoemaker's willingness to disclaim his earlier "established" theories, despite innumerable references throughout his writings that "the most unbeatable evidence is your response to treatment and re-exposure in the five-step repetitive exposure protocol", demonstrates the *ad hoc* and

changeable nature of his still invalid and unaccepted theories on causation as it relates to mold-associated illness.

In addition, Dr. Shoemaker wrote his original study in this case on September 17, 2007, exactly six days after seeing Plaintiffs for the first and only time. (*See* Def. Motion at Exhibit 10). Dr. Shoemaker noted in his report that Plaintiffs "had no confounding medical illnesses or environmental exposures, as confirmed by a collection of medical records forwarded to me before their office visit." (*Id*. at 2). However, two paragraphs earlier, Dr. Shoemaker noted that "while I will not review each office visit and each diagnosis for these patients, the copies of their medical records summaries are provided …" (*Id*.).

Finally, Dr. Shoemaker appears to be utilizing a common inaccuracy in causation analysis known as circular reasoning. That is, the alleged symptoms and ailments are used in an attempt to explain that sufficient exposure and dose have occurred. Then, it is argued that exposure has now been shown to be sufficient, and this "proof of exposure" becomes a basis for explaining the cause of the symptoms and ailments. In short, the symptoms fundamentally become the basis for explaining themselves. Such circular reasoning is not scientifically or medically acceptable. Subjective symptoms thus cannot serve as the basis for concluding that an individual has in fact been exposed to, or received a significant dose of chemicals. This circular reasoning is, in fact, the methodology used by Dr. Shoemaker in this case. (*See* Exhibit 19 at ¶ 21.)

**D. Dr. Shoemaker Conducted an Improper Differential Diagnosis**

Plaintiffs' Opposition is fatally flawed in asserting that Dr. Shoemaker conducted a *proper* differential diagnosis to reach a conclusion of mold causation. (*See* Pl. Opp. at 21). The methodology outlined in Dr. Shoemaker's report clearly demonstrates, however, that he did not conduct any "differential diagnosis" in evaluating Plaintiffs, but rather, used an unreliable and

unproven methodology to reach his own self-serving conclusions regarding mold causation. Dr. Shoemaker's methodology fails to eliminate "illness categories" other than mold illness to explain Plaintiffs' illnesses. Moreover, Dr. Shoemaker does not provide a reliable basis which this Court could rely upon for his "ruling in" mold exposure as the sole cause of Plaintiffs' illnesses. Despite several references in his report and in Plaintiffs' Opposition to his performing a "differential diagnosis", Dr. Shoemaker has circumvented the proper analysis.

Looking at the law of other jurisdictions it is clear that Dr. Shoemaker did not follow the acceptable model recognized for conducting a proper differential diagnosis in this case. A general framework of differential diagnosis involves (1) "ruling in" potential causes of a patient's condition, and then (2) "ruling out" the less likely causes by a process of elimination until only one potential cause remains as the most likely. *See generally, In Re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1229-30 (D.Colo. 1998).

The technique of differential diagnosis is a specific causation analysis, which takes as given that certain causes have been proven to potentially result in a patient's condition and then selects the most likely cause from the proven potential causes. (*Id.).* Even when a differential diagnosis is conducted, the process must be carefully scrutinized for errors in the methodology. For example, "ruling in" a potential cause that has not otherwise been proven to be capable of causing the patient's condition would make the differential diagnosis process faulty and unreliable. *See e.g., Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F.Supp.2d 465 (M.D.N.C. 2006) (excluding differential diagnosis as unreliable where, among other things, diagnosis assumed a potential cause refuted by available epidemiology); *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986 (8th Cir. 2001) (excluding differential diagnosis as unreliable where diagnosis assumed a potential cause in the absence of epidemiological studies or other reliable

evidence of general causation). Likewise, "[a] differential diagnosis that fails to take serious account of other potential causes . . may be so lacking that it cannot provide a reliable basis for an opinion on causation." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999). *See also McDonough v. Allina Health System*, 685 N.W.2d 688 (Minn.App. 2004) (excluding differential diagnosis that failed to rule out alternative causes).

This Court should apply the sound reasoning of *Doe* and *Glastetter* to exclude Dr. Shoemaker's methodology for differential diagnosis as he has not provided any basis for "ruling out" other potential causes for Plaintiffs' alleged symptoms.[1] Cause-and-effect analysis is a formalized process based on the principles and methods in toxicology, which have been refined with the progression of scientific knowledge. A treating physician, medical toxicologist, or any reputable expert asked to assess cause and effect relationships for exposure to a chemical and some clinical outcome must provide and follow a general methodology that is scientifically rigorous and defensible. Causation analysis is not purely a matter of personal opinion in the absence of a defined and consistent methodology. (*See* Exhibit 19 at ¶ 20).

Instead of using a "scientific method" approach for his evaluation of Plaintiffs, Dr. Shoemaker dismisses any cause other than mold-associated illness for Plaintiffs' alleged illness or symptoms without any justification or analysis. (*Id.* at ¶¶ 18, 19). Similarly, Dr. Shoemaker has failed to provide a reliable basis upon which this Court can "rule in" mold exposure as the cause of Plaintiffs' illnesses. (*Id.* at ¶¶ 18-20). Plaintiffs' Opposition does no more than self-validate Dr. Shoemaker's differential diagnosis as "proper" without providing any reliable bases upon which to support his methods or the results. (*See* Pl. Opp. at 22-23). Absent from Dr. Shoemaker's report is any analysis, testing, or evaluation that explores or investigates other

---

[1] The scientifically and generally accepted procedures for conducting a differential diagnosis is explained in the Affidavit of Dr. Scott Phillips at ¶¶ 15-19, attached hereto as Exhibit 19.

potential causes to explain Plaintiffs' symptoms. In its place, Dr. Shoemaker's report shows that he only devotes a single paragraph to discuss how he "ruled out" all possibilities other than mold-related illness. (*See* Def. Motion at Exhibit 10 at 33). Dr. Shoemaker erroneously assumes that there must be a single cause for all of Plaintiffs' alleged symptoms and in one fell swoop disregards dozens of potentially valid diagnoses that are equally valid and applicable with respect to Plaintiffs' symptoms.

Despite Dr. Shoemaker's advocacy of the importance and value of conducting a differential diagnosis for purposes of evaluating Plaintiffs' medical conditions, the shortcuts taken by Dr. Shoemaker to reach his conclusions weaken the validity of his methodologies. For example, Dr. Shoemaker admits that such a complete evaluation was never conducted on Plaintiff Young, if not both Plaintiffs. (*See* Def. Motion at Exhibit 9 at 186:21 to 187:8). Furthermore, Dr. Shoemaker processed his findings of Plaintiffs' mold-related illnesses and prepared his report before receiving the results of Plaintiffs' lab tests or a complete set of records regarding Plaintiffs' medical histories. (*See* Def. Motion at Exhibit 10 at 14-15 (stating in his report that result of lab tests taken on Plaintiffs are still "pending"); *see also* Exhibit 19 at ¶¶ 18, 19). Moreover, Dr. Shoemaker never corroborated any physical findings with Plaintiffs' subjective complaints. (*See* Exhibit *20* at ¶ 26). Without having provided any valid basis for the methodology used in evaluating Plaintiffs' conditions, this Court should exclude Dr. Shoemaker's testimony regarding his diagnosis of Plaintiffs.

## II.    Dr. Shoemaker's Methods, not his Conclusions, are Being Challenged in Defendants' *Daubert* Motion.

Dr. Shoemaker's failure to perform a proper differential diagnosis is not the only problem with his opinions. Despite long and confusing arguments attempting to assure the Court of the reliability of Dr. Shoemaker's unique methodology, it is clear that Dr. Shoemaker's case

definition and treatment protocol for CBAI is currently an unproven hypothesis. As discussed in Defendants' Memorandum of Law, and incorporated by reference herein, Dr. Shoemaker uses an unreliable and unproven methodology to evaluate his patients for mold related illness. This is separate and apart from any opinions regarding the *conclusions* he has reached in this matter. His methodology is flawed and any conclusions that he reaches suffers from the deficiencies of his methods. And indeed, there is much to challenge with regards to Dr. Shoemaker's methods. (*See* Exhibit 20 at ¶ 6; *see also* Exhibit 19 at ¶ 11).

