IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DENICOLE YOUNG, et al.,    )
            )
  Plaintiffs,      )
            ) Civil Action No.:  07-cv-00983 (ESH)
            )
            )
WILLIAM F. BURTON, ESQUIRE, et al., )
            )
  Defendants.     )
            )
            )

## PRAECIPE

In paragraph 10 of Exhibit 2 (the Affidavit of Dr. Ritchie Shoemaker Condensed for June 16, 2008 *Daubert* hearing) and submitted with Plaintiffs' "Memorandum To the Court In Advance of the June 16, 2008 *Daubert* hearing," Dr. Shoemaker lists jurisdictions where he contends that he has been permitted to testify.  Dr. Shoemaker omits Ohio from the list of jurisdictions where he contends that he has been permitted to testify after *Daubert* and *Frye* challenges.

As a supplement to their Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker and to their Reply, the defendants have attached the decision of the trial court from the Court of Common Pleas of Clermont County, Ohio dated May 1, 2007 and have attached the decision from the Court of Appeals of the Twelfth Appellate District of Ohio in the case of Heather Herzner v. Fischer Attached Homes, Ltd. dated May 12, 2008.  As the defendants recently discovered, Dr. Shoemaker was excluded as an expert by the Ohio trial court seven (7) months prior to his deposition for the similar reasons that the defendants have advanced in this matter for why Dr. Shoemaker should not be permitted to testify under *Daubert* and under Fed.

R. Evid. 702.

The defendants were unaware that Dr. Shoemaker had been excluded as an expert on May 1, 2007 by the trial court in the Ohio case captioned, <u>Heather Herzner v. Fisher Attached Homes, Ltd</u>, Case No.: 2004CV00564, and Dr. Shoemaker omitted that May 1, 2007 decision from his testimony at his December 10, 2007 deposition when he listed the cases where he remembered that he had been excluded.  <u>See</u>, Defendant's Exhibit 9 (deposition transcript of Dr. Ritchie Shoemaker dated December 10, 2007) for their Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker, at pgs. 41-45.

Respectfully submitted,


JORDAN, COYNE SAVITS, L.L.P.                    CARR MALONEY, P.C.


By: /s/ *DEBORAH MURRELL WHELIHAN*           By: /s/ *PAUL J. MALONEY*
   Deborah Murrell Whelihan,#412454                  Paul J. Maloney, Esquire, #362533
   1100 Connecticut Ave., N.W.                          Ali A. Beydoun, Esquire, # 475413
   Suite 600                                            1615 L Street, N.W.
   Washington, D.C.  20036                              Suite 500
   Telephone:  (202) 296-4747                           Washington, D.C.  20036
   Fax: (202) 496-2800                                  Telephone: (202) 310-5500
                                                        Fax: (202) 310-5555

Attorneys for Defendant                         Attorneys For Defendant
William F. Burton, Esquire                      Lewis & Tompkins, P.C.

2

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true copy of the foregoing Praecipe was sent electronically

on this <u>11th</u> day of June, 2008, to:

> Peter C. Grenier, Esquire
> Michael K. Hibey, Esquire
> Bode & Grenier, L.L.P.
> 1150 Connecticut Avenue, N.W.
> 9th Floor
> Washington, D.C.  20036
>
> Paul J. Maloney, Esquire
> Ali A. Beydoun, Esquire
> Carr Maloney, P.C.
> 1615 L Street, N.W.
> Suite 500
> Washington, D.C.  20036

> /s/ ***DEBORAH MURRELL WHELIHAN***
> Deborah Murrell Whelihan

**COURT OF COMMON PLEAS**
**CLERMONT COUNTY, OHIO**

| | | |
|---|---|---|
| **HEATHER HERZNER, et al.,** | : | **CASE NO. 2004CVC00564** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **DECISION** |
| | : | |
| **FISCHER ATTACHED HOMES, LTD.:** | | |
| **et al.,** | : | |
| **Defendants.** | : | |

Robert N. Trainor, Attorney for Plaintiffs, The Carroll House, 216 East Fourth Street, Covington, Kentucky 41011-1759.

David A. Futscher and Amy L. Hunt, Attorneys for Defendant Fischer Attached Homes, Ltd., Parry Deering Futscher & Sparks, PSC, 411 Garrand Street, P.O. Box 2618, Covington, Kentucky 41012-2618.


This matter is before the Court upon Defendant Fischer Attached Homes, Ltd.'s ("Fischer") motion to exclude the testimony of Ritchie C. Shoemaker, M.D.. The parties filed extensive briefs with attachments on this matter. Both parties were afforded an opportunity to present evidence by way of exhibits or testimony of witnesses at the hearing. Other than a portion of the materials attached to briefs and admitted at the hearing by agreement, no other evidence was offered by either party. At the hearing, plaintiff's attorney acknowledged that the content of Dr. Shoemaker's planned testimony at trial was entirely contained within Dr. Shoemaker's Report, the filed transcript of Dr. Shoemaker's deposition held in March 2006, and the filed transcript of Dr. Shoemaker's deposition held in July 2006. Following oral argument the court took the matter under advisement.

Thereafter Herzner moved for leave of court to supplement the record with additional scientific articles. This motion is denied. These materials, which were

untimely submitted after the evidentiary hearing, will not be considered by the Court.

From 2002-2003, Plaintiff Heather Herzner resided in a condominium built by Defendant Fischer. Herzner sued Fischer on April 28, 2004, alleging that she sustained bodily injury from exposure to mold toxins in her condominium. Herzner is not asserting that she developed a mold allergy. To establish that mold toxins caused Herzner to suffer from "mold illness," she must show "(1) that the toxic substance is capable of causing the condition (general causation), and (2) that the toxic substance in fact caused [her] medical condition (specific causation)."[1] To demonstrate specific causation, Herzner "must show that she was exposed to the toxic substance and that the level of exposure was sufficient to induce the complained-of medical condition (commonly called a 'dose-response relationship')."[2] Ordinarily, expert testimony is required to prove both general and specific causation.[3] Even where a quantifiable dose-threshold relationship is not required, an expert's conclusions regarding specific causation must be supported by a scientifically valid basis for the conclusions to be reliable and admissible.[4]

Herzner intends to introduce Dr. Shoemaker's opinions at trial in support of her claims. Dr. Shoemaker is a family practitioner who professes to specialize in the health effects of exposure to mycotoxins. Mycotoxins are toxic chemicals sometimes produced by certain mold species. It is Dr. Shoemaker's opinion "that the complex illness suffered by Ms. Herzner, with its multiple health effects and physiologic abnormalities, is solely due to exposure to the contaminated indoor air and

---

[1] *Valentine v. P.P.G. Industries, Inc.*, 158 Ohio App.3d 615, ¶ 17.
[2] *Id.* at fn. 1.
[3] Id. at ¶ 17.
[4] *Terry v. Ottawa County Bd. of Mental Retardation & Developmental Delay* (2006), 165 Ohio App. 3d 638, ¶ 56.

