**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| DENICOLE YOUNG and<br>VANESSA GHEE, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :    Case No.: 1:07cv983 (ESH) |
| | : |
| LEWIS & TOMPKINS, P.C, *et al.,* | : |
| | : |
| Defendants. | : |

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56(b) and Local Rules 7 and 56.1, Defendants Lewis & Tompkins, P.C. and William F. Burton, Esquire, by and through their respective and undersigned counsel, moves this Honorable Court to enter summary judgment in their favor against Plaintiffs because there are no genuine disputes of any material facts and because Defendants are entitled to summary judgment as a matter of law. Defendants are entitled to summary judgment because Plaintiffs cannot establish proximate cause for their claims and cannot show that their toxic mold cases were good and viable causes of action that would have been successful if filed with the Superior Court of the District of Columbia prior to the expiration of the three (3) year statute of limitations. In support of this Motion, Defendants respectfully refer this Honorable Court to the attached Memorandum of Points and Authorities.

WHEREFORE, Defendants Lewis & Tompkins, P.C. and William F. Burton, Esquire respectfully request that this Honorable Court enter summary judgment in their

favor against Plaintiffs and dismiss Plaintiffs' action with prejudice.

Respectfully submitted,

CARR MALONEY P.C.                    JORDAN, COYNE & SAVITS, L.L.P.


By:   /s/ Paul J. Maloney              By:   /s/ Deborah Murrell Whelihan
      Paul J. Maloney #362533                Deborah Murrell Whelihan #412454
      Ali Beydoun #475413                    1100 Connecticut Avenue, N.W.
      1615 L Street, N.W., Suite 500         Suite 600
      Washington, DC  20036                  Washington, DC  20036
      (202) 310-5500 (Telephone)             (202) 296-4747 (Telephone)
      (202) 310-5555 (Facsimile)             (202) 496-2800 (Facsimile)
      Attorneys for Defendant                Attorneys for Defendant
      Lewis & Tompkins, P.C.                 William F. Burton, Esquire

## CERTIFICATE OF SERVICE

I HEREBY certify that a true copy of the foregoing Motion, accompanying

Memorandum of Points and Authorities, Statement of Undisputed Material Facts, and

Proposed Order were served electronically, through ECF, and by mail, postage prepaid, on

this 11th day of August, 2008 to:

> Peter Grenier, Esquire
> Michael Hibey, Esquire
> Bode & Grenier
> 1150 Connecticut Avenue, N.W.
> 9th Floor
> Washington, D.C.  20036
>
> Paul J. Maloney, Esquire
> Ali A. Beydoun, Esquire
> Carr Maloney P.C.
> 1615 L Street, N.W.
> Suite 500
> Washington, D.C.  20036


                                        /s/ Deborah Murrell Whelihan
                                       Deborah Murrell Whelihan

2

## LCvR 7(m) STATEMENT

I, Paul J. Maloney, Esquire hereby certify that a good faith effort has been made to resolve this matter without Court intervention. Pursuant to a conference with this Court and all counsel on July 24, 2008. It is clear that the matter cannot be resolved thereby necessitating the filing of this Motion.

/s/ Paul J. Maloney_____
Paul J. Maloney

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

DENICOLE YOUNG and
VANESSA GHEE,                                              :
                                                          :
                Plaintiffs,                               :
                                                          :
        v.                                                :    Case No.: 1:07cv983 (ESH)
                                                          :
LEWIS & TOMPKINS, P.C, et al.,                            :
                                                          :
                Defendants.                               :

## ORDER

UPON CONSIDERATION of the Defendants' Motion for Summary Judgment, and any opposition thereto, any replies, and the entire record herein, it is this _____ day of _____, 2008, hereby,

ORDERED, that said Motion be, and the same hereby is GRANTED, and it is further,

ORDERED, that judgments are entered in favor of Defendants, Lewis & Tompkins, P.C. and William F. Burton, Esquire, against the Plaintiffs and that Plaintiffs' Action is hereby DISMISSED, with prejudice.


                                        _____
                                        ELLEN SEGAL HUVELLE
                                        United States District Judge

Copies to:

Paul J. Maloney, Esquire
Ali A. Beydoun, Esquire
Carr Maloney P.C.
1615 L Street, N.W.
Suite 500
Washington, D.C.  20036

Peter C. Grenier, Esquire
Michael K. Hibey, Esquire
Bode & Grenier, L.L.P.
1150 Connecticut Avenue, N.W.
9th Floor
Washington, D.C.  20036

Deborah Murrell Whelihan, Attorney-at-Law
Jordan, Coyne & Savits, LLP
1100 Connecticut Avenue, N.W.
Suite 600
Washington, D.C.  20036

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

DENICOLE YOUNG and
VANESSA GHEE,                          :
                                       :
              Plaintiffs,              :
                                       :
       v.                              :    Case No.: 1:07cv983 (ESH)
                                       :
LEWIS & TOMPKINS, P.C, et al.,         :
                                       :
              Defendants.              :

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Lewis & Tompkins, P.C. and William F. Burton, Esquire (hereinafter

"Defendants"), by and through their respective and undersigned counsel, and in support of their

Motion for Summary Judgment, hereby state as follows:

**I.     PRELIMINARY STATEMENT**

Plaintiffs Denicole Young (hereinafter referred to as "Young") and Vanessa Ghee

(hereinafter referred to as "Ghee," or collectively as "Plaintiffs") are suing Defendants William

F. Burton, Esquire and the Law Firm of Lewis and Tompkins, P.C., (hereinafter collectively

referred to as "Defendants") for Professional Negligence (Counts I and II), Breach of Contract

(Counts III and IV), Wanton and Willful Misconduct (Counts V and VI), Breach of Fiduciary

Duties (Counts VII and VIII) and Fraud (Counts IX and X).  All of those claims depend upon

Plaintiffs establishing their claims of legal malpractice as a result of the failure of the Defendants

to timely file their toxic mold cases against Stanton Glenn Limited Partnership (hereinafter

referred to as the "underlying cases").

By way of background, Plaintiffs' underlying cases allegedly stem from Plaintiffs' supposed residence in Apartment 2A at 3064 Stanton Road, S.E. from August 19, 2002 to September 23, 2002 and indirect exposure to mold, which Plaintiffs have alleged to be toxic. During that approximately thirty-four day residency, Plaintiffs contended that they smelled odors of sewage, although Plaintiffs admit that they had no mold in Apartment 2A.

However, in mid September 2002, in the course of investigating the smell of sewage, Plaintiffs entered into the adjacent apartment, that is, Apartment 1A, through a window without first seeking permission from their landlord. Plaintiffs are not certain how long they remained in Apartment 1A directly exposed to that environment, but believe it may have been a minute or two.

The Complaint alleges that, nearly seven months later, on April 15, 2003, Young was admitted to George Washington University Hospital for asthma exacerbation. Young contends that her hospitalization, as well as other medical problems, is a consequence of the exposure to mold in the apartment. Ghee also claims to have suffered adverse physical ailments as a result of the mold exposure.

Following her April of 2003 hospitalization, Plaintiff Denicole Young retained Defendants on May 3, 2003 to pursue her claims, some eight months after Plaintiffs had moved from Apartment 2A. *See*, Statement of Undisputed Material Fact ("SUMF") at paragraph 11. Plaintiff Vanessa Ghee retained Defendants on January 3, 2004 to pursue her claims. SUMF at 12.

As the underpinnings for all of their claims, Plaintiffs allege that Mr. Burton failed to timely file a lawsuit in the Superior Court of the District of Columbia on their behalf. On May 29, 2007, without attempting to file their underlying cases against their former landlord to see if limitations would be asserted as a defense or waived, Plaintiffs filed their Complaint against

Defendants in this Court. Plaintiffs' Complaint alleges that Defendants' conduct has barred them from receiving relief for medical and financial injuries that they claim to have suffered as a result of their exposure to mold.

Following the close of discovery, Defendants filed a *Daubert*[1] Motion to Exclude the Testimony of Dr. Shoemaker. On June 16, 2008, this Court conducted a hearing on the issue of whether Dr. Shoemaker's opinions were sufficiently grounded in scientifically valid principles and methods to satisfy the standards set by *Daubert* and its progeny.

On July 22, 2008, this Honorable Court issued its Memorandum Opinion and Order (hereinafter referred to as the "Opinion") that granted Defendants' *Daubert* Motion to Exclude the Testimony of Plaintiffs' sole medical expert Dr. Shoemaker. Specifically, this Court concluded that Dr. Shoemaker is unable to give an opinion regarding causation in this case. *See* Opinion at 35. ("Given that Dr. Shoemaker arrives at his opinions as to both general and specific causation based on novel and unaccepted theories and methodologies, Plaintiffs cannot sustain their burden under *Daubert* as to causation."). Based upon the Opinion and based upon the undisputed evidence, Defendants are entitled to summary judgment because Plaintiffs cannot establish that the underlying cases were meritorious and cannot possibly establish that the alleged malpractice was the proximate cause of their alleged injuries.

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, a court may properly grant summary judgment when, considering the pleadings and discovery on file in the case, it clearly appears "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A moving party is entitled to summary judgment where the nonmoving party has failed to meet his burden of producing facts that

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595, 113 S.Ct. 2786, 2798 (1993).

support the essential elements of his case, and any factual assertions contained in affidavits and other evidence in support of the moving party's motion shall be accepted as true unless the facts are controverted by the nonmoving party through affidavit or other documentary evidence. *See Williams v. U.S.*, 932 F. Supp. 354 (D.D.C. 1996). If the court is to deny summary judgment, there must be evidence on which a jury could reasonably find for the nonmoving party. *See Rumore v. Belk*, 907 F. Supp. 487 (D.D.C. 1995). It is plaintiff's burden at this stage to produce facts sufficient to create a jury question as to each element of this claim. As described below, Plaintiffs have failed to sustain their burden.

III.    **LEGAL ARGUMENT**

A.    **Plaintiffs' Claims Fail Because They Had No Viable Toxic Mold Claims**

In order for Plaintiffs to maintain their actions for Professional Negligence (Counts I and II), Breach of Contract (Counts III and IV), Wanton and Willful Misconduct (Counts V and VI), Breach of Fiduciary Duties (Counts VII and VIII) and Fraud (Counts IX and X), they must first demonstrate that the underlying cases were meritorious and that they would have succeeded in obtaining awards of damages "but for" the Defendants' alleged wrongful conduct. *See Niosi v. Aiello*, 69 A.2d 57, 60 (D.C. 1949); *see, Macktal v. Garde*, 111 F. Supp. 2d 18, 21 (D.D.C. 2000); *Smith v. Haden*, 872 F. Supp. 1040, 1053 (D.D.C. 1994), *aff'd*, 314 U.S. App. D.C. 442, 69 F.3d 606 (D.C. Cir. 1995); *Mount v. Baron*, 154 F. Supp. 2d 3, 10 (D.D.C. 2001); *Bigelow v. Knight*, 737 F. Supp 669, 671 (D.D.C. 1990); *McCord v. Bailey*, 204 U.S. App. D.C. 334, 636 F.2d 606, 611-12 (D.C. Cir. 1980) (articulating that attorney's failure to assert defense did not cause client cognizable harm because assertion of the defense would not have altered the ultimate outcome).

4

It is undisputed that Plaintiffs had no viable causes of action. Under the legal standard used by this Court in reviewing actions for legal malpractice, Plaintiffs must establish a *prima facie* claim for professional negligence by demonstrating they had a valid cause of action in the underlying matter. *See Thomas v. Powell*, 247 F.3d 260 (D.C.Cir. 2001). As part of its analysis, the courts must look at a plaintiff's claims regarding the underlying matter and effectively undertake a "trial within a trial" or "case within a case" in order to determine the likely outcome in the underlying action, as this Honorable Court has recognized it its Opinion. *See Jacobsen v. Oliver*, 451 F.Supp.2d 181, 187 (D.D.C. 2006) (citing *Rubens v. Mason,* 387 F.3d 183, 190 (2d Cir. 2004) ("The malpractice judge or jury must decide a 'case within a case' and determine what the result would have been [in the underlying lawsuit] absent the alleged malpractice.") Thus, at the summary judgment stage, the Court will consider all pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, in order to determine what "should have been" at the time of the underlying action for purposes of assessing the attorney's allegedly negligent conduct. *Id.* ("[T]he objective of a trial-within-a-trial is to determine what the result *should have been* (an objective standard)...."). Therefore, under District of Columbia law, a plaintiff's burden to demonstrate causation in the underlying matter is a prerequisite to her claims against the defendant for legal malpractice.

Plaintiffs themselves have no admissible evidence to prove that their illnesses stemmed from their brief 2002 residency in Apartment 2A, and their testimony cannot establish any viable claims. It is undisputed that there was no testing of Plaintiffs' apartment or of Apartment 1A.

Under well-established D.C. law, if Plaintiffs cannot causally relate the attorney's conduct to the damages alleged to have been suffered, then Plaintiffs do not have cases against the Defendants because they have lost nothing by the conduct of their attorneys. *Smith v.*

*Haden,* 872 F.Supp. at 1044; *see Weaver v. Bratt,* 421 F.Supp.2d 25, 42 (D.D.C. 2006) (internal

citations omitted).  In legal malpractice actions, a plaintiff must demonstrate proof that she was

damaged as she claims in her underlying matter, and if she cannot, her current action for

professional malpractice cannot be sustained. In the case of *Macktal v. Garde, supra.,* the

plaintiff brought a legal malpractice action against defendant attorney for improperly settling the

action.  The District Court for the District of Columbia, in dismissing a plaintiff's complaint,

held that the defendant attorney cannot be found to have committed malpractice because the

plaintiff had no cognizable claim in the underlying matter.  111 F. Supp. 2d at 22. ("..., since

plaintiff never had a good cause of action against (defendant), he cannot now sue for malpractice

in the legal representation he sought against (defendant) on that cause of action.").  Similarly, in

*Greenberg v. De Tessieres*, 902 F.2d 1002, 1004 (C.A.D.C. 1990), the United States District

Court of Appeals for the District of Columbia Circuit upheld the lower court's grant of summary

judgment finding that plaintiff did not present a sufficient claim because plaintiff did not

demonstrate the existence of any causal elements between the alleged wrongful conduct and the

claimed damages.  In that case, Mr. Greenberg filed a complaint suing his former investment

advisor seeking compensation for investment losses.  The District Court, in denying his claims

and granting summary judgment for the defendant, found that the plaintiff was "attempting to

regain his investment in a failed enterprise on the fortuitous and coincidental ground that his

investment advisor may have omitted to provide certain details unrelated to the cause of the

investment going sour." *Id.* at 1004.  The District Court held that without a finding of the causal

elements relating the defendant's conduct to the plaintiff's alleged damages, the claim must fail.

*Id.*

With the exclusion of Dr. Shoemaker's speculative and inadmissible testimony as to causation, Plaintiffs have no evidence to demonstrate any causal link between their alleged mold exposure and their various illnesses. Even with Dr. Shoemaker's inadmissible testimony, Plaintiffs chose voluntarily to expose themselves to the environment of Apartment 1A. As this Honorable Court recognized, Plaintiffs have no claim because of their trespass. *See*, Opinion at 20. Although Defendants raised defenses to Plaintiffs' claims based upon contributory negligence and assumption of the risk, Plaintiffs inability to prove legally cognizable injuries bars their claims against the Defendants.

Without any proper expert medical and scientific explanation of the cause, nature and extent of the Plaintiffs' alleged illnesses, Plaintiffs cannot prove that they would have been successful in the underlying cases and they cannot disprove the opinions of Defendants' medical experts that they had not viable claims due to their indirect exposure from living in Apartment 2A. *See, Chase v. Gilbert*, 499 A.2d 1203, 1212 (D.C. 1985)(legal malpractice plaintiff must show that his attorney's negligence resulted in and was the proximate cause of the loss to the client).

Under a similar set of facts to the underlying case, another federal court has ruled that a plaintiff's failure to demonstrate a viable cause of action in a mold case requires dismissal. In *Roche v. Lincoln Property Co*., 175 Fed.Appx. 597, 599, 2006 WL 910241, 1 (4th Cir. 2006)(citation history omitted), the Circuit Court of Appeals for the Fourth Circuit affirmed a District Court's grant of the defendants' motion for summary judgment because Plaintiffs were unable to establish duty, proximate causation, or damages. *Id.* In that matter the plaintiffs filed a Complaint claiming that their apartment, which was managed by defendants, was poorly maintained, that there were water leaks, holes in the wall, and mold growing within the

7

apartment. The Complaint further contended that, as a result of being exposed to toxic levels of mold, they developed respiratory and other ailments. *Id.* The plaintiffs in that matter also proffered the testimony of a "mold" expert to support plaintiffs' claims that the alleged mold exposure caused them to suffer respiratory ailments. *Id.* In response, defendants filed two motions based on their arguments that the plaintiffs had failed to demonstrate causation. Defendants filed a motion to exclude the testimony of plaintiffs' expert on issues relating to proximate cause arguing that under *Daubert* and its progeny the plaintiffs' expert's testimony was inadmissible. Using the *Daubert* standard to review defendants' motion to exclude, the District Court granted the motion and excluded the expert's testimony[2]. Thereafter, defendants filed a motion for summary judgment arguing that the plaintiffs had failed to establish proximate causation between any negligence on defendants' part and their personal injuries. *Roche,* 2006 WL at 7. The Appellate Court, in granting the defendants' motion, found that without their expert's testimony the plaintiffs could not establish that the mold in their apartment was the proximate cause of their alleged respiratory ailments. Accordingly, the Court concluded that the District Court properly held that the defendants were entitled to summary judgment on the plaintiffs' claim for personal injuries resulting from the defendants' negligence. *Id.*

Applying the analysis of the *Roche* court and the reasoning of *Mackal* and *Greenberg,* this Honorable Court should grant the Defendants' Motion for Summary Judgment because Plaintiffs have no admissible evidence that would demonstrate the required showing of causation for the damages claimed for their underlying cases. Because the subject matter of the underlying

---

[2] In granting the defendant's motion, this Court concluded that plaintiffs' expert's testimony lacked a methodology satisfying *Daubert* because: (1) he failed to adhere to the established methodology of differential diagnosis by not ruling in the suspected causes and by not ruling out other possible causes; (2) he failed to establish why various reports and studies showing some correlation between exposure to mold and allergic reactions support his conclusions that the mold in the apartment was the proximate cause of Plaintiffs ailments, and (3) he relied solely on temporal relation to arrive at his conclusions. *Roche v. Lincoln Property Co., supra.*

cases is so distinctly related to science as to beyond the ken of average layman and because of the absence of admissible expert testimony, Plaintiffs' claims against the Defendants are barred since they cannot successfully prosecute their claims and they cannot prove the case within the case requirement.

**B.     Plaintiffs' Legal Expert Does Not Carry Plaintiffs' Expert Burden**

Plaintiffs own legal malpractice expert witness in this matter, Christopher G. Hoge, Esquire, acknowledged that causation and proof of the viability of the underlying cases through expert testimony were required for Plaintiffs to have claims against the Defendants. *See*, SUMF at 2. Mr. Hoge testified at deposition that "[c]ausation is a significant issue in any tort case" and that it is the Plaintiffs' burden to prove the proximate cause of their injury. Exhibit 5, Deposition of C. Hoge at 41-42. As Plaintiffs' legal expert concedes, proving the element of causation is always a "liability issue" and a threshold consideration regarding the value of the case. *Id.* at 43:16 to 44:1. In discussing causation in Plaintiffs' cause of action against Defendants, Mr. Hoge relates the importance of demonstrating a causal link in the underlying matter with the viability of the Plaintiffs' claims in the instant case[3]. At his deposition, Mr. Hoge recognized that a toxicologist would be necessary for Plaintiffs to prove their case. Exhibit 5 at pp. 45, 66-68, 104-105, 143-144. In response to questions about the viability of the Plaintiffs' claim in the absence of a retained medical expert to opine on causation, Mr. Hoge said:

> "[Mr. Maloney] Q:     And you would agree that if the toxicologist in the underlying case, had it been brought, was not allowed to testify for whatever reasons, either a *Frye Reed* or whatever reason . . . that there would not have been a viable claim?
>
> [Mr. Hoge] A:     It certainly would have caused problems with the hypothetical simply because there's obviously one toxicologist [Dr. Shoemaker] who seems to have all the necessary criteria to satisfy a *Frye* or *Daubert* inquiry

---

[3] Interestingly, Mr. Hoge stated that he was generally unfamiliar with the terms "general" and "specific" causation in the context of a toxic mold case. *See* Exhibit 5 at 41:19 to 42:5.

9

who has - - went on the record saying that there is causation. So, yeah, if you didn't have somebody like that, it would be a problem.

[Mr. Maloney] Q:     If . . . (hypothetically), Dr. Shoemaker was, then, not allowed to testify, would that not lead you to conclude that the claim was not viable?

[Mr. Hoge] A:     Well, it certainly would have damaged the case. Assuming that Dr. Shoemaker was the only expert who had been identified now, would the trial court have given the plaintiff an opportunity to find another expert who could satisfy the *Frye Reed* criteria? . . . The judge might have given latitude to the plaintiffs' lawyer to either amend Dr. Shoemaker's testimony or his opinion or to get somebody else, you know, who satisfied the *Frye Reed* criteria. So I'm not saying it's necessarily a death knell, but it certainly wouldn't help."

*Id.* at 104-105. Furthermore, Mr. Hoge equates the value and viability of Plaintiffs' damages in the legal malpractice action as "the loss of their claims against the owner and manager of their apartment building for toxic torts ...." Expert Report of Chris Hoge filed September 19, 2008 at ¶ 7, attached hereto as Exhibit 6. Likewise, Mr. Hoge relates all of Plaintiffs' claims to the "viable and valuable toxic tort claims against the owner and manager of the apartment building." *Id.* at ¶ 6. Mr. Hoge's testimony on causation underscores the importance of plaintiffs' burden to show a good cause of action in the underlying matter. Plaintiffs' incapacity to prove causation in the underlying matter, as Mr. Hoge states, causes considerable "problems" and "damages" for the Plaintiffs' cases. Because this Honorable Court has excluded Dr. Shoemaker's testimony on causation, the value and viability of Plaintiffs' claims has been completely eliminated. Mr. Hoge cannot revive a cause of action for Plaintiffs that had no merit in 2005 and has no merit now even with Dr. Shoemaker's inadmissible testimony.

On the other hand, Defendants' legal expert has analyzed Plaintiffs' need for expert testimony to establish both general and specific causation. *See* Defendants' Expert Designation of Robert F. Redmond, Jr., Esquire (Exhibit 7). Mr. Redmond's report and testimony that he would provide if called as a witness in this case (he was not deposed) underscores the fact that

10

Plaintiffs had no viable underlying case in 2005. *Id.* at 18. He even predicted that Dr. Shoemaker would have been excluded in the underlying case, just as he was herein. *Id.* at 13-14. Now that Dr. Shoemaker has been excluded, the "death knell" alluded to by Plaintiffs' legal expert, Mr. Hoge, becomes the reality of this case. Exhibit 5 at 105. Plaintiffs' lack of expert medical testimony to demonstrate causation or damages destroys the value and viability of the underlying case.

### C.    The Lack of Causation Defeats All of Plaintiffs' Claims

Despite the different titles given to the other eight counts in Plaintiffs' Complaint, they are simply restatements of Plaintiffs' legal malpractice cause of action. That is because each separate count, regardless of what Plaintiffs title it, depends on Plaintiffs' ability to demonstrate the merits of the underlying matter in order to be successful. The very same defect that defeats Plaintiffs' claims for professional negligence - *i.e.,* - lack of admissible evidence to show a causal link in the underlying matter - also defeats the remaining counts. Because Plaintiffs cannot offer any admissible evidence demonstrating they had a good cause of action in the underlying matter, Plaintiffs cannot prove causation or damages described in the other counts of their Complaint, regardless of the Defendants' conduct.

### 1.    The Breach of Contract claims should be dismissed because Plaintiffs have failed to demonstrate that Defendants' conduct was the proximate cause of the damages they claim in their Complaint.

In Counts III and IV, Plaintiffs Young and Ghee each bring a claim of Breach of Contract against Defendants. In the District of Columbia, to establish a breach of contract, a plaintiff must demonstrate that "a contract existed, that plaintiff[s] performed [their] contractual obligations, that defendant[s] breached the contract, and that plaintiff[s] *suffered damages due to the breach.*" *Park v. Arnott,* 1992 WL 184521, 4 (D.D.C.1992) (emphasis added); *see also*

*Osbourne v. Capital City Mortg. Corp.* 727 A.2d 322, 324 (D.C.1999)(*citing Sastry v. Coale,* 585 A.2d 1324, 1328-29 (D.C.1991) (breach of contract claim requires proof of damages).) As with the requirements for professional negligence claims, Plaintiffs' claims for Breach of Contract must rely upon a showing of the causal link between the mold exposure and resulting illness. Plaintiffs cannot accomplish this link and thus, their claims for Breach of Contract must fail.

2.    **The Breach of Fiduciary Duties claims should be dismissed because Plaintiffs have failed to demonstrate that Defendants' conduct was the proximate cause of the damages they claim in their Complaint.**

In Counts VII and VIII of their Complaint, Plaintiffs Young and Ghee each claim that Defendants breached their fiduciary duties owed to them, and in turn, that such breach was the proximate cause of Plaintiffs' damages. In the absence of proof of resulting harm, and in this case the lack of a viable underlying case, a breach of fiduciary duty does not give rise to a cause of action for damages. *Herbin v. Hoeffel,* 806 A.2d 186, 195 (D.C. 2002)("In most cases a claim for legal malpractice (or what amounts to the same thing on the facts of this case, breach of a lawyer's fiduciary duty to a client) is directly connected to the aim of the attorney-client relationship-and thus of the lawyer's duty-to preserve the client's legal interests.") It is fundamental that a professional negligence action cannot be sustained without proof of damages, whether the action is framed as legal malpractice, breach of contract or a breach of fiduciary duty claim. In this context, the Plaintiffs must show that it was the natural and continual sequence of events flowing from an act or omission of the Defendants, "unbroken by any intervening cause," that produced their alleged injuries. *See e.g., McGettigan v. National Bank of Washington,* 320 F.2d 703 (C.A.D.C. 1963)( "The ultimate question is whether defendant can fairly be said to be responsible for the injuries complained of."). As the Restatement (Second) of Torts § 430

comment a (1965) explains, "The conditions which are necessary to make the act negligent in respect to the harm of which the other complains [include] ... subjecting the other *to the hazard from which the harm results.*" *Id.* (emphasis added).

In this case, Plaintiffs cannot prove damages for breach of fiduciary duties without first demonstrating a direct relationship between the alleged breach and the Plaintiffs' damages. Because Plaintiffs Young and Ghee cannot demonstrate a causal relationship between the damages they claim to have suffered (the self-defined "mold related illness") and the substance that they claim to being exposed (currently unknown), they cannot maintain their actions for Counts VII and VIII (Breach of Fiduciary Duty) and they should be dismissed as a matter of law.

3.     **The Willful and Wanton Conduct claims should be dismissed because Plaintiffs have failed to demonstrate that Defendants' conduct was the proximate cause of the damages they claim in their Complaint.**

In Counts V and VI of their Complaint, Young and Ghee each bring claims for "wanton and willful misconduct and reckless and conscious disregard for their rights". These two Counts add nothing more than a request for punitive damages to a lawsuit that cannot demonstrate any damages as a matter of law. The only substantive change between Counts V and VI and the other counts are prayers for punitive damages against Defendants in the latter counts.

Given the current case law of this jurisdiction regarding legal malpractice claims, Plaintiffs are barred from recovery under these two Counts. Despite Plaintiffs' characterization of Defendants' conduct as "willful and wanton", the law of this jurisdiction will not find an actor liable to another where causation or damages in the underlying matter have not been proven. In *Niosi v. Aiello*, 69 A.2d 57 (1949), the D.C. Court of Appeals found:

> The rule to be applied in a case where an attorney is accused of negligence in the conduct of litigation is that such attorney is not liable for negligence if, notwithstanding the negligence, the client had no cause of action or meritorious defense as the case may be; or that if conduct of an attorney with respect to

litigation results in no damage to his client the attorney is not liable. Unless a party has a good cause of action against the party proposed to be sued, the first party loses nothing by the conduct of his attorney even though the latter were guilty of gross negligence.

*Id.* at 60.   Clearly, Plaintiffs' hyperbolic allegations of Defendants' "willful and wanton" behavior, the elements of a gross negligence claim, are nonetheless insufficient to override this jurisdiction's requirement that a plaintiff must demonstrate "a good cause of action" in the underlying matter before recovery will be allowed.  Because Plaintiffs are unable to demonstrate that they had a meritorious underlying case, Defendants' conduct is not up for review.  It follows that Plaintiffs cannot obtain any award for Defendants' alleged breach of standard of care even if it amounted to "willful and wanton" conduct. For the same reasons discussed with regard to Counts I through IV, and VII and VIII, these claims must also fail as a matter of law.

### 4.    The Fraud claims should be dismissed because Plaintiffs have failed to demonstrate that Defendants' conduct was the proximate cause of the damages they claim in their Complaint.

In Counts IX and X of their Complaint, Plaintiffs file claims alleging Defendants' fraudulent conduct.  As with all the counts, Plaintiffs cannot demonstrate a causal relationship between the damages they claim to have suffered and the substance they claim to have been exposed in the underlying case, they cannot maintain their causes of action in the present Complaint.  As such, these counts should be dismissed.

D.C. courts have dismissed fraud claims in situations where a plaintiff cannot support a finding of causation.  In *Greenberg v. De Tessieres, supra*, the Circuit Court of Appeals denied plaintiff's claim for fraud because it found that he "did not present a sufficient claim, recognizing that he never demonstrated causation. Even assuming that all other elements of a cause of action for fraud were present, a material omission is only actionable where the harm suffered by the plaintiff resulted naturally from the defendant's omission." *Id.* at 1004.  The Court found that the

plaintiff in that case could not prevail on the claim that the causal element of his investment going bad was related to defendant's omission or the information plaintiff did not possess. The Court went on to find that "a cause of action for fraud exists not to compensate for all omissions or misrepresentations, but only those leading to the loss ultimately suffered, and no such nexus exists here. Summary judgment was proper." *Id.*

As with the plaintiff in *Greenberg*, Plaintiffs in this matter cannot demonstrate any causal relationship between the alleged conduct of Defendants with any damages they are claiming to have suffered. For these reasons, Plaintiffs' claims for fraud against Defendants should be dismissed as a matter of law.

