**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **DENICOLE YOUNG and** | ) |
| **VANESSA GHEE** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   Civil Action No. 07-cv-983 (ESH) |
| | ) |
| **WILLIAM F. BURTON and** | ) |
| **LEWIS & TOMPKINS, P.C.** | ) |
| | ) |
| **Defendants** | ) |
| | ) |

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Denicole Young and Vanessa Ghee, by and through their counsel Bode & Grenier, LLP, hereby oppose Defendants' Motion for Summary Judgment (the "Motion").

### SUMMARY OF ARGUMENTS

As set forth more fully herein, this Court should deny the Motion for the following reasons:

1.    Plaintiffs can establish proximate cause for their claims against Defendants; and

2.    Plaintiffs can show that the underlying claims that Defendants failed to properly prosecute ("the underlying case") were viable causes of action that would have been successful if filed with the Superior Court of the District of Columbia prior to the expiration of the three year statute of limitations.

Defendants' request for summary judgment on each count of Plaintiffs'

Complaint rests on the incorrect assertion that Plaintiffs cannot prove causation in the underlying case.

Defendants' own expert provides proof of causation in the underlying case. Relying on Defendants' medical expert S. Michael Phillips, M.D., Plaintiffs can prove causation in the underlying case, providing Plaintiffs with proximate causation and a basis for each of the counts in Plaintiffs' Complaint.

## BACKGROUND

The Court is well aware of the factual and procedural background of this case. Plaintiffs have alleged legal malpractice against Defendants, and must prove the case which Defendants failed to properly prosecute. The underlying case would have included claims against Stanton Glen Apartments and related entities for damages suffered by Plaintiffs as a result of their exposure to toxic mold and/or raw sewage while residing at the Stanton Glen Apartments.

On July 22, 2008, this Court issued its Memorandum Opinion and Order granting Defendants' *Daubert* Motion to Exclude the Testimony of Plaintiffs' medical expert Dr. Ritchie Shoemaker.

Defendants now move this Court for summary judgment under the false assumption that Plaintiffs cannot establish causation in the underlying case against Stanton Glen Apartments.

## ARGUMENT

### I.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, "summary judgment is upheld on appeal only where there is no genuine issue of material fact, and, viewing the

evidence in the light most favorable to the nonmoving party, the movant is entitled to prevail as a matter of law." *Abourezk v. New York Airlines, Inc.*, 895 F.2d 1456, 1457 (D.C. Cir. 1990) (internal citations and quotations omitted). Additionally, "the party against whom summary judgment was granted has the benefit of all reasonable evidentiary inferences that can be drawn in his favor." *Id*. at 1458; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (U.S. 1986) (holding that at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial). To deny summary judgment, there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 252.

Defendants do not meet this standard. The facts in this action show that there is evidence on which a jury could reasonably find for Plaintiffs, and that there are disputed issues of material facts as to whether Defendants' failure to properly prosecute the underlying case would be considered negligent, reckless, and/or fraudulent.

Because the Motion only attacks Plaintiffs' ability to prove the merits in the underlying case as a basis for Defendants' argument that no proximate causation exists in this case, Plaintiffs need only show that there is evidence on which a jury could reasonably find for Plaintiffs on the merits in the underlying case, which would then provide proximate causation in this case. Defendants attack no other aspects of Plaintiffs' case besides causation in the underlying case, and consequently, causation in this case.

## II.    PLAINTIFFS HAD VIABLE CLAIMS IN THE UNDERLYING CASE.

Defendants state that it is undisputed that Plaintiffs had no viable causes of action

in the underlying case.  This is incorrect.  Defendants' own experts support Plaintiffs'

claims that the underlying case was viable.  Through Defendants' experts, Plaintiffs are

able to offer evidence on which a jury could reasonably find for Plaintiffs on the merits in

the underlying case, and Plaintiffs also are able to show that there is a genuine issue for

trial.

Defendants' medical expert S. Michael Phillips, M.D. states in his report, "I

conclude with reasonable medical certainty that there is evidence to support short-term

irritant response during the 34 days of habitation and voluntary unauthorized exposure to

mold."  (Phillips Report, Exhibit 1, p. 18.)  Earlier in his report, Dr. Phillips also states

that Ms. Ghee's total medical bill of approximately $2,000.00 "can be explained by a

transient mild irritation reaction while living in Apartment #2A."  (*Id.*, Exhibit 1, p. 3.)

Dr. Phillips provides a diagnosis of transient mild irritation while living in

Apartment 2A for Ms. Ghee, and also attributes the cost of medical bills to this illness.

Further, Dr. Phillips' conclusion, to a reasonable medical certainty, is that the evidence in

this case does support a short-term irritant response of both Plaintiffs.  Defendants'

alternative interpretation of Dr. Phillips expected testimony is a genuine issue for trial.

More importantly, Dr. Phillips' report provides evidence upon which a jury could

reasonably find for Plaintiffs on the merits in the underlying case.  Dr. Phillips,

Defendants' own expert, provides Plaintiffs with this evidence.  In Plaintiffs' Rule

26(a)(2) Disclosures, filed on September 19, 2007, Plaintiffs "reserve[d] the right to call

to testify at trial, and/or to rely on the testimony or report(s) of, any expert witness(es)

designated by any of the Defendants."  (Plaintiffs' 26(a)(2) Disclosures, Exhibit 2, pp. 2-

3.)  Plaintiffs will exercise the right to call Dr. Phillips to offer this evidence upon which

a jury could reasonably find for Plaintiffs in the underlying case.

Further, Defendants' legal expert Robert F. Redmond, Jr. provides evidence of the

viability of the underlying case.  He states in his report:

> I calculate Ms. Ghee's medical expenses that she can attribute to mold
> exposure at $1628.  I calculate Ms. Young's medical expenses that she can
> attribute to mold exposure at $1200.50 . . . .  Given these medical specials,
> it would be unlikely that a jury would award either plaintiff more than
> their specials and no more than $3,500.00 each.

(Redmond Report, Exhibit 3, p. 19.)

Mr. Redmond later states:

> It is my opinion to a reasonable degree of professional certainty that, in
> terms of settlement value for the underlying case, a well-informed
> defendant would pay no more than $3,500 for Ms. Ghee and $2,500 for
> Ms. Young's claims.

(*Id.*, Exhibit 3, p. 19.)

Mr. Redmond's report provides Plaintiffs with valuation evidence on the

underlying case.  Mr. Redmond states that the medical expenses of Ms. Ghee and Ms.

Young can be attributed to the mold exposure, and then asserts what each case would be

worth.  Mr. Redmond unequivocally attributes a set amount of medical expenses to the

mold exposure.  Again, this evidence gives rise to a genuine issue for trial, and this is also

evidence upon which a jury could rely to reasonably find for Plaintiffs in the underlying

case.  Mr. Redmond, like Dr. Phillips, was also designated by Plaintiffs to testify through

the reservation statement in Plaintiffs' Rule 26(a)(2) Designation.  (Plaintiffs' Rule

26(a)(2) Designation, Exhibit 2, pp. 2-3.)

Dr. Phillips provides Plaintiffs with expert medical and scientific explanation of

the cause, nature, and extent of Plaintiffs' illnesses in the underlying case.  The

underlying case had merits and through Defendants' experts, Plaintiffs have evidence

upon which reasonable jurors could find for the Plaintiffs.

### III.    ALL COUNTS OF PLAINTIFFS' COMPLAINT SURVIVE SUMMARY JUDGMENT

Defendants' motion for summary judgment must be denied on each count of Plaintiffs' Complaint.  Again, Defendants rely on the argument that Plaintiffs cannot prove the underlying case, and therefore cannot prove proximate causation in this case. Defendants offer no other argument for summary judgment, other than their mistaken belief that Plaintiffs cannot causally connect Defendants' conduct to damages.  Plaintiffs can connect Defendants' conduct to damages because Plaintiffs can prove causation in the underlying case.  Because Plaintiffs can and will offer proof of causation in the underlying case, each count of Plaintiffs' Complaint must survive summary judgment. Defendants' conduct was the proximate cause of Plaintiffs' damages for professional negligence (Counts I and II), breach of contract (Counts III and IV), willful and wanton conduct (Counts V and VI), breach of fiduciary duties (Counts VII and VIII), and fraud (Counts IX and X).

### IV.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny Defendants'

Motion for Summary Judgment. A proposed Order is attached hereto.

                                        Respectfully submitted,


                                        _Peter C. Grenier /s/_____
                              By:       Peter C. Grenier (D.C. Bar No. 418570)
                                        Bode & Grenier, L.L.P.
                                        1150 Connecticut Avenue, N.W.
                                        Washington, D.C.  20036
                                        (202) 828-4100
                                        (202) 828-4130 (fax)
                                        _Counsel for Plaintiffs_

Dated: August 25, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 25th day of August 2008, I served a true and accurate copy of Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment by electronic case filing upon:

> Paul J. Maloney, Esquire
> Carr Maloney, P.C.
> 1615 L Street, N.W., Suite 500
> Washington, D.C.  20006
> *Counsel for Defendant Lewis & Tompkins, P.C.*

> Deborah Murrell Whelihan, Esquire
> Jordan, Coyne & Savits, L.L.P.
> 1100 Connecticut Avenue, N.W., Suite 600
> Washington, D.C. 20036
> *Counsel for Defendant William F. Burton*

*Peter C. Grenier /s/*
    Peter C. Grenier

# EXHIBIT 1

## S. Michael Phillips, M.D., F.A.C.P.
Professor of Medicine and Neurology
Lead Clinical Physician
Division of Pulmonary Allergy and Critical Care
University of Pennsylvania
School of Medicine

Dec. 29, 2007

Paul J. Maloney, Esquire
Carr Maloney, P.C.
1615 L. Street NW
Washington, D.C.  20036-5652

Re: Denicole Young and Vanessa Ghee v. Lewis & Tompkins, et. al.
    File No.: 89007DC002

Dear Mr. Maloney:

I have reviewed the Medical Records regarding Denicole Young and
Vanessa Ghee , which you have sent me.  These records include those
designated as Bates 0001-2207.   Major records reviewed include:
1. Medical Records of Calvert Internal Medicine Group
2. Medical Records of George Washington University Hospital
3. Multiple Pleadings , Complaints, Discovery Responses to
   Interrogatories, and Deposition exhibits
4. Depositions of Denicole Young and Vanessa Ghee
5. Medical records, Report and Deposition of Dr. Ritchie Shoemaker

In addition to reviewing the above records, I have also performed a
Medline search of the National Library of Medicine: OVID relative to
the diagnosis and treatment of Denicole Young and Vanessa Ghee.  I
have also investigated various literature, online information, databases
including PubMed, UPTODATE and The University of Pennsylvania
online databases relative to the diagnosis and treatment of the
putative adverse reactions experienced by Denicole Young and
Vanessa Ghee.

1

**EXHIBIT**

J

My opinions below are based on over 30 years of clinical and basic science experience in the field of Internal Medicine, Allergy and Immunology. I am currently a Professor of Medicine in the Pulmonary Allergy Critical Care Division of The University of Pennsylvania School of Medicine and a Lead Clinical Physician at the University of Pennsylvania, Department of Medicine. I am Director of Allergy Services at the University of Pennsylvania and a Consultant in Medicine and Immunology to the Philadelphia Veterans Administration Hospital. I am Board Certified in Allergy and Immunology and Internal Medicine. In addition, I am a Senior Scholar in Clinical Epidemiology at The University of Pennsylvania and a Fellow of the American College of Physicians.

I have also done extensive research in international health and served as a Consultant to the Surgeon General, World Health Organization, and United States National Institutes of Health in International Health. I am the former Director of the Geographic Medicine Department at the University of Pennsylvania and have extensive experience in international health.    Mold is a particular problem in the developing world.