Even if some of Dr. Shoemaker's assertions are correct in a limited context of biology, the manner in which he asserts them destroys any potential reliability. (*See* Exhibit 20 at ¶ 11). The danger of unreliability lies in Dr. Shoemaker's particular methodology of arbitrarily picking isolated characteristics and joining them to assert a theory that is not a logical consequence of objective findings. In other words, he has chosen facts and tied them together arbitrarily without any regard to the scientifically validated methods and intent of the tests. By ignoring the implications of the tests he uses, he destroys its validity. (*Id.*). As used by Dr. Shoemaker, the characteristics and the tests which characterize the factors, have no biological relevance and are not believed to be relevant by the scientific community. (*Id.* at ¶ 10; *see also* Exhibit 19 at ¶ 14). Of great importance is the fact that the relationships and conclusions which he reaches are not consonant with established biological phenomena and theories[2]. This is because Dr. Shoemaker's theories distort the known biological relationships of the facts. (*Id.*). Clearly, as Dr. Shoemaker's methodologies are unsound therefore any product of his defective methodology

---

[2] For example, Dr. Shoemaker states in his affidavit, that he uses "…standard medical methodologies in examining and treating patients". (*See* Pl. Opp. At Exhibit 14 at ¶ 11). In fact he does not. He is using CSM off label to treat his patients. CSM has not been FDA approved for use in the US for what he alone calls "biotoxin-associated illness". This is not "standard medical methodology" and is not an accepted treatment of "biotoxin-associated illness". *See* Exhibit 19 at ¶ 22. More importantly, despite having written countless articles on the results of "treating" patients with CBAI with CSM, Dr. Shoemaker did not administer any such medication to Plaintiffs in this matter.

must be excluded under *Daubert*. *Cf. Lakie v. SmithKline Beecham*, 965 F.Supp. 49, 54 (D.D.C., 1997)("The court's only function is to ensure that the expert employed scientifically valid methodologies. Once this is clear, the opinions which follow from such reasoning and methodologies are admissible.

### III.    Dr. Shoemaker's Methods are not Generally Accepted in Scientific Community.

#### A.    Dr. Shoemaker's use of the Lab Tests are not Generally Accepted in the Scientific or Medical Communities for Diagnosing Humans for Mold-Associated Illnesses.

Despite the fact that many of the lab tests Dr. Shoemaker relies upon in his assessment of Plaintiffs are not standard mainstream tests, Plaintiffs make the bold (but misleading) statement that "[E]ach of the lab tests Dr. Shoemaker uses are approved for use by the federal licensing agency; each lab test is federally approved from high complexity, national labs." (*See* Pl. Opp. at 24). Plaintiffs' statements are contradicted by the clear disclaimer on many of the lab reports that "[T]his test was performed using a kit that has not been cleared or approved by the FDA . . . This test should not be used for diagnosis without confirmation by other medically established means." (*See e.g.*, MMP-9 Quest Diagnostic Report at Bates Label 02186 and found at Def. Motion at Exhibit 13). Commonly utilized tests do not carry such a notation. (*See* Exhibit 19 at ¶¶ 12, 13; *see also* Exhibit 20 at ¶ 14). Dr. Shoemaker's methodology in using the results of these tests to diagnose mold-associated illness is not generally accepted in the fields of science or medicine. (*See* Exhibit 20 at ¶¶ 14-22).

Similarly, Dr. Shoemaker's affidavit states that "[E]ach of the lab tests I use are approved for use by the Federal licensing agency called Comprehensive Laboratory Improvement Act ("CLIA"); each lab test is CLIA approved for high complexity, national labs". (*See* Pl. Opp. Exhibit 14 at ¶ 33). There are many problems with his statements in this sentence. First of all,

CLIA is not a "Federal licensing agency". (*See* Exhibit 19 at ¶ 27). Moreover, if one searches the CLIA Database of test devices, Dr. Shoemaker's MMP-9, MSH and Leptin are not listed nor "approved" as claimed by Dr. Shoemaker in his affidavit. (*Id.* ; *see also* Exhibit 20 at ¶ 19).

Dr. Shoemaker appears to retreat from his earlier position and concedes in his affidavit that the results of the lab tests are not indicative of mold illness. (*See e.g.*, Pl. Opp. at Exhibit 14 at ¶ 21 ("I do not state that mold illness is caused by having this HLA DR genotype and then being exposed to WBD"); ¶ 23 ("I do not say that a finding of low levels of MSH mean that a person is ill due to WBD exposure."); ¶ 25 ("I do not say that the presence of a high number of MMP9 means that the patient is ill as a result of WDB exposure."); and ¶ 26 ("I do not say that an "abnormal" finding on a VCS test means that the patient was ill as a result of exposure to WBD.")). This is in contrast to earlier statements made in Dr. Shoemaker's expert report where he states that the presence of these biomarkers indicates mold exposure and CBAI. (*See* Def. Motion at Exhibit 10 at 23-24). In an attempt to reconcile his earlier report, Dr. Shoemaker's uses a "spokes on a wheel metaphor" to describe his methodology with each spoke being one of his tests and where no single test should be viewed by itself. (*See* Pl. Opp. at Exhibit 14 at ¶ 34). However, with his novel diagnostic workup, no exposure assessment of what was in the apartment, his use of tests, many of which are experimental, a unique diagnosis (biotoxin-associated illness), and a causation method that is used only by him confirms that "the wheel is broken beyond repair." (*See* Exhibit 19 at ¶ 29; *see also* Exhibit 20 at ¶¶ 11-21).

A.    **Dr. Shoemaker Self-Validates his Own Findings**

The existence of biotoxins has not been demonstrated in this case. In fact, no environmental testing of the area where the exposure allegedly occurred was ever been performed. No physical findings have been corroborated the Plaintiffs' subjective complaints.

No signs or symptoms have been found in Denicole Young and Vanessa Ghee to confirm toxicity due to biotoxins. In short, Dr. Shoemaker has not made any substantiate or tested physical findings which are compatible with his diagnosis. (*See* Exhibit 20 at ¶¶ 24-26). Conventional laboratory studies such as CBC, chemical analyses, TFTs, Sed RT, ANA, urinalysis, etc., are all normal. (*Id.*). There is no evidence for allergic or toxic reactions. (*Id.*). No significant immune responses to molds, fungal glucans, or endotoxins have been demonstrated *in vitro* or *in vivo* by testing Denicole Young and Vanessa Ghee. (*Id.*).

Moreover, while mold exposure, under specialized conditions and circumstances, may cause some adverse health consequences in humans, these maladies are mild, short term and mostly related to an allergic reaction. (*See* Exhibit 20 at ¶¶ 20, 21, 23). It is not generally accepted in science or medicine that mold exposure causes an innate immune response in humans. Rather, Dr. Shoemaker and his fellow "mold warriors" are the only ones who subscribe to this position.

Ultimately, Plaintiffs ask this Court to accept the reliability of Dr. Shoemaker's case definitions based solely on his own authority and without any outside validation. To support and authenticate the claims and "science" utilized in Dr. Shoemaker's report, Plaintiffs' Opposition repeatedly references the 136 paragraphed affidavit of Dr. Shoemaker. In some cases, Dr. Shoemaker's self-authorizing statements are brazenly self-serving. (*See e.g.*, Pl. Opp. at 21 ("Even a one time exposure to the interior of a water damaged building can cause activation of pattern recognition symptoms, each of which sets off its inflammatory cascade. (Shoemaker Aff. ¶ 131, Exhibit 14.)"). Dr. Shoemaker's statements are insufficient to satisfy the Court's requirements under *Daubert*. As the Supreme Court has explained, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

connected to existing data only be the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L.Ed.2d 508, 519 (1997); *see also Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)(explaining that expert testimony must be based on some objective and independent validation of the expert's methodology and stating that the "expert's assurances . . . [are] insufficient.").

## IV.    CONCLUSIONS

Dr. Shoemaker is clearly a doctor practicing on the fringe of medical science.  He has invented a new "diagnosis" by untested methodologies and renders "treatment" that is not evidence based or FDA approved or sanctioned by any legitimate medical organization.  His methodologies do not support a finding of general or specific causation.  His differential diagnosis is not based on reliable medicine or scientific methodologies.

As such, Defendants respectfully request that this Court exclude the opinion and testimony of Dr. Ritchie Shoemaker in this case.  Defendants would alternatively request to be granted a *Daubert* hearing to present its arguments and evidence in support of this Motion to this Court.

Respectfully submitted,


_____/s/_____          ___/s/_____
Deborah M. Whelihan, #412454          Paul J. Maloney, # 362533
Jordan Coyne & Savits, LLP          Ali A. Beydoun, # 475413
1100 Connecticut Avenue, N.W.          Carr Maloney, PC
Suite 600          1615 L Street, N.W.
Washington, D.C.  20036          Suite 500
(202) 296-4747 (telephone)          Washington, D.C.  20036
(202) 496-2800 (facsimile)          (202) 310-5500 (telephone)
Attorney for Defendant William F. Burton, Esq.          (202) 310-5555 (facsimile)
Attorneys for Defendant Lewis & Tompkins, P.C.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a copy of the foregoing was electronically filed, on this 31st day of March, 2008 to:

Peter Grenier, Esquire
Michael Hibey, Esquire
Bode & Grenier
1150 Connecticut Avenue, N.W.
9th Floor
Washington, D.C.  20036

Deborah M. Whelihan, Esquire
Jordan Coyne & Savits, LLP
1100 Connecticut Avenue, N.W.
Suite 600
Washington, D.C.  20036

/s/ Ali A. Beydoun_____
Ali A. Beydoun

# EXHIBIT 18

**ADULT PROGRESS NOTE**

MR01.