2

environment in [the condominium built by Fischer], independent of any pre-existing conditions or diagnosis."[5] Dr. Shoemaker further opines that Herzner has a genetic susceptibility for re-acquisition of "mold illness" from exposure to amplified populations of "toxigenic" fungi.[6] Fischer asserts that Dr. Shoemaker's testimony should be excluded because it is not scientifically reliable.

The purpose of expert testimony is to assist the trier of fact in determining a factual issue or in understanding the evidence.[7] Once the admissibility of an expert's testimony has been challenged, the party seeking to introduce the testimony has the burden of establishing admissibility.[8] The admissibility of expert testimony is governed by Rule 702 of the Ohio Rules of Evidence. The rule sets forth three prerequisites to admissibility. First, the testimony must either "[relate] to matters beyond the knowledge or experience possessed by laypersons or [dispel] a misconception common among laypersons."[9] Second, the witness must be "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony."[10] Third, the witness's testimony must be "based on reliable scientific, technical, or other specialized information."[11]

The first statement on the admissibility of recently ascertained or applied scientific principles can be found in *Frye v. United States*.[12] The *Frye* Court held that "while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the

---

[5] Ritchie C. Shoemaker Report, RS 30.
[6] Id. at RS 52.
[7] See *Miller v. Bike Athletic Co.* (1988), 80 Ohio St. 3d 607, 611.
[8] See *Turker v. Ford Motor Co.*, 2007-Ohio-985, ¶ 16; *Metro. Life Ins. Co. v. Tomchik* (1999), 134 Ohio App. 3d 765, 776.
[9] Evid. R. 702(A).
[10] Evid. R. 702(B).
[11] Evid. R. 702(C).
[12] 293 F. 1013, 1014 (1923).

deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."[13] The Ohio Supreme Court never adopted the *Frye* test.[14] Instead, the Ohio Supreme Court held that "general scientific acceptance" is a "proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence."[15]

The United States Supreme Court expressly rejected *Frye* in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[16] In *Daubert*, the Supreme Court held that expert scientific testimony must be reliable and relevant to the task at hand to be admissible under Fed. R. Evid. 702.[17] To determine reliability, a court must assess whether the reasoning or methodology underlying the testimony is scientifically valid.[18] The *Daubert* Court set forth several factors to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance.[19]

The Ohio Supreme Court held that the *Daubert* factors are not prerequisites to admissibility; they are merely factors for a court to consider in determining reliability.[20] The "ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's 'technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.'"[21] In determining whether an expert's opinion is reliable, a trial court must determine

---

[13] *Id.*
[14] *State v. Williams* (1983), 4 Ohio St. 3d 53, fn 5.
[15] *Id.* at 57.
[16] 509 U.S. 579, 589 (1993).
[17] *Id.*
[18] *Id.* at 592-593.
[19] *Id.* at 593-594.
[20] *Miller v. Bike Athletic Co.* (1998), 80 Ohio St. 3d 607, 613.
[21] *Id.*; citing *DeLuca v. Merrell Dow Pharmaceuticals, Inc.* (1990), 911 F.2d 941, 956; quoting Weinstein's Evidence (1988) 702-35, Section 702[03].

4

whether the expert's conclusions are based on scientifically valid principles and methods.[22]

In *Valentine v. Conrad*,[23] the Ohio Supreme Court adopted *Daubert*'s view that the trial court must act as a gatekeeper to ensure that the expert testimony offered is based upon reliable principles and methods.[24] It is this determination that will ensure that the testimony aids the trier of fact.[25] Where there is too great of an analytical gap between the data and the opinion proffered, the opinion cannot be admitted because it will not be helpful to the trier of fact.[26] The *Valentine* Court found that this determination does not invade the province of the jury, but prevents the jury from "considering information that would not assist in rendering a verdict founded on reliable expert evidence."[27] The *Valentine* Court also held that a trial court must apprise itself of the details of proffered evidence to the extent that doing so is necessary to avoid making an unreasonable, arbitrary, or unconscionable decision.[28]

As the "gatekeeper,"[29] it is incumbent upon this Court to evaluate Dr. Shoemaker's opinions to determine whether they will aid the trier of fact. To reach this conclusion, this Court must determine whether Dr. Shoemaker's planned testimony satisfies the three prerequisites set forth in Evid. R. 702.

*I. Rule 702(A): The Subject Matter of Dr. Shoemaker's Testimony*

To be admissible, Dr. Shoemaker's testimony first must either relate to matters beyond the knowledge or experience possessed by laypersons or dispel a

---

[22] *Miller*, 80 Ohio St. 3d. at paragraph one of the syllabus.
[23] 110 Ohio St. 3d 42 (2006).
[24] *Id.* at ¶ 17.
[25] *Id.*
[26] *Id.* at ¶ 18.
[27] *Id.* at ¶ 19.
[28] *Id.* at ¶ 20.
[29] *Id.*

misconception common among laypersons.[30]  In the Complaint, Herzner asserts that she suffered bodily injury caused by toxins in her condominium building.  Herzner moved into this condominium in 2002 and moved out in 2003.  Herzner asserts that she became increasingly ill while living there.  Her symptoms included chronic fatigue, weakness, aching, blurred vision, shortness of breath, diarrhea, pain in her feet, headaches, red eyes, tearing, and sinus congestion.

On September 10, 2004, four months after filing this suit, Herzner became Dr. Shoemaker's patient.  After looking at Herzner's medical history, conducting tests, and examining her, Dr. Shoemaker diagnosed Herzner with "mold illness," which he defines as a chronic, biotoxin-associated illness.[31]  "Mold illness" does not include an allergy to mold.  Dr. Shoemaker contends that "mold illness" is caused by exposure to water-damaged buildings with resident toxigenic organisms, including, but not limited to, fungi.[32]  At trial, Herzner intends to introduce Dr. Shoemaker's testimony about this illness and its causes.  It is undisputed that Herzner's medical diagnosis and the cause of her alleged injuries are beyond the knowledge or experience possessed by laypersons.  Therefore, the subject matter of Dr. Shoemaker's testimony satisfies Evid. R. 702(A).

*II. Rule 702(B): Dr. Shoemaker's Expert Qualifications*

Under Evid. R. 702(B), Dr. Shoemaker's testimony is admissible only if he qualifies as an expert "by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony."[33]  Fischer asserts that Dr. Shoemaker does not qualify as an expert in toxic mold related illnesses because he is

---

[30] Evid. R. 702(A).
[31] Ritchie C. Shoemaker Dep., March 21, 2006, 38.
[32] Id.
[33] Evid. R. 702(B).

6

not a toxicologist, a microbiologist, or an industrial hygienist.[34]  However, Dr.

Shoemaker is licensed to practice medicine in Maryland and is board certified in the

field of family medicine.[35]  He has 27 years of experience as a treating physician.[36]

Dr. Shoemaker asserts that he specializes in treating patients with "chronic fatiguing

illnesses"[37] and estimates that 60% of his patients have an illness related to exposure

to water-damaged buildings in which there is growth of toxigenic organisms.[38]  Dr.