## V.    CONCLUSION

The undisputed facts of this case, when viewed in light of the case law discussed above, demonstrates conclusively that Defendants are entitled to judgment as a matter of law. Defendants are entitled to judgment because Plaintiffs' sole medical causation expert, Dr. Ritchie Shoemaker, has been excluded from providing testimony in this case. Without testimony from a medical expert that exposure to mold in 2002 caused Plaintiffs' alleged injuries, Plaintiffs cannot prevail in this legal malpractice case in which they contend that their attorneys missed the statute of limitations in filing a mold case on their behalf. The absence of viable underlying cases precludes the Plaintiffs' recovery and claims against their former lawyers. For all of the above reasons, Defendants respectfully request this Honorable Court grant this Motion for Summary Judgment and dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

CARR MALONEY P.C.                        JORDAN, COYNE & SAVITS, L.L.P.


By:  /s/ Paul J. Maloney                By:  /s/ Deborah Murrell Whelihan
     Paul J. Maloney #362533                 Deborah Murrell Whelihan #412454
     Ali Beydoun #475413                     1100 Connecticut Avenue, N.W.
     1615 L Street, N.W., Suite 500          Suite 600
     Washington, DC 20036                    Washington, DC 20036
     (202) 310-5500 (Telephone)              (202) 296-4747 (Telephone)
     (202) 310-5555 (Facsimile)              (202) 496-2800 (Facsimile)
     Attorneys for Defendant                 Attorneys for Defendant
     Lewis & Tompkins, P.C.                  William F. Burton, Esquire

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

DENICOLE YOUNG and
VANESSA GHEE,                                         :
                                                     :
                  Plaintiffs,                        :
                                                     :
         v.                                          :    Case No.: 1:07cv983 (ESH)
                                                     :
LEWIS & TOMPKINS, P.C, et al.,                       :
                                                     :
                  Defendants.                        :

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

1.      Plaintiffs Denicole Young and Vanessa Ghee moved to Apartment 2A at 3064 Stanton Road, S.E. on or about August 19, 2002. *See*, Complaint, ¶8.

2.      Plaintiffs Young and Ghee resided in Apartment 2A for approximately 34 days or until September 23, 2002. *See*, Exhibit 1, excerpts from the deposition transcript of Vanessa Ghee, which is attached hereto as Exhibit 1 and incorporated by reference, at pp. 15, 141-143.

3.      In Young's and Ghee's apartment, Apartment 2A, Plaintiffs' only noticed a sewage smell. *See*, excerpts from the deposition transcript of Denicole Young dated October 31, 2007 (Volume I) which is attached here to Exhibit 2, at p. 204; *see also*, excerpts from the deposition transcript of Denicole Young dated December 5, 2007 (Volume 2), which are attached hereto as Exhibit 3 and incorporated by reference, at pp. 251-253. After moving into Apartment 2A, Plaintiff Ghee noticed a faint smell of sewage after they moved in. Exhibit 1 at pp. 159-160. Plaintiff Young did not smell mold in Apartment 2A. *Id.*

4.      Plaintiffs did not see mold in Apartment 2A. Exhibit 1 at p. 189; Exhibit 3 at pp. 251-253.

5.	Plaintiffs ultimately learned from a neighbor or about September 12, 2007 that the sewage smell was coming from the adjacent apartment, Apartment 1A.  Exhibit 1 at pp. 288-289; Exhibit 3 at p. 251.

6.	In September 2002, in the course of investigating the smell of sewage, Plaintiffs Young and Ghee entered Apartment 1A through a window and took photographs and a videotape of Apartment 1A.  Exhibit 2 at pp. 175-178; Exhibit 1, 92-94.

7.	Plaintiffs Young and Ghee are not certain how long they remained in Apartment 1A, but believe it may have been a minute or two.  Plaintiffs remained in Apartment 1A to take pictures and to make a videotape of the apartment.  Exhibit 2 at pp. 175-180 and Exhibit 3 at 254.

8.	When Plaintiffs Young and Ghee moved into Apartment 2A, the air conditioner was not working, and, if it was hot, they opened the windows.  Exhibit 2 at 181-182, 196.  Plaintiffs do not believe that Apartment 1A and 2A shared a common air source during the time they lived in Apartment 2A.  Exhibit 1, pp. 452-453.

9.	When Young and Ghee moved to another apartment in another building, Apartment 101, they acknowledge that there was no mold in that building or their apartment.  Exhibit 2 at p. 203.

10.	It is undisputed that Plaintiffs received medical treatment after living in Apartment 2A and it is undisputed that Plaintiffs received medical treatment on September 6, 2002 and on September 13, 2002.  *See*, Defendants' Exhibit 4 [Ghee's medical records] and Exhibit 5 [Young's medical records] which were attached and filed with their February 15, 2008 Memorandum of Points and Authorities in support of their Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker (which Defendants have not re-filed with this Motion but upon which these facts derive their support).  See also, Plaintiffs Exhibit 11 [Ghee's medical records] and

MSJ Undisputed Facts.doc

Exhibit 12 [Young's medical records] which were filed with their Opposition to Defendants'

Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker.  On April 15,

2003, Young was admitted to GWUH for asthma exacerbation.  Part of Plaintiff Young's medical

history included past history of asthma, and known triggers for her asthma were identified as pollen

and URI (upper respiratory infection).  *See*, Defendants' Exhibit 5 (at Bates Label Y/G 672-674,

726, 727) and Plaintiffs' Exhibit 12.

      11.    Plaintiff Young retained Defendants William F. Burton, Esquire and Lewis and

Tompkins, P.C. on May 3, 2003 to prosecute her premises liability claim from her against her

landlord.  *See*, Complaint at 5, paragraph 19; Exhibit 3 at pp. 319-321, 326-328, Exhibit 1 at pp.

99, 205-206).

      12.    Plaintiff Vanessa Ghee retained Defendants William F. Burton, Esquire and

Lewis and Tompkins, P.C. on January 3, 2004 to prosecute her premises liability claim against

her landlord.  See, Complaint at 5, paragraph 20; Exhibit 1 at 100; Exhibit 2 at 205-206; Exhibit

3 at 331-332.

      13.    As far as Plaintiffs know, no other tenant hired a lawyer or filed a lawsuit because

of the raw sewage or mold at Stanton Glenn apartments.  Exhibit 3 at 348.

      14.    There was no environmental testing done of the Plaintiffs' apartment, Apartment

2A.  There was no environmental testing done of Apartment 1A.

      15    Plaintiff's sole medical expert, Dr. Ritchie Shoemaker testified that the Plaintiffs'

problem with mold was not something found in their Apartment 2A, but rather the adjacent

apartment.  *See*, Exhibit 4, which are excerpts from the deposition transcript of Dr. Ritchie

Shoemaker Deposition and which are incorporated herein by reference, at pp. 68-69.

16.     Dr. Shoemaker admitted that he does not know the type of mold in the adjacent apartment, he does not know how long Young or Ghee were in that apartment next door, and he does not know if Young or Ghee were exposed to mold in an airborne fashion while in their own apartment.  Exhibit 4 at p. 72 and pp. 203-206.

17.     Dr. Shoemaker admitted that he cannot express an opinion that the alleged mold exposure seven months earlier caused Young's asthma attack in April, 2003.  Exhibit 4 at pp. 174-180.

18.     Dr. Shoemaker admitted that he cannot identify the cause of Young's April 2003 hospitalization.  *Id.*

19.     Dr. Shoemaker admitted that he cannot say whether Young's condition in March/April 2003 was due to pollen, infection, or exposure to mold in a different building.  Exhibit 4 at pp. 177-178).

20.     Dr. Shoemaker cannot say whether Young had allergic asthma in April 2003 because he does not have contemporaneous data such as a blood sample that would have shown what her C-4A was at that time.  (*Id.* at pp.  179-180).

21.     Dr. Shoemaker admitted at the Daubert hearing that he could not quantify what effect Plaintiffs' trespass into Apartment 1A had upon their respective conditions.  Transcript of Daubert Hearing at 242:2-5.  Dr. Shoemaker conceded in his deposition that the Plaintiffs' direct exposure by their trespass was more of a risk to Plaintiffs.  Exhibit 4 at 194-195.

22.     When Plaintiffs could have timely filed their lawsuits, that is 2002 to 2005; Dr. Shoemaker was still working upon and developing his mold theories.  Dr. Shoemaker did not publish Mold Warriors until 2005.  Dr. Shoemaker's three "peer reviewed" papers (Plaintiffs'

Exhibit 16 to their Opposition to Defendants' Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker.) did not exist until 2005-2006.

23.     Plaintiffs have no medical expert to attribute any of their medical treatment to their alleged indirect exposure to mold from living in Apartment 2A, including Plaintiff Young's April of 2003 hospitalization.  In contrast, Defendants have three medical experts, all of whom have opined that there is no causality between Plaintiffs' medical treatment and their alleged indirect exposure to mold from living in Apartment 2A.  *See*, Defendants' Rule 26(a)(2) Disclosure Statement and Exhibits B, C, J, and N, which reports are incorporated by reference herein; *see also*, Exhibits 19 (Affidavit of Defendants' toxicology expert, Scott D. Phillips, M.D.,  and 20 (Affidavit of Defendants' internist, allergist, pulmonologist, and immunologist, S. Michael Phillips, M.D.) attached to their March 13, 2008 Reply to Plaintiffs' Motion in Opposition to Defendants' Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker.

24.     Plaintiffs' legal expert, Christopher G. Hoge, Esquire testified at his deposition that he is a "relative novice to toxic mold cases. *See*, deposition of Christopher G. Hoge dated November 7, 2007, which is attached hereto and incorporated by reference as Exhibit 5, at p. 37. Mr. Hoge noted, among other things, that such a claim requires having evidence of the length of exposure to the toxicity, of the toxic materials, the degree of intensity of the toxic materials analyzed by an expert.  Exhibit 5 at 38, 65-67.  As Mr. Hoge observed, "[c]ausation is a significant issue in any tort case" and that it is the Plaintiffs' burden to prove the proximate cause of their injury as "causation is a liability issue."  Exhibit 5 at pp. 41-43, 144-151.  Furthermore, Mr. Hoge equated the value and viability of Plaintiffs' damages in the legal malpractice action as "the loss of their claims against the owner and manager of their apartment building for toxic torts ...."  *See*, Expert Report of Chris Hoge filed September 19, 2008 at ¶ 7, attached hereto as

5

Exhibit 6.  Plaintiffs' legal expert recognized that Plaintiffs' underlying cases required expert medical testimony to be successful, such as a toxicologist.  Exhibit 5 at pp. 45, 70.  In rendering his opinions, Mr. Hoge understood that Dr. Shoemaker was a toxicologist.  Exhibit 5 at 57.  Mr. Hoge acknowledged that Dr. Shoemaker's testimony was critical to causation because of the case-within a case requirement.  Exhibit 5 at pp. 66-68, 104-105, 143-144.

        25.    Like Mr. Hoge, Defendants' toxic tort legal expert, Robert F. Redmond, Jr., Esquire, also recognized that causation was the crucial element which the Plaintiffs would have to prove to succeed in their claims.  Mr. Redmond has opined that the case within the case would not survive summary judgment because of the lack of causation that could be proven by Dr. Shoemaker's inadmissible opinions.  *See*, Federal Rule of Civil Procedure 26(a)(2)(B) Report of Robert F. Redmond, Jr., which is attached hereto as Exhibit 7 and incorporated by reference.

<div align="center">Respectfully submitted,</div>

CARR MALONEY P.C.                      JORDAN, COYNE & SAVITS, L.L.P.


By:    /s/ Paul J. Maloney            By:    /s/ Deborah Murrell Whelihan
       Paul J. Maloney #362533               Deborah Murrell Whelihan #412454
       Ali Beydoun #475413                    1100 Connecticut Avenue, N.W.
       1615 L Street, N.W., Suite 500         Suite 600
       Washington, DC  20036                  Washington, DC  20036
       (202) 310-5500 (Telephone)             (202) 296-4747 (Telephone)
       (202) 310-5555 (Facsimile)             (202) 496-2800 (Facsimile)
       Attorneys for Defendant                Attorneys for Defendant
       Lewis & Tompkins, P.C.                 William F. Burton, Esquire

1 (Pages 1 to 4)



**Page 1**

1　IN THE UNITED STATES DISTRICT COURT
2　FOR THE DISTRICT OF COLUMBIA
3　Civil Division
4
5　* * * * * * * *
6　DENICOLE YOUNG and　　*
7　VANESSA GHEE　　　　　*
8　　　　Plaintiffs　　*
9　　　VS.　　　　　* CA NO. 07CV983
10　WILLIAM F. BURTON, ESQUIRE　*
11　and　　　　　　*
12　LEWIS & TOMPKINS, P.C.　*
13　　　　Defendants　*
14　* * * * * * * *
15
16　VIDEOTAPED DEPOSITION OF VANESSA GHEE
17　Washington, D.C.
18　Tuesday, October 30, 2007
19　10:10 a.m.
20　Job No. 1-113825
21　Pages 1 - 393
22　Reported by: Leslie L. Schneider

**Page 2**

1　　The videotaped deposition of Vanessa Ghee was held
2　at the law offices of:
3
4　　Carr Maloney, P.C.
5　　1615 L Street, N.W.
6　　Suite 500
7　　Washington, D.C. 20036
8
9
10
11
12
13　Pursuant to notice, before Leslie L. Schneider,
14　a Notary Public in and for the District of Columbia.
15
16
17
18
19
20
21
22

**Page 3**

1　A-P-P-E-A-R-A-N-C-E-S
2
3　ON BEHALF OF THE PLAINTIFFS:
4
5　Michael Hibey, Esquire
6　Bode & Grenier, L.L.P.
7　1150 Connecticut Avenue, N.W.
8　Ninth Floor
9　Washington, D.C. 20036-4192
10　(202) 828-4100
11
12　ON BEHALF OF DEFENDANT LEWIS & TOMPKINS, P.C.:
13　Paul J. Maloney, Esquire
14　Carr Maloney, P.C.
15　1615 L Street, N.W.
16　Suite 500
17　Washington, D.C. 20036
18　(202) 310-5500
19
20
21
22

**Page 4**

1　ON BEHALF OF DEFENDANT WILLIAM F. BURTON, ESQ.:
2　Deborah Murrell Whelihan, Esquire
3　Jordan Coyne & Savits, L.L.P.
4　1100 Connecticut Avenue, N.W.
5　Washington, D.C. 20036
6　(202) 496-4747
7
8
9　ALSO PRESENT: Ms. Young and Mr. Burton
10　Scott Pickering, Videographer
11
12
13
14
15
16
17
18
19
20
21
22

**EXHIBIT**

tabbies

**1**



VIDEOTAPED DEPOSITION OF VANESSA GHEE
CONDUCTED ON TUESDAY, OCTOBER 30, 2007

2 (Pages 5 to 8)

5

C O N T E N T S

Witness                                        Page
VANESSA GHEE
    Examination by Mr. Maloney              7
    Examination by Ms. Whelihan           216

            *    *    *

Exhibits                                       Page
1   Stanton Glenn Lease Agreement       · 141
2   Stanton Glenn Lease Agreement         174
3   Lease Agreement                       179
4   G.W. Hospital Medical Records         182
5   G.W. Hospital Medical Record, 9/13/02  187
6   G.W. Hospital Medical Record, 1/10/04  189
7   G.W. Hospital Medical Record, 9/24/04  193
8   Report of Dr. Carregal                195
9   Document                              202
10  Retainer Agreement                    204
11  Complaint                             206
12  Letter to Mr. Burton                  335

Note: Exhibits marked and retained by counsel.

6

P-R-O-C-E-E-D-I-N-G-S
        - - - - - - - - - -
        THE VIDEOGRAPHER: Here begins videotape
number one in the deposition of Vanessa Ghee in the
matter of Denicole Young and Vanessa Ghee versus
William F. Burton, Esquire and Lewis & Tompkins, P.C.
to be heard in the United States District for the
District of Columbia, civil division, civil action
07-CV-983.
        Today's date is October, 30, 2007. The
time on the video monitor is now 10:10 a.m. The
video operator is Scott Pickering. This video
deposition is taking place at Carr Maloney at 1615 L
Street, northwest, suite 500, Washington, D.C.
        Counsel please identify yourselves and
state whom you represent.
        MR. MALONEY: My name is Paul Maloney and
I represent Lewis & Tompkins, P.C. in this matter.
        MS. WHELIHAN: My name is Deborah Murrell
Whelihan and I represent William F. Burton.
        MR. HIBEY: Michael Hibey here
representing the plaintiffs Denicole Young and



7

Vanessa Ghee.
        MR. MALONEY: And just for the record, I
think we should reflect that Denicole Young is
present today as is Mr. Burton.
        THE VIDEOGRAPHER: The court reporter
today is Leslie Schneider of L.A.D. Reporting. Will
the reporter please swear in the witness.
        - - - - - - - -
        Thereupon,
        VANESSA GHEE,
        the Plaintiff herein, called for examination
by counsel for the Defendants, and, after having been
duly sworn by the notary, was examined and testified
as follows:
        EXAMINATION BY COUNSEL FOR DEFENDANT LEWIS &
                TOMPKINS, P.C.
BY MR. MALONEY:
        Q  Ms. Ghee, my name is Paul Maloney and I
represent the law firm of Lewis & Tompkins in this
matter.  Have you ever been deposed previously?
        A  No.
        Q  Let me go through a few of the ground

8

rules here. I'm sure counsel has reviewed them with
you. But my intent is to ask a number of questions
today and I'll probably show you some documents in
awhile. If at any time you don't understand a
question I ask, I would ask that you please stop me
and ask me to rephrase it, otherwise I will assume
that you understand the question that I'm asking. Is
that clear?
        A  Yes.
        Q  All right. I would also ask that you
respond to questions orally as opposed to with a nod
of your head, yes or no, so that the court reporter
can transcribe everything. Is that agreeable?
        A  Yes.
        Q  If you want to take a break at any time,
please don't hesitate to do so, the only thing I
would ask you is that if there's a question pending,
I would not want you to take a break and consult with
counsel, but other than that, if you want to take a
break at any time, just let me know. Is that
understood?
        A  Yes.

VIDEOTAPED DEPOSITION OF VANESSA GHEE
CONDUCTED ON TUESDAY, OCTOBER 30, 2007

4 (Pages 13 to 16)



**Page 13**

1    A   Yes.
2    Q   Do you know were they live or work?
3    A   Yes.
4    Q   Can you tell me for both?
5    A   I don't know the exact address.
6    Q   Where does Kameco Blake work?
7    A   She works in McLean, Virginia, Reese,
8    Blum and Diaz.
9    Q   I'm sorry?
10   A   Reese, Blum and Diaz.
11   Q   That's a law firm?
12   A   Yes.
13   Q   In what capacity does she work there?
14   A   She's a paralegal.
15   Q   Where does she live?
16   A   She lives in Temple Hills, Maryland.
17   Q   Where does Erica Joyner work?
18   A   I don't know the exact location but she
19   works for the government.
20   Q   She works for the government?
21   A   Yes.
22   Q   Do you know what agency?

**Page 14**

1    A   I do not recall.
2    Q   Do you know where she lives?
3    A   She lives in Maryland.
4    Q   Do you know where in Maryland?
5    A   I do not.
6    Q   Do you have phone numbers for each of
7    those two?
8    A   Yes.
9    Q   And do you have those with you today?
10   A   Yes.
11   Q   Okay. I'll ask that you check on a break
12   and give me those numbers if you could, please. Are
13   they in your phone?
14   A   Yes.
15   Q   Are both of them friends of yours?
16   A   Yes.
17   Q   Do you see them on a regular basis?
18   A   No.
19   Q   Okay. When was the last time you saw
20   each of them?
21   A   I saw Kameco earlier this month.  I
22   haven't seen Erica in, it's been some time, it's been

**Page 15**

1    a few months.
2    Q   And I take it they are social friends,
3    it's not a business relationship of any type?
4    A   Correct.
5    Q   Okay.  Now, you lived at 3064, apartment
6    2A for a period of approximately five or six weeks,
7    and from my review of the records, it looks like you
8    moved to 3084, number 101 on or about October 1 of
9    2002.  Does that sound about right?
10   A   Yes.
11   Q   Did you live in the apartment at 3064,
12   number 2A the entire time, and by that I mean did you
13   stay there every night or were there some times when
14   you did not live there?
15   A   Did I live there the entire time, yes.
16   Q   So did you stay there every night, for
17   example?
18   A   Yes.
19   Q   So from the time you first moved into
20   3064, apartment 2A, you stayed there every night
21   until you moved to apartment 3084, number 101, is
22   that correct?

**Page 16**

1    A   Yes.
2    Q   To your knowledge, did Ms. Young stay at
3    that apartment each night?
4    A   Yes.
5    Q   And by way of example, I understand that
6    you and Ms. Young were not feeling well.  At any time
7    did you and she decide we're not going to stay at
8    this apartment because we're not feeling well, we're
9    going to go stay somewhere else?
10   A   Can you repeat your question, please.
11   Q   Sure.  My understanding is that you and
12   Ms. Young were not feeling well for at least part of
13   the time and maybe the entire time that you were
14   living at 3064, number 2A.  For any of those days or
15   nights did you decide that we were not going to be in
16   the apartment, we're going to go stay someplace else,
17   either at a hotel or with friends?
18   A   I'm sorry, can you re-word your question,
19   please.
20   Q   Sure.  All I'm trying to get to is you've
21   told me that you stayed there the entire time after
22   you moved in.  Was there any time that you decided



VIDEOTAPED DEPOSITION OF VANESSA GHEE
CONDUCTED ON TUESDAY, OCTOBER 30, 2007

23 (Pages 89 to 92)



**89**

1  Q  Does she still live there?

2  A  I don't know.

3  Q  Where did you see her?

4  A  In Pentagon City.

5  Q  Did you talk to her about -- when was it

6  you saw her?

7  A  About a year and a half ago.

8  Q  Did you talk to her about the apartments

9  or the condition of the apartments or anything at

10  that time?

11  A  Yeah, I asked her how she was doing and

12  how her children were doing.

13  Q  What did she say?

14  A  She stated that she was still there and

15  it was getting worse over there.

16  Q  Is there anyone else that you've seen

17  since you left, since you left those apartments?

18  A  No.

19  Q  Have you talked to anyone from the

20  apartments since you left there other than

21  Ms. Johnson?

22  A  No.

**90**

1  Q  Do you know the names of anyone else that

2  may have been affected by mold that lived in the

3  apartments?

4  A  Besides Gwen Johnson, Shawn Gilkes, last

5  name G-i-l-k-e-s.

6  Q  I'm sorry, would you spell that again?

7  A  G as in George -- i-l as in Larry, k-e-s.

8  Q  First name Shawn?

9  A  Yes.

10  Q  Do you know if he still lives at the

11  apartments?

12  A  It's a female and I'm not sure if she

13  still lives there.

14  Q  What problems did she have?

15  A  Her daughter suffered from a lot of

16  respiratory illnesses.

17  Q  All right.  Anyone else?

18  A  Not that I can remember off-hand.

19  Q  Which apartment building did Shawn live

20  in?

21  A  Shawn lived in 3064, apartment 101.

22  Q  How about Gwen?



**91**

1  A  Gwen lived -- I don't remember her

2  address but she lived across the parking lot from

3  where we lived.

4  Q  Now, tell me when you first talked to

5  Mr. Burton about a potential for a claim.

6  A  When I first spoke to him, it had to be

7  in '03.  We mentioned that there was a smell and a

8  sewage back-up and mold in the apartment next door to

9  where we lived and asked if he would be interested in

10  taking the case.

11  Q  All right.  Who was present at that time?

12  First of all, was that over the phone or was that in

13  person?

14  A  Well, actually Denicole spoke to him

15  first.

16  Q  Do you know when she first spoke to him

17  about a potential claim?

18  A  It had to be in '03 sometime, late '02,

19  '03.

20  Q  Possibly '02?

21  A  Possibly '02.

22  Q  Did she tell you she was speaking to him

**92**

1  about potentially making a claim?

2  A  Yes.

3  Q  What did she tell you?

4  A  She stated that she spoke to Mr. Burton

5  regarding the claim and asked him if he would be

6  interested.

7  Q  What was his response?

8  A  Yes.

9  Q  Do you know where Mr. Burton was working

10  at the time?

11  A  He had an office in Virginia.

12  Q  What, if anything, did he do in

13  follow-up, if you know?

14  A  Had several conversations with Ms. Young.

15  Q  All right.  And what did she do, if

16  anything?

17  A  I believe she just told him about the --

18  what the apartment looked like, provided him with

19  some pictures of the apartment.

20  Q  Who took those pictures, by the way?

21  A  I did.

22  Q  Okay.  Did you actually get inside the



apartment?
A **Yes, I did.**
Q And how did you get inside?
A **I climbed through a window.**
Q You climbed through a window?
A **Yes, I did.**
Q It was an open window?
A **Yes, it was.**
Q Do you remember what the date was that you took the pictures?
A **No, I do not.**
Q Was it while you were still living next door?
A **Yes.**
Q Was Ms. Young with you?
A **Yes.**
Q So she was in the apartment also?
A **Yes.**
Q Anyone else?
A **No.**
Q Just the two of you?
A **Yes.**

Q And did the pictures that we have, are they all the photos that were taken at that time?
A **Yes.**
Q Okay. Do you know if those photos were shown to Mr. Burton?
A **Yes.**
Q Do you know when they were shown to him?
A **I don't remember exactly when.**
Q All right. When -- let me ask it this way, did you personally ever talk to Mr. Burton about handling a case for you?
A **Yes.**
Q And when was that?
A **When the car was stolen.**
Q I'm sorry, let me rephrase. Did you ever personally talk to Mr. Burton about handling a mold case for you?
A **Yes.**
Q And when was that?
A **That was in '03 at some time.**
Q Okay. Was that a meeting in person or was that over the phone?

A **In person.**
Q Where did that meeting take place?
A **It took place at my home, 3084, apartment 101.**
Q Who else was present?
A **Ms. Young.**
Q Anyone else?
A **No.**
Q Did anyone come with Mr. Burton?
A **No.**
Q How long did that meeting last?
A **A couple of hours maybe.**
Q Do you -- did you make any notes at that meeting?
A **I'm sure that I did, yes.**
Q Do you still have those notes?
A **Yes, I should, yes.**
Q Do you know if they have been produced in this litigation?
A **I'm not sure.**
Q Where are those notes?
A **I would have them at home.**

Q Okay. Tell me what you said and what Mr. Burton said at that time.
A **You know, can I go back. I think initially when Mr. Burton came to our home, we had some other neighbors at the house also --**
Q All right.
A **-- that we had a meeting with.**
Q All right. Was that -- was that a separate meeting from the one in '03 that you just described?
A **I think that was the same meeting.**
Q Same meeting?
A **Yeah.**
Q Do you remember who any of those other neighbors were that were present?
A **Ms. Johnson, Gwen Johnson was there.**
Q Anyone else?
A **There were a couple of other neighbors that I don't remember the names.**
Q Was it in your apartment?
A **Yes, it was.**
Q Okay. And that's the meeting that lasted

97

1  for two or three hours?
2      A  Yes.
3      Q  And tell me what was said, tell me what
4  the group of tenants said and tell me what Mr. Burton
5  said as best you can remember.
6      A  Well, everybody was complaining about the
7  smells that were in the apartments, showed the
8  pictures to Mr. Burton, it had to be the first time I
9  showed him the pictures, so that was about May 3, I
10  think, of '03.
11      Q  So this was in May of '03?
12      A  It was in May of '03.
13      Q  Do you know an exact date?
14      A  May 3.
15      Q  May 3?
16      A  Yes.
17      Q  And how do you know it was May 3?
18      A  Honestly, that's when I started my locks.
19      Q  That's when you started what?
20      A  My hair, my locks, so I remember it very
21  well.  My hair, that's when I started, yes.
22      Q  Was there any tie-in with the meeting

98

1  with Mr. Burton and starting your locks or was that
2  just happenstance?
3      A  Yeah, just coincidence I guess, that's
4  how I remember it.
5      Q  Okay.  So that was on May 3, '03 that you
6  started your locks?
7      A  Yes.
8      Q  And it was at that same time that you met
9  with Mr. Burton?
10      A  Right, yes.
11      Q  Had you talked to him prior to that time
12  about representing you?
13      A  Representing me?
14      Q  Yes.
15      A  I don't remember.  I think that I did,
16  yes.
17      Q  Now, as of May 3, '03, you were living at
18  3084, number 101, is that right?
19      A  Yes.
20      Q  Did you still have a smell in that
21  building?
22      A  No.

99

1      Q  Okay.  So the complaints of smells dealt
2  with the 3064 building, is that right?
3      A  Yes.
4      Q  Okay.  All right.  What other discussions
5  took place during that meeting?
6      A  Just complaints about the smells, the
7  mold, the illnesses that everyone had, they had the
8  same complaints, respiratory illnesses, repeat sinus
9  infections, bronchitis, things of that nature.
10      Q  All right.  And what did Mr. Burton say?
11      A  He said that he would be able to file a
12  claim on behalf of everyone.
13      Q  And did you have a retainer agreement
14  signed at that time?
15      A  I did not, no.
16      Q  Did Ms. Young?
17      A  Yes.
18      Q  When did she sign a retainer agreement,
19  if you know?
20      A  May 3, '03.
21      Q  So it was on that date?
22      A  Yes.