I maintain an active clinical practice devoting over 95 percent of my time to the clinical evaluation and treatment of patients. I am very familiar with the various medical conditions, which have affected Denicole Young and Vanessa Ghee. As a member of the Pulmonary, Allergy & Critical Care Division, I am very familiar with the evaluation of clinical morbidity due to mold and other adverse atmospheric exposures. I am specifically familiar with presenting of clinical signs and symptoms, finite risks, modes of clinical presentation, proper clinical monitoring, treatment, expectant morbidity, and clinical course. Specifically, I evaluate patients for adverse reactions to molds in terms of allergies, hypersensitivity pneumonitis, direct fungal invasion, and toxic reactions. In my role as a clinical immunologist, I am familiar with the roles of adverse reactions to environmental agents, vis-à-vis human respiratory disease including reactive airway disease, allergies, and both vasomotor and atopic disease.

As a Clinical Immunologist, I am also very familiar with the various illnesses from which Denicole Young and Vanessa Ghee suffer. I am specifically familiar with the presenting clinical signs and symptoms, finite risks, modes of clinical presentation, proper clinical monitoring, treatment, expectant morbidity, and clinical course of these diseases. I am also familiar with the appropriate therapy for these conditions and

the complications of such therapy. I evaluate patients with these problems on a daily basis.

My experience includes both human and animal models in terms of theoretical concepts, experimental models, and epidemiologic evidence. As a Senior Scholar in Clinical Epidemiology, I am called upon to review disease manifestations not only on an individual patient basis but also on a population basis.

I anticipate rendering opinions in the fields of Allergy and Immunology and Epidemiology.

My opinions below are based on Reasonable Medical Certainty.

## REVIEW OF RECORDS:

Vanessa Ghee has a relatively short and unimpressive medical history. Although she complains of the same exposures as those of Ms. Young, her total medical bill is under $2000 and can be explained by a transient mild irritant reaction while living in Apt. #2A.

Denicole Young's history begins 12/10/1996 she complained to Dr. David Tardio of ear and nasal congestion, facial pain, rhinorrhea, cough, and chest congestion. She had been seen in an ER 4 days earlier for similar complaints. A diagnosis of persistent bronchitis and possible right maximally sinuses was made and she received antibiotics and decongestants. On 12/14 she was seen by Cynthia Grandjean, CANP, for sinusitis. On 10/21/1997 she was again seen for sinus congestion, post-nasal drip, ear fullness, and cough. PE confirmed sinusitis and pharyngitis. On 11/9/1998 she was evaluated by Dr. David Gallatin, for hematuria and extreme tiredness of 4 months duration. She also had lymphadenopathy and a complete lab work-up showed no explanation for her complaints. On 7/29/1998 Ms. Grandjean evaluated her for sinus congestion, post-nasal drip, congestion, cough, and wheezing with chest congestion. Ms. Grandjean diagnosed sinusitis, pharyngitis, and asthma based on wheezing which was detected by auscultation. The wheezing cleared with nebulizer treatment confirming asthma and she was treated with two anti-asthma medications, albuterol and Azmacort. Two days later she was treated for resolving bronchitis. There was no wheezing as

she was continuing her anti-asthma meds. A diagnosis of gastric esophageal reflux disease was also made. On 8/7/1998 she was reevaluated for bronchitis and reflux. On 3/10/2000 she was reevaluated for chronic fatigue. On 3/16/2000 she complained of fatigue and was given an Rx for Zoloft, a drug given for depression, a frequent cause of fatigue. Extensive lab studies showed no other co-morbid conditions. At this time a family history of asthma was elicited. On 4/1/2002 she was evaluated at the Unity Health Care for submental lymphadenopathy. These had appeared a year prior and exacerbated 2 weeks earlier. On 4/22 she was reevaluated and noted a good response to Motrin.

Vanessa was evaluated at GWUH on 9/6/02 for three weeks of coughing. A diagnosis of viral bronchitis was made. She had had a similar episode 3 months earlier, i.e. before moving into the apartment, which was treated with an antibacterial antibiotic and codeine. At this time she was given albuterol, a drug usually used for asthma. According to this record she was smoking a pack per week for one year. No mention of mold was made. She was instructed to stop smoking and use a humidifier. On 9/13/02 she was again evaluated at GWUH for bronchitis. She was given Claritin, an antihistamine, and asked to continue her albuterol inhaler and to stop smoking. At this time a history of observing mold around the windows was obtained.

She was seen again at GWUH on 1/10/04 for complaints of sore throat and ear pain. She received Azithromycin. On 9/24/04 she was treated for sinusitis or an orbital cellulitis. A final diagnosis of a viral infection was made. On 3/3/05 an allergy evaluation by Dr. David Eisenman suggested perennial allergic rhinitis with seasonal exacerbation. Skin tests were positive for oak, grass, roach, mite, cat, dog, ragweed, and Alternaria, a strictly outside mold. Her PFTs were normal showing no asthma (obstruction) or restrictive disease.

Denicole was seen at GWUH on 9/6/02 for coughing. A chest x-ray was normal. Azithromycin was prescribed ostensibly for a bacterial infection. This drug would not affect mold. She also received albuterol.

On 9/13/02 she was seen again with a complaint of coughing, burning in the chest, and nausea for 4 weeks. If this timing is accurate it suggests that she was sick for at least a week prior to moving into the apartment. At this time she gave a history of asthma suggesting a

4

preexisting condition. She had used a Z-pack for ostensible bacterial infection as well as Percocet and codeine. She ascribed her problem to mold exposure. A diagnosis of bronchitis was made and she was instructed to continue her use of albuterol and use codeine and Claritin.

On 9/24/02 Denicole was seen at Unity Health Care for bronchitis and asthma not responsive to Azithromycin. She blamed mold exposure at home. She received Flovent, Zyrtec and albuterol. She was seen again at Unity on 11/5/02 at which time she had moved and "pt feels much better". A previous history of asthma was elicited. Her lungs were clear with good air exchange. She was to continue Zyrtec, Flovent, albuterol. She was evaluated at Unity on 2/25/03 for headache and loss of taste and smell. Her lungs were clear and a diagnosis of allergic rhinitis was made. A Unity visit on 3/11/03 showed she was doing well and a visit on 3/26/03 reiterates the previous GWUH admission for asthma on 3/21/03. She was using systemic steroids at this time for increased asthma.

On 4/15/03 Denicole was admitted to GWUH for an asthma exacerbation. This admission also documented a right lower lobe pneumonia. At this time a history of prior intubations for asthma was documented on three occasions and dated to 1997. Her "known triggers of asthma are noted pollen and URI". Parenthetically, this exacerbation occurred in the tree season (Bates 674 and 726) and she was subsequently shown to be allergic to trees by allergy skin testing. Two brothers were noted to have asthma. Her symptoms were progressive over several days and on admission she was in severe respiratory distress, with hypoxia. She required intubations on three occasions. Her right lower lobe pneumonia was confirmed on chest x-ray and responded to Imipenem, suggesting it was bacterial in origin. I will not iterate the details of this admission (Bates 672-898). After a nine-day course she was transferred to Greater Southeast Hospital for insurance reasons. She was stable at transfer.

Denicole was evaluated for recurrent edema at the USNIH on 12/21/2004. No new diagnosis was forthcoming. She also has had numerous evaluations for asthma. The frequency and severity of the illness has not decreased since leaving her initial apartment. She was evaluated on 6/20/2005 by Dr. Daniel Ein, GWU, who documented that her asthma was worse in the spring. Her intradermal skin tests showed reactivity to several trees, grass, mite, cat and dog. She also had an oral allergy syndrome.

5

Deposition of Denicole Young (10/31/2007) Ms. Young states that she is taking medication for asthma and allergy (10). Her brother had asthma (21). She had a history of sickle cell trait and hematuria (37). She has food allergies (48). She ascribes her current swelling to molds and intubations(57). She was inordinately influenced by the opinions of Dr. Shoemaker (62--). She is allergic to mites, pollen, ragweed, fungus, and foods (98). She did not recall previously documented visits for respiratory issues (112) or fatigue (128). She crawled thru a window into the adjacent apartment (1A) and recalls the anatomy of the apartment well. She describes heavy mold growth and sewage stains, therein (175--). The photos were taken on 9/12/02. The air-conditioner was not working and she complained to management(182). She had a headache, stomachache, hurting chest, coughing, and sneezing within a few days after moving into the apartment (185). She moved into a new apartment on Sept. 23 (192). She remembered her medical visits approximately and did not add any significant details to what is documented in the medical records. In 1999 or 2000 she began awakening completely paralyzed and these symptoms continue to this day (227). She subsequently recalled being tired a lot prior to August 19, 2002(263). She also has excessive dry mouth tingling, numbness, joint pain, and skin and food sensitivity subsequent to Sept. 19, 2002(266-267). She recalls discussing mold effects with Ms. Ghee after Ms. Ghee had done literature research(287). This literature is documented (Bates 1746-1794).

Deposition of Vanessa Ghee (10/30/2007). Ms Ghee stated that she developed asthma around 2002 after residing in the apartment(20). She stated that the second apartment flooded 3 times (23). She was treated by Dr. Yasmin Panahy beginning in 2000 (46)and at the GWUH (27). She too was inordinately impressed by the emphasis, which Dr. Ritchie Shoemaker placed on mold toxicity (63---). She smoked pack of cigarettes every 2-3 months(112), less than other documentations. She had a turbinectomies, which were not related to mold(114). Her economic losses due to illness were $1,628 (116). She has severe allergies in spring and fall (116) and asthma since exposure to mold (116). She had problems a week after moving into the apartment(150). After seeing the pictures of mold in the adjacent apartment the manager was very supportive of their desire to move (169).

The Deposition exhibits documented that the lease for #3064 2A began on Aug. 19, 2002. They remained there until 9/23/2002, when they moved to Apt. 101 at 3084 Stanton Road. There is no evidence

or claim of mold exposure in this or later apartments.  Thus there was an approximate claimed exposure of 34 days.

Deposition of Ritchie Shoemaker: A few statements do deserve more specific review and are referred by Deposition page number.  He states that chronic fatigue was diagnosed in 2000 before the putative mold exposure (20), but he was not comfortable with this diagnosis.  She was also treated for depression and on March 16, 2000 for bronchitis (18).  There were three references in the GWUH records suggesting she was on a ventilator for asthma in 1997 (25).  Known triggers for her asthma included upper respiratory infections and pollen (28).  Ms. Ghee was a smoker (33) and probably underestimated the amount she smoked (33).  He speaks of a 7 step protocol to diagnose CBAI which is a totally non-evidence based approach(38) and also states that "no one else who works using my protocols has published anything"(39).  Neither the CDC nor any other organizations validated his diagnostic and treatment approaches (41).  He has no data to support the relationship between serologically defined (56) or molecularly defined (54) genes and specific diseases, which he claims to define by these techniques.  He was not able to pin down if mold exposure in the second building was a likely cause for the GWUH admission on April 15, 2003(66) and certainly other exposures could have caused it (67).  He does not know what kind of mold was in the apartment (72), therefore there is no evidence for toxic mold per se.  Dr Ein showed that Ms. Young attributed most of her symptoms to pollen, but Dr. Shoemaker incorrectly characterized the positive allergy test as being negative (79).  The MMp was his specific test, set up for him by Estoterix for which he has no normal range (96) and his estimates of normal exceed those of LabCor , which have been validated, by tenfold (97).  How can these be valid criteria?  The use of Cholestyramine is "off label" (112), meaning it is not approved by the manufacturer for use in the way he uses it.  His assertions that measuring C4a and VIP are useful (127) are not substantiated by any evidence-based medicine.  Of great importance is his admission that even if he had seen Denicole and Vanessa in 2005, he would not know what happened in 2002 and his data base was less developed (128).  For example the half-life of C4a (time required for its level to reduce by 50%) is measured in minutes, not months.  His claim that the CNI test is "hugely accurate" (136) is not substantiated by any evidence based medical study. There is no ICD9 code for CBAI (196), again showing the diagnosis is not accepted by the medically evidence-based scientific community.   He is not a Toxicologist, Mycologist, Allergist, Immunologist, Epidemiologist, Rheumatologist, Industrial Hygienist, Neuropsychologist, or expert in Occupational Environmental

Medicine(188-189). With these qualifications, how is he qualified to create new scientific theories, evaluation strategies, and treatments and evaluate them with any validity? "I'm a Country Doctor…"(193). He simply does not have the training to do what he is doing. When asked whether CBAI is not a generally accepted diagnosed, he answered "No argument about that" and then admitted that there was no ICD-9 code so he misrepresents the accepted definition of mycotoxins illness (i.e. proven illness due primarily to ingestion of mycotoxins) for billing purposes (196). He admits that MSH is not specific for molds(199) and VIP is investigational (202), i.e. not accepted for human use as a diagnostic agent. He discussed a proinflammatory "stew" of materials, which have potential toxic effects on humans besides mycotoxins(204), but has no data to show that Denicole and Vanessa were exposed to these agents. Similarly MSH does not indicate mold illness (210). He doesn't use VCS to measure mold illness and then misrepresents its value in other venues (211).