DATE 11/5/02  TIME 11:45  BP 110/80  T 97.3  P ___  R ___  HT ___  WT 169  LMP ___  Last PAP ___

PRESENTING COMPLAINT  Pt here for fu visit ___

SUBJECTIVE and OBJECTIVE: History of Present Illness & ROS (May include location, duration, quality, context, severity, modifying factors, associated s/s

| ROS | N | A | |
|-----|---|---|---|
| EYES | | | 24yo AA♀ ∅ PMHx ⊕ hx of sickle trait |
| ENT | | | had allergic rxn to Mold/Swag @ home. |
| CARDIO | | | pt has been unroved to new apt. Using Flovent BID |
| RESP | | | |
| GI | | | Zyrtec 10mg qd  Albuterol prn |
| GU | | | |
| GYN | | | pt feels much better, pt has been told s/p past ⊕ hx of Asthma |
| MUS/SKEL | | | |
| SKIN | | | |
| NEURO | | | Vitals stable |
| PSYCH | | | GEN: NAD A·Ox3 pleasant AA♀ |
| PE | N | A | HEENT: AT NC PERRL VFI ⊕ TM small amt of serous fluid |
| EYES | | | mares pale boggy turbinates ⊕ water d/c |
| ENT | | | N: supple FROM |
| CARDIO | | | L: CTA ⊕ ∅ R/R/w good air exchange |
| RESP | | | H: S₁S₂ ⊕ RRR |
| GI | | | |
| GU | | | |
| GYN | | | |
| MUS/SKEL | | | |
| SKIN | | | |
| NEURO | | | |
| PSYCH | | | |

**ASSESSMENT:**

① Allergic Rhinitis

② RAD - Asthma

③ Needs WWE

refuses flu vaccine

**PLAN:**

① Zyrtec 10mg po qd
    ↓ allergen exposure. ♀ wash
    cover bed w/ plastic.

② ↑ Flovent 110 mg II puff BID
    Albuterol prn
    Peak flow meter
    may consider PFT

③ PAP/pelvic next 1-2wks
    WWE when available

PATIENT EDUCATION: 0 MED COMPLIANCE & REVIEW   0 EXERCISE   0 NUTRITION/DIET   0 SAFE SEX /NEEDLES   0 SUBSTANCE ABUSE T
RETURN TO CLINIC FOR: 0 F/U VISIT   0 CPE   0 LABS   0 PAP  0 RECTAL  0 PPD  0 FLU  0 PNEUMOVAX
SCHEDULE   0 MAMMO   0 X-RAYS   0 EYE   0 DENTAL   0 OB
REFER TO: 0 SOC. SER.   0 PSYCH  0 OTHER ___
PATIENT COUNSELED BY PROVIDER AND VERBALIZED UNDERSTANDING OF ABOVE 0 YES 0 NO   NEEDS REINFORCEMENT  0 YES 0 NO

YOUNG/GHEE   000016

PROVIDER SIGNATURE ___   DATE 11/5/02

Name YOUNG, Veronica   DOB 11/9/77   MR# ___   Site ___

# EXHIBIT 19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

_____
                                    )
**DENICOLE YOUNG and**              )
**VANESSA GHEE**                    )
                                    )
                    Plaintiffs,     )
                                    )
            V.                      )  CIVIL ACTION NO. 07-CV-983 (ESH)
                                    )
**WILLIAM F. BURTON and**           )
**LEWIS & TOMPKINS, P.C.**          )
                                    )
                    Defendants. )
_____)


## AFFIDAVIT OF DR. SCOTT PHILLIPS


I, Dr. Scott Phillips, hereby state a follows:

1.     I have personal knowledge of the matters stated herein and could competently testify thereto if called as a witness.

2.     My name is Scott D. Phillips, M.D.   I am a practicing physician who is subspecialty board certified in medical toxicology.   Medical toxicology is a subspecialty specified by the American Board of Medical Specialties, the medical oversight organization, which defines all specialties and subspecialties that are officially recognized in the United States.   Medical toxicology is a scientific discipline dealing with the evaluation, diagnosis, and treatment of adverse effects of chemical and some biological substances, on living systems.   All medical toxicologists are thus physicians.   Fundamental to this subspecialty is that medical toxicologists must routinely perform an assessment of whether there exists a causal link between an exposure and an adverse effect or exposure and

no adverse effect.  Such an analysis requires the application of proper and generally accepted medical scientific methodology.

3. I am a licensed physician in the State of Colorado and I am board certified in medical toxicology and internal medicine by the American Board of Medical Specialists.  My medical toxicology training consisted of a two-year post-doctoral fellowship at the University of Colorado Health Sciences Center in Denver, Colorado. I subsequently passed the required board certifying examination.  The board certification in medical toxicology is a board supported by the joint American Boards of Preventive Medicine, Pediatrics and Emergency Medicine as the Sub-Specialty Sub-Board on Medical Toxicology.  I was originally certified in 1995, the first year the board was given, and re-certified in 2004.  Physicians who are board certified in internal medicine are eligible for the joint medical toxicology boards through the American Board of Emergency Medicine pathway.

4. I am a member of the American Academy of Clinical Toxicology, the American College of Medical Toxicology, the Society of Toxicology, the American College of Occupational and Environmental Medicine and the American Industrial Hygiene Association.  I have been asked to serve on both governmental and non-governmental advisory panels and committees.  I have received research grants and have published many peer-reviewed papers.

5. Currently, I hold a university faculty appointment in toxicology and I am an Associate Clinical Professor at the University of Colorado Health Sciences Center in the Department of Medicine, Division of Clinical Pharmacology, and Toxicology.  I am also an attending physician with the Rocky Mountain Poison and Drug Center, and have a medical practice in Denver, Colorado.  In my role at the University I provide both didactic lectures and bedside clinical teaching in the area of medical toxicology and general medicine.  I routinely teach medical students, interns, residents, and fellows who are completing subspecialty training in medical toxicology.

6. Throughout my professional career, I have served in various capacities in the American Academy of Clinical Toxicology (AACT) and other major societies dealing with clinical toxicology. I was elected to the Board of Directors of the AACT and have served on many committees within this organization. The AACT is the largest organization in the world devoted to clinical aspects of toxicology and has among its members virtually all medical toxicologists and poison control center directors in the United States and Canada, and a large proportion of those worldwide. In addition, many regulators, policy makers, and scientists with an interest in clinical toxicology are members of AACT.

7. I routinely serve as a peer-reviewer for several journals in clinical toxicology and other medical journals in general. I peer-review many articles a year for these journals.

8. As noted in my *vitae,* I have published approximately 123 scientific articles, letters to the editor, editorials, book chapters, and abstracts, virtually all of them related to clinical toxicology. I have also served as an Editor of several major toxicology texts, including a new book entitled *Critical Care Toxicology – The Diagnosis and Management of the Acutely Poisoned Patient* published in 2005 by Mosby-Saunders-Harcourt.

9. My clinical practice consists of treating toxicology patients in emergency departments, intensive care units, the hospital in general, and in the outpatient setting. I see patients both in the context of my teaching role at the University and in private practice. My private practice involves seeing patients in seven Denver area hospitals, and in my outpatient clinic. In the course of my clinical practice, I routinely evaluate and treat patients with all types of clinical illnesses including neurological, pulmonary, liver, kidney, skin, cardiovascular, metabolic disorders and other organ system injuries related to various agents. I have evaluated many patients with complaints possibly related to mold and/or water

damaged structures. I also serve on the Pharmacy and Therapeutics Committee at Swedish Medical Center. A complete summary of my academic training and position as well as of my publications and hospital appointments can be found in a copy of my *Curriculum vitae*.

10.   I have been asked to review materials related to this case and specifically the PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES (1) IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINION TESTIMONY OF PLAINTIFFS' EXPERT DR. RICHIE SHOEMAKER AND (2) IN OPPOSITION TO DEFENDANTS' REQUEST FOR A *DAUBERT* HEARING, and the AFFIDAVIT OF DR. RICHIE SHOEMAKER and attachments from the perspective of medical toxicology. Toward this end, I have relied upon widely accepted methodology and scientific principles regarding clinical toxicology.

11.   It is my opinion that Dr. Richie Shoemaker has not followed generally accepted methodology in his assessment of the cases in this matter. I will address three main areas of glaring unorthodox methodology and several others issues that, in my opinion, are not a generally accepted medical methodologies.