Shoemaker believes that he is an expert in the diagnosis and treatment of biotoxin

illness, but does not consider himself to be an expert in toxicology.[39]  He has treated

patients with similar illnesses associated with exposure to biologically produced

neurotoxins since 1997.[40]  Dr. Shoemaker contends that he has treated over 2300

patients with chronic illness acquired following exposure to water-damaged

buildings.[41]  He further asserts that he has treated more than 3500 patients with

chronic illness following exposure to biologically produced neurotoxins, including

the water-damaged buildings cohort.[42]

Generally, "any doctor licensed to practice medicine is competent to testify

about medical issues."[43]  The test of admissibility is whether the witness will aid the

trier of fact in determining a factual issue or in understanding the evidence, not

whether the expert is the best witness on the subject.[44]  Any potential weaknesses in

Dr. Shoemaker's credentials relate to the weight to be given to his opinions, not their

---

[34] Shoemaker March Dep. 183-84, 195.
[35] Id. at 8-10.
[36] Shoemaker Report, RS 33.
[37] Shoemaker March Dep., 17.
[38] Id. at 37.
[39] Id. at 195.
[40] Shoemaker Report, RS 34.
[41] Id. at RS 33.
[42] Id.
[43] *Joyce-Couch v. DeSilva* (1991), 77 Ohio App. 3d 278, 285.
[44] *Id.*

admissibility.[45]  Based upon Dr. Shoemaker's license to practice medicine, his

experience and his treatment of plaintiff, Dr. Shoemaker has the specialized

knowledge, skill, experience, training, or education required to qualify as an expert

on the subject matter of his testimony.  Accordingly, Dr. Shoemaker's qualifications

satisfy Evid. R. 702(B).


### III. Rule 702(C): The Reliability of Dr. Shoemaker's Testimony

Finally, Dr. Shoemaker's testimony is admissible only if it is "based on

reliable scientific, technical, or other specialized information."[46]  In *Valentine v.*

*Conrad*,[47] the Ohio Supreme Court expounded upon this reliability requirement.

Before admitting expert testimony, a trial court must examine whether the expert's

conclusion is based on scientifically valid principles and methods.[48]  How an expert

arrived at his conclusions is the focus of this inquiry.[49]  "Knowledge based on

unreliable techniques or principles cannot, as a matter of law, assist the trier of fact

to understand the evidence or to determine a fact in issue."[50]  Thus, an expert's

opinion will not be admitted if it is based on subjective belief or unsupported

speculation.[51]  Any inferences drawn by the expert must accord with scientific

principles and methods.[52]  If there is too great an analytical gap between the data and

the opinion proffered, the testimony must be excluded.[53]

---

[45] *Id.*
[46] Evid. R. 702(C).
[47] 110 Ohio St. 3d 42 (2006).
[48] *Id.* at ¶ 16; citing *Miller v. Bike Athletic Co.* (1998), 80 Ohio St. 3d 607, paragraph one of the syllabus.
[49] *Id.*
[50] *State v. Campbell*, 2002-Ohio-1143; citing *Miller v. Bike Athletic Co.*, 80 Ohio St. 3d at 614.
[51] *State v. Campbell*, 2002-Ohio-1143, *4; citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 590.
[52] *Id.*
[53] *Id.*; citing *Gen. Elec. Co. v. Joiner* (1997), 522 U.S. 136, 146.

To determine whether Dr. Shoemaker's testimony is reliable under the *Valentine* standard, the principles and methods that he used to reach his conclusions must be examined. First, the court will analyze the principles and methods Dr. Shoemaker used in diagnosing Herzner with "mold illness." Second, the court will analyze the principles and methods Dr. Shoemaker used in determining that the condominium caused Herzner's "mold illness."

### A. Reliability of Dr. Shoemaker's "Mold Illness" Diagnosis

Dr. Shoemaker diagnosed Herzner with "mold illness", which he defines as a "toxin-induced defect in innate immune responses in genetically susceptible patients with physiologic abnormalities."[54] Dr. Shoemaker formulated a case definition for "mold illness," which contains two tiers. Tier One provides that a diagnosis must include: (1) the potential for exposure, (2) the presence of a distinctive grouping of symptoms, and (3) the absence of confounding diagnoses and exposures (aka differential diagnosis).[55] Tier Two contains objective factors: (1) HLA DR by PCR showing susceptibility; (2) reduced levels of melanocyte stimulating hormone (MSH) in a properly performed specimen sent to LabCorp.; (3) elevated levels in matrix metalloproteinase-9 (MMP9) in a properly prepared specimen sent to Quest; (4) deficits in visual contrast sensitivity (VCS); (5) dysregulation of ACTH/cortisol in simultaneously obtained specimens; (6) dysregulation of ADH/osmolality in simultaneously obtained specimens.[56] According to Dr. Shoemaker's definition, to be diagnosed with "mold illness," a patient must exhibit three of Tier Two's factors.

Before evaluating the principles and methods of Dr. Shoemaker's diagnosis, the Court notes that the first element of Tier One requires there be a "potential for

---

[54] Shoemaker Report, RS 31.
[55] Id. at RS 36. Dr. Shoemaker asserts that Tier One is adopted from the initial CDC case definition of *Pfiesteria* cases from 1998.
[56] Shoemaker Report, RS 36.

exposure" to toxin producing molds. In his Report, Dr. Shoemaker asserts that it is

"the presence of amplified growth of fungi and not just mere presence of fungi in

competition for econiches from multiple other genera of microorganisms that poses

the risk for illness acquisition."[57] Despite the word "potential" in the first element of

Dr. Shoemaker's own definition of "mold illness", he testified during his deposition

that, for a "mold illness" to exist, toxigenic fungi, toxigenic bacteria (gram negative

rods and gram positive organisms), or actinomyces species must be present.[58] Dr.

Shoemaker's deposition testimony contradicts the wording of the first element of

Tier One of the case definition contained in his report. Clearly, a person cannot be

made ill by mold toxins to which she has not actually been exposed. Based upon Dr.

Shoemaker's deposition testimony, exposure to toxin producing mold, and not the

potential for exposure, will be considered as the first element of the case definition.

### 1. Evidence of Herzner's Exposure to Toxin Producing Molds

On November 3, 2003, Michael Crandall from Indoor Environmental Services

performed an environmental assessment of Herzner's condominium.[59] To perform

the assessment, Crandall took environmental samples including bulk material, bulk

dust, wall cavity air, ambient air for culturable fungi analysis, ambient air for

microscopic examination, and ambient air for fungal identification using PCR

analysis. The assessment found that mold spores were present that had the potential

to produce secondary metabolites or mycotoxins, but no tests were done to

determine whether mycotoxins were present.[60] Crandall stated during his deposition

that he would not describe the mold found in the Herzner residence as "toxic"

---

[57] Id. at RS 48.
[58] Shoemaker March Dep., 39.
[59] Shoemaker Report, RS 31; See Indoor Environmental Assessment Report, January 23, 2004.
[60] See Indoor Environmental Assessment Report, January 23, 2004; Michael Scott Crandall Dep., August 4, 2005, 33.

mold.[61] Additionally, Dr. Shoemaker admitted that fungi can be present in an environment without producing mycotoxins.[62] Dr. Shoemaker further admitted that he cannot state which toxin, or combination of toxins, caused Herzner's illness.[63]

The first element of Tier One of Dr. Shoemaker's case definition for "mold illness" requires that a patient be exposed to mold toxins. When diagnosing Herzner with "mold illness," Dr. Shoemaker inferred from Crandall's report that toxins were present. Dr. Shoemaker based this inference on his belief that the "enormous diversity of toxigenic fungi isolated [at the condominium, make it] biologically implausible that (1) none of these identified species would always not be making the toxin, and (2) that we would be able to identify which toxin(s)" which caused the patient's illness.[64] Dr. Shoemaker offers no reliable scientific or statistical basis for this inference.