100

1      Q  Was it at the apartment?
2      A  Yes.
3      Q  How come you didn't sign a retainer
4  agreement that day?
5      A  Because he didn't bring one for me.
6      Q  Okay.  When did you sign a retainer
7  agreement, if you remember?
8      A  January of '04.
9      Q  January of '04?
10      A  Yes.
11      Q  Was he representing you prior to that
12  time for a mold claim?
13      A  No, I had not signed a retainer at that
14  time, so no.
15      Q  And do you know when he started working
16  with the Lewis & Tompkins firm?
17      A  It was around that same time because he
18  shared with us that he just started working for a new
19  law firm, so it had to be in '03.
20      Q  Around May of '03?
21      A  Uh-huh.
22      Q  All right.  So that meeting took place in





141

1  support a contention that that letter was somehow a
2  fraudulent letter?
3      A  I don't know.
4      Q  Do you know of any facts that would
5  suggest that it was not written on or about July 1,
6  2005?
7      A  I don't know.
8      Q  Okay. Let's go through some documents if
9  we could.
10     (Deposition Exhibit Number 1 was marked
11  for identification and retained by counsel.)
12  BY MR. MALONEY:
13     Q  I have this marked as Exhibit Number 1
14  and we'd ask that you take a look at that. I'm
15  sorry, I don't have -- let me see. Here's an extra
16  copy.
17     (Pause for document review.)
18     Q  Let me just make sure that in the lower
19  corner that we're on the same document, that's 1901
20  through 1913?
21     A  Yes, yes.
22     Q  Is that right? Okay. Now, this was a

142

1  document produced in discovery in this case and this
2  is the Stanton Glenn lease agreement that you had
3  dated August 19, 2002. Do you see that?
4      A  Yes.
5      Q  Now, this lease agreement says it's
6  between you and Stanton Glenn apartments. Is there
7  any reason why Ms. Young's name was not on this
8  document, not on this lease?
9      A  Yes.
10     Q  Why is that?
11     A  Because at the time her credit was not
12  the best so we didn't add her to the lease.
13     Q  Why was her credit not the best at that
14  time?
15     A  I do not know.
16     Q  How do you know she had bad credit at the
17  time?
18     A  That's what she stated to me.
19     Q  Okay. All right. Now, this is dated
20  August 19, 2002. Do you know if you actually moved
21  in on that date?
22     A  We moved in the same day that we signed

143

1  the lease agreement.
2      Q  Well, turn to page 912. Is that your
3  signature?
4      A  Yes, it is.
5      Q  And do you know who signed as agent for
6  the landlord?
7      A  Sharon someone. I don't remember her
8  last name.
9      Q  I'm sorry, what's the name?
10     A  Sharon. I don't know the last name.
11     Q  Okay. And was this done in the rental
12  office there at the apartment complex?
13     A  Yes.
14     Q  How many apartments are there in the
15  complex, if you know?
16     A  I don't know.
17     Q  Had you been into the apartment to look
18  at it prior to signing this lease?
19     A  Yes.
20     Q  And when had you gone to the apartment?
21     A  I'm sorry?
22     Q  When had you first gone to the apartment?

144

1      A  When I first looked at it?
2      Q  Yes.
3      A  The day before I believe.
4      Q  So it was on the 18th of August you first
5  went to the apartment?
6      A  I think I looked at the apartment the
7  first day and then I came back and signed the lease
8  agreement.
9      Q  Was Ms. Young with you on the 18th of
10  August when you went to look at the apartment?
11     A  Yes.
12     Q  Okay. So the two of you looked at it
13  together?
14     A  Yes.
15     Q  Approximately how long were you in the
16  apartment on the 18th of August?
17     A  About 15 or 20 minutes, just on a
18  walk-through.
19     Q  All right. Did you or she have any type
20  of reaction to any smells or to the air or anything?
21     A  No.
22     Q  Did you smell anything in the apartment



VIDEOTAPED DEPOSITION OF VANESSA GHEE
CONDUCTED ON TUESDAY, OCTOBER 30, 2007

40 (Pages 157 to 160)

157

1   Q   What year was that approximately?
2   A   My God, it was in my late teens, so.
3   Q   How about Greater Southeast?
4   A   Greater Southeast, I don't remember but I
5   remember my father taking me so I was pretty young.
6   Q   You've only had three then visits to
7   emergency rooms other than to G.W.?
8   A   Right, correct.
9   Q   Okay. And now, tell me what, if any,
10  involvement you had with the owners of the apartment
11  complex based on any complaints that you or Ms. Young
12  had about the apartment, and this is the first
13  apartment we're talking about.
14  A   Met with Mr. Kisha and informed him that
15  there was a smell coming from the unit next door and
16  that we had seen mold in that apartment and requested
17  that we move. He asked if we had been seen by any
18  doctors. We told him yes. He asked that we give him
19  our medical bills and he would pay the medical bills,
20  and said that he would move us.
21      He actually said that we don't belong
22  over there, what are we doing over there. He said I

158

1   see you in your expensive sunglasses. He also
2   offered us some money to put down on a house, like a
3   thousand dollars or so to put down on a house, in
4   addition to paying our medical bills.
5   Q   Well, where did this conversation take
6   place?
7   A   In his office.
8   Q   Why did he tell you you didn't belong
9   over there?
10  A   He said we were too good to live over
11  there.
12  Q   And he offered you a thousand dollars?
13  A   Yes.
14  Q   Was anyone else present when he offered
15  you that amount of money?
16  A   No.
17  Q   Just you or was Ms. Young there also?
18  A   I'm sorry, Ms. Young was also there.
19  Q   Was that in cash that he offered it to
20  you?
21  A   No, he just said it verbally.
22  Q   Okay. When was that meeting with

159

1   Mr. Kisha?
2   A   I don't remember the date.
3   Q   When did you first smell something in the
4   unit -- or I should say when did you first smell it
5   in your unit?
6   A   Maybe a couple days after we moved in
7   there was a faint smell.
8   Q   And then how soon after that did you
9   complain?
10  A   Immediately once we went to the assistant
11  manager's office, her name I cannot remember, and
12  then we met with the property manager.
13  Q   That would be Mr. Kisha?
14  A   No, the property manager was Rita
15  Horsely.
16  Q   I'm sorry, Rita Horsely?
17  A   Yes.
18  Q   What was Mr. Kisha's involvement?
19  A   He was the owner.
20  Q   What did Rita Horsely say?
21  A   She told us they were draining the pool
22  and that's where the smell was coming from, and I

160

1   informed her that that cannot be the smell, and
2   showed her the pictures, and she said, well, what do
3   you want to do, and I told her that we wanted to
4   move, and --
5   Q   All right. Let me stop you here because
6   I'm going to try to get as an exact sequence as I can
7   on the timing that all this took place.
8   A   Okay.
9   Q   You first said that you smelled a smell
10  within a couple of days of moving in, is that
11  correct?
12  A   Yes.
13  Q   You had already told me that you began to
14  have some medical problems about a week after moving
15  in, is that right?
16  A   Yes.
17  Q   Okay. When was it that you first went to
18  see someone about the smells or the medical problems?
19      MR. HIBEY: Objection.
20  A   I don't remember the exact dates.
21  Q   Was it in August or was it September?
22  A   Maybe late August, early September.

VIDEOTAPED DEPOSITION OF VANESSA GHEE
CONDUCTED ON TUESDAY, OCTOBER 30, 2007

189

1  complaints did not improve?

2      A  I don't remember if that was the reason,

3  but I do remember following up.

4      Q  All right.  And then on page 28, there's

5  a reference to -- under patient's history, there's a

6  reference here:  Also noticed mold around windows at

7  home.  Roommate has similar symptoms.

8          Now, was the mold that you noticed, was

9  that the apartment next door or was it actually in

10  your apartment?

11      A  The unit next door.

12      Q  Okay.  There was no mold that you

13  actually saw in your apartment I take it?

14      A  No.

15      Q  Okay.  Let's mark this as Exhibit 6.

16          (Deposition Exhibit Number 6 was marked

17  for identification and retained by counsel.)

18  BY MR. MALONEY:

19      Q  These pages should be page 34 up to page

20  45.  Is that what you have?

21      A  Yes.

22      Q  All right.  And this is George Washington

190

1  University and the date here is 1-10-04.  Do you see

2  that?

3      A  Yes.

4      Q  And do you remember going to the hospital

5  on that date?

6      A  I don't remember but -- I don't remember

7  going, but.

8      Q  On the face sheet, and that's on page 34,

9  it says the address is 3064 Stanton Road, number

10  2A, but in fact you had moved at that point to 3084,

11  number 101, is that correct?

12      MR. HIBEY:  Objection.

13      A  I'm sorry?

14      MR. HIBEY:  It's got two dates on there

15  unless I'm looking at it wrong, or two addresses, I'm

16  sorry.

17      MR. MALONEY:  That's the one that jumped

18  out at me.  If there's another one --

19      MR. HIBEY:  (Indicating.)  There's that

20  and that address --

21      MR. MALONEY:  That's the right one.

22      MR. HIBEY:  -- is incorrect in a few

191

1  ways.

2      MR. MALONEY:  I got you.  Okay.

3  BY MR. MALONEY:

4      Q  In any event, you were -- well, we've

5  gone through the history of where you were living and

6  you were not living at 3064 number 2A as of 1-10-04.

7  We can agree with that, can we not?

8      A  Yes.

9      Q  Okay.  Now, as of this date, this is

10  1-10-04, if you look at page 38, there's a reference

11  here to past medical history at the top of the page.

12  If you see that, it says asthma, and then it has

13  meds.  Is that Advair?

14      A  Yes.

15      Q  And then what's that?

16      A  Singular.

17      Q  Singulair?

18      A  Yes.

19      Q  And who had diagnosed the asthma as of

20  this date?

21      A  I don't remember if it was Dr. Panahy or

22  if it was my doctor at Kaiser.

192

1      Q  All right.  And I don't think we have

2  either one of those records, at least I haven't seen

3  that.  Can you tell me as you sit here today when

4  that diagnosis was first made?

5      A  I don't remember.

6      Q  Can you tell me what year?

7      A  I don't remember.  I'm assuming '03.

8      Q  Okay.  And the complaints that you had at

9  this time were sore throat and right ear pain for two

10  weeks.  It says you were taking throat lozenges and

11  Nyquil and you had a positive cough.  Do you remember

12  having those complaints when you went to George

13  Washington Hospital?

14      A  Yes.

15      Q  And why is it you went to the emergency

16  room as opposed to going to Kaiser?

17      A  I didn't like the care at Kaiser and I

18  think this had woken me.  I don't remember if it woke

19  me up out of my sleep, but the pain was so severe

20  that I needed something as soon as possible.

21      Q  Okay.  If you turn to page 40, it says:

22  Complaint of right ear pain for three days.  She also



205

Q   All right.  Ms. Ghee, let me show you what's marked as Exhibit 10 for purposes of this deposition.  And if you look on page -- it's actually L&T 375 at the bottom, so it's the second page of the document.  Is that your signature?

A   Yes, it is.

Q   And it has a date there of January 3, 2003?

A   Yes.

Q   Do you know if that's when you actually retained Mr. Burton?

A   **It should have been January 3, '04.**

Q   It should have been January 3 of '04?

A   **Yes, it's a new year.**

Q   All right.  If you look on the next page, it has the retainer agreement and that says January 4 of '03, I think.  It's page L&T 376.  So is that also the wrong year?

A   Yes.

Q   Okay.  So the correct date for those two documents should be January 3 of 2004, is that correct?

206

A   Yes, yes.

Q   And if you go one page further, the retainer agreement for Ms. Young is dated April 21 of 2003 at the top of the page.  Do you see that?

A   Yes.

Q   And then at the bottom of the page it's signed May 3, 2003?

A   Yes.

Q   Was that actually signed on May 3, 2003, if you know?

A   Yes.

Q   Okay.  And do you know why yours was then not signed until January 3 of 2004?

A   **Because that's when I came into his office to sign the retainer.**

Q   Had you actually met Mr. Burton face-to-face prior to that time?

A   Yes.

**(Deposition Exhibit Number 11 was marked for identification and retained by counsel.)**

BY MR. MALONEY:

Q   All right.  The last exhibit I have is

207

Exhibit Number 11 which is the Complaint in this case.  Did you review this Complaint before it was filed?

A   Yes.

Q   All right.  I'm going to go through just some of the facts with you and ask you about some dates, and we've been through some of these already, but I want, if I can, to get a clear chronology on when things happened.

If you look at page 3, paragraph 8, it states here that on or about August 19, 2002, and then it goes on to say that you entered into this lease agreement, you took possession, you moved into the unit on or about that date.  As you sit here today, do you know if the date was any different other than August 19 of 2002?

A   No.

Q   Okay.  And then the next paragraph, paragraph 9 says:  In or about late August or early September 2002, plaintiffs were exposed to toxic mold and/or raw sewage.  Now, as you sit here today, can you tell me when that exposure took place, was it

208

late August or was it early September?

A   **Both.**

Q   When was the first exposure?

A   **It had to be sometime in August.**

Q   So instead of saying "or" this should say "and", would you make that correction to this sentence?  In other words, the way that I read this it said that either in August or in September, you were exposed.  Now you're saying it's both.  So is it not accurate the way that it was written here?

A   **I was still living at 3064, apartment 2A, so I was exposed in August and September.**

Q   Okay.  All right.  Number 10, it says: In or about late August or early September of 2002, as a result of their exposure to toxic mold and/or raw sewage, plaintiffs felt sick, nauseous and weak.  Do you know when that was that you first felt sick, nauseous and weak?

A   **In August of '02.**

Q   Okay.  But at least from what I've seen from the medical records, the first time you sought medical treatment was September 6 of '02, is that

VIDEOTAPED DEPOSITION OF VANESSA GHEE
CONDUCTED ON TUESDAY, OCTOBER 30, 2007

72 (Pages 285 to 288)



285

1    A  Strange, no.

2    Q  Okay.  Nothing out of the ordinary
3  compared to other doctor visits you had been to?

4    A  It was different.

5    Q  Okay.  It was different how?

6    A  Just how he comes up with the findings,
7  the tests that he gave, I felt that that was
8  fascinating I guess.

9    Q  Okay.  And why was that?

10   A  Only because I had never thought that
11  these side effects could come from mold, the reason
12  why I was feeling the way that I was feeling could
13  be --

14   Q  So Dr. Shoemaker told you about side
15  effects with mold?

16   A  Yes.

17   Q  Did you take notes when you were with
18  Dr. Shoemaker?

19   A  No.

20   Q  Do you remember what the side effects
21  that Dr. Shoemaker told you about that were
22  attributable in his opinion to mold?

286

1    A  Fatigue, certain muscle aches, something
2  with vision, some other things I don't remember.

3    Q  Well, do you remember what muscle aches
4  he said were attributable to mold exposure?

5    A  I don't remember exactly.

6    Q  Okay.  Did he tell you how your vision
7  could be affected by mold exposure?

8    A  He did but I don't remember how.

9    Q  After your examination by Dr. Shoemaker,
10  did you talk to any other of your health care
11  providers about the Shoemaker examination?

12   A  No.

13   Q  Okay.  What's the medication that
14  Dr. Shoemaker wants you and Ms. Young to take?

15   A  I don't remember the name.

16   Q  Okay.  Is it the same medication?

17   A  He prescribed us the same medication?

18   Q  Correct.

19   A  Yes.

20   Q  Did he tell you what any of the side
21  effects were of the medication he had prescribed?

22   A  I don't remember.

287

1    Q  Okay.  Did you fill the prescription?

2    A  No.

3    Q  Okay.  Did Ms. Young fill the
4  prescription?

5    A  No.

6    Q  Okay.  And why was that?

7    A  Because I hadn't heard of this
8  medication.

9    Q  Did you call up your regular internist,
10  Dr. Panahy, and ask her about the medication?

11   A  No, I have not.

12   Q  Okay.  Why not?

13   A  Just didn't.

14   Q  Okay.

15   A  Can I take a break, please?

16   Q  Fine.

17       THE VIDEOGRAPHER:  We are off the record
18  at 4:32 p.m.

19       THE VIDEOGRAPHER:  Back on the record,
20  the time now is 4:41 p.m.

21  BY MS. WHELIHAN:

22   Q  Was there somebody living in the

288

1  apartment next to you?

2    A  Which apartment?

3    Q  The apartment where the smell was coming
4  from.

5    A  No.

6    Q  Okay.  Did anybody ever move into that
7  apartment?

8    A  I don't know.  Not while I was there.

9    Q  Okay.  Did you ever have a conversation
10  with anybody who lived in that apartment when you
11  were investigating your case, your mold case?

12   A  Lived in which apartment?

13   Q  The apartment where the smell was coming
14  from.

15   A  No.

16   Q  Okay.  Did Mr. Burton tell you that he
17  went to that apartment?

18   A  I don't remember him saying that.

19   Q  Okay.  Why did you go in through the
20  window?

21   A  To look at the mold.

22   Q  Okay.  And why not just use the door?



**289**

1    A  Because I was shown the mold through the
2  window.
3    Q  Who showed you the mold through the
4  window?
5    A  A neighbor.
6    Q  What neighbor was that?
7    A  I believe her name was Shante, I don't
8  remember her last name.
9    Q  Okay.  Well, how did you happen to be
10  with Shante so that she could tell you about the mold
11  in the other apartment?
12    A  We was on the front step of the unit --
13  of the building, and she said I know where the smell
14  is coming from, and that's when she took me around to
15  the back of the apartment and showed me the mold in
16  the unit.
17    Q  Okay.  And was it just that one window on
18  the back?
19    A  Yes, that I can remember, yes.
20    Q  Okay.  And did you go in the apartment
21  through the window when you were with Shante?
22    A  No.

**290**

1    Q  Okay.  How much time elapsed before you
2  went in through the window with the camera?
3    A  I don't remember exactly how much time
4  went by.
5    Q  Was it the same day?
6    A  Yes.
7    Q  Okay.  Do you know whether it was a
8  couple hours later?
9    A  Maybe a little less than an hour.
10    Q  Okay.  Did you own a digital camera in
11  2002?
12    A  No.
13    Q  Okay.  So did you go buy an instant
14  camera?
15    A  Yes.
16    Q  Okay.  Where did you buy it, do you
17  remember?
18    A  I believe CVS on Alabama Avenue.
19    Q  Okay.  Did you go to the leasing office
20  and tell them that you had seen mold through the
21  window?
22    A  I told them that there was mold in that

**291**

1  unit.
2    Q  Okay.  When did you do that?
3    A  When I had the meeting with Rita Horsely.
4    Q  Okay.  Well, between the time you had the
5  meeting with Rita Horsely and the time Shante showed
6  you the mold through the window, did you contact the
7  leasing office about the mold that you had seen
8  through the window?
9    MR. HIBEY:  Objection.
10    A  I don't remember if I had a meeting prior
11  to that.
12    Q  Okay.  Did you ask the leasing office if
13  you could get into the apartment?
14    A  Did I ask them if I could get into the
15  apartment?
16    Q  Right.  Through the door as opposed to
17  climbing in through the window.
18    A  I don't remember.
19    Q  Okay.  Were you the only person that went
20  in through the window?
21    A  No.
22    Q  Who else went with you?

**292**

1    A  Ms. Young.
2    Q  Michele who?
3    A  Ms. Young.
4    Q  Oh, Ms. Young.  You both climbed through
5  the window?
6    A  Yes.
7    Q  Okay.  And you don't remember when that
8  was?
9    A  No.
10    Q  Okay.  Do you still have the negatives?
11    A  Yes, I think I do.
12    Q  Okay.  Are they in the home file that you
13  have?
14    A  Yes.
15    Q  Okay.  And you have copies of the
16  pictures that you took?
17    A  At this time, no.
18    Q  Okay.  Did you give the copies to your
19  attorneys?
20    A  I did not, no.  I believe Ms. Young gave
21  them to the attorney.
22    Q  Okay.  But you just have the negatives?

VIDEOTAPED DEPOSITION OF VANESSA GHEE - VOLUME III
CONDUCTED ON WEDNESDAY, DECEMBER 5 2007

1 (Pages 431 to 434)



431

1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF COLUMBIA
3
4   DENICOLE YOUNG and        *
5   VANESSA GHEE,
6      Plaintiffs,  * Civil Action
7      vs.         * No. 07-CV-00983
8   WILLIAM F. BURTON, ESQUIRE *
9   and LEWIS & TOMPKINS,      *
10  P.C.,               *
11      Defendants.  *
12
13
14     Videotaped Deposition of VANESSA GHEE
15          Washington, D.C.
16     Wednesday, December 5, 2007
17          12:32 p.m.
18
19
20  Job No.: 1-117890
21  Pages 431 - 544, Volume III
22  Reported by: Vicki L. Forman

432

1       Videotaped Deposition of VANESSA GHEE,
2   held at the offices of:
3
4       Carr Maloney, P.C.
5       1615 L Street, Northwest, Suite 500
6       Washington, D.C. 20036
7       (202) 310-5500
8
9
10
11       Pursuant to agreement, before Vicki L.
12  Forman, Court Reporter and Notary Public in and for the
13  District of Columbia.
14
15
16
17
18
19
20
21
22

433

1       A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFFS:
4   MICHAEL HIBEY, ESQUIRE
5   Bode & Grenier, LLP
6   Suite 900
7   1150 Connecticut Avenue, Northwest
8   Washington, D.C. 20036
9   (202) 828-4100
10
11
12
13  ON BEHALF OF THE DEFENDANT BURTON:
14  DEBORAH M. WHELIHAN, ESQUIRE
15  Jordan, Coyne & Savits, LLP
16  Suite 600
17  1100 Connecticut Avenue, Northwest
18  Washington, D.C. 20036
19  (202) 296-4747
20
21
22

434

1   ON BEHALF OF THE DEFENDANT LEWIS & TOMPKINS:
2   ALI A. BEYDOUN, ESQUIRE
3   PAUL J. MALONEY, ESQUIRE
4   Carr Maloney, P.C.
5   Suite 500
6   1615 L Street, Northwest
7   Washington, D.C. 20036
8   (202) 310-5500
9
10
11  ALSO PRESENT: Denicole Young
12       Scott Forman, Videographer
13
14
15
16
17
18
19
20
21
22



VIDEOTAPED DEPOSITION OF VANESSA GHEE - VOLUME III
CONDUCTED ON WEDNESDAY, DECEMBER    2007

6 (Pages 451 to 454)



451

1    Q    Okay.  Do you remember how close in time it
2    was to when you moved into Apartment 101 in building
3    3084?
4    A    I don't remember.
5    Q    You don't remember whether it was several
6    days or several weeks?
7    A    I don't remember.
8    Q    Okay.  Do you remember how long you had been
9    in Apartment 2-A before you saw these two apartments?
10   A    I don't remember the length of time.
11   Q    At all?
12   A    I don't remember.  I know that we moved into
13   101 on -- I think sometime in September, the end of
14   September.
15   Q    Okay.  Well, and that's what we talked about
16   at your last part of your deposition, was that you moved
17   in on 9/23, the date that's in the lease, right?
18   A    Yes.
19   Q    Okay.  So you don't remember though how long
20   before you moved into Apartment 101 you saw these other
21   apartments?
22   A    I don't remember.

452

1    Q    Did you ever ask Mr. Kisha or anybody at
2    Stanton Glenn to put you and Ms. Young up in a hotel
3    until an apartment became available?
4    A    No.
5    Q    Why did you not do that?
6    A    Because he stated that there would be some
7    other units that he could move us into and we thought we
8    would be able to move fairly quickly.
9    Q    Now, your Apartment 1-A, did it have a
10   central ventilation system?
11   A    2-A?
12   Q    2-A, I'm sorry.
13   A    Yes.
14   Q    Did it have separate units for air
15   conditioning?
16   A    Separate units, yes.
17   Q    Okay.  Window units?
18   A    No.
19   Q    Okay.  Did it have a separate unit for the
20   heating?
21   A    I don't think so.  We had one control for
22   everything.

453

1    Q    Did you have like a radiator or --
2    A    No.
3    Q    -- any kind of ductwork inside the apartment?
4    A    No.
5    Q    Okay.  All right.  And your first meeting
6    with Mr. Burton was in May of 2003?  Your first meeting
7    about this sewage/mold issue was in May of 2003 when
8    Ms. Young signed the retainer, her retainer?
9    A    Yes.
10   Q    Okay.  And you remember that because that's
11   when you had had your locks done?
12   A    Yes.
13   Q    Do you remember who did your locks?  Was it
14   Chad or somebody else?
15   A    It would have been someone else.
16   Q    Do you remember who it was?
17   A    I have no idea.
18   Q    Okay.  And then before you retained
19   Mr. Burton in January of 2004, you attended a second
20   meeting with other people besides Ms. Young that was
21   about rent increases?
22   A    No.

454

1    Q    Okay.  Was the rent increase meeting after
2    you retained Mr. Burton?
3    A    Yes.
4    Q    Okay.  Do you remember when that was?
5    A    Had to be sometime in '04 or '05.
6    Q    Okay.  You had a meeting about the sewage/
7    mold issues with Mr. Burton, right?
8    A    Yes.
9    Q    And that meeting was with other tenants,
10   right?
11   A    Yes.
12   Q    Okay.  And that was in May of 2003, right?
13   A    Yes.
14   Q    Okay.  And then the second meeting you think
15   was in 2004, 2005.
16        Do you remember the month or how long the
17   time period was that had elapsed from the May meeting?
18   A    I'm sorry, can you repeat the question?
19   Q    Do you remember how many months later was the
20   second meeting besides just Ms. Young and you but with
21   the other tenants about the rent increase?
22   A    The rent increase meeting -- I don't remember

1 (Pages 1 to 4)



Page 1

1    IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF COLUMBIA
3            Civil Division
4
5    * * * * * * * *
6    DENICOLE YOUNG and        *
7    VANESSA GHEE              *
8        Plaintiffs           *
9    VS.              * CA NO. 07cv983
10   WILLIAM F. BURTON, ESQUIRE *
11   and                      *
12   LEWIS & TOMPKINS, P.C.    *
13       Defendants           *
14   * * * * * * * *
15
16       VIDEOTAPED DEPOSITION OF DENICOLE YOUNG
17           Washington, D.C.
18       Wednesday, October 31, 2007
19           10:19 a.m.
20   Job No. 1-113826
21   Pages 1 - 234
22   Reported by:  Leslie L. Schneider

Page 2

1        The videotaped deposition of Denicole Young was
2    held at the law offices of:
3
4        Carr Maloney, P.C.
5        1615 L Street, N.W.
6        Suite 500
7        Washington, D.C.  20036
8
9
10
11
12
13   Pursuant to notice, before Leslie L. Schneider,
14   a Notary Public in and for the District of Columbia.
15
16
17
18
19
20
21
22

Page 3

1    A-P-P-E-A-R-A-N-C-E-S
2
3    ON BEHALF OF THE PLAINTIFFS:
4    Michael Hibey, Esquire
5    Bode & Grenier, L.L.P.
6    1150 Connecticut Avenue, N.W.
7    Ninth Floor
8    Washington, D.C.  20036-4192
9    (202) 828-4100
10
11   ON BEHALF OF DEFENDANT LEWIS & TOMPKINS, P.C.:
12   Paul J. Maloney, Esquire
13   Carr Maloney, P.C.
14   1615 L Street, N.W.
15   Suite 500
16   Washington, D.C.  20036
17   (202) 310-5500
18
19
20
21
22

Page 4

1    ON BEHALF OF DEFENDANT WILLIAM F. BURTON, ESQ.:
2    Deborah Murrell Whelihan, Esquire
3    Jordan Coyne & Savits, L.L.P.
4    1100 Connecticut Avenue, N.W.
5    Washington, D.C.  20036
6    (202) 496-4747
7
8
9
10   ALSO PRESENT:  William F. Burton, Esquire
11       Scott Pickering, Videographer
12
13
14
15
16
17
18
19
20
21
22

EXHIBIT
tabbies
2



VIDEOTAPED DEPOSITION OF DENICOLE YOUNG
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

2 (Pages 5 to 8)




CONTENTS

5

Witness                                          Page

DENICOLE YOUNG

   Examination by Mr. Maloney              8

                  *   *   *

Exhibits                                        Page

1  Calvert Internist Group Medical Records   99
2  Calvert Internist Group, 11/20/95      105
3  Calvert Internist Group, 12/10/96      107
4  Calvert Internist Group, 12/14/96      111
5  Calvert Internist Group, 6/21/97       113
6  Calvert Internist Group, 9/18/97       115
7  Calvert Internist Group, 10/21/97      116
8  Calvert Memorial Hospital records      118
   admission 11-6-97-11-9-97
9  Calvert Internist Group, 11/12/97      121
10 Calvert Internist Group, 1/9/98        123
11 Calvert Internist Group, 7/29/98       127
12 Calvert Internist Group, 7/31/98       131
13 Calvert Internist Group, 8/7/98        137
14 Calvert Internist Group, 1/12/99       139
15 Calvert Internist Group, 3/10/00       140

6

Exhibits cont'd                             Page

16 Calvert Internist Group, 3/16/00       142
17 Application for Insurance Form         156
18 Unity Health Care Medical History Form 163
19 Unity Health Care Medical History      166
   Form dated 1-14-04
20 August 2002 Calendar                   169
21 Diagram                                180
22 September 2002 Calendar                180
23 October 2002 Calendar                  180
24 Document                               198
25 Application for Townhome               212
26 Document from Dr. Shoemaker            215
27 9-2-03 Letter from Ghee to Horsely     216
28 6-9-03 Pulmonary Function Test Results 221
29 7-20-06 Report of Timothy Crimmins     223
30 11-29-06 Report of Medical Faculty     226
   Associates

Note:  Exhibits marked and retained by counsel.

7

P-R-O-C-E-E-D-I-N-G-S

        THE VIDEOGRAPHER:  Here begins videotape number one in the deposition of Denicole Young in the matter of Denicole Young and Vanessa Ghee versus William F. Burton, Esquire and Lewis & Tompkins, P.C. to be heard in the United States District Court for the District of Columbia, Civil Division, Civil Action Number 07-CV-983.

        Today's date, October 31, the year 2007. The time on the video monitor is now 10:19 a.m.  The video operator is Scott Pickering.  This video deposition is taking place at Carr & Maloney P.C. at 1615 L Street, Northwest, suite 500, Washington, D.C.

        Counsel, please voice identify yourself and state who you represent.

        MR. MALONEY:  My name is Paul Maloney, I represent Lewis & Tompkins, P.C.

        MS. WHELIHAN:  My name is Deborah Murrell Whelihan and I represent William F. Burton, Esquire.

        MR. HIBEY:  Michael Hibey representing Denicole Young and Vanessa Ghee.

8

        THE VIDEOGRAPHER:  The court reporter today is Leslie Schneider of L.A.D. Reporting.  Would all others present please state your name for the record.

        MR. BURTON:  William F. Burton.

        THE VIDEOGRAPHER:  Would the reporter swear in the witness.

        -  -  -  -  -  -  -  -  -

        Thereupon,

                DENICOLE YOUNG,

        the Plaintiff herein, called for examination by counsel for the Defendants, and, after having been duly sworn by the notary, was examined and testified as follows:

        EXAMINATION BY COUNSEL FOR DEFENDANT LEWIS & TOMPKINS, P.C.

BY MR. MALONEY:

   Q   Good morning, Ms. Young.

   A   Good morning.

   Q   My name is Paul Maloney, as you know, we met yesterday.

   A   Yes.

VIDEOTAPED DEPOSITION OF DENICOLE YOUNG
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007



173

1   invited two of her friends over.
2       Q   And who did she invite over?
3       A   Kameco Blake and Erica Joyner.
4       Q   Are those the two that helped you move
5   in?
6       A   Yes.
7       Q   And they came over at what point in time?
8       A   I can't remember the exact point in time,
9   date, but I do know that they were over.
10      Q   All right.  Can you give me just a quick
11  diagram, and we'll mark this as the next exhibit
12  after you do it, but show me how the rooms were set
13  up there at the -- for the apartment 2A and then
14  where the apartment -- where the mold was, if you
15  could draw that out for me as well.
16      A   (The witness complies.)
17      Q   All right.  Go ahead, hold that in front
18  of you for just a moment.  You can put it down, I
19  just want you to tell me -- draw at the top -- tell
20  me which one is apartment 2A, and what's the other
21  apartment number?
22      A   1A.