In summary, this Deposition of Dr. Shoemaker is of interest as it is fraught with scientific inaccuracies, contentions of biological phenomena, measurement of irrelevant factors, and unsubstantiated claims. His arguments are not predicated on evidence-based medicine and admittedly not accepted by the general medical community, which requires evidence-based medicine as its criterion of validity. Most of his statements are flights of scientific fantasy and are totally unaccepted by the established and reputable scientific community. Please see discussion on Biotoxin Associated Illness.

## FORMULATION:

Denicole Young and Vanessa Ghee suggest that a significant portion of their problems is related to adverse reactions stemming from exposures to mold.

The critical issue is did atmospheric conditions cause the problems experienced by Denicole Young and Vanessa Ghee? The most current, accurate and accepted reference on molds was published as a Position Paper for the American Academy of Allergy, Asthma and Immunology (AAAAI): Bush, R. et.al. The Medical Effects of Mold Exposure : JACI, 117:326, 2006. The leading clinical experts on the effects of molds on human disease prepared this report. The report is the current "state of the art" and widely accepted as authoritative. Less the 1% of the members of the American Academy of Allergy, Asthma, and

Immunology, questioned the report. In this context, the criticisms did not in any way support the majority of the contentions of the plaintiffs. This publication has certain conclusions, which are germane to this case.

1. Allergic responses to inhaled outdoor mold (Alternaria) are a recognized factor in lower airway disease (asthma); however the effect of indoor mold is less clearly established.
2. Current studies do not conclusively prove that exposure to outdoor mold play a role in allergic rhinitis and studies on the contribution of indoor mold to upper airway allergy are even less compelling.
3. Exposure to molds is not recognized as a contributing factor in atopic dermatitis.
4. Exposure to mold is not recognized as a cause of urticaria, angioedema, or anaphylaxis.
5. Patients with suspected mold allergy require confirmation by an accepted method of detection.
6. Data supporting the role of fungi in chronic rhinosinusitis are lacking at this time.
7. The occurrence of mold-related reactions from exposure to fungal irritants in nonoccupational settings is theoretically possible, although unlikely to occur in the general population given exposure and dose considerations.
8. Such irritant reactions would produce transient symptoms-signs related to mucus membranes of the eyes and upper and lower respiratory tracts but would not be expected to manifest in other organs or in a system fashion.
9. Further evidence for thresholds for irritant reactions in at-risk populations is needed to better define the role of mold, mold products, and other potential irritants.
10. Exposure to molds or their products does not induce a state of immune dysregulation (e.g. immunodeficiency or autoimmunity).
11. The practice of performing large numbers of nonspecific immune-based tests as an indication of mold exposure or mold-related illness is not evidence-based and is to be discouraged.
12. Measurement of antibodies to specific mold has scientific merit in the assessment of IgE-mediated allergic disease, HP, and allergic bronchopulmonary mycosis.
13. Measurement of antibodies to molds cannot be used as an immunologic marker to define dose, timing, and/or location of exposure to mold antigen in a noninfectious setting.

9

14. Testing for antibodies to mycotoxins is not scientifically validated and should not be relied on.
15. Sampling of both indoor and outdoor mold spores provides a measure of potential exposures and can be useful in certain clinical conditions, but it has many shortcomings.
16. Bulk, surface, and within-wall cavity measurement of molds or mycotoxins, although having potential relevance for other purposes, cannot be used to assess exposure.
17. Testing for airborne mycotoxins in nonagricultural environment cannot be used to diagnose mold exposure.

An amazingly consistent spectrum of potential mold associated illness was summarized in the article: Adverse Human Health Effects Associated with Molds in the Indoor Environment, Journal of Occupational and Environ. Medicine, 45:470, 2003.

Molds may cause a wide spectrum of illnesses, including allergies, irritation, hypersensitivity pneumonitis, and direct infection. However, these and innumerable other medical reports predicated on evidence-based medicine clearly show that the contentions of the plaintiffs and Dr. Ritchie Shoemaker are totally inconsistent with these medical reports and reflect "junk" science, unaccepted by the general medical community.

In the case of Denicole Young and Vanessa Ghee, molds and sewage exposure may have caused transient irritation; however, these irritants caused no objectively documented illness.
In reviewing the medical records, I find overwhelming evidence to suggest that these allegations are not substantiated. There is no evidence to suggest a causal relationship between the problems experienced by Denicole Young and Vanessa Ghee and their putative environmental exposures. A causal relationship requires several criteria, and these criteria must be met to prevent fallacious conclusions based on the supposition or chance association. Unless these criteria are met, one must conclude that a causal relationship does not exist.

As paraphrased in the criteria espoused by Dr. Bradford Hill, the most critical issues relative to these criteria include:

1. A precipitating event: In this case, there is an allegation of exposures to molds and toxic sewage. There did appear to be mold as well as defective plumbing in the apartment next door.

There was also evidence of a sewer contamination in the yard behind their apartment. However, the medical records which I have been provided do not substantiate that there were actually any measurements of molds, bacteria, biological, or organic materials in the environment. Thus there is no evidence that they were ever exposed to any molds or their toxins, based on any objective studies. In addition, if they were exposed to any significant amount of mold, it occurred when they voluntarily exposed themselves in an unauthorized entry into the adjacent apartment.

2. The spectrum of disease should be logically attributable to mold exposure. This criterion was also not met. There is no evidence that excess moisture and subsequent mold growth, lead to any disease in the Plaintiffs. Many of the subjective complaints of the Plaintiffs are very common in all humans, regardless of their exposure to molds. In this context it would be of value to review the ICTM Electronic Report, Vol 4, No 1, "Baseline levels of symptom reporting". For example, 46 % have stuffy noses, 33 have headache, 30 % are fatigued, 26 % have cough, 25% have itchy eyes, 22% have sore throats, 12% have rashes, 10% have difficulty breathing during the two week period prior to questioning (Hayworth and McCaul, 2001). The NIH found that 30% of girls had headaches and fatigue on a weekly basis (Ghandouer, et al, 2004). 70% of English adults have headache regularly (Boardman, et al, 2003). Asthmatic symptoms such as wheezing or cough are found in 28% and 37% of Canadian adults (Manfred, et al, 2001). Thus most of the subjective symptoms of the Plaintiffs are really normal findings without mold exposure.

Molds can cause irritant reactions , allergies and asthma. However these illnesses would occur only in the context of specific significant exposure. However, Denicole Young complains of a very wide spectrum of diverse physical and psychological problems, including chronic fatigue, depression, idiopathic edema, lymphadenitis, gastroesophageal reflux, somatic pain, weakness, inability to move, cognitive issues, dry mouth, etc. Molds do not cause these latter problems.

Some physicians have dutifully documented the history as iterated by Ms. Denicole Young and Vanessa Ghee . They accept

11

their rendition of events and draw a time correlation, not a causal one. The only physician who strongly supports their contentions of a mold-associated illness is Dr. Ritchie Shoemaker. Dr. Shoemaker claims that these effects are a consequence of a "Chronic Biotoxin Related Illness", stemming from exposure to toxic mold and other environmental products.

Dr. Shoemaker is known for this position, and he has taken it without any evidence vis-à-vis specific physical findings or laboratory findings of support. It appears that he reiterated the history and provided support of mold-associated illnesses, based on no rational thought process, predicated on evidence. He did not and cannot justify his conclusions. I will discuss this issue below.

3. The next criterion included should be a temporal association of effects; i.e., the specific risk factor such as mold exposure should be associated with the onset of problem. In this case, this was not established. The problems preceded the exposure to molds and did not correlate with a mold exposure etiology. Mild irritant reactions can occur quickly with exposure; however, these problems are not true disease and disappear rapidly with the removal of the mold stimulus. When exposed to mold, it takes months or years to develop a true immunologic sensitivity. No clinically consistent sensitivity responses were noted and the problems occurred at too short an interval to allow for mold sensitivity to develop and manifest itself. Indeed the GW Medical Record suggests that Ms. Young had developed her problems several days before renting the apartment, wherein she was putatively exposed to mold and sewage.

4. The next criterion is that there should be a reversal of pathological consequences if the etiology is treated; i.e., when leaving the environment, she should have improved. The medical records document improvement after moving. In the absence of documented re-exposure, their subsequent problems must be ascribed to an alternative cause. There is no evidence for re-exposure. This lack of exposure is a critical factor in determining that the severe exacerbation of asthma on 4/15/03 could not be related to mold exposure, which ended seven months earlier.

5. The next criterion is that there should be physical findings compatible with mold-associated disease. This clearly is not true. Physical findings corroborated a number of physical findings; however, none of these could be ascribed specifically to molds. Indeed bacterial infections (sinusitis, bronchitis, pneumonia) and allergic reactions to pollens were documented as probably causes of their problems.

6. Another criterion for a causal relationship is that there should be no other logical explanations. This clearly is not true. The medical record shows that her asthma would exacerbate with allergies in the spring and with respiratory infections. With specific reference to the 4/15/03 GWUH admission, her respiratory problems can be more ascribed to other allergens such as trees. The exacerbation occurred at the height of the tree allergen season. She was also sensitive to foods, grass, cats, dogs and mites and may have been exposed to these other allergens. Bacterial infections were also directly implicated in their problems and Denicole had pneumonia during this hospitalization. Since x-ray changes generally take several days to develop after the onset of pneumonia, the pneumonia undoubtedly was a cause not effect of the asthma. Pneumonia is well documented as a precipitator of asthma and would be an antecedent cause for the exacerbation of her respiratory symptoms. Finally, she was exposed to passive smoke, a known precipitator of respiratory problems due to irritant reactions. Psychological factors are also important given the unselective research done my Ms. Ghee and the untoward influence of Dr. Shoemaker.

7. The next criterion of mold-associated illness would be confirmation of physical findings or laboratory data. There is no evidence for mold-induced disease on physical examination or by x-rays of her chest and sinuses during the 4/15 admission. There were also no culture criteria demonstrating the presence of mold infection. Her chest x-ray was compatible with bacterial infection and her physicians treated her for a bacterial pneumonia at during this admission. Denicole had no mold sensitivities established by allergy testing criteria. However, she did have documented allergies to trees, grass, mite, dog, and cat. Vanessa was sensitive to several allergens but only to a single mold, Alternaria, which is a strictly outdoor mold. It does not grow in houses or sewage.