12.   The methodology used by Dr. Shoemaker in his assessment of the Plaintiffs in this case is fatally flawed. He prepared a report for the plaintiffs' attorneys, including his opinions, which were furnished prior to obtaining his laboratory test results. This is in direct contradistinction to his personal "methodology" that he outlines in his affidavit. He claims that he uses a standard methodology in his assessment; however, it appears that we are to accept his opinions as fact prior to receiving the objective data of the laboratory test. While it is true that some diagnoses do not always require a laboratory test (e.g., skin laceration), much of his report is devoted to his efforts to convince the readers that the novel, non-validated laboratory tests are important. If the tests are the "spokes of the wheel" as he describes them, how could he have possibly reached opinions to a reasonable degree of medical probability (or certainty) before he saw the results?

Many of the laboratory tests that Dr. Shoemaker relies upon in his Tier II assessment are not standard mainstream tests. This is patently evident from the test result page directly from the laboratory. The following is an example of a caution prepared by the laboratory:

> "(Results for this test are for research purposes only by the assay's manufacturer. The performance characteristics of this product have not been established. **Results should not be used as a diagnostic procedure** [my emphasis added] without confirmation of the diagnosis by another medically established diagnostic product or procedure.)"

13. Commonly utilized tests do not carry such a notation. Tests, such as those conducted by Dr. Shoemaker, *de facto,* demonstrate their novel nature with warning by the lab and the information from the laboratory confirms the caution.

14. The tests proffered by Dr. Shoemaker have not been validated in the context of mold and/or water damaged buildings for any diagnostic purpose. Contrary to Dr. Shoemaker's contention that these are generally accepted tests for this purpose, no other physician(s), to my knowledge use these tests, or patterns of tests, for the same purpose. Thus, these tests are absolutely not generally accepted in the medical community for this purpose. To utilize these tests as spokes to his diagnostic wheel, is not supported in the general medical community, and is faulty methodology.

17. The differential diagnosis is a listing of potential medical explanations for a given set of complaints and findings during a medical workup. This requires the physician to have a broad knowledge base in order to assess relative probabilities of various diseases. It is also paramount for the physician to

understand the clinical significance of missing less likely diseases during this process. The differential diagnosis requires the application of the scientific method. The scientific method of research is one, which identifies a problem, gathers relevant data, and forms a hypothesis, which is then empirically tested.

I have included a example figure below to better illustrate the scientific method of how a differential diagnosis fits into the evaluation of each and every patient.

### *Patient Presentation*

**Complaints (or Symptoms)**
Shortness of breath
Coughing
Chest pain

### *Physical signs*

Wheezing
Intercostal retractions
Rapid breathing
Rapid heart rate

### *Laboratory tests*

Blood smear
Blood tests
Spirometry
Electrocardiogram
Chest x-ray
etc

**Differential Diagnosis** (e.g., mnemonic VINDICATE)

➢ Vascular
  o Pulmonary embolism
  o Heart attack
  o Heart failure
  o Valvular heart disease
  o Rheumatic heart disease
  o Cardiac dysrhythmias
  o etc

➢ Infection
- o Pneumonia
- o Bronchitis/bronchiectasis
- o Diphtheria
- o Epiglottitis
- o etc

➢ Neoplasm
- o Endobronchial tumor
- o Hodgkin's Disease
- o Lymphangitis carcinomatosa
- o etc

➢ Drugs/Chemicals
- o Pill aspiration
- o Pulmonary fibrosis
- o Doxorubicin cardiomyopathy
- o Etc

➢ Inflammatory/Idiopathic
- o Sarcoidoisis
- o Pulmonary fibrosis
- o CREST Syndrome
- o Byssinosis
- o Lymphomatoid granulomatosis
- o Wegener's granulomatosis
- o etc

➢ Congenital/Genetic
- o Heart disease
- o Cystic fibrosis
- o Chest wall deformity
- o etc

➢ Autoimmune/Allergic
- o Environmental Allergies
- o Anaphylactic reaction
- o Drug allergy
- o Asthma

➢ Trauma
- o Foreign body in the airway
- o Thyroid cartilage fracture or crush
- o Vocal cord paralysis
- o etc

➢ Endocrine/Metabolic
- o Goiter
- o Thymus
- o etc

## *Preliminary Diagnosis*

Asthma

↓

### *Causes of Asthma (Alternative Causation)*

Extrinsic (allergic asthma)
Intrinsic (non-allergic asthma)
Irritant Exposure
Cold air
Exercise
Pregnancy
GERD
Infections
Strong emotions
Medications
Occupational
etc

↓

### *Final Diagnosis*

Asthma secondary to aspirin sensitivity

18.    After the physician completes the history, physician examination, laboratory, and other tests, a hypothesis is formed; which is then further tested by collecting more specific data.  The objective data that is collected is then used to "rule-in" or "rule-out" entities from the differential diagnosis list.    The analysis of the differential diagnosis is iterative.    That is, it is repeatedly examined and challenged.  The differential diagnosis may be expanded or contracted based on new information that is gathered during the medical investigation.  The basis for this process should be evidence based.    That is, based in the peer-reviewed scientific literature, on a weight of the evidence basis.

19.    Such an analysis on a case-by-case basis is the only medically and scientifically valid process for establishing the presence and cause of a medical condition.

20.    It is my opinion that Dr. Shoemaker has not followed the generally accepted medical practice of differential diagnosis.    In fact, he reacted a diagnosis (opinions) prior to even seeing the lab tests that he ordered on these plaintiffs.  I can find no evidence that he considered all or any other explanations that could account for the plaintiff's complaints as is done when a proper differential diagnosis is reached.

21.    Furthermore, had Dr. Shoemaker arrived at some generally accepted diagnosis, there is no evidence that he then attempted to consider alternative causes for the "typical biotoxin-associated illness" that he "diagnosed".  Assuming that there is such a "diagnosis", which there isn't, it appears that his opinion was a forgone conclusion from his first visit without even considering any laboratory tests, a meaningful differential diagnosis or alternative causes.

22.    Cause-and-effect analysis is a formalized process based on the principles and methods in toxicology, which have been refined with the progression of scientific knowledge.  A treating physician, medical toxicologist, or any reputable expert asked to assess cause and effect relationships for exposure to a chemical and some clinical outcome must provide and follow a general methodology that is scientifically rigorous and defensible.  This methodology must then be applied to the facts in the case.  Causation analysis is not purely a matter of personal opinion in the absence of a defined and consistent methodology.  The toxicology expert or physician needs to consider such factors as the individual's opportunity for exposure, the amount, and duration of such exposure, the dose received, the precise nature of the clinical condition being considered and its differential diagnosis, and the biologic plausibility and consistency of the evidence.

23. A common inaccuracy in causation analysis is circular reasoning by the use of *post hoc, ergo propter hoc* (after the fact, therefore, because of the fact). That is, the alleged symptoms and ailments are used in an attempt to explain that sufficient exposure and dose have occurred. Then, it is argued that exposure has now been shown to be sufficient, and this "proof of exposure" becomes a basis for explaining the cause of the symptoms and ailments. In short, the symptoms fundamentally become the basis for explaining themselves. Such circular reasoning is not scientifically or medically acceptable. Subjective symptoms thus cannot serve as the basis for concluding that an individual has in fact been exposed to, or received a significant dose of chemicals. This circular reasoning is, in fact, the methodology used by Dr. Shoemaker in this case.

24. Dr. Shoemaker states in his affidavit (Paragraph 11), that he uses "...standard medical methodologies in examining and treating patients". In fact he does not. He is using cholestyramine to treat his patients which, has not been FDA approved for use in the US for what he alone calls, "biotoxin-associated illness". Thus it is clear, that this is not a "standard medical methodology". It is not an accepted treatment of "biotoxin-associated illness".

25. Dr. Shoemaker has coined a novel term to describe his "cases" as "biotoxin-associated illness". This is not a diagnosis of any medical specificity. Biotoxin or biological toxins may range from arthropod envenomations to poisonous plants. Furthermore, he uses the term "associated", not caused. This is a very important distinction.

26. Dr. Shoemaker, in paragraph 16 of his affidavit, claims to use accepted methodology to arrive at his self proclaimed novel diagnosis of "biotoxin-associated illness". He is clearly a doctor practicing on the fringe of medical science, one that has invented a new "diagnosis" by untested methodologies and renders "treatment" that is not evidence based or FDA approved or sanctioned by any legitimate medical organization. He further states in that paragraph

"...prescribing a treatment plan are medical diagnostic methodologies". A prescribed course of treatment is not a diagnostic methodology. It is a therapeutic methodology.

27. Dr. Shoemaker, in paragraph 17 of his affidavit, discusses his differential diagnosis technique. He then describes his two-tier approach. He seems to be confusing differential diagnosis with some novel form of causation analysis. Dr. Shoemaker has not only invented a novel diagnosis, biotoxin-associated illness, but is proffering a novel causal methodology. Both are unique to Dr. Shoemaker, which is evidence of his non-traditional approach that is not generally accepted methodology.

28. Dr. Shoemaker implies that the tests he ordered, which were done many years after the event, somehow are reflective of only the event and nothing prior to, or subsequent to the alleged event. Many of these tests he uses have typical daily circadian patterns of highs and lows (e.g., ACTH, MSH) and have not been validated in the context of "biotoxin-associated illness" by other clinicians at other times.