In determining the reliability of Dr. Shoemaker's conclusion that Herzner was exposed to toxin producing mold in the condominium, it is also important to note that Crandall's testing took place three months after Herzner moved out of the condominium. There is no evidence that the mold spores detected by Crandall in November 2003 existed during Herzner's occupancy. Even assuming that the mold spores present in November 2003 were present during Herzner's occupancy, Dr. Shoemaker does not provide any scientific foundation to support his inference that those mold spores were producing toxins. Dr. Shoemaker offers his conclusion that Herzner was sick with "mold illness" as support for his inference that the mold spores produced toxin before, during, or after the Plaintiff's occupancy of the Fischer condominium. He states that "if you find a sick patient in a building, then that . . .

---

[61] Michael Scott Crandall Dep., August 4, 2005, 33.
[62] Ritchie C. Shoemaker Dep., July 20, 2006, 26-27.
[63] Id. at 62.
[64] Shoemaker Report, RS 31.

patient is a better indicator of toxin formation in the building than any building report would ever be."[65]

Under Dr. Shoemaker's case definition, exposure to toxin producing mold is a pre-requisite for diagnosing a patient with "mold illness." Dr. Shoemaker seeks to establish this prerequisite by inferences not supported by scientific or statistical principles and by diagnosing the patient with "mold illness." An expert may draw inferences from a body of work, but the extrapolation must accord with scientific principles and methods.[66] Establishing one of the essential elements of an illness by diagnosing the patient with that illness is not a reliable scientific method or principle of diagnosis. This is an impermissible leap in logic validated only by circular reasoning. There is just too great an analytical gap between the data and Dr. Shoemaker's opinion that plaintiff suffered exposure to toxins in the Fischer condominium to allow such testimony before a jury.

### 2. Differential Diagnosis[67]

Even assuming that Dr. Shoemaker's conclusion that Herzner was exposed to toxin producing mold was based on reliable scientific principles, Dr. Shoemaker's ultimate diagnosis of "mold illness" would lack a reliable basis. The third element of Tier One requires that there be an "absence of confounding diagnoses and exposures."[68] Essentially, this third element requires the physician to conduct a differential diagnosis. Differential diagnosis "describes the process of isolating the cause of a patient's symptoms through the systematic elimination of all potential

---

[65] Shoemaker March Dep., 190.
[66] *State v. Campbell*, 2002-Ohio-1143, *4; citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 590
[67] Whether the term "differential diagnosis" or "differential etiology" is used, the court refers to the methodology of determining whether or not an environmental exposure caused the patient's disease. See, Reference Manual on Scientific Evidence, 2d edition at p. 433.
[68] Shoemaker Report, RS 36.

causes."[69]  Differential diagnosis is a standard scientific method for determining

causation, but "its use is appropriate only when considering potential causes that are

scientifically known."[70]

### a. Evidence of a Scientifically Valid Link between Toxin Exposure and "Mold Illness"

In evaluating the reliability of scientific evidence, several factors to consider

are: (1) whether the theory or technique has been tested; (2) whether it has been

subjected to peer-review; (3) whether there is a known or potential rate of error; and

(4) whether the methodology has gained general acceptance in the field.[71] [72]

Based upon the evidence presented at the motion hearing, the court finds that

there has been inadequate testing to demonstrate a causal connection between

exposure to mycotoxins and human health effects. Dr. Shoemaker references double

blind tests which he asserts either have been or will be peer reviewed and published

but Plaintiff has offered no evidence to support this claim.

Further, the court notes the lack of peer-reviewed medical literature on "mold

illness" and its causes as defined by Dr. Shoemaker.  Peer-review is a process of

subjecting an author's scholarly work or ideas to the scrutiny of others who are

experts in the filed.  The goal of the peer-review process is to make authors meet the

standards of their discipline and of science in general.  Dr. Shoemaker asserts that he

authored an article that was published in the January 2005 edition of

Neurotoxicology and Teratology.[73]  While Dr. Shoemaker asserts that this article was

peer-reviewed, there is no evidence this journal requires authors to submit their

---

[69] *Valentine*, 110 Ohio St. 3d at ¶ 22.
[70] *Id.*
[71] *Miller v. Bike Athletic Co.* (1998), 80 Ohio St. 3d 607, 611.
[72] This court is aware that the Supreme Court of Ohio has accepted review in *Terry v. Ottawa County Board of Mental Retardation & Developmental Delay,* 110 Ohio State 3d 1409, which may impact consideration of these factors in the future.
[73] Shoemaker Report, RS 38.

13

work to a peer-review process. Other than the articles that Dr. Shoemaker and his physician group wrote, Dr. Shoemaker is not aware of any peer-reviewed articles that use the term "mold illness."[74]

Publication alone is not *prima facie* evidence of peer-review. The Neurotoxicology and Teratology journal is not one that this Court immediately recognizes as peer-reviewed. One indicia of peer-review is publication in a journal that follows the International Committee of Medical Journal Editor's ("ICMJE") Uniform Requirements for Manuscripts Submitted to Biomedical Journals. The Neurotoxicology and Teratology journal is not included in the list of journals of the ICMJE who have agreed to follow these peer review standards.

Further, "mold illness" has not gained general acceptance in the scientific community. "Mold illness," as defined by Dr. Shoemaker, is not taught in any medical schools.[75] Dr. Shoemaker's theory that a "mold illness" patient inhales toxigenic fungi, which become bound within the patient's GI tract by traveling from cell to cell within the blood stream, [76] has not been tested or reviewed by doctors outside of Dr. Shoemaker's physician group. Additionally, Dr. Shoemaker's theory that patients have a "mold susceptible" genotype of HLA DR 17-2-52A has not been widely tested.[77] Other than Dr. Shoemaker, no one has identified this genotype as "mold susceptible."[78] Further, Dr. Shoemaker admits that his analysis of the genotype is not specific enough to identify what types of mold are susceptible for this type of genotype.[79]

Dr. Shoemaker established a case definition for diagnosing "mold illness" by

---

[74] Shoemaker July Dep., 44.
[75] Id. at 44-45.
[76] Id. at 30, 32.
[77] Shoemaker Report, RS 33.
[78] Shoemaker July Dep., 103-104.
[79] Id.