174

1       Q   1A, all right.  Now, when you come into
2   your apartment, where is the door for entering?
3       A   This is door, entry, here.
4       Q   Okay.  And when you come into that door
5   where you enter, which room is that?
6       A   When you enter in, this is the living
7   area here.
8       Q   And where is the bedroom?
9       A   The bedroom is in the hallway here.
10      Q   All right.  Was it one or two bedrooms?
11      A   Two bedrooms, there's a bedroom here,
12  bedroom 1, bedroom 2.
13      Q   Why don't you put BR-1 and BR-2.
14      A   Okay.  No problem.
15      Q   And where did you sleep?
16      A   Bedroom 2.
17      Q   Okay.  That's fine.  And what else is in
18  the apartment?  Is that a kitchen?
19      A   Yes, kitchen.
20      Q   Okay.  Go ahead and put a K for that and
21  circle it.
22      A   (The witness complies.)

175

1       Q   And what's the other room just below B-2?
2       A   This is a bathroom from the bedroom, and
3   this is another bathroom off of the hallway.
4       Q   All right.  Why don't you put bathroom
5   right next to those two.
6       A   (The witness complies.)
7       Q   Now, let's go to the other apartment.
8   And as you walk into that apartment, is that then I
9   take it the living room area?
10      A   Yes.  I remember this being the living
11  area here.
12      Q   Was there any mold in that area?
13      A   Uh-huh.  Yes.
14      Q   In what part?
15      A   All of this.
16      Q   In the living room area there was mold
17  when you were in that apartment?
18      A   Yes.
19      Q   Where was the window that you crawled in
20  through?
21      A   Right here from the back side.
22      Q   That was in the living room?

176

1       A   Yes.
2       Q   All right.  And where else did you find
3   mold in the apartment?
4       A   The whole apartment was filled with mold.
5       Q   All right.  When was the last time that
6   someone had lived in that apartment, if you know,
7   prior to say August 19 of 2002?
8       A   I don't know when was the last time
9   someone lived in that apartment.
10      Q   Why don't you draw with me in yellow
11  where there was mold in apartment 1A.
12      A   (The witness complies.)
13      Q   All right.  Was there mold on the floor?
14      A   The carpet was removed.
15      Q   So there was no carpeting there?
16      A   No.
17      Q   Was there mold on the walls?
18      A   All over the walls.
19      Q   How high up did the mold go on the walls?
20      A   All the way.  Floor to ceiling.
21      Q   Was there mold on the ceiling?
22      A   Yes, I remember.



VIDEOTAPED DEPOSITION OF DENICOLE YOUNG
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

45 (Pages 177 to 180)





177

1    Q  Had there been any sewage that backed up
2  in that apartment, if you know?
3    **A  Yes.**
4    Q  How do you know that?
5    **A  I could see the sewage water marks on the**
6  **wall.**
7    Q  And how high up the wall did that go?
8    **A  At least two-and-a-half -- at least**
9  **two-and-a-half feet.**
10    Q  So you think that there was water that
11  was two-and-a-half feet high on the walls in that
12  apartment?
13    **A  Yes.**
14    Q  And what areas was that?
15    **A  I could see that throughout the living**
16  **area.**
17    Q  Okay.
18    **A  That's where I remember it, and down the**
19  **hallway.**
20    Q  Okay.  And that looked like a water line
21  to you at two-and-a-half feet, approximately?
22    **A  Yes.**

178

1    Q  Is that reflected in pictures that you
2  took?
3    **A  I can't recall.  I know there was some**
4  **pictures taken, but I can't recall.**
5    Q  How long did you stay in the apartment?
6    **A  Maybe like one to two minutes at the**
7  **most.**
8    Q  Did you have any kind of reaction to the
9  mold when you were in the apartment?
10    **A  I can't remember if I had any type of**
11  **reaction other than what I was having already.**
12    Q  And do you know the day that you went
13  into the apartment?
14    **A  I do not.**
15    Q  Did you take a video?
16    **A  There was a videotape of it, yes.**
17    Q  Where is that videotape?
18    **A  We cannot find it.**
19    MR. MALONEY:  Let's go off the record at
20  this time.
21    THE VIDEOGRAPHER:  This is the end of
22  tape 2 of the deposition of Denicole Young.  The time

179

1  is now 2:52 p.m.
2    THE VIDEOGRAPHER:  Back on the record.
3  Here marks the beginning of tape number 3 in the
4  deposition of Denicole Young, the time now is 2:55
5  p.m.
6  BY MR. MALONEY:
7    Q  Ms. Young, you just mentioned that there
8  was a video that was taken when you were inside the
9  apartment, who took that video?
10    **A  Vanessa.**
11    Q  Where did she get the video camera from?
12    **A  Her father.**
13    Q  Have you ever seen a copy of the video
14  that she took?
15    **A  No.**
16    Q  Do you know, was it actually a camcorder?
17    **A  Yes.**
18    Q  Was it ever transcribed to like a VHS
19  tape, if you know?
20    **A  Not that I'm aware of.**
21    Q  Did she ever see it after that day?
22    **A  We had it around the apartment for some**

180

1  time.  I think it got lost in the move.
2    Q  Did you ever show it to anyone?
3    **A  No.**
4    Q  And so you were taking photographs and
5  she took a video inside the apartment, is that right?
6    **A  I can't recall if she was taking the**
7  **photographs or I was or -- I can't remember who was**
8  **doing what.  I know that there were pictures and a**
9  **video being taken at the same time.**
10    Q  And I take it there was no one else in
11  the apartment with you, is that right?
12    **A  That's correct.**
13    Q  Let's mark the diagram that you just drew
14  as Exhibit Number 21.
15    (Deposition Exhibit Number 21 was marked
16  for identification and retained by counsel.)
17    (Deposition Exhibit Number 22 was marked
18  for identification and retained by counsel.)
19    (Deposition Exhibit Number 23 was marked
20  for identification and retained by counsel.)
21  BY MR. MALONEY:
22    Q  If you could have the calendar for the

181

three months in front of you and look at Exhibit 20 also. Now, the beginning lease date was August 19, which was a Monday, and again, you don't know the exact date that you moved in I take it?
**A Correct, I don't.**
Q Can you tell me approximately the date that you went into the apartment 1A that you've just drawn?
**A I can't tell you because I don't remember the approximate date.**
Q Can you tell me if it was in August or September of 2002?
**A I believe it was in -- somewhere in August.**
Q Okay. Do you remember what the temperature was in the last two weeks of August of 2002?
**A No, I do not.**
Q Did you have an air conditioner in your unit, in 2A?
**A We did, it was not working. And yes, that did refresh my memory, it was hot.**

182

Q Did you have a fan in your apartment?
**A Not that I can remember.**
Q Did you have the windows open?
**A If it was hot, I'm sure I did.**
Q Did the air-conditioner ever work in apartment 2A?
**A Yes, it was repaired.**
Q When did it start working?
**A Weeks after we moved in.**
Q Okay. Can you give me an approximation as to the time?
**A I can't give you the exact date. I know it was broken when we first moved in. We complained about it. I was told by the manager, Vanessa and I, that the guy that -- the contractor that they used lived in Baltimore or something and he couldn't come out right away, but they assured us that it would be fixed as soon as possible. I cannot recall the exact date, time or number of weeks that it took to repair that.**
Q Who did you complain to about the air-conditioner?

183

**A Vanessa and I complained to management.**
Q Who specifically?
**A Rita Horsely.**
Q Was that in writing or in person, or was it over the phone?
**A I remember she called and complained over the phone. That's what I remember. I can't remember if it was in person or not, but I remember she called and complained.**
Q Did you ever ask that the rent be rebated since you didn't have air-conditioning?
**A I can't remember.**
Q Can you tell me anything that you did on any of the days from August 19, 2002 to August 31, 2002?
**A Can you repeat that question?**
Q Can you tell me anything you did on any of the days of August 19, 2002 to August 31 of 2002?
**A I can't remember. It's so long ago, I can't remember exactly what I did or recall what I did. I know I was feeling sick. I remember that.**
Q Did you ever leave the apartment on any

184

of those days?
**A Yeah. I think Vanessa -- I remember Vanessa and I went to get a disposable camera at CVS at some point.**
Q Did you have a car at that time?
**A Yes, I did.**
Q Were you going to get groceries for the new apartment, did you ever do that?
**A I can't remember if I went to the grocery store or not.**
Q Did you get supplies during that period of time? And again, I'm talking the 19th of August 2002 to the 31st of August 2002.
**A As I said, I remember going to CVS. I remember Vanessa picking some things up because I was feeling sick, so she got me some things from the store. I don't know if it was CVS or another store. I can't recall.**
Q When you were feeling sick, did you report it to any doctor?
**A I went to the doctor. I can't remember exactly the first time I went to the doctor in August**

193

for the move?
A No, she didn't.
Q Was she there when the move took place?
A No, she wasn't.
Q So only you were there?
A Yes, I was supervising the move.
Q Did anyone else participate?
A The -- just the movers.
Q Okay. And you were physically well enough to supervise the move that day I take it?
A Yeah. I didn't move anything, I just made sure our belongings went from one place to the next.
Q Were you on any medication during that move?
A I can't remember if I was on medication. I know I had been to see the doctor by that time.
Q What doctor had you been to see by that time?
A I went to the emergency room and I believe I went to Unity Health Care.
Q You say you think you had two visits in

194

August or September of 2002 before moving to the second apartment, is that correct?
A Repeat the question.
Q You think you had two visits to health care providers in August or September of 2002 before moving to the new apartment?
A Yes, I do believe that, yes.
Q Do you remember being given any medication either at G.W. or Unity Health Care?
A Yes, I was prescribed something.
Q What were you prescribed?
A I cannot remember.
Q Did the medication make you feel better?
A I believe that the medication wasn't working at that time. I still remained sick.
Q What symptoms did you have when you went to Unity Health Care?
A My chest was hurting, coughing, running eyes, I just felt really sick.
Q Anything else you can remember?
A Coughing a lot. I remember my chest hurting.

195

Q Can you remember anything else that you did on any given day in September of 2002, other than what you've told me about?
A Normal activity or just anything that I can remember about this month?
Q Sure.
A I remember going to the doctor. I remember going to the emergency room. I remember calling Bill Burton. I remember the car being towed from -- the car was towed and stripped by Youngins Towing.
Q That was in September of 2002?
A I'm sorry, I believe that was in August. I remember a meeting with Bill Burton. I remember neighbors coming over to 3084, apartment 101. I remember feeling sick. I think I said moving.
Q Yes.
A That's all I remember at this time.
Q Did you clean any houses?
A No.
Q Did you go see your godmother?
A I remember being there, yeah, because I

196

moved my stuff, so yes. In September?
Q In September of 2002.
A Did I see my godmother? I can't recall. I can't recall.
Q Did you drive anywhere?
A I'm sure I did. I can't remember where.
Q Was September of 2002 hot?
A Yes, it was.
Q Can you tell me when in the month the air-conditioner was repaired?
A I can't recall when the air-conditioning was repaired because I remember moving from that 3064 apartment, so I can't remember when the AC was repaired. I can't.
Q What was the weather like when you moved from the 3064 apartment to 3084 apartment?
A I remember it being sunny, yeah, I think so.
Q When did the meetings take place that Vanessa told us about yesterday with the management?
A I remember meeting with the management sometime in August, letting them know we know we're

VIDEOTAPED DEPOSITION OF DENICOLE YOUNG
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

51 (Pages 201 to 204)



201

1        A  I can't recall.  I don't know.

2        Q  How soon after you were feeling sick did

3   you go to the hospital?

4        A  A couple of days.  Like I said earlier, I

5   tried to -- I wasn't feeling well, so I may have -- I

6   know I got something or Vanessa brought something

7   from the store, like cough medicine or something like

8   that, I can't recall the brand or anything.

9        Q  Did you -- do you remember going to the

10  George Washington University Hospital on Friday,

11  September 13, 2002?

12        A  As I said earlier, I don't know the exact

13  date.  I do remember feeling sick at that time, so I

14  know I went to the hospital.  I don't know the exact

15  date.

16        Q  Do you remember being diagnosed with

17  bronchitis when you went to George Washington

18  Hospital?

19        A  Yes, I remember them saying I had

20  bronchitis.  I do remember that.

21        Q  All right.  Do you remember saying to

22  them that you had -- that you were allergic to Cipro

202

1   and to MSG?

2        A  Not MSG, I don't know what that is, but I

3   do remember them asking me of any allergies.  I told

4   them that my doctor told me not to take Cipro.

5        Q  How about did you tell them that you were

6   allergic to preservatives?

7        A  In 2002?

8        Q  Yes.

9        A  No, I do not remember telling them I was

10  allergic to preservatives in 2002.

11        Q  Were you allergic to preservatives as of

12  September 13, 2002?

13        A  Not of my knowledge, no.

14        Q  Did you start feeling better when you

15  moved to a new apartment?

16        A  Which new apartment?

17        Q  101.

18        A  Did I start feeling better?

19        Q  Yes.

20        A  No.

21        Q  Did you ever tell anyone that you were

22  feeling better after having moved to the new

203

1   apartment?

2        A  Not that I can recall.

3        Q  Did you ever tell any of your health

4   providers that you felt better after moving from

5   apartment 2A to apartment 101?

6        A  Not that I can recall.

7        Q  This was a different building, was it

8   not?

9        A  Yes, it was.

10        Q  All right.  Was there any mold in the new

11  building?

12        A  Not that I could see.

13        Q  Was there any mold in the actual

14  apartment number 101?

15        A  Not that I could see.

16        Q  Did you ever find any mold in the

17  building at any time?

18        A  Not that I could see.

19        Q  Was the air-conditioning working in the

20  new building?

21        A  Yes, it was.

22        Q  Did you ever tell anyone that the smell

204

1   started -- that you began smelling something in your

2   apartment on August 25 of 2002?

3        A  I can't recall.  I can't recall the first

4   time I told someone I smelled something in that

5   apartment.  I know it was shortly after I moved in.

6   I don't know the exact date.  A few days after we

7   moved in we started to smell a smell.  I don't know

8   the exact date.

9        Q  Were you offered a flu vaccine in

10  November of 2002?

11        A  I can't remember.

12        Q  Did you refuse a flu vaccine in November

13  of 2002?

14        A  I can't remember.

15        Q  If you did refuse a flu vaccine, is there

16  any reason why you would have done so?

17        A  I can't remember ever being advised or

18  told to take a flu vaccine.  I don't remember

19  anything about a flu vaccine in 2002.

20        Q  Do you remember telling a health care

21  provider on November 5 of 2002 that you were feeling

22  much better after moving to a new apartment?

VIDEOTAPED DEPOSITION OF DENICOLE YOUNG
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

52 (Pages 205 to 208)





**205**

1    A  No, I don't remember that.

2    Q  Can you tell me, as best you can recall,

3  the number of health care providers that you saw

4  after September of 2002 up until you went into the

5  hospital at George Washington University in April of

6  2003?

7        So in other words, between October 1 of

8  2002 and the time that you went into George

9  Washington Hospital for the major hospitalization in

10  April 2003 --

11    A  Yes.

12    Q  -- can you tell me what doctors you saw?

13    A  I can remember seeing Dr. Raval at

14  Congress Heights Health Clinic.  I can remember

15  seeing some physicians in the emergency room, I

16  cannot recall their name.  Those are the doctors that

17  I remember seeing during that time.

18    Q  Then approximately how many times did you

19  go to the doctor -- how many doctors' visits did you

20  have between October 1 and the time that you were

21  hospitalized in April of 2003?

22    A  I can't remember, sir.

**206**

1    Q  Can you tell me approximately?

2    A  How many times?

3    Q  Yes.

4    A  More than two.

5    Q  Did you tell the doctors all complaints

6  that you had every time that you went to see them in

7  that time frame?

8    A  Can you repeat question?

9    Q  Sure.  Let me been more specific.  Did

10  you tell the doctors that you saw between October 1

11  of 2002 and the April visit, which I think was April

12  15 of 2003 to the hospital at George Washington, when

13  you went to see health providers during that

14  timeframe, did you tell the health care providers of

15  all complaints that you had each time you saw them?

16    A  I can't remember what I told them each

17  time I saw them.

18    Q  Can you tell me the first time that you

19  were given some kind of a -- what do you call the --

20    A  Inhaler.

21    Q  Inhaler.  When was the first time you

22  were given an inhaler after moving into apartment 2A?

**207**

1    A  I really can't remember, sir, the very

2  first time I received an inhaler after moving into

3  2A.

4    Q  Can you tell me anything that you did in

5  October -- you have the calendar there in front of

6  you, can you tell me anything that you remember doing

7  in October of 2002?

8    A  I remember Vanessa's birthday is in

9  October.

10    Q  Did you do anything to celebrate her

11  birthday?

12    A  I can't remember what we did but I'm sure

13  we did something.

14    Q  What day was that?

15    A  Thursday, October 17.

16    Q  Did you have any income coming in in

17  September and October 2002.

18    A  If I'm not mistaken, I think I started to

19  work for Metropolitan Power as an apprentice before

20  joining the union in October.

21    Q  Is that a job you had told me about when

22  I asked you about all the jobs you had before?

**208**

1    A  I can't remember if I told you about that

2  or not.

3    Q  Where is Metropolitan Power located?

4    A  Capitol Heights, Maryland.

5    Q  What type of work was that?

6    A  Electrical.

7    Q  And you think you took that job on before

8  joining the union?

9    A  Yes, I did.

10    Q  And that was while you were living in

11  apartment 2A?

12    A  Not apartment 2A, no.

13    Q  It was after living in apartment 101?

14    A  Yes.

15    Q  So back to my question then, did you --

16  well, let me ask it this way, do you remember any

17  income that you brought in while you were living in

18  apartment 2A?

19    A  I can't remember.

20    Q  So was Vanessa paying all the bills

21  during that time?

22    A  No.  I remember giving her money for the

1 (Pages 235 to 238)

235

1      IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3
4   DENICOLE YOUNG and        *
5   VANESSA GHEE,             *
6          Plaintiffs,  * Civil Action
7       vs.               * No. 07-CV-00983
8   WILLIAM F. BURTON, ESQUIRE *
9   and LEWIS & TOMPKINS,      *
10  P.C.,                      *
11         Defendants.  *
12
13
14      Videotaped Deposition of DENICOLE YOUNG
15            Washington, D.C.
16         Wednesday, December 5, 2007
17               3:38 p.m.
18
19
20  Job No.: 1-117890
21  Pages 235 - 424, Volume II
22  Reported by: Vicki L. Forman

236

1         Videotaped Deposition of DENICOLE YOUNG,
2   held at the offices of:
3
4       Carr Maloney, P.C.
5       1615 L Street, Northwest, Suite 500
6       Washington, D.C.  20036
7       (202) 310-5500
8
9
10
11        Pursuant to agreement, before Vicki L.
12  Forman, Court Reporter and Notary Public in and for the
13  District of Columbia.
14
15
16
17
18
19
20
21
22

237

1              A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFFS:
4   MICHAEL HIBEY, ESQUIRE
5   Bode & Grenier, LLP
6   Suite 900
7   1150 Connecticut Avenue, Northwest
8   Washington, D.C.  20036
9   (202) 828-4100
10
11
12
13  ON BEHALF OF THE DEFENDANT BURTON:
14  DEBORAH M. WHELIHAN, ESQUIRE
15  Jordan, Coyne & Savits, LLP
16  Suite 600
17  1100 Connecticut Avenue, Northwest
18  Washington, D.C.  20036
19  (202) 296-4747
20
21
22

238

1   ON BEHALF OF THE DEFENDANT LEWIS & TOMPKINS:
2   ALI A. BEYDOUN, ESQUIRE
3   PAUL J. MALONEY, ESQUIRE
4   Carr Maloney, P.C.
5   Suite 500
6   1615 L Street, Northwest
7   Washington, D.C.  20036
8   (202) 310-5500
9
10
11  ALSO PRESENT: Vanessa Ghee
12         Scott Forman, Videographer
13
14
15
16
17
18
19
20
21
22

EXHIBIT

3



239

```
1          C O N T E N T S
2    EXAMINATION OF DENICOLE YOUNG         PAGE
3       By Ms. Whelihan              241
4
5
6
7           E X H I B I T S
8        (Retained by Counsel)
9    YOUNG DEPOSITION EXHIBIT              PAGE
10   No. 31  8/6/04 Letter to Rhiannon Dunn      243
11   No. 32  Answers to Interrogatories      248
12   No. 33  Phone Records from 6/9/05-12/8/05     328
13       and 1/9/06 to 4/19/06
14
15
16
17
18
19
20
21
22
```

241

```
1          Would the reporter please swear in the
2    witness.
3          THE REPORTER:  Would you raise your right
4    hand, please.
5          DENICOLE YOUNG
6       having been duly sworn, testified as follows:
7       EXAMINATION BY COUNSEL FOR THE DEFENDANT
8    BY MS. WHELIHAN:
9       Q    All right.  Ms. Young?
10      A    Yes.
11      Q    What did you do to prepare for today's
12   deposition?
13      A    I looked over some of my notes.  That's about
14   it.
15      Q    What notes did you look over?
16      A    I looked over my deposition from Mr. Maloney.
17      Q    Okay.  Anything else?
18      A    No.
19      Q    Did the notes that you looked over -- is that
20   the handwritten note that has Darlene Bryant up at the
21   top or did you just look over your deposition?
22      A    Deposition.
```

240

```
1          P R O C E E D I N G S
2       THE VIDEOGRAPHER:  Here begins tape number
3    one, volume number two in the deposition of Denicole
4    Young in the matter of Denicole Young and Vanessa Ghee
5    versus William F. Burton, Esquire and Lewis & Tompkins,
6    P.C. pending in the United States District Court for the
7    District of Columbia, Case Number 07CV983.
8          Today's date is December 5, 2007.  The time
9    is 3:38 p.m.  The video operator is Scott Forman of
10   L.A.D. Reporting.  This deposition is taking place at
11   Carr Maloney, P.C., 1615 L Street, Northwest,
12   Washington, D.C.
13          Would counsel identify themselves and state
14   whom they represent.
15          MS. WHELIHAN:  Deborah Murrell Whelihan.  I
16   represent defendant William F. Burton.
17          MR. BEYDOUN:  Ali Beydoun for Carr Maloney
18   representing Lewis & Tompkins, P.C.
19          MR. HIBEY:  Michael Hibey for plaintiffs
20   Denicole Young and Vanessa Ghee.
21          THE VIDEOGRAPHER:  Thank you.  The court
22   reporter today is Vicki Forman of L.A.D. Reporting.
```

242

```
1       Q    Okay.  Are you on any medication today?
2       A    Symbicort, Lasix.  That's it.
3       Q    Okay.  Now, do you use any kind of chemicals
4    on your hair, dye, hair straightener?
5       A    (Witness shakes head.)
6       Q    You got to answer "yes" or "no."
7       A    No, I'm sorry.
8       Q    Okay.  Have you ever?
9       A    Yeah, as a teenager.
10      Q    But not recently?
11      A    No.
12      Q    Okay.  Do you wear perfume?
13      A    Sometimes, yes.
14      Q    What perfume do you wear?
15      A    Prada, Gucci, Ferragamo, Dunhill.  That's
16   basically my favorite.
17      Q    Okay.  Have you ever had any reaction to
18   perfume?
19      A    No.
20      Q    Okay.  Now, you used to have a cleaning
21   business?
22      A    Yes, I did.
```



VIDEOTAPED DEPOSITION OF DENICOLE YOUNG - VOLUME II
CONDUCTED ON WEDNESDAY, DECEMBER 5, 2007

5 (Pages 251 to 254)

251

1    A    I can't remember if I did.
2    Q    Okay.  Now, there was no mold in your
3 apartment, your first apartment at Stanton Glenn,
4 Apartment 2-A; is that right?
5    A    Not that I could see.
6    Q    Okay.  Well, it wasn't on the vents, right?
7    A    It was no mold visible that I could -- that I
8 could see.
9    Q    Okay.  And did you clean the apartment or did
10 Ms. Ghee clean the apartment?
11    A    We both did.
12    Q    Okay.  And what cleaning products did you use
13 to clean your apartment?
14    A    Basic household stuff, Windex, Clorox
15 cleaner, Ajax.
16    Q    Now, in your cleaning business what kind of
17 products, chemical products did you use?
18    A    Basically the same thing.
19    Q    Did you store your cleaning products
20 someplace other than your apartment in August of 2002?
21    A    No.
22    Q    And the cleaning products for your business,

252

1 did you store those in your apartment too?
2    A    Yes, they had to be stored in the apartment.
3    Q    Okay.  How many customers did you have -- did
4 Flywheel Cleaning have?
5    A    I can't really recall.  It was basically for
6 family.
7    Q    Did you have any nonfamily customers?
8    A    No.
9    Q    Okay.  And how many days a week did Flywheel
10 clean when Flywheel Cleaning was in operation?
11    A    Maybe three times a week.
12    Q    And how many hours would you clean?
13    A    One or two.
14    Q    Okay.  Now, what you initially observed about
15 the first apartment, Apartment 2-A was that it smelled
16 bad?
17    A    Yes.
18    Q    Okay.  And did it smell like sewage?
19    A    Yes, it did.
20    Q    Was that the smell that you noticed?
21    A    Yes.
22    Q    You didn't smell mold, right?

253

1    A    No, I -- no, I smelled sewage.  It was a
2 sewage smell.
3    Q    Okay.  And you discussed with your neighbors
4 about the smell that you had observed?
5    A    Yes, I can recall having some discussion with
6 my neighbors like what is that smell, yes.
7    Q    Did anybody tell you before Chantay told you
8 that the smell was coming from the apartment next door
9 to yours?
10    A    Not that I can recall.
11    Q    Okay.  So is it correct that your neighbor
12 Chantay was how you found out where the smell was coming
13 from?
14    A    I can't remember if it was Chantay or -- I'm
15 trying to recall their names.  Chantay or Shonn or
16 something.  One of them found where the smell was coming
17 from and told us.
18    Q    Okay.  And that's when you and Ms. Ghee went
19 to go get an instant camera from the drugstore to take
20 pictures of the apartment, right?
21    A    Yes.
22    Q    Now, did Ms. Ghee also go and get a video

254

1 camera or did you get a video camera?
2    A    She did.
3    Q    Okay.  And was there a video taken of that
4 apartment?
5    A    Yes, there was.
6    Q    Okay.  Have you been able to locate that
7 since the last deposition?
8    A    We still can't find it.
9    Q    Okay.  Did you ever tell Mr. Burton about
10 that video?
11    A    I can't remember if I did or didn't.
12    Q    Okay.  Did you ever give him a copy of it?
13    A    Not that I can recall.
14    Q    Do you remember how long you were in the
15 apartment when you were taking photographs or doing the
16 video?
17    A    Very short.
18    Q    Did you see any sewage in that apartment?
19    A    Saw sewage stains.
20    Q    Okay.  Did it smell like sewage?
21    A    Yes, it did.
22    Q    Did it have a strong smell?

VIDEOTAPED DEPOSITION OF DENICOLE YOUNG - VOLUME II
CONDUCTED ON WEDNESDAY, DECEMBER 5, 2007



319

1    Q    Okay. Now, he came and visited you in the
2  hospital?
3    A    They said he did, yes.
4    Q    Do you have any recollection of that at all?
5    A    No.
6    Q    So the next face-to-face meeting that you
7  remember with Mr. Burton after the September,
8  October 2003 Youngins Towing matter was the May 2003
9  meeting that you, Mr. Burton and Ms. Ghee had in
10 Apartment 101; is that right?
11   A    Besides the Youngins -- the court -- going
12 back and forth to court? Besides that?
13   Q    Right. Outside of the Youngins Towing thing
14 in 2003, the next meeting you had with Mr. Burton would
15 have been May of 2003 at your apartment in 101, right?
16   A    Yes.
17   Q    Okay. How long did that meeting last?
18   A    It lasted maybe one or two hours.
19   Q    Okay. What did you, Mr. Burton and Ms. Ghee
20 discuss in that meeting?
21   A    Okay. He -- you know, he expressed that he
22 was glad to see that I was alive, doing well. He

320

1  discussed that, you know, he would take care of me, you
2  know, dealing with any of my legal issues with Stanton
3  Glenn. He told me we're going to get these bastards for
4  what they did to you. He just assured me that he would
5  take care of the legal matter with Stanton Glenn.
6    Q    Okay. And that was the language that he
7  used, that he was going to get those bastards for what
8  they did to you?
9    A    Yes.
10   Q    He used the word "bastards"?
11   A    Yes.
12   Q    Okay. Had he cursed or used profanity with
13 you before?
14   A    Yes.
15   Q    Okay. Now, he brought a retainer agreement
16 for you?
17   A    Yes, he did.
18   Q    Okay. And you signed that retainer agreement
19 at that time?
20   A    Yes, I did.
21   Q    At the end of the meeting?
22   A    At the end of the meeting he told me that he

321

1  was going to start to, you know, get my medical records
2  and do some research, and as he was leaving his car
3  broke down so one of my close friends owned a tow truck
4  business and I called him up and he came over and got
5  Mr. Burton and towed his car. I don't know where he
6  towed his car to and that was it.
7    Q    Okay. But at the end of the meeting that you
8  had with him in the apartment, you signed your retainer
9  agreement or was that during the meeting?
10   A    I signed my retainer agreement during the
11 meeting.
12   Q    Not at the end?
13   A    It was -- it was while we were talking
14 because he was explaining to me the retainer and what
15 was in the retainer.
16   Q    Okay. Have you exhausted your recollection
17 about everything that he said at that meeting?
18   A    Everything that I can remember, yes.
19   Q    Okay. Was there anything that you remember
20 you or Ms. Ghee saying to him in that meeting?
21   A    Yes, I remember asking him do he think we had
22 a strong case.

322

1    Q    Okay. And at that time only you had retained
2  him. Ms. Ghee had not retained him?
3    A    Yes, as I can remember.
4    Q    So did you ask him if you had a strong case
5  or if you and Ms. Ghee had a strong case?
6    A    I asked him do you think we have a strong
7  case.
8    Q    "We" meaning who?
9    A    Vanessa and I.
10   Q    Okay. And did he say anything in response to
11 your inquiry?
12   A    Yes, he did.
13   Q    What did he say?
14   A    Yes, this is a million dollar case.
15   Q    And you're sure he used those words?
16   A    Yes, I'm sure.
17   Q    Okay. Did you ask him why he thought it was
18 a million dollar case?
19   A    No, I didn't ask him.
20   Q    Okay. Now, had Ms. Ghee told you about her
21 job as a paralegal?
22   A    Yes.