13

8.  If mold could cause their problems, then there should be valid
    epidemiologic studies documenting an association between mold
    and the signs and symptoms, which they experienced.  In
    addition, treatment for these sensitivities or removal from the
    environment should improve well-being on a population basis.  I
    specifically reviewed the medical literature, and as an
    epidemiologist and Senior Scholar in clinical Epidemiology, I can
    unequivocally state that there are no epidemiologic studies,
    which would remotely support the contentions of Denicole Young
    and Vanessa Ghee.  The epidemiologic studies, based on
    population bases, clearly do not substantiate the possibility of
    any such association.   Diseases associated with either acute
    stimulation of the Innate Immune System or the Cognate
    Immune System, both require finite re-exposure to perpetuate
    and/or exacerbate disease.

9.  The final criterion would be animal models, wherein exposures to
    molds might recapitulate the signs and symptoms experienced
    by Denicole Young and Vanessa Ghee.  No such experimental
    models exist in the literature.  Therefore, there is no theoretical
    or experimental construct upon which to base a validation of a
    causal relationship.  This contention is especially relevant vis-à-
    vis CBAI.

## CHRONIC BIOTOXIN ASSOCIATED ILLNESS:

Dr. Ritchie Shoemaker contends that the problems of Denicole Young
and Vanessa Ghee can be explained by exposure to bacteria, fungi,
biotoxins, and allergens found in moist areas.  These mold-derived
biotoxins enter the body and by unknown mechanisms can cause
literally any pathologic manifestation in humans, including all the
complaints of Denicole and Vanessa.  The illness is related to
activation of the primordial immune response, termed the Innate
Immune system.  The immune system recognizes consensus surface
structures, shared by many pathogens such as bacteria and molds.
Alternatively, the organisms can produce materials, which directly
stimulate the Innate Immune System.  The result is analogous to an
acute irritant reaction. The disease (Chronic Biotoxin Associated

Illness) is characterized by an elaborate two tier series of clinical and laboratory criteria. These include abnormalities of certain laboratory values for HLA-DR, MSH, ADH, ACTH, cortisol, VEGF, C4a, MMP-9, anti-MBP antibody, etc. There are also a variety of genetic markers, which are highly suggestive of this disease. This "illness" can only be cured by Cholestyramine, a compound that binds the toxins in the gut and removes them from the body, curing the disease. Dr. Shoemaker claims the illness has solid scientific underpinnings and is widely accepted by the scientific community.

His argument is not valid both in general terms and with specific reference to Denicole Young and Vanessa Ghee. Unfortunately, Dr. Shoemaker has convinced Denicole and Vanessa of the validity of his arguments and this belief perpetuates the complaints and maladies of Denicole and Vanessa. Please see additional documentation in my review of his Deposition.

General Critique:

1. Biotoxins exist but must be ingested to reach toxic levels. Aerosolized biotoxins, especially mold-derived biotoxins virtually never reach high enough concentrations to cause disease.

2. The putative precipitating biotoxins, bacterial endotoxin, mycotoxins, fungi, allergens, etc. all act in different way, stimulating different portions of the innate and/or cognitive immune system. They cannot be lumped together by some amorphous hypothesis.

3. Biotoxins do not cause the spectrum of disease shown by Denicole and Vanessa. Biotoxins primarily cause gastrointestinal symptoms and or liver and marrow toxicity.

4. The laboratory criteria, which Dr. Shoemaker claims to establish the presence of effects of biotoxins, do not establish the presence of biotoxins. Mass spectrophotometric or immunologic criteria can show these compounds. They were not done. Indirect measurements are neither specific nor sensitive for establishing the presence or effects of biotoxins. He admits in his Deposition that the tests are not specific and not validated

15

by others. Indeed he establishes his own criteria for normal values, which may very by 10 fold from values established by reputable laboratories.

5. The criteria described are purely theoretical. None have been causally associated with specific biotoxin associated human illnesses. The various measurements are associated with certain diseases, but not with biotoxins in the array described by Dr. Shoemaker. The Federal government has not permitted the use of the measurements to be used clinically to diagnose biotoxin-associated illness. Indeed reputable labs, when reporting values for these compounds, carefully admonish the physicians to interpret the findings with caution. The factors are neither sensitive enough to detect toxins nor specific enough to rule-out other factors. In general they have nothing to do with toxins. For example, VEGF, Vascular Endothelial Growth Factor, causes capillary ingrowth and therefore is important in cancer growth or wound healing. MBP, major basic protein, is a constituent of myelin, which coats neurons. Antibodies against MBP may be associated with demyelinating processes such as Multiple Sclerosis, or Amyotropic Lateral Sclerosis. ADH, anti-diuretic hormone, controls fluid and electrolyte balance by promoting water and salt resorption in the kidney in response to intravascular hypovolemia. ACTH, adrenal cortical stimulating hormone, stimulates the production of cortisol, during stress. HLA-DR is the major histocompatability Locus, defined serologically in humans. It is associated with various genetic linkages and diseases but has never been shown to be important in biotoxin injury. MSH, melanocyte-stimulating hormone, is produced by the supra-optic nucleus, and regulates the sleep cycle. MMP9 is one of a family of naturally occurring membrane metalloproteinases, which are non-specific regulators of tissue inflammation, working by destroying inflammatory materials and/or activating non-inflammatory suppressive factors. None of these agents, alone or in concert have been shown to be germane to biotoxin activity or any toxin related disease.

6. Cholestyramine acts in the gut to absorb toxins. Denicole and Vanessa would have to eat significant amounts of toxic mold to get sick and have it in their gastrointestinal tract for removal by Cholestyramine. Classically Cholestyramine has been used to absorb C. difficile toxin, preventing reactions by preventing the

16

C. difficile toxin from entering the body.  Cholestyramine has never been shown to absorb mycotoxins out of the body. Cholestyramine  is in the gut; how would it reach materials in the blood and then how would it remove the toxins?  In addition, the ability of Cholestyramine to absorb biotoxins and ameliorate human disease has never been shown.   Dr. Shoemaker admits that no one using his methodology has published on its success and that the use of Cholestyramine for this purpose is "off-label", i.e. not suggested as a valid therapy for this disease by the manufacturer or any other recognized medical authority.  He himself has not published any articles in peer-reviewed journals, which establish efficacy.

7.  There are no accepted genetic markers for susceptibility to mold or toxin induced diseases.  Genotype can affect phenotype(the presence of disease) and it does in many instances; however, not in the context of a putative biotoxic response.

8.  The article referring to biotoxin-induced disease, as described by Dr. Shoemaker, has not been published in refereed, peer-reviewed journal and the general medical community does not accept the concept.

9.  There are no ICD-9 Codes for biotoxin-associated illnesses, indicating that the medical community does not recognize this entity.

Specific Critique:

1.  No biotoxins have been demonstrated in this case

2.  No biotoxin producing molds, i.e. Stachybotrys, bacteria, endotoxins, glucans, proteinases, etc. have been found in the home of Denicole Young and Vanessa Ghee.

3.  No responses to biotoxins have been found in the blood of Denicole Young and Vanessa Ghee.

4.  No signs or symptoms have been found in Denicole Young and Vanessa Ghee to confirm toxicity due to biotoxins.

5.  No neuro-cognitive testing, imaging studies, and blood work show any evidence of biotoxic effects.

6.  No laboratory tests, such as multiple chemical analyses have shown any abnormalities of liver, kidneys, etc. which would be caused by a toxin.

17

7. Dr. Shoemaker saw Denicole and Vanessa long after the putative biotoxin exposure. By his own admission, he could not do the tests necessary to confirm his diagnoses.
8. Denicole and Vanessa have never been shown to be responsive to Cholestyramine, a necessary criteria for his diagnosis.
9. Dr. Shoemaker admits to an incomplete knowledge of the medical records and that allergies and infections may be plausible explanations of Denicole's major respiratory exacerbation.
10. There is no evidence of re-exposure to molds or biotoxins, which would be necessary to explain Vanessa's and Denicole's exacerbations and continued disease.

In summary, Chronic Biotoxin Associated Illness is a creation by Dr. Ritchie Shoemaker. It does not exist and is totally unaccepted by the scientific medical community. It is not contingent on evidence-based medicine. Similarly the putative Cholestyramine–based treatment is not established. Even if CBAI did exist, Dr. Shoemaker admits that he did not establish its existence in Denicole and Vanessa. Finally, Dr. Shoemaker admits that he is not fully cognizant of the Medical Records and that pollen allergy or infections are plausible explanations for the problems of Denicole (with special reference to the 4/15/03 GWUH admission).

## CAUSATION:

I conclude with Reasonable Medical Certainty that there is evidence to support a short-term irritant response during the 34 days of habitation and voluntary unauthorized exposure to mold. There is no relationship between the medical problems experienced by Denicole Young and Vanessa Ghee and putative exposures to molds or other biotoxins. Although Denicole Young and Vanessa Ghee claim to be exposed to molds and perhaps other microbiological products due to water incursion in their home, aside from a minor transient possible irritant reaction, there is no evidence to substantiate their assertion of harm due to putative exposures.

These conclusions are based on Reasonable Medical Certainty.

18

Thank you for your consideration.  If I can provide any additional information, please do not hesitate to contact me directly.


Sincerely yours,


S. Michael Phillips, MD, FACP
Professor of Medicine and Neurology
Senior Scholar in Clinical Epidemiology
Lead Physician in Medicine:
Director of Allergy
Pulmonary, Allergy and Critical Care Division
University of Pennsylvania School of Medicine

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DENICOLE YOUNG and VANESSA GHEE | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 07-CV-983 (ESH) |
| WILLIAM F. BURTON and LEWIS & TOMPKINS, P.C. | ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFFS' RULE 26(a)(2) DISCLOSURES

Pursuant to Fed. R. Civ. P. 26(a)(2), Plaintiffs Denicole Young and Vanessa Ghee, by undersigned counsel, hereby disclose to all parties the identities and opinions of the following expert witnesses whom they anticipate will be called to testify on their behalf at the trial of this matter: Ritchie C. Shoemaker, M.D., P.A. and Christopher G. Hoge, Esq.

Ritchie C. Shoemaker, M.D., P.A., an expert on biotoxin associated illnesses, is expected to provide expert testimony concerning, *inter alia*, the cause and extent of the injuries and damages to Denicole Young and Vanessa Ghee, the necessity of the medical care they have received, the amount of and reasonableness of the costs related thereto, as well as the cause, extent, and permanency of their injuries arising from the exposure giving rise to this litigation. A copy of Dr. Shoemaker's written report is attached hereto as Exhibit 1 and incorporated herein per the requirements of Rule 26(a)(2)(B).

Christopher G. Hoge, Esq., an attorney licensed in the District of Columbia, Maryland, and various federal courts with extensive experience handling legal malpractice litigation, is

expected to provide expert testimony concerning, *inter alia*, the various acts of malpractice committed by Defendants, the professional conduct violations committed by Defendants, and the loss to Plaintiffs proximately caused by such malpractice and professional conduct violations, namely the loss of viable personal injury claims for which Defendants had been retained to represent Plaintiffs.  A copy of Mr. Hoge's written report is attached hereto as Exhibit 2 and incorporated herein per the requirements of Rule 26(a)(2)(B).

Each of the aforementioned reports is based upon the factual information available, and thus may require supplementation to the extent that additional pertinent information is produced or discovered.

Plaintiffs reserve the right to offer qualified opinion testimony from individuals who provided medical services to Plaintiffs, but have not been retained by Plaintiffs to provide expert testimony in this case.  These individuals were identified in Plaintiffs' Initial Disclosures, as well as in the medical records produced by Plaintiffs to the parties.