29. In paragraph 33 of Dr. Shoemaker's affidavit, he states, "Each of the lab tests I use are approved for use by the Federal licensing agency called Comprehensive Laboratory Improvement Act ("CLIA"); each lab test is CLIA approved for high complexity, national labs"[sic]. There are many problems with his statements in this sentence. First of all, CLIA stands for the "Clinical Laboratory Improvement Amendments". "Congress passed the Clinical Laboratory Improvement Amendments (CLIA) in 1988 establishing quality standards for all laboratory testing to ensure the accuracy, reliability and timeliness of patient test results regardless of where the test was performed. CLIA are amendments guided by the Food and Drug Administration (FDA)" under the Center for Devices and Radiological Health. (http://www.fda.gov/cdrh/clia/) CLIA is not a "Federal licensing agency". In fact, if one searches the CLIA Database of test

devices, Dr. Shoemaker's MMP-9, MSH and Leptin are not listed nor "approved" as claimed by Dr. Shoemaker in the aforementioned paragraph 33. Furthermore, many of the tests that Dr. Shoemaker uses are not for clinical diagnostic purposes. (See Paragraph 13)

30.  Dr. Shoemaker, in discussing causation in paragraph 109 of his affidavit, states: "Once established, causation does not have to be re-invented for each repeat case". This is contrary to all that we teach in medical school. We teach that for each new case, one must evaluate each patient on a case-by-case basis. This includes a history and physical examination and appropriate tests to guide the examiner through the differential diagnosis to determine the most likely diagnosis and ultimately causes for that disease process. That allows for appropriate treatment and care of the patient. To suggest, as Dr. Shoemaker does, that once the process is established you don't have to do it again is divergent from mainstream medical teaching. It appears that he is implying that he does not have to do a differential diagnosis because he has done one in the past. This is certainly not a generally accepted methodology.

31.  Dr. Shoemaker's uses a spokes on a wheel metaphor to describe his methodology with each spoke being one of his tests. With his novel diagnostic workup, no exposure assessment of what was in the apartment, his use of tests, many of which are experimental, a unique diagnosis (biotoxin-associated illness) and a causation method that is used only by him confirms that the wheel is broken beyond repair.

32.  In my opinion Dr. Shoemaker does not follow medically accepted methodology in reaching his conclusions. Generally accepted methodology includes researching the individual's opportunity for exposure, the amount, and duration of such exposure, the dose received, the precise nature of the clinical condition being considered and its differential diagnosis, and the biologic plausibility and consistency of the evidence. Dr. Shoemaker did not perform approved or

standard tests, did not order testing until well after the event, nor did he have results of those tests, un-validated as they may be, prior to rendering his opinion for the plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 31st, 2008

_____

Scott D. Phillips, MD

# EXHIBIT 20

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

DENICOLE YOUNG and    :
VANESSA GHEE,       :
              :
   Plaintiffs,       :
              :
   v.          :  Case No.: 1:07cv983 (ESH)
              :
LEWIS & TOMPKINS, P.C, et al.,  :
              :
   Defendants.     :

## AFFIDAVIT OF S. MICHAEL PHILLIPS, M.D.

I, S. Michael Phillips, M.D., F.A.C.P., being over the age of eighteen and competent to testify, do hereby state the following, based upon my personal knowledge.

1.  I am a physician licensed to practice in the states of Pennsylvania, Wisconsin, Massachusetts, and also in the District of Columbia. In 1968, I completed my medical residency at the hospitals of the University of Pennsylvania Health System. In 1969, I completed a fellowship in Allergy and Immunology at the hospitals of the University of Pennsylvania Health System. In 1972, I completed a fellowship in Nephrology and Immunology at Peter Bent Brigham Hospital, Harvard Medical School, in Boston, Massachusetts. From 1972 to 1975, I was a Lt. Colonel, M.C., Department of Immunology, Division of Communicable Diseases and Immunology, and a Senior Research Associate at the Walter Reed Army Institute of Research in Washington, D.C. I have been on the faculty of numerous medical schools including Harvard Medical School, George Washington University Medical School, and University of Pennsylvania School of Medicine. I am a Lead Clinical Physician at the University of Pennsylvania School of Medicine, as well as the Director of Allergy and Immunology Clinical Services at the University of Pennsylvania Presbyterian Medical Center. I have been certified by the American Board of

Internal Medicine since 1974 and by the American Board of Allergy and Immunology since 1980. I am currently a Professor of Medicine in the Pulmonary Allergy Critical Care Division of the University of Pennsylvania School of Medicine, and a Professor of Neurology at the University of Pennsylvania School of Medicine. I am a consultant in Medicine to the Philadelphia Veteran's Administration Hospital.

2.    I am Board Certified in Internal Medicine and a Fellow of the American College of Physicians. In addition, I am a Senior Scholar in Clinical Epidemiology at the University of Pennsylvania. Finally, I am the former Chief of the Geographic Medicine Program of the University of Pennsylvania and have held many positions including consultant to the World Health Organization, National Institute of Health, and the Office of the Surgeon General.

3.    I maintain an active clinical practice devoting over 95% of my time to the clinical evaluation and treatment of patients. I am very familiar with the effects of molds, humidity, and environmental factors in terms of source, risks, diagnosis, treatment, mechanisms of disease, and consequences. I evaluate patients with these problems on a daily basis in my office and at the in-patient services and out-patient departments of the University of Pennsylvania Health System. My experience includes work on both human and animal models in terms of theoretical concepts, experimental models, and epidemiologic evidence. As a Senior Scholar in Clinical Epidemiology, I am called upon to review disease manifestations not only on an individual patient basis but also on a population basis.

2

4.    I am very familiar with the allegations regarding the various medical conditions which allegedly have putatively affected Denicole Young and Vanessa Ghee in this matter.

5.    I have reviewed Dr. Shoemaker's report and affidavit and note that he contends the following: that his methodology for diagnosing mold illness and causally relating such illness to mold exposure is scientifically valid and generally accepted by the scientific community; that the methodology is peer-reviewed, tested with rigorous standards, and based on thirty years of practical experience; that he has been allowed to render his opinions by the majority of courts that have assessed the scientific validity of his methodology; and, that his conclusions are based on scientifically valid methods, and therefore not appropriate subjects for a *Daubert* challenge.

6.    Based on my knowledge of the medical literature, clinical experiences, careful review of the facts in this case, and a reading of Dr. Shoemaker's report and affidavit prepared in this matter, I conclude that none of his contentions are valid or accepted by the general scientific community. I will address the main areas of his opinion which are not generally accepted methodologies in the fields of science and medicine. My opinions below are based on reasonable medical certainty.

7.    With regards to biotoxins, it is possible that certain, specific toxicities can occur with high dose exposure. It is particularly well established, however, that the biotoxins must be ingested to reach toxic levels. Moreover, aerosolized biotoxins, especially mold-derived biotoxins, virtually never reach high enough concentrations to cause mold-associated disease.

8.    The putative precipitating biotoxins (bacterial endotoxin, mycotoxins, fungi, allergens, etc.) all act in different ways, stimulating different portions of the innate and/or cognate immune system. They cannot be lumped together by some amorphous hypothesis as Dr. Shoemaker attempts to do in his affidavit and report.

9.    Biotoxins do not cause the spectrum of disease shown by Denicole Young and Vanessa Ghee. Biotoxins primarily cause gastrointestinal symptoms and or liver and marrow toxicity.

10.    The laboratory criteria which Dr. Shoemaker claims to establish the presence of effects of biotoxins, in fact, do not establish the presence of biotoxins. While the use of mass spectrophotometric or immunologic criteria can directly show these compounds, Dr. Shoemaker foregoes these methods and instead relies on indirect measurements that are neither specific nor sensitive enough for establishing the presence or effects of biotoxins. The methods used by Dr. Shoemaker are not generally accepted or scientifically known for the purposes for which he offers them in this matter. They are clearly not reliable.

11.    Many of the things which Dr. Shoemaker contends are only correct in a limited context of biology, but not in the manner which he asserts them. None of the agents referred to by Dr. Shoemaker, alone or in concert, have been shown to be germane to "biotoxin activity" or the generation of a mold-associated disease. In this context, Dr. Shoemaker has chosen a limited number of facts, which can be attributed to a certain biological factor. The danger of unreliability lies in his particular methodology of arbitrarily picking isolated characteristics and

4

joining them to assert a theory that is not a logical consequence. In other words, he has chosen facts and tied them together arbitrarily without any regard to the methods and intent of the tests used to evaluate the factors. He has ignored the implications of the tests, thus destroying their validity. In specific contexts the tests are valid, but not used in the way they were intended and therefore not relevant to any of his conclusions. As used by Dr. Shoemaker, the characteristics and the tests which characterize the factors, have no biological relevance and are not believed to be relevant by the scientific community.