conducting laboratory tests upon persons to determine the levels of certain physiologic elements.[80]  The physiologic tests include HLA and MSH genotype testing, Leptin values, ADH/osmolity, ACTH/cortisol, Adrogens, HLA DR by PCR, matrix metalloproteinase-9 (MMP9), antigliadin antibody, VEGF, C-reactive protein, IgE, C3a, pulmonary stress test, plasminogen activator inhibitor, vascular endothelial growth factor, and interleukin 1 beta.[81]  All of these tests are recognized in the medical community for various purposes, but Dr. Shoemaker's use of these tests to support his diagnosis of "mold illness" is not supported by any scientific literature.  Dr. Shoemaker is unaware of any published literature that specifically addresses his case definition or criteria for diagnosing "mold illness" by using laboratory results.[82]  Additionally, while Dr. Shoemaker claims that Herzner's laboratory results revealed "many abnormalities" consistent with his defined parameters for "mold illness," there are no laboratory results documenting the absence of such abnormalities before Herzner moved into the condominium.[83]

There is insufficient evidence in the record of a reliable scientific link between exposure to toxin producing molds and "mold illness," as it is defined by Dr. Shoemaker, to allow Dr. Shoemaker's testimony.  It will not aid the trier of fact in determining a factual issue or in understanding the evidence in this case.  "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it."[84]

### b. Dr. Shoemaker's Differential Diagnosis of Herzner

The elements of a differential diagnosis may consist of the performance of

---

[80] Shoemaker Report, RS 40-42.
[81] Id.
[82] Shoemaker July Dep., 20-21.
[83] Id., 125, 133, 144.
[84] *Valentine*, 110 Ohio St. 3d at ¶ 23.

physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests.[85] A doctor does not have to employ all of these techniques for his diagnosis to be reliable.[86]

Even assuming a reliable, scientifically valid link existed between exposure to mold toxins and "mold illness," as defined by Dr. Shoemaker, there are fatal flaws in Dr. Shoemaker's differential diagnosis process which render his opinions inadmissible. Dr. Shoemaker asserts that his differential diagnosis process was quite narrow because "there are only a few illnesses that could cause the constellation of abnormalities seen simultaneously in Ms. Herzner."[87] His deposition testimony however belies this assertion.

### (1) Herzner's Symptoms

When Herzner went to Dr. Shoemaker for medical advice, her symptoms included fatigue, weakness, aching, and "unusual sharp, stabbing pains in both her feet," headaches, red eyes, blurred vision, tearing, shortness of breath, sinus congestion, and diarrhea.[88] Dr. Shoemaker performed a physical exam, a cardiogram, a pulmonary function test, pulse oximetry, and a comprehensive blood draw.[89] At the time of the visit, Herzner's blood pressure was 140/82, her weight was 219, her height was 58 ¾ inches, her wingspan was 60 inches, her resting pulse was 94, she was afebrile, her EKG was normal, and her pulmonary tests demonstrated that she had mild restrictive lung disease.[90] Dr. Shoemaker also noted in his records that Herzner had "multiple deficits in executive cognitive

---

[85] *Terry*, 165 Ohio App. 3d at ¶ 57.
[86] *Id.;* citing *Kannankeril v. Terminix Internatl., Inc.* (C.A.3, 1997), 128 F.3d 802, 807.
[87] Shoemaker Report, RS 37.
[88] Id. at RS 32.
[89] Id.
[90] Id. at RS 33.

functioning."[91] These "multiple deficits" included "difficulty handling simple abstract division, impaired recent memory, decreased ability to concentrate, decreased assimilation of new knowledge, confusion, decreased ability to find words in conversation, disorientation . . . mood swings, appetite swings, sweats, difficulty controlling body temperature, and vertigo."[92]

### (2) Dr. Shoemaker's Use of the Visual Contrast Sensitivity Test

As part of his differential diagnosis, Dr. Shoemaker administered a Near Visual Acuity test, testing Herzner's vision, and a Visual Contrast Sensitivity Test ("VCS").[93] To administer the VCS, a patient is shown a visual contrast sensitivity card.[94] This card contains a matrix of circles filled with sinusoidal gratings (dark and light bars). The spatial frequency (1.5, 3, 6, 12, and 18 cycles/degree of visual arc) of the bars is increased from top to bottom. The bars' contrast is decreased from left to right in steps of approximately 0.15 log units. The grating bars are oriented either vertically, or tilted 15 degrees to the left or right. When looking at each circle, a patient must name an orientation (vertical, left, right, or blank) if the patient could see the bars. The contrast sensitivity score for each row (spatial frequency) is recorded as the contrast of the last test patch correctly identified on that row following verification by repeated testing of that patch and the subsequent patch. The procedure is repeated for each row in descending order. The a priori criterion for the inclusion of data in analyses is that the eye has a visual acuity (Snellen Distance Equivalent Score) of 20:50 or better.[95]

Dr. Shoemaker asserts that the results of this test help him diagnose a patient

---

[91] Id. at RS 32.
[92] Id. at RS 32-33.
[93] Id. at RS 39.
[94] Id.
[95] Id.

with "mold illness." However, there is no scientific literature before this Court that supports this conclusion. On February 5, 2007, Herzner moved for leave to supplement the record and to submit VCS related articles. The Court declines to consider these materials as properly submitted after the evidentiary hearing. However, the Court notes that none of the articles submitted provided scientific support for Dr. Shoemaker's interpretation of the VCS results. Dr. Shoemaker uses the VCS test to reach a conclusion that has not been scientifically verified.

### (3) Herzner's Medical History

According to her medical records, Herzner has suffered from low back pain since 1982,[96] she has chronic long term neurodermatitis and excoriations, a long history of hair loss, mild hypertension, hypothyroidism, obesity, and depression.[97] Before becoming Dr. Shoemaker's patient, Herzner's medications included Estradiol, Atacand, l-thyroxine, Neurontin, Vicodin and Paxil.[98]

During his deposition, Dr. Shoemaker admitted that Herzner could have been fatigued because she weighed 219 pounds, that her difficulty regulating her temperature could have been caused by menopause, and that she could have simple nasal allergies giving her headaches and sinus congestion.[99] However, in his Report, he says that "each of these modalities was ruled out by presence of items from history, symptoms, and laboratory studies."[100] Essentially, Dr. Shoemaker states that Herzner's laboratory results met his expectations for "mold illness;" thus, he concluded that he could rule out the other potential causes of her physical symptoms. Dr. Shoemaker also states in his Report that it is theoretically possible that Herzner's

---

[96] Id. at RS 32.
[97] See D. Ann Middaugh Report, Internal Medicine/Occupational Medicine, 14.
[98] Shoemaker Report, RS 32.
[99] Shoemaker March Dep., 135-137.
[100] Shoemaker Report, RS 43-44.

illness was simply the usual progression of allergy, but that "the abundance of incredibly abnormal physiologic measurements found in Ms. Herzner, [sic] preludes that somewhat absurd hypothetical argument."[101] The "abundance of incredibly abnormal physiologic measurements" found in Herzner presumably relates to her laboratory results.

However, Dr. Shoemaker's use and interpretation of the laboratory results in this manner is not widely recognized in the medical community.  Dr. Shoemaker is unaware of any published literature that specifically addresses his case definition or criteria for diagnosing "mold illness" by using these same laboratory results.[102] Although differential diagnosis is a standard scientific method for determining causation of illness, "its use is appropriate only when considering potential causes that are scientifically known."[103]  Here, there is insufficient evidence that "mold illness" is a scientifically known cause of the symptoms that Herzner exhibited.