VIDEOTAPED DEPOSITION OF DENICOLE YOUNG - VOLUME II
CONDUCTED ON WEDNESDAY, DECEMBER 5, 2007

23 (Pages 323 to 326)



323

1    Q    Did she tell you basically that cases were
2   valued on what the damages were, the medical specials,
3   lost wages? Did you have any understanding about that
4   at all?
5    A    We didn't really discuss that. At that time
6   Vanessa and I was just focused on getting myself back
7   together. We really didn't discuss the value of my case
8   period, Vanessa and I.
9    Q    Okay. But in May of 2003 did you have a
10  general understanding as to how cases were valued?
11   A    No, I really didn't. I really didn't.
12   Q    Okay. Did you tell Mr. Burton prior to May
13  of 2003 or at that meeting in May 2003 what your medical
14  bills were?
15   A    No.
16   Q    Okay. Did you know what your medical bills
17  were?
18   A    No, I had no idea.
19   Q    Okay. How about Ms. Ghee? Did you know what
20  Ms. Ghee's medical bills were as of May of 2003?
21   A    No. No, I didn't.
22   Q    Okay. Was Ms. Ghee not as sick as you?

324

1    A    She had some problems with maybe sinus,
2   breathing but she took care of me the majority of the
3   time so she -- I wouldn't say that she was sicker than I
4   or anything like that.
5    Q    After you moved to Apartment 101 did Ms. Ghee
6   get better?
7    A    Better than I, yes.
8    Q    Okay. Did she ever get well?
9    A    It seemed as she was always like suffering
10  from headaches or something, maybe some respiratory
11  problems. It seemed like she always had like headaches,
12  respiratory problems since we ever moved to that
13  apartment.
14   Q    101, Apartment 101 too?
15   A    Yeah, she always had the headaches and the
16  sinus.
17   Q    Now, you, you know, heard Ms. Ghee's entire
18  deposition from beginning to end so I don't want to
19  belabor this but she was the only one who paid the rent
20  for those apartments; is that right?
21   A    Yeah, we had an agreement.
22   Q    Which was you would pay other things and she

325

1   would pay the rent?
2    A    Yes.
3    Q    Okay. And was she the only one on all three
4   leases, right?
5    A    No, the -- I don't know if I was on the
6   second lease or not but I knew that when we had to do
7   something that they called recertification, they asked
8   that I put myself on the lease. Even though they knew I
9   lived there, they didn't have a problem with it. They
10  wanted me to be on the lease I believe in 101 and 201, I
11  believe. I can't remember what lease -- what leases I
12  signed.
13   Q    Okay. And what was the recertification
14  about?
15   A    It was something to do with a tax credit for
16  the property. I'm not sure how that works.
17   Q    Was any part of the housing that you and
18  Ms. Ghee had at Stanton Glenn subsidized?
19   A    No.
20   Q    Okay. Was the letter that's been marked as
21  Deposition Exhibit Number 31 -- was that part of the
22  recertification?

326

1    A    I believe so. They wanted to know if
2   Flywheel Cleaning Service was still active for their
3   records and so I had to write a letter telling them it
4   wasn't.
5    Q    But did Exhibit 31 have something to do with
6   the recertification issue?
7    A    I'm thinking it did, yes.
8    Q    Okay. I don't want you to guess.
9    A    Yes, it did.
10   Q    Okay. All right. So did Mr. Burton make any
11  other statements to you about the value of your case at
12  the May of 2003 meeting?
13   A    At the May?
14   Q    Yes, other than what we've already talked
15  about.
16   A    No, he just assured me that everything was
17  fine. He would take care of me.
18   Q    How about Ms. Ghee? Did he talk about her
19  case versus your case?
20   A    No. He was concerned about how I was doing
21  and he was concerned about, you know, signing the
22  retainer so he could get started on the case.



VIDEOTAPED DEPOSITION OF DENICOLE YOUNG - VOLUME II
CONDUCTED ON WEDNESDAY, DECEMBER 5, 2007

24 (Pages 327 to 330)




---

**327**

1    Q    Okay. Was it your understanding at the May
2  of 2003 meeting that it was in fact your case as opposed
3  to Ms. Ghee's case?
4    A    When he addressed us it was always you guys
5  so it was never -- he never just -- when he was talking
6  to us it was always you guys so I always thought it was
7  our case.
8    Q    Did he express any concerns to you at the May
9  of 2003 meeting or before the May of 2003 meeting about
10  the case not having any value until your
11  hospitalization?
12    A    No.
13    Q    Okay. Did he express any opinions to you at
14  the May of 2003 meeting that your hospitalization had
15  improved the value of the case?
16    A    I can't say if he did or didn't. We just
17  talked about the case and, you know, just me getting
18  better, him taking care of me. That was the basis of
19  the meeting and signing the retainer.
20    Q    Okay. Well, is one of the reasons that he
21  brought a retainer and then you retained him the fact
22  that you had been hospitalized in April of 2003?

---

**328**

1    A    He was concerned and he expressed that to me,
2  that Stanton Glenn -- the result of the mold had really
3  made me sick and he wanted to lock me in as a client and
4  get started on the case right away.
5    Q    Okay. Well, when you say he wanted to lock
6  you in as a client, had you talked to him about entering
7  into a formal retainer agreement before your
8  hospitalization?
9    A    I did ask -- ask him. I remember asking him
10  do I need to sign a retainer. I remember him telling me
11  no. He said, you know, just get your medical records
12  and keep treating with the doctors and we'll go from
13  there.
14    Q    Okay. And that was one of the two or three
15  or whatever conversations you had by telephone prior to
16  this May of 2003 meeting?
17    A    Or at some time in person, you know, back and
18  forth with the Youngins court case.
19    Q    All right. Now, rolling right along.
20    A    Okay.
21    MS. WHELIHAN: It's the same thing.
22    (Young Deposition Exhibit Number 33 was

---

**329**

1  marked for identification and retained by counsel.)
2  BY MS. WHELIHAN:
3    Q    Let me show you what's been marked as your
4  Deposition Exhibit Number 33 which is the summary of the
5  phone calls that either you received or that you made or
6  that Ms. Ghee made that you had been able to find.
7    A    Okay.
8    Q    Right?
9    A    Yes.
10    Q    I mean that's what this exhibit is, right?
11    A    Yes.
12    Q    Okay. Now, do you have any records that
13  would show the telephone calls that you made prior to
14  June 16, 2005?
15    A    Do I have them?
16    Q    Does anybody?
17    A    The records that we've obtained so far has
18  been provided to my counsel. I know they're waiting for
19  other records that have not been provided from T-Mobile
20  as of yet.
21    Q    Okay. T-Mobile was Ms. Ghee's carrier?
22    A    As well as mine and she.

---

**330**

1    Q    You both had T-Mobile?
2    A    Yes.
3    Q    Okay. Has your number, your cell phone
4  number always been (202) 270-4297?
5    A    Yes. At that time, yes.
6    Q    In 2005 or from 2002 forward?
7    A    From -- I believe I got that number I believe
8  in 2004 and -- yeah, I believe I got that number in
9  2004.
10    Q    Okay. Prior to 2004 do you know what your
11  cell phone number was?
12    A    I didn't have a cell phone.
13    Q    So you didn't have any phone?
14    A    I didn't have a cell phone prior to me
15  getting this number.
16    Q    In 2004?
17    A    Yes.
18    Q    Through T-Mobile?
19    A    Yes, through T-Mobile, yes.
20    Q    Okay. So did you have a landline phone in
21  your apartment, either 2-A or 101?
22    A    Yes.

---

VIDEOTAPED DEPOSITION OF DENICOLE YOUNG - VOLUME II
CONDUCTED ON WEDNESDAY, DECEMBER 5, 2007

25 (Pages 331 to 334)



331

1    Q    Who was the carrier for that?
2    A    Verizon.
3    Q    Do you remember what the number was?
4    A    Yes, I do.  (202) 678-3969.
5    Q    Do you have any phone bills from that number?
6    A    No, I do not have any phone bills.
7    Q    Okay.  Do you know whether or not you're
8  attempting to locate those phone bills?
9    A    I am not attempting to locate these -- those
10  phone bills.
11    Q    So the only records you have so far for phone
12  calls that you might have made or received from
13  Mr. Burton would be this Deposition Exhibit 32, right?
14    A    Yes.  So far, yes.
15    Q    Okay.  Do you know when your next
16  face-to-face meeting with Mr. Burton was after May of
17  2003?
18    A    I remember Vanessa and I going to his office.
19  I believe it was on a Saturday sometime in the
20  afternoon.  The purpose of going to his office was to
21  discuss the case and Vanessa -- she was to sign a
22  retainer as well.

332

1    Q    Okay.  So that was the January 3, 2004
2  meeting?
3    A    Yes, it would have to be then.
4    Q    So between May 3, 2003 and January 3, 2004
5  you didn't have any other face-to-face meetings with
6  Mr. Burton?
7    A    Not that I can recall.  Maybe later.
8    Q    Okay.  After you signed the retainer
9  agreement with Mr. Burton in May of 2003, how many
10  telephone calls did you have with Mr. Burton?
11    A    Several.
12    Q    Okay.  Do you remember what the topics were?
13    A    The case.
14    Q    Okay.  Do you remember what it is you and he
15  discussed about the case?
16    A    Yes.
17    Q    Okay.  What?
18    A    I asked him what was going on with the case
19  and he assured me that he was working hard on the case
20  and that he was doing some research and basically that,
21  you know, he was just working hard on the case.
22    Q    Okay.  Did you ask him what he was doing?

333

1    A    He would -- he would kind of tell me what he
2  was doing.
3    Q    Okay.  But did you ask him what he was doing
4  or what he meant by when he said he was working hard?
5    A    He would always fill in that part of the
6  conversation with well, I'm doing research, still trying
7  to get your medical records.  Denicole, we're going to
8  take care of you.  I'm working real hard on the case.
9    Q    Okay.  Did he tell you what research he had
10  done?
11    A    He told me he had looked up some cases
12  involving mold.
13    Q    Did he tell you that mold cases were hard to
14  prove?
15    A    I can't recall him saying that to me, no.
16    Q    Okay.  Did you ever discuss with him the
17  difficulty of proving a mold case?
18    A    I recall asking him how he felt about the
19  case.  He assured me again that it was a great case.  My
20  medical records, you know, with me treating with the
21  doctor from the time I moved in up until present were
22  basically mold related and that I had a good case and he

334

1  was working hard on it.
2    Q    Okay.  Do you remember when that conversation
3  occurred?
4    A    Every time I would talk to him, you know, we
5  would talk about how hard he was working on the case.
6    Q    But in terms of your claim being provable,
7  being mold related, when did you first have that
8  discussion with him after May of 2003?
9    A    I can't recall the exact date but, you know,
10  he just always assured me that I had a good case.
11    Q    Okay.  Did he ever discuss with you the fact
12  that you would need to hire experts in order to prove
13  your mold case?
14    A    No.
15    Q    What was your understanding as to how costs
16  would be paid for before the case went into court?
17    A    From my understanding when he went over the
18  retainer agreement with me, that it was done on a
19  contingency basis.  You know, he felt that it was such a
20  good case that I didn't have to pay any money out of my
21  pocket.  You know, he just -- he told me that, you know,
22  the firm would take care of everything.



347

1    A    I don't know.

2    Q    Did the apartments that you moved to -- when
3  you moved from 2-A to 101 was 101 bigger?

4    A    No, they were the same.

5    Q    Okay. Was 201 bigger than 101?

6    A    No, it was the same.

7    Q    Okay. Do you remember when your rent
8  changed?

9    A    I can remember from the time that we actually
10  was leaving Stanton Glenn, I think the rent was -- well,
11  I know it was higher than when we ever first moved in
12  that complex.

13    Q    Okay. Do you remember who it was who
14  attended the rent meeting in your Apartment 101?

15    A    I remember Darlene Bryant being there. I
16  remember a lady that lived upstairs. I can't recall her
17  last name but I know her name was Norma. We called her
18  Ms. Norma. I can't recall the others. I can't recall
19  their names.

20    Q    Do you remember how many people attended the
21  meeting?

22    A    Over five.

348

1    Q    Okay. Were they all women?

2    A    It was maybe two guys there.

3    Q    Okay. But you don't remember who they were?

4    A    No, I don't.

5    Q    Okay. Were there more people at the rent
6  increase meeting with Mr. Burton than the first mold/raw
7  sewage meeting?

8    A    Yes.

9    Q    Okay. Would it be fair to say that the
10  tenants were more interested in the rent increase than
11  they were the raw sewage problems?

12    A    They were just equally. You know, some of
13  them was -- the meeting was to discuss the rent increase
14  and the problems with the backups and sewage so, you
15  know, it was equally the same. We was fed up.

16    Q    Okay. Did anybody to your knowledge hire a
17  lawyer about the raw sewage or mold problem?

18    A    Not to my knowledge.

19    Q    Did anybody to your knowledge file a lawsuit
20  because of the raw sewage or mold?

21    A    Not to my knowledge.

22    Q    All right. So now looking at Exhibit 33,

349

1  these are the calls that you're aware of that you made
2  or that you, in the case of the August 11, 2005 call,
3  received, right?

4    A    Yes.

5    Q    Okay. Do you know what you and Mr. Burton
6  would have discussed on 6/16/05 or whether you were able
7  to reach him on 6/16/05?

8    A    I don't know what we discussed but when I did
9  talk to him it was always about the case.

10    Q    Okay. Do you know if you actually spoke to
11  him on 6/16/05?

12    A    I can't recall.

13    Q    Okay. How about on 6/17/05 which is a
14  four-minute call at 9:24 a.m.? Do you know if you spoke
15  to Mr. Burton on that date?

16    A    I can't -- I don't know for sure if I spoke
17  to him but, you know, it's apparent that I called him
18  and if, you know, I did speak to him which I likely did
19  for four minutes, it was about the case.

20    Q    Okay. Do you know what you would have spoken
21  to him about though?

22    A    Just the case. I don't know the specifics

350

1  but something pertaining to the case.

2    Q    Okay. Do you remember talking to him in June
3  of 2005 about the status of his filing a lawsuit?

4    A    Can you repeat that question?

5    Q    Do you remember talking to Mr. Burton in June
6  of 2005 as to the status of Mr. Burton either preparing
7  or filing a lawsuit for you or Ms. Ghee?

8    A    Not in June but in July.

9    Q    Okay. Is your recollection the same as
10  Ms. Ghee that you had one conversation with Mr. Burton
11  which was in July of 2005 about the filing or
12  preparation of a complaint?

13    A    Yes, I do remember having a conversation with
14  him about filing a complaint during that time.

15    Q    Okay. Prior to that telephone conversation
16  which we're going to get to in a minute in July of
17  2005 --

18    A    Okay.

19    Q    -- had you ever discussed with Mr. Burton
20  that he was working on, drafting a complaint, anything
21  like that?

22    A    When I discussed -- when I would talk to him

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

COPY

1 (Pages 1 to

1  IN THE UNITED STATES DISTRICT COURT
2     FOR THE DISTRICT OF COLUMBIA
3          Civil Division
4
5  ------------------------------- :
6  DENICOLE YOUNG and            :
7  VANESSA GHEE                  :
8       Plaintiffs      :
9  vs              : CA No.: 07cv983
10  WILLIAM F. BURTON, ESQUIRE     :
11  and LEWIS & TOMPKINS, P.C.     :
12       Defendants      :
13  ------------------------------- :
14
15  Videotaped Deposition of RITCHIE SHOEMAKER, M.D.
16          Pocomoke, Maryland
17         Monday, December 10, 2007
18              9:59 a.m.
19
20  Job No.: 1-117803
21  Pages: 1 - 230
22  Reported by: Janice Dickinson

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFFS:
4
5       MICHAEL HIBEY, ESQUIRE
6       BODE & GRENIER, L.L.P.
7       1150 Connecticut Avenue, N.W.
8       Ninth Floor
9       Washington, D.C.  20036-4192
10       (202) 828-4100
11
12  ON BEHALF OF DEFENDANT LEWIS & TOMPKINS, P.C.:
13
14       PAUL J. MALONEY, ESQUIRE
15       CARR MALONEY, P.C.
16       1615 L Street, N.W.
17       Suite 500
18       Washington, D.C.  20036
19       (202) 310-5500
20
21
22

1  Videotaped Deposition of RITCHIE SHOEMAKER, M.D. held at:
2
3
4
5
6
7
8
9
10  Chronic Fatigue Center
11  500 Market Street, Suite 102-103
12  Pocomoke, Maryland  21851
13
14
15
16
17
18
19
20
21
22

1       APPEARANCES (Continued)
2
3  ON BEHALF OF DEFENDANT WILLIAM F. BURTON, ESQUIRE:
4
5       DEBORAH MURRELL WHELIHAN, ESQUIRE
6       JORDAN COYNE & SAVITS, L.L.P.
7       1100 Connecticut Avenue, N.W.
8       Washington, D.C.  20036
9       (202) 496-4747
10
11  Also present:  Akim Graham, Videographer
12
13
14
15
16
17
18
19
20
21
22

EXHIBIT
4
tabbies

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

2 (Pages 5 to

C-O-N-T-E-N-T-S

EXAMINATION OF RITCHIE SHOEMAKER, M.D.       PAGE:
By Mr. Maloney                                  7
BY Ms. Whelihan                               194
By Mr. Maloney                                218

DEPOSITION EXHIBITS:                        PAGE:
1 - Record, 3/10/00                            18
2 - Record, 3/16/00                            18
3 - Discharge Summary                          26
4 - Patient facesheet                          32
5 - Order                                      46
6 - Appendices                                 52
7 - Initial B/W Draw Results 11/4/77           99
8 - Initial B/W Draw Results, 10/17/74        113
9 - Frequently Asked Questions                153
10 - FDA Warning Letter, 5/13/04              159
11 - Use of Pioglitazone to Prevent
Intensification of Persistent Symptoms        163
12 - 2005 CRBAI Donation Letter               166
13 - Plaintiffs' Rule 26 (a)(2) Disclosures   174

5

Company. Would the reporter please swear in the witness?

RITCHIE SHOEMAKER, M.D.,
having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANTS LEWIS &
TOMPKINS, P.C.

BY MR. MALONEY:

Q   Good morning, Dr. Shoemaker, my name is Paul Maloney. We've had a chance to meet off the record. I will have a number of questions for you today. Miss Whelihan will also have a number of questions for you, I'm sure. This be will be a pretty lengthy deposition, so we can take our time. Any time that you want to take a break for any reason, just let me know. Is there any reason why you can't answer questions truthfully today?

A   No, there's no reason.

Q   Are you on any medications today?

A   **Just my thyroid medicine I always take every day.**

Q   Dr. Shoemaker, are you a treating physician for Ms. Ghee and for Ms. Young?

P-R-O-C-E-E-D-I-N-G-S

6

THE VIDEOGRAPHER:  Here begins videotape number one in the deposition of Dr. Ritchie C. Shoemaker in the matter of Denicole Young and Vanessa Ghee versus William F. Burton, Esquire and Lewis & Tompkins, P.C., in the United States District Court for the District of Columbia, Case Number 07-cv-983.

Today's date is December 10, 2007. The time on the video monitor is 9:59 a.m., and the video operator today is Akim Graham. This video deposition is taking place at the Chronic Fatigue Center at 500 Market Street, Suite 102 and 103 in Pocomoke City, Maryland. Counsel, please voice identify yourselves and state whom you represent.

MR. MALONEY:  My name is Paul Maloney, on behalf of Lewis & Tompkins, P.C.

MS. WHELIHAN:  I'm Deborah Whelihan, on behalf of Defendant Bill Burton.

MR. HIBEY:  Michael Hibey on behalf of plaintiffs Denicole Young and Vanessa Ghee.

THE VIDEOGRAPHER:  The court reporter today is Janice Dickinson on behalf of L.A.D. Reporting

8

A   **I was expecting to be a treating physician for these patients. I saw them in consultation with an eye to correcting their illness. I prescribed medication for these patients following collection of a database, and I anticipate that they will be taking medical sometime in the future.**

Q   Have you had the follow-up call with either of the two patients? Has your office had the follow-up call from them since the visits that they had here on September 11, 2007?

A   **No, we've had occasion to send them documents from their lab results on two separate occasions requesting that they initiate the appointment-making process for that phone call, and to date we've not had that call.**

Q   Do you know why they have not called?

A   **No, I have not spoken to them in the matter.**

Q   Have you reviewed their depositions?

A   **I looked through their depositions for the first time last night.**

Q   Did you see where they are -- at least my recollection from their depositions was that they want

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

17 (Pages 65 to 6

65

1    going to a different building in the same complex.
2    Q    Frankly it was unclear at their deposition,
3    but I believe that the new move-in date to another
4    apartment building was September 23 of 2002. Let me
5    ask you to assume, hypothetically, that those were the
6    dates, August 19 to September 23rd of 2002. Would you
7    agree that that was the time period for the potential
8    exposure to mold or sewage, or whatever it was, when
9    they were in the apartment?
10   A    That's the potential for that exposure. Then
11   they have an additional exposure to the next place in
12   which there are repeated floods in the next place as
13   well.
14   Q    The next place was 3084, Apartment 101; is
15   that correct?
16   A    They stayed on the first floor while they had
17   some additional floods in the second building, then
18   they moved up to the second floor.
19   Q    When did the move take place to the second
20   floor?
21   A    I think that was in 2004, I believe, is where
22   they go to the second floor and then they stayed there

6

1    A    She had progressive shortness of breath over
2    several weeks that prompted an earlier evaluation in
3    the emergency room, for which she was given treatment.
4    Subsequently she was admitted with worsening oxygen
5    levels in her blood and shortness of breath.
6    Q    What was the specific agent that caused all
7    of that?
8    A    I don't know.
9    Q    Could it have been pollen?
10   A    Theoretically.
11   Q    Could it have been simply an upper
12   respiratory infection?
13   A    With pulmonary complications, it does happen.
14   Bad asthmatics is one thing we worry about.
15   Q    Could it have been an exposure to mold that
16   she got from cleaning bathrooms?
17   A    Several years beforehand. That would be less
18   likely.
19   Q    How about in the time period around March or
20   April of 2003?
21   A    Certainly it's possible that other exposures
22   that are not known to me that are not represented in

66

1    for two years before they moved to Alexandria.
2    Q    When did the floods take place?
3    A    After they moved in, and before 2004. I
4    thought it was 2003.
5    Q    Do you have any more information other than
6    that, as far as when the floods take place?
7    A    No.
8    Q    Were there two floods?
9    A    Several was the word that I was given.
10   Q    Do you have any information that one of the
11   floods took place at some point in proximity to Ms.
12   Young's admission to George Washington University
13   Hospital on April 15, 2003?
14   A    I was not able to pin that down in their
15   history as to whether the exposure to the second
16   building was more likely to be the source of the
17   problem for the Washington Hospital, or GW admission or
18   not. Again you asked about validity of history, I
19   can't tell you.
20   Q    What is it that caused the reaction in Ms.
21   Young that led her to go to the hospital on April 15,
22   2003?

68

1    the medical record could have been responsible for her
2    deterioration.
3    Q    Could secondhand smoke have caused it?
4    A    I don't think so.
5    Q    Could taking a medicine that she was allergic
6    to have caused that?
7    A    It would be unusual to see a respiratory
8    failure in the absence of angioedema to be the source
9    of a medication problem. Later on, she does have some
10   angioedema, but there's nothing to suggest that was
11   going on in April of '03.
12   Q    Does she have a history of eczema?
13   A    That I don't know.
14   Q    Was there a history of eczema in her family?
15   A    That I don't know, either.
16   Q    Going back to the first apartment that she
17   lived in, and I think it was 3064 2-A. Does that sound
18   correct to you?
19   A    Yes.
20   Q    Was the exposure that Ms. Young and Ms. Ghee
21   had, was it to mold in their particular apartment, or
22   was it mold in the apartment next door?

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

18 (Pages 69 to

**Page 69**

1    A    To my knowledge, the problem was next door.

2    Q    Was there mold in their particular apartment

3    2-A, in that window, and let's give the window of

4    August 19, 2002 to September 23 of 2002.

5    A    Let me see what I've recorded that they told

6    me. As an aside, what she told me in history is that

7    she had a cleaning service and had two employees, but

8    she didn't clean. So you had asked about could being a

9    cleaner do it, she told me she's not doing the

10   cleaning. That's just additional history that I didn't

11   recall when you asked the question.

12   Q    That's Ms. Young's record you're looking at

13   now?

14   A    That's Ms. Young's record. Initial

15   walk-through, no smells, no water stains, nothing

16   abnormal. First day they had a problem, horrible

17   smell, two to three days later, longstanding sewage

18   problem, has photos, walls, black and green cabinets,

19   had stain at least two feet that were cleaned.

20   Apartment reoccupied. What she's telling me here is

21   that the exposure, the water damage and the sewage was

22   in the apartment next to theirs, not to their

**Page 70**

1    apartment.

2    Q    So you have no history from Ms. Young of any

3    mold in her particular apartment 2-A?

4    A    That's right.

5    Q    What about with Ms. Ghee?

6    A    She was in the same apartment.

7    Q    And you're satisfied that her history was the

8    same as she provided it to you?

9    A    Let's see what she says. No air

10   conditioning, appointment, smoked two cigarettes every

11   two weeks -- I have pretty much recorded the

12   environmental exposure in Young's chart and not Ghee's

13   chart. There's nothing different about Ghee compared

14   to Young.

15   Q    So the exposure, then, was secondary from the

16   apartment next door. Did you have an understanding

17   that at some point Ms. Young and Ms. Ghee went into the

18   apartment next door?

19   A    Yes.

20   Q    Did you have an understanding that they

21   actually broke into that apartment?

22   A    No, I didn't know they broke into it.

**Page 71**

1    Q    How did you think they got into it?

2    A    Probably just opened the door and walked in.

3    Q    They didn't tell you that they went in

4    through a window and went into that apartment?

5    A    No.

6    Q    Did they tell you that they took photographs?

7    A    Yes.

8    Q    Did they tell you that they took a videotape

9    while they were in that apartment?

10   A    I knew there were photos. I didn't know

11   there was a video.

12   Q    Was there a reference to a video? Because I

13   thought I saw that.

14   A    Let's look. Has photos, walls black and

15   green, cabinets had stained cleaned at least two feet,

16   cleaned. I'm not seeing the comment about video. You

17   have a copy of the chart.

18   Q    I'm not sure where I saw it, but I thought as

19   I went through this this morning that I had seen that.

20   How about on the back of one of those notes in Ms.

21   Young's chart?

22   A    No.

**Page 72**

1    Q    No reference to that?

2    A    Was it in Mr. Hibey's notes?

3    Q    It could have been. We'll come back to that.

4    In any event, you've never seen a video?

5    A    Right.

6    Q    Do you know what type of mold was in that

7    apartment next door?

8    A    Nope.

9    Q    Do you know how long they were exposed to it?

10   A    They could not have been exposed before the

11   move-in, and would not have been exposed after they

12   moved out, unless their possessions were

13   cross-contaminated.

14   Q    I mean when they went into the apartment next

15   door. How long were they actually in the apartment?

16   A    I don't know how long they were in the

17   apartment.

18   Q    When they were in their own apartment, were

19   they exposed in an airborne fashion to the mold that

20   was in the apartment next door?

21   A    It certainly is possible.

22   Q    Do you know where their bedrooms were

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

44 (Pages 173 to 1

173

1  phenomenon called relative risk.  The relative risk is
2  derived by looking at the incidence of an illness in a
3  population of sick people, compared to the incidence of
4  a haplotype, and compared to the incidence of a
5  haplotype in the non-sick people.  When that number of
6  sick to non-sick exceeds 2.0, the statisticians tell me
7  that we can call that increase of susceptibility.
8      Q   That's the field of epidemiology: is that
9  right?
10     A   Yes.  Now Allen steer, Dr. Steer has looked
11  further at 4353, one of the other dreadeds, and then in
12  line 5651.  He actually is shown the molecular biology
13  of why there is an increased risk of illness, and
14  people with one kind of antigen presentation type
15  compared to someone that doesn't have that.
16     Q   How we know that, since Ms. Young had the
17  dreaded genotype that she didn't have mold exposure
18  which then led to a diagnosis of chronic fatigue in
19  2000?
20     A   I think it's a perfectly acceptable question.
21  All I have is absence of comment in the medical record,
22  and we've already documented, I have concerns about how

174

1  secure that medical record reliability is, that's
2  number one, and number two, her word.  That's all I
3  have.
4      MR. MALONEY:  Let's go off the record.
5      THE VIDEOGRAPHER:  This marks the end of
6  volume I, tape number two, in the deposition of Dr.
7  Ritchie C. Shoemaker.  Going off the record, the time is
8  2:54 p.m.
9      Back on the record.  Here marks the beginning
10  of volume I, tape number three in the deposition of Dr.
11  Ritchie Shoemaker.  The time is 2:58 p.m
12     BY MR. MALONEY:
13     Q   Now Doctor, the 26 (b)(4) -- actually, it's
14  26 (a)(2) disclosure that was made in this case, and
15  this was prepared by counsel.  Let's go ahead and mark
16  this as an exhibit, so you have it.
17     (Deposition Exhibit 13 was marked for
18  identification.)
19     BY MR. MALONEY:
20     Q   This document, Exhibit 13, makes reference to
21  the expected opinions that you're going to give in this
22  case.  First and foremost, are you going to testify as

1  an expert in this case if these patients, Ms. Ghee and
2  Ms. Young, do not follow your protocols?
3      A   Well, first of all, this is the first time
4  I've seen this document, and so the fact that I don't
5  know who wrote this is really irrelevant.  I'm supposed
6  to say the cause and extent of injuries --
7      Q   Correct, the second paragraph.
8      A   Necessity of medical care, reasonableness
9  cost, permanency of the injuries.  Statistically, I
10  will be able to predict, based on low VIP and low MSH,
11  that they will have some permanence of their injuries.
12  But to the extent, no, there's no way that I can
13  provide that opinion if they've not been treated.
14     Q   You can't testify to the permanency?
15     A   That's right.  People like Vanessa have
16  really excellent looking prognosis, and we should have
17  significant symptom reduction in her.  Denicole is
18  going to have a lot more trouble.  Her C-4a of 10,000
19  is a formidable enemy.
20     Q   Are you going to testify to the amount of and
21  reasonableness of the costs related for the treatment
22  that they've received in the past?