Plaintiffs also reserve the right to designate rebuttal expert witnesses in response to the designations of testifying expert witnesses by the parties.  Plaintiffs also reserve the right to call to testify at trial, and/or to rely on the testimony or report(s) of, any expert witness(es) designated

by any of the Defendants.

Respectfully submitted,


By:    /s/ Peter C. Grenier
       Peter C. Grenier (D.C. Bar No. 418570)
       Bode & Grenier, L.L.P.
       1150 Connecticut Avenue, N.W.
       Ninth Floor
       Washington, D.C. 20036
       (202) 828-4100
       (202) 828-4130 (fax)
       *Counsel for Plaintiffs*

Dated: September 19, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of September, 2007, I served a true and correct copy of the foregoing Plaintiffs' Rule 26(a)(2) Disclosures by electronic filing and first class mail upon:

       Paul J. Maloney, Esquire
       Colleen E. Durbin, Esquire
       Carr Maloney, P.C.
       1615 L Street, N.W.
       Suite 500
       Washington, D.C.  20006
       *Counsel for Defendant Lewis & Tompkins, P.C.*

       Deborah Murrell Whelihan, Attorney-at-Law
       Jordan, Coyne & Savits, L.L.P.
       1100 Connecticut Avenue, N.W., Suite 600
       Washington, D.C. 20036
       *Counsel for Defendant William F. Burton*

                   /s/ Peter C. Grenier
                   Peter C. Grenier

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DENICOLE YOUNG, et al.,                )
                                       )
        Plaintiffs,                    )
                                       )   Civil Action No.:  07-cv-00983 (ESH)
v.                                     )
                                       )
WILLIAM F. BURTON, ESQUIRE, et al.,    )
                                       )
        Defendants.                    )
                                       )
_____)

Federal Rule of Civil Procedure
26(a)(2)(B) Report of Robert F. Redmond, Jr.

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I am

providing the following report:

**List of Qualifications:**

I am an attorney licensed to practice in Maryland (1986); Washington, D.C.

(1989); Virginia (1991) and Texas (1993).  I am a partner in the Litigation Section at

Williams Mullen.  My professional background and qualifications are more particularly

detailed in Exhibit D to the defendants' Rule 26(a)(2) Expert Disclosure Statement,

which is my law firm's biographical information for me.  Exhibit D also contains a list of

all publications which I have authored in the last ten (10) years.

I obtained my B.A. degree from the University of Virginia (UVA) in 1983 from

the College of Arts and Sciences in the Honors English program.  I graduated "with high

distinction" which is the UVA equivalent of *magna cum laude.*

1


EXHIBIT

E

I am a graduate of the Georgetown University Law Center ("Georgetown") and I graduated from Georgetown in 1986, earning my *juris doctorate cum laude*. At Georgetown, I was an Associate Editor for the Georgetown Law Journal.

During law school, I became interested in environmental law and toxic tort cases while working as a law clerk for the law firm of Steptoe and Johnson.

With the exception of my fulfilling my active duty commitment to the United States Army where I was assigned to the 82d Airborne Division in Fort Bragg, North Carolina and served as a prosecutor, my practice has focused on product liability and toxic tort litigation, including alleged toxic mold exposure cases. I have also been involved in numerous complex commercial, patent, and intellectual property lawsuits.

I have also been the National Coordinating Counsel (NCC) for several national clients in multi-district litigation involving thousands of product liability and toxic tort cases. An NCC in toxic tort litigation is an attorney that develops and implements a nationwide defense strategy for a toxic tort defendant. As NCC, I have had final responsibility for the defense of the clients, including all pretrial, trial and appellate activities. Those cases have included product liability and toxic tort litigation related to latex allergy and latex medical products, silica products, and oil refining.

As NCC, I founded a Joint Defense Committee for medical product distributors. I was responsible for identifying, educating and presenting expert witnesses in a variety of fields including toxicology, epidemiology, pulmonology and FDA regulation of medical products.

In my twenty (20) plus years of practice, I have tried approximately fifty (50) cases nationwide and been involved as local and regional counsel for thousands of cases.

In the last month, I tried a mold case to verdict in Fairfax County, Virginia where my client, the landlord defendant, prevailed upon all claims brought against it and also obtained a stipulated judgment for unpaid rent due to it.

I am "AV" rated by Martindale Hubbell. I have been listed in "The Best Lawyers in America" for Mass Tort Litigation since 2006.

**Basis for Opinions:**

I have been provided with numerous documents, which include the pleadings, written discovery exchanged among the parties, and the deposition transcripts of the parties and the Plaintiffs' two experts. To date, my opinions are based upon my review of the following:

1.    Complaint; 2.Plaintiffs' Joint Response to Defendant Lewis & Tompkins, PC's Interrogatories to Denicole Young and Vanessa Ghee; 3. Plaintiffs' Joint Response to Defendant Lewis & Tompkins, PC's Request for Production of Documents to Denicole Young and Vanessa Ghee; 4. Plaintiffs' Initial Disclosures; 5. Plaintiffs' Rule 26(a)(2); 6. Deposition Transcripts of Denicole Young with Exhibits; 7. Deposition Transcripts of Vanessa Ghee with Exhibits; 8. Deposition Transcript of Christopher G. Hoge, Esquire with Exhibits; 9. Deposition Transcript of Dr. Shoemaker with Exhibits; 10. Odaris, et al. v. Morton G. Thalhimer, Inc., Order, February 2, 2007; 11. Roche v. Lincoln Property Co., et al., July 25, 2003; 12. Montgomery Mutual Insurance Co. v. Chesson, et al., Opinion, May 23, 2007; 13. Curry v. Persica Design and Construction, Inc., Order, April 30, 2004; 14. Dumoulin v. Her Majesty the Queen in Right of Ontario, et al., Supplementary Reasons for Decision, March 29, 2006; 15. materials from Kim Stewart Ford v. Summit Realty Group, Inc., LR 2009-1; 16. Wright, et al. v. Fort Lincoln Realty Co., et al., Order, October 15, 2007; 17. George Washington Hospital Bills; 18. Unity Health Care, Inc., Adult Progress Notes, September 24, 2002 and November 5, 2002; and 19. Institute of Medicine, "Damp Indoor Spaces and Health", 2004.

I have not read the reports of the experts retained by the Defendants but I do anticipate that I will rely upon those reports as further support for my opinions listed below. I may also rely upon the depositions of witnesses and of the other experts identified by the Defendants, but those materials are not yet available.

**Summary of Opinions:**

It is my opinion, within a reasonable degree of professional certainty as an experienced toxic tort trial and litigation attorney, that the plaintiffs did not have a meritorious or viable cause of action against Stanton Glenn Limited Partnership or Stanton Glenn Apartments. Because of the costs involved to prosecute toxic tort cases, it is further my opinion that the costs of prosecution of the Plaintiffs' cases against their former landlord would have exceeded any potential recovery, if the case was cognizable which it was not because of causality problems. I also intend to offer my expert opinion in the following six areas:

1. Absence of causation evidence for Plaintiffs' alleged injuries;

2. Inadequacy of Expert Witness Testimony;

3. Credibility of Plaintiffs as Witnesses;

4. Fault of Plaintiffs;

5. Statute of Limitations; and

6. Valuation of the underlying Toxic Tort case

I hold all of my opinions outlined above to a reasonable degree of professional certainty as an experienced litigator and trial attorney in the area of toxic tort litigation.

**1. Absence of Causation Evidence for Plaintiffs' Injuries**

It is my opinion that the Plaintiffs suffered no harm because they could not have proven any causal link between their respiratory complaints and alleged exposure to mold, had the plaintiffs timely filed a complaint against Stanton Glenn, and their case within the case was not a good cause of action.

The Plaintiffs moved into their first apartment at Stanton Glen on or about August 19, 2002. The Plaintiffs moved out of building 3064 to building 3084 on or about September 23, 2002. Both Plaintiffs testified that there was no mold or raw sewage in their first apartment, 2A. The Plaintiffs first retained the Defendants on May 3, 2003, some seven months after they had moved, long after appropriate testing could have been done which would show the type and quantity of the mold in the adjacent apartment or in their apartment at the time.

In a toxic tort case, the Plaintiffs must prove both general and specific causation. General causation addresses whether a substance is capable of causing a particular injury. Specific causation addresses whether the substance caused Plaintiffs' specific injury.

**General Causation:**

Plaintiffs claim that exposure to mold in an adjacent apartment over a period of a few weeks caused a combination of injuries that can generally be categorized as 1) diffuse neurological complaints (i.e. Chronic Fatigue Syndrome) and 2) respiratory symptoms.

As to the Plaintiffs' claim that they were exposed to mold that caused diffuse neurological complaints, that theory has been roundly rejected by numerous courts, governmental publications and peer reviewed medical reports. By way of example ( and not limitation), the Institute of Medicine of the National Academies ( of Sciences, Engineering and Medicine) published a book titled "Damp Indoor Spaces and Health" and concluded that there is inadequate or insufficient evidence to determine whether an association exists between exposure to damp indoor spaces and mold and fatigue or neuropsychiatric symptoms. Similar conclusions have been reached by scientist from

NIOSH and CDC, the American Academy of Allergists and Immunologists and the American College of Occupational and Environmental Medicine.  Additionally, numerous courts have also held that there is insufficient evidence that exposure to mold in damp indoor spaces causes fatigue or neuropsychiatric symptoms including, most recently, the D.C Superior Court in the decision of Wright v. Fort Lincoln Realty Co.

With respect to Plaintiffs' respiratory complaints, the IOM report does not find evidence of a causal relationship between exposure to damp indoor spaces and respiratory symptoms but does find evidence of an association between exposure to damp indoor spaces and respiratory symptoms.  (Association is not the same as causation.)   However, the studies that the IOM relies upon for the association involve, primarily, mold in the home or work place of the study participants and exposure for longer periods of time than in this case.  There are no studies that support an association between short term exposure to mold in an adjacent dwelling with respiratory symptoms.  Consequently, the Plaintiffs lack general causation between the Plaintiffs' respiratory symptoms and their claimed exposure.

### Specific Causation

Plaintiffs must prove, not only, that exposure to damp indoor spaces can cause injuries like those they claim, they also must prove that **their** exposure to a damp indoor space caused **their** injuries.  Plaintiffs also cannot prove this because neither the science, the circumstantial or the medical evidence they have produced supports it.

### Plaintiffs' Exposure to Damp Indoor Spaces

Both Plaintiffs claim the same exposure to the same allegedly damp indoor space. That space is the Apartment 1A 3064 Stanton Road Washington DC 20020.  Plaintiffs

claim that they were exposed while they were living in the adjacent apartment, Apartment

2A. Plaintiffs moved into Apartment 2A on August 19, 2002 and moved out, on

September 23, 2002. They entered Apartment 1A by climbing into the window one day,

perhaps on September 12, 2002 (since Plaintiffs are unsure of the date), and stayed for

five or ten minutes. They claim to have videotaped the inside of 1A but lost the

videotape. They took some photographs of 1A with a disposable camera. The disposable

camera pictures are the only physical evidence of mold in 1A. According to Denicole

Young's testimony, she did not have an acute reaction when she climbed into Apartment

1A or when she was in the Apartment. 1A.

The Plaintiffs' evidence of mold in Apartment 1A is based on their own lay

observations. Although there is some evidence in Mr. Keemer's September 27, 2002

letter that mold was in Apartment 1A, he does not describe it in the dramatic terms used

by Plaintiffs. More importantly, Plaintiffs have no samples of the mold to permit a

scientific evaluation of the types of mold in Apartment 1A, i.e. whether the mold was

toxic or harmless. ( Dr. Shoemaker himself relates how easy it is to obtain samples of

mold—simply apply scotch tape to the mold and lift it off).