12.    Of great importance is the fact that the relationships and conclusions which he reaches are not consonant with established biological phenomena and theories. Dr. Shoemaker's theories distort the known biological relationships of the facts. He pins golden tacks into a velvet-covered board; each tack is beautiful, but the established medical community knows that the tacks are unrelated to each other. Specifically, none of his criteria, alone or in concert, have ever been shown to be associated with a disease, which is contingent on mold exposure.

13.    The two tiered system of criteria described by Dr. Shoemaker is an elaborate, unsubstantiated theory. Dr. Shoemaker cleverly avers that no single test can establish any specific disease, but rather, it is the constellation of tests will establish a disease. This is an epidemiologic absurdity. Under generally accepted scientific methodologies, each component must be judged separately and then juxtaposed to explain scientific variance using ANOVA (Analysis of Variance). Dr. Shoemaker's woeful lack of statistical methodology is manifest throughout his testimony.

13.   No epidemiological event regarding Denicole Young and Vanessa Ghee could be established with a probability of "p<0.000000001". Despite Dr. Shoemaker's assertions that this is so, he gives no data to support such an impossible contention. Dr. Shoemaker has never applied rigorous epidemiological modeling or biostatistics to his contentions. Even his more conservative first tier of criteria, history, physical exam, and testing is not rigorous enough to establish any specific disease. Certainly, the second tier, emphasized above, has absolutely no scientific validity.

14.   The laboratory criteria described by Dr. Shoemaker are experimental in import and are not generally accepted by the medical or scientific community. Prior to Dr. Shoemaker's claims, none of the laboratory criteria have ever been causally associated with specific biotoxin-associated human illnesses. The various measurements are associated with certain diseases but not with biotoxins in the array described by Dr. Shoemaker. Moreover, the federal government has not permitted the use of the measurements to be used clinically to diagnose biotoxin-associated illness. Indeed, reputable labs, when reporting values for these compounds, carefully admonish the physicians to interpret the findings with caution. This is because these factors are neither sensitive enough to detect toxins nor specific enough to "rule out" other factors.

15.   For example and with respect to Dr. Shoemaker's "biomarkers", Vascular Endothelial Growth Factor ("VGEF") causes capillary ingrowths and is therefore important with respect to cancer growth or wound healing, not diagnosing biotoxin-associated illness. Likewise, Major Basic Protein ("MBP") is a constituent of myelin, which coats neurons. Antibodies

6

against MBP may be associated with demyelinating processes such as Multiple Sclerosis, or Amyotropic Lateral Sclerosis, but not with diagnosing biotoxin-associated illness. Similarly, Anti-Diuretic Hormone ("ADH") controls fluid and electrolyte balance by promoting water and salt resorption in the kidney in response to intravascular hypovolemia. Moreover, Adrenal Cortical Stimulating Hormone ("ATCH") stimulates the production of cortisol, during stress. Leptin stimulates appetite and interacts with Melanocyte-Stimulating Hormone ("MSH"). This hormone is produced by the supra-optic nucleus, and regulates the sleep cycle. Despite Dr. Shoemaker's methodologies, measurements of these hormones are not used by the general scientific community to diagnose biotoxin-associated illness.

16.    Importantly, HLA-DR is the major histocompatability locus, defined serologically in humans. It is associated with various genetic linkages and diseases but has never been shown to be important in biotoxin injury. There have never been any controlled prospective studies indicating that any specific markers in the HLA or HLA-DR loci code can be linked with any mold-associated disease. In fact, Dr. Shoemaker's "dreaded haplotypes" have previously never been linked with any mold-associated illness. To be sure, a complete, unbiased molecular haplotype analysis of his patients to confirm his findings would cost over $2,000 per patient (x 7000 patients = $14,000,000; excluding controls). Therefore, by definition he must selectively study his patients, introducing unacceptable selection bias. Statistically he should have at least as many controls as subjects, which would result in doubling this cost. In this context, no experimental or control numbers have been given—just grandiose claims are presented. To prove

7

his hypotheses would cost millions of dollars and such testing has not been performed by Dr. Shoemaker.

17.    Visual Contrast Sensitivity ("VCS"), the various lab criteria, and the putative genetic linkages have never been proven to provide an assay of sensitivity and specificity for any disease entity.  While VCS can measure contrast visual perception, it is not specific for any mold-associated disease.  The general medical community does not accept any of the data or the rambling associations of Dr. Shoemaker as representing valid science.  There are no valid epidemiological studies of prospective, retrospective, or cross-sectional design which support his contentions.

18.    There are no ICD-9 codes for Dr. Shoemaker's biotoxin-associated illnesses. This alone is clearly indicative that the medical community does not recognize this entity.  Dr. Shoemaker admits to using inaccurate coding to be able to bill for his services.

19.    Dr. Shoemaker's practical experience and his use of laboratory tests does not equate to the scientific validity of his given conclusion.  Scientific validity requires rigorous criteria which are then tested scientifically by several complimentary or diverse experimental designs.  By not testing his criteria and by not seeking "evidence based medical conclusions", Dr. Shoemaker simply perpetuates his errors.   He does not test his hypotheses.  Just because a test is validated to measure a specific product or event, it does not readily mean that the use of that same test automatically validates a second, unrelated conclusion. For example, CLIA certification means the test was performed in a laboratory monitored by the federal government

and performed in a manner which accurately measures a specific product. CLIA certification does not mean that the test has been judged to measure the specifics for a claim of a "Chronic Biotoxin-Associated Disease."

20.    Even if Dr. Shoemaker were to use scientifically accepted laboratory tests, his conclusions would not be valid until the tests were utilized properly to measure the claimed implications - *i.e.,* shown to have sensitivity, and specificity, within the context of mold exposure and mold associated disease. Clearly, the tests have not been used or validated in this manner. For example, measuring ACTH can detect the attempt of the human body to stimulate the production of glucocorticoids. The test findings, however, in no way establish that molds had anything to do with ACTH. A similar argument can be made for any and all of the putative laboratory or clinical criteria which Dr. Shoemaker claims to establish "Chronic Biotoxin-Associated Disease". ACTH rises in response to any stress, be it physical, psychological or immunological in origin. ACTH rises in the body within minutes of the stress and falls in hours after the stress. There is no way that measurements of ACTH can be specifically equated to a mold-associated disease. In addition, in the light of the short biological half-life of ACTH, the measurement of ACTH taken years after a putative exposure could not be relevant to that exposure.

21.    Likewise, C4a is a measurement of complement activation. This can occur for many reasons which are not related to mold exposure. C4a is an activation marker, which rises in seconds or minutes and falls to baseline levels with hours after the activation stimulus. Again,

9

in no way can that measurement of C4a be specifically equated to a mold-associated disease. In addition, in the light of the very short biological half-life of C4a, the measurement of C4a taken years after a putative exposure could not be relevant to that exposure.

22.    A similar argument can be made for any and all of the putative laboratory or clinical criteria which Dr. Shoemaker claims to establish "Chronic Biotoxin-Associated Disease". The biology of these agents is well established in the medical literature and not related to the manner used or interpretations of Dr. Shoemaker.

23.    Dr. Shoemaker's findings in this case are also based on the false notion that biotoxins remain in the body for prolonged periods of time. This belief is misplaced and at variance with the known science of mycotoxin metabolism. Furthermore, symptoms that are the result of irritation are rapidly reversible and should have remitted upon Denicole Young and Vanessa Ghee leaving the environment; if that environment was causally related to symptoms. This has not happened. Denicole Young and Vanessa Ghee are no better nearly five years after leaving the environment. Indeed, they are complaining of increasing problems, including the neurocognitive arena.

24.    After reviewing the materials provided, I find that there is insufficient evidence to suggest a causal relationship between specific exposures to mold and the problems experienced by Denicole Young and Vanessa Ghee. A causal relationship requires that several criteria be met in order to prevent fallacious inclusions based on suppositions, chance associations or subjective unsupported beliefs. Unless the criteria are met, one must conclude that no significant causal

10

relationship exists. Dr. Shoemaker has no concrete evidence which support a causal relationship for disease and environmental exposure. He obfuscates with his pseudoscience and has no references supporting his positions.

25.     The existence of biotoxins has not been demonstrated in this case. No biotoxin producing molds (*i.e. Stachybotrys*, etc.) have been found in the air of the former home of Denicole Young and Vanessa Ghee. In fact, no environmental testing of the area where the exposure allegedly occurred has ever been performed.

26.     The physical findings have not corroborated the subjective complaints. No signs or symptoms have been found in Denicole Young and Vanessa Ghee to confirm toxicity due to biotoxins. Dr. Shoemaker has not made physical findings which are compatible with his diagnosis. As noted above, Denicole Young and Vanessa Ghee have no mold sensitivities by allergy testing criteria. There are no abnormalities on chest x-ray, chest CT, or corroborating hypersensitivity pneumonitis panels showing significant mold sensitivities. Conventional laboratory studies such as CBC, chemical analyses, TFTs, Sed RT, ANA, urinalysis, etc., are all normal. There is no evidence for allergic or toxic reactions. No significant immune responses to molds, fungal glucans, or endotoxins have been demonstrated *in vitro* or *in vivo* by testing Denicole Young and Vanessa Ghee.