### (4) Dr. Shoemaker's Consideration of Other Illnesses

As part of the differential diagnosis process, Dr. Shoemaker "looked into" chronic fatigue.  Dr. Shoemaker ruled out chronic fatigue as the cause of Herzner's ailments, but he does not explain how he ruled it out.  Dr. Shoemaker asserts that he and Herzner "went over" tick bites, Lyme disease, rashes, and whether Herzner gets ill after consuming fish, as possible causes of her symptoms.[104]  He does not state how he eliminated these as causes of Herzner's symptoms.

### (5) Herzner's Personal Upheavals

Dr. Shoemaker also acknowledged that Herzner "had a series of personal upheavals" prior to experiencing "a decline in her health earlier that summer," but

---

[101] Id. at RS 44.
[102] Shoemaker July Dep., 20-21.
[103] *Valentine,* 110 Ohio St. 3d at ¶ 22.
[104] Shoemaker March Dep., 149.

that "nothing about those upheavals . . . could possibly contribute to the physiologic abnormalities demonstrated in this case."[105]  Examples of her personal upheavals include the death of her mother, her decision to leave her husband, and that she feared for her life.[106]  Dr. Shoemaker concluded that the personal upheavals did not cause her medical problems by looking at "the power of the expression multiple symptoms for multiple systems."[107]  Essentially, Dr. Shoemaker concluded that Herzner's personal upheavals could not have caused all of her symptoms, while "mold illness" could cause them all to occur simultaneously.  He does not explore the possibility that Herzner's symptoms could have been caused by several different ailments.

### (6) Dr. Shoemaker's Consideration of the Side-Effects of Herzner's Medication

Dr. Shoemaker concluded that Herzner's "illness syndrome" could not be explained as a side-effect of her medication.[108]  Herzner was on Neurontin at the time that she was tested.  Dr. Shoemaker states that many of his patients take Neurontin and that he has not found any visual contrast deficits or MSH deficiency with its use.  He admits that he cannot be certain that Neurontin could not cause changes in levels of C4a or VIP.[109]  Dr. Shoemaker also states that Codeine, Tylox, and hydrocodone do not cause lab abnormalities.  Herzner was also taking Paxil CR at the time of her first appointment with Dr. Shoemaker.  Dr. Shoemaker admits that he has not looked into Paxil CR, but has looked into other selective serotonin re-

---

[105] Shoemaker Report, RS 31.
[106] Shoemaker March Dep., 135.
[107] Id.
[108] Shoemaker Report, RS 32.
[109] Shoemaker July Dep., 9.

uptake inhibitors, such as Prozac and Celexa. Dr. Shoemaker states that Prozac and Celexa do not cause changes in labs and visual contrasts.[110]

### (7) Herzner's Clinical Course

Dr. Shoemaker also used his prescribed clinical course for Herzner as a diagnostic tool. As part of Herzner's clinical course, Dr. Shoemaker prescribed Cholestyramine. The label use of Cholestyramine is to treat high cholesterol. Dr. Shoemaker uses it to treat "mold illness," which is an off-label use of the drug.[111] Dr. Shoemaker instructed Herzner to take one scoop of the drug with fluid, four times a day, thirty minutes before food or other medications.[112] Treatment lasted for one month.[113] Dr. Shoemaker states that Herzner had a "significant salutary response" and her symptoms were markedly reduced with her VCS scores improving, and her MMP9, C3a, and VEGF levels falling.[114]

Dr. Shoemaker asserts that Herzner's reaction to the drug proves that she suffered from "mold illness" because the drug's use would not improve any medical condition considered in the differential diagnosis "aside from mold exposure."[115] Dr. Shoemaker based this conclusion on his clinical experience, not on scientific studies. Dr. Shoemaker asserts that 92% of his patients suffering from illness essentially identical to Herzner's have had an over 75% reduction in their symptoms with this treatment protocol.[116] Instead of fulfilling his case definition criteria, Dr. Shoemaker again validates his diagnosis in reverse order. He concludes that Herzner has "mold illness" after treating her for the illness and interpreting her laboratory results.

---

[110] Id. at 9-10.
[111] Shoemaker March Dep., 143.
[112] Id. at 141-42.
[113] Id.
[114] Shoemaker Report, RS 33.
[115] Id. at RS 37.
[116] Id. at RS 35-36.

However, as discussed above, his use and interpretation of the laboratory results for these purposes is not based upon reliable scientific principles. In his Report dated April 23, 2005, Dr. Shoemaker asserted that his research group had five papers nearing readiness for peer review confirming the efficacy of using Cholestyramine in patients diagnosed with "mold illness."[117] There is no evidence that these papers were ever peer reviewed or published.

### Conclusion Regarding Differential Diagnosis

Dr. Shoemaker's alleged differential diagnosis does not involve the systematic elimination of other possible causes. There is no evidence that Herzner was exposed to mold toxins. Dr. Shoemaker infers this necessary element by concluding that she is sick with "mold illness." To reach this conclusion, he relies heavily on laboratory results. But his use of and interpretation of these tests and results is not based upon reliable or generally accepted scientific principles. Expert testimony is not admissible where the expert merely states his opinion without providing a reliable basis for it.[118]

### B. Reliability of Dr. Shoemaker's Principles and Methods Used in Determining that this Specific Condominium Caused the "Mold Illness"

Dr. Shoemaker's opines that the Fischer condominium was the specific cause of the "mold illness" suffered by Herzner. Even if Dr. Shoemaker's diagnosis was based on reliable scientific principles and methods, Dr. Shoemaker's conclusion that this condominium caused Herzner's illness is flawed. Dr. Shoemaker admits that Herzner's illness "theoretically could have been caused by other exposures

---

[117] Id. at RS 34.
[118] *Flinn v. Parcinski*, 2004-Ohio-3032, ¶ 23; citing *General Elec. v. Joiner* (1997), 522 U.S. 136, 146.

22

independent of exposure to the [condominium],"[119] but he failed to consider that possibility when formulating his conclusions. Although Herzner did not become Dr. Shoemaker's patient until one year after she stopped living in the condominium, there is no evidence concerning the environment in which she lived during that year.[120] Dr. Shoemaker relies instead upon the Repetitive Exposure Protocol ("REP") he developed to support his conclusion.