176

1      A   Well, I don't see that anything that's been
2  done for them and to them has been unreasonable.
3      Q   Do you know how much has been spent in the
4  cost of providing medical care for Denicole Young up to
5  this point?
6      A   No, I don't.
7      Q   So this is the first time that you knew that
8  you were testifying to this particular opinion?
9      A   I know that there was some question that she
10  expressed as to whether or not her seven days, nine
11  days in the hospital, some of which were on a
12  ventilator, was due to the mold exposure or not.
13     Q   This is a question that Ms. Young expressed
14  to you?
15     A   Yes.
16     Q   When she was here?
17     A   Yes.
18     Q   What did you tell her?
19     A   Let's see what the data showed.
20     Q   I haven't seen anything in writing that
21  answers that question.  What is the answer to that
22  question?

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

45 (Pages 177 to

177

1    A    The answer to the question is that if she has
2  an intubation in 1997 and this hyperacute near fatal
3  respiratory failure that she had in April of '03 can be
4  shown to also have a non-mold exposure relationship, we
5  then are going to be asked -- I guess me and the frog
6  in my pocket -- I'm going to be asked to say what is
7  the likelihood that mold did it versus something else
8  doing it. I won't be able to answer that question.
9    Q    Let's assume that you're right and let's
10 assume that she's right in saying I was not intubated
11 in 1997, I don't know where that came from, so that's a
12 mistake in the records. Let's assume that she was on a
13 nebulizer prior to August of 2002, that she had been
14 diagnosed as having asthma, although it doesn't
15 necessarily meet your definition, and then the question
16 comes down to something along the lines of does a
17 34-day exposure to an apartment, or by being in an
18 apartment next to an apartment that has mold in it in
19 August and September of 2003 -- August and September of
20 2002, does that cause the problems that she had some
21 seven months later in April of 2003 when she went to
22 George Washington Hospital and was intubated and

178

1  hospitalized for nine days?
2    A    I understand the importance of that question.
3  We have to add to that question of what additional
4  exposures did she have, say, at the end of March right
5  before her illness gets started. She's developing what
6  other people would call status asthmaticus, in that
7  she's got a visit to the physician, a visit to the
8  emergency room, as antecedent events that lead up to
9  going on the vent, and specifically was that due to
10 exposure to a different building, if such then we can
11 blame the priming of August, September as the cause.
12 If it's due to pollen, if it's due to an infection,
13 then we can't blame it on that. Asthma by itself with
14 ran IGE of 29 is, if it's gonna be there -- and I don't
15 think it's real -- if it's gonna be there, it's
16 intrinsic asthma.
17    Q    Otherwise, you'd have higher IGEs.
18    A    Exactly.
19    Q    I understand that, but would the IGEs have
20 been a 29 necessarily back in April of 2003?
21    A    They rarely change.
22    Q    I'm still not sure I have an answer, then.

1  You've given me some possibilities. What is your
2  opinion in this case? This is my one time to ask you
3  these questions.
4    A    I understand, and I want to be respectful of
5  the need to have a good answer to that, and I posed
6  this to Mr. Hibey earlier. Where is the 1997
7  intubation.
8    Q    What did Mr. Hibey tell you?
9    A    He says he doesn't know. I'll just tell you,
10 if she was intubated in 1997, there's no way in the
11 world I can give anybody reasonable medical certainty
12 about the mold exposure and then six months later.
13 This concept of sicker quicker is that once we start to
14 see a rise of C-4a in this genotype, that doesn't go
15 away. With another exposure on top of it, boom, you
16 can get hit real quickly.
17    Q    What was the additional exposure that she
18 had? Let's assume that you're right. She got sicker
19 quicker in August and September of 2002.
20    A    No, no, no. She got primed, she got sick in
21 August and September, and now she's a time bomb.
22    Q    Now she gets another exposure at some unknown

180

1  time to some unknown mold.
2    A    If it's mold, her C-4a would have gone
3  through the roof. If that intubation is related to an
4  inflammatory acquired immune problem, then what's
5  happened to her in August is irrelevant.
6    Q    I think I understand. You don't have the
7  answers as you sit here today; is that right?
8    A    I don't have the data. Let's go to George
9  Washington's freezer, pull out some blood and send it
10 off to National Jewish for a C-4a. Give me one test
11 and I can answer it.
12    Q    Do you know if she had an allergic asthma in
13 April of 2003?
14    A    No, I don't. What we know is that she had a
15 reduction of diffusion capacity and a PO2 of 50, which
16 will kill you. So gas exchange was stopped by an
17 inflammatory problems between air spaces, which is not
18 what allergic asthma does. That allergic asthma will
19 give you an intra air space problem, not an extra air
20 space problem. Am I clear?
21    Q    I think I understand. Let me ask this. Are
22 you going to testify in this case that Ms. Young had

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

49 (Pages 193 to

193

1  bandage your hand after you burned it when it got
2  infected, it's your fault?
3      Q  Could be.
4      A  I think I know something about that.
5      Q  If Ms. Young and Ms. Ghee don't follow your
6  protocols at this time, and they continue to be injured
7  and say that they're permanently damaged, but they
8  don't follow your protocols, have they failed to
9  mitigate their damages, in your opinion?
10     A  I'm a country doctor and I don't think I can
11 give a legal opinion.
12     MR. MALONEY:  Doctor, I think those are the
13 all the questions I have. I'm going to turn it over to
14 Miss Whelihan. The one thing I do want to do is read
15 through these articles, and I think I'm all done. The
16 one thing I would like to get from you is from Ms.
17 Young's file, I would like to get the pages 21 and 22,
18 and then page 2A, I think it was, which I don't have, I
19 don't believe.
20     A  So you need Young and Ghee for both of those.
21     Q  Ghee, I think the entire file was copied, but
22 I did not get copies of those pages for Ms. Young.

194

1      A  You took me down to the labs for Young, and
2  then we stopped.
3      Q  Yes. Here's a copy of Ms. Young's record,
4  which I've got. I'm not going to mark it as an
5  exhibit.
6      THE VIDEOGRAPHER:  Going off the record. The
7  time is 3:30 p.m.
8      Back on the record. The time is 330 p.m.
9      EXAMINATION BY COUNSEL FOR DEFENDANT WILLIAM F.
10 BURTON, ESQUIRE:
11     BY MS. WHELIHAN:
12     Q  Now you know that Ms. Ghee and Ms. Young went
13 into the adjacent apartment, the one that had the water
14 damage, right?
15     A  Yes.
16     Q  Can you quantify for me what effect going
17 into the apartment would have had on them as opposed to
18 just simply living in the adjacent apartment?
19     A  I can't quantify that. I can give you a
20 qualitative opinion that that increased their exposure.
21     Q  Would it be fair to say that being in the
22 apartment where the mold was would be a greater risk

1  than just living next door to it?
2      A  Yes.
3      Q  Now you have Ms. Ghee's chart still in front
4  of you?
5      A  Yes.
6      Q  In her chart, under history, it says habits,
7  and it says cigarettes/other.
8      A  Yes.
9      Q  And she wrote N/A?
10     A  Yes.
11     Q  That's her handwriting in there?
12     A  I assume so. I don't know that for a fact.
13     Q  When you met with her when you saw her the
14 one time, she told you that she did smoke?
15     A  Yes, she said two cigarettes every two weeks
16     Q  I know Mr. Maloney has already gone over
17 this, so I don't want to be redundant, but you expect
18 to be a treating physician, but would it be fair to say
19 that right not, having only seen them once, you are not
20 currently a treating physician?
21     A  Since they haven't taken medication, I think
22 I'm best described as a consultant.

196

1      Q  Now chronic biotoxin associated illness is a
2  diagnosis of your creation?
3      A  It's a term that I've used in an effort to
4  help the listener have an idea of the physiology
5  involved.
6      Q  So other health care providers don't use the
7  term?
8      A  Whether they do or don't is really not the
9  purpose of what I want to do with mold illness
10 scenario.
11     Q  The shorthand is CBAI?
12     A  Yes.
13     Q  And CBAI, can we say that that's not a
14 generally-accepted diagnosis?
15     A  No argument about that.
16     Q  And it doesn't have a formal ICD-9 CM
17 classification?
18     A  Well, there's a classification for mycotoxin
19 illness, and when we get stuck and need to use
20 something and we know that there's been toxigenic
21 fungi, we can use that. The presence or absence of an
22 ICDM coding is really kind of irrelevant. Pfiesteria

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

51 (Pages 201 to

201

1  one, chronic fatigue is another, lyme syndrome is
2  another. It is a final common pathway to find MSH
3  deficiency when there is altered immunal regulation.
4      Q   How about visual contrast sensitivity? Would
5  it be fair to say that there is no scientific
6  literature that validates the use of visual contrast
7  sensitivity testing as a diagnostic tool for diagnosing
8  illnesses associated with mold exposure?
9      A   What we're looking for in visual contrast is
10  not to diagnose mold illness. We're looking for visual
11  contrast as an accepted test, one that does have a ICDA
12  code for use of visual contrast, and we're looking to
13  see is there evidence of a deficit. We don't use the
14  test to say mold, we use it to define the physiology.
15  VCS is used by EPA, VCS is used by the state of
16  Maryland, VCS is used by NIOSH, and in fairly wide
17  acceptance for people that treat mold illness patients
18  as well as other illness syndromes.
19      Q   Now you started using VIP in 2005?
20      A   I think so.
21      Q   Is VIP a diagnostic tool that is
22  investigational?

202

1      A   Probably.
2      Q   Has the American Medical Association endorsed
3  your CSM protocol?
4      A   The American Medical Association does not
5  endorse any medical protocols. That's not the function
6  of that institution.
7      Q   Has the CDC endorsed your CSM protocols?
8      A   CDC does not endorse treatment protocols.
9  That's not the function of that institution.
10      Q   Now you've heard the paper titled, "The
11  Medical Effects of Mold Exposure," published by the
12  "Journal of Allergy and Clinical Immunology"?
13      A   Is that the Bush stuff from February 2006?
14      Q   It was published in February, 2006 by Drs.
15  Bush, Portnoy and Saxon.
16      A   Portnoy pulled his name, by the way. He was
17  protesting what was said in that paper. He pulled his
18  name out of it.
19      Q   Do you know when that was?
20      A   Sometime between February and September.
21      Q   For the patients that you treat for mold
22  related illnesses, how frequently do you see the

1  patients for a follow-up?
2      A   It depends on many different factors.
3  Distance away from the office is one thing, need for
4  follow-up here is another. For many people that I see,
5  I can treat them over the telephone, once we've
6  established a doctor patient relationship. That means
7  I can order lab tests, that means that I can call in
8  prescriptions or write prescriptions for people to use.
9  If they need to come back here, then they do come back
10  here. Some people need to come back every three weeks,
11  some people come every three months. Most people, once
12  they're stable, come every six to nine months.
13      Q   Is it true that mold exists virtually
14  everywhere?
15      A   Yes, I would agree with that.
16      Q   Is it also true that not every species of
17  mold emits mycotoxins?
18      A   That's true, and if mycotoxins were our only
19  worry, that would be of greater concern to me.
20      Q   Mycotoxins are not biotoxins, right?
21      A   Sure they are.
22      Q   Is there a level of mycotoxin that is not

204

1  harmful?
2      A   We don't know a dose response relationship
3  isolating mycotoxins from all others within a
4  water-damaged building. I have not ever made a public
5  statement, to my knowledge, that said mycotoxins are
6  the sole source of the problem. We're looking at
7  exposures in this dose response idea that are going to
8  be variable. They'll change from day to day. Host
9  susceptibility changes from day to day, based on prior
10  innate immune responses. There are synergistic
11  interactions between mycotoxin forming fungi and toxin
12  forming actinomycetes. There are confounding exposures
13  to proteins, such as protein aces, and hemolysins that
14  add their own inflammatory aspects to the total
15  chemical stew that we see in this situation. There are
16  other inflamogins present within water damaged
17  buildings, including beta glucans and volatile organic
18  compounds, as well as some manos-containing proteins,
19  whose role is one to add, synergistically, to the toxin
20  effects. To solely focus on mycotoxins is completely
21  inaccurate. More importantly, we know that while there
22  is clearly shown neurotoxicity from mycotoxins and from

VIDEOTAPED DEPOSITION OF RITCHIE SHOEMAKER, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

52 (Pages 205 to 2

205

1  endotoxins, the combination is far more than ones
2  taken individually.
3      In this whole situation, every time I hear a
4  question about mycotoxin specifically alone, it shows
5  that there is some denial of the importance of the
6  ecology in a water-damaged building compared to a non
7  water-damaged building.
8      Q   Is it correct that mycotoxins or the vast
9  majority of mycotoxins are not neurotoxic?
10     A   It kind of depends on what the host is. For
11 someone without HLA susceptibility, I don't see any
12 evidence of neurotoxicity from hardly any of these
13 compounds. We know there's a very different approach
14 in people who have been sickened by a different
15 illness, say lyme, with now exposure. We have to sort
16 out in that question, what is the host, what is the
17 organism.
18     Q   We don't know whether there were mycotoxins
19 present in the apartment next to Ms. Ghee and Ms.
20 Young?
21     A   The fact that no testing was done does not
22 change the fact that you had a water-damaged building

206

1  with visible mold growth. The likelihood that that is
2  never going to be a toxigenic material is essentially
3  zero in my experience.
4      Q   But we don't know, right?
5      A   The fact that we don't know doesn't mean it
6  was there.
7      Q   There was a case that you talked about in
8  Alabama where you were not allowed to testify because
9  the lawyer was not admitted in Alabama?
10     A   Right.
11     Q   Is that the Fulmar Kenner case?
12     A   It was Capaci.
13     Q   Is there a case where you were not permitted
14 to testify where the plaintiff was Fulmar Kenner, LLC,
15 filed in Mobile County, Alabama?
16     A   Not to my knowledge.
17     Q   How about another case in Virginia, the
18 Virginia case that you talked about with Mr. Maloney,
19 you called that the Odaris case?
20     A   Odaris, yes.
21     Q   Was there another case, Kim Stewart Ford,
22 where you were not allowed to testified?

1      A   It's not a matter of not allowed. The judge
2  said to David Bailey you have two experts saying the
3  same thing, they are duplicative. Which one do you
4  want.
5      Q   It's not your understanding that you were
6  struck in that case?
7      A   I was not struck in that case.
8      Q   Are you aware that there weren't any other
9  lawsuits filed by any of the other tenants of Stanton
10 Glen, the apartment complex that Ms. Ghee and Ms. Youn
11 complain was the cause of all their injuries?
12     A   I didn't know that.
13     Q   Does that have any significance for you, that
14 there weren't any other lawsuits brought by the other
15 tenants?
16     A   No.
17     Q   Is it your opinion that mold can never be
18 removed?
19     A   No. I've not said that.
20     Q   Does the CDC believe that mold can be removed
21 with bleach?
22     A   CDC has on their 2002 website the suggestion

208

1  to use bleach. An updated opinion from CDC is that
2  there must be some sort of biological inactivation
3  together with cleaning, including vacuuming. Bleach
4  alone is not ever going to take care of the problem, in
5  that a significant number of the toxin formers are
6  resistant to bleach.
7      Q   Is it fair that you have never testified for
8  a defendant in a mold case?
9      A   I've never been called to testify. I've
10 provided an opinion for only one defense organization,
11 and that case was settled against Dr. Guidotti, by the
12 way. It was kind of an interesting turn-around, and I
13 had been retained by Nationwide to be basically on call
14 for their mold cases in this area.
15     Q   How did that come about?
16     A   How did the Natiohnwide deal come out?
17     Q   Yes.
18     A   A guy called me up, said this is what we
19 want, can you do it, I said sure.
20     Q   Do you remember the person who called you?
21     A   Steve Johnson, I think.
22     Q   And has anybody contacted you after that

DEPOSITION OF CHRISTOPHER G. HOGE
CONDUCTED ON WEDNESDAY, NOVEMBER 7, 2007

1 (Pages 1 to 4)



```
                                                    1
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3               Civil Division
 4       - - - - - - - - - - - - - - - X
 5   DENICOLE YOUNG
 6   and                          :
 7   VANESSA GHEE,                :
 8            Plaintiffs,    :
 9   vs.                 : Case No.: 07cv983
10   WILLIAM F. BURTON, ESQUIRE,   :
11   and                    :
12   LEWIS & TOMPKINS, P.C.,      :
13            Defendants.    :
14       - - - - - - - - - - - - - - - X
15
16       Deposition of CHRISTOPHER G. HOGE
17            Washington, D.C.
18       Wednesday, November 7, 2007
19               10:13 a.m.
20   Job No.: 1-113828
21   Pages:   1 - 159
22   Reported by:  Dana C. Ryan, RPR, CRR
```

```
                                                    2
 1       Deposition of CHRISTOPHER G. HOGE, held at the
 2   law offices of:
 3          Carr Maloney, P.C.
 4          1615 L Street, N.W.
 5          Suite 500
 6          Washington, D.C. 20036
 7          (202) 310-5500
 8
 9
10       Pursuant to agreement, before Dana C. Ryan,
11   Registered Professional Reporter, Certified Realtime
12   Reporter and Notary Public in and for the District of
13   Columbia.
14
15
16
17
18
19
20
21
22
```

```
                                                    3
 1               A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4       MICHAEL K. HIBEY, Esquire
 5       Bode & Grenier, L.L.P.
 6       1150 Connecticut Avenue, N.W.
 7       Ninth Floor
 8       Washington, D.C. 20036
 9       Telephone:  (202) 828-4100
10
11
12   ON BEHALF OF THE DEFENDANT LEWIS & TOMPKINS, P.C.:
13       PAUL J. MALONEY, Esquire
14       Carr Maloney, P.C.
15       1615 L Street, N.W.
16       Suite 500
17       Washington, D.C. 20036
18       Telephone:  (202) 310-5500
19
20
21
22
```

```
                                                    4
 1         A P P E A R A N C E S  C O N T I N U E D
 2
 3   ON BEHALF OF THE DEFENDANT WILLIAM F. BURTON,
 4   ESQUIRE:
 5       DEBORAH MURRELL WHELIHAN, Esquire
 6       Jordan, Coyne & Savits, L.L.P.
 7       1100 Connecticut Avenue, N.W.
 8       Suite 600
 9       Washington, D.C. 20036
10       Telephone:  (202) 296-4747
11
12
13
14
15
16
17
18
19
20
21
22
```

EXHIBIT

tabbies

5

5

1        C O N T E N T S
2   EXAMINATION OF CHRISTOPHER G. HOGE:
3     By Mr. Maloney                     7
4     By Ms. Whelihan                  106
5
6
7
8
9        E X H I B I T S
10      (attached to the transcript)
11   DEPOSITION EXHIBIT                 PAGE
12   No. 1   Handwritten List Of Mr. Hoge's      9
13          Expert Witness Testimony Dated
14          July 6, 2006
15   No. 2   Handwritten Notes               23
16   No. 3   List Of The Phone Calls Made     30
17          Between The Plaintiffs And
18          William F. Burton In The Period
19          Of June 9, 2005 Through December 8,
20          2005 And The Period Of January 9,
21          2006 Through April 19, 2006
22

6

1   No. 4    Handwritten Notes Dated        84
2           September 7, 2007
3   No. 5    Handwritten Notes Dated        86
4           September 13, 2007
5   No. 6    Handwritten Notes Dated        91
6           November 6, 2007
7   No. 7    Document Titled Report Of       95
8           Christopher G. Hoge
9   No. 8    Retainer Agreement           141
10
11
12
13
14
15
16
17
18
19
20
21
22

7

1        P R O C E E D I N G S
2        CHRISTOPHER G. HOGE,
3   having been duly sworn, testified as follows:
4     EXAMINATION BY COUNSEL FOR THE DEFENDANT
5        LEWIS & TOMPKINS, P.C.
6   BY MR. MALONEY:
7     Q   Please state your name for the Record.
8     A   Christopher G. Hoge.
9     Q   And what is your occupation?
10    A   I'm an attorney.
11    Q   Mr. Hoge, we've known each other over the
12   years. I think we've had cases together. I think
13   you've probably had cases with Ms. Whelihan as well,
14   so I'm going to dispense with a lot of formalities
15   here.
16       How many times have you been deposed
17   previously?
18    A   You'll have to allow me to refer to some
19   handwritten notes. I have not kept extremely good
20   track of my expert witness experience, but I did make
21   a handwritten list a while ago, and, so, I can count
22   on this handwritten list -- it's a piece of paper I've

8

1   shown you -- one, two, three, four -- looks like four
2   times.
3     Q   So four times you've been deposed and --
4     A   As an expert.
5     Q   All right. And is -- that list that you
6   have in front of you, is that the list of experts --
7   or times that you've been retained to be an expert
8   witness?
9     A   Yes. Now, of course this doesn't count
10   times when I've been asked to be an expert and
11   declined to get involved because I didn't subscribe to
12   the opinion that was being asked of me.
13    Q   Got ya.
14    A   And these are -- and let me just make a
15   caveat that these are the ones that I could remember
16   sitting down about a year and a half ago when I got
17   retained in another case, and I combed through a few
18   records. I can't say that there are not others out
19   there that I'm not remembering, but these are the ones
20   that I remember.
21    Q   I can do this one of two ways. I would like
22   to mark that as Exhibit 1. Do you have a problem if

DEPOSITION OF CHRISTOPHER G. HOGE
CONDUCTED ON WEDNESDAY, NOVEMBER 7, 2007

37

1  exposure to the toxic mold, if the mold exacerbated
2  those conditions, the case had value. There's plenty
3  of personal injury in toxic tort litigation that talks
4  about exacerbation of preexisting conditions. So,
5  yes, it has an impact on what the value is. Many
6  different things have an impact on what the value is,
7  and ultimately it is a jury that's going to determine
8  what the value is, but does it make a difference in
9  terms of was there some value or was there no value?
10  No, I don't think so.
11    Q    What are some of the factors that go into
12  determining what the value of a mold case is?
13    A    Let me preface my answer by saying that I am
14  a relative novice to toxic mold cases. I've been in
15  practice for 32 years, handling a wide variety of all
16  kinds of litigation, but my actual first involvement
17  in a toxic mold case, other than being an expert in
18  this case, is through another case that came in my
19  office just a little bit before this case came in, and
20  I've been doing quite a bit of research into toxic
21  tort litigation, but I certainly do not consider
22  myself and do not purport to be an expert specifically

38

1  as to toxic tort litigation.
2        Having said that, certainly -- and -- and --
3  and by the way, I will use that as an excuse, that if
4  I don't use appropriate technical terminology, it's
5  out of my relative inexperience, I'd say, with
6  specifically toxic tort cases, but certainly the
7  length of exposure to the toxicity, the toxic
8  materials, the degree of intensity of the toxic
9  materials as analyzed by an environmental -- I forget
10  the name. There are -- we have a number of reports in
11  my other case from environmental people who come in
12  and can measure the degree and intensity of toxic
13  mold. I forget what they call themselves. They're
14  not toxicologist, but something like that. And those
15  things can be measured, and certainly that would have
16  an impact on the value.
17        Another impact, obviously, is the degree of
18  the physical reaction to the toxic mold; how intense
19  the symptoms are, how long lasting the symptoms are,
20  what the nature of the disease is, whether it's asthma
21  or an allergic reaction or bronchial malfunction, what
22  have you.

39

1        Another factor would be has the plaintiff
2  lost income as a result of being incapacitated after
3  exposure to the toxic mold, the degree of pain and
4  suffering suffered by the plaintiff as a result of --
5  of that exposure, including both the intensity of the
6  symptoms and the duration of the symptoms.
7        I think another factor as to the value of
8  such a case is going to be the responsibility or lack
9  of responsibility of the entity or person responsible
10  for maintaining the premises in a toxic-free
11  condition. In other words, if the defendant, in this
12  case, I guess, called Stanton Glenn, the owners or
13  managers of the apartment building that Ms. Ghee and
14  Ms. Young lived in -- if the owners were on clear and
15  repeated notice that there was a mold problem in their
16  apartments and failed to take action to remedy that,
17  that would be a more severe liability situation than
18  somebody who had no reason to believe that there was
19  mold until the particular incident giving rise to the
20  claim. That's really more of a liability issue than a
21  value damages type issue, but I think it can go to
22  damages, particularly if there's a punitive -- there

40

1  could be a punitive element to the case if there is a
2  really egregious failure to respond to notice.
3        The personality of the plaintiff is a
4  factor. I think it's a large factor, as I think you
5  well know from your own experience, in the value of
6  the case. If you have a plaintiff with a pleasing
7  personality who seems to be a worthy individual, that
8  person is more likely to get a favorable verdict than
9  somebody who has been impeached as being noncredible
10  or has some personal attributes which a jury might
11  find offensive or at least not appealing. All of
12  those are factors that go into the valuation of a
13  toxic tort case.
14    Q    How about the amount of the medical
15  specialists themselves: is that another factor?
16    A    That's a good one. In this case I think
17  there was some 85,000 for one hospitalization alone.
18    Q    How about the question of causation; is that
19  a significant factor in valuing a mold case?
20    A    Well, when you say, "valuing a mold case,"
21  there's different purposes for which one does a
22  valuation. There is a valuation that one does for

11 (Pages 41 to 44)

41

1  settlement purposes, for settlement negotiations, and
2  then there's a value that a jury puts on it. I would
3  say that for settlement purposes that is a factor.
4  For the value that a jury might put on a claim, it
5  probably is not a factor.
6      Q    Why do you say that? Out of curiosity, I'm
7  just -- maybe I'm not clear of what you're saying,
8  but --
9      A    And I want to make sure I'm answering your
10  question, so would you actually repeat your question
11  to me?
12     Q    Sure. Let me try and rephrase it so we're
13  on the same page. Is the issue of causation a
14  significant issue in handling a mold case?
15     A   .Causation is a significant issue in any tort
16  case.
17     Q    Got ya. Are you aware of issues dealing
18  with both a specific and general causation in handling
19  a toxic tort case? Are you familiar with those terms?
20     A    It sounds like you're using those as a term
21  of art, and I'm not sure that I could say that I know.
22  I mean, I'm certainly familiar after 32 years of tort

42

1  litigation with the concept of causation, and I
2  certainly know it's the burden of a plaintiff to prove
3  that the allegedly responsible agent, in this case
4  toxic mold, in fact caused and is the direct and
5  proximate cause of injury to the plaintiff.
6      Q    Have you ever engaged in a Daubert Hearing?
7      A    As an attorney?
8      Q    Yes.
9      A    No, actually I've never done that.
10     Q    Have you ever engaged in a trial --
11     A    I'm familiar with it.
12     Q    Have you ever engaged in a Frey Reed
13  Hearing?
14     A    I never have.
15     Q    Have you ever as an expert been in involved
16  in a Daubert or Frey Reed Hearing?
17     A    No.
18     Q    Have you attended any seminars on mold?
19     A    On mold?
20     Q    Yes.
21     A    Seminars?
22     Q    Yes.