The Plaintiffs also have no evidence of air transfer between Apartments 1A and

2A. This is significant because Plaintiffs testified in their depositions that they did not

have mold in their apartment. Thus, the Plaintiffs' alleged exposure to mold (attributable

to the landlord) could only come from Apartment 1A. At a minimum, they would need

evidence that mold from Apartment 1A moved through the air to Apartment 2A. It is my

understanding from reviewing the reports of the Plaintiffs' experts that they have no

expert evidence from any environmental engineer or HVAC expert that will establish that

there was toxic mold in Apartment 1A or that there was any transfer of air between the Apartment 1A and Apartment 2A.

An essential element of toxic tort litigation is proving exposure through evidence of "proximity, frequency and regularity." From my research in my practice, there must be evidence of exposure to a specific product or substance on a regular basis over some extended period of time in proximity to where the plaintiff worked or lived.

Here, the Plaintiffs' best evidence is that they lived near a vacant apartment for 34 days that appeared to have mold in it. This evidence, absent some expert support on air transfer between the apartments fails the "proximity, frequency and regularity" test and fails to prove exposure.

**Specific Causation: Denicole Young's Alleged Injuries**

Plaintiff Young cannot prove that her alleged injuries are caused by her alleged exposure to mold in Apartment 1A rather than some other cause.

With respect to her claims of diffuse neurological injuries (i.e. Chronic Fatigue Syndrome), she cannot cross the hurdle of general causation outlined above. But even if she could, she cannot establish that her particular neurological injuries were caused by mold in Apartment 1A because she has a prior history of fatigue and related neurological/ psychological complaints. These pre-incident illnesses were developed at her deposition and show that she was being treated for fatigue since January 1998 and had complaints of fatigue for several months before that. She was prescribed anti-depressants for her fatigue symptoms several years before her alleged exposure to mold.

Similarly, Plaintiff Young had an extensive pre-incident history of respiratory illness. The discussion of her pre-existing illnesses goes on for several pages in her

deposition. The medical records suggest that Plaintiff was intubated in 1997. As Dr. Shoemaker concedes, if Plaintiff was intubated in 1997, that fact strongly undercuts specific causation from mold in Apartment 1A. Additionally, Plaintiff Young was found to have several allergies that could account for her respiratory problems in September 2002. These include her allergy to ragweed as well as other allergens. Notably, at the same time Plaintiff Young was suffering her symptoms in the late summer of 2002, her air conditioning unit was not working and she had to open windows in her apartment.

All of this evidence, as well as other evidence in the medical records prevents Plaintiff Young from establishing that her respiratory illness in September 2002 is attributable to mold in Apartment 1A.

Equally important, Plaintiff Young's only medical expert, Dr. Ritchie Shoemaker, did not learn of these pre-incident illnesses during his two-plus hour interview with Ms. Young. By his own admission, Dr. Shoemaker relies, for his opinion, on a differential diagnoses. He cannot offer a sound differential diagnosis without a complete medical history. The medical history he was provided was incomplete and therefore, his differential diagnosis is unsound. Additionally, because Plaintiff Young has not followed Dr. Shoemaker's protocol (taking cholesterol medicine for mold illness), Dr. Shoemaker cannot offer an opinion on specific causation for Plaintiff Young.

The largest portion of Ms. Young's medical expenses are for her ICU hospital stay at George Washington Hospital in the spring of 2003, after she was no longer living in Apartment 2A. Plaintiff Young cannot attribute that stay to her alleged exposure to mold in the late summer of 2002 because it is too remote in time and because of her history of pre-existing respiratory illnesses. Dr. Shoemaker conceded in his deposition

that "I don't have the data" to associate that hospital stay with her mold exposure in late summer of 2002. This concession is dispositive and precludes Plaintiff Young from offering the Spring 2003 hospital stay as damages for her alleged mold exposure.

In sum, Plaintiff Young cannot prove specific causation for any of her injuries because she has no medical or scientific evidence to meet her burden of proof and because her medical records show that she had pre-existing injuries that mirrored the injuries she would have sued for. Additionally, her own medical expert will not testify as to specific causation for the reason stated in his deposition and outlined above.

**Specific Causation: Vanessa Ghee's Alleged Injuries**

Plaintiff Ghee's medical expenses are limited to $1,628. She went to George Washington Hosptital two times with Ms. Young and was treated and released both times. Ms. Ghee's only complaints are nasal/respiratory illnesses. She admits that she was a smoker with a history of allergic reactions. Like Plaintiff Young, Plaintiff Ghee's alleged injuries arose in the late summer of 2002 when their air conditioning unit was broken and when they had to leave windows open.

Because of the paucity of evidence that her two medical treatments were attributable to mold in Apartment 1A and because of other sources of respiratory illness (i.e. smoking, pollen/dust allergies) as well as other evidence in the medical records Plaintiff Ghee cannot establish that her respiratory illness in September 2002 is attributable to mold in Apartment 1A.

Additionally, because Plaintiff Ghee, like Plaintiff Young, has not followed Dr. Shoemaker's protocol, Dr. Shoemaker conceded that he cannot offer an opinion on specific causation for Plaintiff Ghee.

Because of the Plaintiffs' lack critical expert testimony and because of the facts alleged by the Plaintiffs, it is my opinion to a reasonable degree of professional certainty that Plaintiffs would not have been able to establish either general or specific causation for any of their injuries and that they would not have been successful in the prosecution of their claims against their former landlord for their alleged indirect exposure to mold and/or raw sewage.

**Inadequacy of Plaintiffs' Expert Witness Testimony**

Plaintiffs rely on Dr. Ritchie C. Shoemaker of Pocomoke City, Maryland for causation and medical testimony. Because of my toxic tort practice, I am very familiar with Dr. Shoemaker and his opinions, which lack accepted scientific and medical bases. His diagnosis of chronic biotoxin associated illness is of his own creation, and his treatment using "off label" prescription medication is at best controversial.

I agree with the Plaintiffs' legal expert insofar as Mr. Hoge testified that Plaintiffs "need to find a toxicologist." Unfortunately, they do not have one in Dr. Shoemaker. By his own admission, he is a "country doctor" who has no board certifications in toxicology (or allergy, immunology, rheumatology, epidemiology, mycology, pulmonology, environmental medicine, occupational medicine, neuropsychology, or a host of other specialties). Dr. Shoemaker has not published on mold illness in significant or accepted peer reviewed publications and he attempts, in his deposition as he does in other depositions and court testimony, to exaggerate the stature of both his publications and his "poster" presentations.

Dr. Shoemaker is a family practitioner who has no hospital privileges. Many of his patients are referred by attorneys who file personal injury lawsuits. He writes books

11

about his availability as a plaintiff's mold witness. He operates a website that provides referral and contact information for personal injury plaintiff's attorneys.

Significantly, Dr. Shoemaker appears to engage in the practice of "litigation screening." This practice, roundly excoriated by many courts, involves doctors who provide medical support for questionable legal claims. The practice was most thoroughly examined and criticized by Judge Janis Jack in MDL 1553, Silica Products Litigation. Judge Jack conducted in-court depositions of several doctors and learned that they were favorites, chosen by plaintiff's attorney to reliably provide medical reports that claimed that persons allegedly exposed to silica products suffered from silicosis. Judge Jack learned that some of these doctors found silicosis in 90% – 94% of the patients they examined. Judge Jack concluded that these positive rates were wildly beyond expectations and could only be explained by either 1) a nationwide silcosis epidemic or 2) litigation chicanery. She concluded the latter.

I note that Dr. Shoemaker relies on his own diagnostic method that both he and many courts consider "not generally accepted" in the medical community. Dr. Shoemaker's method appears to generate a 92% positive rate. This number mirrors the positive rate found by Judge Jack in her analysis of silicosis screeners in MDL 1553. It is also significant that Dr. Shoemaker uses a boilerplate expert report in this case. He conceded that "there is a lot of template" in the report. Indeed, one can see the grammatical confusion when Dr. Shoemaker tried to make his boilerplate report fit for two plaintiffs: "Mss. Young's and Ghee's past medical history and absent any other confounding occupational or townhouse (sic) exposures and after reviewing the results of her (sic) comprehensive lab evaluation...."

Interestingly, the Plaintiffs seem to recognize that Dr. Shoemaker is in the litigation business and not the healing arts. Neither Plaintiff has followed Dr. Shoemaker's prescriptions. Both are waiting until they can talk to a treating doctor for a second opinion before taking Dr. Shoemaker's medicine and following his protocol. Even though both Plaintiffs have had an opportunity to seek this second opinion, they have not followed through and, to date, they have not taken Dr. Shoemaker's medicine.

It is my opinion that Dr. Shoemaker would have been excluded, had he been used by the Plaintiffs to prosecute their claims against their former landlord in the action that they claim they intended the Defendants file in the District of Columbia Superior Court. Dr. Shoemaker is subject to exclusion because his opinions and methodology are not generally accepted in the scientific community and because his methodology is not reliable. Dr. Shoemaker's unique, litigation friendly practice has resulted in his exclusion as an expert witness in the District of Columbia Superior Court and in Virginia, as well as other jurisdictions. Dr. Shoemaker is the subject of an exclusory hearing in the remanded Chesson litigation in Maryland, which I understand is due to be heard in early 2008. I have relied on the numerous opinions which I have reviewed and which are listed above, including the decision by the D.C. Superior Court in *Wright*, as well as my own knowledge and experience from my toxic tort practice.

In his deposition, I note that Dr. Shoemaker seems to recognize his vulnerability for exclusion and was very defensive about the prior orders excluding his testimony. His description of some of those orders was incomplete and inaccurate. He alluded to a confidential communication he had with an attorney warning him about the dangers of serial exclusion. His open contempt for defense experts and even for the competence of

13

the plaintiffs' lawyers that have retained him shows that he is not an objective expert and that, if allowed to testify, he would have been an ineffective and unbelievable expert. His poor demeanor, his dissembling, his boilerplate expert report and his generally pedantic attitude would likely alienate a District of Columbia jury.

Furthermore, because the weaknesses of the Plaintiffs' claims and because they have not followed his protocols, Dr. Shoemaker's deposition testimony narrowed and, perhaps even eliminated most of his opinions provided in his written report, making his testimony even weaker. In his deposition, he clearly testified that he cannot associate Plaintiff Young's Spring 2003 hospitalization with the August/September 2003 alleged mold exposure in Apartment 1A. He concedes that, if the Plaintiffs do not follow his protocol, then he cannot offer specific causation testimony. Even if Dr. Shoemaker was a legitimate medical expert, his testimony makes it virtually impossible for the Plaintiffs to establish any causal relationship between their claimed medical issues and their prior indirect alleged mold and raw sewage exposure.

It is my opinion, to a reasonable degree of professional certainty that Dr. Shoemaker would have been excluded from testifying, had the Plaintiffs relied upon Dr. Shoemaker to prosecute their lawsuit in the District of Columbia Superior Court, as he was in the *Wright* decision. It is also my opinion, to a reasonable degree of professional certainty, that to the extent Dr. Shoemaker would have been permitted to testify and to the extent that a jury was allowed to consider his opinions about the Plaintiffs, the jury would have likely disregarded his testimony because he because of his inadequate professional qualifications, his frequent exclusions, his lack of professional standing in

14

the relevant fields, his combative demeanor, his lack of adequate foundation for any conclusions about the Plaintiffs, and his poor credibility.

### Credibility of Plaintiffs as Witnesses

Both Plaintiff have substantial problems with their credibility.

**Vanessa Ghee:** Plaintiff Ghee is impeachable because of her past theft conviction. This fact is admissible as evidence and would have a negative impact upon a jury considering her case. Ms. Ghee has also offered testimony that seems incredible on its face, and she is not an effective witness. For example, in her deposition, Ms. Ghee testified that when she complained to the landlord about the smell in the adjacent apartment, the landlord complimented her sunglasses, told her she was too good for the apartment complex, offered to move her out of the complex and offered her $1000.00. There are several other instances in Ms. Ghee's deposition where she offers testimony that is not credible or seems very unbelievable. Additionally, Ms. Ghee demonstrates a selective memory in her deposition, which would make her subject to impeachment.