27.     Dr. Shoemaker claims that Denicole Young and Vanessa Ghee may have been exposed to toxic molds such as *Stachybotrys* in order to explain the neurological issues. He reports cognitive defects due to mold, but there is no documentation of such cognitive defects in

11

the form of psychological testing. He ascribes these to mold exposure, specifically *Stachybotrys*. Evidence for exposure to the toxins is not convincing. The acknowledged manifestations, as well as a variety of other infectious and pharmacological considerations of the effects of toxic molds, have been reviewed in an excellent article, Clinical Microbiological Reviews: 1/2/03, pages 144–172. This comprehensive review clearly shows that *Strachybotrys* does not cause the constellation of symptoms that Denicole Young and Vanessa Ghee claim to have experienced.

28.    As a Senior Scholar in Epidemiology, I can unequivocally state that mold exposure cannot explain the spectrum of disease of which Denicole Young and Vanessa Ghee complain. In addition, no experimental models of mold exposure can result in the disease spectrum described by Denicole Young and Vanessa Ghee. There is neither theoretical basis nor experimental confirmation of a causal link between mold exposure and their problems.

29.    No one is claiming that mold is incapable of causing human disease. For example, mold can cause allergic reactions, irritant reactions, hypersensitivity reactions, and invasive infection. Mold, however, does not cause the "chronic biotoxin-associated illness" that Dr. Shoemaker hypothesizes.

30.    Finally, Dr. Shoemaker's contention that I am not part of the relevant scientific community is incorrect and misleading. I am a Professor of Medicine and Neurology at the University of Pennsylvania. I spend 95% of my time in clinical care and see patients with mold associated problems every day. I am a Senior Scholar in Clinical Epidemiology, and therefore much more qualified to assess biostatistics and experimental clinical design than is Dr.

12

Shoemaker. In the past I have performed innumerable immunological and molecular studies and have a comprehensive understanding of the concepts of Innate and Cognate Immunology. I am the Director of the Allergy Program at the University of Pennsylvania. In this position it is my role to mentor students, fellows, and peers in the clinical matters germane to the problems currently being alleged by Denicole Young and Vanessa Ghee. As a Lead Physician in the Department of Medicine, it is my responsibility to assure that "evidence based medical conclusions" be inculcated into our curriculum and be used as the primary tool for optimizing patient evaluations and treatment. It is critical that the medical profession not endorse unsubstantiated evidence.


I HEREBY CERTIFY UNDER PENALTIES OF PERJURY THAT THE ABOVE STATEMENTS ARE TRUE, BASED UPON MY PERSONAL KNOWLEDGE.


3/31/08
Date

S. Michael Phillips, M.D.

13

# EXHIBIT 21

**Fighting America's hidden threat**

# mold warriors

**Ritchie C. Shoemaker, MD** with
**James Schaller, MD & Patti Schmidt**

## FREQUENTLY ASKED QUESTIONS

1. I'm sick. How do I know if I'm sick from toxins in a water-damaged building?
2. How do I know if the mold growing on the ceiling in my living room is dangerous? Same question for the mildew on my books?
3. How will my doctor know if I'm sick from neurotoxins?
4. Is the mold illness contagious?
5. I took CSM for my neurotoxic illness but I'm not any better. Why not?
6. My doctor said the blood tests Dr. Shoemaker recommends are too expensive and too new. What should I do?
7. I took the VCS test online but my doctor doesn't know how to read it.
8. How can I best individualize my neurotoxic illness treatment?
9. A lot of my co-workers are sick but their doctors say the problem is allergies and fibromyalgia. How can we tell if it's really a neurotoxic illness?
10. I find myself unable to follow your suggestions. I just cannot follow through as I could have done 10 years ago. What should I do?
11. What can I do if my doctor is unable to read my HLA results?
12. I filed a lawsuit against my landlord because of mold, but my attorney said he was worried about the strength of testimony from defense medical experts, so he didnÂ't want to bring a personal injury claim. What can I do to strengthen my case?
13. I improved when I took CSM, but my MMP-9 stayed high and I still have many neurologic abnormalities. They said I had MS, then ParkinsonÂ's and now they don't know. What advice do you have for me?
14. What proof do you have that mold causes CFS?
15. Why do you attack the CDC and consensus panels of medical experts repeatedly, just like you did in Desperation Medicine? Why don't you think the CDC acts in our best interests?
16. I have one of the "dreaded" genotypes and low MSH, but I donÂ't feel ill. What advice do you have for me?
17. Why are MARCONS difficult to eradicate?
18. Are other physicians treating mold the way you do?
19. Why is VEGF deficiency a major problem for your patients who donÂ't show improvement?
20. Autoantibodies are a big deal in your Biotoxin Pathway, but they also occur in people without biotoxin illnesses.
21. My blood tests show all these antibodies -- IgA, IgG and IgM --- to fungi. My doctor says these tests help him diagnose and treat.
22. Why am I now so sensitive to various chemicals, perfumes, petrochemicals, inks, fumes from computers and copying machines?
23. Why do so many school kids get nosebleeds after they're exposed to mold?
24. If I'm exposed to mold and sick from it, what's the first thing I should do?
25. I'm planning to spend thousands of dollars to remediate my home. Is this a waste of

money?

### I'm sick. How do I know if I'm sick from toxins in a water-damaged building?

Mold Warriors' careful scientific definitions will help you figure out whether you have the symptoms of neurotoxic illness. An included series of biological markersÂ—including the gene susceptibility HLA DR test and the visual contrast sensitivity (VCS) testÂ—will also help you sort out whether the illness could be related to mold toxins, such as from exposure to water-damaged buildings. The VCS test has been used for 40 years to assess the potential for exposure to biologically produced neurotoxins. Also, evaluating your specific lab tests will help you and your physician confirm the diagnosis. These labs include hypothalamic hormones, MSH deficiency and abnormal regulation of pituitary hormones, antidiuretic hormone and concomitant measure of osmolality; ACTH and simultaneous cortisol, VEGF, cytokines, complement and measurement of MMP-9.

### How do I know if the mold growing on the ceiling in my living room is dangerous? Same question for the mildew on my books?

Sampling molds is incredibly easy. Making a Â"tape-lift,Â" rubbing a piece of clear Scotch tape over the mold, is the first step. Send the tape to a reputable lab for identification. P and K Microbiology charges $35 for the service. Contact your physician to find out more details, as most labs won't accept samples from patients.

### How will my doctor know if I'm sick from neurotoxins?

You will have many health symptoms, VCS deficits and abnormalities in labs from the Biotoxin Pathway. Any physician can order the lab tests and look for the markers that will diagnose neurotoxic illness. If you meet the diagnostic definition and your exposure is simply to mold, then treatment is begun with chole- styramine. If you have Lyme disease, youÂ'll need antibiotics first, and then pretreatment with Actos before cholestyramine is begun.

### Is the mold illness contagious?

No, exposure is necessary.

### I took CSM for my neurotoxic illness but I'm not any better. Why not?

Cholestyramine (CSM) therapy is just the first step in a series of steps that are followed sequentially. Do one intervention at a time! All biotoxic illness patients, for example, follow one month of CSM therapy before beginning the second step. If there is a biofilm-forming, multiply antibiotic resistant coagulase negative Staph colonizing your nose, that organism must be eradicated. If there is auto immunity present, those complicating factors must be identified and changes initiated. If there are reductions of levels of VEGF, that also needs to be identified and treated. There are some people, especially those with 4-3-53 and the 11/12, 3-52B genotype, who frequently won't get better. We're using new therapies for these patients and hope to have results to report shortly.

### My doctor said the blood tests Dr. Shoemaker recommends are too expensive and too new. What should I do?

The tests aren't new; they have been in use for a long time. The blood tests that we use are standard in commercial laboratories and insurance reimbursable. The illness that you have has already defied diagnosis, and the standard tests used, such as a CBC or simple metabolic profiles, don't show any abnormalities. The blood tests listed at the end of this book will profile your illness and show you what's wrong. In fact, not doing those blood tests and not knowing whatÂ's wrong is what's really too expensive!

*I took the VCS test online but my doctor doesn't know how to read it.*
The eye test available at this link http://www.chronicneurotoxins.com is a screening test; it's designed to assess your potential for exposure to biologically produced neurotoxins. The test itself does not diagnose the illness; what we're looking for is the presence of a distinctive number of errors that will signal to your physician that additional work up is necessary. You can sign up for an interpretation of your VCS test at the chronicneurotoxins website.

*How can I best individualize my neurotoxic illness treatment?*
Every patient has a unique illness profile. Do the complete symptom recording, VCS and labs to profile your illness. Although biotoxin illness causes common problems in people, ultimately, like a tailored dress or suit, your treatment will be unique.