### 1. Repetitive Exposure Protocol

Dr. Shoemaker's opinion that the condominium's mold caused Herzner's "mold illness" is based on (1) his opinion that she has "mold illness," ergo the building is "sick,"[121] and (2) the results of a Repetitive Exposure Protocol test that he conducted with Herzner. REP involves re-exposure to the condominium after the patient has been successfully treated for "mold illness." Before conducting the REP, Dr. Shoemaker treated Herzner for "mold illness" by prescribing Cholestyramine and Actos.[122] The label for Cholestyramine states that the drug is to treat high cholesterol. Dr. Shoemaker's use of the drug is an off-label use.[123] Dr. Shoemaker prescribed Actos, a diabetes drug, to lower Herzner's MMP9.[124] This is an off-label use of Actos.[125] Dr. Shoemaker states that Herzner had a "significant salutary response" to treatment.[126] Her VCS scores improved, MMP9 fell to 290, C3a fell to 174, and VEGF fell to 107.[127]

He then instructed Herzner not to take her medication and to return to the

---

[119] Shoemaker Report, RS 43.
[120] Shoemaker March Dep. 149.
[121] Id. at 190.
[122] Shoemaker Report, RS 33; Shoemaker March Dep., 196-197.
[123] Shoemaker March Dep., 143.
[124] Id. at 196-197.
[125] Id.
[126] Shoemaker Report, RS 33.
[127] Id.

condominium for "re-exposure". In his Report, Dr. Shoemaker stated that Herzner suffered a "recrudescence of symptoms" shortly after returning to the condominium.[128] Specifically, during her "re-exposure", Herzner experienced a "froggy voice," a stuffy head, hair falling out, increased pain, difficulty walking, increased fatigue, shortness of breath with minimal exertion, itching, and leg swelling.[129] After experiencing these symptoms, Herzner left the residence and re-started her medication. Dr. Shoemaker asserts that her symptoms and VCS score improved.[130] Dr. Shoemaker opines that this REP therefore confirms his diagnosis of "mold illness" and his theory that she acquired the illness from exposure to the indoor air of the Fischer condominium.[131]

### 2. Reliability of the Repetitive Exposure Protocol

Rule 702(C) states that testimony that reports the result of a procedure, test, or experiment is reliable only if: "(1) the theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; (2) the design of the procedure, test, or experiment reliably implements the theory; and (3) the particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

With respect to the first element, Dr. Shoemaker asserts that the REP is validly derived from Koch's postulates. Koch's postulates were formulated by Robert Koch and Friedrick Loeffler in 1884 and published by Koch in 1890. Koch's postulates are four criteria designed to establish a causal relationship between a microbe and a disease. The postulates are: (1) The organism must be found in all animals suffering from the disease, but not in healthy animals, (2) the organism

---

[128] Id.
[129] Shoemaker March Dep., 177-178.
[130] Shoemaker Report, RS 33.
[131] Id.

must be isolated from a diseased animal and grown in pure culture, (3) the cultured organism should cause disease when introduced into a healthy animal, and (4) the organism must be re-isolated from the experimentally infected animal.

The theory behind the REP is that a healthy patient, who has previously been sick with "mold illness," should become ill again with "mold illness" once that patient is re-introduced to the mold toxin. Dr. Shoemaker designed the REP to establish a causal relationship between mold toxins and "mold illness," but it is unclear how the REP is otherwise related to Koch's postulates.

Even assuming that the REP is validly derived from Koch's postulates, the REP fails to meet the requirements of Evid. R. 702(C)(2) – (3). The second element of Evid. R. 702(C) requires the design of the procedure, test, or experiment to reliably implement the theory. The design of the REP does not reliably implement the theory behind it because there is no evidence that Herzner was exposed to mold toxin during her original exposure to the condominium environment, nor is there evidence that she was exposed to mold toxin during her re-exposure. No tests were performed to verify that toxin producing molds ever existed in the condominium.[132]

As to the third element of Evid. R. 702(C), the court finds that the REP was not conducted in a way that will yield an accurate result. First, the REP did not include any controlled factors. The condominium was not tested during either "exposure" for toxin producing molds. Over a year had passed since Herzner originally lived in the condominium. The environment likely changed since the first time that Herzner inhabited the condominium. Second, at the time of the re-

---

[132] See Indoor Environmental Assessment Report, January 23, 2004; Michael Scott Crandall Dep., August 4, 2005, 33.

exposure, Herzner was told to stop taking the Cholestyramine and Actos.[133]  Dr. Shoemaker did not account for the effects of quitting these medications.  Third, Dr. Shoemaker did not test any other environments that Herzner was exposed to during the REP.  Finally, the REP only included one extra exposure to the condominium environment.  Dr. Shoemaker admitted that "we did not have as clean a re-exposure protocol as I might like."[134]  Since the REP does not satisfy Evid. R. 702(C)'s requirements, it is not a reliable basis upon which Dr. Shoemaker could base his diagnosis and opinion.

Dr. Shoemaker's conclusion that the REP proves that the condominium contained toxin producing mold and caused Herzner's symptoms is supported by nothing other than a temporal relationship.  He inferred that the condominium contained toxin producing molds, which caused "mold illness," because Herzner re-exhibited many symptoms upon re-exposure.  Such a *post hoc, ergo propter hoc*— "after this, because of this"—analysis is unpersuasive.  This fallacy is based upon the mistaken notion that "Y follows X; thus, Y must be a result of X."[135]  A temporal relationship, standing alone, does not establish causation.[136]  This unreliable evidence is made even less so because no factors were controlled during the re-exposure and no allowance was made for the effects of taking Herzner off of the Cholestyramine and Actos during the re-exposure.

### IV. Conclusion

Based upon the foregoing, Dr. Shoemaker's testimony is unreliable under Evid. R. 702(C).  As a result, his testimony regarding the general and specific causation of Herzner's symptoms would not aid the trier of fact in determining a

---

[133] Shoemaker Report, RS 33.
[134] Shoemaker March Dep., 150.
[135] *State v. Madsen*, 2005-Ohio-3850, ¶ 31.
[136] *Valentine*, 110 Ohio St. 3d at ¶ 23.

factual issue or in understanding the evidence. Therefore, the Court grants

Defendant Fischer's motion to exclude the testimony of Ritchie C. Shoemaker, M.D.,

in all respects. The Court also denies Plaintiff Herzner's motion to supplement the

record and to submit VCS related articles in all respects. Counsel for Fischer shall

prepare and submit an appropriate entry.


JUDGE WILLIAM WALKER


CERTIFICATE

I hereby certify that a copy of the foregoing was sent to all counsel of

record by regular U.S. Mail this _1st_ day of ~~April~~ *May* 2007.


27

[Cite as *Herzner v. Fischer Attached Homes, Ltd.*, 2008-Ohio-2261.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| HEATHER HERZNER, et al., | : | |
| Plaintiffs-Appellants, | : | CASE NO. CA2007-08-090 |
| | : | O P I N I O N |
| - vs - | | 5/12/2008 |
| | : | |
| FISCHER ATTACHED HOMES, LTD.,et al., | : | |
| Defendants-Appellees. | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2004 CVC 00564


Robert N. Trainor, The Carroll House, 216 East Fourth Street, Covington, KY 41011-1759, for plaintiffs-appellants

Parry, Deering, Futscher & Sparks, PSC, David A. Futscher, Amy L. Hunt, 411 Garrard Street, P.O. Box 2618, Covington, KY 41012-2618, for defendants-appellees

Thomas B. Bruns, 105 East Fourth Street, Suite 1400, Cincinnati, OH 45202, for defendant-appellee, Bridgehaven at Woodcreek Condominiums


**YOUNG, J.**

{¶1}   Plaintiffs-appellants, Heather Herzner and Bonnie Pettit, appeal a decision of the Clermont County Court of Common Pleas granting summary judgment to defendant-appellee, Fischer Attached Homes, Ltd., in an action to recover for bodily injuries arising out of the negligent construction of a residence.  For the reasons outlined below, we affirm the

decision of the trial court.