43

1      A    No.
2      Q    And I take it you've never presented
3  anything on mold?
4      A    No.
5      Q    Never written or presented anything on mold
6  litigation?
7      A    That is correct.
8      Q    All right. So back to the -- I think you
9  gave an answer that causation might have an impact on
10  settlement but not on jury verdict. I'm not sure I
11  understand.
12     A    Well, when you say it has an impact on the
13  value, I think when a jury looks at it they decide
14  either there's causation or there's not.
15     Q    Right.
16     A    And once they decide there's no causation,
17  then they don't issue a verdict on value because
18  they're not required to, and if they find that there
19  is causation, then they're not considering the factor
20  of causation. To me it's -- when a jury looks at a
21  case, you know, you get through the liability issue
22  and then you go to the damages question, and causation

44

1  is a liability issue.
2      Q    Got you. I guess, then, let's -- let's look
3  at it from this perspective. As a plaintiff's
4  attorney in evaluating a case and -- both in
5  determining whether to take a case in the first
6  instance and then in evaluating whether to take it to
7  trial or not, certainly one of the factors is how the
8  case will play in front of a jury, causation being a
9  large factor, and in particular in a mold case it
10  would be a large factor; would you agree with that?
11     A    I don't know why it's more of a factor in a
12  mold case than in any other case. I would agree with
13  you that causation is always a highly significant
14  issue.
15     Q    All right. Well, let's do it this way. In
16  a perfect world, if the case had been filed timely in
17  this instance, do you have a sense as to who the
18  causation experts would have been in the underlying
19  matter?
20     A    The toxicologist who wrote a very lengthy
21  report in this case, and then there were city agencies
22  that sent in inspectors. I've seen the records from I

DEPOSITION OF CHRISTOPHER G. HOGE
CONDUCTED ON WEDNESDAY, NOVEMBER 7, 2007

12 (Pages 45 to 48)



45

1  think the Department of Health and Human Services or
2  whatever the city agency is that covers that area --
3  and I can find the document if you want -- that went
4  in and inspected and found these things.
5      They could well have been called as an
6  expert as to their experience with mold and whether or
7  not that causes the types of symptoms that Ms. Ghee
8  and Ms. Young experienced, but primarily it's the
9  toxicologist.
10     Q   So you would agree that you need a
11  toxicologist in a case such as this?
12     A   Yes.
13     Q   And --
14     A   They had one -- or, I'm sorry, there is one
15  who has been identified since the statute of
16  limitations has been missed to supply that causation
17  element.
18     Q   Have the treating physicians, from your
19  review of the underlying records, provided such
20  causation testimony?
21     A   Actually, I saw -- well, first of all, they
22  haven't provided any testimony because nobody has

46

1  taken their depositions.
2      Q   I agree with that.  But have they -- in
3  their records --
4      A   There is something --
5      Q   -- and --
6      A   Yes.
7      Q   -- in their reports, have they provided
8  causation in your judgment?
9      A   I don't think you're going to find anything
10  in an emergency room record or a hospital record
11  that's going to say, I specifically find that these
12  conditions were caused by mold; although, I can't say
13  for certain that there's not something along those
14  lines, but I did see a record that was significant on
15  that issue if you'll give me a moment to try to find
16  it.
17     Q   Sure.  And if you need your assistant to
18  help, that's fine as well.
19     A   You know, actually, I don't think I do.
20  No -- well, I'm looking at --
21     Q   Just give me the big number.
22     A   Well, interestingly, it may have been

47

1  clipped off the bottom.  Let's see.  Unity Health
2  Care, Inc., Adult Progress Note, 9/24/02.  I think
3  this would be from G.W.  I'll show it to you.  There's
4  no Bates number on there that I see.
5      Q   All right.  There is no Bates number on this
6  document.  It is dated September 24th, 2002.  At the
7  top it has Unity Health Care, Inc., Adult Progress
8  Note, and actually there is a Bates number in the
9  middle of the page.  It's L&T0345.
10     A   I'm sorry.  I didn't see that.  I covered it
11  with my sticky.
12     Q   That's okay.
13     A   I'm just looking under the heading
14  Assessment, there's a number one that says, Allergic
15  reaction/rhinitis/RAD, and right under there, Mold
16  exposure, and then, Has had two course, C-O-U-R-S-E, I
17  think -- although it could be cause, C-A-U-S-E.  I
18  can't read it -- of ABX.  I don't know what ABX means.
19     That certainly indicates that somebody -- I
20  think this has to do with the G.W. hospitalization --
21  made a connection between the allergic reaction and
22  the mold exposure.  Now, I'm not saying that's the

48

1  be-all and end-all.  In fact, there's more on this
2  page.  It's hard to read some of these notes,
3  obviously, but it says something, Per patient thinks
4  that mold in house is triggering symptoms; that's S/S.
5  Roommate has similar symptoms.  Other members in
6  apartment have similar symptoms, has cough, dry, et
7  cetera.  Now, that's, of course, history.  That's not
8  a physician's assessment.  But under Assessment, it
9  says, Allergic reaction, and then, Mold exposure, so
10  that's one instance that seems to be an indication
11  that a doctor has found a connection.
12     Now, I should also say that in my notes when
13  I was reviewing these records the first time, I wrote
14  down a reference to a report that I thought was
15  significant, but then this morning when I went to try
16  to find it, I couldn't find it, but I did write down
17  the date and the author of the report, and that might
18  have something that's relevant to that answer as well.
19     Q   What's the date and the author?
20     A   12/21/04, Dr. Chitkara, C-H-I-T-K-A-R-A.
21     Q   Do you have the Bates number?
22     A   I didn't write down a Bates number in my

45

1  think the Department of Health and Human Services or
2  whatever the city agency is that covers that area --
3  and I can find the document if you want -- that went
4  in and inspected and found these things.
5       They could well have been called as an
6  expert as to their experience with mold and whether or
7  not that causes the types of symptoms that Ms. Ghee
8  and Ms. Young experienced, but primarily it's the
9  toxicologist.
10      Q  So you would agree that you need a
11  toxicologist in a case such as this?
12      A  Yes.
13      Q  And --
14      A  They had one -- or, I'm sorry, there is one
15  who has been identified since the statute of
16  limitations has been missed to supply that causation
17  element.
18      Q  Have the treating physicians, from your
19  review of the underlying records, provided such
20  causation testimony?
21      A  Actually, I saw -- well, first of all, they
22  haven't provided any testimony because nobody has

46

1  taken their depositions.
2      Q  I agree with that. But have they -- in
3  their records --
4      A  There is something --
5      Q  -- and --
6      A  Yes.
7      Q  -- in their reports, have they provided
8  causation in your judgment?
9      A  I don't think you're going to find anything
10  in an emergency room record or a hospital record
11  that's going to say, I specifically find that these
12  conditions were caused by mold; although, I can't say
13  for certain that there's not something along those
14  lines, but I did see a record that was significant on
15  that issue if you'll give me a moment to try to find
16  it.
17      Q  Sure. And if you need your assistant to
18  help, that's fine as well.
19      A  You know, actually, I don't think I do.
20  No -- well, I'm looking at --
21      Q  Just give me the big number.
22      A  Well, interestingly, it may have been

47

1  clipped off the bottom. Let's see. Unity Health
2  Care, Inc., Adult Progress Note, 9/24/02. I think
3  this would be from G.W. I'll show it to you. There's
4  no Bates number on there that I see.
5      Q  All right. There is no Bates number on this
6  document. It is dated September 24th, 2002. At the
7  top it has Unity Health Care, Inc., Adult Progress
8  Note, and actually there is a Bates number in the
9  middle of the page. It's L&T0345.
10      A  I'm sorry. I didn't see that. I covered it
11  with my sticky.
12      Q  That's okay.
13      A  I'm just looking under the heading
14  Assessment, there's a number one that says, Allergic
15  reaction/rhinitis/RAD, and right under there, Mold
16  exposure, and then, Has had two course, C-O-U-R-S-E, I
17  think -- although it could be cause, C-A-U-S-E. I
18  can't read it -- of ABX. I don't know what ABX means.
19      That certainly indicates that somebody -- I
20  think this has to do with the G.W. hospitalization --
21  made a connection between the allergic reaction and
22  the mold exposure. Now, I'm not saying that's the

48

1  be-all and end-all. In fact, there's more on this
2  page. It's hard to read some of these notes,
3  obviously, but it says something, Per patient thinks
4  that mold in house is triggering symptoms; that's S/S.
5  Roommate has similar symptoms. Other members in
6  apartment have similar symptoms, has cough, dry, et
7  cetera. Now, that's, of course, history. That's not
8  a physician's assessment. But under Assessment, it
9  says, Allergic reaction, and then, Mold exposure, so
10  that's one instance that seems to be an indication
11  that a doctor has found a connection.
12      Now, I should also say that in my notes when
13  I was reviewing these records the first time, I wrote
14  down a reference to a report that I thought was
15  significant, but then this morning when I went to try
16  to find it, I couldn't find it, but I did write down
17  the date and the author of the report, and that might
18  have something that's relevant to that answer as well.
19      Q  What's the date and the author?
20      A  12/21/04, Dr. Chitkara, C-H-I-T-K-A-R-A.
21      Q  Do you have the Bates number?
22      A  I didn't write down a Bates number in my

**65**

1  Q  Assuming the case had been filed in August
2  of 2005, the designation for experts under a track two
3  or track three would likely have been made sometime in
4  2006; can we agree?
5  A  Yeah, probably early 2006.
6  Q  Early 2006.
7  A  Maybe February, March.
8  Q  And for the underlying case you identified a
9  toxicologist as someone who would be needed. Anyone
10  else that you can think of that would be necessary to
11  bring a case such as the underlying case? And
12  actually I think you mentioned someone that would test
13  the mold. I think that might be an industrial
14  hygienist, although I'm not sure.
15  A  Right. I have one working for me in this
16  case that I've got, this Reed case, an outfit called
17  Enviro-Techs. There are others -- there's one called
18  ECM or something. There are organizations that have
19  people with the proper credentials. In fact, I had
20  somebody come in and do mold testing in my house. I
21  don't know what they call themselves, frankly. I
22  don't remember the name, but I've got this

**66**

1  Enviro-Techs report back in my office, and I would be
2  happy to read you whatever initials this person has
3  after his name.
4  Q  That's fine.
5  A  I think they're specially trained in
6  environmental engineering of some sort.
7  Q  All right. Are there any other experts,
8  though, that you would anticipate would have been
9  needed in the case had it been brought in August of
10  2005 other than the toxicologist and that particular
11  expert?
12  A  Well, I think people who would be experts
13  but would be testifying as fact witnesses probably
14  more would be the actual treating physicians, both at
15  the emergency room and later for the sustained
16  hospital stay.
17  Q  All right. Now, is there anyone that you're
18  aware of from your review of the records in this case
19  that related the sustained hospital stay in April of
20  2003 to the mold exposure in August/September of 2002?
21  A  You mean other than Dr. Carmichael.
22  Q  Other than Dr. Carmichael?

**6**

1  A  Or, I'm sorry --
2  Q  Dr. Shoemaker?
3  A  -- Shoemaker. Excuse me. I got the name
4  wrong.
5  Q  Is there anyone else?
6  A  No, I don't think Mr. Burton or Ms. Tompkins
7  ever took that step. I don't think they did the
8  necessary investigation to get that done. 
9  Q  All right. But -- well, let me ask it this
10  way. Is there anything that you saw in the medical
11  records from April of 2003 that established that step,
12  i.e., a causal relationship between mold exposure in
13  August or September of 2002 and the hospitalization
14  some seven months later in April of 2003?
15  A  Well, the hospital record from April 2003
16  was a hospital record that was not forensic in nature.
17  It was not something where the doctors were tuned in
18  to the issue of whether or not there was a causal
19  relationship for legal purposes. That's something
20  that a toxicologist such as Dr. Carmichael has to do.
21  Q  Shoemaker.
22  A  Shoemaker. I've said that wrong twice.

**68**

1  Excuse me. I'm going to write that down.
2  Q  I'll keep reminding you. It's all right.
3  A  I'm making a total fool out of myself.
4  Okay. I think it was certainly part -- and
5  I'm not sure that this is really responsive to your
6  question, so if I'm straying a little bit, please stop
7  me, but I think it was certainly part of Mr. Burton's
8  responsibility to make that causal link, to get the
9  expert support that he needed that, you know, the
10  plaintiffs now have gotten from that doctor we've been
11  trying to remember.
12  Q  And you're aware from your experience in
13  handling legal malpractice cases that -- and
14  particularly with a missed statute of limitations
15  case, which is the claim in this matter, based on your
16  expert opinion that it becomes the case within the
17  case that is tried in front of the jury --
18  A  Certainly.
19  Q  -- do you agree with that?
20  A  Absolutely.
21  Q  And, so, here, in dealing with the case
22  within the case, have you had the opportunity to see



**69**

1  anything in the underlying file that expresses an
2  opinion from a treating doctor that there was a causal
3  relationship between the mold exposure and the
4  hospitalization seven months later in April -- on or
5  about April 15th, I think it was, 2003 for Ms. Young?
6      A   I think --
7          MR. HIBEY: Objection.
8          THE WITNESS: -- I see where you're
9  going with this, and let me respond as follows. The
10  case within the case concept is the subject of a lot
11  of literature in the legal malpractice field. The
12  question you're focusing on is whether or not the
13  state of Lewis & Tompkins's file prior to the running
14  of the statute of limitations was sufficient to
15  sustain their burden of proof in bringing this claim.
16  BY MR. MALONEY:
17      Q   Actually, that's not what I'm asking. But
18  go ahead.
19      A   The answer to that is no.
20      Q   Okay.
21      A   Does that mean that there was not a case
22  within the case?  No, it does not mean that.

**7**

1      Q   Okay.  Anything other than that?
2      A   I've talked about at least one notation that
3  I've seen in the original records that seems to
4  contain an assessment that there is a linkage, and I
5  believe that there is -- the records are extensive.
6  And, frankly, to really answer that question
7  adequately, I would feel the need to comb page by page
8  through those records.  I know that I, in looking at
9  the records, felt that there was enough there to
10  support the toxicologist's conclusion.
11      Q   Okay.  How much time have you spent on this
12  matter up to this point, excluding the deposition
13  today?
14      A   You know, I meant to print out my bill.
15  I've given them a bill for my time through the
16  rendering of my report, and I don't have those
17  available, but those would certainly reflect quite
18  specifically how much time I spent.
19      Q   Just give me an approximation.
20      A   I'm going to say ten hours up to the time of
21  the report, and I'm going to say really nothing until
22  yesterday and today.  Probably -- I met with

**70**

1      Q   All right.
2      A   The case was there.  It's like a sculptor
3  trying to take a piece of rock and finding the form
4  within the piece of rock.  Some sculptors are going to
5  do it, and some sculptors are not, but the form is
6  going to be there.  That's a bad analogy.
7      Q   But I understand what you're saying, and,
8  again, hypothetically assuming the case was filed in
9  August of 2005, there was work that needed to be done
10  in order to bring the case to fruition.  That's
11  your --
12      A   Sure.  You needed to find a toxicologist.
13      Q   And -- but I guess my question is a little
14  bit different, because what I'm saying now is that --
15  can you as an expert witness coming in and looking now
16  at material that has been developed -- so the material
17  for the sculptor is now there -- have you seen
18  anything in the records here from the treating doctors
19  that causally relates the mold exposure in August and
20  September of 2002 to the hospitalization for Ms. Young
21  in April of 2003?
22      A   Yes, the toxicology report.

**72**

1  Mr. Grenier and Mr. Hibey for two hours yesterday, and
2  I spent about another two hours reviewing documents
3  yesterday, and I spent about another hour reviewing
4  stuff before I came down here today.
5      Q   So about another five hours?
6      A   Yeah, something like that.
7      Q   I think I know the answers to these
8  questions, but I'm just going to go ahead and ask it
9  for completeness of the Record.  You have never taken
10  a case from beginning to end which involves mold
11  exposure; is that correct?
12      A   That is correct.
13      Q   And you're now in the beginning processes of
14  handling a mold case; is that correct?
15      A   That is correct.
16      Q   Have you ever rejected handling a mold case
17  as -- you, as a practicing attorney, at any time prior
18  to this date?
19      A   No, I don't think I've ever been asked to
20  handle one before this.
21      Q   So you've never evaluated one?
22      A   That's correct.



141

1    MR. HIBEY:  Is there a letter you want
2  to refer us to?
3  BY MS. WHELIHAN:
4     Q   I mean, I haven't seen any letter like that.
5     A   You haven't?  Okay.
6     Q   There are letters that they --
7     A   I think it was in this --
8     Q   There are letters that they wrote
9  complaining about their living conditions, but I have
10 not seen one that talks about the mold.
11    A   See, I -- I just -- (witness reviews
12 documents.)
13       MR. MALONEY:  While you're taking time
14 to look for that, can I have one more exhibit marked
15 which I intended to mark, and that's the retainer
16 agreement?  I don't need to ask any questions about
17 it.  Let me just mark it, and then I'll go get a copy
18 of that.
19       (Deposition Exhibit Number 8 was marked for
20 identification and attached to the transcript.)
21       THE WITNESS:  Can we go off the Record
22 for a second?

142

1       (Discussion off the Record.)
2       THE WITNESS:  Ms. Whelihan, we've done
3  sort of a quick run through these documents and I
4  cannot find any letter, and I don't have any specific
5  recollection of a letter in which either Ms. Ghee or
6  Ms. Young complained to a landlord about the toxic
7  mold.
8  BY MS. WHELIHAN:
9     Q   Okay.  But you are aware that they wrote
10 letters to their landlord complaining about other
11 issues with respect to their living conditions;
12 correct?
13    A   I have seen a couple of those.
14    Q   Okay.  You don't have an opinion as to
15 whether or not Ms. Ghee would have been successful in
16 the prosecution of her case if it had been filed;
17 correct?
18    A   The only opinions I can give on that would
19 be within a reasonable degree of legal certainty based
20 upon my experience in tort litigation and my very
21 limited experience, as you now know, in toxic tort
22 litigation.  I have said that she had a viable case,

14

1  and I believe she had a viable case.  Can I tell you
2  what a jury would have done if it was presented to the
3  jury?  Absolutely not.
4     I don't -- I -- my own cases that I have
5  worked on diligently and faithfully for two and three
6  years to put together and go to trial have gone to
7  trial and I have not been able to accurately predict
8  what the jury would do.  So, do I know what a jury
9  would have done with this case?  No, I do not.
10    Q   So would it be fair to say that you can't
11 offer any opinions and you're not going to offer any
12 opinions as to whether or not Ms. Ghee would have been
13 successful in the prosecuting of the case if it had
14 been timely filed?
15    A   I don't mean to quibble with you, but when
16 you talk about successful in the prosecution of the
17 case --
18    Q   Oh, yes, you do.
19    A   You know, successful prosecution to me would
20 entail a settlement, a verdict for the plaintiff.
21 Ms. Ghee might get a verdict for the plaintiff for a
22 certain amount and feel that she wasn't successful

144

1  because it wasn't the amount she wanted, so you're
2  using the word "successful" in a way that I don't
3  think I can really respond to.
4     Q   Let me try it a different way.  You're not
5  going to offer any opinions that Ms. Ghee would have
6  prevailed in her case before a jury if the case had
7  been successfully filed?
8     A   I think that's the case within the case.  I
9  don't think it's my place to decide that.
10    Q   All right.  And that would be true of
11 Ms. Young, too?
12    A   Correct.
13    Q   Okay.  And would it be fair to say that all
14 of your opinions with respect to the standard of care
15 are derived from the failure to timely file the
16 lawsuit for the plaintiffs?
17    A   No, that's not true.  I've also talked about
18 the duty to keep the clients reasonably informed about
19 the status of the matter and reasonably and promptly
20 comply with reasonable requests for information.  I've
21 talked about the failure to communicate among
22 themselves.  Now, obviously the 800-pound gorilla in

DEPOSITION OF CHRISTOPHER G. HOGE
CONDUCTED ON WEDNESDAY, NOVEMBER 7, 2007

37 (Pages 145 to 148)

145

1  the room is the failure to file within the statute of
2  limitations, but, you know, there was a lot else that
3  I saw going wrong with the handling of this case.
4     Q   Okay. Well, you're assuming that the
5  failure to communicate occurred because of what you
6  believe to be the plaintiffs' testimony as opposed to
7  what is the defendants' testimony?
8     A   I'm basing it on answers to interrogatories
9  that I've looked at. I'm basing it on other documents
10  that I've looked at. I'm basing it upon those case
11  notes that I saw plenty of that indicates that there
12  was an endemic problem in Lewis & Tompkins with
13  staying on top of their caseload.
14     Q   Okay. Let's try it this way. The opinion
15  that you hold that the defendants failed to file suit
16  within the statute of limitations, that's the only
17  opinion that you have that relates to the proximate
18  cause and losses, right, of the plaintiff?
19     A   I don't think I understand that question.
20  I'm sorry.
21     Q   All right. Let me try it again. Like, in
22  your opinion number seven, which is referenced in

146

1  Deposition Exhibit Number 7 --
2     A   Yes.
3     Q   -- you say the proximate cause of
4  Ms. Young's and Ms. Ghee's loss of claims against the
5  owner/manager of their apartment building for toxic
6  torts was the failure of Lewis & Tompkins and William
7  F. Burton to file suit within the applicable statute
8  of limitations?
9     A   Yes.
10     Q   Okay. Would you agree that any other issues
11  that you have with respect to the defendants do not
12  have any proximate cause?
13     A   I think it's collective facts. I think all
14  of it added up to cause this problem.
15     Q   Okay. Well, why is it that you characterize
16  the failure to file the lawsuit within the statute of
17  limitations as the 800-pound gorilla in the room?
18     A   Well, I mean, that's the most obvious thing.
19  In my view they almost didn't need me to establish
20  that basis for malpractice liability. Any lawyer
21  practicing any kind of tort litigation knows about
22  statutes of limitations, knows that there are

147

1  deadlines and knows that if you have a viable claim
2  and you don't file within the statute of limitations,
3  that viable claim will be lost. So it's just obvious.
4     The other things are a little bit more
5  judgment calls, like the level of communication within
6  the office, the nonresponsiveness to requests for
7  information. Those are things that, you know, might
8  be more subtle, but missing a statute is a big deal.
9     I mean, I told you before in my answer -- I
10  told Mr. Maloney before about the Mallen & Smith legal
11  malpractice treatise that I looked at, and I looked
12  specifically at the section that deals with missed
13  statutes of limitations, of which there is plenty.
14  And the first sentence in that section -- I think it's
15  23.3. I'm going from memory here. Let me look at my
16  note. The first section there, 23.3, very good, says
17  that the most prevalent form of legal malpractice
18  claims is missed statute of limitations. So that's
19  what I meant by paragraph 7.
20     Q   Okay. But the -- if the lawsuit had been
21  timely filed, there would be no legal malpractice
22  claim against either of the defendants; correct?

148

1     A   You know, without -- I mean, obviously --
2  well, who knows what would happen after the lawsuit
3  was filed? If they failed to get an expert, if they
4  failed to comply with discovery requirements, all
5  sorts of things could have gone wrong that would
6  have -- you know, which -- you know, we can talk about
7  different scenarios forever.
8     Yes, assuming that there was no further
9  negligence by Mr. Burton or Ms. Tompkins or that law
10  firm after the lawsuit was timely filed, then there
11  would be no basis for a legal malpractice case.
12     Q   All right. And if there had been no
13  communications between Mr. Burton and the plaintiffs
14  and the lawsuit had been timely filed, there would be
15  no legal malpractice case; correct?
16     A   You mean just based on the failure of
17  communication?
18     Q   Correct.
19     A   Yeah, that would be more of an ethical
20  violation, frankly.
21     Q   Okay. You're not offering any opinions
22  about actual ethical violations; right?

DEPOSITION OF CHRISTOPHER G. HOGE
CONDUCTED ON WEDNESDAY, NOVEMBER 7, 2007

38 (Pages 149 to 152)

149

1    A    Well, I've cited it.

2    Q    You've cited to the rules --

3    A    Sure.

4    Q    -- and you're relying on the rules to

5    support your opinions; right?

6    A    Sure.

7    Q    But you're not coming to any conclusions

8    that those ethical rules were violated, are you?

9    A    Yeah, if they didn't communicate, it was

10   violated.

11   Q    Okay.

12   A    Assuming the truth of -- that I have been

13   given to understand that indeed there was no

14   communication about the, you know, noncompliance with

15   the statute of limitations, that Mr. Burton didn't

16   tell Ms. Young and Ms. Ghee until 2006 that the

17   statute of limitations deadline had been missed, yeah,

18   that's a big violation of Rule 1.4(a).

19   Q    Did you do any research on ethics opinions

20   about those rules that you cited in your report?

21   A    I looked at the rules and I looked at the

22   model rules.

150

1    Q    But did you actually look at any of the

2    opinions underlying those rules?

3    A    Not specifically for this case, but I do

4    legal malpractice. It's a big part of my practice,

5    and I work with those rules all the time and I

6    research those rules all the time and I have

7    definitely read opinions about that subject. I just

8    haven't read any that I can cite to you specifically

9    for this case.

10   Q    Okay. Just so I'm clear now, are you saying

11   that the Rules of Professional Conduct require

12   attorneys within an office to communicate with one

13   another?

14   A    No, no, the Rules of Professional Conduct

15   require the office, the lawyers to communicate with

16   the client; however, to the extent that there is a

17   failure of communication within the office among the

18   people who are responsible for the handling of the

19   case, that can impact on the duty of the lawyers to

20   reasonably communicate. In other words, if left hand

21   doesn't know what right hand is doing and something

22   happens that's significant because of that

151

1    miscommunication and that significant thing doesn't

2    get communicated to the lawyer, then you have a

3    violation.

4    Q    Okay. But if the plaintiffs and Mr. Burton

5    or the plaintiffs and Lewis & Tompkins had no

6    communications but the complaint had been timely

7    filed, you would not be opining that any of the

8    defendants in this case committed malpractice;

9    correct?

10   A    Well, you'd have a causation issue, then.

11   Q    Okay.

12   A    You know, I get people coming in all the

13   time to say, my lawyer doesn't return my phone calls

14   and doesn't tell me what's going on. I say, that's

15   fine. You can send that to bar counsel, but show me

16   how it's impacted your case. If it hasn't impacted

17   the case, there's no causation and, hence, no legal

18   malpractice.

19   Q    Okay. Do you know either -- well, do you

20   know Mr. Burton or Ms. Tompkins or Mr. Tompkins?

21   A    No.

22   Q    Did you have any prior relationship with

152

1    Mr. Grenier or his law firm?

2    A    The only thing I can -- I've sort of been

3    aware of Peter Grenier for a while. I don't think I

4    had ever met him before yesterday. However, we did

5    share a case in the sense that I represented a client

6    who was a witness in -- a fact witness in a case of

7    Mr. Grenier's, and we did communicate about that some

8    year or two ago.

9    Q    Okay. Is that the only case you've ever

10   worked on with Mr. Grenier?

11   A    That's the only one I remember.

12   Q    Are you involved in any of the same

13   organizations, same plaintiffs organizations that

14   Mr. Grenier is?

15   A    I think we're both members of the DC -- I

16   know I'm a member of the DCTLA, trial lawyers

17   association, and I think he is. I'm not a

18   particularly active member, but I'm a member. I'm a

19   member of the Bar Association of the District of

20   Columbia. I don't know if he is a member, frankly.

21   We're obviously a member of the D.C. bar. I'm a

22   member of the Counselors. I don't think I've ever

# REPORT OF CHRISTOPHER G. HOGE

Pursuant to Fed. R. Civ. P. 26(a)(2)(B), I am submitting the following expert report on behalf of the plaintiffs in the case of *Young & Ghee v. Burton, et al.*, Civil Action No. 07-cv-00983(ESH), United States District Court for the District of Columbia.

I am an attorney licensed in the District of Columbia, Maryland, and various federal courts, including the United States Supreme Court. I graduated from the Washington College of Law, American University, in 1974. I served as law clerk to Judge George Revercomb of the Superior Court of the District of Columbia from 1974 to 1975, and have been in a general trial practice since 1975. I handle a wide variety of civil litigation in the District of Columbia and Maryland, in both local and federal courts.

Over the past twenty years I have handled over 100 legal malpractice cases, almost entirely for plaintiffs. I was counsel in at least four legal malpractice cases which culminated in published appellate opinions. I have been retained as an expert in approximately six legal malpractice cases, and I have given deposition testimony within the last four years in two of those cases: *Michael Lewis v. Sylvia Rolinski*, (D.C. Superior Court), and *Macedo v. Rosen* (D.C. Superior Court).

I am a past president of the Bar Association of the District of Columbia and of the George Washington American Inn of Court. I currently serve as president of the Foundation of the Bar Association of the District of Columbia, chair of the Bench - Bar Committee of the Bar Association of the District of Columbia, and chair of the Practice Management Service

1

**EXHIBIT**

**6**

Committee of the District of Columbia Bar. I have published an article entitled "Preventing Legal Malpractice" which is currently on the website of the District of Columbia Bar, and have given several educational presentations on legal malpractice and litigation issues. I have an "A.V." rating from Martindale Hubbell.

My fee for expert services in this case is $300 per hour for study and testimony.

In connection with the case of *Young & Ghee v. Burton, et al.*, I have reviewed approximately 1,000 pages of documents, including but not limited to the retainer agreements between Ms. Young and Ms. Ghee and the law firm of Lewis & Tompkins, P.C.; the complaint drafted on behalf of Ms. Young and Ms. Ghee by Mr. Burton; a rejection slip from the Civil Clerk's office of the D.C. Superior Court; correspondence between Ms. Young, Ms. Ghee and the law firm, including but not limited to a letter purportedly written to Ms. Young and Ms. Ghee by Sharon Tompkins on July 1, 2005; documents from the District of Columbia Department of Health and the Housing Regulation and Enforcement Division of the D.C. Department of Consumer and Regulatory Affairs; extensive medical records of Denicole Young; research materials on toxic mold and on legal liability theories relating to toxic mold cases; materials from the files of Lewis & Tompkins, P.C.'s file concerning Ms. Young and Ms. Ghee, including but not limited to case diaries and hand-written notes; the complaint in *Young & Ghee v. Burton, et al.*; a letter dated January 2, 2007 from Peter Grenier to Sharon L. Tompkins and William F. Burton; discovery responses from Lewis & Tompkins, P.C. and from William F. Burton; and a report by Ritchie C. Shoemaker, M.D. I have also drawn on my experience in a toxic mold case that I am handling at the present time.

Based upon my review of the above materials and on my experience litigating cases over

2

the past 32 years, I hold the following opinions:

1. The law firm of Lewis & Tompkins, P.C. and William F. Burton breached the standard of care applicable to attorneys practicing in civil litigation in the District of Columbia by failing to effectively file a complaint on behalf of Ms. Young and Ms. Ghee in court within the three year statute of limitations period applicable to toxic tort claims. According to the July 1, 2005, letter purportedly written by Sharon Tompkins to Ms. Young and Ms. Ghee, the statute of limitations was due to expire in September of 2005. While a complaint was drafted by Mr. Burton, apparently in June of 2005, and while Lewis & Tompkins apparently attempted to file it in court, the complaint was rejected by the clerk of the court for unexplained reasons. Assuming that they did not effectively withdraw from the case, Lewis & Tompkins and Mr. Burton had the obligation to do what was needed to effectively file the complaint and get the case docketed within the statute of limitations period, and they failed to do so.

2. The law firm of Lewis & Tompkins, P.C. and William F. Burton breached the standard of care applicable to attorneys practicing in civil litigation in the District of Columbia, and specifically violated Rule 1.16(b) of the Rules of Professional Conduct applicable to members of the District of Columbia Bar, by purporting to withdraw from representation of Ms. Young and Ms. Ghee in such a manner that it had a material adverse effect on their interests. Assuming that the July 1, 2005 letter was in fact sent, the law firm and Mr. Burton had an obligation to ensure that their clients received actual notice of the withdrawal in time to retain new counsel before expiration of the statute of limitations deadline. The apparent failure of communication between Sharon Tompkins and Mr. Burton, described in Mr. Burton's answers to interrogatories, indicates that steps were not taken to ensure no adverse effect would inure to

3

their clients.

3.  The law firm of Lewis & Tompkins, P.C. and William F. Burton breached the
standard of care applicable to attorneys practicing in civil litigation in the District of Columbia
by failing to communicate among themselves in order to ensure that Ms. Young's and Ms.
Ghee's rights were protected.

4.  The law firm of Lewis & Tompkins, P.C. and William F. Burton breached the
standard of care applicable to attorneys practicing in civil litigation in the District of Columbia,
and also breached the Rules of Professional Conduct applicable to members of the District of
Columbia Bar, by failing to keep their clients (Ms. Young and Ms. Ghee) advised of the status of
the case.  Rule 1.4(a) requires an attorney to "keep a client reasonably informed about the status
of a matter and promptly comply with reasonable requests for information".  Lewis & Tompkins
and William Burton failed to comply with this rule by not advising Ms. Young and Ms. Ghee that
their claim had not been effectively filed in court and that the statute of limitations period for
filing the claim was about to lapse and eventually did elapse.

5.  Assuming that the letter purportedly drafted by Sharon Tompkins on July 1, 2005 was
not actually sent to Ms. Young or Ms. Ghee, Ms. Tompkins breached Rule 3.4(b) of the Rules of
Professional Conduct applicable to members of the District of Columbia Bar by falsifying
evidence.

6.  Ms. Young and Ms. Ghee had viable and valuable toxic tort claims against the owner
and manager of their apartment building, including but not limited to claims for negligence,
breach of contract, breach of the implied warranty of habitability, and breach of the duty of good
faith and fair dealing.

4

7.  The proximate cause of Ms. Young's and Ms. Ghee's loss of their claims against the owner and manager of their apartment building for toxic torts was the failure of Lewis & Tompkins and William F. Burton to file suit within the applicable statute of limitations period.

I hold all of the foregoing opinions within a reasonable degree of legal certainty.

Respectfully submitted,

Christopher G. Hoge

Dated: Sept. 19, 2007

cgh/z/wpdirs/misc
gheeexpertreport.wpd

5

CROWLEY, HOGE & FEIN, P.C.
ATTORNEYS AT LAW
1710 RHODE ISLAND AVENUE, NW
SEVENTH FLOOR
WASHINGTON, D.C. 20036-3125
(202) 483-2900
FAX (202) 483-1365
WWW.CHF-LAW.COM

DANIEL H. CROWLEY (DC, MD)
CHRISTOPHER G. HOGE (DC, MD)
LESLIE G. FEIN (DC, MD, TN)
KATHERINE M. WIEDMANN (DC, NY)

4604 LANGDRUM LANE
CHEVY CHASE, MD 20815

## RETAINER AGREEMENT

1. **Employment.** We hereby employ Christopher G. Hoge of the law firm of Crowley, Hoge & Fein, P.C. to undertake an expert evaluation of the legal malpractice claim brought by Denicole Young and Vanessa Ghee against William F. Burton and the law firm of Lewis & Tompkins, P.C., and, if appropriate, to provide expert testimony at deposition or in court.