**Denicole Young:** Ms. Young is subject to impeachment because she has not filed tax returns for many years or paid taxes, yet is making a substantial salary apparently as a source of business for mortgage company which pays her commissions. Additionally, even though Ms. Young has been employed making $7,000-8000 per month from her mortgage banking commissions and drives a Mercedes-Benz, she was relying on Medicaid for health insurance. Ms. Young is also subject to impeachment based on her very selective memory. Her deposition revealed numerous instances where Ms. Young

had no memory of pre-existing illnesses and the details related to those illnesses. However, she claims a verbatim memory of events related to her pending claim.

Although I am offering opinions as to the viability of the "case within the case," I agree with the Plaintiffs' standard of care expert, Mr. Hoge, that juries tend to favor or punish parties based on their assessment of character. I think that fact will work to the detriment of the Plaintiffs in this case, and, assuming that a D.C. jury was allowed to consider the Plaintiffs' claims (which I believe would have been unlikely), it is my opinion to a reasonable degree of professional certainty that both Ms. Ghee's and Ms. Young's credibility would be held in low regard by a District of Columbia jury for the reasons set forth above.

**Fault of Plaintiffs**

Plaintiffs have fault that supports viable defenses of contributory negligence and assumption of the risk defenses. Plaintiffs' fault also weighs on the jury's assessment of liability and damages.

Here, Plaintiffs' have fault as to both the underlying medical issues and also the prosecution of their case. Regarding the medical issues, in their depositions, the Plaintiffs had a difficult time explaining why they did not move out of their allegedly toxic apartment before September 23, 2002. According to their testimony, neither Plaintiff even tried to move away from the apartment although both could have made alternate temporary living and/or sleeping arrangements. The fact that both Plaintiffs continued to live, work, eat and sleep in an apartment that they claim made them sick is evidence of contributory negligence and assumption of the risk. The Plaintiffs may also have caused their alleged injuries by illegally breaking into Apartment 1A to take their

16

photographs and their videotape of that apartment, as Dr. Shoemaker acknowledged in his deposition.

The Plaintiffs also failed to prosecute their case. Ms. Ghee has direct and practical experience in personal injury litigation as the paralegal and sole office worker for an experienced personal injury plaintiff attorney just blocks from D. C Superior Court. Although she was frequently in court, she never checked on the status of her case. In her deposition, Ms. Ghee clearly testified to her knowledge of the Statute of Limitations for her and Ms. Young's case and her concern that the case had not been filed before the Statute of Limitations or then served and prosecuted. Ms. Ghee discussed her concerns with Ms. Young, and Ms. Young was also aware of the Statute of Limitations bar.

It is my opinion to a reasonable degree of professional certainty that, if the Plaintiffs' claims had been decided by a District of Columbia jury, the jury would have rejected the Plaintiffs' claims or substantially reduced any damages that they might have awarded to the Plaintiffs because of their contributory fault and/or assumption of the risk.

**Statute of Limitations**

The Plaintiffs' claims are governed by a three year statute of limitations. Under the discovery rule, their claims accrue when they know or have reason to know that their injuries are caused by the negligence of another. As noted above, I do not think that the Plaintiffs suffered any injuries caused by exposure to mold in Apartment 1A. Thus, they do not have a claim that accrued.

To the extent Plaintiffs can establish some causal nexus between their medical treatment and their brief residence in Apartment 2A, both of their claims likely accrued

on September 6, 2003, the date they first visited the ER at George Washington Hospital,

At that time, Plaintiffs themselves associated their alleged injuries with mold. Thus, it is

my opinion, within a reasonable degree of professional certainty, that the applicable

Statute of Limitations likely would have expired on September 6, 2005, although it could

have been later on September 13, 2005.   I hold these opinions to a reasonable degree of

professional certainty.

### Valuation of the underlying Toxic Tort case

As noted above, it is my opinion that the Plaintiff Young cannot associate her

Spring 2003 claims with mold exposure, nor can her expert, Dr. Shoemaker.

Additionally, as noted above, Dr. Shoemaker cannot offer an opinion on specific

causation because Plaintiffs have not followed his protocol. He also cannot offer general

or specific causation opinions for either plaintiff for any injury because his methodology

is unsound and not generally accepted in the scientific community.  Additionally, for all

the reasons outlined above, the Plaintiffs' claims are very weak, and it is my opinion that

the case within a case was not a good case that would have survived a motion for

judgment to be heard by a jury.

Assuming that the Plaintiffs' speculative claims would have been decided by a

D.C. jury (which is not my opinion), I do have an opinion of the value the potential jury

verdicts in the event of a successful verdict which I think was highly unlikely.   It is my

opinion that the underlying defendants would have received a defense verdict because the

jury would not find either of the plaintiffs or Dr. Shoemaker to be credible or effective

witnesses.  In the unlikely event of a plaintiff's verdict for either Plaintiff (which again I

think is highly unlikely), I agree with Mr. Hoge that the value of Plaintiffs' toxic tort

claims are affected by many factors, including the medical expenses incurred by Plaintiffs as well as their credibility or lack of credibility. Relying on the medical expenses reported in the discovery responses and produced by Plaintiffs (and excluding Ms. Young's medical expenses for the 2003 ICU stay), I calculate Ms. Ghee's medical expenses that she can attribute to mold exposure at $1628. I calculate Ms. Young's medical expenses that she can attribute to mold exposure at $1200.50, although I am missing bills for some of her clinic treatment from September of 2002 and November of 2002. Given those medical specials, it would be unlikely that a jury would award either plaintiff more than their specials and no more than $3,500.00 each. Because of the costs involved in prosecution of their alleged mold claims, the plaintiffs would not have received any recovery since the costs would have exceeded any potential for recovery.

Based on the weaknesses of their claims, as outlined above, it is my opinion to a reasonable degree of professional certainty that, in terms of settlement value for the underlying case, a well-informed defendant would pay no more than $3,500 for Ms. Ghee and $2,500 dollars for Ms. Young's claims.

**Rule 26(a)(2)(B)(iii): Exhibits**

I have not prepared any exhibit to summarize my testimony.

**Rule 26(a)(2)(B)(v) : Prior Trial and Deposition Testimony**

I have not testified in trial or by deposition in the past four (4) years.

**Rule 26(a)(2)(B)(vi): Compensation**

I am being paid $375 per hour for my time, which time to date has included reviewing the pleadings and documents produced in discovery, formulating my opinions, and preparing this Report

Robert F. Redmond, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| **DENICOLE YOUNG and** ) | |
| **VANESSA GHEE** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | CIVIL ACTION NO. 07-CV-983 (ESH) |
| ) | |
| **WILLIAM F. BURTON and** ) | |
| **LEWIS & TOMPKINS, P.C.** ) | |
| ) | |
| **Defendants** ) | |
| ) | |

**PLAINTIFFS' STATEMENT OF GENUINE ISSUES IN OPPOSITION TO
DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

In accordance with LCvR 7(h), Plaintiffs submit this statement of genuine issues in opposition to Defendants' statement of undisputed facts.

1.      **Defendants' alleged fact:**      Plaintiffs Denicole Young and Vanessa Ghee moved to Apartment 2A at 3064 Stanton Road, S.E. on or about August 19, 2002. *See,* Complaint, ¶8.

      **Response:**      Plaintiffs do not dispute the fact stated.

2.      **Defendants' alleged fact:**      Plaintiffs Young and Ghee resided in Apartment 2A for approximately 34 days or until September 23, 2002. *See,* Exhibit 1, excerpts from the deposition transcript of Vanessa Ghee, which is attached hereto as Exhibit 1 and incorporated by reference, at pp. 15, 141-143.

      **Response:**      Plaintiffs do not dispute the fact stated.

3.      **Defendants' alleged fact:**      In Young's and Ghee's apartment, Apartment 2A, Plaintiffs' only noticed a sewage smell. *See,* excerpts from the deposition

transcript of Denicole Young dated October 31, 2007 (Volume I) which is attached here

to Exhibit 2, at p. 204; *see also,* excerpts from the deposition transcript of Denicole

Young dated December 5, 2007 (Volume 2), which are attached hereto as Exhibit 3 and

incorporated by reference, at pp. 251-253.  After moving into Apartment 2A, Plaintiff

Ghee noticed a faint smell of sewage after they moved in.  Exhibit 1 at pp. 159-160.

Plaintiff Young did not smell mold in Apartment 2A. *Id.*

> **Response:**    Plaintiffs do not dispute the fact stated.

4.    **Defendants' alleged fact:**    Plaintiffs did not see mold in Apartment 2A.

Exhibit 1 at p. 189; Exhibit 3 at pp. 251-253.

> **Response:**    Plaintiffs do not dispute the fact stated.

5.    **Defendants' alleged fact:**    Plaintiffs ultimately learned from a neighbor

or about September 12, 2007 that the sewage smell was coming from the adjacent

apartment, Apartment 1A.  Exhibit 1 at pp. 288-289; Exhibit 3 at p. 251.

> **Response:**    Plaintiffs do not dispute the fact stated.

6.    **Defendants' alleged fact:**    In September 2002, in the course of

investigating the smell of sewage, Plaintiffs Young and Ghee entered Apartment 1A

through a window and took photographs and a videotape of Apartment 1A.  Exhibit 2 at

pp. 175-178; Exhibit 1, 92-94.

> **Response:**    Plaintiffs do not dispute the fact stated.

7.    **Defendants' alleged fact:**    Plaintiffs Young and Ghee are not certain

how long they remained in Apartment 1A, but believe it may have been a minute or two.

Plaintiffs remained in Apartment 1A to take pictures and to make a videotape of the

apartment.  Exhibit 2 at pp. 175-180 and Exhibit 3 at 254.

**Response:**    Plaintiffs do not dispute the fact stated.

8.    **Defendants' alleged fact:**    When Plaintiffs Young and Ghee moved into Apartment 2A, the air conditioner was not working, and, if it was hot, they opened the windows.  Exhibit 2 at 181-182, 196.  Plaintiffs do not believe that Apartment 1A and 2A shared a common air source during the time they lived in Apartment 2A.  Exhibit 1, pp. 452-453.

**Response:**    Plaintiffs do not dispute the fact stated.

9.    **Defendants' alleged fact:**    When Young and Ghee moved to another apartment in another building, Apartment 101, they acknowledge that there was no mold in that building or their apartment.  Exhibit 2 at p. 203.

**Response:**    Plaintiffs do not dispute the fact stated.

10.    **Defendants' alleged fact:**    It is undisputed that Plaintiffs received medical treatment after living in Apartment 2A and it is undisputed that Plaintiffs received medical treatment on September 6, 2002 and on September 13, 2002.  *See,* Defendants' Exhibit 4 [Ghee's medical records] and Exhibit 5 [Young's medical records] which were attached and filed with their February 15, 2008 Memorandum of Points and Authorities in support of their Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker (which Defendants have not re-filed with this Motion but upon which these facts derive their support).  *See also*, Plaintiffs Exhibit 11 [Ghee's medical records] and Exhibit 12 [Young's medical records] which were filed with their Opposition to Defendants' Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker.  On April 15, 2003, Young was admitted to GWUH for asthma exacerbation.  Part of Plaintiff Young's medical history included past history of asthma,

and known triggers for her asthma were identified as pollen and URI (upper respiratory infection).  *See,* Defendants' Exhibit 5 (at Bates Label *Y/G* 672-674, 726,727) and Plaintiffs' Exhibit 12.