*A lot of my co-workers are sick but their doctors say the problem is allergies and fibromyalgia. How can we tell if it's really a neurotoxic illness?*
We've done a number of building studies where we go on site and screen everyone in the building, using visual contrast and symptom questionnaires. If at least 25% of the patients have the distinctive pattern of Sick Building Syndrome symptom abnormalities, then we do some additional testing. If there are correlations between visual contrast deficits and those with symptoms, the likelihood of neurotoxic illness exceeds 90%. The laboratory tests will profile and define the illness. The best way to know if there really is a problem in the workplace is to follow the 5-step repetitive exposure protocol. When one person is ill, we call him a complainer; two people working in the same area is a conspiracy; and three a cohort. Find a couple of buddies to go through the battles with you; the action can get rough.

*I find myself unable to follow your suggestions. I just cannot follow through as I could have done 10 years ago. What should I do?*
These illnesses are chronic; they don't leave on their own. There's no question that proper approach to treatment requires discipline, time and personal commitment. If you're not able to take medication, there's no way you'll improve. I suppose it's not necessary to understand the illness, but without understanding, the patient doesn't have the "power" to control his own health as much as possible. Cognitive issues are almost always present in the illness. Ask family or friends to help you, take Mold Warriors to your physician for help, or contact info@moldwarriors.com or info@chronicneurotoxins.com

*What can I do if my doctor is unable to read my HLA results?*
At first glance the HLA wording is difficult to grasp. But we're very excited to offer a special key -- Follow the Rosetta Stone in the appendix to help you interpret HLAs and sort out which genotype you have. After you've done a few of these, it'll seem like second nature.

*I filed a lawsuit against my landlord because of mold, but my attorney said he was worried about the strength of testimony from defense medical experts, so he didnÂ't want to bring a personal injury claim. What can I do to strengthen my case?*
You'll run up against a seemingly unbeatable array of experts routinely hired by insurance companies in court cases. Fear not. The strength of your case is based on documenting your illness with symptoms and lab markers; the most unbeatable evidence is your response to treatment and re-exposure in the 5-step repetitive exposure protocol. As long as those who testify against you aren't treating physicians and have no knowledge of this illness, you certainly can be shown to be right.

*I improved when I took CSM, but my MMP-9 stayed high and I still have many neurologic*

**abnormalities. They said I had MS, then ParkinsonÂ's and now they don't know. What advice do you have for me?**
I hope that you were able to document your lab abnormalities before you started on therapy. I hope that we know what your potential for exposure is. If the problem is simply elevated MMP-9, I would strongly suggest that you also have a test of myelin basic protein (see Chapter 14) to understand better what the MMP-9 is doing in your brain. If MMP-9 alone is your problem then simply using the no-amylose diet and taking Actos will quickly lower that level.

**What proof do you have that mold causes CFS?**
Direct patient care and multiple studies. In my referral practice, I often see people with a prior diagnosis of chronic fatigue syndrome. Many of those patients have an illness thatÂ's simply caused by mold in their basement, bathroom and/or attic. The problem here is that when a diagnosis of chronic fatigue is made according to CDC guidelines, no biological markers were used and no exposure histories were recorded. By expanding what we understand about chronic fatiguing illnesses, eventually weÂ'll show that true chronic fatigue syndrome has multiple causes, one of which is mold.

**Why do you attack the CDC and consensus panels of medical experts repeatedly, just like you did in Desperation Medicine? Why don't you think the CDC acts in our best interests?**
The CDC is one of the strongest federal organizations with a huge influence on current public health thinking and medicine. My conflict with the CDC is I see that much of the extraordinary work done by their excellent research scientists is then "spun" by managers whose priority is CDC image, or merely a concern about appearances and public opinion. The CDC isn't an organization that will take the initiative readily, unless there's a clear public health mandate. It's clear the CDC is failing to act to defend the public in mold illness, Lyme Disease and Chronic Fatigue Syndrome. And that's a national disgrace.

**I have one of the "dreaded" genotypes and low MSH, but I donÂ't feel ill. What advice do you have for me?**
WeÂ'd probably like to include you in our study of people weÂ're following to see what affects future symptoms. MSH deficiency alone doesnÂ't create symptoms. MSH controls the innate immune responses. Clearly, with your high susceptibility, exposure to biologically produced toxins puts you at a tremendous risk to develop illness, because you donÂ't have the protection from MSH. It's been our experience that patients who have low MSH and the dreaded genotype need to be treated rapidly if biotoxin exposure occurs. So I would suggest that you have frequent testing to assess your health status, especially VCS, C3a and MMP-9.

**Why are MARCONS difficult to eradicate?**
Most of theses organisms make biofilms, which are near-im- penetrable barriers for antibiotics to cross. Also, their presence reduces our white blood cells' ability to leave mucus membranes and attack these colonizing organisms. This community of organismsÂ' capability to rapidly make antibiotic resistance factors is extraordinary. The new age in microbiology must take into account biofilm formation and how it affects human illness.

**Are other physicians treating mold the way you do?**
Fortunately, yes, we have a large number of physicians who are using my protocols and beginning to collaborate. It wonÂ't be long before we have national standards from treating physicians that would lead the way for those in academia who have scientific credentials, but limited access to primary care in biotoxin illnesses. The biggest shift in physician attitudes is

likely to follow the beginning of legal actions against treating doctors for failure to diagnose.

### Why is VEGF deficiency a major problem for your patients who donÂ't show improvement?

VEGF controls delivery of oxygen and nutrients in capillary beds. Cells that arenÂ't receiving necessary increases in oxygen and nutrients donÂ't function normally. Please see Chapter 17 for the additional discussion about the incredible importance of VEGF. ItÂ's necessary to measure a VEGF level repeatedly to follow treatment.

### Autoantibodies are a big deal in your Biotoxin Pathway, but they also occur in people without biotoxin illnesses.

The presence of an autoantibody in your blood doesn't necessarily mean you have an autoimmune illness. The blood test is just a part of a clinical evaluation. The study of autoantibodies is still an emerging part of medicine, and we're only starting to explore why biotoxin patients commonly have significant auto- antibodies. Even basic autoimmune issues are still unclear. For example, science doesn't yet understand how people develop antibodies to gliadin, a protein found in gluten, which is not part of our "self," yet ends up being treated as "self" by the immune response.

### My blood tests show all these antibodies -- IgA, IgG and IgM --- to fungi. My doctor says these tests help him diagnose and treat.

Be careful with the analysis of antibody tests. Changes in antibody levels have been thought to be helpful in many illnesses, but that idea has never been confirmed. For example, antibiotic therapy bears no clear role in antibody levels in Lyme Disease.

### Why am I now so sensitive to various chemicals, perfumes, petrochemicals, inks, fumes from computers and copying machines?

So-called Multiple Chemical Sensitivity (MCS) is still a commonly seen clinical condition without much in the way of a confirmatory diagnostic literature. I have treated more than 500 patients with MCS, and have developed the condition myself, but I still havenÂ't found anyone with MCS who didnÂ't begin their illness with mold exposure. My illness responded nicely to medications; many don't. Following a long recent discussion with Dr. Martin Pall, we're looking at changing levels of cit- rulline, an amino acid made when nitric oxide interacts with another amino acid, arginine, after an exposure adequate to initiate MCS symptoms. If weÂ're able to create MCS symptoms, it could implicate changes in nitric oxide metabolism in MCS patients. But no one knows why MCS occurs.

### Why do so many school kids get nosebleeds after they're exposed to mold?

This is a difficult question to answer, since noses bleed after many common events. If you watch people in a car, waiting at a stoplight, you'll routinely see men pick their noses and women fluff their hair. Kids in a classroom are always at their noses. So nosebleeds, commonly caused by nasal irritation and nasal trauma, both from humidity and contact, are a common event. In a group of People Who Denied Nose-Picking, With Unusual Bleeding, including nosebleeds, after mold exposure, we have found hy- peracute changes in C3a affecting changes in clotting. We don't have the number of kids studied before exposure to answer the question, "do physiologic responses to mold/mold toxins cause nosebleeds?" properly yet. But we're working on it.

### If I'm exposed to mold and sick from it, what's the first thing I should do?

Plan to get out before it's too late! If you remain sick after you're no longer exposed, don't be

surprised. ThatÂ's a marker for toxin illness.

***I'm planning to spend thousands of dollars to remediate my home. Is this a waste of money?***
Often it is. Remediation should mean removal of all sources of biotoxin illness. That's often impossible. Make sure you have some back-up financial protection in case you get sick with re-exposure to your "remediated home." Since merely leaving a fraction of spores or biotoxins behind can make a home "sick," many find their remediation was unable to prevent a return of their illness.

back to top

**Ritchie C Shoemaker MD PA**
500 Market Street Suite 102
Pocomoke, Maryland 21851
info@moldwarriors.com

© 2005-2006 Ritchie C Shoemaker MD PA