{¶2}    In September 2002, appellant Herzner moved into a Milford condominium ("condo") constructed by appellee, Fischer Attached Homes ("Fischer").  Herzner reported problems with water intrusion and mold in the ground level condo.  She maintains that she became increasingly ill as a result of mold exposure.  After attempts to remedy the water intrusion by the property management company and Fischer were unsuccessful, Herzner moved out of the residence in August 2003.

{¶3}    Herzner commenced this action in April 2004.  In November 2006, Fischer filed a motion to exclude the testimony of Herzner's medical expert, Dr. Ritchie Shoemaker. Following a hearing, the trial court granted the motion.  Fischer subsequently moved for summary judgment, which the trial court granted.  Herzner and Pettit[1] (collectively, "appellants") timely appeal, raising one assignment of error.[2]

{¶4}    Assignment of Error No. 1:

{¶5}    "THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFFS-APPELLANTS BY EXCLUDING THE EXPERT TESTIMONY OF DR. RITCHIE SHOEMAKER, M.D."

{¶6}    Appellants retained Dr. Shoemaker, a family practitioner who claims to specialize in the health effects of exposure to mycotoxins,[3] to testify in support of their claim that the negligent construction of Herzner's condo caused her to become sick.  Appellants challenge a number of the trial court's reasons for excluding Dr. Shoemaker's testimony, arguing that the court imposed a higher standard than that required for determining the

---

1.  Bonnie Pettit, Herzner's sister, is the party who contracted with the former owners for the purchase of the condo for the benefit and primary residence of Herzner.

2.   Appellants set forth two assignments of error in their appellate brief, but voluntarily withdrew the first assignment of error at oral argument.

3.  Per the trial court's decision, "[m]ycotoxins are toxic chemicals sometimes produced by certain mold species."

scientific validity of the testimony.

{¶7}   A trial court's decision on whether to admit or exclude expert testimony will not be reversed absent an abuse of discretion.  *State v. Jones*, 90 Ohio St.3d 403, 414, 2000-Ohio-187.  An abuse of discretion connotes an arbitrary, unreasonable, or unconscionable decision by the trial court.  *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

{¶8}   It is undisputed that Dr. Shoemaker's testimony related to matters beyond the knowledge or experience of laypersons and that Dr. Shoemaker qualified as a medical expert. Evid.R. 702(A) and (B).  At issue was the reliability of Dr. Shoemaker's testimony.  The trial court excluded Dr. Shoemaker's testimony under Evid.R. 702(C), which provides that expert testimony must be based upon reliable scientific, technical, or other specialized information in order to be admissible.

{¶9}   In keeping with Evid.R. 702(C), expert testimony should be admitted only where it is established that the principles and methods underlying the testimony are scientifically valid.  *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶16; *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611, 1998-Ohio-178; *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 589, 113 S.Ct. 2786.  This ensures that the testimony assists the trier of fact in understanding the evidence or determining a factual issue.  *Valentine* at ¶17.  In making this inquiry, the trial court considers several factors, including: "(1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance."  *Miller* at 611.  The focus is not on the substance of the expert's conclusions, but on how the expert arrived at his conclusions.  *Valentine* at ¶16.

{¶10}  The trial court cited numerous reasons in support of its ruling that Dr. Shoemaker's expert evidence was not scientifically valid.  Among these reasons was the lack of evidence demonstrating Herzner's exposure to mold toxins.  Michael Crandall of Indoor

Environmental Services ("IES") performed an assessment of Herzner's condo in November 2003.  Crandall identified a number of mold spores in the condo that were capable of producing mycotoxins.  However, no tests were performed to determine whether the mold spores were in fact producing mycotoxins.  In diagnosing Herzner with "mold illness,"[4] Dr. Shoemaker inferred from the IES report that the mold in Herzner's residence produced mycotoxins that in turn caused her illness.

{¶11}  The IES tests were conducted three months after Herzner had vacated the condo.  There was no evidence that the mold spores detected by Crandall were present while Herzner occupied the premises.  Even if the mold spores were present, there was no evidence that they were producing mycotoxins during Herzner's occupancy.  Dr. Shoemaker conceded in his deposition that mold capable of producing toxins can be present in a location without producing any mycotoxins.  The trial court concluded that there was too great a gap between the data and Dr. Shoemaker's opinion that Herzner suffered from exposure to toxins in the condo to admit Dr. Shoemaker's testimony.

{¶12}  The trial court also excluded Dr. Shoemaker's testimony on the basis that there was insufficient evidence of a reliable scientific link between exposure to toxin-producing molds and "mold illness," as defined by Dr. Shoemaker.  Appellants produced no evidence that Dr. Shoemaker's testing methods or his theory on the contraction of "mold illness" had been tested or peer reviewed by other experts in the field outside those in Dr. Shoemaker's physician group.  Furthermore, appellants presented no scientific literature to support the manner in which Dr. Shoemaker utilized physiologic tests to support his diagnosis of "mold illness."

{¶13}  The trial court also observed a number of flaws in Dr. Shoemaker's use of

---

4. According to the trial court's decision, Dr. Shoemaker defined "mold illness" as a chronic, biotoxin-associated illness caused by exposure to water-damaged buildings with resident toxin-producing organisms.

differential diagnosis, insisting that he relied upon laboratory tests in a manner that was not reliable or based upon generally accepted scientific principles. Rather than involving the systematic elimination of other possible causes for Herzner's symptoms, Dr. Shoemaker's differential diagnosis merely reflected his own opinion and unverified interpretation of laboratory results. See *Terry v. Ottawa Cty. Bd. of Mental Retardation & Dev. Delay*, 165 Ohio App.3d 638, 2006-Ohio-866, ¶59-61, reversed on other grounds; *Valentine*, 2006-Ohio-3561 at ¶22-23.

{¶14} The trial court also challenged Dr. Shoemaker's conclusion that the condo built by Fischer was the specific cause of Herzner's "mold illness." Herzner began seeing Dr. Shoemaker one year after she vacated the condo. Appellants failed to produce any evidence about the environment Herzner was exposed to during that year. In addition, the trial court reasoned that the test employed by Dr. Shoemaker involving re-exposure to the condo after Herzner had been treated was not reliable. This was because appellants failed to present evidence that Herzner was exposed to mold toxins during her habitation in the condo or during her re-exposure when she returned to the condo. As stated, the condo was never actually tested for the presence of mycotoxins. Dr. Shoemaker's inferences, tests, and conclusions thus lacked an adequate scientific basis in order to support their validity and enable the admission of his testimony.

{¶15} The trial court's thorough and well-reasoned analysis exposed numerous faults in the principles and methods utilized by Dr. Shoemaker to draw his conclusions. We conclude that the trial court did not abuse its discretion in granting Fischer's motion to exclude the testimony of Dr. Shoemaker. Appellants' single assignment of error is overruled.

{¶16} Judgment affirmed.

BRESSLER, P.J. and POWELL, J., concur.

[Cite as *Herzner v. Fischer Attached Homes, Ltd.*, 2008-Ohio-2261.]