2. **Compensation.** We agree to pay Mr. Hoge at the rate of $300.00 per hour for his services and $75.00 per hour for the services of paralegal assistants and law clerks, if necessary and agreed upon. In addition, we agree to reimburse Mr. Hoge for all costs and expenses incurred on our behalf[1].

3. **Payment.** We agree to pay an initial retainer to Crowley, Hoge & Fein, P.C. of $1,500.00. Such retainer shall be earned by Mr. Hoge and his staff at the above-stated rates. Charges for services rendered and costs incurred in excess of the retainer shall be billed monthly. We agree either to pay such bills in full, or to make regular monthly payments thereon of at least 10% of the amount billed or in the amount of $500.00, whichever is greater, with interest on the unpaid balance of six percent per annum. We consent to Mr. Hoge's withdrawal from this matter in the event any of the aforesaid payments is not made within 60 days after a bill is rendered. In the event we default in the terms of payment, we agree to pay Crowley, Hoge & Fein, P.C., all costs of its collection including reasonable attorney's fees, which we expressly agree shall not be limited by any statute or Rule of Court.

Signature: *Michael K. Hibey*
Name: Michael K. Hibey
Address: 1150 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: 202 - 828 - 4100
Date: 8 - 24 - 04

Accepted: *Christopher G. Hoge*
for the firm
Date: 8 -17- 07

(Forms\Ret-chf)

_____

[1] Such costs and expenses shall include, but shall not be necessarily limited to, postage and delivery costs; photocopying and fax transmission receipts at $0.20 per page; long distance telephone charges; and travel costs of attorneys and staff.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DENICOLE YOUNG, et al.,                    )
                                           )
          Plaintiffs,                      )
v.                                         )   Civil Action No.:  07-cv-00983 (ESH)
                                           )
WILLIAM F. BURTON, ESQUIRE, et al.,        )
                                           )
          Defendants.                      )
                                           )
_____    )

Federal Rule of Civil Procedure
26(a)(2)(B) Report of Robert F. Redmond, Jr.

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I am

providing the following report:

**List of Qualifications:**

I am an attorney licensed to practice in Maryland (1986); Washington, D.C.

(1989); Virginia (1991) and Texas (1993).  I am a partner in the Litigation Section at

Williams Mullen.  My professional background and qualifications are more particularly

detailed in Exhibit D to the defendants' Rule 26(a)(2) Expert Disclosure Statement,

which is my law firm's biographical information for me.  Exhibit D also contains a list of

all publications which I have authored in the last ten (10) years.

I obtained my B.A. degree from the University of Virginia (UVA) in 1983 from

the College of Arts and Sciences in the Honors English program.  I graduated "with high

distinction" which is the UVA equivalent of *magna cum laude*.

1

EXHIBIT

tabbies®

7

I am a graduate of the Georgetown University Law Center ("Georgetown") and I graduated from Georgetown in 1986, earning my *juris doctorate cum laude*. At Georgetown, I was an Associate Editor for the Georgetown Law Journal.

During law school, I became interested in environmental law and toxic tort cases while working as a law clerk for the law firm of Steptoe and Johnson.

With the exception of my fulfilling my active duty commitment to the United States Army where I was assigned to the 82d Airborne Division in Fort Bragg, North Carolina and served as a prosecutor, my practice has focused on product liability and toxic tort litigation, including alleged toxic mold exposure cases. I have also been involved in numerous complex commercial, patent, and intellectual property lawsuits.

I have also been the National Coordinating Counsel (NCC) for several national clients in multi-district litigation involving thousands of product liability and toxic tort cases. An NCC in toxic tort litigation is an attorney that develops and implements a nationwide defense strategy for a toxic tort defendant. As NCC, I have had final responsibility for the defense of the clients, including all pretrial, trial and appellate activities. Those cases have included product liability and toxic tort litigation related to latex allergy and latex medical products, silica products, and oil refining.

As NCC, I founded a Joint Defense Committee for medical product distributors. I was responsible for identifying, educating and presenting expert witnesses in a variety of fields including toxicology, epidemiology, pulmonology and FDA regulation of medical products.

In my twenty (20) plus years of practice, I have tried approximately fifty (50) cases nationwide and been involved as local and regional counsel for thousands of cases.

2

In the last month, I tried a mold case to verdict in Fairfax County, Virginia where my

client, the landlord defendant, prevailed upon all claims brought against it and also

obtained a stipulated judgment for unpaid rent due to it.

I am "AV" rated by Martindale Hubbell. I have been listed in "The Best Lawyers

in America" for Mass Tort Litigation since 2006.

**Basis for Opinions:**

I have been provided with numerous documents, which include the pleadings,

written discovery exchanged among the parties, and the deposition transcripts of the

parties and the Plaintiffs' two experts. To date, my opinions are based upon my review

of the following:

1.      Complaint; 2.Plaintiffs' Joint Response to Defendant Lewis & Tompkins, PC's
Interrogatories to Denicole Young and Vanessa Ghee; 3. Plaintiffs' Joint Response to
Defendant Lewis & Tompkins, PC's Request for Production of Documents to Denicole
Young and Vanessa Ghee; 4. Plaintiffs' Initial Disclosures; 5. Plaintiffs' Rule 26(a)(2); 6.
Deposition Transcripts of Denicole Young with Exhibits; 7. Deposition Transcripts of
Vanessa Ghee with Exhibits; 8. Deposition Transcript of Christopher G. Hoge, Esquire
with Exhibits; 9. Deposition Transcript of Dr. Shoemaker with Exhibits; 10. Odaris, et
al. v. Morton G. Thalhimer, Inc., Order, February 2, 2007; 11. Roche v. Lincoln Property
Co., et al., July 25, 2003; 12. Montgomery Mutual Insurance Co. v. Chesson, et al.,
Opinion, May 23, 2007; 13. Curry v. Persica Design and Construction, Inc., Order, April
30, 2004; 14. Dumoulin v. Her Majesty the Queen in Right of Ontario, et al.,
Supplementary Reasons for Decision, March 29, 2006; 15. materials from Kim Stewart
Ford v. Summit Realty Group, Inc., LR 2009-1; 16. Wright, et al. v. Fort Lincoln Realty
Co., et al., Order, October 15, 2007; 17.  George Washington Hospital Bills;
18. Unity Health Care, Inc., Adult Progress Notes, September 24, 2002 and November 5,
2002; and 19. Institute of Medicine, "Damp Indoor Spaces and Health", 2004.

I have not read the reports of the experts retained by the Defendants but I do

anticipate that I will rely upon those reports as further support for my opinions listed

below. I may also rely upon the depositions of witnesses and of the other experts

identified by the Defendants, but those materials are not yet available.

**Summary of Opinions:**

It is my opinion, within a reasonable degree of professional certainty as an experienced toxic tort trial and litigation attorney, that the plaintiffs did not have a meritorious or viable cause of action against Stanton Glenn Limited Partnership or Stanton Glenn Apartments. Because of the costs involved to prosecute toxic tort cases, it is further my opinion that the costs of prosecution of the Plaintiffs' cases against their former landlord would have exceeded any potential recovery, if the case was cognizable which it was not because of causality problems. I also intend to offer my expert opinion in the following six areas:

1. Absence of causation evidence for Plaintiffs' alleged injuries;

2. Inadequacy of Expert Witness Testimony;

3. Credibility of Plaintiffs as Witnesses;

4. Fault of Plaintiffs;

5. Statute of Limitations; and

6. Valuation of the underlying Toxic Tort case

I hold all of my opinions outlined above to a reasonable degree of professional certainty as an experienced litigator and trial attorney in the area of toxic tort litigation.

**1. Absence of Causation Evidence for Plaintiffs' Injuries**

It is my opinion that the Plaintiffs suffered no harm because they could not have proven any causal link between their respiratory complaints and alleged exposure to mold, had the plaintiffs timely filed a complaint against Stanton Glenn, and their case within the case was not a good cause of action.

4

The Plaintiffs moved into their first apartment at Stanton Glen on or about August 19, 2002. The Plaintiffs moved out of building 3064 to building 3084 on or about September 23, 2002. Both Plaintiffs testified that there was no mold or raw sewage in their first apartment, 2A. The Plaintiffs first retained the Defendants on May 3, 2003, some seven months after they had moved, long after appropriate testing could have been done which would show the type and quantity of the mold in the adjacent apartment or in their apartment at the time.

In a toxic tort case, the Plaintiffs must prove both general and specific causation. General causation addresses whether a substance is capable of causing a particular injury. Specific causation addresses whether the substance caused Plaintiffs' specific injury.

**General Causation:**

Plaintiffs claim that exposure to mold in an adjacent apartment over a period of a few weeks caused a combination of injuries that can generally be categorized as 1) diffuse neurological complaints (i.e. Chronic Fatigue Syndrome) and 2) respiratory symptoms.

As to the Plaintiffs' claim that they were exposed to mold that caused diffuse neurological complaints, that theory has been roundly rejected by numerous courts, governmental publications and peer reviewed medical reports. By way of example ( and not limitation), the Institute of Medicine of the National Academies ( of Sciences, Engineering and Medicine) published a book titled "Damp Indoor Spaces and Health" and concluded that there is inadequate or insufficient evidence to determine whether an association exists between exposure to damp indoor spaces and mold and fatigue or neuropsychiatric symptoms. Similar conclusions have been reached by scientist from

NIOSH and CDC, the American Academy of Allergists and Immunologists and the American College of Occupational and Environmental Medicine. Additionally, numerous courts have also held that there is insufficient evidence that exposure to mold in damp indoor spaces causes fatigue or neuropsychiatric symptoms including, most recently, the D.C Superior Court in the decision of <u>Wright v. Fort Lincoln Realty Co.</u>

With respect to Plaintiffs' respiratory complaints, the IOM report does not find evidence of a causal relationship between exposure to damp indoor spaces and respiratory symptoms but does find evidence of an association between exposure to damp indoor spaces and respiratory symptoms. (Association is not the same as causation.) However, the studies that the IOM relies upon for the association involve, primarily, mold in the home or work place of the study participants and exposure for longer periods of time than in this case. There are no studies that support an association between short term exposure to mold in an adjacent dwelling with respiratory symptoms. Consequently, the Plaintiffs lack general causation between the Plaintiffs' respiratory symptoms and their claimed exposure.

**Specific Causation**

Plaintiffs must prove, not only, that exposure to damp indoor spaces can cause injuries like those they claim, they also must prove that **their** exposure to a damp indoor space caused **their** injuries. Plaintiffs also cannot prove this because neither the science, the circumstantial or the medical evidence they have produced supports it.

**Plaintiffs' Exposure to Damp Indoor Spaces**

Both Plaintiffs claim the same exposure to the same allegedly damp indoor space. That space is the Apartment 1A 3064 Stanton Road Washington DC 20020. Plaintiffs

6

claim that they were exposed while they were living in the adjacent apartment, Apartment

2A. Plaintiffs moved into Apartment 2A on August 19, 2002 and moved out, on

September 23, 2002. They entered Apartment 1A by climbing into the window one day,

perhaps on September 12, 2002 (since Plaintiffs are unsure of the date), and stayed for

five or ten minutes. They claim to have videotaped the inside of 1A but lost the

videotape. They took some photographs of 1A with a disposable camera. The disposable

camera pictures are the only physical evidence of mold in 1A. According to Denicole

Young's testimony, she did not have an acute reaction when she climbed into Apartment

1A or when she was in the Apartment. 1A.

The Plaintiffs' evidence of mold in Apartment 1A is based on their own lay

observations. Although there is some evidence in Mr. Keemer's September 27, 2002

letter that mold was in Apartment 1A, he does not describe it in the dramatic terms used

by Plaintiffs. More importantly, Plaintiffs have no samples of the mold to permit a

scientific evaluation of the types of mold in Apartment 1A, i.e. whether the mold was

toxic or harmless. ( Dr. Shoemaker himself relates how easy it is to obtain samples of

mold—simply apply scotch tape to the mold and lift it off).

The Plaintiffs also have no evidence of air transfer between Apartments 1A and

2A. This is significant because Plaintiffs testified in their depositions that they did not

have mold in their apartment. Thus, the Plaintiffs' alleged exposure to mold (attributable

to the landlord) could only come from Apartment 1A. At a minimum, they would need

evidence that mold from Apartment 1A moved through the air to Apartment 2A. It is my

understanding from reviewing the reports of the Plaintiffs' experts that they have no

expert evidence from any environmental engineer or HVAC expert that will establish that

there was toxic mold in Apartment 1A or that there was any transfer of air between the Apartment 1A and Apartment 2A.

An essential element of toxic tort litigation is proving exposure through evidence of "proximity, frequency and regularity." From my research in my practice, there must be evidence of exposure to a specific product or substance on a regular basis over some extended period of time in proximity to where the plaintiff worked or lived.

Here, the Plaintiffs' best evidence is that they lived near a vacant apartment for 34 days that appeared to have mold in it. This evidence, absent some expert support on air transfer between the apartments fails the "proximity, frequency and regularity" test and fails to prove exposure.

**Specific Causation: Denicole Young's Alleged Injuries**

Plaintiff Young cannot prove that her alleged injuries are caused by her alleged exposure to mold in Apartment 1A rather than some other cause.

With respect to her claims of diffuse neurological injuries (i.e. Chronic Fatigue Syndrome), she cannot cross the hurdle of general causation outlined above. But even if she could, she cannot establish that her particular neurological injuries were caused by mold in Apartment 1A because she has a prior history of fatigue and related neurological/ psychological complaints. These pre-incident illnesses were developed at her deposition and show that she was being treated for fatigue since January 1998 and had complaints of fatigue for several months before that. She was prescribed anti-depressants for her fatigue symptoms several years before her alleged exposure to mold.

Similarly, Plaintiff Young had an extensive pre-incident history of respiratory illness. The discussion of her pre-existing illnesses goes on for several pages in her

deposition. The medical records suggest that Plaintiff was intubated in 1997.  As Dr.

Shoemaker concedes, if Plaintiff was intubated in 1997, that fact strongly undercuts

specific causation from mold in Apartment 1A.  Additionally, Plaintiff Young was found

to have several allergies that could account for her respiratory problems in September

2002.  These include her allergy to ragweed as well as other allergens.  Notably, at the

same time Plaintiff Young was suffering her symptoms in the late summer of 2002, her

air conditioning unit was not working and she had to open windows in her apartment.

       All of this evidence, as well as other evidence in the medical records prevents

Plaintiff Young from establishing that her respiratory illness in September 2002 is

attributable to mold in Apartment 1A.

       Equally important, Plaintiff Young's only medical expert, Dr. Ritchie Shoemaker,

did not learn of these pre-incident illnesses during his two-plus hour interview with Ms.

Young.  By his own admission, Dr. Shoemaker relies, for his opinion, on a differential

diagnoses.  He cannot offer a sound differential diagnosis without a complete medical

history. The medical history he was provided was incomplete and therefore, his

differential diagnosis is unsound.  Additionally, because Plaintiff Young has not followed

Dr. Shoemaker's protocol (taking cholesterol medicine for mold illness), Dr. Shoemaker

cannot offer an opinion on specific causation for Plaintiff Young.

       The largest portion of Ms. Young's medical expenses are for her ICU hospital

stay at George Washington Hospital in the spring of 2003, after she was no longer living

in Apartment 2A.  Plaintiff Young cannot attribute that stay to her alleged exposure to

mold in the late summer of 2002 because it is too remote in time and because of her

history of pre-existing respiratory illnesses.  Dr. Shoemaker conceded in his deposition

that "I don't have the data" to associate that hospital stay with her mold exposure in late

summer of 2002. This concession is dispositive and precludes Plaintiff Young from

offering the Spring 2003 hospital stay as damages for her alleged mold exposure.

In sum, Plaintiff Young cannot prove specific causation for any of her injuries

because she has no medical or scientific evidence to meet her burden of proof and

because her medical records show that she had pre-existing injuries that mirrored the

injuries she would have sued for. Additionally, her own medical expert will not testify as

to specific causation for the reason stated in his deposition and outlined above.

**Specific Causation: Vanessa Ghee's Alleged Injuries**

Plaintiff Ghee's medical expenses are limited to $1,628. She went to George

Washington Hosptital two times with Ms. Young and was treated and released both

times. Ms. Ghee's only complaints are nasal/respiratory illnesses. She admits that she

was a smoker with a history of allergic reactions. Like Plaintiff Young, Plaintiff Ghee's

alleged injuries arose in the late summer of 2002 when their air conditioning unit was

broken and when they had to leave windows open.

Because of the paucity of evidence that her two medical treatments were

attributable to mold in Apartment 1A and because of other sources of respiratory illness

(i.e. smoking, pollen/dust allergies) as well as other evidence in the medical records

Plaintiff Ghee cannot establish that her respiratory illness in September 2002 is

attributable to mold in Apartment 1A.

Additionally, because Plaintiff Ghee, like Plaintiff Young, has not followed Dr.

Shoemaker's protocol, Dr. Shoemaker conceded that he cannot offer an opinion on

specific causation for Plaintiff Ghee.

Because of the Plaintiffs' lack critical expert testimony and because of the facts alleged by the Plaintiffs, it is my opinion to a reasonable degree of professional certainty that Plaintiffs would not have been able to establish either general or specific causation for any of their injuries and that they would not have been successful in the prosecution of their claims against their former landlord for their alleged indirect exposure to mold and/or raw sewage.

**Inadequacy of Plaintiffs' Expert Witness Testimony**

Plaintiffs rely on Dr. Ritchie C. Shoemaker of Pocomoke City, Maryland for causation and medical testimony. Because of my toxic tort practice, I am very familiar with Dr. Shoemaker and his opinions, which lack accepted scientific and medical bases. His diagnosis of chronic biotoxin associated illness is of his own creation, and his treatment using "off label" prescription medication is at best controversial.

I agree with the Plaintiffs' legal expert insofar as Mr. Hoge testified that Plaintiffs "need to find a toxicologist." Unfortunately, they do not have one in Dr. Shoemaker. By his own admission, he is a "country doctor" who has no board certifications in toxicology (or allergy, immunology, rheumatology, epidemiology, mycology, pulmonology, environmental medicine, occupational medicine, neuropsychology, or a host of other specialties). Dr. Shoemaker has not published on mold illness in significant or accepted peer reviewed publications and he attempts, in his deposition as he does in other depositions and court testimony, to exaggerate the stature of both his publications and his "poster" presentations.

Dr. Shoemaker is a family practitioner who has no hospital privileges. Many of his patients are referred by attorneys who file personal injury lawsuits. He writes books

11

about his availability as a plaintiff's mold witness. He operates a website that provides referral and contact information for personal injury plaintiff's attorneys.

Significantly, Dr. Shoemaker appears to engage in the practice of "litigation screening." This practice, roundly excoriated by many courts, involves doctors who provide medical support for questionable legal claims. The practice was most thoroughly examined and criticized by Judge Janis Jack in MDL 1553, Silica Products Litigation. Judge Jack conducted in-court depositions of several doctors and learned that they were favorites, chosen by plaintiff's attorney to reliably provide medical reports that claimed that persons allegedly exposed to silica products suffered from silicosis. Judge Jack learned that some of these doctors found silicosis in 90% – 94% of the patients they examined. Judge Jack concluded that these positive rates were wildly beyond expectations and could only be explained by either 1) a nationwide silcosis epidemic or 2) litigation chicanery. She concluded the latter.

I note that Dr. Shoemaker relies on his own diagnostic method that both he and many courts consider "not generally accepted" in the medical community. Dr. Shoemaker's method appears to generate a 92% positive rate. This number mirrors the positive rate found by Judge Jack in her analysis of silicosis screeners in MDL 1553. It is also significant that Dr. Shoemaker uses a boilerplate expert report in this case. He conceded that "there is a lot of template" in the report. Indeed, one can see the grammatical confusion when Dr. Shoemaker tried to make his boilerplate report fit for two plaintiffs: "Mss. Young's and Ghee's past medical history and absent any other confounding occupational or townhouse (sic) exposures and after reviewing the results of her (sic) comprehensive lab evaluation...."

Interestingly, the Plaintiffs seem to recognize that Dr. Shoemaker is in the litigation business and not the healing arts. Neither Plaintiff has followed Dr. Shoemaker's prescriptions. Both are waiting until they can talk to a treating doctor for a second opinion before taking Dr. Shoemaker's medicine and following his protocol. Even though both Plaintiffs have had an opportunity to seek this second opinion, they have not followed through and, to date, they have not taken Dr. Shoemaker's medicine.

It is my opinion that Dr. Shoemaker would have been excluded, had he been used by the Plaintiffs to prosecute their claims against their former landlord in the action that they claim they intended the Defendants file in the District of Columbia Superior Court. Dr. Shoemaker is subject to exclusion because his opinions and methodology are not generally accepted in the scientific community and because his methodology is not reliable. Dr. Shoemaker's unique, litigation friendly practice has resulted in his exclusion as an expert witness in the District of Columbia Superior Court and in Virginia, as well as other jurisdictions. Dr. Shoemaker is the subject of an exclusory hearing in the remanded Chesson litigation in Maryland, which I understand is due to be heard in early 2008. I have relied on the numerous opinions which I have reviewed and which are listed above, including the decision by the D.C. Superior Court in *Wright,* as well as my own knowledge and experience from my toxic tort practice.

In his deposition, I note that Dr. Shoemaker seems to recognize his vulnerability for exclusion and was very defensive about the prior orders excluding his testimony. His description of some of those orders was incomplete and inaccurate. He alluded to a confidential communication he had with an attorney warning him about the dangers of serial exclusion. His open contempt for defense experts and even for the competence of

the plaintiffs' lawyers that have retained him shows that he is not an objective expert and that, if allowed to testify, he would have been an ineffective and unbelievable expert. His poor demeanor, his dissembling, his boilerplate expert report and his generally pedantic attitude would likely alienate a District of Columbia jury.

Furthermore, because the weaknesses of the Plaintiffs' claims and because they have not followed his protocols, Dr. Shoemaker's deposition testimony narrowed and, perhaps even eliminated most of his opinions provided in his written report, making his testimony even weaker. In his deposition, he clearly testified that he cannot associate Plaintiff Young's Spring 2003 hospitalization with the August/September 2003 alleged mold exposure in Apartment 1A. He concedes that, if the Plaintiffs do not follow his protocol, then he cannot offer specific causation testimony. Even if Dr. Shoemaker was a legitimate medical expert, his testimony makes it virtually impossible for the Plaintiffs to establish any causal relationship between their claimed medical issues and their prior indirect alleged mold and raw sewage exposure.

It is my opinion, to a reasonable degree of professional certainty that Dr. Shoemaker would have been excluded from testifying, had the Plaintiffs relied upon Dr. Shoemaker to prosecute their lawsuit in the District of Columbia Superior Court, as he was in the *Wright* decision. It is also my opinion, to a reasonable degree of professional certainty, that to the extent Dr. Shoemaker would have been permitted to testify and to the extent that a jury was allowed to consider his opinions about the Plaintiffs, the jury would have likely disregarded his testimony because he because of his inadequate professional qualifications, his frequent exclusions, his lack of professional standing in

14

the relevant fields, his combative demeanor, his lack of adequate foundation for any conclusions about the Plaintiffs, and his poor credibility.

**Credibility of Plaintiffs as Witnesses**

Both Plaintiff have substantial problems with their credibility.

**Vanessa Ghee:** Plaintiff Ghee is impeachable because of her past theft conviction. This fact is admissible as evidence and would have a negative impact upon a jury considering her case. Ms. Ghee has also offered testimony that seems incredible on its face, and she is not an effective witness. For example, in her deposition, Ms. Ghee testified that when she complained to the landlord about the smell in the adjacent apartment, the landlord complimented her sunglasses, told her she was too good for the apartment complex, offered to move her out of the complex and offered her $1000.00. There are several other instances in Ms. Ghee's deposition where she offers testimony that is not credible or seems very unbelievable. Additionally, Ms. Ghee demonstrates a selective memory in her deposition, which would make her subject to impeachment.

**Denicole Young:** Ms. Young is subject to impeachment because she has not filed tax returns for many years or paid taxes, yet is making a substantial salary apparently as a source of business for mortgage company which pays her commissions. Additionally, even though Ms. Young has been employed making $7,000-8000 per month from her mortgage banking commissions and drives a Mercedes-Benz, she was relying on Medicaid for health insurance. Ms. Young is also subject to impeachment based on her very selective memory. Her deposition revealed numerous instances where Ms. Young

had no memory of pre-existing illnesses and the details related to those illnesses. However, she claims a verbatim memory of events related to her pending claim.

Although I am offering opinions as to the viability of the "case within the case," I agree with the Plaintiffs' standard of care expert, Mr. Hoge, that juries tend to favor or punish parties based on their assessment of character. I think that fact will work to the detriment of the Plaintiffs in this case, and, assuming that a D.C. jury was allowed to consider the Plaintiffs' claims (which I believe would have been unlikely), it is my opinion to a reasonable degree of professional certainty that both Ms. Ghee's and Ms. Young's credibility would be held in low regard by a District of Columbia jury for the reasons set forth above.

**Fault of Plaintiffs**

Plaintiffs have fault that supports viable defenses of contributory negligence and assumption of the risk defenses. Plaintiffs' fault also weighs on the jury's assessment of liability and damages.

Here, Plaintiffs' have fault as to both the underlying medical issues and also the prosecution of their case. Regarding the medical issues, in their depositions, the Plaintiffs had a difficult time explaining why they did not move out of their allegedly toxic apartment before September 23, 2002. According to their testimony, neither Plaintiff even tried to move away from the apartment although both could have made alternate temporary living and/or sleeping arrangements. The fact that both Plaintiffs continued to live, work, eat and sleep in an apartment that they claim made them sick is evidence of contributory negligence and assumption of the risk. The Plaintiffs may also have caused their alleged injuries by illegally breaking into Apartment 1A to take their

photographs and their videotape of that apartment, as Dr. Shoemaker acknowledged in his deposition.

The Plaintiffs also failed to prosecute their case. Ms. Ghee has direct and practical experience in personal injury litigation as the paralegal and sole office worker for an experienced personal injury plaintiff attorney just blocks from D. C Superior Court. Although she was frequently in court, she never checked on the status of her case. In her deposition, Ms. Ghee clearly testified to her knowledge of the Statute of Limitations for her and Ms. Young's case and her concern that the case had not been filed before the Statute of Limitations or then served and prosecuted. Ms. Ghee discussed her concerns with Ms. Young, and Ms. Young was also aware of the Statute of Limitations bar.

It is my opinion to a reasonable degree of professional certainty that, if the Plaintiffs' claims had been decided by a District of Columbia jury, the jury would have rejected the Plaintiffs' claims or substantially reduced any damages that they might have awarded to the Plaintiffs because of their contributory fault and/or assumption of the risk.

**Statute of Limitations**

The Plaintiffs' claims are governed by a three year statute of limitations. Under the discovery rule, their claims accrue when they know or have reason to know that their injuries are caused by the negligence of another. As noted above, I do not think that the Plaintiffs suffered any injuries caused by exposure to mold in Apartment 1A. Thus, they do not have a claim that accrued.

To the extent Plaintiffs can establish some causal nexus between their medical treatment and their brief residence in Apartment 2A, both of their claims likely accrued

17

on September 6, 2003, the date they first visited the ER at George Washington Hospital,

At that time, Plaintiffs themselves associated their alleged injuries with mold. Thus, it is

my opinion, within a reasonable degree of professional certainty, that the applicable

Statute of Limitations likely would have expired on September 6, 2005, although it could

have been later on September 13, 2005. I hold these opinions to a reasonable degree of

professional certainty.

### Valuation of the underlying Toxic Tort case

As noted above, it is my opinion that the Plaintiff Young cannot associate her

Spring 2003 claims with mold exposure, nor can her expert, Dr. Shoemaker.

Additionally, as noted above, Dr. Shoemaker cannot offer an opinion on specific

causation because Plaintiffs have not followed his protocol. He also cannot offer general

or specific causation opinions for either plaintiff for any injury because his methodology

is unsound and not generally accepted in the scientific community. Additionally, for all

the reasons outlined above, the Plaintiffs' claims are very weak, and it is my opinion that

the case within a case was not a good case that would have survived a motion for

judgment to be heard by a jury.

Assuming that the Plaintiffs' speculative claims would have been decided by a

D.C. jury (which is not my opinion), I do have an opinion of the value the potential jury

verdicts in the event of a successful verdict which I think was highly unlikely. It is my

opinion that the underlying defendants would have received a defense verdict because the

jury would not find either of the plaintiffs or Dr. Shoemaker to be credible or effective

witnesses. In the unlikely event of a plaintiff's verdict for either Plaintiff (which again I

think is highly unlikely), I agree with Mr. Hoge that the value of Plaintiffs' toxic tort

claims are affected by many factors, including the medical expenses incurred by Plaintiffs as well as their credibility or lack of credibility. Relying on the medical expenses reported in the discovery responses and produced by Plaintiffs (and excluding Ms. Young's medical expenses for the 2003 ICU stay), I calculate Ms.Ghee's medical expenses that she can attribute to mold exposure at $1628. I calculate Ms. Young's medical expenses that she can attribute to mold exposure at $1200.50, although I am missing bills for some of her clinic treatment from September of 2002 and November of 2002. Given those medical specials, it would be unlikely that a jury would award either plaintiff more than their specials and no more than $3,500.00 each. Because of the costs involved in prosecution of their alleged mold claims, the plaintiffs would not have received any recovery since the costs would have exceeded any potential for recovery.

Based on the weaknesses of their claims, as outlined above, it is my opinion to a reasonable degree of professional certainty that, in terms of settlement value for the underlying case, a well-informed defendant would pay no more than $3,500 for Ms. Ghee and $2,500 dollars for Ms. Young's claims.

**Rule 26(a)(2)(B)(iii): Exhibits**

I have not prepared any exhibit to summarize my testimony.

**Rule 26(a)(2)(B)(v) : Prior Trial and Deposition Testimony**

I have not testified in trial or by deposition in the past four (4) years.

**Rule 26(a)(2)(B)(vi): Compensation**

I am being paid $375 per hour for my time, which time to date has included reviewing the pleadings and documents produced in discovery, formulating my opinions, and preparing this Report

Robert F. Redmond, Jr.