> **Response:**   Plaintiffs dispute the characterization of Plaintiffs' Exhibit 12 to Plaintiffs' Opposition to Defendants' Motion to Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker, as showing a past history of asthma for Plaintiff Young.

11.   **Defendants' alleged fact:**   Plaintiff Young retained Defendants William F. Burton, Esquire and Lewis and Tompkins, P.C. on May 3, 2003 to prosecute her premises liability claim from her against her landlord.  *See,* Complaint at 5, paragraph 19; Exhibit 3 at pp. 319-321, 326-328; Exhibit 1 at pp. 99, 205-206.

> **Response:**   Plaintiffs do not dispute the fact stated.

12.   **Defendants' alleged fact:**   Plaintiff Vanessa Ghee retained Defendants William F. Burton, Esquire and Lewis and Tompkins, P.C. on January 3, 2004 to prosecute her premises liability claim against her landlord.  *See*, Complaint at 5, paragraph 20; Exhibit 1 at 100; Exhibit 2 at 205-206; Exhibit 3 at 331-332.

> **Response:**   Plaintiffs do not dispute the fact stated.

13.   **Defendants' alleged fact:**   As far as Plaintiffs know, no other tenant hired a lawyer or filed a lawsuit because of the raw sewage or mold at Stanton Glenn apartments.  Exhibit 3 at 348.

> **Response:**   Plaintiffs do not dispute the fact stated.

14.   **Defendants' alleged fact:**   There was no environmental testing done of the Plaintiffs' apartment, Apartment 2A.  There was no environmental testing done of

Apartment 1A.

      **Response:**     Plaintiffs do not dispute the fact stated.

    15.    **Defendants' alleged fact:**    Plaintiff's sole medical expert, Dr. Ritchie Shoemaker testified that the Plaintiffs' problem with mold was not something found in their Apartment 2A, but rather the adjacent apartment. *See,* Exhibit 4, which are excerpts from the deposition transcript of Dr. Ritchie Shoemaker Deposition and which are incorporated herein by reference, at pp. 68-69.

      **Response:**     Plaintiffs dispute this characterization of Dr. Shoemaker's opinion and testimony.

    16.    **Defendants' alleged fact:**    Dr. Shoemaker admitted that he does not know the type of mold in the adjacent apartment, he does not know how long Young or Ghee were in that apartment next door, and he does not know if Young or Ghee were exposed to mold in an airborne fashion while in their own apartment. Exhibit 4 at p. 72 and pp. 203-206.

      **Response:**     Plaintiffs dispute this characterization of Dr. Shoemaker's opinion and testimony.

    17.    **Defendants' alleged fact:**    Dr. Shoemaker admitted that he cannot express an opinion that the alleged mold exposure seven months earlier caused Young's asthma attack in April, 2003. Exhibit 4 at pp. 174-180.

      **Response:**     Plaintiffs dispute this characterization of Dr. Shoemaker's opinion and testimony.

    18.    **Defendants' alleged fact:**    Dr. Shoemaker admitted that he cannot identify the cause of Young's Apri12003 hospitalization. *Id.*

**Response:**    Plaintiffs dispute this characterization of Dr. Shoemaker's opinion and testimony.

19.    **Defendants' alleged fact:**    Dr. Shoemaker admitted that he cannot say whether Young's condition in March/April 2003 was due to pollen, infection, or exposure to mold in a different building.  Exhibit 4 at pp. 177-178.

**Response:**    Plaintiffs dispute this characterization of Dr. Shoemaker's opinion and testimony.

20.    **Defendants' alleged fact:**    Dr. Shoemaker cannot say whether Young had allergic asthma in April 2003 because he does not have contemporaneous data such as a blood sample that would have shown what her C-4A was at that time. *Id.* at pp. 179-180.

**Response:**    Plaintiffs dispute this characterization of Dr. Shoemaker's opinion and testimony.

21.    **Defendants' alleged fact:**    Dr. Shoemaker admitted at the Daubert hearing that he could not quantify what effect Plaintiffs' trespass into Apartment 1A had upon their respective conditions.  Transcript of Daubert Hearing at 242:2-5.  Dr. Shoemaker conceded in his deposition that the Plaintiffs' direct exposure by their trespass was more of a risk to Plaintiffs.  Exhibit 4 at 194-195.

**Response:**    Plaintiffs dispute this characterization of Dr. Shoemaker's opinion and testimony.

22.    **Defendants' alleged fact:**    When Plaintiffs could have timely filed their lawsuits, that is 2002 to 2005; Dr. Shoemaker was still working upon and developing his mold theories.  Dr. Shoemaker did not publish *Mold Warriors* until 2005.  Dr.

Shoemaker's three "peer reviewed" papers (Plaintiffs' Exhibit 16 to their Opposition to Defendants' Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker) did not exist until 2005-2006.

      **Response:**    Plaintiffs do not dispute the fact stated.

    23.    **Defendants' alleged fact:**    Plaintiffs have no medical expert to attribute any of their medical treatment to their alleged indirect exposure to mold from living in Apartment 2A, including Plaintiff Young's April of 2003 hospitalization. In contrast, Defendants have three medical experts, all of whom have opined that there is no causality between Plaintiffs' medical treatment and their alleged indirect exposure to mold from living in Apartment 2A. *See,* Defendants' Rule 26(a)(2) Disclosure Statement and Exhibits B, C, J, and N, which reports are incorporated by reference herein; *see also,* Exhibits 19 (Affidavit of Defendants' toxicology expert, Scott D. Phillips, M.D.) and 20 (Affidavit of Defendants' internist, allergist, pulmonologist, and immunologist, S. Michael Phillips, M.D.) attached to their March 13,2008 Reply to Plaintiffs' Motion in Opposition to Defendants' Motion To Exclude Opinion Testimony of Plaintiffs' Expert, Dr. Ritchie Shoemaker.

    **Genuine Issue:**    There is a genuine issue of dispute about the testimony of Defendants' medical expert S. Michael Phillips, M.D. There is a genuine issue of dispute about whether Plaintiffs have a medical expert to attribute their medical treatment to their exposure to mold and/or raw sewage. Plaintiffs deny Defendants' above description of Plaintiffs' case. Plaintiffs have a medical expert to attribute medical treatment to their exposure – Defendants' medical expert, S. Michael Phillips, M.D. Dr. Phillips states in his report, "I conclude with reasonable medical certainty that there is

evidence to support short-term irritant response during the 34 days of habitation and

voluntary unauthorized exposure to mold."  (Phillips Report, Exhibit 1 to Plaintiffs'

Memorandum in Opposition to Defendants' Motion for Summary Judgment, p. 18.)

Earlier in his report, Dr. Phillips also states that Ms. Ghee's total medical bill of

approximately $2,000.00 "can be explained by a transient mild irritation reaction while

living in Apartment #2A."  (Phillips Report, Exhibit 1 to Plaintiffs' Memorandum in

Opposition to Defendants' Motion for Summary Judgment, p. 3.)

     24.    **Defendants' alleged fact:**    Plaintiffs' legal expert, Christopher G.

Hoge, Esquire testified at his deposition that he is a "relative novice to toxic mold cases."

*See,* deposition of Christopher G. Hoge dated November 7, 2007, which is attached

hereto and incorporated by reference as Exhibit 5, at p. 37.  Mr. Hoge noted, among other

things, that such a claim requires having evidence of the length of exposure to the

toxicity, of the toxic materials, the degree of intensity of the toxic materials analyzed by

an expert.  Exhibit 5 at 38, 65-67.  As Mr. Hoge observed, "[c]ausation is a significant

issue in any tort case" and that it is the Plaintiffs' burden to prove the proximate cause of

their injury as "causation is a liability issue."  Exhibit 5 at pp. 41-43, 144-151.

Furthermore, Mr. Hoge equated the value and viability of Plaintiffs' damages in the legal

malpractice action as "the loss of their claims against the owner and manager of their

apartment building for toxic torts ...."  *See,* Expert Report of Chris Hoge filed September

19, 2008 at ¶ 7, attached hereto as Exhibit 6.  Plaintiffs' legal expert recognized that

Plaintiffs' underlying cases required expert medical testimony to be successful, such as a

toxicologist.  Exhibit 5 at pp. 45, 70.  In rendering his opinions, Mr. Hoge understood that

Dr. Shoemaker was a toxicologist.  Exhibit 5 at 57.  Mr. Hoge acknowledged that Dr.

Shoemaker's testimony was critical to causation because of the case-within a case requirement. Exhibit 5 at pp, 66-68, 104-105, 143-144.

**Response:** Plaintiffs deny that the above description of Mr. Hoge's opinion and testimony is complete.

25. **Defendants' alleged fact:** Like Mr. Hoge, Defendants' toxic tort legal expert, Robert F. Redmond, Jr., Esquire, also recognized that causation was the crucial element which the Plaintiffs would have to prove to succeed in their claims. Mr. Redmond has opined that the case within the case would not survive summary judgment because of the lack of causation that could be proven by Dr. Shoemaker's inadmissible opinions. *See,* Federal Rule of Civil Procedure 26(a)(2)(B) Report of Robert F. Redmond, Jr., which is attached hereto as Exhibit 7 and incorporated by reference.

**Genuine Issue:** There is a genuine issue of dispute about the testimony of Defendants' legal expert Robert F. Redmond, Jr., Esquire. Plaintiffs deny that the above description of Mr. Redmond's opinion and testimony is complete. As stated in Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, Mr. Redmond provides evidence of the viability of the underlying case. He states in his report that the medical expenses of Ms. Ghee and Ms. Young can be attributed to the mold exposure, and then asserts what each case would be worth. (Redmond Report, Exhibit 3 to Plaintiffs' Memorandum in Opposition to Defendants'

Motion for Summary Judgment, p. 19.)

Respectfully submitted,


_Peter C. Grenier /s/_

By:    Peter C. Grenier (D.C. Bar No. 418570)
       Bode & Grenier, L.L.P.
       1150 Connecticut Avenue, N.W.
       Washington, D.C.  20036
       (202) 828-4100
       (202) 828-4130 (fax)
       _Counsel for Plaintiffs_

Dated: August 25, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of August 2008, I served a true and accurate copy of Plaintiffs' Statement of Genuine Issues in Opposition to Defendant's Statement of Undisputed Facts by electronic case filing upon:

> Paul J. Maloney, Esquire
> Carr Maloney, P.C.
> 1615 L Street, N.W., Suite 500
> Washington, D.C.  20006
> *Counsel for Defendant Lewis & Tompkins, P.C.*

> Deborah Murrell Whelihan, Esquire
> Jordan, Coyne & Savits, L.L.P.
> 1100 Connecticut Avenue, N.W., Suite 600
> Washington, D.C. 20036
> *Counsel for Defendant William F. Burton*

*Peter C. Grenier /s/*
Peter C. Grenier

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **DENICOLE YOUNG and** | ) | |
| **VANESSA GHEE** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 07-CV-983 (ESH)** |
| | ) | |
| **WILLIAM F. BURTON and** | ) | |
| **LEWIS & TOMPKINS, P.C.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of the Defendants' Motion For Summary Judgment, Plaintiffs'

Opposition thereto, any replies, and the entire record herein, it is by the Court, this _____

day of _____, 2008:

ORDERED:    That Defendants' Motion For Summary Judgment be and hereby is

DENIED.

_____
Judge Ellen S. Huvelle

Dated: _____

Copies to:

Paul J. Maloney, Esquire
Carr Maloney P.C.
1615 L Street, N.W.
Washington, D.C.  20036

Deborah Murrell Whelihan, Attorney-at-Law
Jordan, Coyne & Savits, LLP
1100 Connecticut Avenue, N.W.
Washington, D.C.  20036

Peter C. Grenier, Esquire
Bode & Grenier LLP
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, D.C.  20036